Lincoln/Bunch 0075

Lincoln Life Assurance Company of Boston
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68172-9688

KENNETH SHAKESHAFT
SHAKESHAFT-GORMAN LAW FIRM
1935 JAMBOREE DRIVE
SUITE  202
COLORADO SPRINGS CO 80920

EXHIBIT

2



Lincoln Life Assurance Company of Boston
Disability and Life Claims Appeal
PO Box 2578
Omaha, NE 68172-9688
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5704

August 31, 2021

Kenneth J. Shakeshaft
Shakeshaft-Gorman Law Firm
1935 JAMBOREE DRIVE
SUITE  202
COLORADO SPRINGS, CO 80920

RE:    Long Term Disability (LTD) Benefits
       Charter Communications, Inc.
       Claim #: 8220685
       Claimant: Mark Bunch

Dear Kenneth Shakeshaft:

Lincoln Life Assurance Company of Boston (Lincoln) is responsible for managing claims for Long Term Disability (LTD) benefits under the Charter Communications, Inc.'s Group Disability Policy. We reviewed Mark Bunch's appeal request for LTD benefits under the Charter Communications, Inc.'s Group Disability Income Policy and maintained the decision to deny benefits beyond November 9, 2020.

**Initial Claim Decision**

Mr. Bunch submitted a claim for his absence from work as of February 14, 2018, due to a concussion from a motor vehicle accident.  His LTD benefits began on August 15, 2018.  Therefore, the change in definition of disability occurred on August 14, 2020, and to receive benefits beyond 24 months he must be disabled from Any Occupation as defined in the Policy.  Benefits beyond November 9, 2020 were denied as the evaluation concluded he was no longer disabled as defined by the Policy.

The basis for the decision was outlined in a letter dated November 16, 2020. Mr. Bunch was provided an opportunity to request an appeal review of the denial, stating the reasons why he felt that his claim should not have been denied, and submit additional information to support his claim. Specifically, he was advised to submit the following information:

> "*Office treatment notes, diagnostic test results, prescribed medications, procedure reports, exam findings, and specific restrictions/limitations given beyond November 9, 2020, that support your inability to perform one or more of the material and substantial duties of your Any Occupation.*

1  of  15

Lincoln/Bunch 0076

*You should also provide any additional information that you feel will support his claim."*

## Appeal

On April 15, 2021, we received an appeal from your office on behalf of Mr. Bunch. The letter stated the 180 day deadline would be May 14, 2021. Therefore, you requested a 30 day extension to provide additional information in support of Mr. Bunch's appeal.

Lincoln sent you a letter on May 4, 2021, provide your office with the extension. The letter stated the information was due by June 14, 2021.

On June 18, 2021, we received medical records from your office. The information included a May 25, 2021 Initial Rehab Psychology Evaluation and Concussion Review from Anthony Ricci, PhD. We also received the June 1, 2021 letter from Dr. Ricci addressed to your office.

We received additional information from your office on June 29, 2021. The information included a June 17, 2021 letter from Dr. Thomas Higginbotham.

## Appeal Evaluation

During the review of Mr. Bunch's claim, his claim was also reviewed by Dr. Lloyd Wilcox., an independent physician, Board Certified in Ophthalmology. Dr. Wilcox stated the primary impairing diagnoses included convergence insufficiency and visual disturbance (unspecified). After review of the medical documentation on file, Dr. Wilcox concluded:

*"This review is from the ophthalmology perspective only and does not address the specific neuro-psychological aspects of possible "vision" issues or some of the soft neurologic signs/symptoms that may be remotely related to vision symptoms. This review addresses only the standard and conventionally accepted medical signs, symptoms, and treatments for ophthalmic conditions.*

*The claimant has had a concussion without loss of consciousness from MVA in February 2018 and has been treating with AP Dr. Thomas Higginbotham O.D. since May 3, 2018 until February 25, 2020, the most recent examination in the chart. He last saw AP on June 18, 2020 but the is not in the file documents yet. The diagnosis of convergence insufficiency (CI) was made by Dr. Saxerud O.D. the optometrist, after finding a remote near point of convergence 20" (20 inches) and is supported by the medical record. The claimant was treated appropriately by prescribing prism glasses on July 13, 2018 and appropriately orthoptic exercises were recommended but it was unclear if they were performed. The claimant returned on August 17, 2018 and September 21, 2018 and during the September exam the near point of convergence had improved to 4 inches which is near-normal for his age. This finding should be expected to improve symptoms and visual functionality. By his last exam on November 21, 2018 symptoms have improved with reported better depth perception.*

*The impairing diagnosis is convergence insufficiency (CI) of mild level of severity and is supported in the medical record. It appears the CI is somewhat responsive to traditional standard treatment with prismatic glasses and possibly with orthoptic training exercises. Convergence*

**Lincoln/Bunch 0077**

*insufficiency is most often treatable but even if unresponsive it is not disabling vocationally unless the specific occupation demands a high degree of stereopsis and depth perception. If all else fails with treatment of CI, the person can always resort to the monocular state with occlusion of one eye and function visually. For most occupations including those that require reading and computer usage, a monocular person has the capacity for occupational functionality if they have good vision in the better eye. The claimant has 20/20 vision in both the right and left eye so he could occlude either eye and still have capability for work. Convergence insufficiency is not considered a significantly impairing diagnosis occupationally unless there is an impingement on the capacity to perform the occupational functionality in this case reading seeing computer work. The person with CI could have some visual fatigue when concentrating in the reading seeing computer work. The claimant's occupation is largely sedentary status, and a substantial portion is driving to appointments to engage in sales conversation. The impairing diagnosis does allow the claimant to have the capacity for occupational functionality in the sedentary status of computer/reading and driving given the following R and Ls with accommodations noted.*

*The following restrictions and limitations apply for CI in this case:*

- *no use of cranes or forklifts*
- *no specific jobs that require high degree of stereopsis/depth perception*
- *no use of industrialized motor carts equipment movers*
- *no heights*
- *no ladders*
- *no extreme overhead reaching*
- *use of computer work is limited to a work period of one hour followed by a 10 minute work break then repeat*

*The period of 10 minutes is to allow resting the eyes and local/personal orthoptic exercises e.g., pencil push-ups. This cycle of one hour on, 10 minutes off repeat, does not include driving which uses the far vision rather than the near vision that brings on the symptoms of convergence insufficiency. The claimant is restricted from extremely intense lighting/high intensity fluorescent lighting and strobe lighting. The claimant meets the DMV driving standards requirement. There are no restrictions from driving from an ophthalmology perspective. Any driving restrictions (or lack of restrictions) should be evaluated by neuropsychology and occupational medicine. The duration of R and Ls and accommodations is one year with reassessment at that time.*

*The second impairing diagnosis is visual disturbance unspecified, relates to the symptoms of unformed images, photophobia, reading issues, headache, spatial disorientation, and blurred vision among others for this claimant. The AP categorizes much of the symptoms as visual spatial disorientation for which the treatment at each visit seems to be observation. The claimant has been observed by AP swaying from side to side, head forward, avoiding light, and with apparent cognitive issues manifested as an inability to answer very simple questions with some type of irregular speech. There has been no therapeutic intervention for these manifest behaviors other than recording them. The claimant symptoms are not correlated with any organic lesions by imaging studies previously done (CT scan, MRI with and without contrast). Additional clinical examinations repeatedly by AP, the "neuro-optometrist", the medically trained neurologists and Occ./Rehab. Physician specialists do not show convincing pathologic eye movements e.g., nystagmus, vertical nystagmus, skew deviation, or pathophysiologic pupil abnormalities e.g.,*

**Lincoln/Bunch 0078**

*Horner's syndrome/pupil. There are no convincing correlations between these diffuse, variable, and vague symptoms/mannerisms and any defined medical organic, pathophysiologic finding on testing or examination assuming the imaging studies are in fact correctly interpreted.*

*In conclusion the diagnosis of visual disturbance, unspecified/visual disorientation is not supported by medical record in terms of a pathophysiologic etiology. The claimant has 20/20 visual acuity in each eye, a normal ocular examination by the optometrist, purportedly normal visual field testing, all of which show that the diagnosis is not supported by record. From an ophthalmology perspective no restrictions and limitations can be determined because the impairing diagnosis is not specific, determined and not causally related to organic pathophysiology."*

During the review of Mr. Bunch's claim, his claim was reviewed by Dr. Jonathan Marehbian, an independent physician, Board Certified in Neurology.  Dr. Marehbian's medical evaluation indicated there was no primary impairing diagnosis.  His comorbid diagnosis included somatization disorder. After review of the medical documentation on file, Dr. Marehbian concluded:

*"The medical information does not provide clear and convincing medical evidence of ongoing impairment that would translate into restrictions and limitations from 3/1/20 to the present.*

*In conclusion, the available medical information demonstrates that the claimant reportedly suffered a concussion in the accident in February 2018. Whilst the presented history and reported symptoms on initial evaluation may indeed be seen as consistent with concussion, there was no loss of consciousness, there was no dizziness or nausea initially, and the descriptions of the accident were mild. Diagnostic imaging was normal. There is no medical evidence to support any significant concussion in February 2020. At best, a very mild concussion may be supported. It is reported that the claimant then developed post-concussive syndrome. Some reports subsequently perplex this diagnosis into a traumatic brain injury, which is not so. Whilst concussion may indeed be described as a very mild form of a brain injury, post-concussive syndrome is in no way a traumatic brain injury. Such descriptions and indications mislead to believe as if the claimant has a permanent brain damage, which then results in all of the reported issues. This is not so; the claimant has no brain damage. Post-concussive syndrome is a condition essentially resolvable with no significant treatment, but simply with time. A period of one year is more than sufficient for resolution of these issues even in the most severe instances. Oddly enough, the claimant reports most significant symptoms and is identified to have most significant examination findings only one year after the accident. It has been described above that firstly, the severity of the reported symptoms and the symptoms themselves are inconsistent with a post-concussive syndrome; secondly, the symptoms and presented findings are inconsistent within themselves – the claimant is identified to have mild issues after the accident, which then somehow developed into severe issues one year later, and were again mild by early 2020; thirdly, the fact that the condition is reported to go on for more than two years after a quantifiable mild motor vehicle accident is inconsistent with the condition that essentially resolves in one year even in very severe cases. As also described above, the medical information demonstrates on several measurable tests that the claimant is prone to exaggeration, over-reporting and possibly malingering. On his initial visit with the neurologist, the claimant is not truthful concerning the loss of consciousness. There are notes that some surveillance video (not provided for this review) has shown that the claimant was driving, albeit for a short distance, back in 2018 – an ability that is completely inconsistent with the reported issues. Medical reports consistently note that the claimant shows lack of effort. The scores and findings that the claimant obtains during examinations/evaluation are completely inconsistent with his overall presentation. Finally, after the review of the medical information, and*

**Lincoln/Bunch 0079**

*especially of the recent reports, there is no demonstration of any motivation by the claimant to receive any treatment. The claimant only follows up with Thomas W. Higginbotham, MD (Occupational Medicine), paying for the visits out of his pocket, who refills his blood pressure medications. When asked when he last saw a neurologist, the claimant does not even know. The claimant's preference to pay out of pocket for a visit with a physician reported to be a Worker's Compensation physician, but lack of desire to obtain a visit with a neurologist for treatment leads to a question of what exactly the claimant's motivation is. Finally, and most importantly, all the issues reported by the claimant may be measurably demonstrated by quantifiable testing, such as for example VNG/vestibular testing for reported balance issues. However, there is not a single such testing result available.*

*As such, taking into consideration the claimant's evident presentation of symptom exaggeration and over-reporting, the fact that some of the examination findings are inconsistent and questionable, the fact that recent examinations and examinations immediately after the accident only identify mild issues that are not indicative of true functional deficits, the fact that there is no quantifiable testing for the reported issues available, the medical information does not provide clear and convincing medical evidence of ongoing impairment as of 3/1/20 and beyond.*

*Briefly, whilst some the reported symptoms may be seen as consistent with multiple sclerosis, there is no full consistency and there are no definite findings to support existence of multiple sclerosis.*

*It should be noted that there are brief indications of adjustment disorder/somatization disorder noted within the medical records. It is possible that the claimant's issues, which are additionally exaggerated by the claimant, could be stemming from conditions of adjustment disorder/somatization disorder. The presently available medical information, however, does not provide clear and valid medical evidence of any true ongoing deficits. Adjustment disorder/somatization disorder are psychiatric conditions and the primary difficulty associated with these is to determine if symptoms are malingered or are indeed true. This diagnosis and this condition are outside of the scope of practice of neurological review and addressing these from neurology standpoint is inappropriate. Therefore, I respectfully defer further consideration of this to the psychiatry specialist, as this is outside my scope of practice.*

*The March 19, 2018 MRI of the brain by Curtis Harlow, MD (Radiology) identifies mild white matter disease possibly from multiple sclerosis. An April 13, 2018 office visit note by Steven Wayne Olson, MD (Family Medicine) addressed this by indicating that it was likely an incidental finding and that the fact that issues reported by the claimant started only after the accident, and that there were no issues before the accident, further supported that the symptoms are not related to multiple sclerosis. Dr. Olson, however, acknowledges that neurological evaluation is necessary and refers the claimant to a neurologist. This is the last medical report by Dr. Olson available. Further medical records do not demonstrate that the claimant was ever evaluated for multiple sclerosis or that repeat imaging was performed. As discussed above, this contradicts the standards of care. With the present available medical information, no clear conclusion can be provided and organic changes such as multiple sclerosis may not be clearly excluded. Whilst the indications by Dr. Olson are indeed reasonable, it may not be excluded that theoretically, the claimant does have some neurological symptoms even before the accident, but neurological symptoms are simply mild and were unnoticed by the claimant before the accident. The claimant's reported symptoms and complaints are consistent with multiple sclerosis to some extent – that is visual symptoms, gait/balance issues and cognitive symptoms are indeed seen with multiple sclerosis. However, visual issues with multiple sclerosis primarily include optic nerve issues/deficits. The claimant did*

5  of 15

**Lincoln/Bunch 0080**

*have evaluation with neuro-optometrist Dr. Saxerud, but there are no indications of a finding of any optic nerve issue recorded. Such finding is a significant one and would surely be recorded/demonstrated within the medical information. Furthermore, it is indicated that the claimant does report improvement to his reported visual symptoms with prism goggles. Such improvement would not be achieved if the underlying etiology was multiple sclerosis. The March 19, 2018 MRI of the brain itself is not sufficiency specific or focal to clearly support multiple sclerosis condition. The findings are mild and whilst these may be consistent with multiple sclerosis, they are not specific to multiple sclerosis. Therefore, there is presently no clear evidence to support existence of multiple sclerosis, but a theoretical possibility of existence of this condition does exist. An appropriate course of action would be to simply have the claimant get repeat MRI of the brain and cervical spine with contrast. This would provide complete certainty on existence of multiple sclerosis."*

During the review of Mr. Bunch's claim, his claim was also reviewed by Jeremy Hertza Psy.D., an independent physician, Board Certified in Neuropsychology. After review of the medical documentation on file, Dr. Hertza concluded:

*"The results of the remote assessments do not offer convincing evidence regarding the claimant's actual cognitive and emotional/behavioral functioning. On June 1, 2018 (Dennis Helffenstein, PhD: Neuropsychological Report) the claimant performed as follows on validity measures: VSVT – Easy Subtest 20/24 (pass), forced choice recognition 6/24 and far below chance and concerning for intentional lack of effort – total score of 26/48 is a questionable score. TOMM – trial 1 22/50 (borderline pass), trial 2 27/50 well below cutoff of 45/50, retention trial 24/50 (fail). Testing was then discontinued as it was stated that it was evident that the examiner was not going to be able to obtain a valid neuropsychological profile. Although the claimant reported headache and shoulder pain on date of testing, in addition to reporting fatigue, poor sleep, and chronic pain – factors that the examiner supports are possibly explanatory for the failure of validity measures, there are no findings to convincingly indicate the claimant's actual cognitive functioning. Additionally, the claimant reported BDI = 45 (examiner notes that after taking into account residual effects of PCS, moderate depression is likely indicated), PCL5 79/80. The score on the PCL5 is significantly overreported/exaggerated. While the claimant reported headache and shoulder pain on date of testing, in addition to reporting fatigue, poor sleep, and chronic pain, this does not provide an explanation as to why he exaggerated considerably on the PCL5. As the PCL5 is extremely questionable in combination with failed cognitive validity measures, I am unconvinced that the results of the BDI are valid and representative of his actual emotional functioning. Then, on August 6, 2018 (Herman Staudenmayer, PhD) the claimant again provided noncredible responses indicating significant overreporting of somatic, cognitive, and emotional symptoms on the MMPI (Fr = 120), rendering the protocol invalid. As there is again significant exaggeration on the MMPI, I am unconvinced that his PCL5 and SCAT2 scores on this assessment are valid. The claimant scored 20/30 on the MoCA however the examiner notes that MSE suggests exaggeration and adopting the sick role, and objective findings note no word finding difficulty, he was alert and attentive, immediate, and remote memory intact, fund intact, no signs of thought disorder or psychosis, and his thought process was coherent, logical and goal directed. The MoCA does not have a validity component, as this is a screening measure. Furthermore, examiner notes that during the interview he showed no lapses in thinking or impaired cognitive processing. As such, this assessment also does not convincingly represent the claimant's actual cognitive or emotional function.*

**Lincoln/Bunch 0081**

*What is notable is that as of the present date, over two years post injury, there has been no effort to re-assess the claimant's neuropsychological functioning with a comprehensive assessment featuring an extensive protocol of both stand-alone and embedded validity measures for both psychological and cognitive domains, as is expected due to the above-noted performances.*

*Due to validity failures and significant overreporting of cognitive symptoms, with a lack of repeat assessment (which is certainly expected in such a case), I am unable to find convincing evidence of functional cognitive deficits secondary to TBI or another etiology that interferes with or limit/restrict working. Please note that this does not automatically indicate that there is an express absence of cognitive impairment, but rather the available evidence is inconclusive.*

*As with cognitive functioning, due to significant overreporting of psychological symptoms and the lack of repeat assessment (which is expected), I am unable to find convincing evidence of functional psychological deficits secondary to TBI or another etiology that interferes with or limit/restrict working. Please note that this does not automatically indicate that there is an express absence of psychological impairment."*

The medical information received on appeal included a May 25, 2021 Initial Rehab Psychology Evaluation and Concussion Review from Anthony Ricci, PhD.  The evaluation indicated Mr. Bunch's Beck Depression Inventory (BDI) score was 40. Beck Anxiety Inventory (BAI) score was 41. The pain checklist and neuropsychological symptom checklist notes persistent pain, vision changes, ringing in the ears, muscle weakness, spasms. The records indicate Dr. Ricci observed stuttering and difficulty with ambulation. Dr. Ricci's impression was that Mr. Bunch had post-concussion syndrome, adjustment reaction, and situational anxiety.  Based on the history clinical presentation in screening psychological testing, Dr. Ricci opined that with a reasonable degree of psychological certainty that Mr. Bunch continued to manifest moderate post-concussion syndrome and continued to demonstrate evidence of sensory and cognitive changes which have not been completely evaluated and treated. Dr. Ricci also stated Mr. Bunch presented with significant adjustment reaction difficulties with depression and anxiety and continued with an unresolved situational anxiety pattern associated with all forms of driving and riding.  Dr. Ricci stated with dysphasia, unresolved vision problems, difficulty with balance, difficulty with ambulation, and difficulty with motor control including his inability to drive, he opined Mr. Bunch was not capable of working.

The June 17, 2021 letter from Dr. Thomas Higginbotham indicated Mr. Bunch had a motor vehicle collision and suffered a closed head injury.  He had a history of diffuse traumatic brain injury without loss of consciousness but with altered consciousness, post-concussion syndrome with neurocognitive disorder, visuospatial neglect, difficulty in walking, balance, dysphasia, persistent cervical strain, adjustment reaction with depressed mood and anxiety, hypertension, physical deconditioning, and lack of exercise.  Dr. Higginbotham stated Mr. Bunch had difficulty in walking and with the balance which had been consistent since he began treating him on May 3, 2018. Dr. Higginbotham stated Mr. Bunch had problems bumping into doorways, walls, and gait was consistent when observed walking from the parking lot to the office as it was walking from the waiting room to the examining room. He walked without an assistive device. Dr. Higginbotham stated that Mr. Bunch was unable to perform the material and substantial duties required for employment. Dr. Higginbotham also stated Dr. Ricci concurred with his opinion that Mr. Bunch was precluded from regular employment.

**Lincoln/Bunch 0082**

During the review of Mr. Bunch's appeal, his claim was reviewed by Dr. Frank Polanco, an independent physician Board Certified in Occupational Medicine. Dr. Polanco's medical evaluation concluded the records supported the following primary impairing diagnoses: post-concussion syndrome and convergence insufficiency of mild severity. The comorbid diagnoses included: adjustment reaction with depression and anxiety, unresolved situational anxiety, hypertension, dysphagia, dysphasia, and cervical strain. However, Dr. Polanco noted the comorbid diagnoses would not require additional restrictions. After reviewing all of the medical documentation on file, Dr. Polanco concluded:

*"The claimant discontinued working on February 14, 2018 secondary to traumatic brain injury with post-concussion sequela of visual difficulties with spatial disorientation and neurocognitive disorder and visual changes including vertical heterophobia, status post MVA on February 13, 2018. The claimant was involved in a motor vehicle accident on February 13, 2018. He presented to the ED (emergency room) reporting the airbags did not deploy and he hit his head on the steering wheel, left forehead region. No loss of consciousness was reported, but he had some initial blurred vision deficits of left eye pain. He also reported problems with equilibrium when he stepped off of the car. These symptoms resolved by the time he got to the Emergency Department, where CT (computed tomography) scans of the head and cervical spine revealed no evidence for any acute traumatic process. He was given acetaminophen and was discharged. The claimant was seen by Dr. Olson for mental health complaints. The doctor notes the claimant has intact eye-movement but is not fluidly tracking. Dr. Olson has requested evaluation protocol to rule out Multiple Sclerosis which, at least until February 2021, had not been completed. Follow ups by Dr. Higginbotham noted the claimant still complained of cervical pain, changes in vision, and imbalance. Neurological and neuropsychological testing were recommended. An MRI (magnetic resonance imaging) of the brain performed March 28, 2021 revealed mild white matter disease possibly from multiple sclerosis, but he opined that it was more likely secondary to the MVA rather than MS. The claimant was evaluated by the neuro optometrist Michael Saxerud, OD on September 21, 2018, who prescribed him prism spectacles for symptoms of double vision, headaches, imbalance, problems with depth. The claimant was last seen by Dr. Saxerud in 2019. The claimant underwent a psychological evaluation in 2018 by Herman Staudenmayer, PhD, which concur that the claimant is still experiencing post-concussion syndrome sequelae. The claimant still reports problems with memory, word finding, changes in mood and behavior, significant balance issues and visual disturbances. The claimant was evaluated by Neurologist Julia Brinley, DO in 2018. On exam, the claimant presents with normal attention and concentration, normal recent and remote memory, stuttering noted at times, with intact comprehension, full orientation, normal judgment. Impressions include post-concussion syndrome. There are no subsequent follow up notes. The claimant has attended physical therapy for his cervical complaints. He has also attended psychotherapy for depression, anxiety, PTSD, adjustment disorder as well as speech therapy. There was a gap in treatment due to the claimant losing insurance, but he has been approved for SSDI and Medicaid since. Speech therapy treatment note indicates the claimant was working towards improvement with speech fluency, selective attention, recall, and problem-solving.*

*The following restrictions and functional limitations are supported in an 8-hour workday from November 10, 2020 and ongoing as follows:*

- *Frequent walking and standing, 8 hours combined, limited to 60 minutes combined at one time*

**Lincoln/Bunch 0083**

- *Constant sitting with ability to alter position as necessary for comfort*
- *Occasional crawling, kneeling, stooping, bending, and no balancing or climbing*
- *Frequent reaching at all planes, gripping, grasping, and fingering*
- *Unrestricted lifting, carrying, pushing, and pulling*
- *Full-time, 40-hour, 5 day per week capacity*

*From an occupational medicine perspective there are no clinical or diagnostic findings that would preclude fulltime capacity.*

*The findings within the medical records reflect the claimant is a 57-year-old male, date of birth September 17, 1963, who was previously employed as a Direct Sales Representative. He discontinued working on February 14, 2018 secondary to traumatic brain injury with post-concussion sequela of visual difficulties with spatial disorientation and neurocognitive disorder and visual changes including vertical heterophobia, status post MVA on February 13, 2018. The claimant has appropriate time for recovery. During the dates under review, there is no evidence of significant motor of neurological deficits. There is no evidence of significant level of pain. No medications side effects are noted.  Thus, from an occupational medicine perspective there are no clinical or diagnostic findings that would preclude the full-time performance of the essential duties of his work activities."*

During the review of Mr. Bunch's appeal, his claim was also reviewed by David Nowell, Ph.D., an independent physician specializing in Psychology/Neuropsychology.  After reviewing all of the medical documentation on file, Dr. Polanco concluded:

*"The claimant presents with a constellation of symptoms consistent with post-concussive syndrome. The post-concussive syndrome includes symptoms which are within my area of expertise (cognitive inefficiency, irritability, sleep changes, depression) as well as symptoms which fall outside my area of practice and expertise (balance problems and headache for example). I defer to medical regarding functional impairment attributable to impairment outside my area of expertise. At the current review, records provided do not support restrictions and limitations on the basis of severe psychiatric or neurocognitive impairment.*

*Records indicate the claimant sustained head strike in motor vehicle accident. Reports initially indicated no loss of consciousness, while later clinical documentation indicates the claimant reports there was a period of loss of consciousness. Subsequent symptoms are consistent with post-concussive syndrome, including cognitive inefficiency, mood changes, sleep changes, balance, and visual changes. Records do not support a psychiatric disorder of severity which would limit daily activity. The level of behavioral health care and frequency of office visits is not consistent with severe psychiatric disorder. Records do not indicate the claimant has been referred for higher level of behavioral health care. Records do not indicate the claimant has been involved in a level of psychiatric care which would prevent daily activity. Records indicate there were rehabilitation therapies following the car accident, and these included speech-language pathology. No subsequent course of cognitive rehabilitation is noted. In 2018, an effort to evaluate neurocognitive functioning was aborted when there was indication of poor performance validity. There has evidently been no follow-up neuropsychological evaluation since that time, and exam findings noted across the records provided for review do not include clinician observed evidence of cognitive impairment which would require limitations and restrictions. The claimant's symptoms are consistently documented across records, both in narrative form and in a self-report symptom checklist form. When records indicate there was effort at assessment of symptom validity (for*

*example in personality inventory such as MMPI) there was indication of poor symptom validity. The symptom magnification noted at 2018 MMPI administration was such that in a self-report including symptom checklist that evaluation would be difficult to interpret, and it would not be possible to form impressions of actual capacities and limitations on the basis of those self-report data. No subsequent administration of personality inventory of other symptom validity assessment is noted since that 2018 exam. Without exam findings or test results are neuropsychological data to support cognitive impairment, review of the records provided here do not support psychiatric or neurocognitive impairment within the timeframe under consideration.*

*The May 25, 2021 rehabilitation psychology evaluation and concussion review by Anthony Ricci, PhD, notes the claimant was referred by his attorney. BDI score is 40. BAI score is 41. Pain checklist and neuropsychological symptom checklist notes persistent pain, vision changes, ringing in the ears, muscle weakness, spasms. The doctor notes observed stuttering and difficulty with ambulation. The doctor offers impression of post-concussion syndrome, adjustment reaction, and situational anxiety. The results of cognitive testing are noted. No performance validity or symptom validity indicators are noted. For these reasons, it is difficult for an independent reviewer to form impression of capacities and limitations on the basis of these data alone. Records provided do not support restrictions and limitations on the basis of severe psychiatric or neurocognitive impairment.*

*Records reviewed do not provide clear and credible support for inability to sustain full time employment on the basis of functional impairment attributed to severe psychiatric or neurocognitive impairment. At the current review, records provided do not support restrictions and limitations on the basis of severe psychiatric or neurocognitive impairment."*

## Vocational Review

Mr. Bunch's claim was *previously* reviewed by a Vocational Case Manager (VCM) for a transferable skills analysis based on his prior work history, educational background, life experience, and restrictions and limitations outlined by Dr. Lloyd Wilcox.  The analysis showed based on his capabilities, training, education, and experience, he has the ability to perform the following sedentary occupations:

- Manager, Sales
- Fundraiser I
- Supervisor of Communications

During the review of Mr. Bunch's appeal, his claim was reviewed by a VCM to determine if the above occupations remained viable.  The VCM reviewed the additional information received on appeal and Dr. Frank Polanco's medical evaluation.  The VCM concluded the previously identified occupations remain viable given the updated restrictions.

*"An additional OASYS analysis was performed and given the updated restrictions and limitations, the insured's own occupation was identified as an additional alternative. These occupations would allow one the ability to alter positions as needed for comfort."*

- Sales Representative, Television Cable Service
- Manager, Sales

**Lincoln/Bunch 0085**

- Fundraiser I
- Supervisor of Communications

On August 2, 2021, we wrote to you and sent you a copy of the medical reports from David Nowell, PhD, Dr. Frank Polanco, and the transferrable skills assessment offering you the opportunity to provide additional information for further consideration of Mr. Bunch's appeal, prior to the rendering a final decision on his appeal. Any new information was due in our office by August 23, 2021. No additional medical information was submitted. Therefore, we rendered a decision based on the information contained in Mr. Bunch's file.

This appeal review and analysis considered all the medical and claim documentation contained in Mr. Bunch's LTD administrative record, whether or not specifically referenced in this document. We acknowledge Mr. Bunch's diagnosis of post-concussion syndrome and convergence insufficiency of mild severity. Based on the medical documentation on file, the medical records outline restrictions and limitations that would not prevent Mr. Bunch from performing the occupations outlined in the vocational review. The records do not provide any evidence of significant motor or neurological deficits, there is no evidence of significant level of pain, and there is no evidence of medications side effects noted. In summary, without examination findings or neuropsychological test results to support cognitive impairment, the records on file do not support psychiatric or neurocognitive impairment.

We acknowledge Mr. Bunch's conditions; however, the medical records on file do not document detailed examination findings including measurable physical or neurological deficits. Our role in reviewing Mr. Bunch's file is to determine whether his medical condition(s) and the medical documentation contained in his file supports he is unable to perform the material and substantial duties of Any Occupation beyond November 9, 2020. Based on our review of the information contained in his claim file, we have determined he can perform, with reasonable continuity, the material and substantial duties of the above occupation(s) based on his capacity and skill level. We have determined he does not meet the Charter Communications, Inc.'s definition of disability from Any Occupation beyond November 9, 2020. Furthermore, the medical evaluations do not preclude him from the identified occupations outlined in the TSA.

As a result of technological advancement, employers are providing a variety of workstation types and associated equipment that would allow an individual opportunity to experience and sustain comfort in their respective work settings within the occupations. This would allow you to change positions at will for comfort.

Determinations made by Lincoln Financial Group are based on the provisions outlined in the LTD Policy. These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities. Therefore, an award of Social Security Disability Benefits is not determinative of entitlement to benefits under the specific terms and conditions of the Group Disability Income Policy.

In our review of Mr. Bunch's claim, we fully considered the totality of all medical documentation received. We also obtained and considered independent medical reviews that were not considered by the Social Security Administration in its determination process.

Lincoln/Bunch 0086

Mr. Bunch was notified on November 21, 2020 that his claim had been overpaid in the amount of $47,668.16. Payment should be made payable to Lincoln Life Assurance Company of Boston, due to his Social Security Disability Award for the benefits paid with no reduction for Social Security Benefits. Please work with Kirstie McGary, Recovery Specialist, at the following phone number (888)437-7611 extension 16383 with regard to repayment.

**Conclusion**

We acknowledge he may have continued to experience some symptoms associated with his conditions beyond November 9, 2020. However, the medical documentation on file does not contain physical examination findings, mental status examination findings, diagnostic test results, neuropsychological test results, cognitive test results, or other forms of medical documentation supporting his symptoms and impairments remained of such severity, frequency, and duration that they resulted in restrictions or limitations rendering him unable to perform the duties of the occupations identified as being with in his functional capacity and vocational skills beyond November 9, 2020.

After a complete evaluation of the claim, including all information submitted with the appeal, all medical reviews completed on the file, and taking into consideration the opinion of his providers as set forth in their written record, we determined the clinical evidence does not support he is precluded from performing Any Occupation beyond November 9, 2020. Our position remains that Proof of continued disability in accordance with the Policy provisions has not been provided, and our original determination to deny benefits is upheld. Therefore, no further benefits are payable.

This claim decision reflects an evaluation of the claim facts and Policy provisions.

**Policy Provisions**

In order to continue receiving benefits, you must satisfy the requirements of all Policy provisions that state, in part:

*LONG TERM DISABILITY COVERAGE*

*Disability Benefit*

*When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:*

*1. Disability;*
*2. Regular Attendance of a Physician; and*
*3. Appropriate Available Treatment.*

**Lincoln/Bunch 0087**

*The Proof must be given upon Liberty's request and at the Covered Person's expense. In determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.*

*"**Disability**" or "**Disabled**", with respect to Long Term Disability, means:*

*1. For persons other than truck drivers, pilots, co-pilots, and crewmembers of an aircraft:*

> *i. that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*

> *ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*

*"**Any Occupation**" means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.*

*"**Proof**" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:*

> *1. a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;*
> *2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and*
> *3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.*

*Proof must be submitted in a form or format satisfactory to Liberty.*

*LONG TERM DISABILITY COVERAGE*

*Discontinuation of the Long-Term Disability Benefit*

*The Monthly Benefit will cease on the earliest of:*

*…*
> *9. the date the Covered Person is no longer Disabled according to this policy;*
*…*

Under the Employee Retirement Income Security Act (ERISA) appeal guidelines, she was entitled to appeal the decision made by Lincoln, and to submit any additional information she wished to be considered as part of the appeal.  Lincoln has conducted a full and fair review of his appeal and accompanying materials and has concluded that the denial of benefits will be maintained.

13 of 15

**Lincoln/Bunch 0088**

At this time, his administrative right to review has been exhausted; no further review will be conducted by Lincoln and his claim will remain closed.  She may request to receive, free of charge, copies of all documents relevant to his claim.  She has the right to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on review.

The Charter Communications, Inc.'s Group Disability Income Policy contains the below provision:

*Legal Proceedings*

*A claimant or the claimant's authorized representative cannot start any legal action:*

1. *until 60 days after Proof of claim has been given; or*

2. *more than three years after the time Proof of claim is required.*

If his policy is subject to ERISA, she may have other voluntary alternative dispute resolution options, such as mediation.  One way to find out what may be available is to contact his local U.S. Department of Labor Office or his state insurance regulatory agency.  In addition, once all required reviews of his claim have been completed, she has the right to bring a civil action under applicable law.  His employer's policy has a contractual limitations period of three years, which means that a lawsuit must be brought within three years after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is November 24, 2024.

Nothing in this letter should be construed as a waiver of any Lincoln rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

Decisions made by Lincoln are based on the provisions outlined in Charter Communications, Inc.'s LTD Policy.  These provisions are not contingent on decisions made by either the Social Security Administration or other disability-determining entities.  No internal rules, guidelines, protocols, standard or other similar criteria were relied upon in rendering the claim determination.

If you require language translation assistance, please contact Lincoln to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłį́į' dóó ná'ookąąh nííní'ą́ągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtį́į́ł nínízingo doo bą́ą́h ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

14 of 15

**Lincoln/Bunch 0089**

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If you have any questions regarding this matter, please contact me.

Sincerely,

Jane Daniell
Appeals Specialist
Phone No.: (888) 437-7611 Ext. 16393
Secure Fax No.: (603) 334-5704

**Lincoln/Bunch 0090**