**NEUROPSYCHOLOGICAL SCREENING**
Mark B. Bunch
Page 6

minimum. He reports some ongoing passenger anxiety. He would rate his passenger anxiety as 0 to 5 on a 10-point scale with 10 being a panic attack. His anxiety is highest when the vehicle was traveling at high speeds or there are bad road conditions (e.g., snow or rain). Mr. Bunch is hypervigilant when in a motor vehicle. If other vehicles get too close, he experiences a hyperstartle response. He reports nightly nightmares. He also reports intrusive thoughts related to the accident.

## RECORDS REVIEWED

I reviewed the Parkview Medical Center Emergency Room Report dated February 13, 2018 authored by David Wilson, M.D. Dr. Wilson's description of the accident was similar to the description that I received from Mr. Bunch, including hitting his head on the steering wheel. Mr. Bunch denied loss of consciousness. Symptoms reported included blurry vision; left eye pain; disequilibrium; headache; dizziness; neck and shoulder pain; left scalp tenderness with mild abrasion; and, bruising around his right eye. A CT scan of the brain was normal. Mr. Bunch was placed on concussion precautions. His discharge diagnoses were Concussion with Closed Head Injury; Cervical Strain; and, Right Periorbital Ecchymosis. He was alert and oriented and his Glasgow Coma Scale Score was 15.

I had an opportunity to review the CT Scan Report. This was a CT scan of the head without contrast performed on February 13, 2018 as part of his evaluation in the Emergency Room at Parkview Medical Center. That study was read as normal.

I reviewed the Employer's First Report of Injury. That report indicates that the accident occurred on February 13, 2018 on Colorado Highway 50 in Pueblo, Colorado. This report confirms the basic information provided by Mr. Bunch related to the accident. The report indicates that he immediately experienced blurry vision and had difficulty moving his left eye sideways. The injury summary cites soft tissue (head) contusion due to motor vehicle accident.

I reviewed the results of an MRI of the brain without contrast performed on March 19, 2018 and read by Curtis Harlow, M.D. Dr. Harlow identified significant findings as mild scattered areas of high signal intensity seen on FLAIR and T2-weighted sequences in the periventricular white matter regions. He noted that some of these signal intensities were in the perpendicular pattern suggesting demyelinating white matter disease from multiple sclerosis.

I reviewed some records from Steven Olson, M.D. Regarding the MRI of the brain cited above. Dr. Olson states, "For symptoms to be present after an accident seems coincidental for MS without previous symptoms. More likely the changes are secondary to the trauma." I would totally agree with Dr. Olson regarding his opinion regarding the MRI results. Dr. Olson's records document persisting problems with headaches, neck pain, balance, coordination and eye movement. Specifically related to the eye movement deficit, he noted problems with coordination and smoothness of tracking suggesting an eye smooth pursuit deficit. He noted that Mr. Bunch does not have a history of neurological deficits. His diagnoses include Concussion

```
┌─────────────────┐
│    EXHIBIT      │
│                 │
│   3, part 2     │
└─────────────────┘
```

**Lincoln/Bunch 0723**

**NEUROPSYCHOLOGICAL SCREENING**
Mark B. Bunch
Page 7

and Traumatic Brain Injury.  I received a letter, dated April 13, 2018, authored by Dr. Olson referring him to me for Neuropsychological Evaluation.

## ATTEMPTED TESTING

On May 18, 2018, we attempted formal neuropsychological testing with Mr. Bunch.  He presented for the evaluation ambulatory.  He was well groomed and casually dressed.  He was experiencing a headache that day, which he rated as 4 on a 10-point pain scale.  He was also reporting significant pain in his left shoulder when he moved his left arm.  He also reported that from the time of my original interview with him until the day of testing, he had begun use of Flexeril, a muscle relaxant, as a sleep aid.  He reported that this medication did help somewhat with his sleep but that his sleep was still significantly disrupted.  He reported that he was also utilizing a medication for anxiety.  He could not recall the name of that medication.  He reported that he had used both medications the night prior to testing.

Early on in the course of testing, Mr. Bunch was administered a standalone Performance Validity Test.  This was the Victoria Symptom Validity Test.  His performance on the Easy Subtest was 20/24 correct.  This is considered to be a passing score.  His performance on the Difficult Subtest was 6/24 correct.  This is considered to be a failing score.  As the Victoria Symptom Validity Test is a forced-choice digit recognition test, his score of 6/24 is far below chance which is concerning for intentional lack of effort.  His Total Score of 26/48 correct is a "questionable" score.  Due to Mr. Bunch's performance on the VSVT, we then administered the Tombaugh Test of Memory Malingering (TOMM).  His score on Learning Trial 1 was to 22/50 correct.  This is a borderline passing score.  His performance on Learning Trial 2 was 27/50 correct.  His performance on the Retention Trial was 24/50 correct.  These are both failing scores.  A passing score for the TOMM Learning Trial 2 and Retention Trial would be 45/50 correct.  Based on Mr. Bunch's performance on two standalone Performance Validity Tests, I made the decision to discontinue his testing.  At that point in time, it was evident that I was not going to be able to obtain valid neuropsychological test scores.

## PSYCHOLOGICAL FACTORS

As part of the current evaluation, Mr. Bunch completed the Beck Depression Inventory – 2 (BDI-2).  His Raw Score on this depression inventory was 45.  However, his score was notably elevated as a result of his responding affirmatively to a variety of symptoms that may relate to the residual effects of a Post-Concussive Syndrome.  This includes ongoing problems with fatigue, concentration, irritability, sleep disturbance, difficulties with decision making, loss of interest, agitation and emotional lability.  When this factor is taken into account, Mr. Bunch's BDI-2 is best interpreted as representing at least moderate feelings of depression at this time.

Mr. Bunch was also administered the PCL-5, a PTSD inventory based on the diagnostic criteria for PTSD as established by the DSM-5.  His Raw Score on this PTSD inventory was 79 (Note: maximum score on the PCL-5 is 80).  In summary, Mr. Bunch is reporting essentially all symptoms of PTSD at a very high level.

**Lincoln/Bunch 0724**

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 8

## SUMMARY AND RECOMMENDATIONS

Based on Mr. Bunch's retrospective description of the motor vehicle accident of February 13, 2018, he does meet the diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic Brain Injury as established by the American Congress of Rehabilitation Medicine (1993). This definition has now been accepted by the World Health Organization (2009). He also meets the diagnostic criteria for a Mild Traumatic Brain Injury as established by the DSM-5 (2013). He meets the diagnostic criteria for a Grade II (Moderate) Concussion as established by the American Academy of Neurology (1997). He sustained a blow from the steering wheel to his forehead in the course of the accident. He experienced an acceleration-deceleration force to his head that resulted in a whiplash injury. While he did not experience a loss of consciousness related to the accident, he did experience altered consciousness in the form of being dazed and confused. This altered consciousness lasted for approximately four weeks. His memories up to and during the accident are quite vague. He has several gaps in his memory post-accident, which may relate to a period of post-traumatic amnesia. He experienced nausea, vomiting, dizziness, and lethargy post-accident, which would all be behavioral indicators of a concussion. Mr. Bunch continues to report a constellation of physical, fatigue, visual, cognitive and emotional coping deficits consistent with a Post-Concussive Syndrome. He reports a clear temporal onset of cognitive problems immediately post-accident. He has been diagnosed with a Concussion/Closed Head Injury by his primary care provider, Steven Olson, M.D.

We attempted neuropsychological testing with Mr. Bunch on May 18, 2018. Based on his suboptimal performance on two standalone Performance Validity Tests, I made the decision to discontinue his testing as it was evident that we were not going to be able to obtain valid neuropsychological test results. There are a number of factors that can negatively impact performance on standalone Performance Validity Tests including pain, depression, fatigue and intentional lack of effort. At the time of his attempted testing, Mr. Bunch was experiencing at least a moderate to perhaps severe level of depression based on his self-report and results of his the Beck Depression Inventory – 2. He was experiencing a significant headache as well as left shoulder pain the day of testing. He was also experiencing a high level of fatigue due to poor and disrupted sleep as well as the potential effects of a concussion and chronic pain. These factors alone or in combination can explain most of his sub-optimal scores from the Performance Validity Tests. As noted in the body of the report, his below chance performance on the Difficult Subtest of the Victoria Symptom Validity Test is concerning for an intentional lack of effort.

As noted above, Mr. Bunch does meet the diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic Brain Injury as established by a number of professional organizations as well as by the DSM-5. We attempted testing with Mr. Bunch at just three months post-accident. He is therefore experiencing the most rapid phase of spontaneous recovery from the concussion that I would anticipate. At this point, he is not at MMI related to the concussion that he sustained in the February 13, 2018 motor vehicle accident.

**Lincoln/Bunch 0725**

**NEUROPSYCHOLOGICAL SCREENING**
Mark B. Bunch
Page 9

Mr. Bunch is experiencing some moderate to severe feelings of depression at this time. He is also reporting significant ongoing problems with fatigue, irritability, reduced stress tolerance, emotional lability and reduced motivation. These are all post-concussive symptoms that typically respond well to use of anti-depressant medications in the Select Serotonin Reuptake Inhibitor (SSRI) Class. By the writing of this report, I was informed that Frank Polanco, M.D. has taken over as Mr. Bunch's primary Workers' Compensation physician. Dr. Polanco may wish to consider Mr. Bunch for prescription of an SSRI-type anti-depressant medication. I would initially recommend Cymbalta or it's generic duloxetine. If that medication is ineffective then I would suggest Zoloft.

By the time of attempted testing, Mr. Bunch had been prescribed a muscle relaxant to be used at night as a sleep aid. He has also apparently been prescribed an anti-anxiety medication, again to be used at night possibly as a sleep aid. He could not recall the name of this medication. In either event, he reports that the medications do help somewhat, but he still experiences significant problems with both sleep onset and sleep maintenance. I would, therefore, suggest that Dr. Polanco consider trazodone as a sleep aid.

For Mr. Bunch's residual cognitive problems, he would likely benefit from a period of individual cognitive rehabilitation. Given that he is early post-accident that treatment should take a restorative approach. It should also focus on helping him to develop strategies to compensate for his residual cognitive problems.

As noted above, Mr. Bunch is experiencing moderate to perhaps severe feelings of depression at this time. He is also reporting problems with irritability and reduced stress tolerance. He is reporting symptoms consistent with a Post-Traumatic Stress Disorder related to the accident. These are all accident-related issues that should be addressed in individual psychotherapy. I would recommend that this be with a therapist familiar with Post-Concussive Syndrome if at all possible.

Mr. Bunch is reporting a variety of vision problems consistent with a Post-Traumatic Vision Syndrome. It appears that ocular motor and smooth pursuit deficits have been identified post-accident. He is also reporting symptoms suggestive of a possible left visual inattention. He would, therefore, benefit from further evaluation and possible treatment with a neuro-optometrist. Based on the type of visual problems that Mr. Bunch is reporting, I would recommend evaluation with a neuro-optometrist prior to releasing him to return to drive.

As noted above, I would recommend evaluation with a neuro-optometrist prior to releasing Mr. Bunch to return to driving. Some consideration might also be given to a formal driving evaluation prior to releasing Mr. Bunch to drive. As driving is an integral part of Mr. Bunch's job, a release to return to driving will be a key component to his overall release to return to work.

**Lincoln/Bunch 0726**

06/04/2019  16:30    7196350966                                    PAGE 96/99

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 10

### DSM-5 DIAGNOSIS

331.83                          Mild Neurocognitive Disorder due to Traumatic
                                Brain Injury with Behavioral Disturbance
                                (behavioral disturbance includes irritability, reduced
                                stress tolerance, and anger outburst).

293.83                          Depressive Disorder due to Traumatic Brain Injury,
                                Mild.

309.81                          Post-Traumatic Stress Disorder.

Once Mr. Bunch's pain, depression and fatigue are better resolved, I will be happy to see him back for a neuropsychological update. Until that time, I hope the above findings and recommendations are helpful to your overall care and treatment of Mr. Bunch. Should you have any further questions, please feel free to contact me at anytime.

*Dennis a. Helffenstein, Ph. D.*

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Colorado License # 1484
Certified Rehabilitation Counselor # 00001338
Diplomate, American Board of Vocational Experts # 64073
Certified, Health Service Provider in Psychology National Register # 41454

**Lincoln/Bunch 0727**

06/04/2019  16:30    7196350966

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Clinical Director

Diana M. Helffenstein, M.A., L.P.C.
Licensed Professional Counselor

Brian D. Reusink, M. Ed.
Director of Operations

**COLORADO**
Neuropsychological
**ASSOCIATES**, P.C.



Primary Office
10 Inverness Dr. East
Suite 215
Englewood, CO 80112
(720) 529-0190
(720) 529-1099 Fax

Also serving clients in
Colorado Springs

March 12, 2019

Kenneth J. Shakeshaft, Esq.
1935 Jamboree Drive
Suite 202
Colorado Springs, CO  80920

**RE:**        Mark B. Bunch
**D.O.B.:**

Dear Mr. Shakeshaft:

At your request, I have now had an opportunity to review additional records regarding Mr. Bunch's treatment since I originally saw him.  These include the records of Julia Brinley, D.O., Neurologist; Thomas W. Higginbotham, D.O., Occupational Medicine Specialist; Anthony Ricci,, Ph.D., Licensed Clinical Psychologist; Michael Saxerud, O.D., Neuro-Optometrist; and, Herman Staudenmayer, Ph.D., Licensed Clinical Psychologist.  You also asked that I review an Independent Medical Examination performed by Frank Polanco, M.D.  and then comment on Mr. Bunch's condition based on that review.  You also asked me if information contained in the records has any impact on my prior diagnoses and treatment recommendations.  You also asked if this information helps to explain why I was unable to obtain valid neuropsychological test scores when I attempted testing with Mr. Bunch.  You also asked me to specifically address the issue of malingering and if Mr. Bunch is committing fraud.

As you will recall, I originally saw Mr. Bunch on May 3, 2018 on referral from Steven Olson, M.D.  I now understand from a review of the records that Dr. Olson is Mr. Bunch's primary care physician and may have for a period of time served as his Workers' Compensation Physician.  I attempted neuropsychological testing with Mr. Bunch on May 18, 2018; and, as you will recall, I discontinued the testing based on Mr. Bunch's inconsistent performance on Performance Validity Testing.  Those test scores suggested that I was not going to be able to obtain valid neuropsychological test results.  As noted in my original report, I felt that there were a number of factors that were negatively impacting his performance on the standalone Performance Validity Tests such as pain, depression, fatigue, and possibly an intentional lack of effort.  I also felt that comorbid factors, including pain, depression and fatigue individually, or in combination, could explain most of his suboptimal scores on Performance Validity Testing.  In retrospect, those premorbid symptoms should have been better addressed prior to attempting neuropsychological

**Lincoln/Bunch 0728**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 2

testing with Mr. Bunch. Based on my assessment, I did diagnose Mild Neurocognitive Disorder due to Traumatic Brain Injury with Behavioral Disturbance; Depressive Disorder due to Traumatic Brain Injury; and, Post-Traumatic Stress Disorder related to the motor vehicle accident. In addition, I made a number of treatment recommendations, some of which have now been acted upon.

Following my evaluation with Mr. Bunch, Dr. Olson referred him to Thomas W. Higginbotham, D.O., a specialist in Occupational and Environmental Medicine. Since beginning my practice in Colorado Springs in 1994, I have co-treated many patients with Dr. Higginbotham and have come to respect his diagnostic opinions and recommendations. Based on a review of Dr. Higginbotham's records, it appears that he has taken over as Mr. Bunch's primary care physician for injuries sustained in the work-related motor vehicle accident of February 13, 2018. I reviewed Dr. Higginbotham's May 3, 2018 Initial Evaluation. In this evaluation, he obtains a detailed history of the accident as well as Mr. Bunch's symptoms surrounding the accident including diagnostic criteria associated with a possible Mild Traumatic Brain Injury. This included obtaining data that he sustained a blow to his forehead in the course of the accident; experienced altered consciousness post-accident in the form of being dazed; and, experienced some alteration of his memories post-accident. He also obtained data regarding post-concussive symptoms such as being dizzy and having difficulty standing. He conducted a thorough review of symptoms and documented that Mr. Bunch was experiencing multiple post-accident symptoms clearly suggestive of a Post-Concussive Syndrome/Mild Traumatic Brain Injury including dizziness, headaches, depression, nausea, blurry vision, photophobia, tinnitus, fatigue, sleep disturbance, mood swings, change in sense of taste and smell, problems with attention and concentration, short-term memory, photophobia, phonophobia, problems with word finding, difficulties with math, and irritability/reduced stress tolerance. He ultimately diagnosed Mr. Bunch with a history of head trauma with emotional and behavioral disturbance/changes, Neurocognitive Disorder, visual difficulties with spatial disorientation, as well as light and sound sensitivity. Other diagnoses included post-traumatic headaches, cervicalgia, cervical strain, and thoracic myofascial strain. Regarding his diagnoses, Dr. Higginbotham made a number of referrals including specialty evaluations with a neurologist, clinical psychologist, psychotherapy and neuro-optometrist.

In his September 3, 2018 report, Dr. Higginbotham indicates that he reviewed my Neuropsychological Screening report dated June 1, 2018. He concluded that the results of my attempted testing were "likely invalid because of his visual difficulties, headaches and inability to concentrate and focus." In Dr. Higginbotham's own assessment of Mr. Bunch's functioning, he noted that Mr. Bunch had difficulty reading due to double vision and blurry vision. He noted that he had to move the paper and his neck at various angles in order to correctly visualize what was on the page. Even then, he had difficulty maintaining his focus for more than several seconds. He went on to render the opinions that these visual difficulties alone would likely invalidate any psychometric testing including validity testing. I would note that both of the Performance Validity Tests that I administered to Mr. Bunch as part of the attempted testing did, in fact, have a visual component. Also, as a direct result of Mr. Bunch's visual problems as well

**Lincoln/Bunch 0729**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 3

as other cognitive deficits and limitations, Dr. Higginbotham rendered the opinion that Mr. Bunch was unable to drive; and, therefore, was unable to resume his work (which required extensive driving). He felt that further evaluation and treatment with a neuro-optometrist was critical to Mr. Bunch's overall care and rehabilitation.

I would also note that Dr. Higginbotham appreciated and documented the emotional and psychological symptoms that Mr. Bunch was experiencing associated with the motor vehicle accident. These included depression, nervousness, mood swings and panic attacks. At various times, he diagnosed Situational Adjustment reactions with anxiety and depressed mood; and, Traumatic Brain Injury resulting in emotional and behavioral disturbance/changes. He referred Mr. Bunch for individual psychotherapy with Herman Staudenmayer, Ph.D. Based on a review of my Screening report, he was aware that I had recommended that Mr. Bunch be considered for prescription of an SSRI-type anti-depressant medication. Indeed, Dr. Higginbotham considered prescription of an anti-depressant but made the decision to hold on prescription of an anti-depressant medication until he was evaluated by a neurologist. That evaluation ultimately occurred on October 19, 2018 with Julia Brinley, D.O. Dr. Brinley recommended prescription of nortriptyline (Pamelor), a tricyclic anti-depressant medication. I will discuss this recommendation later when I review her report.

I would note that throughout his records, Dr. Higginbotham documents Mr. Bunch's emotional response to daily surveillance by the Workers' Compensation insurance company. Mr. Bunch clearly found the surveillance to be highly distressing and intrusive. Dr. Higginbotham documented increased depression in response to what appeared to be a long-term surveillance program by the insurance company. I would further note that based on my 39 years of experience, Mr. Bunch's emotional response to this type of intrusive surveillance is quite typical and understandable.

In his November 2018 note, Dr. Higginbotham reviews Mr. Bunch's response to his evaluation with Dr. Polanco. Mr. Bunch noted that Dr. Polanco stated in his report that he spent 40+ minutes in his evaluation with Mr. Bunch. Mr. audio Bunch recorded the assessment. He reported that he had a total of about 11 minutes of recording, 6 of those minutes being spent in face-to-face time with Dr. Polanco. Mr. Bunch felt that there were a number of significant errors and discrepancies with facts of his case in Dr. Polanco's report. In this note, Dr. Higginbotham documents that the nortriptyline prescribed by Dr. Brinley is helping with his sleep.

I reviewed the Neurological Evaluation report, authored by Julia Brinley, D.O. dated October 19, 2018. In my interview with Mr. Bunch, he noted that with regard to memories for some events of the accident, his memories are "vague." He also reported feeling "stunned" immediately post-accident. Perhaps, because of these vague memories, by the time he sees Dr. Brinley he believes that he most likely did lose consciousness for some brief period of time. Based on her assessment and review of records, Dr. Brinley ultimately diagnosed Post-Concussion Syndrome as her primary diagnosis. She also diagnosed intractable chronic migraines and insomnia. She states, "Based on patient's history and exam, I do believe he has continued Post-Concussive

**Lincoln/Bunch 0730**

06/04/2019  16:30  7196350966  PAGE 99/99

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 4

Syndrome with worsening factors to include mood disturbance." I would note that Dr. Brinley prescribed nortriptyline (Pamelor) 10 mg q h.s. (one time at night) for one week and then increase to 20 mg q h.s. thereafter. She stated, "I am hoping this will help with his headaches in addition to sleep and some mood disturbances." I have several observations regarding this particular prescription. I would first note that the therapeutic dose of Pamelor to address depression is 25 mg three to four times per day for a maximum of 150 mg per day. Therefore, the prescribed dose would not be expected to have any positive impact whatsoever on Mr. Bunch's depression. This is only a level of Pamelor that might be expected to help with sleep. In my clinical experience, it is most common for physicians to prescribe an SSRI-type anti-depressant medication for depression in brain-injured individuals. As noted above, nortriptyline (Pamelor) is a tricyclic anti-depressant and not an SSRI. In my experience, physicians will prescribe low doses of tricyclic anti-depressant medications such as nortriptyline and trazodone to help with sleep. Indeed, as noted above, this medication at 20 mg did help Mr. Bunch somewhat with his sleep.

I reviewed a September 25, 2018 report authored by Anthony M. Ricci, Ph.D., a Diplomate in Rehabilitation Psychology. Over several decades, I have co-treated several hundred patients with Dr. Ricci and have come to respect his diagnostic impressions, opinions and treatment with patients. On Page 15 of his report, Dr. Ricci states, "I agree with Dr. Helffenstein and Dr. Staudenmayer's observations that formal neuropsychological testing is not appropriate at this time. Mr. Bunch presents with specific visual-vestibular changes and with significant elements of anxiety, depression and adjustment to disability which contributes to the cognitive dysfunction and creates a pattern of response which is highly frustrating and confusing. His testing results should be considered in light of his despondence and he should be encouraged, supported and allowed venting and directed towards behavioral and self-directed strategies to improve his circumstances and help him to reestablish personal control." Dr. Ricci further stated, "Mr. Bunch is manifesting a somewhat classic presentation of a post-concussion recovery with frontal lobes dysexecutive function." Dr. Ricci correctly notes that this type of executive dysfunction can significantly confound a patient's recovery. Dr. Ricci further states, "It is my opinion that the current difficulties described by Mr. Bunch are related to his psychological and neuropsychological condition and relate to sequelae of the February 13, 2018 MVA." Dr. Ricci recommends additional individual psychotherapy to include conjoint treatment with his fiancee. Dr. Ricci had previously reviewed Dr. Staudenmayer's reports and opinions that the current trauma related to the motor vehicle accident has "rekindled" some prior trauma experienced when Mr. Bunch was 8 years old. Mr. Bunch reported to Dr. Ricci that he did not find a Dr. Staudenmayer's focus on this prior trauma to be particularly beneficial. Dr. Ricci felt that focus on this prior trauma could "detract from his current post-concussion treatment needs." I would totally agree with Dr. Ricci in this regard. Dr. Ricci's diagnoses were Concussion without Loss of Consciousness; Situational Anxiety; and, Adjustment Disorder with Anxiety and Depression.

With regard to Dr. Ricci's assessment, I would note that Dr. Ricci administered the Beck Depression Inventory – Second Edition (BDI-2) on September 25, 2018. Mr. Bunch's score was 27. This score is notably lower than Mr. Bunch's BDI-2 score obtained by me in May of 2018

**Lincoln/Bunch 0731**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 5

which, at that time, was 45. While a score of 27 still reflects a fairly high level of depression, this score would suggest some improvement in his depression from the time of my evaluation with him.

I also reviewed the records of Michael Saxerud, O.D. Dr. Saxerud is also a local provider that I have co-treated patients with on multiple occasions. I have also come to trust his diagnostic impressions, opinions and treatment. It appears that Mr. Bunch first saw Dr. Saxerud on July 13, 2018. Dr. Saxerud documented a number of post-concussive symptoms as well as a wide variety of vision problems suggestive of a Post-Traumatic Vision Syndrome. His impressions include convergence insufficiency, headache, visual-perceptual disorder, pursuit eye movement disorder, focal midline right, dizziness, myopia, astigmatism, diplopia, vertical heterophoria, and bilateral visual discomfort. His diagnoses include Post-Concussion Syndrome, visual distortions of shape and size, chronic post-traumatic headaches intractable, diplopia, dizziness, other irregular eye movements, convergence insufficiency, vertical heterophoria, abnormalities of gait and mobility, visual discomfort bilateral, myopia bilateral, and regular astigmatism right. Dr. Saxerud ultimately prescribed corrective lenses with prism correction. A September 21, 2018 letter states, "Mark is under my care for a visual-perceptual disorder secondary to a concussion. At this time, Mark is not capable of working, as his depth perception and eye movements are not adequate to keep him safe in the workplace."

I also reviewed the records of Herman Staudenmayer, Ph.D. This included a Psychological Evaluation report dated August 6, 2018. I would note that Dr. Staudenmayer re-administered the PCL-5, the same PTSD inventory that I administered as part of my screening with Mr. Bunch. Mr. Bunch's PCL-5 score was 66. This score was notably lower than the score of 79 that he obtained as part of my screening with him. This score remains clinically significant, but suggests some improvement in PTSD symptoms from the time that I saw him. I would note that Dr. Staudenmayer also administered the MMPI-2-RF as part of his evaluation with Mr. Bunch. He noted that Mr. Bunch's F-r Score was 120T, which he felt indicated over reporting of psychiatric, somatic, and cognitive symptoms. He ultimately concluded that the results of the MMPI-2-RF as well as the PCL-5 and the SC AT2 were not valid due to his symptom reporting. In general regarding the issue of over reporting symptoms, scores on tools such as the MMPI-2-RF and PCL-5 can be elevated as a result of the patient's honest report of persisting symptoms associated with actual medical conditions including Post-Concussion Syndrome. Dr. Staudenmayer notes in later records that scores on these types of tools can be elevated as a "cry for help." That is, the patient is in a high level of emotional and/or physical distress and they are reporting symptoms in the hope that the provider can help them in some way. As part of his Psychological Evaluation report, Dr. Staudenmayer states, "Mental status exam suggest exaggeration and adopting the sick role. Psychological testing indicated that his self-report reflects over reporting bias, making these self-reported symptoms invalid. Comprehensive neuropsychological testing is contraindicated at this time." Dr. Staudenmayer's working diagnosis was Psychological Factors Affecting a Medical Condition. Dr. Staudenmayer recommended individual psychotherapy which he then proceeded to provide to Mr. Bunch.

**Lincoln/Bunch 0732**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 6

Dr. Staudenmayer's later Treatment Notes document a prior trauma which Mr. Bunch experienced when he was 8 or 9 years old when he was hiking by himself in the foothills and accidentally fell into a dry well. The well was so deep he could not get out and he spent the night "terrorized" at the bottom of the well. Mr. Bunch thought that at that time he would die. He could not recall how he was rescued, but was apparently was told that he was rescued by fire department personnel. He apparently reported some post-traumatic stress symptoms through his teenage years, but appeared to be symptom-free throughout his adulthood. In his August 13, 2018 note, Dr. Staudenmayer states, "I explained to him the nature of how trauma memories, particularly sensory and emotional memories are stored and how they are interconnected by association pathways such that a recent experience can trigger the others. It appears that the motor vehicle accident was traumatic enough in its own right but also rekindled past associated experiences and traumatic symptoms." I would agree with Dr. Staudenmayer that current traumas can certainly "rekindle" past traumas which have been quite dormant for many years. It is my clinical experience treating many PTSD patients that the focus of treatment should remain on treating the current trauma. As that trauma resolves then past traumas will typically return to their dormant state. I would also note that past traumas can result in a situation where an individual can be more sensitive to and responsive to a more current trauma. That is, the individual is more symptomatic related to the current trauma because they are sensitized to trauma by the past traumas. Again, it is my experience that treating the current trauma should be the first line of treatment.

In brief summary, I would note that Dr. Staudenmayer felt that comprehensive neuropsychological testing was contraindicated due to Mr. Bunch's emotional and psychological status. It would be important to note that the emotional and psychological distress that Mr. Bunch was experiencing at the time of my screening with him was even more pronounced than at the time of Dr. Staudenmayer's evaluation.

I reviewed Dr. Staudenmayer's Review of Records report dated November 17, 2018. Dr. Staudenmayer apparently reviewed an IME report, authored by Dr. Lesnak, dated September 18, 2018. He also reviewed a report generated by Dr. Polanco as well as Dr. Brinley's neurological evaluation. He concluded this note by stating, "I am updating my diagnoses adding (F44.7) Conversion Disorder (Functional Neurologic Symptoms Disorder) with Mixed Symptoms. The most difficult aspect of Conversion Disorder is to identify the specific motivation underlying it including malingering, primary gain or secondary gain. In my experience, it is not secondary gain but primary gain. Under such circumstances, patients with primary gain are extremely difficult to treat because they are vested in their distorted beliefs." This additional diagnosis essentially reinforces Dr. Staudenmayer's initial impression that Mr. Bunch is adopting the "not well role" and that this is a psychological component to his symptom presentation.

I reviewed a Comprehensive Consultation report authored by Frank Polanco, M.D. The date of this report is unclear, but it may be November 6, 2018. Dr. Polanco indicates that the "reason for visit" is that Mr. Bunch is "seeking a primary provider for his industrial injury of February 13, 2018." This statement is inconsistent with a transcript of a recording of this evaluation, which

**Lincoln/Bunch 0733**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 7

you also provided to me. Mr. Bunch clearly states to Dr. Polanco when asked why he is there that he is unsure why he is there or who sent him. At this point in time, Mr. Bunch was being treated by Dr. Higginbotham and I see no indication in Dr. Higginbotham's records or any other records that he was dissatisfied with Dr. Higginbotham's care. Dr. Higginbotham does note that there were apparently some efforts on behalf of the insurance company to usurp Mr. Bunch from his care into the care of Dr. Polanco. I would note that when Mr. Bunch stated to Dr. Polanco that he did not know why he was there or who had referred him, Dr. Polanco did not help to clarify the situation or in any other way explain the reason for his evaluation with Mr. Bunch. I would further note that Dr. Polanco indicated that he spent 2-1/2 hours reviewing surveillance video as part of his evaluation with Mr. Bunch. If this was, in fact, an initial treatment assessment, I would find spending 2-1/2 hours reviewing surveillance video to be quite unusual for such an evaluation. On a surface, this appeared to be more of an IME as opposed to a true clinical assessment.

Based on a review of the transcript of the evaluation that you provided, it appears that the medical evaluation conducted by Dr. Polanco was quite minimal. However, as I am not a physician, I cannot comment on the thoroughness of the medical evaluation. I can, however, comment on the thoroughness of Dr. Polanco's concussion assessment, which was minimal and highly inadequate. When discussing the accident, Mr. Bunch spontaneously offered to Dr. Polanco that he did strike his head in the course of the accident and provided a picture to Dr. Polanco documenting that head trauma. Dr. Polanco did ask one follow-up question on Page 3, Line 22, "Did you pass out or anything?" Mr. Bunch's response suggested that he feels he may have lost consciousness, however, as opposed to following up on that response, Dr. Polanco again asked him if he hit his head and again Mr. Bunch responded that he did strike his head in the course of the accident. On Page 4, Lines 21 and 22, Dr. Polanco again asked Mr. Bunch if he passed out. However, this was a compound question and he also asked if Mr. Bunch exited the vehicle, Mr. Bunch's response was, "I don't recall." Dr. Polanco then pursues the issue of if he exited the vehicle as opposed to asking further questions regarding a possible loss of consciousness. On Page 5, Line 6, Mr. Bunch reported that he felt "woozy" post-accident. This response would suggest some alteration of consciousness. This is not a symptom that Dr. Polanco asked about further. Therefore, the only questions related to a possible concussion that Dr. Polanco asked were "did you hit the head" and "did you lose consciousness." I see nowhere in the transcript that Dr. Polanco specifically asked about altered consciousness post-accident such as feeling dazed, confused, or disoriented. I see nowhere in the transcript where Dr. Polanco asked about the alteration of memories surrounding the accident. Therefore, Dr. Polanco's assessment of a possible brain injury was quite inadequate.

Dr. Polanco ultimately states, "The findings in the records do not support a concussion/TBI and the diagnostics do not support a brain injury." As noted above, Dr. Polanco's personal assessment of the brain injury/concussion was inadequate and incomplete. Providers such as Dr. Olson, Dr. Higginbotham, and Dr. Brinley as well as myself did obtain adequate data to make the concussion/brain injury diagnosis. In addition, it is now accepted that medical diagnostics such as CT scans and MRIs are almost always negative in cases of Mild Traumatic Brain Injury.

**Lincoln/Bunch 0734**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 8

These types of medical diagnostics are "rule in" and not "rule out" tests. Dr. Polanco ultimately renders an assessment of PTSD (pre-existing condition not permanently aggravated). By this, Dr. Polanco was referring to Dr. Staudenmayer's perception that a prior trauma sustained at age 8 was aggravated/"rekindled" by the motor vehicle accident. Nowhere in his report does Dr. Polanco address the issue that Mr. Bunch may have PTSD symptoms related to the motor vehicle accident. Based on a review of the transcripts, he did not ever ask Mr. Bunch even one question about possible PTSD symptoms.

I noted a number of misrepresentations in Dr. Polanco's report. He stated that Dr. Staudenmayer did "not support a concussion/TBI diagnosis." Dr. Staudenmayer's report was very clear that he was deferring that diagnosis to Mr. Bunch's other providers and that his assessment did not rule out that diagnosis. In the discussion section of his report, Dr. Staudenmayer states, "It was not until 2-1/2 months later that he complained of a multitude of symptoms, which is inconsistent with concussion or traumatic brain injury." This misrepresents the facts of the case. In fact, Mr. Bunch was reporting multiple post-concussive symptoms early post-accident.

## SUMMARY AND RECOMMENDATIONS:

Based on my review of the above records, I have several observations and treatment recommendations:

1. Mr. Bunch's providers are all in agreement that he has experienced notable feelings of depression post-accident. Following my screening assessment with him, I recommended individual psychotherapy as well as prescription of an SSRI-type anti-depressant medication. While Mr. Bunch has received some individual psychotherapy with Dr. Staudenmayer, he has not been prescribed an SSRI-type anti-depressant medication. He has been prescribed a tricyclic anti-depressant medication (Pamelor) at a subtherapeutic dose for sleep. As I believe a significant component of his depression is organically-based, I would strongly recommend that Dr. Higginbotham consider Mr. Bunch for prescription of an SSRI-type anti-depressant medication such as Cymbalta or its generic, duloxetine. If that medication is ineffective, then I would suggest Zoloft.

2. With regard to individual psychotherapy, it is evident that Mr. Bunch requires additional treatment to address accident-related issues such as depression, reduced stress tolerance and PTSD related to the motor vehicle accident. I would recommend that the focus of any PTSD treatment be on the motor vehicle accident and not on any prior traumas. He would likely be a good candidate for use of EMDR to address his PTSD symptoms as well.

3. With regard to the issue of symptom over reporting and/or malingering, I would note that these are two separate issues in the field of neuropsychology. An individual may over report symptoms for a number of reasons, including experiencing a high level of emotional or psychological distress; a cry for help; or, over reporting of symptoms for some primary or secondary gain reason. At this point, I do not have enough data to render an opinion

**Lincoln/Bunch 0735**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 9

regarding this issue.  It appears that Dr. Staudenmayer is at least considering the possibility that any over reporting of symptoms may relate to a "cry for help."  At this point, that appears to be a reasonable working theory.  He also believes that, to some degree, Mr. Bunch's over reporting of symptoms relates to his adopting the "sick role."  While this explanation is certainly possible, I would want to explore this possibility more fully in therapy with such a patient.

With regard to malingering, again I do not have enough data to render an opinion regarding this issue.  I am the only provider that has administered Performance Validity Tests to Mr. Bunch.  It remains my opinion that the bulk of his suboptimal scores on Performance Validity Testing are, in fact, explained by his residual high level of pain, depression, anxiety and fatigue at the time of my assessment with him.  This is an opinion that seems to be corroborated by a number of his providers and evaluators, including Dr. Higginbotham and Dr. Ricci.  At this point, there is only one score from one test that would suggest malingering.  That is not enough data for any provider to render the professional opinion (or diagnosis) of malingering.

Should you have any further questions, please feel free to contact me at anytime.

Sincerely,

*Dennis a. Helffenstein, Ph. D.*

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Colorado License # 1484
Certified Rehabilitation Counselor # 00001338
Diplomate, American Board of Vocational Experts # 64073
Certified, Health Service Provider in Psychology National Register # 41454

**Lincoln/Bunch 0736**

06/04/2019  16:30    7196350966                                          PAGE 99/99

# *Patient Encounter*

| Patient | Provider | Encounter |
|---|---|---|
| **Mark Bunch** | Michael Saxerud, OD | Date  11/02/2018 |
| | Pine Creek Vision Clinic | Type:  Brain Injury Follow-Up EP |
| | 9475 Briar Village Point Suite 200 | |
| DOB:          55 Years | Colorado Springs CO 809207918 | |
| Sex:    Male | (719) 594-2020 | |

## History

### Reason For Visit

**Patient Reason·**                                    **Referring**

Follow up for post concussion
The last set of taped safties provided good vision for 5 weeks, then
vision declined again   Bending down to tie shoes causes dizziness       **Addl Reason**
Bean bag toss went well while vision was doing well   headaches
continue to improve, less frequent in nature   Distance vision seems
to do pretty well, trouble with near, his OTC readers are broken
Double vision only occasional, depth perception improving, stairs are
not as difficult

**Provider Reason:**

### Contact Lens History

Printed On·    11/05/2018                                              Page 1 of 4

1118324S5459043  20181119

**Lincoln/Bunch 0737**

06/04/2019   16:30    7196350966                                                          PAGE 99/99

| Mark Bunch (          ) | Michael Saxerud, OD | 11/02/2018 |
|---|---|---|

**Contact Lens History**

**Current Lenses**

*No Contact Lens information available*

**Lens History**

Lens Age                                    Supply          None

**Wearing History**

Ave Daily Wearing Time                      Ave Replacement Period:

Today's Wearing Time:                       Continuous Wear Period·

**Care History**

Solutions

Drops Used:

Other Supplies.

Additional Comments:

---

**Examination**

**VA/Color/Stereo**

**Aided Visual Acuity**

| OD Distance VA (20/) | 20 | OS Distance VA (20/) | 20 |
|---|---|---|---|
| OU Distance VA (20/) | 20 | | |

**Vital Signs**

| Arm | Left | Height Unit | feet |
|---|---|---|---|
| Weight Unit | pounds | | |

**Cover/NPC/EOM**

**Cover Test**

| UCT Distance | No Motion | UCT Near | No Motion |
|---|---|---|---|

**EOM (Motility)**

| OD Full Range | Yes | OS Full Range | Yes |
|---|---|---|---|
| OD Limitation Comment | 3+ losses with pursuits with taped safties, worse without safties | OS Limitation Comment | |

Printed On     11/05/2018                                                     Page 2 of 4

1118324S5459043  20181119

**Lincoln/Bunch 0738**

| Mark Bunch ( | | Michael Saxerud, OD | | 11/02/2018 |
|---|---|---|---|---|

**NPC**

| Break | 8 | in | Yes |
|---|---|---|---|

## CL Evaluation

### CL Evaluation

| OD Lens Centration | Even | OS Lens Centration | Even |
|---|---|---|---|
| OD Lens Quality | No Defects | OS Lens Quality | No Defects |
| OD Lens Surface | Clean | OS Lens Surface | Clean |
| OD Limbal Coverage | Full | OS Limbal Coverage | Full |
| OD Rotation Direction | None | OS Rotation Direction | None |

## Assessment and Plan

### Diagnoses

| Dx Date | Dx | Description | Eye | Care Plan |
|---|---|---|---|---|
| 11/02/2018 | F07 81 | Postconcussional syndrome | | Add walk with head turns |
| | | | | Have PT rule out BPPV |
| | | | | RTC one month |
| | | | | Continue bean bag toss |
| | | | | Taped softies with 0 25 yoked base up along with 1 mm taped UNO. |
| 11/02/2018 | H53 15 | Visual distortions of shape and size | | |
| 11/02/2018 | H53 2 | Diplopia | | |
| 11/02/2018 | R42 | Dizziness and giddiness | | |

### Diagnoses Comments

### Additional Comments

## Coding

| Service | Description | Diagnoses |
|---|---|---|
| 99214 | E&M LEVEL 4, EST PT | H53 2, H53 15, F07 81, R42 |
| 92065 | Vision Therapy Exam | F07 81 |

**Signed by Michael Saxerud, OD on 11/02/2018**

## Contact Lens Trials

Printed On.    11/05/2018                                              Page 3 of 4

1118324S5459043  20181119

**Lincoln/Bunch 0739**

| Mark Bunch ( | Michael Saxerud, OD | 11/02/2018 |
|---|---|---|

Trial #.    *9028873*

OD: Biofinity (Coopervision Inc )
OS: Biofinity (Coopervision Inc )

|     | BC | Sph | Cyl | Axis | Diam | Add | Add Des | Tint |
|-----|------|-------|-----|------|------|-----|---------|------|
| OD: | 8 60 | -2 00 |     |      | 14 0 |     |         |      |
| OS  | 8 60 | -2 00 |     |      | 14 0 |     |         |      |

Trial Comments
OD:
OS:

OD Dispensed·    No          OS Dispensed.    No

*This information is a summary of all examination findings from this patient encounter, and should be taken only as a representation of clinical data and decisions made at that individual visit*

1118324S5459043  20181119

**Lincoln/Bunch 0740**

06/04/2019   16:30    7196350966



Lincoln/Bunch 0741

7C158190008



**SHAKESHAFT-GORMAN**
— LAW FIRM, LLP —

| | | |
|---|---|---|
| Kenneth J. Shakeshaft | • Attorney at Law | **Main Office** |
| Joseph M. Gorman | • Attorney at Law | Shakeshaft - Gorman Law Firm |
| Cindy Maddox | • Paralegal | 1935 Jamboree Drive, Suite 202 |
| Brandy Newton | • Paralegal | Colorado Springs, CO 80920 |

June 4, 2019

<u>**Via U.S. Mail & Facsimile: 603-559-9400**</u>

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
Adjuster – Courtney Grygiel
P.O. Box 7213
London, KY  40742-7213

**RE:    Claimant:    Mark Bunch**
**        Employer:    Charter Communications, Inc.**
**        Claim No.:    8220685**

Dear Ms. Grygiel:

Please consider this as additional information in support of Mr. Mark Bunch's appeal for long-term disability benefits.

We are providing additional information for Liberty Life Assurance's review.

I attach a statement from Mr. Bunch.  Mr. Bunch confirms the events of the motor vehicle collision which lead to his injury.  Mr. Bunch confirms he still has issues with his post-concussion/mild TBI such as headaches, ringing in ears, balance, insomnia, depression at times, neck pain and loss of range of motion.  He also experiences double vision and difficulties with focusing and reading.

Mr. Bunch confirms in his statement he has followed the recommendations of Dr. Higginbotham in seeing a neurologist, Dr. Julia Brinley, seen a speech therapy therapist for treatment, undergone physical therapy and also treated with Dr. Saxerud.

It appears some of the information provided by the document reviewing doctors are questioning Mr. Bunch's financial motivation.

I am attaching a copy of Mr. Bunch's 2017 W-2 which documents Mr. Bunch's earnings were $103,698.71.

**Lincoln/Bunch 0742**

7C158190008

At the time of the crash, Mr. Bunch was employed earning over six figures per year.

In regard to so called "litigation" motivation, Mr. Bunch did have a claim for damages against the at-fault driver. I attach a copy of the injury Release dated October 3, 2018, confirming the bodily injury claim was resolved. There is no pending claim. Additionally, there never was any litigation involving this motor vehicle collision.

Mr. Bunch also had a Workers' Compensation claim arising out of the motor vehicle collision since he was on duty, that claim has also been fully resolved.

I provide a copy of the following medical records:

- Dr. Thomas Higginbotham records dated 5/3/18 through11/20/18;
- Lincoln Group correspondence dated 4/23/19 to Dr. Higginbotham with hand written notes on letter from Dr. Higginbotham;
- Dr. Steven Olson – Report dated 2/27/18;
- Dr. Dennis Helffenstein reports dated 6/1/18 through 3/12/19;
- Parkview Medical Center report dated 2/13/18;
- St. Thomas More Hospital Physical Therapy Report dated 5/31/18;
- Dr. Julia Brinley report dated 10/19/18;
- Centura Health Outpatient Rehabilitation Speech Therapy records dated 10/31/18 through 4/24/19;
- Dr. Saxerud report dated 11/2/18; and
- Photo of head injury.

Mr. Bunch has been undergoing speech therapy as recommended by Dr. Higginbotham. He has received the speech therapy at Centura Health Outpatient Rehabilitation. We have included these records.

It appears that the review of Mr. Bunch's claim is focused on his financial motivation, potential litigation and whether he is malingering. As shown, Mr. Bunch was earning over $100,000.00 per year. His income since that time has been strictly limited to the minor settlements he received, and, the limited amount of Workers' Compensation benefits. At this juncture, he is still not working. He is losing over $100,000.00 annually by not working. There is no financial motivation he has to continue not working other than he has medical problems which prevent him from working.

In regard to malingering, I would refer you to the specialist, Dr. Helffenstein's report of March 12, 2019. Dr. Helffenstein notes:

> With regard to malingering, again I do not have enough data to render an opinion regarding this issue. I am the only provider that has administered Performance Validity Tests to Mr. Bunch. It remains my opinion that the bulk of his suboptimal scores on Performance Validity Testing are, in fact, explained by his residual high level of pain, depression, anxiety and fatigue at the time of my assessment with him. This is an opinion that seems to be corroborated by a number of his providers and evaluators, including Dr. Higginbotham and Dr. Ricci. At this point, there is

**Lincoln/Bunch 0743**

7C158190008

only one score from one test that would suggest malingering. That is not enough data for any provider to render the professional opinion (or diagnosis) of malingering.

In summary, unfortunately Mr. Bunch has significant medical problems resulting from the concussion syndrome which have prevented him from returning to any employment. Mr. Bunch has undergone appropriate treatment. However, Mr. Bunch is also in a situation where he does not have health insurance as a result of the loss of his job.

While Mr. Bunch has shown improvement, he has not been released to work by his physicians. Mr. Bunch's conditions and limitations are verified not only by Dr. Higginbotham, a board certified occupational medicine physician, but also Dr. Dennis Helffenstein, and Dr. Michael Saxerud who has performed the neuro-vision therapy.

We would request a full favorable decision be issued for Mr. Bunch.

If you need any further information please let us know.

Sincerely,

Kenneth J. Shakeshaft
KJS/bn
Enclosures

**Lincoln/Bunch 0744**

7C158190008

On February 13th, 2018 I was injured in a accident car in Pueblo while coming home from working in Lamar and La Junta Colorado. That particular day I had left my house at around 7:30 in the morning in order to drive to my territory working in Lamar Colorado, approximately a 3 hour trip one way just to get there. After working day all long in both Lamar and La Junta, I made the daily journey back home after dark. I was hit by driver another in Pueblo Colorado and suffered a moderate concussion and cervical sprain.

Since that day, I have been unable to return to work due to the associated problems with this accident. I still headaches, ringing in ears my, balance problems, insomnia, sometimes depressed, neck pain and loss of range of motion. I still cannot go up stairs as my balance is still shaky because of my vision. I still have double vision and probelems focusing and reading. For months after my accident I was unable to even watch tv, I had to just listen to it. I can watch slow moving things now, but anything moving quickly like sports I am unable to watch as it makes me dizzy and gives me a headache as does flurescent lights.

For months I have been seen by a certified speec pathologist for trouble swallowirg and speaking. I was diagnosed with dysphagia resulting from my head trauma and concussion. Thankfully I have seen improvement but anytime I get nervous I start stuttering which is very embarrassing.

I have been following the recommendations of my treating physician Dr. Higginbotham, who recommended/prescribed speech therapy, PT, chiropractic care and also to a vision specialist Dr. Saksenrud. I do not have any health insurance so it has been challenging to see and follow thru with everything at the same time but I have been doing my best to seek the treatment that I still need.

I had been set to be married on valentines day of 2018, the very next day after my accident. Since then with all the added stress of this accident, huge loss of income my relationship with my fiance' has been very strained. I went from making over $100,000 annually to having absolutely no income whatsoever. Thankfully at the end of 2018 I reached a settlement agreement with Worker's Comp for my injuries which have allowed me to at least stay in my home. I do not have any pending lawsuits or legal actions currently going on, but have applied for long term disability under my companies ltd insurance which hopefully they will approve.

I'm not sure what my holds future for me or what is going to happen which is very nerve racking and scary. From being in the top 5 % of sales reps for Charter communications on a national level, making more than $100,000 per year to not being able to walk stairs or even close my eyes in the shower for fear of losing my balance and falling again is a huge difference in my quality of life thru no fault of my own.

Sincerely,

Mark Bunch

Mark Bunch

**Lincoln/Bunch 0745**

7C158190008

# 2017 W-2 and EARNINGS SUMMARY

Employee    Reference    Copy

**W-2**    Wage and Tax **2017**
Statement
Copy C for employee's records.    OMB No. 1545-0008

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 1531239  VSP | | | 111875 |

c  Employer's name, address, and ZIP code

CHARTER COMM HOLDING CO, LLC
AS AGENT FOR CHARTER COMMUNICATI
7800 CRESCENT EXECUTIVE DRIVE
CHARLOTTE, NC 28217

e/f Employee's name, address, and ZIP code

| b Employer's FED ID number  43-1854210 | a Employee's SSA number |
|---|---|
| 1 Wages, tips, other comp.  97427.13 | 2 Federal income tax withheld  2484.32 |
| 3 Social security wages  103698.71 | 4 Social security tax withheld  6429.32 |
| 5 Medicare wages and tips  103698.71 | 6 Medicare tax withheld  1503.63 |
| 7 Social security tips | 8 Allocated tips |
| | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12  C  107.64 |
| 14 Other | 12b D  6271.58 |
| | 12c DD  6938.76 |
| | 12d |
| | 13 Stat emp  Ret. plan  3rd party sick pay  X |

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| CO | 01808828 | 97427.13 |
| 17 State income tax  4400.00 | | 18 Local wages, tips, etc. |
| 19 Local income tax | | 20 Locality name |

MARK BRYAN BUNCH

Social Security Number:

© 2016 ADP, LLC

**PAGE 01 OF 01**

---

| 1 Wages, tips, other comp.  97427.13 | 2 Federal income tax withheld  2484.32 |
|---|---|
| 3 Social security wages  103698.71 | 4 Social security tax withheld  6429.32 |
| 5 Medicare wages and tips  103698.71 | 6 Medicare tax withheld  1503.63 |

| d Control number | Dept | Corp. | Employer use only |
|---|---|---|---|
| 1531239  VSP | | | 111875 |

c  Employer's name, address, and ZIP code

CHARTER COMM HOLDING CO, LLC
AS AGENT FOR CHARTER COMMUNICATI
7800 CRESCENT EXECUTIVE DRIVE
CHARLOTTE, NC 28217

| b Employer's FED ID number  43-1854210 | d Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12  C  107.64 |
| 14 Other | 12b D  6271.58 |
| | 12c DD  6938.76 |
| | 12d |
| | 13 Stat emp  Ret. plan  3rd party sick pay  X |

e/f Employee's name, address and ZIP code

MARK BRYAN BUNCH

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| CO | 01808828 | 97427.13 |
| 17 State income tax  4400.00 | | 18 Local wages, tips, etc. |
| 19 Local income tax | | 20 Locality name |

Federal    Filing    Copy

**W-2**    Wage and Tax **2017**
Statement
Copy B to be filed with employee's Federal Income Tax Return.    OMB No. 1545-0008

---

| 1 Wages, tips, other comp.  97427.13 | 2 Federal income tax withheld  2484.32 |
|---|---|
| 3 Social security wages  103698.71 | 4 Social security tax withheld  6429.32 |
| 5 Medicare wages and tips  103698.71 | 6 Medicare tax withheld  1503.63 |

| d Control number | Dept | Corp. | Employer use only |
|---|---|---|---|
| 1531239  VSP | | | 111875 |

c  Employer's name, address, and ZIP code

CHARTER COMM HOLDING CO, LLC
AS AGENT FOR CHARTER COMMUNICATI
7800 CRESCENT EXECUTIVE DRIVE
CHARLOTTE, NC 28217

| b Employer's FED ID number  43-1854210 | a Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a  C  107.64 |
| 14 Other | 12b D  6271.58 |
| | 12c DD  6938.76 |
| | 12d |
| | 13 Stat emp  Ret. plan  3rd party sick pay  X |

e/f Employee's name, address and ZIP code

MARK BRYAN BUNCH

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| CO | 01808828 | 97427.13 |
| 17 State income tax  4400.00 | | 18 Local wages, tips, etc. |
| 19 Local income tax | | 20 Locality name |

CO. State    Filing    Copy

**W-2**    Wage and Tax **2017**
Statement
Copy 2 to be filed with employee's State Income Tax Return.    OMB No. 1545-0008

---

| 1 Wages, tips, other comp.  97427.13 | 2 Federal income tax withheld  2484.32 |
|---|---|
| 3 Social security wages  103698.71 | 4 Social security tax withheld  6429.32 |
| 5 Medicare wages and tips  103698.71 | 6 Medicare tax withheld  1503.63 |

| d Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 1531239  VSP | | | 111875 |

c  Employer's name, address, and ZIP code

CHARTER COMM HOLDING CO, LLC
AS AGENT FOR CHARTER COMMUNICATI
7800 CRESCENT EXECUTIVE DRIVE
CHARLOTTE, NC 28217

| b Employer's FED ID number  43-1854210 | a Employee's SSA number |
|---|---|
| 7 Social security tips | 8 Allocated tips |
| | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a  C  107.64 |
| 14 Other | 12b D  6271.58 |
| | 12c DD  6938.76 |
| | 12d |
| | 13 Stat emp  Ret. plan  3rd party sick pay  X |

e/f Employee's name, address and ZIP code

MARK BRYAN BUNCH

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| CO | 01808828 | 97427.13 |
| 17 State income tax  4400.00 | | 18 Local wages, tips, etc. |
| 19 Local income tax | | 20 Locality name |

City or Local    Filing    Copy

**W-2**    Wage and Tax **2017**
Statement
Copy 2 to be filed with employee's City or Local Income Tax Return.    OMB No. 1545-0008

Lincoln/Bunch 0746

7C158190008

# BODILY INJURY RELEASE

Claim #: 18-4409205

Date: 10/3/2018

KNOW ALL BY THESE PRESENTS, THAT I/WE, Mark Bunch, a single male, for and in consideration of the sum of seventeen thousand and 0/100 dollars ($17,000.00), the receipt of which is hereby acknowledged, do hereby for myself/ourselves release and forever discharge Lisa Medina and Alexander Medina from any and all claims, actions, causes of action, demands, damages, costs and any compensation whatsoever, including any claims for loss of consortium, which the undersigned now has/have or which may hereafter accrue on account of or in any way arising out of an accident which occurred on or about 2/13/18, at or near I-25 and Highway 50 in Pueblo, Colorado/Pueblo County.

The undersigned reserve(s) their right to pursue and recover future medical expenses, health care and related expenses from any person, firm, or organization who may be responsible for payment of such expenses, including any first party health or first party automobile coverage, if so entitled. However, said reservation does not include the party(ies) released who is/are given a full and final release of all claims.

Nothing herein shall be construed to release, remise, or discharge any person, entity or subsequent tortfeasor other than the parties specifically named in this release for the specific incident described. No claim for medical negligence/malpractice which the undersigned now has, or hereafter may have, arising out of the incident described herein is released.

**The execution of this Release does not affect the property damage portion of this claim, if any.**

It is understood and agreed that this settlement is full compromise of a disputed claim as to questions of liability and as to the nature and extent of the injuries and damages. Further, neither this release, nor the payment pursuant hereto, shall be construed as an admission of liability.

**THE UNDERSIGNED HAS READ THE FOREGOING RELEASE AND FULLY UNDERSTANDS IT.**

Printed name _____Mark Bunch_____

Signature _____    Date _10/3/18_

Printed name _____

Signature _____    Date _____

**Lincoln/Bunch 0747**

7C158190008

# Occupational
# And
# Environmental Health Services

Thomas W. Higginbotham, DO
Board Certified,
Occupational And
Environmental Medicine

NEW PATIENT EVALUATION/WC

BUNCH, Mark
05/03/18
DOB:

Mr. Bunch was referred here by Dr. Steven Olson of Centura Health Primary Care at St. Thomas-Moore Hospital in Canon City, Colorado. The referral reads, 'for evaluation of traumatic brain injury'.

DOI:                    02/13/2018

CARRIER:                ESIS
CARRIER #:              2D338776817591
CLAIM REPRESENTATIVE:   Landon Wallis (303-728-9013)
CARRIER ATTORNEY:       NA
CLAIMANT ATTORNEY:      Kenneth Shakeshaft, Esq. (719-635-5886

EMPLOYER AT TIME OF INJURY:  Charter Communications
EMPLOYED AT TIME OF INJURY:  2.5 years
JOB TITLE AT TIME OF INJURY: Direct Sales Representative

DUTIES:
At the time of his injury, he worked full-time-plus. He did not have a second job at the time of his injury. He relates that he would travel in his vehicle for up to 6 hours a day and sees clients an additional 6-8 hours. He relates it wasn't uncommon for him work 12-hour days. They do not do much in the way of lifting or carrying.

PRESENT EMPLOYER: The same
EMPLOYED:         The same
JOB TITLE:        The same
DUTIES:           He hasn't worked since the date of injury, 02/13/2018.

MECHANISM OF INJURY:
Mr. Bunch was involved in a motor vehicle collision on 02/13/2018 at about 6 p.m. There was a police report. The collision occurred at the off-ramp intersection of I-25 and Highway 50 West in Pueblo, Colorado. Weather was not a factor. Construction was not a factor.

1430 South 21ª Street, Suite 101
Colorado Springs, CO 80904
(719)260-8190
FAX: 260-6086

Lincoln/Bunch 0748

7C158190008

Page 2
BUNCH, Mark
05/03/18

He was the driver of a Ford Taurus, wearing seatbelt and shoulder harness.
There were no passengers.

He was struck about the front of his vehicle when another vehicle sped
backwards. He was traveling about 20-25 mph. The striking vehicle, a 1990's
Jeep Cherokee, was traveling backwards at about 5-10 mph. He was unaware of
the impending impact until the moments before.  He had come off the
interstate with the green light for a left turn underneath the
intersection. Mr. Bunch surmises that the other driver was trying to get
back into another lane and decided to back into it quickly, unaware of on-
coming traffic.  He recalls driving, looking straight ahead with his hands
on the steering wheel in a 11:00 and 5:00 o'clock position.  The airbag did
not deploy.  There was no second impact.  The force of the impact caused
his vehicle to arrest in a diagonal manner to his right.  His vehicle was
eventually completely totaled.

He denies loss of consciousness.  He relates of head trauma; his forehead
hit the steering wheel forcibly. He recalls his knees hitting the under
dash. He relates of being dazed and stunned momentarily.  He then noticed
the other driver preparing to leave the scene of the collision.  He gave
chase for about a mile that involved going down the road and then turning
into a shopping center and around the shopping center until the other
driver finally stopped.  Mr. Bunch relates that he was attempting to take
pictures of the other vehicle's license plate when he gave chase.  It was
quite obvious to Mr. Bunch that the other driver was evading
responsibility.

He called 911 and about 20-25 minutes later, the police came.  He also
summoned his boss who also came to the scene about the time that the police
arrived.  He didn't get out of the vehicle but once to take pictures of the
other car.  When he stepped out, he held onto the door and took the
pictures and sat back in the vehicle.  He attempted to get out of the
vehicle when his boss arrived.  He summarily got dizzy and fell to the
ground.  He doesn't recall this but was reminded about the incident by his
boss.  He began noting pain and discomfort immediately. He experienced pain
about the head and neck.  His boss helped him deal with the police report.
His boss then transported him to Parkview Medical Center emergency
department.  He doesn't recall much of those events.

**Lincoln/Bunch 0749**

7C158190008

Page 3
BUNCH, Mark
05/03/18

He does not recall much of the trip to the emergency room.  However, when he got out of the vehicle to walk to the ED, he again lost his balance, got dizzy and fell.  According to his boss who told him later, several people assisted him up onto a wheelchair and into the emergency department room. He, again, has poor recollection of those events.

At the emergency room, he received diagnostics that included a CT of the head and neck.  He recalls having visual difficulties with the left eye. He recalls having difficulties dealing with the bright fluorescent lights. There were no lacerations to repair.  He was observed and eventually released after ~6 hours.  He does recall that there was some discussion as to whether they would admit him for observation.

His first medical assessment since the emergency room visit/collision was with his PCP, Dr. SW Olson. He relates that eventually the worker's compensation carrier admitted liability about 2 weeks after the injury. Dr. Olson referred him to see a neuropsychologist, Dr. Helfenstein.  He saw Dr. Helfenstein this morning.  A neuropsychologic testing is scheduled.  He asked for chiropractic care, but it hasn't been authorized yet.  He had asked for physical therapy, and it starts tomorrow with Centura Hospital in in Canon City, Colorado.  He relates that he is not driving, as he is disoriented with visual difficulties and with headache.

MEDICAL RECORDS REVIEW:
02/23/2018:  Dr. SW Olson, PCP: Follow-up from a car accident; did not have loss of consciousness; did have head trauma with some vision changes and balance/coordination issues; CT scan at that time was negative; diagnosed with a concussion; speech fluent; positive Romberg's; cranial nerve exam unremarkable other than difficulty tracking; eye movement was intact but he is not fluidly tracking; blood pressure 150/90; diagnoses were traumatic brain injury without loss of consciousness with cranial nerve impairment, balance problem; referred to neurologist; MRI of the brain ordered

03/21/2018:  MRI of the brain: White matter disease possibly from multiple sclerosis; white matter lesion showed perpendicular pattern suggesting demyelinating white matter disease from MS; the sinuses and mastoids were clear; no evidence of hemorrhage

04/13/2018:  Dr. SW Olson, PCP: Seen for TBI; had significant eye findings but those had resolved; a referral for neurology to evaluate was considered;

**Lincoln/Bunch 0750**

7C158190008

Page 4
BUNCH, Mark
05/03/18

Referrals were made for chiropractic care and physical therapy for chronic neck pain; he continued with headaches and neck pain; MRI of the brain was done showing some white matter change possibly MS; no history of neuro deficits before the trauma; 180/122..82..95% O2 on room air; BMI 31.7; prescribed extra strength Tylenol and Flexeril

## PAST MEDICAL HISTORY:
Surgical history is positive for a 1970 tonsillectomy and a 2017 umbilical hernia repair. Past medical history is positive for a bout of pneumonia around 2004 for which he denies any ongoing sequela. THERE IS A KNOWN DRUG ALLERGY TO PENICILLIN. His present medication is over-the-counter Tylenol. He takes no nutritional or herbal supplements.

## PRIOR INJURIES:
He relates of fracturing his right fingers and ankle in 2004 and in 2007. He denies any prior motor vehicle collisions that required treatment. He denies any prior work-related injuries. He denies any prior traumatic brain injuries or loss of consciousness.

## SOCIAL HISTORY:
Smoking history is negative. He denies ever being treated for drug or alcohol problems. He is engaged to be married. Education history is a BS in Communications and a Master's in Business. He is a native to the Canon City, Colorado area. Prior hobbies included target shooting, ATV riding, and movies. With respect to exercise, he did none regularly but relates that his work involved a lot of walking.

## OCCUPATIONAL HISTORY:
Occupationally, he has been involved in some form of sales for years. He also worked in a long-term care facility for years.

## REVIEW OF SYSTEMS:
Mr. Bunch has completed a clinical pain picture diagram. He identifies pain and discomfort about the head, left scapulothoracic area, left upper hip, left elbow, and left thumb. He identifies numbness and tingling sensations about the dorsum of the left hand and the back of his head.

On a symptom checklist, the following are identified: Dizziness; headaches; muscle cramps; depression and nervousness; nausea; recent change in vision with blurred vision and photophobia; sonophobia with ringing in the ears; marked tiredness; trouble falling and staying asleep; and mood swings with panic attacks. He relates of headaches and neck and back pains.

**Lincoln/Bunch 0751**

7C158190008

Page 5
BUNCH, Mark
05/03/18

He relates of sensitivity to fluorescent lights not only from their brightness but also from the sound.

A neuropsychologic symptom screening was reviewed and positive for the following:

    Change in sense of taste and smell
    Headaches
    Ringing in the ears
    Change in vision with difficulty focusing, double vision or blurred
        vision and problems seen at night
    Changes in sensitivity to sound and light
    Sense of weakness of the left side
    Dizziness that is better presently than initially
    Fatigue, described as rapid onset with mild activity
    Numbness and tingling sensations of the left hand and neck/head
    Disrupted sleep patterns with only 1 hour of sleep continuously
    Difficulty remembering things
    Problems with attention
    Distractibility particularly with noise
    Trouble finding the right words, but this has improved since
        initially
    Difficulty with arithmetic
    Irritability and less patient

He denies any hearing changes, excessive energy, coughing, trouble breathing, vomiting, problems with handwriting, or weight loss.

He relates that his headache is constant. He denies having headaches prior to the MVC. He relates that physical and emotional stressors may worsen the headache. The headache is about the forehead but will generalize about the head. He relates of tunnel vision when the headache gets bad enough. He is sensitive to sound and light. Bright lights and loud sounds will aggravate the headache. He describes the pain quality of the headache as throbbing. He did have nausea with the headaches soon after the accident but not so now. He does relate of dizziness with the headaches. He does experience nasal stuffiness.

PHYSICAL EXAMINATION:
Mr. Bunch is a 54-year-old, Caucasian male that is in no acute distress, but he is quite uncomfortable with his headaches and neck discomforts. He is accompanied by his significant other. He shows me pictures of his head and face that were taken within the hour of the collision. He has a positive Romberg's sign in that he falls to the back rather readily.

**Lincoln/Bunch 0752**

7C158190008

Page 6
BUNCH, Mark
05/03/18

He cannot recognize a pencil being in the center of his vision when coming from the periphery of either side. He has difficulty tracking, particularly to the right horizon, but the eyes do move in all directions. Pupils are equal and reactive to light. He puffs his cheeks symmetrically, and his smile is symmetrical and can shrug his shoulders symmetrically. Tongue protrusion is midline. Blood pressure is 188/100. Heart rate is 87. Pulse oximetry is 97% O2 on room air. There is no pedal edema. Heart is of regular rate and rhythm with a 1/6 systolic ejection murmur heard best at the mid-sternal and fifth intercostal space. Lungs are clear to auscultation. There are no carotid bruits. Backward extension of the head results in dizziness. He is diffusely tender about the cervical anterior and posterior musculature.

ASSESSMENTS:
History of a work-related motor vehicle collision
History of head trauma without loss of consciousness

Postconcussion sequala with spatial disorientation, imbalance, cervicalgia, headache, tinnitus, cognitive difficulties, and sound and light sensitivity

Cervical myofascial strain
Thoracic myofascial strain
Right thumb sprain

PLAN:
Mr. Bunch will return as soon as practical for a complete physical examination. In the meantime, I will referrals for him to see a neurologist and a neuro-optometrist. He is to attend to physical therapy. I hope to get a copy of the neuropsychologic report. I do not endorse him to drive; hence, he cannot attend to his usual duties at work.

Thomas W. Higginbotham, DO, FAADEP
Board Certified, Occupational Medicine

cc:   Mr. Bunch
      Dr. SW Olson
      Neurologist
      Neurooptometrist
      WC carrier
      Atty. Shakeshaft      *via email 5/3/18 E mtm*

Encl:   Clinical pain diagram

**Lincoln/Bunch 0753**

7C158190008



Lincoln/Bunch 0754

7C158190008

BUNCH, Mark                                                                MVC
05/10/18
DOB:

S:   Mr. Bunch returns for a second visit.   He is accompanied by his
     significant other.   The new patient evaluation report was reviewed,
     and a correction was made under work duties on page 1, noting that he
     does very little in the way of lifting or carrying.

     He still describes headache and neck pain, visual difficulties,
     imbalance and dizziness and cognitive issues such as forgetfulness
     and word finding.   He denies any radicular component into the upper
     extremities.

     He is still pending the neurology and neuro-optometry consults.

     He has questions about work restrictions.

O:   His visual perception of objects is grossly not centered.   He has
     difficulty with gaze to his right.   He still has a positive Romberg's
     sign.   There is palpatory tenderness about the suboccipital, scalp
     and cervical paraspinal musculature.   Deep tendon reflexes are
     symmetrical.

A:   History of a work-related motor vehicle collision
     History of closed head trauma with visual spatial disorientation,
            posttraumatic headache and cognitive sequela
     Cervicalgia
     Cervical strain without signs of radiculopathy

P:   Counseling was offered with strategies to minimize frustration and
     anxiety with respects to his cognitive difficulties.

     I recommended a trial of triple drug combination of an anti-
     inflammatories and muscle relaxant of betamethasone 0.75 mg,
     methocarbamol 210 mg and indomethacin 25 mg to use one a night for
     the next 3 nights and then every 3 nights thereafter.   I reviewed its
     use, indications and side effects.

     I completed a WC 164 form.   I provided him with a prescription,
     noting he is unable to return to work in any capacity for 1 month
     until further evaluation.

Thomas Higginbotham D.O.

**Lincoln/Bunch 0755**

7C158190008

BUNCH, Mark                                                    **WC**
05/22/18
DOB:

S:    Mr. Bunch returns for follow-up evaluation of injuries related to a
      work related motor vehicle collision.  He denies any new trauma.  He
      has been attending to physical therapy.  He notes that the triple
      drug combination of betamethasone-Robaxin-indomethacin has been
      helpful and would like a refill prescription if possible.  He has
      been resting and doing general self-care stretch exercises.

      We are still awaiting authorization for neuro-optometry and neurology
      consults.  He drove himself to this visit.

O:    Body habitus remains the same.  He is alert and oriented. Sitting
      tolerance is reasonable. Gait and stance seem unremarkable. Sitting
      tolerance is reasonable. Hydration is adequate.

      He seems to be more cogent today.  He has negative Romberg's
      maneuver.  Balance is reasonable.  He is still with a midline shift
      on testing but somewhat improved. Cervical range of motion is still
      quite limited with sharp pain about the left mid cervical area
      radiating into the left scapulothoracic area.  Deep tendon reflexes
      are symmetrical. He has negative Spurling's maneuver.

      With his consent, osteopathic manipulative therapy was performed to
      the cervical, thoracic, upper rib, and upper quadrant areas using
      combination of soft tissue and vertebral mobilization.  He responded
      quite well. He had better range of motion of his neck after the
      treatment and felt that his headaches were lessened.

A:    Posttraumatic headache G44.309
      Muscle tension headache G47.3
      Closed head injury with sequela S06.2XXD
      Visuospatial disorientation H 53.30
      Cognitive changes, unspecified R 41.89
      Cervicalgia M54.2
      Cervical strain S16.1XXD
      Thoracalgia M54.6
      Thoracic strain S23.5XXD
      Osteopathic segmental and somatic dysfunction of the cervical spine
            M9901
      Osteopathic segmental and somatic dysfunction of the thoracic region
            M9902
      Osteopathic segmental and somatic dysfunction of the rib cage M9908

**Lincoln/Bunch 0756**

7C158190008

Page 2
BUNCH, Mark
05/22/18

P:    He remains off work as previously identified.

Self-care strategies were reviewed including strategies to help him
with his cognition and particularly involving his work as a customer
service representative. I also emphasized auto-massage techniques.

I refilled the betamethasone 0.75 mg, Robaxin 215 mg and indomethacin
25 mg, #10 to use one every other night. I asked that he return to
see me in 1-2 weeks. He is to coordinate with his attorney to
facilitate referrals to the neuro-optometrist and neurologist.

Thomas Higginbotham D.O.

Lincoln/Bunch 0757

7C158190008

**WC-MVC**

BUNCH, Mark
06/05/18
DOB:

S:    Mr. Bunch returns for further evaluation and treatment for injuries
stemming from a work-related motor vehicle collision.    The injury
occurred on 02/13/2018.    His first visit with myself was on
05/03/2018.  This is his third follow-up visit.  He is accompanied by
his fiancée.

In the interim, I received from his attorney those medical records
from Parkview Medical Center involving an ED visit of 02/14/2018 at
about 1 AM.

From my initial visit, he raised concerns for post-concussion
syndrome with visual spatial disorientation and cognitive and
behavioral concerns.  Based on the initial exam, he was referred for
neuro-optometry and neurology consults.

A number of issues have evolved since he was seen on 05/22/2018.
First, the claims adjuster stopped all involvement on his claim.
This seemingly was based on me not being recognized by the claims
adjuster as an authorized treating provider.  This is in part based
on confusing his primary care provider, Dr. Olson, with the workers
compensation provider also by the name Dr. Olson.  Unfortunately, his
temporary total disability wage protection was stopped, as well as
the appointments for the neuro-optometrist and neurologist.
Apparently, his attorney got involved and, as of this date, the
misperceptions and mismanagements have been corrected.
Unfortunately, the appointment for the neuro-optometrist now was
rescheduled for 07/23/2018.

Given his affective visual spatial disorientation stemming from
this motor vehicle related concussion, he cannot afford to wait
any longer.  I called and attempted to move the appointment up
earlier but, due to the neuro-optometrist's schedule, he is
booked that that far away, and is now 7th on the list for
cancellation.

Secondly, there apparently has already been video surveillance of Mr.
Bunch.  Apparently, he was driving about a half a mile from his home
to a grocery/retail store and back. I had recommended that he not
drive given his visuospatial disorientation and imbalance and
dizziness. Mr. Bunch relates that he needed food and personal items
and had no one to help him in a timely manner.  He also wanted to
test his ability to drive.

**Lincoln/Bunch 0758**

7C158190008

Page 2
BUNCH, Mark
06/05/18

He relates that he was successful with his errand but also relates
that he feels compromised with respects to safely operating a
vehicle.

I again recommended that he not drive, particularly for work, and
only for urgent issues and with caution that he drive otherwise. He
was driven here today through a contracted transportation service,
Coach Transportation Inc. Total miles was identified as being 96
miles.

Thirdly, Mr. Bunch and his fiancé feel victimized, affronted and
adversarial as a consequence of the claims adjuster's actions and the
private investigation.   Apparently, the claims adjuster wanted to
steer him to another provider for which he declined.

There is an undertow of distrust now.  I reviewed the mores of
the workers' compensation system.  I attempted to depersonalize
the claims adjuster's actions, noting that he is just doing his
job on behalf of his employer.  I emphasized the importance of
trying to get back on track and to be positive with his health
expectations.

On a good note, he does seem to be responsive to the anti-
inflammatories/muscle relaxant combination.  He did respond to last
visit's osteopathic manipulative treatment.  He still has evidence of
not visualizing items in the midline of his vision.   He still
demonstrates issues with imbalance, albeit slightly improved.  He
continues with headache and neck tension.  He continues with facial
pain.   He is having difficulty sleeping.   His fiancé notes
irritability.  He is attempting simple recollection strategies that
we have discussed previously.  He is attending to self-care with
auto-massage techniques and stretching.  He continues with physical
therapy.

I reviewed the ED notes of Dr. Wilson.
Blood pressures averaged ~180/120.  PERLA.  Speech pattern was
normal.  Coma scale was 15.  Patient denied visual changes.
Had dizziness and eye pain which resolved.   Left scalp
tenderness with mild abrasion noted; some left masseter muscle
tenderness noted; appeared to be developing a right periorbital
ecchymosis; noted cervicoparaspinal muscle tenderness; noted
normal gait with no ataxia and with no neuromotor or
neurosensory deficits of the upper or lower extremities.

**Lincoln/Bunch 0759**

7C158190008

Page 3
BUNCH, Mark
06/05/18

CT of the head and cervical spine revealed no evidence for any acute traumatic process. Noted the elevated blood pressures; was stable at discharge with diagnoses of concussion with closed head injury, dizziness, cervical strain, right periorbital ecchymosis and elevated blood pressure.

A:   History of a head trauma with
        Emotional and behavioral disturbance/changes F59
        Neurocognitive disorder G31.84
        Visual difficulties with spatial disorientation H53.30
     Cervicalgia
     Cervical strain
     Cephalgia, combination of myofascial tension and posttraumatic
     Situational adjustment reactions with anxiety and depressed mood

P:   Given that it has been almost 4 months since his injury and he persists with concussion sequela, I have asked that he attend to a neuropsychologic screening with considerations for cognitive behavioral therapy. I called and talked to Dr. Staudenmayer (303-758-8934/fax 303-736-4373) who is able and capable of evaluating him and, more importantly, he maintains a presence in Pueblo, Colorado, closer to Mr. Bunch's residence.

     To facilitate a quicker evaluation and likely treatment for the visuospatial issues, I wrote a referral to Dr. Blair (719-999-8404), neuro-optometrist. Dr. Blair also maintains a presence in Pueblo, Colorado. I left a message for Dr. Blair to discuss the referral.

     I completed a WC 164 form and identified no return to work until 07/04/2018. I've asked that he return in the next 1-2 weeks for directing treatment and evaluation and a course of osteopathic manipulative therapy. Several questions were asked and answered. Reassurances were given. (Time spent face to face with patient: 75 minutes)

Thomas Higginbotham D.O.

cc:   Mr. Bunch
      WC adjuster
      Dr. Blair
      Dr. Staudenmayer
      Atty. Shakeshaft

**Lincoln/Bunch 0760**

7C158190008

MVC/WC

BUNCH, Mark
06/19/18
DOB:

S:   Mr. Bunch returns for a follow-up visit for injuries stemming from a
     work-related motor vehicle collision.    He  was  last  seen  on
     06/05/2018.

     In the interim, I reviewed a short video and commented about that on
     a separate dictation.   I shared with him my follow-up conversation
     with the neuro-optometry's office and shared that dictation to his
     attorney for assistance in expediting this neuro-optometry referral.

     He denies any subsequent injuries.   We haven't heard regarding the
     referral for a neuropsych evaluation.   He continues with physical
     therapy and I received some notes from the therapist.   The therapist
     apparently concurs with my concerns of visuals vestibular disruption
     related to his head injury.   The therapist is working on strategies
     on helping Mr. Bunch.   My hope is to have a neuropsych evaluation and
     based on the findings, direct cognitive-behavioral therapy through
     early speech-language pathologist.

O:   On observation of walking in and about the exam room and with
     positive Romberg's maneuver and balance testing, there are still
     concerns with coordination and proprioception.   He still has a
     positive visual midline shift testing that regressed from the last
     visit and consistent with our initial visit.   He relates of having a
     fall in physical therapy when trying to attend to some balance
     exercises while under the care of the therapist.

     I took time discussing and recommending nutritional support for his
     condition.   I reviewed briefly the DOWC Medical Treatment Guidelines
     for Traumatic Brain Injury.   I noted that there is no consensual
     acceptance of specific nutritional supplements in the Guidelines and
     he likely will need to have to self-pay for these.

A:   Concussion with
          Emotional and behavioral disturbance/changes F59
          Neurocognitive disorder G31.84
          Visual difficulties with spatial disorientation H53.30
          Posttraumatic headache, not intractable G44.309
     Cervicalgia M54.2
     Cervical strain S16.1XXD

**Lincoln/Bunch 0761**

7C158190008

Page 2
BUNCH, Mark
06/19/18

P:   I am concerned about the delays in the initial referrals for
     neurology, neuropsychology, and neuro-optometry and cognitive
     behavioral therapy.

     His visual-spatial disorientation is concerning that I again have
     recommended that he not drive unless absolutely necessary for urgent
     needs.

     He raised concerns about his ability to continue in his usual
     capacity with what he is experiencing presently.  He is about 17
     weeks past his motor vehicle collision.  He is not at MMI.  It is too
     early to assess permanent impairment but he does have concerns for
     such.

     I've asked that he return to see me in 1-2 weeks to continue review
     of self-care strategies, monitor his progress, and await
     authorizations for the referrals. (Time spent: 40 minutes with 100%
     of the time spent in face-to-face)

Thomas Higginbotham D.O.

Cc:   Mr. Bunch
      Atty. Ken Shakeshaft
      Landon Wallis, Adjuster

**Lincoln/Bunch 0762**

7C158190008

BUNCH, Mark                                                    WC MVA
07/03/18
DOB:

S:     Mr. Bunch returns for a follow-up visit after last seeing him on
       06/19/2018. He is about 30 minutes late for his appointment, and he
       is frustrated with the tardiness of the prearranged driver.

       He relates that when he gets stressed, his headaches worsen and he
       gets tunnel vision. He denies any of these complexes happening prior
       to his motor vehicle collision. He relates that he rarely took an
       Advil perhaps only after many hours of working hard in his property.

       I relayed the gist of the SAMMS conference on 06/22/2018.
       Unfortunately, my recommendations for a neurologist, a neuro-
       optometrist and a neuropsychologist/psychologist has not happened to
       date. He was able to get the rescheduled appointment for the other
       neuro-optometrist earlier on 07/16 instead of 07/26. The initial
       referral was made on 05/03/2018.

       He is attending to physical therapy and they are doing balance
       exercises. He has also not heard about the speech therapy referral.

O:     He is with photosensitivity and the office blinds were brought down
       in to minimize the light. He holds his head in his hands,
       complaining of a throbbing headache. His gait is slightly unsteady.
       He cannot attend to left-sided finger-to-nose testing even while
       watching the finger. He still persists with a midline visual shift
       on testing. The Romberg's testing is improved in that he doesn't
       fall readily backwards, but he does rock and reel and must catch
       himself a couple times during the 10 second test.

       I reviewed Dr. Hellfenstein's report, and it is likely invalid
       because of his visual difficulties, headaches and inability to
       concentrate and focus. I believe these issues were brought up by Dr.
       Helffenstein. I believe the respondent attorney finds the word
       'invalid' as meaning something else. Probably the basic premise that
       a neuropsychologist is to understand the nature of the medical
       conditions that are present when evaluating a person for
       neuropsychologic sequela from a head injury.

       When I provided Mr. Bunch with something to read, he can't see it
       very well, complaining of double vision and blurred vision and moves
       the paper and his neck in angles in order to see it and, even when he
       sees it, he cannot maintain his glance but for a couple seconds.

**Lincoln/Bunch 0763**

7C158190008

Page 2
BUNCH, Mark
07/03/18

I cannot imagine him attending to detailed questioning of validity testing, let alone psychometric testing with his visual difficulties.

A:    Concussion with
      Emotional and behavioral disturbance and changes F59
      Neurocognitive disorder G 31.84
      Visual difficulties with spatial disorientation H53.30
      Cervicalgia M 54.2
      Cephalgia, posttraumatic and intermittently intractable G 44.311

P:    I will contact his attorney regarding the status of these referrals.

      I described a potential worker's comp scenario in an attempt to prepare him.  This is a possible scenario whereby the adjuster and the respondent attorney doubt his veracity enough to schedule a flurry of independent medical evaluations that will no less discredit him and all involved.  Only to run months later an ALJ undoubtedly will rule in his favor because of how these circumstances prevail. He needs to get his finances in order and prepare his fiancée for this as well.  I invited his fiancée to his next visit.

      I reiterated self-directed strategies.  I would like to see him again in 2 weeks, the day or so after his neuro-optometry evaluation.

Thomas Higginbotham D.O.


cc:   WC carrier
      Atty. Pollart
      Atty. Shakeshaft
      Dr. Saxerud

**Lincoln/Bunch 0764**

7C158190008

BUNCH, Mark                                                                        MVC/WC
07/17/18
DOB:

S:    Mr. Bunch had his neurooptometry evaluation yesterday.    He was
      provided corrective lenses and other measures for his vision
      difficulties.    I await the neurooptometrist's report.    He has noted
      marked improvement with the corrective lenses already.    In fact, last
      night and this morning, he was able to watch the news on TV.    He has
      not been able to focus well enough to watch TV since the accident.
      He has avoided reading because of visual difficulties.    This, no
      doubt, affected his initial neuropsychologic testing which was
      invalidated. This may have led to misinterpretation by respondent
      attorney. It is important for a neuropsychologist to fully appreciate
      any medical conditions that may affect testing measures.

      The previous video surveillance capturing him driving 0.4 miles from
      his home did not entail him going to a grocery store or to a pawn
      shop but rather to the car repair shop to discuss further details on
      repairing his vehicle.    He apparently was told by the
      neurooptometrist not to drive.    There is a follow-up appointment in
      one month.

      He is more alert and oriented today.    Headaches seem to be improved.
      He still has neck stiffness and discomfort.    He still is undergoing
      physical therapy.

      We have not heard from the referral for speech therapist for
      cognitive behavioral therapy for his head injury or the
      neuropsych/psychologist evaluation.    I placed a call in to his
      attorney asking for the status of these referrals; we have been
      playing phone tag in the last day or so.

      Mr. Bunch still relates of sensory overload with photosensitivity and
      with motion resulting in headache and dizziness.

O:    With the corrective visual measures, his vision is in the midline and
      much improved.    He was observed unknowingly, walking from the waiting
      room to the exam room and back without swaying or bumping into items.
      In fact, he was able to gaze to his right at a picture on the wall
      and maintain a straight course for the few paces.    This is something
      he had not been able to do before the corrective measures.

      Romberg's maneuver is equivocal now.    He is able to maintain the
      posture longer but still has a sense of falling backwards.    Tandem
      gait with heel-to-toe is improved but still marginal.

**Lincoln/Bunch 0765**

7C158190008

Page 2
BUNCH, Mark
07/17/18

Cervical range of motion is limited and with palpatory tenderness about the paraspinal, suboccipital and scalp musculature as well as about the suprascapular regions bilaterally.  Deep tendon reflexes are symmetrical.  He has negative Spurling's maneuver.

A:    History of closed head injury with,
            Neurocognitive disorder, improved G31.84
            Emotional/behavioral disturbance and changes, improved F59
            Visual difficulties with spatial neglect and disorientation
            with early improvement with corrective lenses H53.30
       Cervicalgia M54.2
       Cervical strain S16.1 XXD
       Cephalgia, posttraumatic and intermittent in improved G 44.311

P:    I hope we can get on track with referrals for neuropsych, psychologist and speech therapy.  He is to continue with the physical therapy.  He is precluded from work as he is precluded from driving. He will follow up with the neuro-optometrist in one month.

       Upon his queries, we discussed MMI, impairment, and disability issues.  Self-care strategies were reviewed.  I encouraged that he continue with the memory improving exercises we've discussed over our visits.

Thomas Higginbotham D.O.

CC:    WC Adjuster
       Atty. Pollart
       Atty. Shakeshaft

**Lincoln/Bunch 0766**

7C158190008

BUNCH, Mark                                                          WC
09/11/2018
DOB:

S:    Mr. Bunch returns for follow-up for injuries stemming from a work-
      related motor vehicle collision.  He denies any new trauma.  He has
      not been driving.

      He saw Dr. Staudenmeyer yesterday, and I have his report.  He sees
      the neuro-optometrist, Dr. Saxerud, tomorrow.  We have not heard from
      the WC carrier for authorization for the neurologist or for the
      speech language pathology consults.  Apparently, physical therapy was
      discontinued because of nonpayment.  He had improved with his balance
      from their treatment.  He has transitioned to chiropractic care which
      has been helpful for his cervical complaints.

      He feels that the intermittent use of Buspar has been helpful for his
      anxiety experiences.

O:    His body habitus remains the same.  He is polite and cooperative.  He
      is alert and oriented.  Mood and affect give the sense of an
      undertone of frustration.  While observed, his gait and stance are
      abnormal.  His body posture is such that his head and shoulders are
      forward-rolled, and he tilts his head to the right and has an unsure
      gait with listing to the left.  He did lightly brush against the
      hallway while walking to the treatment room.  Pivoting gives a sense
      of imbalance.  Although improved, Romberg's maneuver still is
      positive with falling backwards.

      Vision is still difficult with blurred vision and, again, with
      reading a document, he must cover his left eye and hold the document
      at arm's length to read it.  He again did not see an object
      accurately in the midline of his vision.  When reaching to grab an
      object, he swings his arm far to the periphery before coming to the
      object instead of directly reaching towards it.

      Neck range of motion on gross observation is improved but not full.

A:    History of head injury S06.2X0D
      Imbalance R26.2
      Visual spatial disorientation/neglect H53.30
      Cervicalgia, improved M54.2
      Posttraumatic cephalgia, improved G44.309
      Cervical strain, improved S16.1XXD
      Adjustment reactions with anxiety and frustration F43.22

**Lincoln/Bunch 0767**

7C158190008

Page 2
BUNCH, Mark
09/11/2018

P:  He is still unsafe to drive. I anticipate a corrective measure with his lenses at the neuro-optometry visit tomorrow.

I've asked that he continue with the psychologic evaluations and treatment. He would benefit from further vestibular therapy. A prescription was provided. I've asked for a speech-language pathology consult as he has some difficulty with word finding and stammers with his voice and still has manifestations of cognitive difficulties. I am still requesting a neurology consult for any other evaluation and treatment considerations.

No medication changes were made. He uses the Buspar once every 2-3 days. Self-care strategies were reemphasized. A WC 164 form was completed.

Thomas Higginbotham D.O.

Lincoln/Bunch 0768

7C158190008

BUNCH, Mark                                                              WC
11/06/18
DOB:

S:    Mr. Bunch returns for follow-up for his worker's compensation claim.

In the interim,
He had seen the neuro-optometrist on 11/02/2018 and further
adjustments were made which seems to have offered early improvement.
He has a follow-up appointment on 11/28/2018

He had a speech therapy evaluation last week with an initial
treatment session scheduled for on 11/09/2018

He followed-up with the neurologist on 12/26/2018 with notable
improvement with sleep from the prescribed nortriptyline; initial
evaluation is still pending;

He has a follow-up appointment scheduled with the psychologist, Dr.
Staudenmeyer, on 11/12/2018 with notable improved treatment
relationship

He has continued chiropractic care with Dr. Christiansen with latest
treatment performed early this morning at treatment frequency of once
a week with notable improvement in cervical and left shoulder
conditions

He had Independent Medical Examination performed by Dr. Lesniak on
09/18/2018 which I have not yet reviewed in its entirety.

He had seen Dr. Polanco and his report is still pending.

O:    His body habitus remains the same. He is oriented ×4. His alertness
is not as sharp as it had been since around June. Psychologically he
has decompensated since June with posttraumatic stress features. His
speech is slow and quiet with an episode or two of some stammering.
This is not related to his traumatic brain injury but more so to
psychologic stress reactions. Gait is still off but somewhat
improved. He still has evidence of midline vision shifting but
somewhat improved with present corrective measures. Romberg testing
is still met with falling backwards. Sitting tolerance is
reasonable. Postural obliquities still evident with an extensively
forward held head in resting posture. 175/110_ 94_ 95% O2 on room
air; thoracic expansion is fair; there is no pedal edema.

**Lincoln/Bunch 0769**

7C158190008

Page 2
BUNCH, Mark
11/06/18

A:    History of a motor vehicle collision with facial/head trauma
      TBI with
              adjustment disorder with depressed mood F06.30
              emotional and behavioral disturbance/changes F59
              neurocognitive disorder G31.84
              visual difficulties with spatial disorientation H53.30
      Posttraumatic stress disorder

P:    He is now on track with speech/cognitive and vestibular therapy.   He
      will continue with chiropractic care.    He is to follow-up with
      specialty care as noted above.

      Cyclobenzaprine 10 mg, #30 was prescribed to take one at night along
      with the nortriptyline.

      Reassurances were given. I've asked that he return in 2 weeks for
      follow-up.



Thomas Higginbotham D.O.

ADDENDUM:
I referred him to his PCP for management of his hypertension.    In the
interim of seeing his PCP, I prescribed clonidine 0.1 mg to take twice a
day for his elevated blood pressure; #30.   I prescribed Micardis 20 mg once
a day to begin tomorrow.   He is to call back in 1-2 days to inform me how
he has been feeling with the blood pressure medications.

Lincoln/Bunch 0770

7C158190008

# Occupational
# And
# Environmental Health Services

Thomas W. Higginbotham, DO
Board Certified,
Occupational And
Environmental Medicine

November 20, 2018

Kenneth Shakeshaft, Esq.
1935 Jamboree Drive, Suite 202
Colorado Springs, CO 80920

RE:   Mark Bunch
      DOB:

Dear Atty. Shakeshaft:

I received your letter of 11/20/2018. A correction is necessary from a visit note generated by myself on 05/26/2018. I commented that Mr. Bunch drove himself to his appointment with me.

It is obvious that he did not drive himself to this appointment. You provided evidence to the contrary. He had transportation arranged by the insurance company on that day.

Please accept this letter as a correction that Mr. Bunch did not drive himself to that appointment. I apologize for any inconveniences.

Sincerely,

Thomas Higginbotham D.O.

1430 South 21st Street, Suite 101
Colorado Springs, CO 80904
(719)260-8190
FAX: 260-6086

Lincoln/Bunch 0771

APR-24-2019(WED) 09:49    DR HIGGINBOTHAM              (FAX)115 EOU 0000    7C1581900068UL:003
Rx Jale/Time    APB-23-2019(TUB) 08:49                                         P.002

Apr 23 2019 11:53:26 EDT Liberty Mutual Insur.        HS68 1523921621-886-1    Page 882 OF 884



Liberty Life Assurance
Company of Boston, a Lincoln
Financial Group company

Group Benefits Disability Claim
P.O. Box 7206
London, KY 40742-7206
Secure Fax 866-841-1415

April 23, 2019

Thomas Higginbotham DO
1430 South 21st Street, Suite 101
Colorado Springs, CO 80904
By fax: 719-260-6086

Re: Disability Benefits
Claimant Name: Mark Bunch
Claimant DOB:
Claim Number: 8220685

Dear Dr. Higginbotham:

Thank you for taking my call earlier today. I am the physician who was asked by Lincoln Financial Group to review the medical records Mr. Bunch submitted in support of his request for disability benefits. I appreciated the chance to speak with you and I'm writing to summarize my understanding of our conversation. My questions, and your responses, were:

*Q1.    Did you see this patient between 08/13/18 and 02/18/19?*
A1.     No. I saw him as part of a contested workers compensation claim. My understanding was that the claim had settled, the patient could not return to work, and he was applying for disability, Social Security ~~items~~ *~~Ned~~ 2-11/20/18 3 11/6/2018*

*Q2.    Have you seen this patient since 02/19/19?*
A2.     No. I had conferences with the attorney in November and December 2018. And, I saw the patient on 02/19/19 for a report, ~~I think~~ for his Social Security disability claim.

*Q3.    Your 02/19/19 report lists recommendations for vestibular therapy, occupational therapy, and physical therapy. Has the patient gone on to see these therapists?*
A3.     I don't know.

*Q4.    The patient is off work based on postconcussion syndrome. The records that were sent to the insurer consist of the PCP notes, some physical therapy notes for a neck strain per the PCP, your notes, some chiropractic notes, and two neuropsychological evaluations, each deemed invalid. Typically, if someone is severely impaired by postconcussion syndrome, the expectation would be that they'd see a neurologist, undergo diagnostic workup for their symptoms (vestibular, eye, etc.), and if the symptoms continue be seen at a headaches center, a tertiary care provider. The records that were sent to the insurer include no neurology evaluation, and no records from vestibular, vision, or other specialists.*
A4.     Many of the referrals got held up by insurance coverage issues. The patient had seen occupational medicine Dr. Frank Polanco, who treated this like he was doing an IME for the insurance company, and dismissed the patient. The insurer then started questioning further referrals. The

APR-24-2019(WED) 09:49    DR HIGGINBOTHAM          (FAX)115 260 0000    7C158190008'0J'00J
Rx Date/Time    APR-23-2019(TUE) 08:49                                              P.003

Apr 23 2019 11:54:05 EDT Liberty Mutual Insur    F: MSG# 1523921621-006-1 .    Page 003 OF 004

Re: Mark Bunch                                                          April 23, 2019
                                                                        Page 2

patient did see neurologist Dr. Brinley in Colorado Springs on 10/19/18, and she recognized he had
ongoing postconcussion symptoms and suggested vestibular therapy. I also have a paragraph that the
neuro-optometrist wrote on 11/21/18 stating the patient has perception problems. I think the
neuropsychological tests were compromised because the patient had vision and balance problems. *[handwritten]*

Q5.    *I understand the patient reports vision and balance problems. But, we've not received any vision test
result, balance test results, or records of treatment for vision or balance problems.*
A5.    It sounds like you need to gather those records.

Q6.    *The disability insurance company probably already asked the patient to provide all of the records. I'm
not sure how much more record gathering takes place at this appeal stage of the claim.*

To ensure that I have accurately summarized our conversation, please make any corrections or
comments to this letter if necessary, sign below in the space provided, and fax this letter to Lincoln
Financial at the toll free and secure return fax number (866) 841-1415.

Thank you for your help. Lincoln Financial is willing to reimburse you for any reasonable costs incurred
in responding to requests for information.

Respectfully yours,

-Electronically Signed-

Robert Swotinsky MD
Consulting Physician
Board Certified, Occupational Medicine
978 337 4479 c, 866 81 1415 f

___ No changes/comments, OR
_✓ With changes/comments as noted above

Thomas Higginbotham, DO          Date

*Please fax to 866 841 1415*

Enclosure: Signed release form

c.c. *[handwritten]* K. Shukarhaft

**Lincoln/Bunch 0773**

7C158190008

Bunch, Mark Bryan (MR # CEUL0963303) DOB:        Encounter Date: 02/27/2018

**Letter by Steven Wayne Olson, MD on 2/27/2018**



# Centura
# Health.®        CHPG PRIMARY CARE ST THOMAS MORE
CHPG PRIMARY CARE ST THOMAS MORE
## Referral to External Consultant

February 27, 2018

CSNA
2312 N. Nevada Avenue, Suite 100 Colorado Springs, CO 80907
719.473.3272
719.389.1191

Patient:      **Mark Bryan Bunch**
Date of Birth:
Date of Visit: **2/27/2018**

Dear CSNA:

I am referring my patient, Mark Bunch, to you for evaluation of **Traumatic brain injury, without loss of consciousness, subsequent encounter,Cranial nerve impairment, - Balance problem** .

He has a past medical history of Allergy; Bronchitis; Bunion; Pneumonia; and Umbilical hernia. His has a past surgical history that includes Tonsillectomy and Tonsillectomy (1970). He reports that he has never smoked. He has never used smokeless tobacco. He reports that he does not drink alcohol or use drugs.

He has a current medication list which includes the following prescription(s): acetaminophen, hydrocodone-acetaminophen, and tadalafil. He is allergic to penicillins.

I appreciate your assistance in his care and look forward to your findings and recommendations.

Sincerely,

Steven Wayne Olson, MD

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 5/18/18 4:48 PM        Page 1 of 6

**Lincoln/Bunch 0774**

7C158190008

Bunch, Mark Bryan (MR # CEUL0963303) DOB:    Encounter Date: 02/27/2018

**Assessment/Plan:**

**Problem List Items Addressed This Visit**
None

**Visit Diagnoses**
**Traumatic brain injury, without loss of consciousness, subsequent encounter** -
Primary
Relevant Orders
MR Brain without Contrast
Ambulatory Referral to Neurology

**Cranial nerve impairment**
Relevant Orders
MR Brain without Contrast
Ambulatory Referral to Neurology

**Balance problem**
Relevant Orders
MR Brain without Contrast
Ambulatory Referral to Neurology

Patient is here for follow up TBI. He has significant eye findings, namely coordination problems. He doesn't exactly have cranial nerve deficits. His eyes have full ROM but the coordination and smoothness of tracking is not present. Romberg also positive. Since the CT scan was negative and symptoms are perhaps worse, I am going to Order an MRI.

Follow up in 2 weeks.

25 minutes spent in patient encounter with 15 minutes spent face to face counseling physical activity, reviewing medications, chart review

**Subjective:**

Mark Bryan Bunch is a 54 y.o. male here for follow up car accident. The other driver reversed full speed and hit him. He did not have loss of consciousness. He had a head trauma with some vision changes and balance/coordination issues. CT scan at the time was negative. He was diagnosed with a concussion and sent home. No fevers, chills. No nausea, vomiting. He had no neurological problems before the car accident.

The following portions of the patient's history were reviewed and updated as appropriate: allergies, current medications, past family history, past medical history, past social history, past surgical history and problem list.

**Review of Systems**

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 5/18/18 4:48 PM    Page 2 of 6

**Lincoln/Bunch 0775**

7C158190008

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 02/27/2018

**General:** No fevers, chills
**Psychological:** Mood normal, no anxiety or depression
**ENT:** Denies sore throat, ear pain, hearing changes
**Respiratory:** Denies cough, shortness of breath, wheezing
**Cardiovascular:** No chest pain, peripheral edema, palpitations
**Gastrointestinal:** Denies abdominal pain, constipation, bloody stools
**Genito-Urinary:** Denies incontinence, dysuria
**Musculoskeletal:** joint aches in back, shoulders, knees
**Neurological:** headaches, balance problems, vision changes.
**Dermatological:** Denies rashes, lesions, pruritis

**Objective:**

**EXAM:**

**Vital Signs**
| | |
|---|---|
| BP | 150/90 |
| Pulse | 63 |
| Temp | 36.3 °C (97.3 °F) (Touch free) |
| Wt | 106 kg (234 lb) |
| SpO2 | 97% |
| BMI | 31.74 kg/m² |

| | |
|---|---|
| **General Appearance:** | Alert, cooperative, no distress, comfortable |
| **Lungs:** | Clear to auscultation bilaterally, respirations unlabored |
| **Heart:** | Regular rate and rhythm, S1 and S2 normal, no murmur |
| **Neurologic:** | Speech fluent, answers questions appropriately. Romberg positive. CN2-12 normal but he has difficulty tracking. Eye movement is intact but he is not fluidly tracking. |
| **Psych:** | Pleasant, cooperative, affect normal, judgement normal |

Current Outpatient Prescriptions:
• acetaminophen (TYLENOL) 500 MG tablet, Take 500 mg by mouth every 6 (six) hours as needed for mild pain., Disp: , Rfl:
• HYDROcodone-acetaminophen (NORCO) 7.5-325 mg per tablet, Take 1 tablet by mouth every 6 (six) hours as needed for moderate pain. Max Daily Amount: 4 tablets, Disp: 40 tablet, Rfl: 0
• tadalafil (CIALIS) 10 MG tablet, Take 1 tablet (10 mg total) by mouth daily as needed for erectile dysfunction., Disp: 10 tablet, Rfl: 3

Steven Wayne Olson, MD

**Lincoln/Bunch 0776**

RECEIVED  05/28/2018  03:05PM    7C158190008
2018/05/28 16:05:07    19 /42

**Parkview Medical Center**
**400 W 16th Street**
**Pueblo, CO 81003**
**719-584-4000**

**ED Physician Documentation**

Patient: BUNCH,MARK B
DOB:                    MRN: M000886127
Age: 54      Acct #: A00191377982
Sex: M       Loc: ED
Adm Date:
Disch. Date:

Admitting Physician:
Attending Physician:
PCP: Specified,None

Documenting Provider: David R Wilson

## Adult-HPI

**- Note Date & Time**
Note Date & Time: 02/13/18  2236

**- Gen Info/Blank HPI**
**Note(s):**

This is a 54-year-old male who presents after a motor vehicle accident. He was going about 15 miles per hour and the exit ramp, when some he stopped in front of him and then started to back up. He estimates the total force of occlusion was around 25 miles per hour. No airbags deployed, though he does not believe his vehicle has airbags. He was restrained, but hit hard enough that his head struck the steering wheel on the left forehead region. He denies loss of consciousness. Initially he felt like he had some blurred vision and maybe even some left eye pain, but this has resolved. When he first got out of the car, he felt like his equilibrium was off, like he has felt previously with sports injuries to the head. He no longer has that symptom. He does have a pounding headache. He denies and anticoagulate use. No history of hypertension in the past, although his blood pressures were noted to be ultimately high here. No other acute complaints. He denies chest or abdominal injury.
**Chief Complaint:** Motor Vehicle Collision
**Stated Complaint:** MVC/neck pain
**Time Seen by Provider:** 02/13/18 22:32
**Source:** Patient

**- Triage Note - View Only**
**Triage Assessment/Note - Documented by Nursing Staff:** pt presents after MVC around 1840. pt states a another backed into him going about 25mps. pt states hitting head on stearing wheel, denies LOC, pt states being dizzy after MVC. pt having left eye, neck/shoulder "muscle" pain. Pt denies visual changes, denies extermity numbness/weakness, nauses/vomiting.

## Adult-PMH

**- Past Medical History**
**Past Medical History:** PMH:  Oenies significant past medcial problems.  Social hx:  nonsmoker

1 of 4

**Lincoln/Bunch 0777**

RECEIVED   05/28/2018 03:05PM    7C158190008
2018/05/28 16:05:07    20 /42

BUNCH,MARK B
M000886127
A00191377982

### Adult-ROS

**- Review of Systems**
**Constitutional:** negative: Chills, Fever
**Neurological:** Dizziness - though the dizziness is now resolved, Headache.  negative: Fainting Spells
**Eyes:** Other - he was having some eye pain earlier but this has resolved.  negative: Photophobia, Pain
**ENT:** Other - some pain in the left jaw, which is now resolved other than tenderness over the left masseter muscle.  No chipped or loose teeth.

### Adult-Medical EXAM

CONSTITUTIONAL
Vital signs reviewed, Patient appears non toxic.
HEAD
        There is left scalp tenderness and a mild abrasion .  No cephalohematoma.
EYES
Pupils equally round and reactive to light, Extraocular muscles intact, Conjunctiva normal, Sclera normal.
No photophobia.  Anterior and posterior segments are unremarkable.  No evidence for hyphema or vitreous hemorrhage.
ENT
        MMM, No oral lesions.  Oropharynx is clear without tonsilar exudate.  No mandibular tenderness.
No tenderness over the maxilla or zygomatic arches.  There is some left masseter muscle tenderness.
There appears to be developing right periorbital ecchymosis.
NECK
Supple, no midline ttp.  No cervical adenopathy.  No JVD.  Paraspinal muscle tenderness bilaterally.
RESPIRATORY CHEST
        Breath sounds clear to auscultation bilaterally, No wheezing, No rales.  No crepitus or subcutaneous emphysema.  No significant tenderness to the chest wall.
CARDIOVASCULAR
        RRR, normal S1, normal S2, no murmurs, no rub, no thrills.
ABDOMEN
        Soft, nontender and non distended.  No guarding or rebound tenderness.
BACK
        No midline tenderness to palpation, range of motion normal, no costovertebral angle tenderness.
UPPER EXTREMITY
        Range of motion normal, Motor strength normal, Radial pulse normal.
LOWER EXTREMITY
        Range of motion normal, Motor strength normal, no cyanosis, no clubbing, no edema.  No palpable venous cords.
NEURO
        Awake, Alert and appropriate, Moves all extremities, Cranial nerves II-XII intact.  Normal gait.  No ataxia.
SKIN

Lincoln/Bunch 0778

RECEIVED  05/28/2018 03:05PM    7C158190008
2018/05/28 16:05:07    21 /42

BUNCH,MARK B
M000886127
A00191377982

Warm, dry and normal in color, no rash.

PSYCHIATRIC
Normal affect, Mood appropriate.

### Infant/Child/Adult-Data

**- Vital Signs**
**Vital Signs:**

**Vital Signs (All)**

|  | Temp | Pulse | Resp | BP | Pulse Ox |
|---|---|---|---|---|---|
| 02/13/18 22:24 |  | 74 | 16 | 182/119 | 95 |
| 02/13/18 20:05 | 98.3 F | 76 | 18 | 205/119 | 97 |

**Vital Signs - 12 hr**

|  | Temp | Pulse | Resp | BP | Pulse Ox |
|---|---|---|---|---|---|
| 02/13/18 22:24 |  | 74 | 16 | 182/119 | 95 |
| 02/13/18 20:05 | 98.3 F | 76 | 18 | 205/119 | 97 |

### Infant/Child/Adult-Doctor Note

**- ED Course**

This is a 54-year-old male who presents after a motor vehicle accident that is fairly low mechanism. He did strike his head, and had several neurologic symptoms such as blurred vision and dizziness, which is now resolved. This does seem consistent with concussion. CT of the head and cervical spine were performed revealing no evidence for any acute traumatic process. The patient was doing better. He was given acetaminophen for his headache, and we discussed concussion precautions, which she will be given. His blood pressures were elevated, but with the recent trauma, the headache, and being in the emergency department, I do not feel that immediate treatment with antihypertensives would be beneficial. I instructed the patient that this was very important to follow-up within one week with his primary care physician to have this rechecked and to initiate treatment of his blood pressures remained high. He verbalized understanding.

He was comfortable with the plan and stable at discharge.

**- Attending**
**Agree Statement:**

***ED Physician Scribe Agree***

Scribe documentation is identified by corresponding username and ID. Identified user acted as a scribe only, under the direct supervision of the Attending ED Provider as identified by that provider's signature authenticating this record.
In the event of a discrepancy between the scribe's transcription and that of the Attending, it should

3 of 4

**Lincoln/Bunch 0779**

RECEIVED   05/28/2018  03:05PM   7C158190008
2018/05/28 16:05:07   22 /42

BUNCH,MARK B
M000886127
A00191377982

be understood that the attending's documentation is correct.

**Cosigned by:** David R Wilson

**Date:** 02/13/18 **Time:**2257

### Infant/Child/Adult-Diagnosis
**Diagnosis:** concussion with closed head injury
**Secondary Diagnosis:** cervical strain
**Additional Diagnosis:** right periorbital ecchymosis
**Additional Diagnosis:** elevated blood pressure
**Additional Diagnosis:** Status post MVA

### Infant/Child/Adult-Disposition

**- Departure**
**Follow up with::**
Specified,None [Primary Care Provider] -

<Electronically signed by David R Wilson MD>  02/13/18 2258

**4 of 4**

**Lincoln/Bunch 0780**

From:

Bunch, Mark Bryan (MR # CEUL0963303) DOB:

7C158190008
Encounter Date: 05/31/2018

# Bunch, Mark Bryan

MRN: CEUL0963303

**Treatment** 5/31/2018
St Thomas More Hospital
Outpatient Rehabilitation Dept

Provider: Ethan J Freedman, PT (Physical Therapy)
Primary diagnosis: Cervical pain (neck)
Reason for Visit: Referred by Steven Wayne Olson, MD

## Progress Notes

Ethan J Freedman, PT (Physical Therapist) • Physical Therapy

Expand All   Collapse All

**Centura Health.**

**St. Thomas More Hospital**
**Outpatient Rehabilitation**
**1338 Phay Avenue**
**Canon City, CO 81212**
**Phone: (719) 285-2000**
**Fax: (719) 285-2255**

### Physical Therapy Re-evaluation Note - Visit #5

Treatment date: 05/31/18

Time Calculation
Start Time : 1002
Stop Time : 1057
Time Calculation (min): 55 min

Precautions: driving restrictions.

**Assessment/Plan:**

In 3 wks, pt will:
1. Demonstrate safety and independence with HEP--met
2. Decrease pain at worst to 6/10--met
3. Increase ROM of cervical spine to <50% restricted and pain free--not met
4. Increase ROM of L shoulder to: flexion and ABD 0-160--not met
5. Decrease score on NDI by 9 points (22/50)--not met

In 6 wks, pt will:
1. Decrease pain at worst to 4/10--not met
2. Increase strength of B UE to 5/5--met
3. Increase ROM of cervical spine to <20% restricted and pain free--not met
4. Increase ROM of L shoulder to WFL--not met
5. Decrease score on NDI by 18 points (13/50)--not met

At this time, patient has only made improvements on B UE strength, and all other goals there
has been minimal progress.  Patient's re-evaluation shows inconsistent results with B UE
strength, visual tracking, and balance testing.  Will follow up with PCP and neurology specialist
to inquire as to POC in PT.  Requesting additional 6 visits to achieve PT goals.

**Subjective:**

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 6/13/18 8:10 AM                    Page 1 of 3

**Lincoln/Bunch 0781**

. .∴....

Bunch, Mark Bryan (MR # CEUL0963303) DOB:

7C158190008
Encounter Date: 05/31/2018

**Subjective**

Mark Bryan Bunch is a 54 y.o. male c/o acute on chronic L sided cervical pain, muscle restrictions post MVA.
Current pain rated at 4/10 and at worst since last session rated at 6/10. Patient reported improved symptoms but was very sore after last session.

**Objective:**

Cervical Scan:
Cervical spine ROM (in % restricted): flexion 25% with pain in posterior cervical spine, extension 25% with tightness; R side bending 25%, increased with overpressure and hold; L side bending 25% restricted and no increased pain with overpressure and hold; R rotation 50% restricted and increased sharp pain with overpressure and no change with holds; L rotation 25% restricted and no increased pain from overpressure and holds.
Neurogenic fatigue: Cervical retraction and protraction painful, with protraction > retraction; L scapular elevation painful and weak; all others WFL.
Compression/Traction: increased pain with compression in neutral and extension; tractions in neutral no increased pain.
Reflexes: 2+
Sensation: Intact to light touch sensation to B UE.
UMN: Hoffman's and clonus absent.
Dural testing: Cervical slump (-).
Posture: FHP
Shoulder ROM (in degrees):
L shoulder flexion 0-160 and tightness; ABD 0-142 no increased pain; IR WFL at 0*, 1" difference behind back; ER WFL at 0*, no pain at 90*.
B UE Strength: B UE 5/5 and pain free.
Palpation: severe TTP L lateral neck, C2-6, and ~T6.
Outcome Measures--NDI: Evaluation score on 5/4/18: 31/50=62%; Re-evaluation score on 5/31/18: 30/50=60%.
CN testing: H-testing showed smooth tracking, no impairment, convergence slightly delayed on L; saccades showed smooth and direct tracking with no impairment.
Balance: EO shoulder width apart, narrow BOS, tandem good; EC with all situations instantaneous and inconsistent LOB, with resistance when guarded. No attempt to self correct.

Patient completed following exercises:
UBE lvl 2 x6mins

Consider specific segmental cervical spine mobility, quadruped stabilization as indicated.

Referring Provider: Olson

Ethan J Freedman, PT

## Additional Documentation

Flowsheets:      PT Daily Treatment, PT Charges
Encounter Info:   Billing Info, History, Allergies, Detailed Report, Patient Education, Facesheet

## History

Not marked as reviewed during this visit.

Lincoln/Bunch 0782

From:

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                          7C158190008

                                                        Encounter Date: 05/31/2018

## Linked Episodes

PT cervical spine pain 2018 Noted 5/4/2018

## Orders Performed

Ambulatory Referral to Physical Therapy Closed

## Medication Changes

As of 5/31/2018 3:51 PM

None

## Visit Diagnoses

Cervical pain (neck) M54.2
Chronic neck pain M54.2, G89.29

Lincoln/Bunch 0783

From:

Bunch, Mark Bryan (MR # CEUL0963303) DOB:

7C158190008
Encounter Date: 06/04/2018

# Bunch, Mark Bryan

MRN: CEUL0963303

**Treatment** 6/4/2018    Provider: Ethan J Freedman, PT (Physical Therapy)
St Thomas More Hospital    Primary diagnosis: Cervical pain (neck)
Outpatient Rehabilitation Dept    Reason for Visit: Referred by Steven Wayne Olson, MD

## Progress Notes

Ethan J Freedman, PT (Physical Therapist) · Physical Therapy

Expand All    Collapse All

Centura Health.

**St. Thomas More Hospital**
**Outpatient Rehabilitation**
**1338 Phay Avenue**
**Canon City, CO 81212**
**Phone: (719) 285-2000**
**Fax: (719) 285-2255**

### Physical Therapy Daily Note - Visit #6

Treatment date: 06/04/18

Time Calculation
Start Time : 0920
Stop Time : 1000
Time Calculation (min): 40 min

Precautions: driving restrictions.

**Assessment/Plan:**

Patient significantly improved the lazer stabilization ability, but continues to not tolerate manual therapy well. Will follow up with PCP and neurology specialist to inquire as to POC in PT. Patient to see Dr. Higginbathom tomorrow (6/5/18).

**Subjective:**

**Subjective**

Mark Bryan Bunch is a 54 y.o. male c/o acute on chronic L sided cervical pain, muscle restrictions post MVA.
Current pain rated at 3/10 and at worst since last session rated at 5/10. Patient reported improved symptoms overall but was very sore after last session.

**Objective:**

Patient completed following exercises:
B UE 0.5kg ball CW/CCW circles 2x20ea.
Lateral band walks with lvl 2 tband x2 lengths
UBE lvl 3 x6mins
Lazer diode stabilization x1 ea:

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 6/13/18 8:10 AM      Page 1 of 2

**Lincoln/Bunch 0784**

From:

7C158190008

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 06/04/2018

Spiral balloon (improved from last session, but still requires more control at bottom of page); maze (improved ability to maintain center of maze); tracing lines (difficulty with curves more than diagonals).
Manual x10mins:
     Supine: cervical SOR, B trap stretches, STM of suboccipital mm.
MHP on thoracic and cervical spine x10mins

Consider quadruped stabilization as indicated.

Not today:
Lvl 2 tcord rows, extensions, and reverse flys 2x10ea.

Referring Provider: Olson

Ethan J Freedman, PT

## Additional Documentation

Flowsheets:      Travel and Exposure Screening, PT Daily Treatment, PT Charges
Encounter Info:    Billing Info, History, Allergies, Detailed Report, Patient Education, Facesheet

## Media

Electronic signature on 6/4/2018 9:18 AM
Electronic signature on 6/4/2018 9:18 AM

## History

Not marked as reviewed during this visit.

## Linked Episodes

PT cervical spine pain 2018 Noted 5/4/2018

## Orders Placed

None

## Medication Changes

As of 6/4/2018 11:04 AM

None

## Visit Diagnoses

Cervical pain (neck) M54.2

Lincoln/Bunch 0785

7C158190008


## CSNA
neurosurgery & neurology

## BUNCH, MARK B
55 Y old Male, DOB:
Account Number: 206490

Home:
Guarantor: BUNCH, MARK B    Insurance: w ESIS
PCP: STEVEN OLSON, MD    Referring: STEVEN OLSON, MD
Appointment Facility: Colorado Springs Neuro Assoc.

10/19/2018                                    Progress Notes: JULIA BRINLEY, DO

### Current Medications
**Taking**
- Flexeril 10 mg Tablet 1 tab tid

### Past Medical History
Bronchitis.
Hernia.
Pneumonia.

### Surgical History
Tonsillectomy
Hernia repair

### Family History
COPD.

### Social History
Alcohol Use
  Did you have a drink containing alcohol in the past year? No
  Points o
  Interpretation Negative
Tobacco Use
  Status Never smoked

### Allergies
penicillin: rash - Drug Allergy

### Review of Systems
General:
  no Fever. Fatigue yes. no Loss of appetite. no Significant weight loss. no Weight gain.
Dermatology:
  no Itching. no Redness. no Lumps. no Rash. no Skin cancer.
Endocrinology:
  no Excessive sweating. no Excessive thirst. no Temperature intolerance. no Lactation.
Neurology:
  Headache yes. Memory Problems yes. no Tremors. Balance difficulty yes. no Numbness. no Weakness. Speech problems yes. Dizziness yes. no Seizures.
Ophthalmology:
  Vision loss yes. Blurring of vision yes. Double vision yes.

### Reason for Appointment
1. Brain injury

### History of Present Illness

General:
  55-year-old gentleman who presents today for evaluation of traumatic brain injury. In February of this year he got an accident. Patient describes that the car in front of them was put in reverse and "stomped on the gas." He was hit rather hard in the front and he reports that he hit his head on the steering wheel. He did lose consciousness, unclear for how long. Directly after he reports that he could not see out of his left eye and it felt as though somebody pulled a shirt over his head. He did have a fall due to balance issue and he reports disorientation, confusion along with neck pain and headache. He did go to the ER for further evaluation and he was diagnosed with concussion and "something else." He has been working with Workmen's Comp. and overall he is undergone physical therapy, psychotherapy, vision therapy and has had neuropsych testing. He reports that overall he has gotten better but is not back to his baseline. He continues to have balance issues, headaches, memory difficulties in addition to speech difficulties and double vision. He is doing vision therapy and is currently wearing prism glasses through Dr. Saxerud. He continues to see a therapist to help with his significant mood symptoms which he feels as though has gotten better. Reviewed neuropsych testing that demonstrated postconcussive recovery with frontal lobe just executive function although there was also mention of symptom validity testing concerning for intentional lack of effort. He also continues to have headaches. He reports that these are bilateral temples, worse on the left side that will radiate everywhere. He also has radiation into his neck, more so on the left and is described as a throbbing pain. This is associated with light and sound sensitivity along with nausea but no vomiting. These are currently lasting 2-3 times per week and can be up to an entire day. His pain skills approximately a 5/10. He reports that he was tried on amitriptyline at one point but this made him feel "weird" and his skin crawl. He does report difficulty with sleeping both difficulty getting to sleep and staying asleep. It is recommended that patient receive massage therapy but he reports that this was never approved. There is also recommended the patient undergo speech therapy due to significant difficulty with communicating, the patient reports that again this was

http://192.168.60.253:9090/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.jsp?en...    10/31/2018

Sent to OC
11/08/2018
by PM LLC

**Lincoln/Bunch 0786**

7C158190008

**Hematology:**
no History of transfusion. no Easy bruising.
**ENT-Respiratory:**
no Hearing loss. Ringing in ears yes. no Shortness of breath. no Sleep apnea. no Cold and cough. no Change in voice. no Difficulty swallowing.
**Cardiology:**
no Chest pain. no Palpitations/irregular heartbeat. no Leg swelling. no History of heart attack. no Atrial fibrillation.
**Musculoskeletal:**
no Joint pain. no Joint swelling. no Joint stiffness. no Muscle aches.
**Gastroenterology:**
no Abdominal pain. no Heartburn. Nausea yes. no Vomiting. no Blood in stool.

**Psychology:**
Anxiety yes. no Depression. Sleep disturbances yes. no Hyperactivity. Attention Deficit yes.
**Genitourinary:**
no Difficulty urinating. no Urinary urgency. no Increased urinary frequency. no Urinary incontinence.

has not been approved yet. He denies any of these issues prior to his accident and states that he has never had a focal neurologic issue in the past. An MRI of his brain was done that demonstrated white matter disease, mild, that could be in a pattern compatible with multiple sclerosis.

**Vital Signs**
BP sitting 150/90 mm Hg, Pulse sitting 78, Respirations 16, Wt 230 lbs, Height 72 inches, BMI 31.19.

**Examination**
General:
    General pleasant, in NAD, thin, well-groomed.
    Eyes normal lids and conjunctivae, pupils reactive, grossly normal funduscopic exam.
    Back nontender to palpation.
    Respiratory clear to auscultation, good effort.
    Cardiovascular normal auscultation, normal carotid auscultation, no pedal edema.
    Musculoskeletal normal tone, no atrophy, no cyanosis or clubbing.
Neurological:
    Cortical Functions : normal attention span and concentration, normal recent remote memory, speech fluent although stuttering at times, comprehension and language intact, alert and oriented X 3, general knowledge and judgement within normal variation.
    Cranial Nerves : I - Not Tested, II - Pupils 4mms reacting briskly to 2 mms, No afferent pupil defect, III , IV, VI - EOM were full with normal pursuit and saccade, No ptosis or nystagmus, V - Motor V intact, Pinprick, light touch intact in all three divisons, VII - No asymmetry or weakness, VIII - Actuity intact to finger rub bilaterally, IX , X- Palate rose in midile, XI - Sternocleidomastoid, trapezius strength intact, XII - Tongue protruded midline w/o atrophy or fasciculations.
    Motor Strength :  V/ V bilaterally.
    Sensory : intact to light touch, temperature and vibration throughout.
    Reflexes : bilaterally symmetrical, babinski absent.
    Tremors : absent.
    Coordination : with finger to nose patient will often miss my finger by an inch bilaterally, often has to close one eye.
    Gait and Station : Romberg was positive, difficulty with tandem.

**Assessments**
1. Post-concussional syndrome - F07.81 (Primary)
2. Intractable chronic migraine without aura and without status migrainosus - G43.719
3. Diplopia - H53.2
4. Other symptoms and signs involving appearance and behavior - R46.89
5. Other symptoms and signs involving cognitive functions and awareness - R41.89
6. Insomnia, unspecified type - G47.00
7. Imbalance - R26.89

Patient: BUNCH, MARK B   DOB:          Progress Note: JULIA BRINLEY, DO   10/19/2018
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

http://192.168.60.253:9090/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.jsp?en...   10/31/2018

Sent to OC
11/06/2018
by PM LLC

**Lincoln/Bunch 0787**

7C158190008

**Treatment**
**1. Post-concussional syndrome**
Start nortriptyline capsule, 10 mg, 1 to 2 cap(s), orally, qd as directed,
30 day(s), Refills 2
    PROCEDURE: Speech therapy

**Follow Up**
2 Months

Electronically signed by JULIA BRINLEY on 10/31/2018 at
08:55 AM MDT

Sign off status: Pending

---

Colorado Springs Neuro Assoc.
2312 N. Nevada Avenue
Suite 100
Colorado Springs, CO 809075307
Tel: 719-473-3272
Fax: 719-389-1191

Patient: BUNCH, MARK B    DOB:                Progress Note: JULIA BRINLEY, DO    10/19/2018

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

http://192.168.60.253:9090/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.jsp?en...    10/31/2018

Sent to OC
11/06/2018
by PM LLC

**Lincoln/Bunch 0788**

7C158190008

Penrose Hospital                                  Bunch, Mark Bryan
2222 N Nevada Ave                                 MRN: CEUL0983303, DOB:          Sex: M
COLORADO SPRINGS CO 80907                         Visit date: 4/24/2019

**04/24/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services**

Notes

Progress Notes

Carolyn K Lyon, CCC-SLP at 4/24/2019 12:40 PM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO 80907
719-776-5200 (P)
719-776-5392 (F)

**Daily Speech Therapy Treatment**

**General:**
Time Calculation
Start Time: 1240
Stop Time : 1320
Time Calculation (min): 40 min
Visit # 17
Re-Assessment due: 5/1/19
Pain: 2/10 neck

**Subjective:**

Pt arrived to the visit, alert and cooperative.

**Objective:**

Automatics - counting to 15 - 90% fluent with hand tapping as a pacing technique, until he reached the teens, was approximately 75% fluent - worked to decrease the tapping to be less visual by using foot tapping, noted a decrease in fluency on the teens to approximately 60%. SLP recommended using a finger to be less noticeable on more difficult utterances and work to decrease anxiety about difficult words ahead, since it decreases fluency.
Days of the week - overall 70% fluent with mod cues for use of melodic intonation therapy/rhythm - 5/7
Months - 9/12 - 75% with difficulty
/k - final position of words (pt has marked difficulty on this phoneme - pt educated on using less pronounced production of /k/ and increased fluency was noted.
/k/, /s/, and /g/ in initial position of words (pt has HEP for these) - pt educated on using relaxation (use tongue/jaw release for tension in between words if needed. Overall fluency was 80%.
SLP instructed on using /k/ in phrases - pt produced at 60% acc.
pt completed oral motor exercise home program with min-mod assist.

**Assessment:**

Marked decrease in overall fluency due to pt's emotional state in the session. HEP was advanced and pt appeared to benefit from practicing relaxation from a dysfluency at the first of a word. SLP discussed plans to d/c on or before 5/1/19 as pt progress dictates, pt verbalized understanding.
SHORT TERM GOALS:
1. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc (word level - 80%, phrase level 60% acc for /k/ - progressing).

Printed on 4/24/19  1:47 PM

**Lincoln/Bunch 0789**

7C158190008

Penrose Hospital                          Bunch, Mark Bryan
2222 N Nevada Ave                         MRN: CEUL0963303, DOB:        Sex: M
COLORADO SPRINGS CO 80907                 Visit date: 4/24/2019

## 04/24/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

2. Pt will complete oral motor exercise home program with min assist. (currently min-mod assist) for speech and swallowing.
3. Pt will achieve 60% speech fluency at the sentence level with min assist. (70% word level with max cues).
4. Pt will use compensatory memory strategies for attention and recall tasks and home program with min-mod assist. (GOAL MET).
5. Pt will tolerate po trials of liquids/solids with less than 3-4 sec delay in bolus propulsion for 4/5 trials. (goal met)

**Plan (Next Session):**

Continue ST plan of care for speech -  Complete HEP and d/c with max potential reached next session.

**Lincoln/Bunch 0790**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:          Sex: M
Visit date: 3/27/2019

### 03/27/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 3/27/2019 12:40 PM

 **Centura Health®**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO  80907
719-776-5200 (P)
719-776-5392 (F)

### Daily Speech Therapy Treatment

**General:**

Time Calculation
Start Time: 1245
Stop Time : 1325
Time Calculation (min): 40 min
Visit # 16
Re-Assessment due: **5/1/18**
Pain: 2/10 headache

**Subjective:**

Pt arrived late to the visit due to having a new driver, alert and cooperative. Pt stated that they nearly had an accident on the way there with the driver running a red light, speech fluency was markedly reduced, pt was tearful and appeared anxious during most the session. SLP recommended at the first of the session that the pt call and ask for another driver, and the pt refused.

**Objective:**

Breathing ex's - blowing on the corner of a Kleenex, noted slighlty less spasticity of lips, min cues for keeping lips open but pursed - overall 70% acc.
Sustained "ah" - noted sign spasms at first, SLP had pt perform in unison - 9, 9, 10, 11, avg 9.75 sec (pt could not sustain an "ah" at the start of therapy).
Pt counted 1-10 with SLP in unison with hand tapping - noted increased fluency and SLP stopped the unision pt was still using a louder, more fluent voice.
Days of the week -
Singing - nursery rhymes - using hand tapping.
Speech/naming room objects and their functions - overall fluency was 40%, SLP edcucated on tension/release for first syllable with pt intentionally stuttering for the first syllable and then focusing on release for the rest of the word, pt's fluency for the rest of the word increased to 75%.
Pt was given list of automatics for home practice, verbalized understanding of the instructions.

**Assessment:**

Printed on 4/24/19  1:47 PM

Page 3

**Lincoln/Bunch 0791**

7C158190008

| | |
|---|---|
| Penrose Hospital | Bunch, Mark Bryan |
| 2222 N Nevada Ave | MRN: CEUL0963303, DOB:    Sex: M |
| COLORADO SPRINGS CO 80907 | Visit date: 3/27/2019 |

## 03/27/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

Marked decrease in overall fluency due to pt's emotional state in the session. HEP was advanced and pt appeared to benefit from practicing relaxation from a dysfluency at the first of a word. SLP discussed plans to d/c on or before 5/1/19 as pt progress dictates, pt verbalized understanding.

SHORT TERM GOALS:

1. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc (word level - 75% - progressing).

2. Pt will complete oral motor exercise home program with min assist. (currently mod assist) for speech and swallowing.

3. Pt will achieve 60% speech fluency at the sentence level with min assist. (70% word level with max cues).

4. Pt will use compensatory memory strategies for attention and recall tasks and home program with min-mod assist. (GOAL MET).

5. Pt will tolerate po trials of liquids/solids with less than 3-4 sec delay in bolus propulsion for 4/5 trials. (goal met)

**Plan (Next Session):**

Continue ST plan of care for speech, advance complexity of skilled therapy tasks as pt tolerates.

Electronically signed by Carolyn K Lyon, CCC-SLP at 3/27/2019  1:38 PM

**Lincoln/Bunch 0792**

7C158190008

| Penrose Hospital | Bunch, Mark Bryan | |
|---|---|---|
| 2222 N Nevada Ave | MRN: CEUL0963303, DOB: | Sex: M |
| COLORADO SPRINGS CO 80907 | Visit date: 3/20/2019 | |

### 03/20/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 3/20/2019 12:40 PM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO 80907
719-776-5200 (P)
719-776-5392 (F)

## Daily Speech Therapy Treatment

**General:**

Time Calculation
Start Time: 1240
Stop Time : 1320
Time Calculation (min): 40 min
Visit # 15
Re-Assessment due: 5/1/19
Pain: 0/10

**Subjective:**

Pt arrived to the visit, alert and cooperative. Pt missed his session last week due to the OP dept being closed due to a blizzard/adverse weather conditions.

**Objective:**

Pt was eating the last of a package of peanut butter crackers at the start of the session, noted less than 4 sec delay in initiating the swallow for 5/5 trials, is not c/o dysphagia.
Pt completed tongue ex's for /l/ CV syllables - 5 rep's each - noted overall fluency of 60%, used finger tapping as a pacing technique with min cues, noted increased acc with less cues.
Speech for naming 3 items of 10 concrete categories - using hand tapping pacing, rhythm/melodic intonation therapy. and semantic cueing as a speech compensatory technique - overall fluency was 65-70%
Pt completed words without blends/with blends (bond/blonde) - Pt had to use hand tapping and intonation - 75-80% fluency (15/20 pairs) vs than 30% fluency no hand tapping. Pt was given 2 sheets for home practice.
Pt used decreased intonation in his speech, which further reduced his overall speech intelligibility for the listener, completed speech drills with use of interrogative vs declarative stress to assist with speech fluency and intelligibility, less than 25% at first with max cues but increased to 50% at the end of 6 trials with mod cues. Pt was given task as part of his HEP.

**Assessment:**

Feel that pt is completing home program and is making slow but steady gains in speech fluency. Goals have been met for cognition and swallowing. Pt would benefit from continued ST sessions for unmet goals.
SHORT TERM GOALS:
1. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc (word level - 75% - progressing).

Printed on 4/24/19 1:47 PM

**Lincoln/Bunch 0793**

7C158190008

Penrose Hospital                                    Bunch, Mark Bryan
2222 N Nevada Ave                                  MRN: CEUL0963303, DOB:          Sex: M
COLORADO SPRINGS CO 80907                          Visit date: 3/20/2019

## 03/20/2019 - Treatment In Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

2. Pt will complete oral motor exercise home program with min assist. (currently mod assist) for speech and swallowing.

3. Pt will achieve 60% speech fluency at the sentence level with min assist. (70% word level with max cues).

4. Pt will use compensatory memory strategies for attention and recall tasks and home program with min-mod assist. (GOAL MET).

5. Pt will tolerate po trials of liquids/solids with less than 3-4 sec delay in bolus propulsion for 4/5 trials. (goal met)

**Plan (Next Session):**

Continue ST plan of care at once a week for 4-6 weeks for speech production, advance complexity of skilled therapy tasks as pt tolerates.

Electronically signed by Carolyn K Lyon, CCC-SLP at 3/20/2019  1:32 PM

**Lincoln/Bunch 0794**

7C158190008

Penrose Hospital                              Bunch, Mark Bryan
2222 N Nevada Ave                            MRN: CEUL0963303, DOB:            Sex: M
COLORADO SPRINGS CO 80907                    Visit date: 3/6/2019

**03/06/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services**

**Notes**

Progress Notes

Carolyn K Lyon, CCC-SLP at 3/6/2019  2:40 PM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO  80907
719-776-5200 (P)
719-776-5392 (F)

**Daily Speech Therapy Treatment**

**General:**

Time Calculation
Start Time: 0240
Stop Time : 0320
Time Calculation (min): 40 min
Visit # 14
Re-Assessment due: 5/1/19
Pain: 4/10 headache

**Subjective:**

Pt arrived to the visit, alert and cooperative.

**Objective:**

Pt completed tongue ex's for rapid CV /l/ /k/ and /n/ syllable production - 5 rep's of 4 words (la, lee, loo, low) - overall fluency for /l/ and /n/ was 75% with marked increase in fluency and breath control. Pt had marked difficulty with the pressure consonant of /k/ with only 40% fluency.
Picture naming - Photo ID cards - using hand tapping pacing, rhythm, and semantic cueing as a speech compensatory technique - noted increased speech fluency with object naming using a lead-in sentence by using the function of the word (ie, you sit on a _____). Pt named 1-3 syllable words using hand tapping, sentence completion, using singing type rhythm with max cues at first, mod cues at the end of task and 60% overall fluency with repetition. SLP noted increased use of all self cueing methods this session.

**Assessment:**

Noted increased speech fluency this session, pt is using more of the cueing strategies with greater effectiveness.
NEW SHORT TERM GOALS:
1. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc (word level - 75% - progressing).
2. Pt will complete oral motor exercise home program with min assist. (currently mod assist) for speech and swallowing.
3. Pt will achieve 60% speech fluency at the sentence level with min assist. (70% word level with max cues).
4. Pt will use compensatory memory strategies for attention and recall tasks and home program with min-mod assist. (GOAL MET).

Printed on 4/24/19 1:47 PM

**Lincoln/Bunch 0795**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:          Sex: M
Visit date: 3/6/2019

**03/06/2019 - Treatment In Penrose Hospital Outpatient Rehabilitation Services (continued)**

**Notes (continued)**

5. Pt will tolerate po trials of liquids/solids with less than 3-4 sec delay in bolus propulsion for 4/5 trials.

**Plan (Next Session):**

Continue ST plan of care at once a week for speech/swallowing skills, advance complexity of skilled therapy tasks as pt tolerates.

Electronically signed by Carolyn K Lyon, CCC-SLP at 3/6/2019  5:00 PM

Printed on 4/24/19  1:47 PM

**Lincoln/Bunch 0796**

7C158190008

Penrose Hospital                          Bunch, Mark Bryan
2222 N Nevada Ave                         MRN: CEIJL0963303, DOB:          Sex: M
COLORADO SPRINGS CO 80907                 Visit date: 3/1/2019

### 03/01/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 3/1/2019 12:40 PM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO 80907
719-776-5200 (P)
719-776-5392 (F)

### Daily Speech Therapy Treatment

**General:**

Time Calculation
Start Time: 1240
Stop Time : 1320
Time Calculation (min): 40 min
Visit # 13
Re-Assessment due: **5/1/19**
Pain: 0/10

**Subjective:**

Pt arrived to the visit, alert and cooperative.

**Objective:**

Pt's speech was notably more fluent for greetings/social conversation, pt stated "I practiced a lot".
Picture naming - using hand tapping pacing and semantic cueing as a speech compensatory technique - noted increased speech fluency with object naming using a lead-in sentence by using the function of the word (ie, you sit on a _____ ). Pt was over 75% fluent for name 5/15 for 2-3 syllable words using hand tapping and sentence completion with max cues.
Pt was able to respond to automatic sentence completion with 40% fluency on single syllable word responses.
Pt questioned at length by SLP re independence of memory/cogntition at home and for use of compensatory memory strategies - Pt stated he felt he was close to baseline level "doing ok" - cognitive goals will be considered met and d/c'd.
Home practice tasks of automatic speech were given, pt verbalized understanding of instructions.

**Assessment:**

Noted increased speech fluency this session, HEP was advanced. Cognitive goals have been met.
NEW SHORT TERM GOALS:
1. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc (word level - 75% - progressing).
2. Pt will complete oral motor exercise home program with min assist. (currently mod assist) for speech and swallowing.
3. Pt will achieve 60% speech fluency at the sentence level with min assist. (70% word level with max cues).
4. Pt will use compensatory memory strategies for attention and recall tasks and home program with min-mod assist.

Printed on 4/24/19  1:47 PM

**Lincoln/Bunch 0797**

7C158190008

Penrose Hospital                                     Bunch, Mark Bryan
2222 N Nevada Ave                                   MRN: CEUL0963303, DOB:          Sex: M
COLORADO SPRINGS CO 80907                           Visit date: 3/1/2019

**03/01/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services** (continued)

**Notes (continued)**

(GOAL MET).
5. Pt will tolerate po trials of liquids/solids with less than 3-4 sec delay in bolus propulsion for 4/5 trials.

·

| Plan (Next Session): |
| --- |

Continue ST plan of care at once a week for speech/swallowing skills, advance complexity of skilled therapy tasks as pt tolerates.

Electronically signed by Carolyn K Lyon  CCC SLP at 3/1/2019  1 32 PM

**Lincoln/Bunch 0798**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:                Sex: M
Visit date: 2/22/2019

**02/22/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services**

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 2/22/2019  3:20 PM

 **Centura Health**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO  80907
719-776-5200 (P)
719-776-5392 (F)

**Daily Speech Therapy Treatment**

| General: |
| --- |

Time Calculation
Start Time: 0320
Stop Time : 0400
Time Calculation (min): 40 min
Visit # 12
Re-Assessment due: **5/1/10**
Pain: 4/10 right ear from ear infection

| Subjective: |
| --- |

Pt arrived to the visit, alert and cooperative.

| Objective: |
| --- |

Breath control and lip control ex's - blowing on Kleenex 2-3 sec  to decrease laryngeal tension and spasm which appears to occur during speech - mod cues.
Pt produced /h/ CV syllables while blowing on his hand to decrease vocal tension - overall acc was 5/8, noted less tension.
Singing - Pt sang in chorus for several songs - approximately 40-50% fluent and more relaxed voicing. Recommended practicing to his favorite music.
Tongue exercises - 2 sets of 10 rep's each to increase speech coordination and oral swallowing control -
including  protrusion, lateralization, and for alternating elevation/depression, tongue clicks, and 1 set of 10 rep's for, licking lips circumoral outside his mouth - min-mod cues.
Pt completed rapid lateralization for 15 sec duration - 5.5, 5, 5, 5.5, 6.0 - 5.4 sec avg - noted lingual tremor.
Pt completed 5 sets of 5 for  rapid CV /l/   Pt required min-mod cues overall for ex's, noted increased fluency for all of the rep's with markedly less vocal tension/dysfluency.
Pt educated that his progress in ST was overall reduced, and if greater progress was not noted in the next 2 sessions, d/c would be considered. Pt stated "I will practice really hard."

| Assessment: |
| --- |

 Pt is possibly reaching max potential from ST, will re-assess pt's progress in the next 2 sessions.
NEW SHORT TERM GOALS:
1. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.

Printed on 4/24/19  1:47 PM

**Lincoln/Bunch 0799**

7C158190008

| | |
|---|---|
| Penrose Hospital | Bunch, Mark Bryan |
| 2222 N Nevada Ave | MRN: CEUL0963303, DOB:          Sex: M |
| COLORADO SPRINGS CO 80907 | Visit date: 2/22/2019 |

## 02/22/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

2. Pt will complete oral motor exercise home program with min assist. (currently mod assist) for speech and swallowing.
3. Pt will achieve 60% speech fluency at the sentence level with min assist.
4. Pt will use compensatory memory strategies for attention and recall tasks and home program with min-mod assist.
5. Pt will tolerate po trials of liquids/solids with less than 3-4 sec delay in bolus propulsion for 4/5 trials

**Plan (Next Session):**

Continue ST plan of care for eech/swallowing/cognitive-communication skills - advance complexity of skilled therapy tasks as pt tolerates, consider d/c in next 2 sessions.

Electronically signed by Carolyn K Lyon, CCC-SLP at 2/22/2019 4:40 PM

**Lincoln/Bunch 0800**

7C158190008

Penrose Hospital                                    Bunch, Mark Bryan
2222 N Nevada Ave                                  MRN: CEUL0963303, DOB:          Sex: M
COLORADO SPRINGS CO 80907                          Visit date: 2/5/2019

## 02/05/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services

**Notes**

Progress Notes

Carolyn K Lyon, CCC-SLP at 2/5/2019 12:40 PM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO  80907
719-776-5200 (P)
719-776-5392 (F)

### Daily Speech Therapy Treatment

**General:**
Time Calculation
Start Time: 1240
Stop Time : 1320
Time Calculation (min): 40 min
Visit # 11
Re-Assessment due: **5/1/19**
Pain: 0/10

**Subjective:**

Pt arrived to the visit, alert and cooperative.

**Objective:**

Breath control and lip control ex's - blowing on Kleenex 2-3 sec  to decrease laryngeal tension and spasm which appears to occur during speech - mod cues.
Pt produced /h/ CV syllables while blowing on his hand to decrease vocal tension - overall acc was 4/10.
Singing - Pt sang in chorus for several songs - approximately 40-50% fluent and more relaxed voicing.
Pt educated on tongue exercises at 5 rep's each to increase speech coordination and oral swallowing control - including  protrusion, lateralization, and for alternating elevation/depression, tongue clicks, tongue resistance inside of his cheek against his finger, licking lips circumoral outside and inside his mouth. Pt completed 5 sets of 5 for  rapid CV /l/ syllables with marked increase in speed/coordination.  Pt required mod cues overall.
Pt was given written instructions for all ex's for home practice.
Pt reported no choking in the past 2 past weeks.

**Assessment:**

Pt with increased oral and respiratory control at this session.
 NEW SHORT TERM GOALS:
1. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.
2. Pt will complete oral motor exercise home program with min assist. (currently mod assist) for speech and swallowing.
3. Pt will achieve 60% speech fluency at the sentence level with min assist.
4. Pt will use compensatory memory strategies for attention and recall tasks and home program with min-mod assist.

Printed on 4/24/19  1:47 PM

**Lincoln/Bunch 0801**

7C158190008

Penrose Hospital                                          Bunch, Mark Bryan
2222 N Nevada Ave                                        MRN: CEUL0963303, DOB:          Sex: M
COLORADO SPRINGS CO 80907                                Visit date: 2/5/2019

**02/05/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)**

**Notes (continued)**

5. Pt will tolerate po trials of liquids/solids with less than 3-4 sec delay in bolus propulsion for 4/5 trials

**Plan (Next Session):**

Continue ST plan of care for speech and swallowing, advance complexity of skilled therapy tasks as pt tolerates.

Electronically signed by Carolyn K Lyon, CCC-SLP at 2/5/2019  1:19 PM

**Lincoln/Bunch 0802**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:                Sex: M
Visit date: 1/30/2019

**01/30/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services**

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 1/30/2019  2:00 PM

 **Centura Health.**

Centura Health Outpatient
Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO  80907
719-776-5200 (P)
719-776-5392 (F)

**Insurance requires a physician signature on this plan of care. Please sign and fax back to 719-776-5392 at your earliest convenience.**

I CERTIFY THE NEED FOR THESE SERVICES FURNISHED UNDER THIS PLAN OF TREATMENT AND WHILE UNDER MY CARE
Based upon review of the patient's progress and continued therapy plan, it is my medical opinion that **Mark Bryan Bunch** should continue speech therapy at Penrose Hospital Outpatient Rehabilitation Services:

Signed: _____

Date:_____

Julia Brinley, DO

**90 DAY RE-ASSESSMENT/10TH VISIT SPEECH THERAPY UPDATE**

General:

Time Calculation
Start Time: 1400
Stop Time : 1440
Time Calculation (min): 40 min
Visit # 10
Re-Assessment due: **1/31/19**
Pain: 2/10 headache

ONSET DATE: 2/13/18
PRIMARY DIAGNOSIS: Post concussive syndrome
TREATMENT DIAGNOSIS: cognitive-communication deficits, dysarthria, possible dysphagia

INITIAL ASSESSMENT: Patient is a 55 year old male referred for cognitive evaluation/treatment. Pt reports he arrived with assist of a transportation company. Noted flat affect and reduced eye contact during the session.

**Lincoln/Bunch 0803**

7C158190008

Penrose Hospital                                    Bunch, Mark Bryan
2222 N Nevada Ave                                  MRN: CEUL0963303, DOB:        Sex: M
COLORADO SPRINGS CO 80907                          Visit date: 1/30/2019

**01/30/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)**

Notes (continued)

PMHX: obtained from the patient/medical records includes but may not be limited to the following:
Medical History

**Past Medical History:**
Diagnosis                                                              Date
- Allergy
- Bronchitis
- Bunion
  *Left foot*
- Pneumonia
  *12 yrs ago*
- Umbilical hernia

MRI of the brain without contrast on 3/19/18 revealed FINDINGS: The ventricles and sulci are normal.
There are no masses.
There is no evidence of hemorrhage. Mild scattered areas of high
signal intensity seen on FLAIR and T2-weighted sequences in the
periventricular white matter regions. Some of these white matter
lesions show perpendicular pattern suggesting demyelinating white
matter disease from multiple sclerosis. The sinuses and mastoids are
clear. Calvarium is unremarkable.

IMPRESSION:
Mild white matter disease possibly from multiple
sclerosis.

Pt requires assist to drive, pay bills, and has significant residual balance problems. Pt has unsteady
gait, is at fall risk due to balance and visual-spatial deficits. Deficits are affecting the pt's ability to
work. Pt has s/s of dysphagia, was seen for MBS this date for evaluation. Pt stated he had muscle
function testing due to MRI results,  he reported the results were "normal".

PRIOR ST TREATMENT: Pt has been seen for the past 3 months for ST but only 10 visits total thus
far.   His attendance was markedly reduced for half of the treatment time due to transportation
problems (worker's comp provides transportation). Pt was initally recommended for 2 times a week ST,
but could only attend once due to transportation problems. Pt had MBS this date.

**RE-ASSESSMENT/OBJECTIVE:**

ORAL MOTOR: Oral mechanism eval demonstrated labial and lingual deficits with good strength, fair
ROM but markedly decreased coordination, noted apraxic type errors.

SWALLOWING: MBS this date -
RESULTS: adequate acceptance of all boluses given this date. No anterior labial leakage.
Initial bolus control within functional limits, mild spillover on thin liquids when patient begins pumping
and rocking bolus.
Pt demonstrated significant lingual pumping and rocking with multiple swallows to clear oral cavity
across all consistencies.
Pt also demonstrated visible neck tension, facial grimacing and upper body rocking while trying to
initiate the swallow.
Complete oral clearance after last swallow on all consistencies except the 13 mm barium pill. Pt
expectorated the pill. Pt not able to propel the pill posteriorly with the pill remaining between the lips

Printed on 4/24/19  1:47 PM

**Lincoln/Bunch 0804**

7C158190008

| Penrose Hospital | Bunch, Mark Bryan | |
|---|---|---|
| 2222 N Nevada Ave | MRN: CEUL0963303, DOB: | Sex: M |
| COLORADO SPRINGS CO 80907 | Visit date: 1/30/2019 | |

**01/30/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)**

**Notes (continued)**

and front teeth. Once bolus is propelled to the base of tongue, swallow is triggered in a timely manner. Mildly reduced tongue base retraction. Pharyngea phase within functional limits for age. No evidence of penetration
or aspiration on any of the consistencies presented. No residual in the pharynx after the swallows

PLAN:
*Compensatory Strategies for speech, cognition, and swallowing
 Speech fluency tasks
*Cognitive-communication Exercises
 Oral motor exercises including lip/facial and lingual ex's
 Swallowing precautions
*HEP
*Patient/Family Education and Training

Patient agrees with goals and plan of care
SHORT TERM GOALS:
1. Patient will complete speech fluency tasks with 70% accuracy. (50-60% at the word/phrase level for structured tasks - mod-max cues).
2. Patient will complete selective attention tasks with 90% accuracy. (50-60% acc - goal d/c'd).
3. Patient will complete moderately complex organization/problem solving tasks with 90% accuracy. (60% acc - goal d/c'd.).
4. Patient will recall a series of 7 items (visual) with 80% accuracy. (GOAL MET).
5. Patient will recall a series of 7 items (auditory) with 80% accuracy. (GOAL MET).
6. Patient will complete working memory tasks with 80% accuracy. (goal d/c'd).
7. Patient will complete memory tasks with a distractor with 80% accuracy (GOAL MET).
8. Patient will complete oral motor exercise home program with min assist. (currently mod assist).
9. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc. (currently at 40-50% although inconsistent).

LONG TERM GOALS:
1. Patient will improve functional cognitive/linguistic skills for home and in the community.
2. Patient will use learned compensatory strategies for cognition at home and in the community with min-mod assist.
3. Patient improve functional speech skills at at home and in the community with mod assist.
4. Pt will tolerate the least restrictive diet without s/s of aspiration per MBS results. (GOAL MET).

NEW SHORT TERM GOALS:
1. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.
2. Pt will complete oral motor exercise home program with min assist. (currently mod assist) for speech and swallowing.
3. Pt will achieve 60% speech fluency at the sentence level with min assist.
4. Pt will use compensatory memory strategies for attention and recall tasks and home program with min-mod assist.
5. Pt will tolerate po trials of liquids/solids with less than 3-4 sec delay in bolus propulsion for 4/5 trials.

NEW LONG TERM GOALS:
1. Patient will improve functional cognitive/linguistic skills for home and in the community.
2. Patient will use learned compensatory strategies for cognition at home and in the community with

**Lincoln/Bunch 0805**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:          Sex: M
Visit date: 1/30/2019

**01/30/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)**

**Notes (continued)**

min-mod assist.
3. Patient improve functional speech skills at at home and in the community with mod assist.
4. Pt will improve swallowing efficiency for po intake.

SUMMARY: Pt has increased his speech, cognitive, and swallowing skills, although progress was affected by attendance and inconsistency in pt's performance as a result. Pt continues to display the most difficulty with speech fluency, with milder cognitive and swallowing deficits. Pt has inconsistent responses at times, has responded with partial progress to voicing techniques for his speech deficits. Pt's cognition is variable in progress, although part of pt's goals were met, and SLP has noted a possible lack of effort in this area. Swallowing has increased with pt c/o coughing less than once a week, MBS showed no aspiration but oral incoordination of the swallow. Pt demonstrated unusual oral phase swallowing movements during the MBS on this date.

RECOMMENDATIONS:
  1.  Skilled ST to improve functional speech, cognitive/linguistic, and swallowing skills.
  2.  PT consult for continued fall risk - pt reports this is in progress.

FREQ/DURATION:  1 times a week for 6 weeks, will assess for the need for further therapy at that time.

CERTIFICATION DATE FROM: 2/1/19

CERTIFICATION DATE TO: 5/1/19

Electronically signed by Carolyn K Lyon, CCC-SLP at 2/1/2019 10:00 AM

**Lincoln/Bunch 0806**

7C158190008

| | |
|---|---|
| Penrose Hospital<br>2222 N Nevada Ave<br>COLORADO SPRINGS CO 80907 | Bunch, Mark Bryan<br>MRN: CEUL0963303, DOB:         Sex: M<br>Visit date: 1/23/2019 |

## 01/23/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 1/23/2019  2:00 PM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO  80907
719-776-5200 (P)
719-776-5392 (F)

### Daily Speech Therapy Treatment

**General:**
Time Calculation
Start Time: 0200
Stop Time : 0240
Time Calculation (min): 40 min
Visit # 9
Re-Assessment due: 1/31/19
Pain: 0/10

**Subjective:**

Pt arrived to the visit, alert and cooperative.  Stated his transportation provider had hired a driver, and he no longer has to take a cab.

**Objective:**

Pt was re-assessed for various speech and swallowing goals.
Pt educated re no straw. Pt ate soup last night without coughing, stated he coughs more when he's nervous, stressed or excited. SLP educated re swallowing precaution of not eating when distracted, and re-educated on swallowing anatomy, pt verbalized understanding.
Pt performed tongue ex's with mod cues for production, noted increased accuracy but pt still exhibited incoordination - overall acc was 60-70%.
Pt performed initial vowel VC production for easy onset voice - noted fluency increased to 60% for the words and pt required mod cues at first for easy onset and softer production of the final consonant.
Pt was given a phrase starting with the vowel words - 70% fluency with mod-max cues.
Memory tasks - recalling 6/7 numbers visual and 6/7 numbers (auditory) - 86% - goal met.
Memory tasks with a distractor - pt educated on the use of compensatory memory strategies - overall acc was 80% - goal met.

**Assessment:**

Printed on 4/24/19  1:47 PM

Page 19

**Lincoln/Bunch 0807**

7C158190008

Penrose Hospital                          Bunch, Mark Bryan
2222 N Nevada Ave                         MRN. CEUL0963303, DOB:        Sex: M
COLORADO SPRINGS CO 80907                 Visit date: 1/23/2019

**01/23/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)**

**Notes (continued)**

Pt met several cognitive goals this session for recall. Pt demonstrated increased speech fluency at the single and 2 syllable word level, speech is inconsistent overall. Pt was educated on SLP's re-assessment for continued therapy or not next week, has MBS on the same day, he verbalized understanding.

SHORT TERM GOALS:

1. Patient will complete speech fluency tasks with 70% accuracy. (60-70% at the word/phrase level for structured tasks - mod-max cues).
2. Patient will complete selective attention tasks with 90% accuracy.
3. Patient will complete moderately complex organization/problem solving tasks with 90% accuracy.
4. Patient will recall a series of 7 items (visual) with 80% accuracy. (GOAL MET).
5. Patient will recall a series of 7 items (auditory) with 80% accuracy. (GOAL MET).
6. Patient will complete working memory tasks with 80% accuracy.
7. Patient will complete memory tasks with a distractor with 80% accuracy (GOAL MET).
8. Patient will complete oral motor exercise home program with min assist. (currently mod assist).

9. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.

**Plan (Next Session):**

Continue ST plan of care for speech, cognition and swallowing, advance complexity of skilled therapy tasks as pt tolerates  Consider d/c since SLP has concerns about pt's questionable effort in sessions and overall slow speech progress.

Electronically signed by Carolyn K Lyon, CCC-SLP at 1/23/2019  5:09 PM

**Lincoln/Bunch 0808**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEULO963303, DOB:           Sex: M
Visit date: 1/16/2019

### 01/16/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services

Notes

Progress Notes

Carolyn K Lyon, CCC-SLP at 1/16/2019  2:00 PM

 **Centura Health**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave
Colorado Springs, CO  80907
719-776-5200 (P)
719-776-5392 (F)

### Daily Speech Therapy Treatment

| General: |
| --- |

Time Calculation
Start Time: 0200
Stop Time : 0240
Time Calculation (min): 40 min
Visit # 8
Re-Assessment due: 1/31/19
Pain: 5/10 headache

| Subjective: |
| --- |

Pt arrived to the visit, alert and cooperative.

| Objective: |
| --- |

Pt reported that he has had to cancel so many sessions due to the fact that his worker's Comp carrier does not have a driver to take him from Canon City to therapy, and he can only come for once a week until Feb due to the fact that they are having to hire a driver. SLP educated pt on MBS and need to complete to assess pt's swallow to direct possible therapy efforts, pt asked SLP to assist with scheduling due to his speech deficits. SLP called Central Scheduling and scheduled for 1/30/19 at 1 pm, gave handout with times to pt, he verbalized understanding. Pt to be re-assessed for the need for further ST for speech/dysphagia based on speech progress at that time, pt was made aware.
Pt assessed with po intake since he stated he is still having problems at times, although he has stated it has improved in the last month or so. Pt now states that he used to cough at every meal, now 1-2 times per day on primarily particulate foods and "tart foods".
Solid/graham cracker - 3 trials, pt reported feeling of small amount of residual localized to the vocal folds, 2-3 swallows noted per bite.. Noted increased effort to initiate the swallow for the 3rd trial. Pt instructed
Peaches - 1 trial, pt choked immediately after the swallow, coughed for several minutes. Pt stated "It's too tart."
Pears - 2 trials , pt took 2 attempts to clear on 1st atttempt, took 3 swallows to clear the second attempt.
Applesauce - pt instructed to use the effortful swallow and noted immediate choking during the swellow. On second attempt, pt took only 2 attempts to clear.
Pt instructed not to use the effortful swallow with any po intake, but to use as an exercise with 2 sets of 5, 2-3 times per day or more if tolerated.
For speech tasks/easy onset, pt demonstrated the same voicing/strained onset/dysfluency as was noted in the previous 1-2 sessions.

Printed on 4/24/19  1:47 PM

Page 21

**Lincoln/Bunch 0809**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:          Sex: M
Visit date: 1/16/2019

## 01/16/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

**Assessment:**

Pt demonstrated s/s of aspiration this session that were inconsistent with previous reports of his swallowing improved.
SHORT TERM GOALS:
1. Patient will complete speech fluency tasks with 70% accuracy.
2. Patient will complete selective attention tasks with 90% accuracy.
3. Patient will complete moderately complex organization/problem solving tasks with 90% accuracy.
4. Patient will recall a series of 7 items (visual) with 80% accuracy.
5. Patient will recall a series of 7 items (auditory) with 80% accuracy.
6. Patient will complete working memory tasks with 80% accuracy.
7. Patient will complete memory tasks with a distractor with 80% accuracy.
8. Patient will complete oral motor exercise home program with min assist.
9. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.

**Plan (Next Session):**

Continue ST plan of care for speech and swallowing, advance complexity of skilled therapy tasks as pt tolerates.
Consider d/c at a future date considering pt's MBS results and speech progress.

Electronically signed by Carolyn K Lyon, CCC-SLP at 1/16/2019 5:46 PM

**Lincoln/Bunch 0810**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEU10963303, DOB:          Sex: M
Visit date: 1/2/2019

## 01/02/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 1/2/2019 12:40 PM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO 80907
719-776-5200 (P)
719-776-5392 (F)

### Daily Speech Therapy Treatment

| General: |
| --- |

Time Calculation
Start Time: 1241
Stop Time : 1320
Time Calculation (min): 39 min
Visit # 7
Re-Assessment due: **1/31/19**
Pain: 0/10

| Subjective: |
| --- |

Pt arrived to the visit, alert and cooperative.

| Objective: |
| --- |

Speech relaxation and breath support exercises due to spastic voice/apraxia which is affecting pt's fluency - tongue jaw release for sigh X 10, vowels with 66% for 5 rep's each, tended to tense on /u/. Pt completed initial vowel words tongue jaw release for first attempt and with less tongue release for 2nd attempt with marked increase in carryover of easy onset/breath support. Pt had near complete air stoppage for /k/ and /s/, SLP gave list of CVC words with /k/, /g/, and /s/ for practice, pt verbalized understanding of instructions. Pt also instructed to practice singing with rationale. Pt stated he will call to schedule MBS.
Pt recalled a series of 7 items (visual) with 80% accuracy - goal met.

| Assessment: |
| --- |

Pt is carrying over speech techniques and breath support exercises with inconsistent results with his speech, although overall improvement is noted. Pt met his STG for visual recall and reports increased cognitive-communication skills.
SHORT TERM GOALS:
1. Patient will complete speech fluency tasks with 70% accuracy.
2. Patient will complete selective attention tasks with 90% accuracy.
3. Patient will complete moderately complex organization/problem solving tasks with 90% accuracy.
4. Patient will recall a series of 7 items (visual) with 80% accuracy.
5. Patient will recall a series of 7 items (auditory) with 80% accuracy.
6. Patient will complete working memory tasks with 80% accuracy.

**Lincoln/Bunch 0811**

7C158190008

Penrose Hospital                                    Bunch, Mark Bryan
2222 N Nevada Ave                                  MRN: CEUL09633C3, DOB:        Sex· M
COLORADO SPRINGS CO 80907                          Visit date: 1/2/2019

**01/02/2019 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)**

**Notes (continued)**

7. Patient will complete memory tasks with a distractor with 80% accuracy.
8. Patient will complete oral motor exercise home program with min assist.
9. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.

**Plan (Next Session):**

Continue ST plan of care for speech, swallowing and cognitive-communication skills, advance complexity of skilled therapy tasks as pt tolerates.

Electronically signed by Carolyn K Lyon, CCC-SLP at 1/2/2019  3:48 PM

Printed on 4/24/19  1:47 PM                                                     Page 24

**Lincoln/Bunch 0812**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:    Sex: M
Visit date: 12/26/2018

### 12/26/2018 - Treatment in Penrose Hospital Outpatient Rehabilitation Services

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 12/26/2018 12:40 PM

### Daily Speech Therapy Treatment

**General:**
Time Calculation
Start Time: 1240
Stop Time : 1320
Time Calculation (min): 40 min
Visit # 6
Re-Assessment due: **1/31/19**
Pain: 0/10

**Subjective:**

Pt arrived to the visit, alert and cooperative, had strep throat last week and missed ST sessions.

**Objective:**

Pt completed speech/voicing/fluency tasks for tongue/jaw release with easy onset for sigh, falling pitch sigh,  rising pitch sigh, and vowels. Pt required mod-max cues for easy onset to decrease vocal spasticity, achieved approximately 50% acc with markedly less vocal spasticity and dysfluency for vowels and /m/ words. Pt given home practice sheet and verbalized understanding of instructions.
SLP educated re consideration of decreasing particulate foods, using lingual sweep and small bites to control any oral residual (pt c/o having small pieces in his mouth after swallowing). SLP re-educated re pt needing to reschedule his MBS and gave # to Central Scheduling, pt verbalized understanding. SLP discussed pt keeping to twice a week ST schedule due to many missed sessions in order to increase his progress, and he was in agreement.

**Assessment:**

Pt demostrated increased fluency with use of tongue/jaw release at this session, still having "coughing spells" at times, needs to be rescheduled for his MBS.
 SHORT TERM GOALS:
1. Patient will complete speech fluency tasks with 70% accuracy.
2. Patient will complete selective attention tasks with 90% accuracy.
3. Patient will complete moderately complex organization/problem solving tasks with 90% accuracy.
4. Patient will recall a series of 7 items (visual) with 80% accuracy.
5. Patient will recall a series of 7 items (auditory) with 80% accuracy.
6. Patient will complete working memory tasks with 80% accuracy.
7. Patient will complete memory tasks with a distractor with 80% accuracy.
8. Patient will complete oral motor exercise home program with min assist.
9. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.

**Plan (Next Session):**

Printed on 4/24/19  1:47 PM

Page 25

**Lincoln/Bunch 0813**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:          Sex: M
Visit date: 12/26/2018

**12/26/2018 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)**

**Notes (continued)**

Continue ST plan of care for swallowing, speech and cognitive-communication deficits, advance complexity levels as pt tolerates.

Electronically signed by Carolyn K Lyon. CCC-SLP at 12/28/2018  8:38 AM

**Lincoln/Bunch 0814**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:
Visit date: 12/12/2018

Sex: M

**12/12/2018 - Treatment in Penrose Hospital Outpatient Rehabilitation Services**

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 12/12/2018 12:40 PM

 **Centura Health**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO 80907
719-776-5200 (P)
719-776-5392 (F)

**Daily Speech Therapy Treatment**

**General:**

Time Calculation
Start Time: 1245
Stop Time : 1320
Time Calculation (min): 35 min
Visit # 5
Re-Assessment due: 1/31/19
Pain: 5/10 headhcache

**Subjective:**

Pt has been out of town for the past several weeks due to the accidental death of his brother, missed his MBS while out for the funeral.

**Objective:**

Pt stated he has problems with solid foods sticking, with choking on particulate foods and thin liquids. Pt choked on combread and steak while out of town. SLP educated at length re the anatomy and physiology of normal and abnormal swallowing using multiple videos from the Dysphagia app, pt verbalized understanding re aspiration and penetration, as well as risks/consequences. Pt re-educated re small bites/sips, no consecutive swallows, no straws, no particulate foods. Pt was educated re 2 second hold for thin liquids to prevent possible premature spillage with thin liquids until MBS can determine pt's swallowing status, he verbalized understanding. Pt speech was less fluent this session with decreased breath support until the end of the session, when he appeared to be more relaxed.

**Assessment:**

Pt is increasing his understanding of his dysphagia disease process, speech was less fluent this session.
SHORT TERM GOALS:
1. Patient will complete speech fluency tasks with 70% accuracy.
2. Patient will complete selective attention tasks with 90% accuracy.
3. Patient will complete moderately complex organization/problem solving tasks with 90% accuracy.
4. Patient will recall a series of 7 items (visual) with 80% accuracy.
5. Patient will recall a series of 7 items (auditory) with 80% accuracy.

Printed on 4/24/19 1:47 PM

Page 27

**Lincoln/Bunch 0815**

7C158190008

Penrose Hospital                                    Bunch, Mark Bryan
2222 N Nevada Ave                                  MRN: CEUL0963303, DOB:          Sex: M
COLORADO SPRINGS CO 80907                          Visit date: 12/12/2018

### 12/12/2018 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

6. Patient will complete working memory tasks with 80% accuracy.
7. Patient will complete memory tasks with a distractor with 80% accuracy.
8. Patient will complete oral motor exercise home program with min assist.
9. Pt will use speech fluency techniques with min–mod assist at the phrase/sentence level with 70% acc.

**Plan (Next Session):**

Continue ST plan of care for speech, cognitive-communication skills and swallowing, advance complexity of skilled therapy tasks as pt tolerates. Pt to reschedule MBS study.

Electronically signed by Carolyn K Lyon, CCC-SLP at 12/12/2018  3:58 PM

**Lincoln/Bunch 0816**

7C158190008

Penrose Hospital                              Bunch, Mark Bryan
2222 N Nevada Ave                            MRN: CEUL0963303, DOB:            Sex: M
COLORADO SPRINGS CO 80907                     Visit date: 11/21/2018

**11/21/2018 - Treatment in Penrose Hospital Outpatient Rehabilitation Services**

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 11/21/2018 12:40 PM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO  80907
719-776-5200 (P)
719-776-5392 (F)

**Daily Speech Therapy Treatment**

| General: |
| --- |

Time Calculation
Start Time: 1240
Stop Time : 1320
Time Calculation (min): 40 min
Visit # 4
Re-Assessment due: 1/31/19
Pain: 0/10

| Subjective: |
| --- |

Pt arrived to the visit, alert and cooperative.

| Objective: |
| --- |

Pt completed ex's for blowing on a Kleenex for breath control X5 with  cues, increased breath control and less vocal spasms noted for last 2 rep's, markedly with mod-max cues at first, max at end of the tasks, overall acc was 80%. Pt given 10 rep's of 3-4 syllable phrase drills with the use of a breath in between words and the use of a sing-asong intonation (Melodic Intonation Therapy for increasing fluency). Pt required mod cues for both breath support and use of intonation, noted increased breath support (60%) and fluency (40-50% for the words spoken). Pt completed short sentence drills with a breath every 2-3 words, noted less tension and dysfluency with difficulty using intonation. Pt completed automatic sentence completion with 50% fluency.  Pt exhibited selective attention to tasks with 80% accuracy in the session. Pt recalled a series of 4 items with 3/4 acc with difficulty in repeat them due to speech fluency problems. SLP instructed re use of humming and singing as home practice ex's.

| Assessment: |
| --- |

Pt is gradually increasing his speech fluency and is practicing his HEP outside of therapy session.
SHORT TERM GOALS:
1.  Patient will complete speech fluency tasks with 70% accuracy.
2.  Patient will complete selective attention tasks with 90% accuracy.
3.  Patient will complete moderately complex organization/problem solving tasks with 90% accuracy.
4.  Patient will recall a series of 7 items (visual) with 80% accuracy.
5.  Patient will recall a series of 7 items (auditory) with 80% accuracy.

Printed on 4/24/19  1:47 PM                                                              Page 29

**Lincoln/Bunch 0817**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:          Sex: M
Visit date: 11/21/2018

**11/21/2018 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)**

**Notes (continued)**

6.   Patient will complete working memory tasks with 80% accuracy.
7.   Patient will complete memory tasks with a distractor with 80% accuracy.
8.   Patient will complete oral motor exercise home program with min assist.
9. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.

**Plan (Next Session):**

Continue twice a week ST for speech and cognitive functioning.

Electronically signed by Carolyn K Lyon, CCC-SLP at 12/4/2018  8:18 AM

**Lincoln/Bunch 0818**

7C158190008

Penrose Hospital                          Bunch, Mark Bryan
2222 N Nevada Ave                         MRN: CEUL0963303, DOB:          Sex: M
COLORADO SPRINGS CO 80907                 Visit date: 11/15/2018

**11/15/2018 - Treatment in Penrose Hospital Outpatient Rehabilitation Services**

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 11/15/2018 11:00 AM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO 80907
719-776-5200 (P)
719-776-5392 (F)

**Daily Speech Therapy Treatment**

**General:**
Time Calculation
Start Time: 1100
Stop Time : 1140
Time Calculation (min): 40 min
Visit # 3
Re-Assessment due: **1/31/19**
Pain: 2/10 headache

**Subjective:**
Pt arrived to the visit with transportation, pt stated "I think that my speech is better, although I still stutter more when I am nervous".

**Objective:**

Pt completed ex's for blowing on a Kleenex for breath control X 6 with mod-max cues, increased breath control and less vocal spasms noted for last 2 rep's, had spastic lip closure unless cued. Pt completed 10 rep's each of tongue out/jaw released sigh, humming, vowels for reducing significant vocal tension/spasm and increasing fluency with mod max cues at first, max at end of the tasks, overall acc was 40%. Pt given 10 rep's of 3-4 syllable phrase drills with the use of a breath in between words and the use of a sing-song intonation (Melodic Intonation Therapy for increasing fluency). Pt required max cues for both breath support and use of intonation, but was able to produce more relaxed vocal control and breath support at then end of the session. Pt noted to have no spastic vocal pattern for automatic functions such as laughing X2. Pt counted 1-10 with breath in between numbers, 40% fluent/ 20% with relaxed voicing with max cues. Pt exhibited selective attention to tasks with 70% accuracy in the session.

**Assessment:**

Pt completed tasks with less cues and more vocal control than last session, still needs considerable cue for control of breath support/onset of voicing.

SHORT TERM GOALS:

Printed on 4/24/19  1:47 PM

**Lincoln/Bunch 0819**

7C158190008

Penrose Hospital                                    Bunch, Mark Bryan
2222 N Nevada Ave                                  MRN: CEUL0963305, DOB:          Sex: M
COLORADO SPRINGS CO 80907                          Visit date: 11/15/2018

**11/15/2018 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)**

**Notes (continued)**

1. Patient will complete speech fluency tasks with 70% accuracy.
2. Patient will complete selective attention tasks with 90% accuracy.
3. Patient will complete moderately complex organization/problem solving tasks with 90% accuracy.
4. Patient will recall a series of 7 items (visual) with 80% accuracy.
5. Patient will recall a series of 7 items (auditory) with 80% accuracy.
6. Patient will complete working memory tasks with 80% accuracy.
7. Patient will complete memory tasks with a distractor with 80% accuracy.
8. Patient will complete oral motor exercise home program with min assist.
9. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.

**Plan (Next Session):**

Continue ST plan of care for speech and cognitive-linguistic skills - check on carryover of HEP.

Electronically signed by Carolyn K Lyon  CCC-SLP at 12/4/2018  8:19 AM

**Lincoln/Bunch 0820**

7C158190008

Penrose Hospital
2222 N Nevada Ave
COLORADO SPRINGS CO 80907

Bunch, Mark Bryan
MRN: CEUL0963303, DOB:          Sex: M
Visit date: 11/9/2018

### 11/09/2018 · Treatment in Penrose Hospital Outpatient Rehabilitation Services

**Notes**

**Progress Notes**

Carolyn K Lyon, CCC-SLP at 11/9/2018 10:20 AM

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO  80907
719-776-5200 (P)
719-776-5392 (F)

### Daily Speech Therapy Treatment

**General:**
Time Calculation
Start Time: 1020
Stop Time : 1100
Time Calculation (min): 40 min
Visit # 2
Pain: 0/10

**Subjective:**

Pt arrived at the visit with transportation assist, flat affect.

**Objective:**

SLP reviewed deficit areas noted on the RBANS, and re-educated re goals, pt agreeable. MD order has been obtained for MBS, awaiting scheduling. Pt instructed to take small sips for thin liquids due to pt report of choking at times, he verbalized understanding. Noted significant vocal spasms in pt's connected speech. Pt completed ex's for blowing on a Kleenex for breath control X 8 with max cues, increased breath control and less vocal spasms noted for last 3 rep's. Pt completed 5 rep's each of tongue out/jaw released sigh, humming, vowels, and /m/ words  for reducing significant vocal tension/spasm and increasing fluency with max cues at first, mod-max at end of the tasks, overall acc was 30%. Pt educated re breath support and of his habit of releasing most of his breath before initiating a word, then tensing after the word due to lack of breath control. SLP referred to those episodes as a "false start", and cued for pt to take a full breath in between words for exercise of counting to 5, pt required max cues and achieved appropriate timing of breath with 40% acc for the 5 words. It was noted that when the pt better approximated adequate breath control at the start of the word, the word was more fluent and the voicing was uninterrupted by spasms. Pt sang a few lines of "happy birthday" in unison with the SLP with approximately 30% fluency and accuracy.  The pt was given a written handout with home exercises (5 rep's) of the tasks covered in the session, verbalized understanding of the tasks and to d/c to another time if marked dysfluency occurred. Pt selectively attended to the task with 40% acc.   Pt verbalized being pleased with his responses in the session.

SHORT TERM GOALS:
1. Patient will complete speech fluency tasks with 70% accuracy.
2. Patient will complete selective attention tasks with 90% accuracy.
3. Patient will complete moderately complex organization/problem solving tasks with 90% accuracy.
4. Patient will recall a series of 7 items (visual) with 80% accuracy.

Printed on 4/24/19  1:47 PM

**Lincoln/Bunch 0821**

7C158190008

| Penrose Hospital | Burch, Mark Bryan | |
| --- | --- | --- |
| 2222 N Nevada Ave | MRN: CEUL0983303, DOB: | Sex: M |
| COLORADO SPRINGS CO 80907 | Visit date: 11/9/2018 | |

### 11/09/2018 - Treatment in Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

5. Patient will recall a series of 7 items (auditory) with 80% accuracy.
6. Patient will complete working memory tasks with 80% accuracy.
7. Patient will complete memory tasks with a distractor with 80% accuracy.
8. Patient will complete oral motor exercise home program with min assist.
9. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.

**Assessment:**

Pt is progressing toward more fluent speech with adequate voice control, increased attention span noted in the session, waiting for MBS to be scheduled.

**Plan (Next Session):**

Continue ST POC for speech, cognitive-communication, and swallowing skills, check on pt's compliance and carryover with home program exercises.

Electronically signed by Carolyn K. Lyon CCC-SLP at 12/4/2018 8:20 AM

**Lincoln/Bunch 0822**

7C158190008

| | |
|---|---|
| Penrose Hospital<br>2222 N Nevada Ave<br>COLORADO SPRINGS CC 80907 | Bunch, Mark Bryan<br>MRN. CEUL0963303, DOB:       Sex: M<br>Visit date. 10/31/2018 |

### 10/31/2018 - Evaluation in Penrose Hospital Outpatient Rehabilitation Services

**Notes**

**Progress Notes**

**Carolyn K Lyon, CCC-SLP at 10/31/2018 10:40 AM**

 **Centura Health.**

Centura Health Outpatient Rehabilitation
Penrose Hospital
2222 N. Nevada Ave.
Colorado Springs, CO 80907
719-776-5200 (P)
719-776-5392 (F)

**Insurance requires a physician signature on this plan of care. Please sign and fax back to 719-776-5392 at your earliest convenience.**

I CERTIFY THE NEED FOR THESE SERVICES FURNISHED UNDER THIS PLAN OF TREATMENT AND WHILE UNDER MY CARE
Based upon review of the patient's progress and continued therapy plan, it is my medical opinion that **Mark Bryan Bunch** should continue speech therapy at Penrose Hospital Outpatient Rehabilitation Services:

Signed: _____

Date:_____

Julia Brinley, DO

### COGNITIVE/LINGUISTIC EVALUATION

Time Calculation
Start Time: 1140
Stop Time : 1330
Time Calculation (min): 110 min

ONSET DATE: 2/13/18
PRIMARY DIAGNOSIS: Post concussive syndrome
TREATMENT DIAGNOSIS: cognitive-communication deficits, dysarthria
PAIN: 2 ,mild headache
HAVE YOU EXPERIENCED ANY NEGLECT/ABUSE IN THE LAST YEAR: no

INITIAL ASSESSMENT: Patient is a 55 year old male referred for cognitive evaluation/treatment. Pt reports he arrived with assist of a transportation company. Noted flat affect and reduced eye contact during the session.

PMHX: obtained from the patient/medical records includes but may not be limited to the following:
Past Medical History:
Diagnosis                                                                    Date
  • Allergy
  • Bronchitis
  • Bunion
    *Left foot*

Printed on 4/24/19  1:47 PM                                                  Page 35

**Lincoln/Bunch 0823**

7C158190008

Penrose Hospital                                    Sunch, Mark Bryan
2222 N Nevada Ave                                  MRN: CEUL0963303, DOB:          Sex: M
COLORADO SPRINGS CO 80907                          Visit date: 10/31/2018

### 10/31/2018 - Evaluation in Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

- Pneumonia
  *12 yrs ago*
- Umbilical hernia

PLOF: Pt was independent in all areas prior to MVA, was working as a sales rep for a communications company at the time of the MVA.

CLOF: Pt has pronounced deficits in cognitive function, speech, and visual spatial skills. Pt requires assist to drive, pay bills, and has significant residual balance problems. Pt displayed difficulty in walking to the exam room and needed manual assist, is at fall risk due to balance and visual-spatial deficits. Deficits are affecting the pt's ability to work.

PRIOR TREATMENT: Pt reports he has not had any speech therapy sessions since the MVA, stating "they never got approved until now."

NEUROPSYCHOLOGICAL EVALUATION: review per Dr Brinley's note indicated post concussive recovery with frontal lobe executive function deficits "with mention of symptom validity testing concerning for intentional lack of effort."

ASSESSMENT: Cognitive skills were assessed using the Repeatable Battery for the Assessment of Neuropsychological Status (Rbans) Form D.

RBANS: Scores are as follows:

IMMEDIATE MEMORY
*Index score: 69
*Range: Extremely Low

VISUALSPATIAL/CONSTRUCTIONAL
*Index score: 64
*Range: Extremely Low

LANGUAGE
*Index score:79
*Range: Borderline

ATTENTION
*Index score: 64
*Range: Extremely Low

DELAYED MEMORY
*Index score: 56
*Range: Extremely Low

SUM OF INDEX SCORE: 332
TOTAL SCALE: 57
PERCENTILE RANK: 0.2

Classification in order of severity: very superior, superior, high average, average, low average, borderline, extremely low.

Printed on 4/24/19 1:47 PM

**Lincoln/Bunch 0824**

7C158190008

| | |
|---|---|
| Penrose Hospital | Bunch, Mark Bryan |
| 2222 N Nevada Ave | MRN: CEUL0963303, DOB:          Sex: M |
| COLORADO SPRINGS CO 80907 | Visit date: 10/31/2018 |

## 10/31/2018 - Evaluation in Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

RBANS SUMMARY: Results of the RBANS indicate overall classification of performance in the Extremely Low range, placing patient at the **0.2 %ile for age matched peers.** Greatest deficits are noted in the domains of memory (immediate and delayed), attention, visuospatial/construction. Areas of strength include motivation and prior level of functioning, language was . It was noted that the pt's speech dysfluencies could have affected part of the test scores requiring verbal skills, and his visual deficits for other sections of the test measure. Deficits in the above areas may likely impacts pt's overall independence in activities of daily living.Pt would likely benefit from skilled speech therapy services to educate/instruct pt in the use of compensatory strategies and skilled cognitive therapy to improve independence in home , work and social related tasks.

PHYSICAL SYMPTOMS:  patient reports frequent and severe headaches, fatigue, vision changes including double vision, wears prism glasses, sleep disturbances, balance issues, memory loss, noise sensitivity, light sensitivity.

BEHAVIORAL SYMPTOMS: patient reports changes in comprehension, decreased attention ,increased frustration, decreased eye contact with frequent side to side eye movement when attempting to focus. Pt has decreased eye contact and flat affect.

ORAL MOTOR: Oral mechanism eval demonstrated labial, lingual and palatal weakness noted, as well as decreased mouth opening, noted bilateral  palatal elevation. Dentition WFL

SWALLOWING: Pt assessed with graham cracker and water via cup edge.  Pt drooled from the right side during the first sip via cup edge and displayed mastication delay, states he cannot "eat soups any more" due to his drooling. Pt reports choking with OJ via cup edge this am, reported choking occurs on thin liquids more then solids but is uncertain of frequency, "maybe a few times a week or more."

SPEECH: Pt demonstrated marked dysfluencies throughout the evaluation with prolongations on initial phonemes (particularly sibilants) and vowels, with markedly disordered prosody and scanning intonation with monotone voice.Speech rate was significantly slow, noted tension and facial grimace on several severely dysfluent production for initial sibilants.  Pt reported "This is not what I sounded like at all before."

PATIENT GOAL:" I need to work again and be able to talk better'.

PROGNOSIS: fair for increased cognitive and communication skills.

PLAN:
*Cognitive/Linguistic Exercises
*Compensatory Strategies
 Speech fluency tasks
 Oral motor exercises including lip/facial and lingual ex's
 Swallowing compensatory strategies and diet rec's
*HEP
*Patient/Family Education and Training

Patient agrees with goals and plan of care

SHORT TERM GOALS:
1. Patient will complete speech fluency tasks with 70% accuracy.
2. Patient will complete selective attention tasks with 90% accuracy.
3. Patient will complete moderately complex organization/problem solving tasks with 90% accuracy.
4. Patient will recall a series of 7 items (visual) with 80% accuracy.
5. Patient will recall a series of 7 items (auditory) with 80% accuracy.
6. Patient will complete working memory tasks with 80% accuracy.
7. Patient will complete memory tasks with a distractor with 80% accuracy.

**Lincoln/Bunch 0825**

7C158190008

| | |
|---|---|
| Penrose Hospital | Bunch, Mark Bryan |
| 2222 N Nevada Ave | MRN: CEU_0963303, DOB:    Sex: M |
| COLORADO SPRINGS CO 80907 | Visit date: 10/31/2018 |

### 10/31/2018 - Evaluation in Penrose Hospital Outpatient Rehabilitation Services (continued)

**Notes (continued)**

8. Patient will complete oral motor exercise home program with min assist.
9. Pt will use speech fluency techniques with min-mod assist at the phrase/sentence level with 70% acc.

LONG TERM GOALS:
1. Patient will improve functional cognitive/linguistic skills for home and in the community.
2. Patient will use learned compensatory strategies for cognition at home and in the community with min-mod assist.
3. Patient improve functional speech skills at at home and in the community with mod assist.
4. Pt will tolerate the least restrictive diet without s/s of aspiration per MBS results.

SUMMARY: Pt exhibited significantly impaired cognitive-linguistic and speech skills, also displayed s/s of oropharyngeal dysphagia.

RECOMMENDATIONS:
1. Skilled ST to improve functional cognitive/linguistic, speech and swallowing skills.
2. PT consult for continued fall risk.
3. MBS for evaluation of s/s of dysphagia and report of choking on thin liquids.

FREQ/DURATION: 2 times a week for 10-12 weeks

CERTIFICATION DATE FROM: 11/1/2018

CERTIFICATION DATE TO: 1/31/2019

70 minutes session 1: Test administration
40 mintues session 2: Test interpretation and report generation

Due to the complexity of the treatment diagnosis, certification dates are for 3 months to cover any missed appointments and to allow for a decrease in frequency of visits as patient nears discharge. Patient will be re-assessed regularly to ensure progress toward goals. A report will be generated and sent if there are any changes in current POC.

Electronically signed by Julia Marie Brinley, DO at 3/11/2019 4:50 PM

**Lincoln/Bunch 0826**

7C158190008

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Clinical Director

Diana M. Helffenstein, M.A., L.P.C.
Licensed Professional Counselor

Brian D. Reusink, M. Ed.
Director of Operations

COLORADO
Neuropsychological
ASSOCIATES, P.C.

Primary Office
10 Inverness Dr. East
Suite 215
Englewood, CO 80112
(720) 529-0190
(720) 529-1099 Fax

Also serving clients in
Colorado Springs

# NEUROPSYCHOLOGICAL SCREENING

**NAME:**    Mark B. Bunch            **EVALUATION DATES:**    5/03/18 & 5/18/18

**DOB:**                              **REPORT PREPARED:**    6/01/18

## THIS REPORT REPRESENTS EIGHT (8) HOURS OF SERVICE

## REFERRAL INFORMATION

Mr. Bunch was referred for a Neuropsychological Evaluation by his Workers' Compensation physician, Steven Olson, M.D. Mr. Bunch was involved in a work-related motor vehicle accident on February 13, 2018 at 6:37 p.m. On that date, he was the driver of a 2003 Ford Taurus and he was on Colorado Highway 50 in Pueblo, Colorado. Mr. Bunch reported that he was exiting I-25 onto Highway 50 West. This was a three-lane exit and he was in the middle lane. Traffic in the left lane was stopped for traffic. As he came down the ramp, a Jeep Cherokee that was in the left lane pulled into the middle lane, at which point the driver of the Jeep put his vehicle in reverse and started backing up quickly. Mr. Bunch is unsure why the driver of the Jeep took this action. The rear of the Jeep crashed into the front of Mr. Bunch's Ford Taurus. Mr. Bunch estimated that he was traveling at approximately 20 miles per hour at the time of impact and that the Jeep Cherokee was traveling at approximately 15 to 20 miles per hour. Mr. Bunch reported that his Ford Taurus did not have airbags, but he was wearing a seatbelt and shoulder harness. The impact propelled him forward and he struck his forehead on the steering wheel. Mr. Bunch showed me pictures of his forehead from following the accident. His forehead was red and swollen just to the right of center high on his forehead. To the best of his awareness, Mr. Bunch did not lose consciousness. He does report altered consciousness post-accident in the form of being dazed and confused. He reported feeling "woozy" post-accident. In addition, he experienced problems with communication such as transposing words when he talked. He texted his fiancee post-accident and he noted that his text made no sense. He reports that this altered consciousness lasted for approximately four weeks.

**Lincoln/Bunch 0827**

7C158190008

**NEUROPSYCHOLOGICAL SCREENING**
**Mark B. Bunch**
**Page 2**

I had an opportunity to review the State of Colorado Traffic Accident Report dated February 13, 2018. That report confirms that Mr. Bunch was driving a 2003 Ford Taurus Sedan. The Police Officer's report confirms Mr. Bunch's description of the accident. That report clarifies that the driver of the Jeep reversed his vehicle as he felt he was too close to the vehicle in front of him and did not see Mr. Bunch's vehicle in his rearview mirror. The report indicated there was "slight" damage to the front of Mr. Bunch's Ford Taurus. The report also indicates there was "slight" damage to the rear of the Jeep Grand Cherokee.

Mr. Bunch reports that he recalls seeing the brake lights of the Grand Cherokee. He does recall the sound and force of the accident as well as hitting his head on the steering wheel, although he described this memory as "vague." While Mr. Bunch felt "stunned" immediately post-accident, when he looked up, he saw the driver of the Jeep Cherokee leaving the scene of the accident. He followed the Jeep Cherokee for two to three minutes. The driver of the Jeep Cherokee ultimately pulled into the parking lot of some frontage road stores. When Mr. Bunch exited his vehicle, he felt "woozy." At that point, he sat back down in his vehicle and called 911 as well as his immediate supervisor. He believes it took the Police approximately 20 to 30 minutes to arrive on scene. His immediate supervisor arrived on scene shortly after the Police Officer. He remained in his vehicle while talking with the Police Officer. When his immediate supervisor arrived, he helped Mr. Bunch move into his vehicle. At that point, he was still feeling woozy and was also experiencing dizziness. His immediate supervisor took him to Parkview Hospital Emergency Room where he was evaluated and released. The Emergency Room physician apparently diagnosed a concussion with closed head injury as well as cervical sprain. A CT scan of the brain performed in the Emergency Room was negative. Mr. Bunch reports minimal memory of the Emergency Room evaluation. He was experiencing nausea and apparently vomited on two occasions but has no memory for doing so. Following release from the Emergency Room, his immediate supervisor drove him to his home in Canyon City. He believes he slept most of the way home. He reported feeling quite fatigued and lethargic for several weeks post-accident. The nausea, vomiting, dizziness and lethargy would all be behavioral indicators of a concussion. His memories for the day leading up to the accident are quite vague.

Mr. Bunch continues to report a constellation of physical, fatigue, visual, cognitive and emotional coping deficits consistent with a post-concussive syndrome. Dr. Olson has referred him for a Neuropsychological Evaluation as a way to more fully evaluate his current neurocognitive and neurobehavioral status. I was also asked to assist with treatment planning. Mr. Bunch is represented by an attorney, Kenneth Shakeshaft, Esq.

## BACKGROUND INFORMATION

### Developmental History

Mr. Bunch was born via normal vaginal delivery without complications. He met all developmental milestones within normal limits.

**Lincoln/Bunch 0828**

7C158190008

**NEUROPSYCHOLOGICAL SCREENING**
Mark B. Bunch
Page 3

## Educational History

Mr. Bunch graduated from Canyon City High School in May of 1982. He reported his Grade Point Average was 3.84. He went on to attend the University of Southern Colorado. There, he completed a B.S. Degree in Communications in May of 1986. His Grade Point Average was 3.55. He obtained a M.A. in Organizational Management from the University of Phoenix in 2000. His Grade Point Average was 3.95. He reports no learning disabilities, involvement with special education or ever having been held back a grade.

## Work History

From 1975 to 1979 Mr. Bunch worked as a cook at Mr. Ed's Restaurant. From 1979 to 1981, he was a cook at Sambo's Restaurant. From 1981 to 1988, he worked in advertising sales for the Canyon City Daily Record newspaper. From 1988 to 1995, he worked for the Colorado Department of Corrections as a Security Officer. From 1995 to 1997, he worked in advertising sales for Telecom Yellow Pages. From 1997 to 1999, he worked as Director of Marketing for Pueblo Diversified Industries. From 1999 to 2001, he worked as Director of Sales for Knowledge Alliance. From 2001 to 2007, he worked as a Sales Representative for Organo Pharmaceuticals. From 2007 to 2008, he was the Director of Marketing for HealthSouth. From 2008 to 2013, he was Director of Business Development for Evercare Hospice. From 2013 to 2015, he was a Sales Manager at Goodwill.

From January of 2016 to present, Mr. Bunch has worked as a Direct Sales Representative for Charter Communications. He described Charter Communications is a high-speed fiber-optic company similar to Comcast. He sells their products residentially, door-to-door. His marketing area is all of Southern Colorado. Mr. Bunch remains off work post-accident.

## Medical History

Mr. Bunch does not use alcohol and has never abused alcohol in anyway. He has never used or experimented with illicit drugs. He does not use tobacco or marijuana products. His medical history is notable for a tonsillectomy in 1970 and an umbilical hernia repair in May of 2017. He currently does not use any prescription medications. He uses over-the-counter pain medication such as Advil or Tylenol for his headaches and body pains.

His neuropsychological history is unremarkable, having never sustained any other traumatic brain injuries or concussions of any type, periods of unconsciousness for any reason, epilepsy, toxic exposure or neurological illnesses.

Mr. Bunch's family psychological history is unremarkable. His personal psychological history is also unremarkable. He has never previously worked with a mental health professional. To the best of his awareness, he has never been given a psychological or psychiatric diagnosis. He has never been prescribed a psychotropic medication.

**Lincoln/Bunch 0829**

7C158190008

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 4

## CLINICAL INTERVIEW

When asked about his current physical status, Mr. Bunch reports ongoing neck, back, and shoulder pain. He would rate this pain as ranging from 5 to 7 on a 10-point scale with 10 being pain so severe that he would go to the Emergency Room if he experienced it. He reports that he is now receiving physical therapy and chiropractic care for his neck, back, and shoulder pain. He reports a constant headache, which he rated as 4 to 8 on a 10-point scale. He denied any significant problems with headaches pre-accident. He is also now occasionally experiencing what he refers to as "migraine" headaches. He would rate this headache pain as 9 on a 10-point pain scale. With these headaches, he notes a decrease in his peripheral vision as well as significant light sensitivity. He reports that with these headaches he has to lie down in a dark quiet room. He denied any migraine headaches pre-accident. Mr. Bunch reports ongoing dizziness and vertigo post-accident. These are both severe enough to negatively impact his balance. Triggers include closing his eyes. He gave the example that he cannot close his eyes when he takes a shower, therefore, he now takes baths. He also experiences episodes of disequilibrium. He is particularly aware of this problem when he reaches over to pick something up and then stands back up. He reports that his sense of smell is hypersensitive post-accident. He also note some change in his taste post-accident. By this, he is referring to the fact that there are some foods and drinks that he used to like, but no longer likes post-accident (e.g., Pepsi and pizza). He reports an ongoing problem with tinnitus bilaterally post-accident. He experiences tinnitus approximately 75% of the time. He denied any tinnitus pre-accident. He reports an ongoing problem with noise sensitivity (phonophobia) post-accident. When in a noisy or loud environment, this causes him to feel irritable, edgy, and anxious. He reports an ongoing problem with fatigue post-accident. He finds he becomes more tired more easily whether performing physical or cognitive activities. He would rate his current stamina and endurance as 25% of normal for him. He noted that he was a very high-energy individual pre-accident.

When asked about his current visual status, Mr. Bunch reports ongoing problems with both double vision and blurry vision post-accident. He reports that when he is tired the vision in his left eye will become extremely blurry as though he is looking through some sort of mesh. He also notes some decrease in his peripheral vision at those times. He reports ongoing sensitivity for fluorescent lights post-accident. He is aware that he bumps into things more frequently most notably on his left side. When driving or walking in a straight line, he tends to be veer center to the left side. He reports an ongoing problem both eye fatigue and depth perception post-accident. Based on his description, objects seem further away from him than they actually are. He notes that his eyes are slow to refocus, suggesting a possible problem with accommodation. He reports difficulties with visual scanning such as missing things that he is looking for and losing his place when reading.

When asked about his current cognitive status, Mr. Bunch reports ongoing problems with attention and concentration. He finds his mind wanders more easily and that he is more easily distractible. He reports events that most likely relate to cognitive set-loss. He reports problems with multi-tasking post-accident. He has difficulty alternating his attention between several tasks and he can no longer attend to several things simultaneously. He reports a significant

**Lincoln/Bunch 0830**

7C158190008

**NEUROPSYCHOLOGICAL SCREENING**
**Mark B. Bunch**
**Page 5**

problem with short-term memory post-accident. He finds he will more frequently forget his intentions, appointments, what is said to him, what he is doing if he is distracted, what he has done or said, and that he loses and misplaces things more frequently. He uses written notes, alarms, and post-it notes as a means of compensation for his memory problem. He reports that cueing will most often help his memory but occasionally it does not. He also reports that there are times when his memory for events or conversations is distinctly different from the memory of other people who have participated in the same event or conversation. Based on his description, this appears to relate to some memory contamination and/or confabulation. He reports a slight problem at times accessing remote memories but indicates that cueing typically will help his memory. He reports a number of language-based problems post-accident including difficulties with word finding, paraphasic errors in his speech, language comprehension, reading comprehension, and spelling. Mental math and math on paper are more difficult for him post-accident. Problem-solving and decision-making activities are more difficult for him post-accident. He feels his speed of information processing is slower than prior to the accident. He notes that it takes him longer to complete all tasks at this time. When writing, he will at times transpose letters and numbers. He reports an ongoing problem with spatial disorientation, finding that he will more frequently get disoriented and lost. He is aware that he makes more mistakes than usual and has difficulty catching his mistakes. He also reports problems with initiation post-accident.

When asked about his current emotional and psychological status, Mr. Bunch acknowledges feelings of depression post-accident. He would rate his depression as 3 to 4 on a 10-point scale with 10 being depression so severe that he would seriously consider suicide. Issues which he remains depressed and concerned about include his ongoing physical and cognitive deficits and the limitations that these impose. He is extremely distressed at being unable to work, as this is causing significant financial stressors for him. He is also acknowledging grief and loss associated with his various limitations. He made observation, "I just want myself back." He denied any depression pre-accident. At this point, Mr. Bunch is acknowledging social isolation which to some degree he attributes to his significant fatigue. He also avoids social situations due to cognitive and stimulus overload. He reports that if there is too much stimuli in the environment or if too much information is presented to him too rapidly, he will become overloaded and overwhelmed. At those times, he has to leave the environment. He also reports that post-accident he has difficulty filtering out background noise, suggesting an ongoing problem with his auditory gating mechanism. He denied any suicidal ideation. He does acknowledge some anhedonia, emotional lability (crying more frequently and easily), mood swings, reduced motivation, and being more emotional when tired. He reports difficulty getting to sleep at night secondary to rumination. He made the observation, "I just can't my brain off." He reports that once he gets to sleep he will wake almost hourly and at times has difficulty falling back to sleep. He reports some decreased appetite post-accident. He also reports a significant ongoing problem with irritability and reduced stress tolerance. He finds he becomes more easily upset and angry over small things that would not have bothered him previously.

Mr. Bunch acknowledges some generalized feelings of anxiety post-accident as well as more specific performance anxiety. At this point, he drives occasionally, but keeps his driving to a

**Lincoln/Bunch 0831**

7C158190008

**NEUROPSYCHOLOGICAL SCREENING**
**Mark B. Bunch**
**Page 6**

minimum. He reports some ongoing passenger anxiety. He would rate his passenger anxiety as 0 to 5 on a 10-point scale with 10 being a panic attack. His anxiety is highest when the vehicle was traveling at high speeds or there are bad road conditions (e.g., snow or rain). Mr. Bunch is hypervigilant when in a motor vehicle. If other vehicles get too close, he experiences a hyperstartle response. He reports nightly nightmares. He also reports intrusive thoughts related to the accident.

## RECORDS REVIEWED

I reviewed the Parkview Medical Center Emergency Room Report dated February 13, 2018 authored by David Wilson, M.D. Dr. Wilson's description of the accident was similar to the description that I received from Mr. Bunch, including hitting his head on the steering wheel. Mr. Bunch denied loss of consciousness. Symptoms reported included blurry vision; left eye pain; disequilibrium; headache; dizziness; neck and shoulder pain; left scalp tenderness with mild abrasion; and, bruising around his right eye. A CT scan of the brain was normal. Mr. Bunch was placed on concussion precautions. His discharge diagnoses were Concussion with Closed Head Injury; Cervical Strain; and, Right Periorbital Ecchymosis. He was alert and oriented and his Glasgow Coma Scale Score was 15.

I had an opportunity to review the CT Scan Report. This was a CT scan of the head without contrast performed on February 13, 2018 as part of his evaluation in the Emergency Room at Parkview Medical Center. That study was read as normal.

I reviewed the Employer's First Report of Injury. That report indicates that the accident occurred on February 13, 2018 on Colorado Highway 50 in Pueblo, Colorado. This report confirms the basic information provided by Mr. Bunch related to the accident. The report indicates that he immediately experienced blurry vision and had difficulty moving his left eye sideways. The injury summary cites soft tissue (head) contusion due to motor vehicle accident.

I reviewed the results of an MRI of the brain without contrast performed on March 19, 2018 and read by Curtis Harlow, M.D. Dr. Harlow identified significant findings as mild scattered areas of high signal intensity seen on FLAIR and T2-weighted sequences in the periventricular white matter regions. He noted that some of these signal intensities were in the perpendicular pattern suggesting demyelinating white matter disease from multiple sclerosis.

I reviewed some records from Steven Olson, M.D. Regarding the MRI of the brain cited above. Dr. Olson states, "For symptoms to be present after an accident seems coincidental for MS without previous symptoms. More likely the changes are secondary to the trauma." I would totally agree with Dr. Olson regarding his opinion regarding the MRI results. Dr. Olson's records document persisting problems with headaches, neck pain, balance, coordination and eye movement. Specifically related to the eye movement deficit, he noted problems with coordination and smoothness of tracking suggesting an eye smooth pursuit deficit. He noted that Mr. Bunch does not have a history of neurological deficits. His diagnoses include Concussion

**Lincoln/Bunch 0832**

7C158190008

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 7

and Traumatic Brain Injury. I received a letter, dated April 13, 2018, authored by Dr. Olson referring him to me for Neuropsychological Evaluation.

## ATTEMPTED TESTING

On May 18, 2018, we attempted formal neuropsychological testing with Mr. Bunch. He presented for the evaluation ambulatory. He was well groomed and casually dressed. He was experiencing a headache that day, which he rated as 4 on a 10-point pain scale. He was also reporting significant pain in his left shoulder when he moved his left arm. He also reported that from the time of my original interview with him until the day of testing, he had begun use of Flexeril, a muscle relaxant, as a sleep aid. He reported that this medication did help somewhat with his sleep but that his sleep was still significantly disrupted. He reported that he was also utilizing a medication for anxiety. He could not recall the name of that medication. He reported that he had used both medications the night prior to testing.

Early on in the course of testing, Mr. Bunch was administered a standalone Performance Validity Test. This was the Victoria Symptom Validity Test. His performance on the Easy Subtest was 20/24 correct. This is considered to be a passing score. His performance on the Difficult Subtest was 6/24 correct. This is considered to be a failing score. As the Victoria Symptom Validity Test is a forced-choice digit recognition test, his score of 6/24 is far below chance which is concerning for intentional lack of effort. His Total Score of 26/48 correct is a "questionable" score. Due to Mr. Bunch's performance on the VSVT, we then administered the Tombaugh Test of Memory Malingering (TOMM). His score on Learning Trial 1 was to 22/50 correct. This is a borderline passing score. His performance on Learning Trial 2 was 27/50 correct. His performance on the Retention Trial was 24/50 correct. These are both failing scores. A passing score for the TOMM Learning Trial 2 and Retention Trial would be 45/50 correct. Based on Mr. Bunch's performance on two standalone Performance Validity Tests, I made the decision to discontinue his testing. At that point in time, it was evident that I was not going to be able to obtain valid neuropsychological test scores.

## PSYCHOLOGICAL FACTORS

As part of the current evaluation, Mr. Bunch completed the Beck Depression Inventory – 2 (BDI-2). His Raw Score on this depression inventory was 45. However, his score was notably elevated as a result of his responding affirmatively to a variety of symptoms that may relate to the residual effects of a Post-Concussive Syndrome. This includes ongoing problems with fatigue, concentration, irritability, sleep disturbance, difficulties with decision making, loss of interest, agitation and emotional lability. When this factor is taken into account, Mr. Bunch's BDI-2 is best interpreted as representing at least moderate feelings of depression at this time.

Mr. Bunch was also administered the PCL-5, a PTSD inventory based on the diagnostic criteria for PTSD as established by the DSM-5. His Raw Score on this PTSD inventory was 79 (Note: maximum score on the PCL-5 is 80). In summary, Mr. Bunch is reporting essentially all symptoms of PTSD at a very high level.

**Lincoln/Bunch 0833**

7C158190008

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 8

## SUMMARY AND RECOMMENDATIONS

Based on Mr. Bunch's retrospective description of the motor vehicle accident of February 13, 2018, he does meet the diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic Brain Injury as established by the American Congress of Rehabilitation Medicine (1993). This definition has now been accepted by the World Health Organization (2009). He also meets the diagnostic criteria for a Mild Traumatic Brain Injury as established by the DSM-5 (2013). He meets the diagnostic criteria for a Grade II (Moderate) Concussion as established by the American Academy of Neurology (1997). He sustained a blow from the steering wheel to his forehead in the course of the accident. He experienced an acceleration-deceleration force to his head that resulted in a whiplash injury. While he did not experience a loss of consciousness related to the accident, he did experience altered consciousness in the form of being dazed and confused. This altered consciousness lasted for approximately four weeks. His memories up to and during the accident are quite vague. He has several gaps in his memory post-accident, which may relate to a period of post-traumatic amnesia. He experienced nausea, vomiting, dizziness, and lethargy post-accident, which would all be behavioral indicators of a concussion. Mr. Bunch continues to report a constellation of physical, fatigue, visual, cognitive and emotional coping deficits consistent with a Post-Concussive Syndrome. He reports a clear temporal onset of cognitive problems immediately post-accident. He has been diagnosed with a Concussion/Closed Head Injury by his primary care provider, Steven Olson, M.D.

We attempted neuropsychological testing with Mr. Bunch on May 18, 2018. Based on his suboptimal performance on two standalone Performance Validity Tests, I made the decision to discontinue his testing as it was evident that we were not going to be able to obtain valid neuropsychological test results. There are a number of factors that can negatively impact performance on standalone Performance Validity Tests including pain, depression, fatigue and intentional lack of effort. At the time of his attempted testing, Mr. Bunch was experiencing at least a moderate to perhaps severe level of depression based on his self-report and results of his the Beck Depression Inventory – 2. He was experiencing a significant headache as well as left shoulder pain the day of testing. He was also experiencing a high level of fatigue due to poor and disrupted sleep as well as the potential effects of a concussion and chronic pain. These factors alone or in combination can explain most of his sub-optimal scores from the Performance Validity Tests. As noted in the body of the report, his below chance performance on the Difficult Subtest of the Victoria Symptom Validity Test is concerning for an intentional lack of effort.

As noted above, Mr. Bunch does meet the diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic Brain Injury as established by a number of professional organizations as well as by the DSM-5. We attempted testing with Mr. Bunch at just three months post-accident. He is therefore experiencing the most rapid phase of spontaneous recovery from the concussion that I would anticipate. At this point, he is not at MMI related to the concussion that he sustained in the February 13, 2018 motor vehicle accident.

**Lincoln/Bunch 0834**

7C158190008

**NEUROPSYCHOLOGICAL SCREENING**
**Mark B. Bunch**
**Page 9**

Mr. Bunch is experiencing some moderate to severe feelings of depression at this time. He is also reporting significant ongoing problems with fatigue, irritability, reduced stress tolerance, emotional lability and reduced motivation. These are all post-concussive symptoms that typically respond well to use of anti-depressant medications in the Select Serotonin Reuptake Inhibitor (SSRI) Class. By the writing of this report, I was informed that Frank Polanco, M.D. has taken over as Mr. Bunch's primary Workers' Compensation physician. Dr. Polanco may wish to consider Mr. Bunch for prescription of an SSRI-type anti-depressant medication. I would initially recommend Cymbalta or it's generic duloxetine. If that medication is ineffective then I would suggest Zoloft.

By the time of attempted testing, Mr. Bunch had been prescribed a muscle relaxant to be used at night as a sleep aid. He has also apparently been prescribed an anti-anxiety medication, again to be used at night possibly as a sleep aid. He could not recall the name of this medication. In either event, he reports that the medications do help somewhat, but he still experiences significant problems with both sleep onset and sleep maintenance. I would, therefore, suggest that Dr. Polanco consider trazodone as a sleep aid.

For Mr. Bunch's residual cognitive problems, he would likely benefit from a period of individual cognitive rehabilitation. Given that he is early post-accident that treatment should take a restorative approach. It should also focus on helping him to develop strategies to compensate for his residual cognitive problems.

As noted above, Mr. Bunch is experiencing moderate to perhaps severe feelings of depression at this time. He is also reporting problems with irritability and reduced stress tolerance. He is reporting symptoms consistent with a Post-Traumatic Stress Disorder related to the accident. These are all accident-related issues that should be addressed in individual psychotherapy. I would recommend that this be with a therapist familiar with Post-Concussive Syndrome if at all possible.

Mr. Bunch is reporting a variety of vision problems consistent with a Post-Traumatic Vision Syndrome. It appears that ocular motor and smooth pursuit deficits have been identified post-accident. He is also reporting symptoms suggestive of a possible left visual inattention. He would, therefore, benefit from further evaluation and possible treatment with a neuro-optometrist. Based on the type of visual problems that Mr. Bunch is reporting, I would recommend evaluation with a neuro-optometrist prior to releasing him to return to drive.

As noted above, I would recommend evaluation with a neuro-optometrist prior to releasing Mr. Bunch to return to driving. Some consideration might also be given to a formal driving evaluation prior to releasing Mr. Bunch to drive. As driving is an integral part of Mr. Bunch's job, a release to return to driving will be a key component to his overall release to return to work.

**Lincoln/Bunch 0835**

7C158190008

**NEUROPSYCHOLOGICAL SCREENING**
**Mark B. Bunch**
**Page 10**

## DSM-5 DIAGNOSIS

| | |
|---|---|
| 331.83 | Mild Neurocognitive Disorder due to Traumatic Brain Injury with Behavioral Disturbance (behavioral disturbance includes irritability, reduced stress tolerance, and anger outburst). |
| 293.83 | Depressive Disorder due to Traumatic Brain Injury, Mild. |
| 309.81 | Post-Traumatic Stress Disorder. |

Once Mr. Bunch's pain, depression and fatigue are better resolved, I will be happy to see him back for a neuropsychological update. Until that time, I hope the above findings and recommendations are helpful to your overall care and treatment of Mr. Bunch. Should you have any further questions, please feel free to contact me at anytime.

*Dennis a. Helffenstein, Ph. D.*

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Colorado License # 1484
Certified Rehabilitation Counselor # 00001338
Diplomate, American Board of Vocational Experts # 64073
Certified, Health Service Provider in Psychology National Register # 41454

**Lincoln/Bunch 0836**

7C158190008

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Clinical Director

Diana M. Helffenstein, M.A., L.P.C.
Licensed Professional Counselor

Brian D. Reusink, M. Ed.
Director of Operations

**COLORADO**
Neuropsychological
ASSOCIATES, P.C.

Primary Office
10 Inverness Dr. East
Suite 215
Englewood, CO 80112
(720) 529-0190
(720) 529-1099 Fax

Also serving clients in
Colorado Springs

March 12, 2019

Kenneth J. Shakeshaft, Esq.
1935 Jamboree Drive
Suite 202
Colorado Springs, CO  80920

**RE:**       Mark B. Bunch
**D.O.B.:**

Dear Mr. Shakeshaft:

At your request, I have now had an opportunity to review additional records regarding Mr. Bunch's treatment since I originally saw him.  These include the records of Julia Brinley, D.O., Neurologist; Thomas W. Higginbotham, D.O., Occupational Medicine Specialist; Anthony Ricci,, Ph.D., Licensed Clinical Psychologist; Michael Saxerud, O.D., Neuro-Optometrist; and, Herman Staudenmayer, Ph.D., Licensed Clinical Psychologist.  You also asked that I review an Independent Medical Examination performed by Frank Polanco, M.D.  and then comment on Mr. Bunch's condition based on that review.  You also asked me if information contained in the records has any impact on my prior diagnoses and treatment recommendations.  You also asked if this information helps to explain why I was unable to obtain valid neuropsychological test scores when I attempted testing with Mr. Bunch.  You also asked me to specifically address the issue of malingering and if Mr. Bunch is committing fraud.

As you will recall, I originally saw Mr. Bunch on May 3, 2018 on referral from Steven Olson, M.D.  I now understand from a review of the records that Dr. Olson is Mr. Bunch's primary care physician and may have for a period of time served as his Workers' Compensation Physician.  I attempted neuropsychological testing with Mr. Bunch on May 18, 2018; and, as you will recall, I discontinued the testing based on Mr. Bunch's inconsistent performance on Performance Validity Testing.  Those test scores suggested that I was not going to be able to obtain valid neuropsychological test results.  As noted in my original report, I felt that there were a number of factors that were negatively impacting his performance on the standalone Performance Validity Tests such as pain, depression, fatigue, and possibly an intentional lack of effort.  I also felt that comorbid factors, including pain, depression and fatigue individually, or in combination, could explain most of his suboptimal scores on Performance Validity Testing.  In retrospect, those premorbid symptoms should have been better addressed prior to attempting neuropsychological

**Lincoln/Bunch 0837**

7C158190008

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 2

testing with Mr. Bunch. Based on my assessment, I did diagnose Mild Neurocognitive Disorder due to Traumatic Brain Injury with Behavioral Disturbance; Depressive Disorder due to Traumatic Brain Injury; and, Post-Traumatic Stress Disorder related to the motor vehicle accident. In addition, I made a number of treatment recommendations, some of which have now been acted upon.

Following my evaluation with Mr. Bunch, Dr. Olson referred him to Thomas W. Higginbotham, D.O., a specialist in Occupational and Environmental Medicine. Since beginning my practice in Colorado Springs in 1994, I have co-treated many patients with Dr. Higginbotham and have come to respect his diagnostic opinions and recommendations. Based on a review of Dr. Higginbotham's records, it appears that he has taken over as Mr. Bunch's primary care physician for injuries sustained in the work-related motor vehicle accident of February 13, 2018. I reviewed Dr. Higginbotham's May 3, 2018 Initial Evaluation. In this evaluation, he obtains a detailed history of the accident as well as Mr. Bunch's symptoms surrounding the accident including diagnostic criteria associated with a possible Mild Traumatic Brain Injury. This included obtaining data that he sustained a blow to his forehead in the course of the accident; experienced altered consciousness post-accident in the form of being dazed; and, experienced some alteration of his memories post-accident. He also obtained data regarding post-concussive symptoms such as being dizzy and having difficulty standing. He conducted a thorough review of symptoms and documented that Mr. Bunch was experiencing multiple post-accident symptoms clearly suggestive of a Post-Concussive Syndrome/Mild Traumatic Brain Injury including dizziness, headaches, depression, nausea, blurry vision, photophobia, tinnitus, fatigue, sleep disturbance, mood swings, change in sense of taste and smell, problems with attention and concentration, short-term memory, photophobia, phonophobia, problems with word finding, difficulties with math, and irritability/reduced stress tolerance. He ultimately diagnosed Mr. Bunch with a history of head trauma with emotional and behavioral disturbance/changes, Neurocognitive Disorder, visual difficulties with spatial disorientation, as well as light and sound sensitivity. Other diagnoses included post-traumatic headaches, cervicalgia, cervical strain, and thoracic myofascial strain. Regarding his diagnoses, Dr. Higginbotham made a number of referrals including specialty evaluations with a neurologist, clinical psychologist, psychotherapy and neuro-optometrist.

In his September 3, 2018 report, Dr. Higginbotham indicates that he reviewed my Neuropsychological Screening report dated June 1, 2018. He concluded that the results of my attempted testing were "likely invalid because of his visual difficulties, headaches and inability to concentrate and focus." In Dr. Higginbotham's own assessment of Mr. Bunch's functioning, he noted that Mr. Bunch had difficulty reading due to double vision and blurry vision. He noted that he had to move the paper and his neck at various angles in order to correctly visualize what was on the page. Even then, he had difficulty maintaining his focus for more than several seconds. He went on to render the opinions that these visual difficulties alone would likely invalidate any psychometric testing including validity testing. I would note that both of the Performance Validity Tests that I administered to Mr. Bunch as part of the attempted testing did, in fact, have a visual component. Also, as a direct result of Mr. Bunch's visual problems as well

**Lincoln/Bunch 0838**

7C158190008

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 3

as other cognitive deficits and limitations, Dr. Higginbotham rendered the opinion that Mr. Bunch was unable to drive; and, therefore, was unable to resume his work (which required extensive driving). He felt that further evaluation and treatment with a neuro-optometrist was critical to Mr. Bunch's overall care and rehabilitation.

I would also note that Dr. Higginbotham appreciated and documented the emotional and psychological symptoms that Mr. Bunch was experiencing associated with the motor vehicle accident. These included depression, nervousness, mood swings and panic attacks. At various times, he diagnosed Situational Adjustment reactions with anxiety and depressed mood; and, Traumatic Brain Injury resulting in emotional and behavioral disturbance/changes. He referred Mr. Bunch for individual psychotherapy with Herman Staudenmayer, Ph.D. Based on a review of my Screening report, he was aware that I had recommended that Mr. Bunch be considered for prescription of an SSRI-type anti-depressant medication. Indeed, Dr. Higginbotham considered prescription of an anti-depressant but made the decision to hold on prescription of an anti-depressant medication until he was evaluated by a neurologist. That evaluation ultimately occurred on October 19, 2018 with Julia Brinley, D.O. Dr. Brinley recommended prescription of nortriptyline (Pamelor), a tricyclic anti-depressant medication. I will discuss this recommendation later when I review her report.

I would note that throughout his records, Dr. Higginbotham documents Mr. Bunch's emotional response to daily surveillance by the Workers' Compensation insurance company. Mr. Bunch clearly found the surveillance to be highly distressing and intrusive. Dr. Higginbotham documented increased depression in response to what appeared to be a long-term surveillance program by the insurance company. I would further note that based on my 39 years of experience, Mr. Bunch's emotional response to this type of intrusive surveillance is quite typical and understandable.

In his November 2018 note, Dr. Higginbotham reviews Mr. Bunch's response to his evaluation with Dr. Polanco. Mr. Bunch noted that Dr. Polanco stated in his report that he spent 40+ minutes in his evaluation with Mr. Bunch. Mr. audio Bunch recorded the assessment. He reported that he had a total of about 11 minutes of recording, 6 of those minutes being spent in face-to-face time with Dr. Polanco. Mr. Bunch felt that there were a number of significant errors and discrepancies with facts of his case in Dr. Polanco's report. In this note, Dr. Higginbotham documents that the nortriptyline prescribed by Dr. Brinley is helping with his sleep.

I reviewed the Neurological Evaluation report, authored by Julia Brinley, D.O. dated October 19, 2018. In my interview with Mr. Bunch, he noted that with regard to memories for some events of the accident, his memories are "vague." He also reported feeling "stunned" immediately post-accident. Perhaps, because of these vague memories, by the time he sees Dr. Brinley he believes that he most likely did lose consciousness for some brief period of time. Based on her assessment and review of records, Dr. Brinley ultimately diagnosed Post-Concussion Syndrome as her primary diagnosis. She also diagnosed intractable chronic migraines and insomnia. She states, "Based on patient's history and exam, I do believe he has continued Post-Concussive

Lincoln/Bunch 0839

7C158190008

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 4

Syndrome with worsening factors to include mood disturbance." I would note that Dr. Brinley prescribed nortriptyline (Pamelor) 10 mg q h.s. (one time at night) for one week and then increase to 20 mg q h.s. thereafter. She stated, "I am hoping this will help with his headaches in addition to sleep and some mood disturbances." I have several observations regarding this particular prescription. I would first note that the therapeutic dose of Pamelor to address depression is 25 mg three to four times per day for a maximum of 150 mg per day. Therefore, the prescribed dose would not be expected to have any positive impact whatsoever on Mr. Bunch's depression. This is only a level of Pamelor that might be expected to help with sleep. In my clinical experience, it is most common for physicians to prescribe an SSRI-type anti-depressant medication for depression in brain-injured individuals. As noted above, nortriptyline (Pamelor) is a tricyclic anti-depressant and not an SSRI. In my experience, physicians will prescribe low doses of tricyclic anti-depressant medications such as nortriptyline and trazodone to help with sleep. Indeed, as noted above, this medication at 20 mg did help Mr. Bunch somewhat with his sleep.

I reviewed a September 25, 2018 report authored by Anthony M. Ricci, Ph.D., a Diplomate in Rehabilitation Psychology. Over several decades, I have co-treated several hundred patients with Dr. Ricci and have come to respect his diagnostic impressions, opinions and treatment with patients. On Page 15 of his report, Dr. Ricci states, "I agree with Dr. Helffenstein and Dr. Staudenmayer's observations that formal neuropsychological testing is not appropriate at this time. Mr. Bunch presents with specific visual-vestibular changes and with significant elements of anxiety, depression and adjustment to disability which contributes to the cognitive dysfunction and creates a pattern of response which is highly frustrating and confusing. His testing results should be considered in light of his despondence and he should be encouraged, supported and allowed venting and directed towards behavioral and self-directed strategies to improve his circumstances and help him to reestablish personal control." Dr. Ricci further stated, "Mr. Bunch is manifesting a somewhat classic presentation of a post-concussion recovery with frontal lobes dysexecutive function." Dr. Ricci correctly notes that this type of executive dysfunction can significantly confound a patient's recovery. Dr. Ricci further states, "It is my opinion that the current difficulties described by Mr. Bunch are related to his psychological and neuropsychological condition and relate to sequelae of the February 13, 2018 MVA." Dr. Ricci recommends additional individual psychotherapy to include conjoint treatment with his fiancee. Dr. Ricci had previously reviewed Dr. Staudenmayer's reports and opinions that the current trauma related to the motor vehicle accident has "rekindled" some prior trauma experienced when Mr. Bunch was 8 years old. Mr. Bunch reported to Dr. Ricci that he did not find a Dr. Staudenmayer's focus on this prior trauma to be particularly beneficial. Dr. Ricci felt that focus on this prior trauma could "detract from his current post-concussion treatment needs." I would totally agree with Dr. Ricci in this regard. Dr. Ricci's diagnoses were Concussion without Loss of Consciousness; Situational Anxiety; and, Adjustment Disorder with Anxiety and Depression.

With regard to Dr. Ricci's assessment, I would note that Dr. Ricci administered the Beck Depression Inventory – Second Edition (BDI-2) on September 25, 2018. Mr. Bunch's score was 27. This score is notably lower than Mr. Bunch's BDI-2 score obtained by me in May of 2018

Lincoln/Bunch 0840

7C158190008

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 5

which, at that time, was 45. While a score of 27 still reflects a fairly high level of depression, this score would suggest some improvement in his depression from the time of my evaluation with him.

I also reviewed the records of Michael Saxerud, O.D. Dr. Saxerud is also a local provider that I have co-treated patients with on multiple occasions. I have also come to trust his diagnostic impressions, opinions and treatment. It appears that Mr. Bunch first saw Dr. Saxerud on July 13, 2018. Dr. Saxerud documented a number of post-concussive symptoms as well as a wide variety of vision problems suggestive of a Post-Traumatic Vision Syndrome. His impressions include convergence insufficiency, headache, visual-perceptual disorder, pursuit eye movement disorder, focal midline right, dizziness, myopia, astigmatism, diplopia, vertical heterophoria, and bilateral visual discomfort. His diagnoses include Post-Concussion Syndrome, visual distortions of shape and size, chronic post-traumatic headaches intractable, diplopia, dizziness, other irregular eye movements, convergence insufficiency, vertical heterophoria, abnormalities of gait and mobility, visual discomfort bilateral, myopia bilateral, and regular astigmatism right. Dr. Saxerud ultimately prescribed corrective lenses with prism correction. A September 21, 2018 letter states, "Mark is under my care for a visual-perceptual disorder secondary to a concussion. At this time, Mark is not capable of working, as his depth perception and eye movements are not adequate to keep him safe in the workplace."

I also reviewed the records of Herman Staudenmayer, Ph.D. This included a Psychological Evaluation report dated August 6, 2018. I would note that Dr. Staudenmayer re-administered the PCL-5, the same PTSD inventory that I administered as part of my screening with Mr. Bunch. Mr. Bunch's PCL-5 score was 66. This score was notably lower than the score of 79 that he obtained as part of my screening with him. This score remains clinically significant, but suggests some improvement in PTSD symptoms from the time that I saw him. I would note that Dr. Staudenmayer also administered the MMPI-2-RF as part of his evaluation with Mr. Bunch. He noted that Mr. Bunch's F-r Score was 120T, which he felt indicated over reporting of psychiatric, somatic, and cognitive symptoms. He ultimately concluded that the results of the MMPI-2-RF as well as the PCL-5 and the SC AT2 were not valid due to his symptom reporting. In general regarding the issue of over reporting symptoms, scores on tools such as the MMPI-2-RF and PCL-5 can be elevated as a result of the patient's honest report of persisting symptoms associated with actual medical conditions including Post-Concussion Syndrome. Dr. Staudenmayer notes in later records that scores on these types of tools can be elevated as a "cry for help." That is, the patient is in a high level of emotional and/or physical distress and they are reporting symptoms in the hope that the provider can help them in some way. As part of his Psychological Evaluation report, Dr. Staudenmayer states, "Mental status exam suggest exaggeration and adopting the sick role. Psychological testing indicated that his self-report reflects over reporting bias, making these self-reported symptoms invalid. Comprehensive neuropsychological testing is contraindicated at this time." Dr. Staudenmayer's working diagnosis was Psychological Factors Affecting a Medical Condition. Dr. Staudenmayer recommended individual psychotherapy which he then proceeded to provide to Mr. Bunch.

Lincoln/Bunch 0841

7C158190008

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 6

Dr. Staudenmayer's later Treatment Notes document a prior trauma which Mr. Bunch experienced when he was 8 or 9 years old when he was hiking by himself in the foothills and accidentally fell into a dry well. The well was so deep he could not get out and he spent the night "terrorized" at the bottom of the well. Mr. Bunch thought that at that time he would die. He could not recall how he was rescued, but was apparently was told that he was rescued by fire department personnel. He apparently reported some post-traumatic stress symptoms through his teenage years, but appeared to be symptom-free throughout his adulthood. In his August 13, 2018 note, Dr. Staudenmayer states, "I explained to him the nature of how trauma memories, particularly sensory and emotional memories are stored and how they are interconnected by association pathways such that a recent experience can trigger the others. It appears that the motor vehicle accident was traumatic enough in its own right but also rekindled past associated experiences and traumatic symptoms." I would agree with Dr. Staudenmayer that current traumas can certainly "rekindle" past traumas which have been quite dormant for many years. It is my clinical experience treating many PTSD patients that the focus of treatment should remain on treating the current trauma. As that trauma resolves then past traumas will typically return to their dormant state. I would also note that past traumas can result in a situation where an individual can be more sensitive to and responsive to a more current trauma. That is, the individual is more symptomatic related to the current trauma because they are sensitized to trauma by the past traumas. Again, it is my experience that treating the current trauma should be the first line of treatment.

In brief summary, I would note that Dr. Staudenmayer felt that comprehensive neuropsychological testing was contraindicated due to Mr. Bunch's emotional and psychological status. It would be important to note that the emotional and psychological distress that Mr. Bunch was experiencing at the time of my screening with him was even more pronounced than at the time of Dr. Staudenmayer's evaluation.

I reviewed Dr. Staudenmayer's Review of Records report dated November 17, 2018. Dr. Staudenmayer apparently reviewed an IME report, authored by Dr. Lesnak, dated September 18, 2018. He also reviewed a report generated by Dr. Polanco as well as Dr. Brinley's neurological evaluation. He concluded this note by stating, "I am updating my diagnoses adding (F44.7) Conversion Disorder (Functional Neurologic Symptoms Disorder) with Mixed Symptoms. The most difficult aspect of Conversion Disorder is to identify the specific motivation underlying it including malingering, primary gain or secondary gain. In my experience, it is not secondary gain but primary gain. Under such circumstances, patients with primary gain are extremely difficult to treat because they are vested in their distorted beliefs." This additional diagnosis essentially reinforces Dr. Staudenmayer's initial impression that Mr. Bunch is adopting the "not well role" and that this is a psychological component to his symptom presentation.

I reviewed a Comprehensive Consultation report authored by Frank Polanco, M.D. The date of this report is unclear, but it may be November 6, 2018. Dr. Polanco indicates that the "reason for visit" is that Mr. Bunch is "seeking a primary provider for his industrial injury of February 13, 2018." This statement is inconsistent with a transcript of a recording of this evaluation, which

Lincoln/Bunch 0842

7C158190008

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 7

you also provided to me. Mr. Bunch clearly states to Dr. Polanco when asked why he is there that he is unsure why he is there or who sent him. At this point in time, Mr. Bunch was being treated by Dr. Higginbotham and I see no indication in Dr. Higginbotham's records or any other records that he was dissatisfied with Dr. Higginbotham's care. Dr. Higginbotham does note that there were apparently some efforts on behalf of the insurance company to usurp Mr. Bunch from his care into the care of Dr. Polanco. I would note that when Mr. Bunch stated to Dr. Polanco that he did not know why he was there or who had referred him, Dr. Polanco did not help to clarify the situation or in any other way explain the reason for his evaluation with Mr. Bunch. I would further note that Dr. Polanco indicated that he spent 2-1/2 hours reviewing surveillance video as part of his evaluation with Mr. Bunch. If this was, in fact, an initial treatment assessment, I would find spending 2-1/2 hours reviewing surveillance video to be quite unusual for such an evaluation. On a surface, this appeared to be more of an IME as opposed to a true clinical assessment.

Based on a review of the transcript of the evaluation that you provided, it appears that the medical evaluation conducted by Dr. Polanco was quite minimal. However, as I am not a physician, I cannot comment on the thoroughness of the medical evaluation. I can, however, comment on the thoroughness of Dr. Polanco's concussion assessment, which was minimal and highly inadequate. When discussing the accident, Mr. Bunch spontaneously offered to Dr. Polanco that he did strike his head in the course of the accident and provided a picture to Dr. Polanco documenting that head trauma. Dr. Polanco did ask one follow-up question on Page 3, Line 22, "Did you pass out or anything?" Mr. Bunch's response suggested that he feels he may have lost consciousness, however, as opposed to following up on that response, Dr. Polanco again asked him if he hit his head and again Mr. Bunch responded that he did strike his head in the course of the accident. On Page 4, Lines 21 and 22, Dr. Polanco again asked Mr. Bunch if he passed out. However, this was a compound question and he also asked if Mr. Bunch exited the vehicle, Mr. Bunch's response was, "I don't recall." Dr. Polanco then pursues the issue of if he exited the vehicle as opposed to asking further questions regarding a possible loss of consciousness. On Page 5, Line 6, Mr. Bunch reported that he felt "woozy" post-accident. This response would suggest some alteration of consciousness. This is not a symptom that Dr. Polanco asked about further. Therefore, the only questions related to a possible concussion that Dr. Polanco asked were "did you hit the head" and "did you lose consciousness." I see nowhere in the transcript that Dr. Polanco specifically asked about altered consciousness post-accident such as feeling dazed, confused, or disoriented. I see nowhere in the transcript where Dr. Polanco asked about the alteration of memories surrounding the accident. Therefore, Dr. Polanco's assessment of a possible brain injury was quite inadequate.

Dr. Polanco ultimately states, "The findings in the records do not support a concussion/TBI and the diagnostics do not support a brain injury." As noted above, Dr. Polanco's personal assessment of the brain injury/concussion was inadequate and incomplete. Providers such as Dr. Olson, Dr. Higginbotham, and Dr. Brinley as well as myself did obtain adequate data to make the concussion/brain injury diagnosis. In addition, it is now accepted that medical diagnostics such as CT scans and MRIs are almost always negative in cases of Mild Traumatic Brain Injury.

Lincoln/Bunch 0843

7C158190008

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 8

These types of medical diagnostics are "rule in" and not "rule out" tests. Dr. Polanco ultimately renders an assessment of PTSD (pre-existing condition not permanently aggravated). By this, Dr. Polanco was referring to Dr. Staudenmayer's perception that a prior trauma sustained at age 8 was aggravated/"rekindled" by the motor vehicle accident. Nowhere in his report does Dr. Polanco address the issue that Mr. Bunch may have PTSD symptoms related to the motor vehicle accident. Based on a review of the transcripts, he did not ever ask Mr. Bunch even one question about possible PTSD symptoms.

I noted a number of misrepresentations in Dr. Polanco's report. He stated that Dr. Staudenmayer did "not support a concussion/TBI diagnosis." Dr. Staudenmayer's report was very clear that he was deferring that diagnosis to Mr. Bunch's other providers and that his assessment did not rule out that diagnosis. In the discussion section of his report, Dr. Staudenmayer states, "It was not until 2-1/2 months later that he complained of a multitude of symptoms, which is inconsistent with concussion or traumatic brain injury." This misrepresents the facts of the case. In fact, Mr. Bunch was reporting multiple post-concussive symptoms early post-accident.

## SUMMARY AND RECOMMENDATIONS:

Based on my review of the above records, I have several observations and treatment recommendations:

1.  Mr. Bunch's providers are all in agreement that he has experienced notable feelings of depression post-accident. Following my screening assessment with him, I recommended individual psychotherapy as well as prescription of an SSRI-type anti-depressant medication. While Mr. Bunch has received some individual psychotherapy with Dr. Staudenmayer, he has not been prescribed an SSRI-type anti-depressant medication. He has been prescribed a tricyclic anti-depressant medication (Pamelor) at a subtherapeutic dose for sleep. As I believe a significant component of his depression is organically-based, I would strongly recommend that Dr. Higginbotham consider Mr. Bunch for prescription of an SSRI-type anti-depressant medication such as Cymbalta or its generic, duloxetine. If that medication is ineffective, then I would suggest Zoloft.

2.  With regard to individual psychotherapy, it is evident that Mr. Bunch requires additional treatment to address accident-related issues such as depression, reduced stress tolerance and PTSD related to the motor vehicle accident. I would recommend that the focus of any PTSD treatment be on the motor vehicle accident and not on any prior traumas. He would likely be a good candidate for use of EMDR to address his PTSD symptoms as well.

3.  With regard to the issue of symptom over reporting and/or malingering, I would note that these are two separate issues in the field of neuropsychology. An individual may over report symptoms for a number of reasons, including experiencing a high level of emotional or psychological distress; a cry for help; or, over reporting of symptoms for some primary or secondary gain reason. At this point, I do not have enough data to render an opinion

7C158190008

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 9

regarding this issue. It appears that Dr. Staudenmayer is at least considering the possibility that any over reporting of symptoms may relate to a "cry for help." At this point, that appears to be a reasonable working theory. He also believes that, to some degree, Mr. Bunch's over reporting of symptoms relates to his adopting the "sick role." While this explanation is certainly possible, I would want to explore this possibility more fully in therapy with such a patient.

With regard to malingering, again I do not have enough data to render an opinion regarding this issue. I am the only provider that has administered Performance Validity Tests to Mr. Bunch. It remains my opinion that the bulk of his suboptimal scores on Performance Validity Testing are, in fact, explained by his residual high level of pain, depression, anxiety and fatigue at the time of my assessment with him. This is an opinion that seems to be corroborated by a number of his providers and evaluators, including Dr. Higginbotham and Dr. Ricci. At this point, there is only one score from one test that would suggest malingering. That is not enough data for any provider to render the professional opinion (or diagnosis) of malingering.

Should you have any further questions, please feel free to contact me at anytime.

Sincerely,

Dennis a. Helffenstein, Ph. D.

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Colorado License # 1484
Certified Rehabilitation Counselor # 00001338
Diplomate, American Board of Vocational Experts # 64073
Certified, Health Service Provider in Psychology National Register # 41454

Lincoln/Bunch 0845

7C158190008

# *Patient Encounter*

| Patient | Provider | Encounter |
|---|---|---|
| **Mark Bunch** | Michael Saxerud, OD | Date: 11/02/2018 |
| | Pine Creek Vision Clinic | Type: Brain Injury Follow-Up EP |
| | 9475 Briar Village Point Suite 200 | |
| DOB:          55 Years | Colorado Springs CO 809207918 | |
| Sex:    Male | (719) 594-2020 | |

## History

### Reason For Visit

**Patient Reason:**                                                  **Referring**

Follow up for post concussion
The last set of taped safties provided good vision for 3 weeks, then
vision declined again   Bending down to tie shoes causes dizziness        **Addl Reason**
Bean bag toss went well while vision was doing well   headaches
continue to improve, less frequent in nature   Distance vision seems
to do pretty well, trouble with near, his OTC readers are broken
Double vision only occasional, depth perception improving, stairs are
not as difficult

**Provider Reason:**

### Contact Lens History

1118324S5459043 20181119

**Lincoln/Bunch 0846**

7C158190008

| Mark Bunch (09/12/1963) | Michael Saxerud, OD | 11/02/2018 |
|---|---|---|

## Contact Lens History

### Current Lenses

No Contact Lens information available

### Lens History

Lens Age                                    Supply          None

### Wearing History

Ave Daily Wearing Time                      Ave Replacement Period:
Today's Wearing Time:                       Continuous Wear Period·

### Care History

Solutions
Drops Used:
Other Supplies.
Additional Comments:

## Examination

### VA/Color/Stereo

#### Aided Visual Acuity

OD Distance VA (20/)    20          OS Distance VA (20/)    20
OU Distance VA (20/)    20

#### Vital Signs

Arm             Left                Height Unit     feet
Weight Unit     pounds

### Cover/NPC/EOM

#### Cover Test

UCT Distance    No Motion           UCT Near        No Motion

#### EOM (Motility)

OD Full Range   Yes                 OS Full Range   Yes
OD Limitation Comment   3+ losses with pursuits with taped safties,    OS Limitation Comment
                        worse without safties

Printed On    11/05/2018                                    Page 2 of 4

1118324S5459043  20181119

**Lincoln/Bunch 0847**

7C158190008

| Mark Bunch | Michael Saxerud, OD | 11/02/2018 |
|---|---|---|

### NPC

| Break | 8 | m | Yes |
|---|---|---|---|

## CL Evaluation

### CL Evaluation

| | | | |
|---|---|---|---|
| OD Lens Centration | Even | OS Lens Centration | Even |
| OD Lens Quality | No Defects | OS Lens Quality | No Defects |
| OD Lens Surface | Clean | OS Lens Surface | Clean |
| OD Limbal Coverage | Full | OS Limbal Coverage | Full |
| OD Rotation Direction | None | OS Rotation Direction | None |

## Assessment and Plan

### Diagnoses

| Dx Date | Dx | Description | Eye | Care Plan |
|---|---|---|---|---|
| 11/02/2018 | F07 81 | Postconcussional syndrome | | Add walk with head turns |
| | | | | Have PT rule out BPPV |
| | | | | RTC one month |
| | | | | Continue bean bag toss |
| | | | | Taped safties with 0 25 yoked base up along with 1 mm taped UNO. |
| 11/02/2018 | H53 16 | Visual distortions of shape and size | | |
| 11/02/2018 | H53 2 | Diplopia | | |
| 11/02/2018 | R42 | Dizziness and giddiness | | |

### Diagnoses Comments

### Additional Comments

## Coding

| Service | Description | Diagnoses |
|---|---|---|
| 99214 | E&M LEVEL 4, EST PT | H53 2, H53 15, F07 81, R42 |
| 92065 | Vision Therapy Exam | F07 81 |

**Signed by Michael Saxerud, OD on 11/02/2018**

## Contact Lens Trials

Printed On.    11/05/2018

1118324S5459043 20181119

**Lincoln/Bunch 0848**

7C158190008

| Mark.Bunch ( | Michael Saxerud, OD | 11/02/2018 |

**Trial #.**    *9028873*

OD: Biofinity (Coopervision Inc )
OS: Biofinity (Coopervision Inc )

|      | BC   | Sph   | Cyl | Axis | Diam | Add | Add Des | Tint |
|------|------|-------|-----|------|------|-----|---------|------|
| OD:  | 8 60 | -2 00 |     |      | 14 0 |     |         |      |
| OS   | 8 60 | -2 00 |     |      | 14 0 |     |         |      |

*Trial Comments*
   OD:
   OS:

   OD Dispensed·    No        OS Dispensed.    No

*This information is a summary of all examination findings from this patient encounter, and should be taken only as a representation of clinical data and decisions made at that individual visit*

1118324S5459043  20181119

**Lincoln/Bunch 0849**



**Lincoln/Bunch 0850**

7C158190008



**$9.70**  US POSTAGE
2 LB PRIORITY MAIL RATE
ZONE 6 NO SURCHARGE
COMMERCIAL BASE PRICING

062S0009018701
FROM 80920

stamps.com

06/04/2019

# PRIORITY MAIL 3-DAY™

KENNETH SHAKESHAFT
1935 JAMBOREE DR., SUITE 202
COLORADO SPRINGS CO 80920

**B900**

SHIP
TO:  Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
Adjuster Courtney Grygiel
P.O. Box 7213
London KY 40742-7213

## USPS TRACKING #



**9405 5118 9956 1831 5496 83**

**Lincoln/Bunch 0851**

 

MLS National Medical Evaluation Services

Phone: 888.657.4634  |  Fax: 248.356.6757  |  www.mls-ime.com

5/23/2019

| RE: | Claimant Name | : | Mark Bunch |
|---|---|---|---|
| | Client | : | LIBERTY MUTUAL INSURANCE CO - NH 92 |
| | Referred By | : | Grygiel, Courtney |
| | Type of Review | : | Disability |
| | Type of Service | : | LTD |
| | Claim Number: | : | 8220685 |

## MEDICAL DOCUMENTATION REVIEWED

I have reviewed all of the documents provided.

| Referral | | 04/02/19-05/14/19 |
|---|---|---|
| Progress notes | J. Brinley DO | 10/19/18 |
| Progress notes | Centura Health | 02/23/18-04/13/18 |
| Progress notes | Dr. M. Christiansen | 07/30/18-09/20/18 |
| Progress notes | Colorado Neuropsychological Associates | 06/01/18-03/12/19 |
| Progress notes | Colorado Springs Neuro Associates | 10/19/18 |
| Progress notes | Colorado Springs Psychological Center | 09/25/18 |
| Progress notes | Gleneagle Vision Center | 06/30/18-09/21/18 |
| Progress notes | T. Higginbotham DO | 05/03/18-04/29/19 & undated |
| Progress notes | Parkview Medical Center | 02/13/18 |
| Progress notes | Pines Creek Vision Clinic | 11/21/18 |
| Progress notes | H. Staudenmayer PhD | 08/06/18-08/13/18 |
| Progress notes | Unknown provider | 10/01/18-10/30/18 |
| PT | St. Thomas More Hospital | 05/31/18-06/11/18 |
| UR Report | T. Belliveau PhD, ABPP | 04/29/19 |
| UR Report | R. Swotinsky MD | 04/23/19-05/11/19 |
| UR Report | J. Young MD | 09/10/18 |
| CT | Parkview Medical Center | 02/13/18-03/13/18 |
| Job | Charter Communications | 01/03/19 |
| Misc | | 11/15/17-05/11/19 & undated |
| ROI | | undated |

**Lincoln/Bunch 0852**

Page - 2  Claimant Name: Mark Bunch Claim Number: 8220685

**SUMMARY OF PEER OUTREACH**

TELECONFERENCE #1:
   1) AP NAME: Dr. Michael Saxerud
   2) DATE: 5/20/2019
   3) TIME: 12:29 PM ET
   4) PERSON SPOKEN WITH: Voicemail
   5) POSITION OF PERSON SPOKEN WITH: Voicemail

SUMMARY OF CONVERSATION: I left a message for the provider to return my call.

TELECONFERENCE #2:
   1) AP NAME: Dr. Michael Saxerud
   2) DATE: 5/21/2019
   3) TIME: 12:30 PM ET
   4) PERSON SPOKEN WITH: Sandra/Voicemail
   5) POSITION OF PERSON SPOKEN WITH: Receptionist/Voicemail

SUMMARY OF CONVERSATION: I left a message for the provider to return my call.

TELECONFERENCE #3:
   1) AP NAME: Dr. Michael Saxerud
   2) DATE: 5/22/2019
   3) TIME: 11:00 AM ET
   4) PERSON SPOKEN WITH: Ashley/Voicemail
   5) POSITION OF PERSON SPOKEN WITH: Receptionist/Voicemail

SUMMARY OF CONVERSATION: I spoke with Ashley, who transferred me to leave a voicemail message for the provider to return my call.

**SUMMARY OF MEDICAL DOCUMENTATION**

The claimant is a 55 year old male Direct Sales Representative with recurrent major depressive disorder for whom functionality is reviewed from an ophthalmologic perspective. History is also notable for history of MVC, traumatic brain injury and post-conscussion syndrome with visuospatial disorientation. Physical demands of his job include visual tasks such as frequent reading, seeing, driving, and climbing stairs.

An exam by Dr. Saxerud dated 7/13/18 documents complaints of headaches, eye strain/fatigue, neck pain, poor reading, photophobia, and poor depth perception and concentration. The claimant had been in an motor vehicle accident in February of 2018. Vision was best corrected to 20/20- OU with a low myopic prescription. Intraocular pressures were 17 mm Hg OD and 18 mm Hg OS. Near point of accommodation was 16 inches. Final diagnoses included postconcussional syndrome, visual distortions of shape and size, chronic post-traumatic headache, diplopia, dizziness and giddiness, other irregular eye movements, convergence

**Lincoln/Bunch 0853**

Page - 3  Claimant Name: Mark Bunch Claim Number: 8220685

insufficiency, vertical heterophoria, other abnormalities of gait and mobility, visual discomfort, myopia and regular astigmatism. A trial of prisms was recommended.

An exam by Dr. Saxerud dated 8/17/18 documents the claimant is still bothered by bright lights, double vision and overlapping images on occasion.  The claimant was able to watch TV but was still not driving. Orthoptic vision therapy (92065) was recommended.

A note from Dr. Saxerud dated 9/21/18 documents the claimant being under the provider's care for a visual perceptual disorder secondary to a concussion.  At that point, the claimant was not capable of working as his depth perception and eye movements were not adequate to keep him safe in the work place. On exam, near point of convergence was 4 inches.

In a note dated 11/21/18, Dr. Saxerud opines that the claimant was making steady progress, and while his depth perception and eye movements were improving, he continued to have difficulties in these areas.  He was hopeful that the claimant would be able to drive a vehicle and return to work in the next couple of months.  However, the patient was not yet ready to return to these activities.

## QUESTION

**1. What is the supported ophthalmologic diagnosis?**

Ophthalmologic diagnoses supported by the records provided include convergence insufficiency, vertical heterophoria, and myopic astigmatism.

**2. Does the medical evidence support any diagnoses causing functional impairment from 8/15/18 to the present? Please explain your medical rationale as to why or why not.**

Yes. The medical evidence supports the claimant as having convergence insufficiency as manifested by remote near point of convergence causing functional impairment from 8/15/18 to present.

**3. If functional/visual impairment is supported, please describe how that translates into restrictions or limitations and for what period(s) of time. Please explain your medical rationale for any restrictions or limitations or why restrictions or limitations are not supported.**

From 8/15/18 to present, functional impairment would translate to restrictions on the length of time the claimant would be required to read or use a computer.  The claimant would be limited to performing these tasks for 15 minutes at a time followed by a 15 minute break from such activities throughout an 8 hour day.

These restrictions are not supported beyond the present without reassessment as the claimant's most recent record provided was from 11/21/18, six months ago.

**Lincoln/Bunch 0854**

Page - 4  Claimant Name: Mark Bunch Claim Number: 8220685

**4. When contacting the treating provider please discuss the claimant's condition, treatment, and functional capacity. Please indicate the information reviewed and indicate whether or not you reached consensus with the treating provider. If not, please discuss your final assessment after the call.**

Attempts at contacting the provider were unsuccessful

CONFLICT OF INTEREST:

*I certify that I have no relationship or affiliation with the beneficiary of this independent review or a significant past or present relationship with the Attending Provider and/or the treatment facility. I further certify that I have no familial or material professional or business relationship or incentive to promote the use of a certain product or service associated with the review of this case. I further certify that I have no direct or indirect financial incentive for a particular determination or ownership interest of greater than 5% between any affected parties.*

*This attestation certifies that the peer reviewer named below has the appropriate scope of licensure or certification that typically manages the medical condition, procedure, treatment, or issue under review and has current, relevant experience and/or knowledge to render a determination for the case under review.*

Sincerely,

Bradley Davitt, M.D.
Board Certified: American Board of Ophthalmology
Fellowship, Pediatric Ophthalmology & Adult Strabismus
Professor of Ophthalmology, Saint Louis University Health Sciences Center
Associate Professor of Pediatrics, Cardinal Glennon Children's Medical Center
American Academy of Ophthalmology
American Association for Pediatric Ophthalmology and Strabismus
Christian Medical and Dental Society
Christian Ophthalmology Society
Missouri Society for Eye Physicians and Surgeons
St. Louis Ophthalmology Society

*MLS attests to the fact that there is no conflict of interest with this review MLS attests that its compensation is not dependent on the specific outcome of this review. All opinions in this report are solely the opinions of the author. All opinions are advisory only, independently developed by the author and are based upon a reasonable degree of medical certainty and evidence-based medical concepts, considering the data available at the time of this report.*

**Lincoln/Bunch 0855**

**Invoice**    **51109-1**                                   **MLS Group of Companies**

**Date of Invoice**  5/23/2019                                        P.O. Box 492417
                                                                Redding CA  96049
                                              248-945-9001 Fax:  248-356-6757

LIBERTY MUTUAL INSURANCE CO - NH 92         **Case ID:**      8220685
P.O. Box 1525                                **Referral ID:**  51109
Dover, NH 03821                              **Name:**         Mark Bunch
                                             **Employer:**
**Attention:**                               **Physician:**    Bradley Davitt
Courtney Grygiel                             **Specialty:**    Ophthalmology
                                             **Svc Date:**     5/23/2019

| Item | Rate |
|---|---|
| Peer Review | $1365.00 |

                              **Invoice Total**    $1365.00
                              **Receipt Total**    $0.00
                              **Invoice Balance**  $1365.00

Please visit our new web-site address located at www.mlsgroupllc.com

MLS Tax ID #: 38-3341904                 Please make checks payable to:
                                            MLS Group of Companies

                                         **Lincoln/Bunch 0856**



## Occupational Analysis

**Date: 05/16/19**
**Name: Mark Bunch**
**Claim Number: 8220685**
**Policy Holder: Charter Communications, Inc.**

An Occupational Analysis was completed to compare the job, Direct Sales Representative (Medium), to the own occupation in the National Economy per the DOT of Sales Representative, Television Cable Service (DOT: 259.357-022, Light; O*NET: 41-3099.00).

The following resources/documents were utilized in this comparison:
- OASYS
- SOC/O*NET
- ER provided Job Description

The employee is out of work due to post-concussive syndrome. There were no restrictions or limitations outlined within the referral.

The comparison to the position with the employer to the national economy is as follows:

**Essential Duties**:
Comparable between the employer and the National Economy, per the DOT, as they both travel throughout their assigned territory to sell cable television services to prospective customers.

**Physical Demands**:
The employer indicates this job is Medium with job demands to include:
- <u>Frequent</u> sitting, standing, walking, climbing stairs, balancing
- <u>Occasional</u> bending, stooping, crouching, twisting upper body
- <u>Rarely</u> lifting up to 25lbs, reaching at shoulder/above shoulder, pushing/pulling, kneeling, crawling
- <u>Never</u> climbing ladders/poles

The occupation is typically performed as Light in the National Economy per the DOT. National Economy demand levels include:
- <u>Frequent</u> sitting, standing, walking, handling
- <u>Occasional</u> reaching, fingering
- <u>Never</u> climbing, balancing, stooping, kneeling, crouching, crawling

**Mental/Cognitive Demands (Work Situations):**
National Economy requires one to influence people in their opinions, attitudes and judgments, work closely with and deal directly with the public and people/customers, and make judgments and decisions. These activities are comparable with the employer.

**Lincoln/Bunch 0857**

**Summary**:
The employer requirements of the job are greater than that of the national requirements of the occupation. The occupation is most often performed at the Light level in the National Economy per the DOT. Part-time opportunity does exist for this occupation in the National Economy.

I have not met with the employee for the purpose of this review. All opinions are based on a review of medical records and resources listed only.

Respectfully submitted,

Electronically Signed

*Nicole Hall, M.S., C.R.C.*
*Vocational Case Manager*

**Lincoln/Bunch 0858**

**259.357-022  Sales Representative, Television Cable Service**
**O\*NET Code:**  41-3099.00  Sales Representatives, Services, All Other

Contacts homeowners, apartment managers, and other prospects to sell cable television service:  Compiles list of prospective customers from lists of homes that do not have cable television and lists of residential addresses with names of owners and occupants.  Travels throughout assigned territory to call on prospective customers in their homes to solicit orders.  Performs duties as described under SALES REPRESENTATIVE (retail trade; wholesale tr.) Master Title.
DLU:  1988

## OCCUPATIONAL REQUIREMENTS

**Title:**  Sales Representative, Television Cable Service                    **DOT Code:**   259.357-022
**Industry:**  Radio and TV Broadcasting

**Specific Vocational Preparation:** Level 3 (1 to 3 months)

**General Educational Development:**                    Reasoning  Grades 9-12
                                                        Mathematics  Grades 7-8
                                                        Language  Grades 9-12

**Strength:**    Light          Lifting, Carrying, Pushing, Pulling 20 Lbs. occasionally, frequently up to 10 Lbs., or negligible amount constantly. Can include walking and or standing frequently even though weight is negligible. Can include pushing and or pulling of arm and or leg controls.

| Physical Demands: | | Environmental Conditions: | |
|---|---|---|---|
| Climbing | Never | Noise Intensity Level | Moderate |
| Balancing | Never | Exposure to Weather | Never |
| Stooping | Never | Extreme Cold | Never |
| Kneeling | Never | Extreme Heat | Never |
| Crouching | Never | Wet and/or Humid | Never |
| Crawling | Never | Vibration | Never |
| Reaching | Occasionally | Atmospheric Conditions | Never |
| Handling | Frequently | Proximity to Moving Mechanical Parts | Never |
| Fingering | Occasionally | Exposure to Electrical Shock | Never |
| Feeling | Never | Working in High Exposed Places | Never |
| Talking | Constantly | Exposure to Radiation | Never |
| Hearing | Constantly | Working with Explosives | Never |
| Tasting/Smelling | Never | Exposure to Toxic or Caustic Chemicals | Never |
| Near Acuity | Occasionally | Other Environmental Conditions | Never |
| Far Acuity | Never | | |
| Depth Perception | Never | | |
| Accommodation | Never | | |
| Color Vision | Occasionally | | |
| Field of Vision | Never | | |

| **Work Situations:** | Influencing people in their opinions, attitudes, judgments. | **Data:** | 3 Compiling |
|---|---|---|---|
| | Dealing with people. | **People:** | 5 Persuading |
| | Making judgments and decisions. | **Things:** | 7 Handling |

| **Aptitudes:** | **DOT** | **OAP** |
|---|---|---|
| General Learning Ability | 3  (34-66 Percentile) | 3- (34 - 44 Percentile) |

**Lincoln/Bunch 0859**

| | | |
|---|---|---|
| Verbal Aptitude | 3 (34-66 Percentile) | Not Included |
| Numerical Aptitude | 3 (34-66 Percentile) | 4+ (26 - 33 Percentile) |
| Spatial Aptitude | 3 (34-66 Percentile) | Not Included |
| Form Perception | 4 (11-33 Percentile) | Not Included |
| Clerical Aptitude | 3 (34-66 Percentile) | 4+ (26 - 33 Percentile) |
| Motor Coordination | 4 (11-33 Percentile) | Not Included |
| Finger Dexterity | 4 (11-33 Percentile) | Not Included |
| Manual Dexterity | 4 (11-33 Percentile) | Not Included |
| Eye-Hand-Foot Coordination | 5 (Below 11 Percentile) | |
| Color Discrimination | 4 (11-33 Percentile) | |

**Lincoln/Bunch 0860**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 422-7909

| | |
|---|---|
| Date: May 15, 2019 | |
| To: | SHAKESHAFT-GORMAN LAW FIRM<br>1935 JAMBOREE DRIVE<br>SUITE  202<br>COLORADO SPRINGS CO 80920 |
| Attn: | Kenneth Shakeshaft |
| Fax: | (719) 635-0966 |
| From: | Courtney Grygiel<br>Appeals Consultant<br>Phone No.: Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 427-2110 |
| Total Pages<br>(Including Cover):    38 | |
| RE:<br><br>Claim #:    8220685<br>Claimant:   Mark Bunch<br><br>Charter Communications, Inc. | |

**Welcome to Lincoln Financial Group.**
Effective May 1, 2018, Liberty Life Assurance Company of Boston was acquired by The Lincoln National Life Insurance Company, a Lincoln Financial Group company. During the transition, you may receive communications from both companies. Please open and read all correspondence you receive about your benefits.
Thank you.

**Bienvenido a Lincoln Financial Group.**
A partir del 1 de mayo de 2018, Liberty Life Assurance Company of Boston pasó a pertenecer a The Lincoln National Life Insurance Company, una compañía de Lincoln Financial Group. Durante la transición, es posible que reciba comunicados de ambas compañías. Abra y lea toda la correspondencia que reciba sobre sus beneficios.
Muchas gracias.

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

**Lincoln/Bunch 0861**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 422-7909

May 15, 2019

Shakeshaft-Gorman Law Firm
1935 JAMBOREE DRIVE
SUITE  202
COLORADO SPRINGS, CO 80920

RE:    Long Term Disability (LTD) Benefits
       Charter Communications, Inc.
       Claim #: 8220685
       Claimant: Mark Bunch

To Whom It May Concern:

Lincoln Financial Group is responsible for managing claims for your client's benefits under the Charter Communications, Inc. long-term disability (LTD) insurance policy.

The purpose of this letter is to inform you that we require additional time to render a determination on this LTD appeal. Under the Employee Retirement Income Security Act of 1974 (ERISA), an appeal determination should be rendered within 45 days of receipt of the appeal, unless there are special circumstances which require a delay in making an appeal determination.  If additional time is needed, ERISA allows for a 45-day extension to evaluate and render an appeal decision.

We are in process of reviewing your client's appeal of our decision regarding the above-referenced claim.  This letter and enclosure(s) is to provide you with an opportunity to review and comment on new/additional evidence that has been received before a decision is rendered on this appeal.

Please find attached a copy of the independent medical reviews by Robert Swotinsky, MD, Board Certified in Occupational Medicine and Timothy Belliveau, PhD, ABPP, Board Certified in Clinical Neuropsychology and Rehabilitation Psychology which is new or additional evidence in connection with this appeal.  You may review these peer reviews and provide a response to us, which we will consider in making our decision on this appeal.  If we do not receive your response within 21 days of the date of this letter, we will proceed with making a determination on this appeal.

As noted in Dr. Swotinsky's addendum, Mr. Bunch's file has been sent for an independent ophthalmology review. Upon completion of this medical review it will be forwarded for your review and response.

Under ERISA, the period for making a benefit determination shall be tolled (suspended) from the date of this notice until we receive your timely response.  Upon receipt of your response, we will

1  of  2

**Lincoln/Bunch 0862**

promptly complete our review and render a determination on this appeal.  If your response is not received by June 4, 2019 (21 days from date of this letter), we will render a determination based on the information contained in this file.

Should you have any questions pertaining to the status of this appeal, please contact me at the telephone number below. Please include the claim number listed above in all communications.

If you have any questions regarding this matter, please contact me.

Sincerely,

Courtney Grygiel
Appeals Consultant
Phone No.: (888) 437-7611 Ext. 13301
Secure Fax No.: (603) 427-2110

Attachments:   8220685-MEDICAL-CP/PEER REVIEW-04.23.2019
                8220685-MEDICAL-CP/PEER REVIEW-04.23.2019
                8220685-MEDICAL-CP/PEER REVIEW-04.29.2019
                8220685-MEDICAL-CP/PEER REVIEW-05.11.2019

**Lincoln/Bunch 0863**



# *FAX COVER SHEET*

**Date:** Tuesday, April 23, 2019

**To:**    Thomas Higginbotham DO

**Fax #:** 719-260-6086

**From:** Robert Swotinsky MD

**Phone #:** 978 337 4479

**Fax #:** 866 841 1415

**Pages**
**(including cover):**    04

**Notes:**

*This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me via return fax or via telephone and permanently delete the original and any copy of any fax and any printout thereof.*

**Lincoln/Bunch 0864**



Liberty Life Assurance
Company of Boston, a Lincoln
Financial Group company

Group Benefits Disability Claim
P.O. Box 7206
London, KY 40742-7206
Secure Fax 866-841-1415

April 23, 2019

Thomas Higginbotham DO
1430 South 21st Street, Suite 101
Colorado Springs, CO  80904
By fax: 719-260-6086

Re: Disability Benefits
Claimant Name: Mark Bunch
Claimant DOB:
Claim Number: 8220685

Dear Dr. Higginbotham:

Thank you for taking my call earlier today. I am the physician who was asked by Lincoln Financial
Group to review the medical records Mr. Bunch submitted in support of his request for disability
benefits. I appreciated the chance to speak with you and I'm writing to summarize my understanding
of our conversation.  My questions, and your responses, were:

*Q1.    Did you see this patient between 08/13/18 and 02/18/19?*
A1.    No.  I saw him as part of a contested workers compensation claim.  My understanding was that
the claim had settled, the patient could not return to work, and he was applying for disability, Social
Security I think.

*Q2.    Have you seen this patient since 02/19/19?*
A2.    No.  I had conferences with the attorney in November and December 2018.  And, I saw the
patient on 02/19/19 for a report, I think for his Social Security disability claim.

*Q3.    Your 02/19/19 report lists recommendations for vestibular therapy, occupational therapy, and
physical therapy.  Has the patient gone on to see these therapists?*
A3.    I don't know.

*Q4.    The patient is off work based on postconcussion syndrome.  The records that were sent to the
insurer consist of the PCP notes, some physical therapy notes for a neck strain per the PCP, your notes,
some chiropractic notes, and two neuropsychological evaluations, each deemed invalid.  Typically, if
someone is severely impaired by postconcussion syndrome, the expectation would be that they'd see a
neurologist, undergo diagnostic workup for their symptoms (vestibular, eye, etc.), and if the symptoms
continue be seen at a headaches center, a tertiary care provider.  The records that were sent to the
insurer include no neurology evaluation, and no records from vestibular, vision, or other specialists.*
A4.    Many of the referrals got held up by insurance coverage issues.  The patient had seen
occupational medicine Dr. Frank Polanco, who treated this like he was doing an IME for the insurance
company, and dismissed the patient.  The insurer then started questioning further referrals.  The

**Lincoln/Bunch 0865**

Re: Mark Bunch

April 23, 2019
Page 2

patient did see neurologist Dr. Brinley in Colorado Springs on 10/19/18, and she recognized he had ongoing postconcussion symptoms and suggested vestibular therapy. I also have a paragraph that the neuro-optometrist wrote on 11/21/18 stating the patient has perception problems. I think the neuropsychological tests were compromised because the patient had vision and balance problems.

Q5.    *I understand the patient reports vision and balance problems. But, we've not received any vision test result, balance test results, or records of treatment for vision or balance problems.*
A5.    It sounds like you need to gather those records.

Q6.    *The disability insurance company probably already asked the patient to provide all of the records. I'm not sure how much more record gathering takes place at this appeal stage of the claim.*

_____

To ensure that I have accurately summarized our conversation, please make any corrections or comments to this letter if necessary, sign below in the space provided, and fax this letter to Lincoln Financial at the toll free and secure return fax number (866) 841-1415.

Thank you for your help. Lincoln Financial is willing to reimburse you for any reasonable costs incurred in responding to requests for information.

Respectfully yours,

-Electronically Signed-

Robert Swotinsky MD
Consulting Physician
Board Certified, Occupational Medicine
978 337 4479 c, 866 81 1415 f

\_\_ No changes/comments, OR
\_\_ With changes/comments as noted above

_____    _____
Thomas Higginbotham, DO            Date

*Please fax to 866 841 1415*

Enclosure: Signed release form

Page **2** of **2**

Liberty Mutual Insurance

**Lincoln/Bunch 0866**

3W212180030

 **Liberty Mutual.** INSURANCE

| Liberty Life Assurance Company of Boston |
| Group Benefits Disability Claims |
| P.O. Box 7207 |
| London, KY 40742-7207 |
| Phone No.: (844) 384-5858 |
| Secure Fax No.: (603) 559-9400 |

## AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

**I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:**

**Person(s) or group(s) of persons authorized to use or disclose the information:** Any physicians, medical practitioners, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

**Person(s) or group(s) of persons authorized to collect or otherwise receive the information:** The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employees, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

**Description of the information that may be used or disclosed:** This Authorization specifically includes the release of all information related to:
* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatments, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including **HIV/AIDS**.
* Job duties, earnings, personnel records and other work related information and credit reports, bank records, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents

**The information will be used or disclosed only for the following purpose(s):** For purposes of investigating, evaluating and processing my claim, and/or for insurance-related functions.

## STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:

I understand that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

I understand that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

I understand that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization. If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration. The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print) *Frank Bunch*

Name of legal representative, if applicable (print) *Ken Stakeshaft*    Relationship *Attorney*

Signature of claimant or legal representative _____

Date of Birth: __    _____    Claim Number: __8220685__ Date: _____

**A copy of this authorization will be considered as valid as the original.**

pg. 1 Authorization-Standard-2016

Lincoln/Bunch 0867

| Plan Holder | Claimant Name (Last, First) | Claim # |
|---|---|---|
| Charter Communications | Bunch, Mark | 8220685 |

| | |
|---|---|
| **Referred by:** | Courtney Grygiel |
| **Report Date:** | 04/23/2019 |
| **CP Reviewer and Specialty:** | R Swotinsky MD; Occupational Medicine |
| **Claimant DOB:** | |
| **Job Title/Occupation:** | Direct Sales Representative |
| **DOD:** | 02/14/2018 |
| **Diagnosis:** | Postconcussion syndrome, history of |
| **Type of Claim:** | LTD |

## Appeal Review

### Responses to Questions

*Q1.    What diagnoses are supported by the medical evidence?*

A1.    Diagnosis                                                                                                ICD-10 code

1.    Primary (essential) hypertension                                                   I10
2.    Postconcussion syndrome, history of                                          F07.81
3.    Persistent mood [affective] disorder, unspecified                    F34.9
4.    Post-traumatic stress disorder                                                    F43.10

*Q2.    Does the medical evidence support any diagnoses causing functional impairment from 2/14/18 to 8/14/18 and 8/15/18 to the present? Please explain your medical rationale as to why or why not.*

A2.    From 02/14/18 until as late as 08/14/18, impairment is supported by postconcussion syndrome and a pending neuro-optometry appointment.  There is not support for a diagnosis causing functional impairment from 08/15/18 to the present.

*Q3.    If functional impairment is supported, please describe how that translates into restrictions or limitations and for what period(s) of time. Please define in terms of frequency (never, occasional, frequent, constant) and task (sit, stand, lift/carry, type, etc.). Please explain your medical rationale for any restrictions or limitations or why restrictions or limitations are not supported.*

A3.    The submitted information is too nonspecific to define the activity limitations/restrictions during 02/14/18 – 08/14/18.  The support that I find in the record for impairment (perhaps sufficient to preclude full duty) is based on the diagnosis and the estimated mid-August return-to-work date after the neuro-optometry visit as per occupational medicine Dr. Higginbotham.

*Q4.    Are there any reported or observed cognitive and/or physical side effects attributed to claimant's medications?  If yes, do the side effects contribute to claimant's impairment? Please explain your medical rationale.*

**Lincoln/Bunch 0868**

Ms. Courtney Grygiel                          Claimant:  Mark Bunch
April 23, 2019                                Claim #8220685
Page 2

A4.     The submitted information indicates antihypertensive medication, only.   It does not in-
dicate side effects from that medication.

*Q5.     Does the (overall functional and ) medical evidence support the claimant can sustain full-
time capacity (8 hours/day, five days/week) within the identified restrictions and limitations
from 2/14/18 to 8/14/18 and 8/15/18 to present?  Please explain your medical rationale.*
A5.     The diagnoses and clinical findings do not correlate with ability to work only part-time,
instead of full-time, during either interval.

*Q6.     When contacting treating provider Dr. Higginbotham, please discuss the claimant's con-
dition, treatment, and functional capacity. Please indicate the information reviewed and indi-
cate whether or not you reached consensus with the treating provider. If not, please discuss
your final assessment after the call.*
A6.     Dr.  Higginbotham and I spoke on 04/23/19.  Dr. Higginbotham said he saw the claimant
as part of a workers' compensation claim and his involvement ended once that claim got set-
tled, except for the February 2019 report that the claimant's attorney request for the disability
claim.  The end of this report summarizes my discussion with Dr. Higginbotham further.

**_Impairment Review_**

1.      Primary (essential) hypertension

The claimant's hypertension is treated with antihypertensive medication.  This diagnosis poses
a risk of end-organ damage, e.g., stroke, heart attack, etc.  If end-organ damage occurs, it may
be a source of functional impairment.

Dr. Higginbotham cites "malignant hypertension."  The term "malignant hypertension" entered
the medical lexicon in 1928 because, at that time, patients had a prognosis that was similar to
patients with many cancers.  The term is not currently relevant because antihypertensive ther-
apies can quickly and safely lower blood pressures and improve outcomes.

2.      Postconcussion syndrome

        a.      The symptoms are consistent with postconcussion syndrome

        The claimant reports headache, dizziness, cognitive impairment, and psychological
        symptoms after a mild traumatic brain injury (TBI) on 02/13/18.  These are symptoms of
        postconcussion syndrome.

        b.      The prolonged symptoms and related factors are consistent with a nonmedical
                cause

**Lincoln/Bunch 0869**

Ms. Courtney Grygiel                              Claimant:  Mark Bunch
April 23, 2019                                    Claim #8220685
Page 3

The vast majority of patients have largely recovered from postconcussion syndrome by three months.[i] Litigation and compensation issues are a strong consistent risk factor for persistent symptoms and disability after mild TBI.[ii] While Attorney Shakeshaft states that the claimant's condition is physical and not psychologic/psychiatric, treatment guidelines advise that in patient with persistent post-concussive symptoms which have been refractory to treatment, consideration should be given to other factors including psychiatric disorders, lack of psychosocial support, and compensation/litigation.[iii]

Potential indicators of malingering include inconsistencies in neuropsychological test performance, financial stressors, lack of reasonable follow-through on treatments, and engaging in activities inconsistent with reported deficits.[iv,v] These indicators are present. For example:

- Inconsistencies in neuropsychological test performance per Dr. Helffenstein (May 2018) and Dr. Staudenmayer (August 2018).
- Financial stress as reported by the claimant to Dr. Helffenstein (May 2018) and Dr. Staudenmayer (August 2018).
- Lack of follow-through on treatments. For example:
    - Dr. Higginbotham made referrals to about seven therapists. The submitted records are from just one of these, neuropsychologist Dr. Staudenmayer.[1]
    - Dr. Staudenmayer suggested an initial course of eight, 1-hour therapy sessions. The submitted records are from just one completed therapy session.
- Engaging in activities inconsistent with reported deficits. On 05/03/18, the claimant stated he was not driving and could not drive. On 07/25/18, he stated he was legally blind. In contrast:
    - On 05/03/18, surveillance filmed him driving.
    - On 05/22/18, Dr. Higginbotham noted, "He drove himself to this visit."
    - In May 2018, the claimant told Dr. Helffenstein that he was driving.

c.      Scant records of evaluation and treatment for postconcussion syndrome

Treatment of postconcussion syndrome should be individualized to the patient's particular complaints. For example, for headaches, amitryptilline is a first-line drug treatment. For psychologic and cognitive symptoms, treatments include cognitive rehabilitation, supportive psychotherapy, antidepressant and anxiolytic medications, and perhaps donepezil. For balance symptoms,  neuro-otologic evaluation is recommended and, if the evaluation is positive, referral to clinicians with experience in balance training. For vision symptoms, a comprehensive vision evaluation is recommended and, if positive, treatment.[iii,vi]

---

[1] Dr. Higginbotham's notes indicate that the claimant also saw an optometrist and got updated corrective lenses. The records from that optometrist were not submitted.

**Lincoln/Bunch 0870**

Ms. Courtney Grygiel                                    Claimant:  Mark Bunch
April 23, 2019                                          Claim #8220685
Page 4

The claimant's records present scant evaluation/treatment for postconcussion syn-
drome.  The evaluation has not been managed by a specialist with expertise in postcon-
cussion syndrome.  The treatment that Dr. Higginbotham has prescribed for the claim-
ant's postconcussion symptoms has consisted of 5/22/18 prescriptions for three pain
medications – indomethacin, Robaxin, and betamethasone  - and recommendations for
nutritional supplements and self-help brain (e.g., memory) exercises.  (Nutritional sup-
plements and self-help brain exercises are not established in the evidence-based medi-
cal literature as effective and recommended treatments for postconcussion syndrome.)
The file has no records from the various referrals made by Dr. Higginbotham, with the
exception of the session with psychologist Dr. Staudenmayer.  Records have not been
submitted that present:

- Evaluation and treatment by a specialist in neurology or in postconcussion
  headaches.
- Treatment for psychological and cognitive symptoms, with the exception of the
  session with psychologist Dr. Staudenmayer.
- Evaluation or treatment of balance symptoms.
- Evaluation or treatment of vision symptoms.

The 07/31/18 visit with Dr. Higginbotham marked the end of the records of evalua-
tion/treatment of postconcussion syndrome, with the exception of the 02/14/19 ap-
pointment that Atty Shakeshaft arranged with Dr. Higginbotham for a disability report.
The absence of documented medical care for postconcussion syndrome since 07/31/18
fails to support the acuity/severity of this condition.

d.      Summary: Lack of support for current impairment from postconcussion syn-
        drome

The claimant had a mild TBI on 02/13/18.  He reports postconcussion symptoms a year
later.  He has not been evaluated or treated by a specialist in postconcussion syndrome.
The records present scant evidence of evaluation/treatment for postconcussion syn-
drome, and no evaluation or treatment at all after 07/31/18 (until Atty Shakeshaft sent
the claimant back to Dr. Higginbotham in February 2019).  The diagnostic findings do
not define a brain injury.  Instead, multiple factors in the record point to nonmedical
basis (bases) for the symptoms that the claimant reports.

e.   02/14/18 – 08/14/18; 08/15/18 to the present.

During 02/14/18 – 08/14/18, the record indicates evaluation/treatment of postconcus-
sion syndrome by PCP Dr. Olson and occupational medicine Dr. Higginbotham.  The
evaluation was fairly nonspecific (e.g., anti-inflammatory medication) and nonspecial-
ized.  And, the symptoms and submitted exam findings were nonspecific as well.  The
claimant was driving as early as May 2018, which suggests some degree of capacity with

**Lincoln/Bunch 0871**

Ms. Courtney Grygiel                                      Claimant:  Mark Bunch
April 23, 2019                                            Claim #8220685
Page 5

regard to vision, cognition, and use of the upper extremities/upper body.  The submit-
ted information is too nonspecific to further define the claimant's impairments during
that period.  The medical literature supports some degree of impairment during the
first approximately three months after the 02/13/18 accident, i.e., until 05/13/18.  And,
Dr. Higginbotham made some referrals that were not yet complete at that time, so this
could perhaps support a longer absence pending those referrals.  Dr. Higginbotham had
anticipated return to work in mid-August after the neuro-optometry visit.  This was not
unreasonable.

Since no records of evaluation/treatment of postconcussion syndrome after 07/31/18
were submitted, the information does not document clinical findings to substantiate
ongoing impairment from postconcussion syndrome, including from 08/15/18 to the
present.  (The February 2019 visit with Dr. Higginbotham was per referral from Dr.
Shakeshaft for purposes of the appeal.  There are not records that Dr. Higginbotham
has been treating the claimant for postconcussion syndrome after 07/31/18.)

3.      Mood disorder, unspecified
4.      Post-traumatic stress disorder

The records refer to symptoms of anxiety, depression, and PTSD.  I am not a psychiatrist.  The
record has just one assessment of impairment by a psychiatrist (Dr. Young) and I defer to that
assessment.

5.      Cognitive impairment, r/o

The neuropsychology evaluations by Dr. Helffenstein (May 2018) and Dr. Staudenmayer (Au-
gust 2018) each reported inconsistencies in neuropsychological test performance.  The records
lack valid measures of cognitive impairment.  The record lacks physical findings of brain dam-
age.  No treatment records for cognitive disorder(s) were submitted.  Since there are no valid
measures of cognitive impairment, no clinical findings relevant to cognitive impairment, and no
records of treatment for cognitive impairment, the information does not document clinical ev-
idence to substantiate cognitive impairment.

6.      Vision impairment, r/o

Since no records of evaluation/treatment of vision were submitted, the information does not
document clinical findings to substantiate vision impairment.

7.      Ulnar neuropathy, r/o

Dr. Higginbotham noted on his 02/14/19 report to Atty Shakeshaft that the claimant had
"weakly positive Tinel's at the right cubital tunnel," and "He complains of numbness and tin-
gling sensations about the ulnar aspect of the left hand and distal forearm."  Dr. Hig-

**Lincoln/Bunch 0872**

Ms. Courtney Grygiel                                  Claimant:  Mark Bunch
April 23, 2019                                        Claim #8220685
Page 6

ginbotham's conclusion that the claimant has "ulnar neuritis, left" is unsupported by the sub-
mitted medical evidence because there are not:

    a.    Clinical findings of a left ulnar neuropathy.  (Dr. Higginbotham's records have no
        clinical findings about the left ulnar nerve.)

    b.    Electrodiagnostic tests demonstrating an ulnar neuropathy.  (Nerve conduction
        studies are the usual diagnostic test to verify the presence and severity of an ul-
        nar neuropathy.)

    c.    Records of referral to a neurologist or hand orthopedist for this condition.  (The-
        se are the types of specialist who evaluate and treat ulnar neuropathy.)

    d.    Records of treatment for ulnar neuropathy.

8.    Cervical spine injury, r/o
9.    Thoracic spine injury, r/o

While the claimant reported pain on 02/14/19, the information in the file lacks clinical findings
to support pathology of the cervical or thoracic spine.  Records of treatment for a cervical or
thoracic strain/sprain end with the 09/24/18 chiropractic adjustments.

### *Records Review*

The claimant is a 55-year-old travelling salesman.  The policy's disability test changes to "any
occupation" on ~08/14/2020.

On 02/13/18, the claimant had a car accident at work.  The claimant has remained off work.

A.    Clinical information

In the car accident, the claimant's forehead struck the steering wheel.  He did not lose con-
sciousness.  The claimant drove after the hit-and-run driver who had struck his car and got that
driver to pull over until police came.

- 02/13/18.  Emergency room.  CT scan: No visible intracranial pathology.

- 04/13/18.  Steven Olson, MD.  Family practice.  The claimant had reported problems
  with his vision, but this has resolved.  He wants referrals to physical therapy and to a
  chiropractor for neck pain.  I am also referring him to neuropsychologist Dr. Helffen-
  stein.  On exam: BP 150/90.  "Eye movement is intact but he is not fluidly tracking."
  Other exam findings were normal.

- 05/03/18.  Thomas Higginbotham, DO.  Occupational medicine.  Initial visit; office note
  sent to claimant's Attorney Shakeshaft.  The claimant reports constant headaches ac-
  companied by tunnel vision, dizziness, and sensitivity to sound and light.  On exam: BP

**Lincoln/Bunch 0873**

Ms. Courtney Grygiel                                      Claimant:  Mark Bunch
April 23, 2019                                               Claim #8220685
Page 7

188/100.  The claimant appears imbalanced (positive Romberg's test, gets dizzy with ex-
tension of the head) and he reports pain (tenderness) over the "cervical anterior and
posterior musculature."  I am referring him to a neurologist and neuro-optometrist,[2]
and I hope to get a copy of the neuropsychological report.  I do not endorse him to
drive; hence, he cannot do his job.

- 05/03/18 and 05/18/18.  Dennis Helffenstein, Ph.D.  Neuropsychological testing.  The
  claimant reports "significant financial stressors."  The claimant reports that he drives.
  By history, he has a post-concussive syndrome/mild traumatic brain injury and would
  not be expected to have reached maximal medical improvement, yet.  "Based on his
  suboptimal performance on two standalone Performance Validity Tests, I made the de-
  cision to discontinue his testing as it was evidence that we were not going to be able to
  obtain valid neuropsychological test results."

- 05/22/18.  Dr. Higginbotham.  "He drove himself to this visit… He has negative Rom-
  berg's maneuver.  Balance is reasonable.."  My impression is this patient has posttrau-
  matic and tension headache, visuospatial disorientation, unspecified cognitive changes,
  and strain and sprain injuries.  Treatment includes osteopathic manipulations.  Treat-
  ment consists of indomethacin, Robaxin, and betamethasone.

- 06/08/18.  Dr. Higginbotham.  I expect that, after he sees a neuro-optometrist and is
  treated, the claimant will be able to return to work in mid-August 2018.

- 06/11/18.  Physical therapy visit #8 for neck pain, per order by PCP Dr. Olson.  (There
  are no physical therapy records after 06/11/18.)

- 07/17/18.  Dr. Higginbotham.  "Mr. Bunch had his neuro-optometry evaluation yester-
  day.  He was provided corrective lenses… He has noted marked improvement with the
  corrective lenses."  Treatment consists of "memory improving exercises."

Dr. Higginbotham saw the claimant periodically until 07/31/18.  Treatment provided by Dr.
Higginbotham consisted of recommendations for nutritional supplements and self-help brain
(e.g., memory) exercises.   Dr. Higginbotham watched a surveillance video from an insurer
showing the claimant driving ~1 mile in May 2018.   Dr. Higginbotham corresponded with the
claimant's Attorney Shakeshaft.  Dr. Higginbotham's notes indicate he referred the claimant
for:

- Cognitive behavioral therapy

---

[2] The file includes a reference to Michael Saxerud, OD.  He used to practice at Gleneagle Vision in Colorado
Springs.  That practice appears to have closed.

**Lincoln/Bunch 0874**

Ms. Courtney Grygiel                              Claimant:  Mark Bunch
April 23, 2019                                    Claim #8220685
Page 8

- Physical therapy[3]
- Driving evaluation
- Neurology
- Speech therapy
- Vestibular therapy

The file has no records from providers of the above-listed services.  The file does include a report by neuropsychologist Dr. Staudenmayer:

- 08/06/18.  Herman Staudenmayer Ph.D.  The claimant reports financial stress.  "Mental status exam suggest exaggeration and adopting the sick role.  Psychological testing indicated that his self-report reflects over-reporting bias, making the self-reported symptoms invalid.  Comprehensive neuropsychological testing is contraindicated at this time.  He may benefit from psychotherapy to address these issues."  Dr. Staudenmayer recommended an initial course of 8, 1-hour sessions.  The submitted documents indicate the claimant had one session, on 08/13/18, for a visit at which the claimant recounted traumatic childhood events and was thought to have PTSD.

There are chiropractic notes through 09/24/18 for adjustments of the cervical and thoracic spine.  The chiropractic notes refer to "decreased range of motion" and tension."  After 09/24/18, the next record of evaluation/treatment is on 02/14/19, when the claimant returned to Dr. Higginbotham for evaluation and a report to Atty Shakeshaft.  Dr. Higginbotham noted abnormal findings on exam of "an equivocally positive Romberg's sign," "balance is poor," a "weakly positive Tinels at the right cubital tunnel," and "gait is abnormal as it is slow and cautious but without assistance."  Dr. Higginbotham stated these were the diagnoses:

1. History of motor vehicle accident
2. History of a mild traumatic brain injury
3.  Emotional and behavioral disturbance/changes
4. Neurocognitive disorder
5. Visual difficulties with spatial disorientation
6. Post traumatic headache
7. Cervical strain/sprain
8. Thoracic strain
9. Ulnar neuritis, left
10. Imbalance
11. Dysphasia
12. Dysphagia
13. History of falls
14. Generalized anxiety with depressed mood
15. PTSD
16. Situational adjustment reactions
17. Sleep disturbance
18. Overweight
19. Hypertension, malignant

---

[3] The claimant attended physical therapy through 06/11/18 visit #8 per referral by PCP Dr. Olson for neck pain.

**Lincoln/Bunch 0875**

Ms. Courtney Grygiel                    Claimant:  Mark Bunch
April 23, 2019                          Claim #8220685
Page 9

Dr. Higginbotham recommended antihypertensive medication, speech therapy, physical thera-
py, and vestibular therapy.  The record does not indicate that Dr. Higginbotham made referrals
to any of these providers, not does the file include records from speech therapy, physical ther-
apy, or vestibular therapy providers as recommended by Dr. Higginbotham on 02/14/19.[4]

B.      Work fitness opinions and related information

   1.      05/03/18.  Video surveillance.  The claimant was filmed driving ~1 mile to and
           from a store, opening and closing a gate, walking shorts distances unencum-
           bered.

   2.      05/03/18.  Dr. Higginbotham.  "He relates that he is not driving, as he is disori-
           ented with visual difficulties and with headache… I do not endorse him to drive,"
           so he can't work.

   3.      07/25/18.  Claimant.  I cannot work because I am legally blind since the car acci-
           dent, I have "horrible headaches, double vision, ringing in my ears, unable to
           sleep or concentrate…"

   4.      09/01/18.  Dr. Markovitz.  Consulting Neurologist, Physician, Lincoln Financial
           Group.  There has been no evaluation by a neurologist.  The claimant reports
           feeling anxious, depressed, and posttraumatic stress disorder.  The information
           does not support a neurologic diagnosis, but the claimant may have psychiatric
           impairment – I defer to a consulting psychiatrist.

   5.      09/10/18.  John Young, MD.  Consulting Psychiatrist, Lincoln Financial Group.
           The information does not support a need for psychiatrically-based work limita-
           tions or restrictions.

   6.      09/13/18.  Insurer.  Letter to the claimant notifying him that the disability claim
           was being closed.  If appealing, please send us any new/updated medical rec-
           ords beyond August 2018.

   7.      03/12/19.  Attorney Shakeshaft.  Appeal for disability benefits.  The appeal in-
           cludes Dr. Higginbotham's report to the attorney re: a 02/14/19  evaluation.
           Attorney Shakeshaft states that, per Dr. Higginbotham's restrictions, the claim-
           ant cannot work in any occupation.  Per Attorney Shakeshaft, the claimant's im-
           pairments are physical and caused by the -2/13/18 car accident.

---

[4]The claimant attended physical therapy through 06/11/18 visit #8 per referral by PCP Dr. Olson for neck pain.

**Lincoln/Bunch 0876**

Ms. Courtney Grygiel                                     Claimant:  Mark Bunch
April 23, 2019                                          Claim #8220685
Page 10

### *Peer-to-Peer Consultation*

Thomas Higginbotham, DO.  Occupational medicine.  719-260-8190.  We spoke at 10:45 a.m.
EST 04/23/19.  My questions, and Dr. Higginbotham's responses, were:

*Q1.*     *Did you see this patient between 08/13/18 and 02/18/19?*
A1.     No.  I saw him as part of a contested workers compensation claim.  My understanding
was that the claim had settled, the patient could not return to work, and he was applying for
disability, Social Security I think.

*Q2.*     *Have you seen this patient since 02/19/19?*
A2.     No.  I had conferences with the attorney in November and December 2018.  And, I saw
the patient on 02/19/19 for a report, I think for his Social Security disability claim.

*Q3.*     *Your 02/19/19 report lists recommendations for vestibular therapy, occupational thera-*
*py, and physical therapy.  Has the patient gone on to see these therapists?*
A3.     I don't know.

*Q4.*     *The patient is off work based on postconcussion syndrome.  The records that were sent*
*to the insurer consist of the PCP notes, some physical therapy notes for a neck strain per the*
*PCP, your notes, some chiropractic notes, and two neuropsychological evaluations, each*
*deemed invalid.  Typically, if someone is severely impaired by postconcussion syndrome, the ex-*
*pectation would be that they'd see a neurologist, undergo diagnostic workup for their symptoms*
*(vestibular, eye, etc.), and if the symptoms continue be seen at a headaches center, a tertiary*
*care provider.  The records that were sent to the insurer include no neurology evaluation, and no*
*records from vestibular, vision, or other specialists.*
A4.     Many of the referrals got held up by insurance coverage issues.  The patient had seen
occupational medicine Dr. Frank Polanco, who treated this like he was doing an IME for the in-
surance company, and dismissed the patient.  The insurer then started questioning further re-
ferrals.  The patient did see neurologist Dr. Brinley in Colorado Springs on 10/19/18, and she
recognized he had ongoing postconcussion symptoms and suggested vestibular therapy.  I also
have a paragraph that the neuro-optometrist wrote on 11/21/18 stating the patient has per-
ception problems.  I think the neuropsychological tests were compromised because the patient
had vision and balance problems.

**Lincoln/Bunch 0877**

Ms. Courtney Grygiel                          Claimant:  Mark Bunch
April 23, 2019                               Claim #8220685
Page 11

*Q5.    I understand the patient reports vision and balance problems.  But, we've not received
any vision test result, balance test results, or records of treatment for vision or balance prob-
lems.*
A5.    It sounds like you need to gather those records.

*Q6.    The disability insurance company probably already asked the patient to provide all of the
records.  I'm not sure how much more record gathering takes place at this appeal stage of the
claim.*

_____


<electronically signed>

Robert Swotinsky, MD
Consulting Physician, Lincoln Financial Group
Bd Cert, Occupational Medicine

_____


### *References*

[i] Kashluba S, Paniak C, Blake T, et al. A longitudinal, controlled study of patient complaints following treated mild traumatic brain injury.  *Arch Clin Neuropsychol.*  2004;19:805.

[ii] Carroll L, Cassidy J, Peloso P, et al. Prognosis for mild traumatic brain injury: results of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury.  *J Rehabil Med.*  2004

[iii] *VA/DoD Clinical Practice Guideline for the Management of Concussion-mild Traumatic Brain Injury, Version 2.0.*  Washington, DC: Department of Defense.  February 2016.

[iv] Binder L, Rohling M.  Money matters: a meta-analytic review of the effects of financial incentives on recovery after closed-head injury.  *Am J Psychiatry.*  1996;153:7.

[v] Ruff R, Wylie T, Tennant W.  Malingering and malingering-like aspects of mild closed head injury.  *J Head Trauma Rehabil.*  1993;8:60.

[vi] Division of Workers' Compensation.  Mild traumatic brain injury.  Medical Treatment Guideline.  Colorado Department of Labor & Employment.  Rev. 12/07/2018.

**Lincoln/Bunch 0878**

**Clinical Case Review**

| | |
|---|---|
| Customer Name: | CHARTER COMMUNICATIONS, INC. |
| Claim Number: | 8220685 |
| Product Type: | LTD |
| Claimant Name: | Mark Bunch |
| Job Title: | DIRECT SALES REP |
| Claimant Date of Birth: | |
| Date of Disability: | 02/14/2018 |
| Medical Condition: | concussion |
| Submitter's Name: | GRYGIEL, COURTNEY |
| Submitter's Phone: | 096 8*731-3301 |
| Report Date: | 04/29/2019 |

**Referral Questions:** LTD APPEAL FILE-- claimants date of disability 2/14/18 due to MVA. LTD BBD 8/15/18. Assessing functionality from 2/14/18 to 8/14/18 and 8/15/18 and beyond.

Please note all diagnoses supported by the medical evidence (including co-morbids).

Please review the enclosed neuro-psych assessments (neuropsych testing 5/3/18 and 5/18/18 by Dennis A. Helffenstein, Ph.D.) and discuss the findings and validity. Please indicate whether the assessment substantiates functional impairment that translates to restrictions and limitations, and for what period.

Please provide your overall assessment of the claimants cognitive capacity based on the totality of information provided in the file and co-morbid complaints. What is the etiology of the impairment? Does the information reasonably support R/Ls in work capacity secondary to cognitive impairment on a sustained, full-time basis? Please discuss. What is the anticipated duration?

**Response to Referral Questions**: The scope of the following analysis is limited to consideration of the claimant's mental health and neuropsychological status. Consideration for any possible impairment related to non-neuropsychological medical conditions is outside the scope of this review.

The medical records available for review include the minimum criterion for the clinical diagnosis of cerebral concussion, which in essence consists of head trauma with a transient alternation of mental status, in this case based on the claimant's subsequent retrospective report rather than documentation of any observation of gross confusion or altered mental status. At the time of his presentation to the emergency department, the Glasgow Coma Scale score was 15, there is no evidence of an extended period of peritraumatic amnesia, no evidence of focal acute neurological findings, and no evidence of acute neuroradiological findings. Therefore, if the claimant sustained a traumatic brain

Lincoln/Bunch 0879

injury on 02/13/18, the severity of such a brain injury would have to have been in the range of cerebral concussion / mild traumatic brain injury. The medical records provide limited but adequate support for a case formulation of post-concussion syndrome for a period of a few months post-injury. However, by May 2018 the scope and severity of his reported symptoms was unusual at 3 months post-injury, and the results of the neuropsychological examination at that time revealed clear and compelling scientifically-supported findings which do not support ongoing case formulation of cognitive impairment due to traumatic brain injury. The August 2018 psychological evaluation findings also provide converging scientifically-supported indications that the claimant's aggregate pattern of self-reported symptoms was not a valid representation of his actual psychological status. The assertion that the claimant's repeated failures on performance and symptom validity tests was due to visual problems is untenable considering the nature of these performance validity tasks, and the oral presentation of the August 2018 psychological tests. In summary, the medical record information provides insufficient support, beyond mid-May 2018, for a diagnoses of cognitive impairment due to traumatic brain injury, for the presence of a psychiatric disorder, or for associated need for occupational restrictions or limitations beyond mid-May 2018 on the basis of cognitive or psychological impairment.

**Additional Recommendations**: None.

**Analysis**: The scope of the following analysis is limited to consideration of the claimant's mental health / neuropsychological status. Consideration for any possible impairment related to non-neuropsychological medical conditions is outside the scope of this review.

Synopsis: The Emergency Department record from Parkview Medical Center (02/13/18) indicates that he presented after a motor vehicle accident in which he was a restrained driver, that his head struck the steering wheel on the left forehead region, and that he denied loss of consciousness. He reported that initially he felt like he had some blurred vision and perhaps left eye pain which had resolved, and that he felt like initially his equilibrium was off. There is a note that he felt "like he has felt previously with sports injuries to the head," and there is a nursing note indicates which indicates that he reported a history of concussion [illegible] years ago. The Glasgow Coma Scale Score is recorded as 15. The record indicates that a the time of E.D. presentation he no longer felt in disequilibrium or dizzy, but reported having a pounding headache, as well as neck and shoulder pain. Notes pertaining to exam indicate left scalp tenderness and a mild abrasion. The E.D. record indicates that he was at that time awake, alert, and appropriate, with intact cranial nerves and normal gait. The radiology report indicates that a CT of the head did not reveal any acute traumatic process. The E.D. note indicates that his symptoms seemed consistent with concussion. He was advised to follow-up with his primary care physician about his high blood pressure.

Subsequent records include primary care evaluation / treatment (Wayne Olson, MD), as well as evaluation / treatment (including pharmacological and osteopathic manipulation)

**Lincoln/Bunch 0880**

with multiple specialists including Occupational Medicine (Thomas Higgenbotham, D.O.), physical therapy, optometry, neuropsychological evaluation (Dennis Helffenstein, PhD), psychological evaluation and treatment (Herman Staudenmayer, PhD), and chiropractic treatment.

A primary care note of 02/23/18 (Wayne Olson, MD) indicates that he had "significant eye findings, namely coordination problems. He doesn't exactly have cranial nerve deficits. His eyes have full ROM but the coordination and smoothness of tracking is not present. Romberg also positive." The plan was to obtain an MRI of the brain.

The radiology report for a brain MRI done on 03/21/18 indicates mild white matter disease (mild scattered areas of high signal intensity in the periventricular white matter regions, some of which show a perpendicular pattern suggesting demyelinating white matter disease) possibly from multiple sclerosis.

The primary care record of 04/13/18 (Wayne Olson, MD) indicates that he reported headaches and neck pain, and that a brain MRI showed some white matter change, possibly multiple sclerosis. Dr. Olson opined that he suffered a concussion, that it is very likely that his current symptoms were related to the motor vehicle accident but it was not possible to confirm without additional testing, and that return to work was unknown.  He was referred to neurology and for a clinical neuropsychological evaluation.

The Occupational Medicine "New patient Evaluation / WC" note of 05/03/18 (Thomas Hignbotham, D.O.) indicates that he denied any prior work-related injuries, and denied any prior traumatic brain injuries or loss of consciousness.  Notes pertaining to *Review of Systems* indicate that he endorsed a wide range of symptoms, including pain, numbness and tingling, dizziness, headaches, muscle cramps, depression and nervousness, nausea, visual problems, photophobia, sonophobia with ringing in the ears, marked tiredness, sleep disturbance, mood swings with panic attacks, light and sound sensitivity to florescent lights, as well as change in taste and smell, ringing in the ears, problems seeing at night, left sided weakness, difficulty remembering things, distractibility, word-finding problems, difficulty with arithmetic, and irritability.  Notes pertaining to exam include the following: "He cannot recognize a pencil being in the center of his vision when coming from the periphery of either side," and he is described as having difficulty tracking. [Incidentally, if this description is intended to mean that he was unable to recognize a pencil when it was in his central vision, such an occurrence would be different from his May 2018 report of problems with peripheral vision, would be atypical for post-concussion syndrome, and would be different from what is described in the literature as a visual midline shift syndrome.] The assessment was:

- History of work-related motor vehicle collision
- History of head trauma without loss of consciousness
- Postconcussion sequala with spatial disorientation, imbalance, cervicalgia, headache, tinnitus, cognitive difficulties, and sound and light sensitivity
- Cervical myofascial strain

<div align="center">3 of 14          8220685 F 04 29 19</div>

**Lincoln/Bunch 0881**

- Thoracic myofascial strain
- Right thumb sprain

A report of "Neuropsychological Screening" (Dennis Helffenstein, PhD) indicates 05/03/18 and 05/18/18 as dates of evaluation. At that time, he reported what are described in the report as "a constellation of physical, fatigue, visual, cognitive and emotional coping deficits consistent with a post-concussive syndrome." During the clinical interview, he reported a wide range of symptoms, including headaches, dizziness, vertigo, disequilibrium, hypersensitive smell, some changes in food preferences, tinnitus, sensitivity to sound, fatigue, double vision, blurring vision, decrease in peripheral vision when tired, sensitivity to fluorescent lights, problems with eye fatigue and depth perception, that his eyes are slow to refocus, and that he has difficulty with visual scanning. He reported having cognitive problems, including problems with attention, concentration, multitasking, alternating attention, problems with short-term memory / forgetfulness, distorted recollections of events compared to others' recall of them, a slight problem with recall for remote memories, word-finding problems, paraphasic errors, difficulty with language comprehension, difficulty with reading comprehension, spelling problems, problems with math, difficulty with problem-solving and decision-making, slower speed of information, transposing letters and numbers when writing, spatial disorientation, and problems with initiation. He reported emotional changes including some depression, feelings of loss, social isolation associate to some degree with fatigue, avoidance due to cognitive or stimulus overload, anhedonia, emotional lability, mood swings, reduced motivation, anxious rumination, intrusive thoughts, sleep disturbance, nightmares, irritability, reduced stress tolerance, and anxiety, particularly on the road. Dr. Helffenstein's report indicates that the results of the neuropsychological tests were invalid. Nevertheless, his report indicates that he "does meet the diagnostic criteria for a Post-Concussive Syndrome / Mild Traumatic Brain injury…", that he was "experiencing moderate to perhaps severe feelings of depression," was "reporting symptoms consistent with a Post-Traumatic Stress Disorder related to the accident…", and was "reporting a variety of vision problems consistent with a Post-Traumatic Vision Syndrome." The diagnoses are listed as:
- Mild Neurocognitive Disorder due to Traumatic Brain Injury with Behavioral Disturbance (behavioral disturbance includes irritability, reduced stress tolerance, and anger outburst).
- Depressive Disorder due to Traumatic Brain Injury, Mild
- Post-Traumatic Stress Disorder

Recommendations were provided for medication management, cognitive rehabilitation, psychotherapy, and referral to a neuro-optometrist. [Refer to the subsequent report section, "*May 2018 Neuropsychological Exam*" for further analysis.]

A 05/05/18 Occupational Medicine report includes the following description: "He still has evidence of not visualizing items in the midline of his vision," and he is described as having slightly improved imbalance, as well as continued facial pain, difficulty sleeping, and irritability.

**Lincoln/Bunch 0882**

A 05/10/18 Occupational medicine report indicates that he reported headache, neck pain, visual difficulties, imbalance, dizziness, and cognitive issues such as forgetfulness and word-finding problems. It is noted that his visual perception of objects is grossly not centered, had difficulty with gaze to his right, and had a positive Romberg's sign.

A 05/10/18 *Physician's Report of Worker's Compensation Injury* (Thomas Higgenbotham, D.O) indicates diagnoses of: "TBI post MVA; C-strain; [illegible] syndrome."

A 05/22/18 Occupational Medicine report indicates that his gait and stance seemed unremarkable, that he seemed to be more cogent, and had a negative Romberg's maneuver with reasonable balance. He is described as still having a midline shift on testing, but somewhat improved.

In his 05/30/18 responses to a fax from Landon Wallis, Senior Claims Representative, Dr. Helffenstein indicated diagnoses of: Concussion (moderate); Post Concussive Syndrome; Post Traumatic Stress Disorder; and Major Depression, and he responded to questions about treatment recommendations and driving ability.

The Occupational Medicine report of 06/05/18 indicates an assessment of:
- Concussion with
  - Emotional and behavioral disturbance and changes
  - Neurocognitive disorder
  - Visual difficulties with spatial disorientation
- Cervicalgia
- Cervical strain
- Cephalgia
- Situational adjustment reactions with anxiety and depressed mood

A 06/05/18 *Physician's Report of Worker's Compensation Injury* (Thomas Higgenbotham, D.O) indicates diagnoses of: "Postconcussion, visuospatial disorientation, cervical strain."

A 06/19/18 Occupational Medicine report indicates a positive finding on Romberg and balance testing, but concerns about his coordination and proprioception. He is described as having a visual midline shift which "regressed from the last visit and consistent with our initial visit" which he attributes to a fall in physical therapy.

A 07/03/18 Occupational Medicine report indicates that he reported headaches, photosensitivity, had a slightly unsteady gait, cannot attend to left-sided finger-to-nose testing, has persisting visual midline shift, that he rocked and reeled and caught himself during Romberg testing but this is described as improved. Dr. Higginbotham reported that he had reviewed the report of neuropsychological exam, and opined that it was "likely

**Lincoln/Bunch 0883**

invalid because of his visual difficulties, headaches and inability to concentrate and focus." During Dr. Higginbotham's exam, he complained of double vision and blurred vision, and he is described as being unable to maintain a glance at something to read for more than a couple of seconds.

A 07/17/18 Occupational Medicine report indicates that he had been prescribed corrective lenses by the neuro-optometrist. Dr. Higginbotham provides further opinion that his vision problems undoubtedly affected his initial neuropsychological test results. He is described as being more alert and oriented, with improved headaches but persisting neck stiffness and discomfort. He reported photosensitivity and headache and dizziness in response to motion. His gait is described as essentially improved, and his behavior during Romberg assessment (that he is able to maintain the posture longer but still has a sense of falling backwards) is interpreted as yielding an equivocal finding. Tandem gait with heel-to-toe is described as improving but still marginal.

An 08/06/18 report of Psychological Evaluation (Herman Staudenmayer, PhD) indicates that during the interview he was sad and tearful. His affect is described as being dysphoric yet also blunted. It is noted that his speech was essentially normal. He reported feeling overwhelmed, unhappy, tearful, sad, depressed, anxious, nervous, hostile, angry, frustrated, irritable, short-tempered, and anxious. It is noted that when presented with something to read, while seated he placed the reading material on the floor so that he could see it. He was using corrective lenses. The psychological assessment included administration of a standardized, self-report psychological test (MMPI-2 RF: Minnesota Multiphasic Personality Inventory – 2 Restructured Form), a cognitive screening assessment (MoCA: Montreal Cognitive Assessment), a concussion symptom scale (SCAT2: Sport Concussion Assessment Tool), and a PTSD checklist (PCL-5: Posttraumatic Checklist for DSM-5). The report indicates that the psychological tests were presented orally so that he would not have to read the material. Dr. Staudenmayer's report indicates that:
> "Mental Status Exam suggest exaggeration and adopting the sick role. Psychological testing indicates that his self-report reflects over-reporting bias, making the self-reported symptoms invalid."

"Psychological factors affecting other medical conditions" is recorded as a "Working Diagnosis." The note indicates that due to the invalid test findings, comprehensive neuropsychological testing was contraindicated, and that he may benefit from psychotherapy. [Refer to the subsequent report section, *August 2018 Psychological Exam* for further analysis.]

An 08/13/18 "Treatment Note" (Herman Staudenmayer, PhD) indicates results of the MMPI-2 RF were reviewed, and that the results were invalid. The note refers to his presentation with unrealistically high levels of symptoms. The note refers to a discussion of previous traumatic experiences, one of which was an incident during childhood when he fell into a dry well and was not rescued until the following day, one of which was when he was stabbed in the leg in 1990, and another during which he was stabbed in the

6 of 14          8220685 F 04 29 19

**Lincoln/Bunch 0884**

abdomen in 1993 while working for the Department of Corrections.  The narrative report indicates, "Based on this updated assessment, he meets criteria for complex PTSD, a diagnosis is not in DSM 5 but is under review for inclusion in the next version of the DSM … It appears that the motor vehicle accident was traumatic enough in its own right, but also rekindled past associated experiences and traumatic symptoms."

A 02/19/19 Occupational Medicine evaluation (Thomas Higginbotham, D.O.) indicates a list of diagnoses, including:
- History of mild traumatic brain with post-concussion with the following sequelae:
  o Emotional and behavioral disturbance / changes
  o Neurocognitive disorder
  o Visual difficulties with spatial disorientation
  o Post traumatic headache
- Cervical strain / sprain
- Thoracic strain
- Ulnar neuritis, left
- Imbalance
- Dysphasia
- Dysphagia
- History of falls
- Generalized anxiety with depressed mood over health status
- Post Traumatic Stress Disorder, chronic
- Situational adjustment reactions with mixed anxiety and depressed mood
- Sleep disturbance
- Overweight
- Hypertension, malignant

Analysis: *Mechanism of injury and acute neurological status:* Dr. Helffenstein's report indicates that at the time of the neuropsychological screening (in May 2018) the claimant described events which occurred immediately prior to the motor vehicle collision. Although he referred to his recollection as "vague" in some respects, the narrative report includes a description of the circumstances around the accident, the brake lights of the other vehicle, and the sound of the collision,   The description that "His memories for the day leading up to the accident are quite vague," would be somewhat atypical with preserved recall of events immediately prior to the accident.  He also reported that immediately after the accident he drove his vehicle for two to three minutes to follow the driver of the other vehicle, which had left the scent of the accident.

At the time of Dr. Helffenstein's assessment, the claimant scribed having felt dazed, confused, "stunned" and/or "woozy" immediately after the accident.  If the claimant had a transient period of being at least dazed, such an alteration of mental status would represent the minimal criterion for the presence of a traumatic brain injury.  However, his capacity to operate a motor vehicle for even short period of time is notable.  The

**Lincoln/Bunch 0885**

Emergency Department medical records indicate that at the time of E.D. presentation he was alert, and that his Glasgow Coma Scale score was 15. If the claimant experienced a transient period of altered mental status, when considered in the context of no evidence of an extended period of peritraumatic amnesia, no evidence of focal acute neurological findings, and no evidence of acute neuroradiological findings, the severity of such a brain injury would have to have been in the range of cerebral concussion / mild traumatic brain injury (e.g., ACRM definition of mild traumatic brain injury, 1993; Ruff et al., 2009; Menon et al., 2010).

*Typical Course of Post-Concussive Recovery*: Decades of scientific research has shown that among groups of individuals who have sustained a cerebral concussion / mild traumatic brain injury, most people experience some post-concussive symptoms during the days to weeks post-injury, and many experience some residual symptoms for months post-injury. However, the scientific literature pertaining to the natural course of recovery after cerebral concussion provides converging evidence that symptom persistence beyond 3 months is atypical, and that while injury-related variables account for more variance in initial post-injury presentation, non-injury related variables account for more variance among those who report long-term persisting symptoms (e.g., Iverson, 2005; McCrea, 2008). Similarly, the World Health Organization's (WHO) Collaborating Centre Task Force on Mild Traumatic Brain Injury published a comprehensive review of the literature on prognosis after mild traumatic brain injury (Carroll et al., 2004), based on 120 studies which contributed to this best-evidence synthesis on prognosis. The Task Force found that the scientific evidence supported the conclusion that concussion symptoms resolved within days to weeks post-injury for the vast majority of mild traumatic brain injury patients. Among its findings, the WHO Task Force concluded that there was consistent and methodologically sound evidence that prognosis was highly favorable, with little evidence of residual / permanent cognitive or behavioral deficits after a single, uncomplicated concussion. This conclusion is similar to results of several meta-analytic studies which have shown that neuropsychological recovery from a single mild traumatic brain injury most often follows a favorable course over a period of days to weeks, with little or no indication of permanent impairment on neuropsychological testing by 3 months post injury in group studies. Meta analyses of data pooled from prospective studies of neuropsychological functioning after concussion (in the absence of litigation) have also shown no significant effect sizes by 3 months post-injury (e.g. Belanger et al., 2005). As summarized by McCrea (2009),

"… findings from large, prospective studies now illustrate that post-concussion symptoms, cognitive dysfunction, and other functional deficits are most severe during the earliest acute period after MTBI, then follow a gradual, overlapping course of recovery beginning within hours of injury and completely resolve within days to weeks in the overwhelming majority of cases. In the case of neuropsychological recovery, meta-analytic studies demonstrate undetectable effect sizes beyond roughly 2 – 4 weeks after MTBI." :

**Lincoln/Bunch 0886**

More recent research studies have repeatedly replicated the previous empirically-based conclusion that by 3 months post-injury, mild traumatic brain injury is not the strongest predictor of persisting symptoms. Rather, preinjury physical and/or psychosocial factors (e.g., preinjury mental health, anxiety symptoms, life stressors, pain) are stronger predictors of symptom persistence beyond 3 months, and due to the nonspecific nature of symptoms commonly attributed to concussion, there is a high false positive diagnosis rate at 1 year post injury (Ponsford et al., 2012; Waljas et al., 2015). Since the natural course of recovery is quite favorable for most individuals who have sustained a single, uncomplicated mild traumatic brain injury, and many neuropsychological symptoms are nonspecific in nature (e.g., Cassidy et al, 2014), there is often a broad differential diagnosis when examining for late effects of mild traumatic brain injury. Objective, scientifically supported measures of structural and functional integrity include neuroimaging studies, EEG, neurological exam, and neuropsychological test data.

The claimant's medical records include a neuropsychological evaluation in May 2018, and a psychological evaluation in August 2018.

*May 2018 Neuropsychological Exam*: The validity of neuropsychological exam results cannot be interpreted with confidence in the absence of objective psychometric indicators of effort and symptom validity. The importance of this is supported by a *Consensus Conference Statement of the American Academy of Clinical Neuropsychology*[2] and a *National Academy of Neuropsychology Position Paper on symptom validity assessment*[3]:

> "Use of psychometric indicators is the most valid approach to identifying neuropsychological response validity. Stand-alone effort measures and embedded validity indicators should both be employed. The evaluation of self-reported symptoms is best accomplished using psychometric instruments containing proven validity measures. As the number and extent of findings consistent with the absence or presence of response bias increases, confidence in conclusions regarding the validity of the examination is strengthened accordingly."[1]

> "Adequate assessment of response validity is essential in order to maximize confidence both in the results of ability measures and in the diagnoses and recommendations that are based on the results."[2]

The importance of this is supported by a *Consensus Conference Statement of the American Academy of Clinical Neuropsychology* and a *National Academy of Neuropsychology Position Paper on symptom validity assessment*:

> "Use of psychometric indicators is the most valid approach to identifying neuropsychological response validity. Stand-alone effort measures and embedded validity indicators should both be employed. The evaluation of self-reported symptoms is best accomplished using psychometric instruments containing proven validity measures. As the number and extent of findings consistent with

**Lincoln/Bunch 0887**

the absence or presence of response bias increases, confidence in conclusions regarding the validity of the examination is strengthened accordingly."[1]

"Adequate assessment of response validity is essential in order to maximize confidence both in the results of ability measures and in the diagnoses and recommendations that are based on the results."

Such tests were included in the May 2018 neuropsychological exam. The examinee's responses to the Victoria Symptom Validity Test (VSVT) yielded a total score (26/48) which is reported as being in the "questionable" range.  His performance on the "easy" items (20/24) was considered by the examiner to be a passing score.  His performance on the more "hard" items (06/24) was considered by the examiner to be a failing score, and is described as "far below chance which is concerning for intentional lack of effort." Compared to recommended cut-off scores based on known groups design (c.f., Silk-Eglit et al., 2016) this pattern of responses represents a failed validity test.  Furthermore, even in the absence of empirically-derived normative data, and based solely on appreciation of response probabilities for a 24-item test with a multiple-choice format consisting of two options (i.e., a 50/50 chance of correct answers via purely random responses), a score of 06/24 correct is obviously not indicative of effortful responding, extremely improbable in the context of a series even random responses (which would on average yield about 12 correct responses), and is suggestive of suppression of actual ability (i.e., an aggregate pattern of awareness of correct responses and providing incorrect responses).  For a .50 probability of correct/incorrect responses, a score of 12 / 24 represents the Median (i.e., 50th percentile), a score of 10 / 24 is at the 25th percentile, and a score of 06 / 24 (25% correct) is at the 01st percentile of a randomly generated distribution of scores. In other words, among examinees with no perceptual or cognitive abilities who are able to respond randomly, 99 out of 100 would achieve a score higher than 06 / 24.  As tested mathematically, using a Bayesian frequency analysis based on the binomial theorem with no information other than a .50 base rate of correct responses, a null hypothesis that the score 06 / 24 is within the range of at least random responses, and an alternative hypothesis that the score 06/24 is below the range of random responses, the result (Bayes Factor = 9.9) provide moderate to strong evidence for the alternative hypothesis (Table and Plot below). (A Bayes Factor = 10 represents the cusp of the moderate and strong categories of evidence.)

**Bayesian Binomial Test**

| | Level | Counts | Total | Proportion | BF₋o |
|---|---|---|---|---|---|
| VSVT | 0 | 18 | 24 | 0.750 | 0.073 |
| | 1 | 6 | 24 | 0.250 | 9.899 |

Note.  For all tests, the alternative hypothesis specifies that the proportion is less than 0.5.

**Lincoln/Bunch 0888**



The examinee was also administered a second performance validity test (TOMM: Test of Memory Malingering). As recognized by the examining neuropsychologist, "His performance on Learning Trial 2 was 27 / 50 correct. His performance on the Retention Trial was 24/50 correct. These are both failing scores... At that point in time, it was evident that I was not going to be able to obtain valid neuropsychological test scores." The self-report psychological tests administered (BDI-2: Beck Depression Inventory - 2 and PCL-5: Post-traumatic Stress Checklist for DSM-5) do not have embedded symptom validity indices. The report indicates that his responses to the PCL-5 yielded a total score of 79 (out of a maximum score of 80), and that, "In summary, Mr. Bunch is reporting essentially all symptoms of PTSD at a very high level." Considering the extraordinarily broad range, severity, and persistence of the examinee's self-reported symptoms compared to the typical course of post-concussion syndrome, and despite converging objective findings of invalid neuropsychological test data, the examining neuropsychologist's assertion of a May 2018 diagnosis of Mild Neurocognitive Disorder due to traumatic brain injury is inexplicable.

*August 2018 Psychological Exam*: The August 2018 exam did not include any methods for determining performance validity during the cognitive assessment. The examinee's responses to self-report symptom checklists yielded extremely high scores on scales of post-concussion and post-traumatic stress questionnaires. However, the psychological evaluation included administration of one psychological test (MMPI-2 RF) which includes embedded symptom validity indices, on which his aggregate pattern of responses was clearly invalid (i.e., F-r = 120). This finding is interpreted by the examining psychologist as follows: "Elevated scores are associated with over-reporting of a broad range of psychological cognitive, and somatic symptoms. This protocol is invalid." and the recognition that, "The bias to over-report symptoms on the MMPI-2 RF suggests the self-reported symptoms on the PCL-5 and the SCAT2 are not valid." Although Dr. Staudenmayer's subsequent note of 08/13/18 includes a rationale that further information obtained from the examinee at that time, about a remote history of trauma, led to an updated assessment (i.e., diagnosis of "complex PTSD"), the inference that this or any

**Lincoln/Bunch 0889**

psychiatric condition is present reflects disregard for converging test findings that the obtained neuropsychological test data are not accurate measures of the examinee's actual cognitive or psychological status.

Conclusions: The medical records available for review include the minimum criterion for the clinical diagnosis of cerebral concussion, which in essence consists of head trauma with a transient alternation of mental status, in this case based on the claimant's subsequent retrospective report rather than documentation of any observation of gross confusion or altered mental status. At the time of his presentation to the emergency department, the Glasgow Coma Scale score was 15, there is no evidence of an extended period of peritraumatic amnesia, no evidence of focal acute neurological findings, and no evidence of acute neuroradiological findings.  Therefore, if the claimant sustained a traumatic brain injury on 02/13/18, the severity of such a brain injury would have to have been in the range of cerebral concussion / mild traumatic brain injury. The medical records provide limited but adequate support for a case formulation of post-concussion syndrome for a period of a few months post-injury.  However, by May 2018 the scope and severity of his reported symptoms was unusual at 3 months post-injury, and the results of the neuropsychological examination at that time provide clear and compelling scientifically-supported findings which do not support ongoing case formulation of cognitive impairment due to traumatic brain injury.  The August 2018 psychological evaluation findings also provide converging scientifically-supported indications that the claimant's aggregate pattern of self-reported symptoms was not a valid representation of his actual psychological status. The assertion that the claimant's repeated failures on performance and symptom validity tests was due to visual problems is untenable considering the nature of these performance validity tasks, and the oral presentation of the August 2018 psychological tests. In summary, the medical record information provides insufficient support, beyond mid-May 2018, for a diagnoses of cognitive impairment due to traumatic brain injury, or for the presence of a psychiatric disorder.

**Case Summary**: Medical records of this 55 year-old man indicate that he sustained injuries in a motor vehicle collision on 02/13/18.  Since then, he has reported a wide range of persisting sensory-perceptual, motor, cognitive, and emotional symptoms. Medical records include primary care evaluation / treatment (Wayne Olson, MD), as well as evaluation / treatment (including pharmacological and osteopathic manipulation) with multiple specialists including Occupational Medicine (Thomas Higgenbotham, D.O.), physical therapy, optometry, neuropsychological evaluation (Dennis Helffenstein, PhD), psychological evaluation and treatment (Herman Staudenmayer, PhD), and chiropractic treatment.

**References:**

American Psychiatric Association.  (2013). *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition).*  Arlington, VA: American Psychiatric Association.

**Lincoln/Bunch 0890**

Belanger, H. et al. (2005). Factors moderating neuropsychological outcomes following mild traumatic brain injury: A meta-analysis. *Journal of the International Neuropsychological Society*, 11, 215-227.

Bush, S.S. et al. (2005). Symptom validity Assessment: Practice issues and medical necessity. NAN Policy and planning committee. *Archives of Clinical Neuropsychology*, 20, 419-426.

Board of Directors (2007). American Academy of Clinical Neuropsychology (AACN) Practice Guidelines for Neuropsychological Assessment and Consultation, *The Clinical Neuropsychologist*, 21, 209-231.

Carroll, L. et al. (2004). Prognosis from mild traumatic brain injury: Results of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury. *Journal of Rehabilitation Medicine*, 43, 84-105.

Cancelliere, C. et al. (2014). Systematic search and review procedures: Results of the International Collaboration on Mild Traumatic Brain Injury Prognosis. *Archives of Physical Medicine and Rehabilitation*, 95(3 Suppl), S101-131.

Cassidy, J. et al. (2014). Systematic review of self-reported prognosis in adults after mild traumatic brain injury: Results of the International Collaboration on Mild Traumatic Brain Injury Prognosis. *Archives of Physical Medicine and Rehabilitation*, 95, (3 Suppl): S132-51.

Heilbronner, R.L. et al., (2009), American Academy of Clinical Neuropsychology Consensus Conference Statement on the Neuropsychological Assessment of Effort, Response Bias, and Malingering. *The Clinical Neuropsychologist*, 23, 1093 – 1129.

Iverson, G.  (2005). Outcome from mild traumatic brain injury. *Current opinion in psychiatry*, 18, 301-317.

Ponsford, J. et al. (2012). Predictors of postconcussive symptoms 3 months after mild traumatic brain injury. *Neuropsychology*, 26, 304-313.

McCrea, M. (2008). *Mild traumatic brain injury and postconcussion syndrome: The new evidence base for diagnosis and treatment*. New York: Oxford University Press.

McCrea, M. et al. (2009). An integrated review of recovery after mild traumatic brain injury (MTSBI): Implications for clinical management. *The Clinical Neuropsychologist*, 23, 1368-1390.

Menon, D. et al. (2010). Special communication: Definition of traumatic brain injury. *Archives of Physical Medicine and Rehabilitation*, 91, 1637 – 1640.

**Lincoln/Bunch 0891**

Mild Traumatic Brain Injury Committee of the Head Injury Interdisciplinary Special Interest Group of the American Congress of Rehabilitation Medicine (1993). Definition of mild traumatic brain injury, *Journal of Head Trauma Rehabilitation*, 8, 86-87.

Ruff, R. et al. (2009). Recommendations for diagnosing a mild traumatic brain injury: A National Academy of Neuropsychology Education Paper. *Archives of Clinical Neuropsychology*, 24, 3-10.

Silk-Eglit, G., et al. (2016). Validation of Victoria Symptom Validity Test Cutoff Scores among mild traumatic brain injury litigants using a known-groups design. *Archives of Clinical Neuropsychology*, 31, 231-245.

Waljas, M. et al. (2015).  A prospective biopsychosocial study of the persistent post-concussion symptoms following mild traumatic brain injury. *Journal of Neurotrauma*, 32, 534-547.

< electronically signed >
Timothy Belliveau, PhD, ABPP
*Board Certified in Clinical Neuropsychology*
*Board Certified in Rehabilitation Psychology*
Consultant, Clinical Support

**Lincoln/Bunch 0892**

**ICP Memo**

| Customer Name | Claimant Name | Claim Number |
|---|---|---|
| Charter Communications, Inc. | Mark Bunch | 8220685 |

| | | | |
|---|---|---|---|
| **Referred By:** | Courtney Grygiel | **Claimant DOB:** | |
| **Referral Date:** | 04/30/2019 | **Job Title:** | |
| **Due Date:** | 05/09/2019 | **Medical/ Surgical Condition:** | Postconcussion syndrome, history of |
| **Referral Type:** | Priority | **Disability Occupational Type:** | Direct Sales Representative |
| **Reason for Priority Handling:** | | **Product Type:** | LTD |
| **Other Considerations** | | **LDW:** | 02/13/2018 |
| **Report Date:** | 05/11/2019 | **DOD:** | 02/14/2018 |
| | | **BBD:** | |

**Questions**

*Please assign file to Dr. Swotinsky for an addendum to his 4/23/19 report. Additional medical records received dated in EDM as 4/24/19 and 4/25/19 listed as Employee/Attorney. See also responses received from attending provider Thomas Higginbotham DO regarding the summary of the conversation.*

*Q.        Please review and comment. Does this alter your prior opinion or support any additional restrictions or limitations?*

A.        The additional information is in three categories:

1.        Vision. No records of vision evaluation/treatment were previously submitted. Now, there are records from optometrist Dr. Saxerud from 06/30/18 – 09/21/18, i.e., ending eight months ago. After 09/21/18, there is a neurology note from 10/19/18 with normal eye-related exam findings and an occupational medicine note from 02/14/19 with scant and normal eye-related exam findings. The available information lacks updated and abnormal clinical findings or treatment records to substantiate impairment from a visual disorder. If someone is incapacitated by a visual disorder, then one would expect that person to be evaluated by an ophthalmologist and undergo treatment and monitoring for that condition. In the claimant's case, his evaluation consisted of several visits with an optometrist for corrective prism lenses, the last visit eight months ago.

If additional analysis of the claimant's visual condition based on the clinical findings in the 06/30/18 – 09/21/18 optometry notes is desired, then consider having an ophthalmologist review the claim for vision-related diagnoses and findings. Consider asking that ophthalmologist:

**Lincoln/Bunch 0893**

RE: Mark Bunch                                                                    May 11, 2019
Claim 8220685                                                                        Page 2

> *Q1.     What is the supported ophthalmologic diagnosis?*
> *Q2.     What vision-related activity limitations/restrictions are supported?*
> *Does the claimant's vision (dis)qualify him from driving a car?*
> *Q3.     If you believe it would be helpful to better understanding this claim,*
> *please contact Dr. Saxerud at 719-594-2020.*

2.       Neuropsychologic.  There are no new records or clinical findings of neuropsychologic evaluation or treatment.  I do not know how informative it would be to have Dr. Belliveau review and comment on the reports by Drs. Ricci and Helffenstein to Attorney Shakeshaft in support of the disability claim.

3.       Neurology.  There is just the one note from Dr. Brinley from 10/19/18, i.e., seven months ago.  She noted the claimant reported symptoms from his concussion, stuttered sometimes, and appeared imbalanced/uncoordinated.  Dr. Brinley prescribed nortriptyline and speech therapy and asked the claimant to return in 2 months.  But, subsequent records (e.g., Dr. Higginbotham's 02/19/19 note) indicate the claimant was not taking nortriptyline, and there are no records of speech therapy or follow-up visits with the neurologist.[1]  The only neurologic findings after 10/19/18 are in Dr. Higginbotham's occupational medicine note, and they are normal.  The available information lacks updated and abnormal clinical findings or treatment records to substantiate functional impairment from a neurologic condition.

The claim is based primarily on post-concussion syndrome from a closed head injury 15 months ago when the claimant states his forehead hit the steering wheel of his car.  There was no loss of consciousness, and instead the claimant took off after the hit-and-run drive and detained him until police came.  There is no definition, test, or diagnostic criteria for postconcussion syndrome.  If someone reports the nonspecific symptoms that fall in the category of postconcussion syndrome, that is considered consistent with postconcussion syndrome.  The syndrome is controversial, especially in its protracted form.  After the first few months, the submitted records include several chiropractic manipulation notes, a neurology consult, and the remainder consisting or reports to the claimant's attorney from Dr. Ricci (09/25/18), Dr. Saxerud (11/21/18), and Dr. Higginbotham (02/14/19).  There are scant records from treating providers beyond the first few months.  This is as expected, since the vast majority of patients have largely recovered from postconcussion syndrome by three months.[i]  The scant records from treating providers fail to support severity and acuity.  (If someone is completely incapacitated by a medical condition, there is an expectation that there would be records of evaluation and treatment to try and restore that person to health, especially someone who is not that old.)

From 02/14/18 until as late as 08/14/18, impairment was supported by postconcussion syndrome and a pending optometry appointment.  After 08/14/18, there remained support for impaired vision that required the accommodation of corrective lenses.  There was also

---

[1] Mr. Bunch wrote a statement that his attorney submitted in March 2019.  Mr. Bunch stated that he was still attending occupational and speech therapy.  The available information includes no records of occupational or speech therapy, nor does it identify providers of occupational or speech therapy.

**Lincoln/Bunch 0894**

RE: Mark Bunch                                                                                        May 11, 2019
Claim 8220685                                                                                         Page 3

mention of impaired depth perception through 09/28/18.  This does not preclude driving.
For example, people with just one functioning eye (and thereby impaired depth perception)
are not precluded from driving.

**Records and Impairment Review**

1.      My previous review and 04/23/19 report

In April 2019, I reviewed the claim file and spoke with Dr. Higginbotham.  My 04/23/19
report noted:

- The claimant had a mild traumatic brain injury on 02/13/18.  After that, he began
  and continues to report headache, dizziness, cognitive, and psychological symptoms
  that are feature of postconcussion syndrome.  He also reports visual symptoms that
  are not common features of postconcussion syndrome.

- The record presented scant evaluation/treatment for postconcussion syndrome
  beyond the first few months.  There were no records of evaluation or treatment of
  balance of vision symptoms and no evaluation and treatment by a specialist in
  neurology or headaches.  After 07/31/18 (9½ months ago), the only record of
  evaluation and treatment of postconcussion symptoms was a February 2019 report
  that occupational medicine Dr. Higginbotham prepared for Attorney Shakeshaft for
  the disability claim.

  - The record had multiple, potential indicators of malingering.[ii,iii]   These
    included:

    - Invalid performance and symptom magnification per
      neuropsychologist Dr. Hilffenstein who saw the claimant (May 2018)
      and Stadenmayer (08/06/18).
    - The claimant stating that he could not drive a car because of visual
      and other deficits while at the same time he was driving a car, i.e.,
      engaging in activities inconsistent with reported deficits.
    - Lack of reasonable follow through on treatments.  These included
      referrals, and failure to follow through with referrals, to speech
      therapy, vestibular therapy, for a driving evaluation, and 8 sessions of
      psychotherapy.

  - Postconcussion syndrome rarely lasts more than a few months.

  Postconcussion syndrome is controversial, especially in its protracted form.[iv]  Where
  symptoms of postconcussion syndrome persist, compensation/litigation is a factor,
  but there is little consistent evidence for other predictors.[v]

My 04/23/19 report concluded that while the claimant reported that he was highly
symptomatic, there was a paucity of abnormal clinical findings and records of treatment –
essential no record of evaluation/treatment since 07/31/18 other than the disability

**Lincoln/Bunch 0895**

RE: Mark Bunch                                                                    May 11, 2019
Claim 8220685                                                                       Page 4

evaluation by Dr. Higginbotham in February 2019.  Postconcussion syndrome in its
protracted form commonly represents psychosocial, nonmedical factors.  The submitted
information did not include information to support persistent, medically-based activity
limitations/restrictions.

(Dr. Higginbotham responded to my summary of our conversation by writing back that the
claimant's problems, including his invalid performance on neuropsychological testing, were
due to postconcussion syndrome.)

2.      Additional documents submitted by the claimant's attorney

When I spoke with Dr. Higginbotham last month, I told him that we had received the
neuropsychological reports and no other specialists' reports.  Dr. Higginbotham told the
claimant's attorney.  That attorney submitted additional medical records and documents.
The additional records and documents are from:

- Optometry.  06/30/18 – 09/21/18.  Michael Saxerud, OD.

    o   Visual acuity with corrective lenses: 20/20
    o   Visual field screening:  Normal on the right, "scattered, reduced" on
        the left.  (This is how Dr. Saxerud describes it.  The visual field test
        results were not submitted.)
    o   Convergence insufficiency per near point of convergence of 15 (cm?).
    o   Extraocular muscles: "Pursuits, moderate fixation loss."
        "Underaction" during adduction.

    Dr. Saxerud prescribed corrective prism lenses.  Dr. Saxerud's impressions included
    "convergence insufficiency" and "visual perceptual disorder secondary to a
    concussion."  Dr. Saxerud wrote on 09/21/18 that the claimant could not work
    because of inadequate depth perception and eye movements, but within a few
    months, he could probably return to at least part-time work.  (I did not see an
    examination of or treatment for the claimant's depth perception.)  Records of
    evaluation/treatment of vision end with that 09/21/18 note.

    On 11/21/18, Dr. Saxerud wrote a letter again stating that the claimant could not
    work because of inadequate depth perception and eye movements, but within a few
    months, he could probably return to at least part-time work.

- Neurology.  10/19/18.  Julia Brinley, DO.  Initial evaluation for "brain injury."
  Abnormal neurologic findings consisted of:

    -   Speech fluent although stuttering at times.
    -   With finger to nose patient will often miss my finger by an inch
        bilaterally, often has to close one eye.
    -   Romberg was positive, difficulty with tandem [gait].

**Lincoln/Bunch 0896**

RE: Mark Bunch                                                    May 11, 2019
Claim 8220685                                                        Page 5

Other neurologic findings were normal. Dr. Brinley noted the claimant reported symptoms following a concussion and had a history of 'neuropsych testing that demonstrated postconcussive recovery with frontal lobe just executive function." Dr. Brinley concluded the claimant had postconcussion syndrome and she prescribed nortriptyline, speech therapy, and follow up in 2 months. (There are no speech therapy records and no other records from Dr. Brinley.)

- Neuropsychology.

  - 09/25/18. Anthony Ricci, Ph.D. Evaluation and report to Attorney Shakeshaft supporting the claimant's disability claim based on review of records and several symptom questionnaires that Dr. Ricci had the claimant complete. Dr. Ricci recommended "self-directed services such as cardiac biofeedback, relaxation training, cognitive therapy, conjoint therapy, conjoint therapy, venting, redirection, education, and support."

  - 03/12/19. Dennis Helffenstein, Ph.D. Letter to Attorney Shakeshaft supporting the claimant's disability claim based on his review of the medical and psychology records. Dr. Helffenstein respects and agrees with the doctors who support the disability claim, and he disagrees with Dr. Polanco who does not support the disability claim. (The file has no records from Dr. Polanco.) Dr. Helffenstein believes that the abnormal validity results on the neuropsychological tests that he performed are attributable to the claimant's pain, depression, anxiety, and fatigue.

3.    Consulting neuropsychologist's review

Consulting neuropsychologist Timothy Belliveau, Ph.D., reviewed the neuropsychology records. These included Dr. Helffenstein's records except for Dr. Helffenstein's 03/12/19 report to Atty Shakeshaft – that letter had not yet been submitted. Dr. Belliveau's assessment was that the claimant had reported a 02/13/18 concussion/mild traumatic brain injury and the neuropsychological testing did not corroborate cognitive or psychological impairment beyond mid-May 2018.

_____

***Peer-to-Peer Consultation***

Julia Brinley, DO. Neurology.

Call #1. 3:15 p.m. EST 05/10/19 t/c to 719-473-3273. Bridgette said Dr. Brinley was with a patient. I l/m for c/b from Dr. Brinley.

On 05/11/19, I faxed to Colorado Springs Neuro Assoc at 719-389-1191 the claimant's signed release form and a cover letter asking for the most recent office note if after

**Lincoln/Bunch 0897**

RE: Mark Bunch                                                                  May 11, 2019
Claim 8220685                                                                      Page 6

10/19/18, and the name of the speech therapy provider that Dr. Brinley referred the claimant to on 10/19/18.

_____

### *References*

[i] Kashluba S, Paniak C, Blake T, et al.  A longitudinal, controlled study of patient complaints following treated mild traumatic brain injury. *Arch Clin Neuropsychol.*  2004;19:805.

[ii] Binder L, Rohling M. Money matters: a meta-analytic review of the effects of financial incentives on recovery after closed-head injury. *Am J Psychiatry.*  1996;153:7.

[iii] Ruff R, Wylie T Tennant W.  Malinginger and malingering-like aspects of mild closed head injury. *J Head Trauma Rehabil.*  1993;8:60.

[iv] Evans R.  Persistent post-traumatic headache, postconcussion syndrome, and whiplash injuries: the evidence for a non-traumatic basis with an historical review.  Headache.  2010;50:716.

[v] Carroll L, Cassidy J, Peloso P, et al.  Prognosis for mild traumatic brain injury: results of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury.  J Rehabil Med.  2004.

**Lincoln/Bunch 0898**

**VOC Suite**

# VOCATIONAL CASE MANAGEMENT

## Occupational Analysis

---

**PLEASE HAVE THE FOLLOWING IN THE CLAIM FILE BEFORE REFERRING**

☑ JOB DESCRIPTION    (if cannot obtain in writing, must have phone doc from discussions with EE/ER detailing job duties)

☐ PHYSICAL JOB EVALUATION FORM (if available)

☐ UPDATED MEDICAL WITH CLEAR R&L'S        ☐ TRAINING-EDUCATION-EXPERIENCE FORM

☐ MANAGER APPROVAL (if required)           ☐ ATTORNEY INFO (if applicable)

---

FROM:    Courtney Grygiel                    DATE:        Tuesday, May 14, 2019

## CLAIM BACKGROUND

---

Claimant Name:    MARK BUNCH              Claim Number:        8220685

☐ STD   ☑ FULLY INSURED          ( THRESHOLD $ )

☑ LTD   ☐ ASO    ☐ LIFE       Has MDS worked the claim?  ☐ YES  ☑ NO

Employer:  CHARTER COMMUNICATIONS, INC.

Change In DEF. Date:    08/14/2020

Pre-Disability Earnings:    $8,961.96    /  M       Claim Service Type:    ADOP
                                         (mode)

---

┌ **Document Locations** ─────────────────────────────────┐

☑ Document List       ☐ Correspondence       ☐ Paper File

└─────────────────────────────────────────────────────────┘

**Case Manager's Recommendations / Reason For Referral:**

---

please conduct OA

---

DP 512

**Lincoln/Bunch 0899**

# Lincoln Financial Group - Independent Evaluation

## Peer Review

Requested By:    Courtney Grygiel

Disability Claims
P.O. Box 7206
London, KY 40742-7206

(888) 437-7611 x13301

Fax:    (603) 422-7909

Document Locations

☑ Document List
☐ Correspondence
☐ Paper File

**Return Report to: VendorReferrals@lfg.com**

| | | | |
|---|---|---|---|
| Customer Name: | CHARTER COMMUNICATIONS, INC. | Date Sent: | 5/14/2019 |
| Funding type: | CON | Coverage Type: | LTD |
| Claimant Name: | MARK  B  BUNCH | Claim #: | 8220685 |
| Claimant Address: | | Claimant SSN: | |
| | | Claimant DOB: | |
| City: | | Claimant Tel. #: | |
| State: | | Claimant DOD: | 2/14/2018 |
| Zip: | | Primary Diagnosis: | Major depressive disorder, recurrent |
| Gender: | MALE | Att. Physician: | |
| Specialist Type Requested : | Ophthalmology | Physician: Phone/Fax | Michael Saxerud, OD  (719)-594-2020 |

Referral Questions:                                    Vendor Chosen:        MLS Group of Companies

Claimant Name:    MARK  B  BUNCH

**Lincoln/Bunch 0900**

# Lincoln Financial Group - Independent Evaluation

## Peer Review

LTD appeal file.

What is the supported ophthalmologic diagnosis?

Does the medical evidence support any diagnoses causing functional impairment from 8/15/18 to the present? Please explain your medical rationale as to why or why not.

If functional/visual impairment is supported, please describe how that translates into restrictions or limitations and for what period(s) of time. Please explain your medical rationale for any restrictions or limitations or why restrictions or limitations are not supported.

When contacting the treating provider please discuss the claimant's condition, treatment, and functional capacity. Please indicate the information reviewed and indicate whether or not you reached consensus with the treating provider. If not, please discuss your final assessment after the call.

Instructions For Vendor:

Claimant Name:    MARK  B  BUNCH

**Lincoln/Bunch 0901**

# Lincoln Financial Group - Independent Evaluation

## Peer Review

Attorney Information (if applicable):

SHAKESHAFT-GORMAN LAW FIRM
1935 JAMBOREE DRIVE
SUITE 202
COLORADO SPRINGS CO 80920

Claimant Name:     MARK  B  BUNCH

**Lincoln/Bunch 0902**



# *FAX COVER SHEET*

**Date:** Saturday, May 11, 2019

**To:** Colorado Springs Neuro Assoc

**Fax #:** 719-389-1191

**From:** Robert Swotinsky MD

**Phone #:** 978 337 4479

**Fax #:** 866 841 1415

**Pages
(including cover):** 03

**Notes:**

*This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me via return fax or via telephone and permanently delete the original and any copy of any fax and any printout thereof.*

**Lincoln/Bunch 0903**



Liberty Life Assurance
Company of Boston, a Lincoln
Financial Group company

Group Benefits Disability Claim
P.O. Box 7206
London, KY 40742-7206
Secure Fax 866-841-1415

May 11, 2019

Colorado Springs Neuro Assoc.

By fax: 719-389-1191

Re: Disability Benefits
Claimant Name: Mark Bunch
Claimant DOB:
Claim Number:

To Colorado Springs Neuro Assoc:

I am the physician who was asked by Lincoln Financial Group to review the medical records Mark Bunch submitted in support of his request for disability benefits. These included Dr. Brinley's 10/19/2018 progress note which mentions a referral to speech therapy and follow-up in two months.

Please clarify::

*Q1.* *Did Mr. Bunch return for follow-up after 10/19/18?*

☐ Yes. (If yes, please fax the most recent office note from after 10/19/18 to Lincoln Financial at 866 841 1415 f.)

☐ No.

*Q1.* *Did Mr. Bunch attend speech therapy??*

☐ Yes, at _____ (speech therapy provider's name)

☐ No.

☐ Unknown

_____

Mr. Bunch's signed release form is enclosed. Lincoln Financial Group is willing to reimburse Colorado Springs Neuro Assoc for the cost of responding to this request. Please contact the Lincoln Case Manager for this case, Courtney Grygiel at 888-437-7611 x13301 for any questions regarding reimbursement. Thank you in advance for your attention to this matter.

Respectfully yours,

-Electronically Signed-

Robert Swotinsky MD
Consulting Physician
978 337 4479, 866 841 1415 f

Responses as above/enclosed

_____  _____
Colorado Springs Neuro rep.     Date

*Please fax with most recent office note if after
10/19/18 to 866 841 1415*

Enclosed: Signed release form

**Lincoln/Bunch 0904**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (800) 384-5858
Secure Fax No.: (603) 559-9608

### AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

**I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:**

Person(s) or group(s) of persons authorized to use or disclose the information: Any physician, medical practitioner, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

Person(s) or group(s) of persons authorized to collect or otherwise receive the information: The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employees, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

Description of the information that may be used or disclosed: This Authorization specifically includes the release of all information related to:

* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatment, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including HIV/AIDS.
* Job duties, earnings, personnel records and other work related information and credit reports, bank records, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents.

The information will be used or disclosed only for the following purpose(s): For purposes of investigating, evaluating and processing my claim, and/or for insurance related functions.

### STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:

I understand that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

I understand that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

I understand that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization. If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration. The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print): _Mark K. Bunnett_

Name of legal representative, if applicable (print): _K. Stokstaft_    Relationship: _Attorney_

Signature of claimant or legal representative: _Mark Emel_

Date of Birth: _____    Claim Number: _6726665_    Date: _____

A copy of this authorization will be considered as valid as the original.

pg. 1 Authorization-Standard-2016

Lincoln/Bunch 0905

```
From: RightFax E-mail Gateway  <RightFaxE-mailGate@LibertyMutual.com>
Sent: Saturday, May 11, 2019 6:26 PM
To:  Swotinsky, Robert
Subject:   Your fax has been successfully sent to Colorado Springs Neuro
Assoc at
719-389-1191. RE:

Your fax has been successfully sent to Colorado Springs Neuro Assoc at
719-389-1191. RE:
-------------------------------------------------------------
From: Robert Swotinsky MD
Account: 8220685
-------------------------------------------------------------
5/11/2019 6:23:50 PM Transmission Record
     Sent to 719-389-1191 with remote ID "7193891191"
     Result: (0) Success
     Page record: 1 - 3
     Elapsed time: 01:33 on channel 6
```

**Lincoln/Bunch 0906**

**ICP Memo**

| Customer Name | Claimant Name | Claim Number |
|---|---|---|
| Charter Communications, Inc. | Mark Bunch | 8220685 |

| | | | |
|---|---|---|---|
| **Referred By:** | Courtney Grygiel | **Claimant DOB:** | |
| **Referral Date:** | 04/30/2019 | **Job Title:** | |
| **Due Date:** | 05/09/2019 | **Medical/ Surgical Condition:** | Postconcussion syndrome, history of |
| **Referral Type:** | Priority | **Disability Occupational Type:** | Direct Sales Representative |
| **Reason for Priority Handling:** | | **Product Type:** | LTD |
| **Other Considerations** | | **LDW:** | 02/13/2018 |
| **Report Date:** | 05/11/2019 | **DOD:** | 02/14/2018 |
| | | **BBD:** | |

**Questions**

*Please assign file to Dr. Swotinsky for an addendum to his 4/23/19 report.  Additional medical records received dated in EDM as  4/24/19  and 4/25/19 listed as Employee/Attorney.   See also responses received from attending provider Thomas Higginbotham DO regarding the summary of the conversation.*

Q.    *Please review and comment.  Does this alter your prior opinion or support any additional restrictions or limitations?*

A.    The additional information is in three categories:

1.    <u>Vision</u>.  No records of vision evaluation/treatment were previously submitted.  Now, there are records from optometrist Dr. Saxerud from 06/30/18 – 09/21/18, i.e., ending eight months ago.  After 09/21/18, there is a neurology note from 10/19/18 with normal eye-related exam findings and an occupational medicine note from 02/14/19 with scant and normal eye-related exam findings.  The available information lacks updated and abnormal clinical findings or treatment records to substantiate impairment from a visual disorder.  If someone is incapacitated by a visual disorder, then one would expect that person to be evaluated by an ophthalmologist and undergo treatment and monitoring for that condition.  In the claimant's case, his evaluation consisted of several visits with an optometrist for corrective prism lenses, the last visit eight months ago.

If additional analysis of the claimant's visual condition based on the clinical findings in the 06/30/18 – 09/21/18 optometry notes is desired, then consider having an ophthalmologist review the claim for vision-related diagnoses and findings.  Consider asking that ophthalmologist:

**Lincoln/Bunch 0907**

RE: Mark Bunch                                                              May 11, 2019
Claim 8220685                                                                  Page 2

> *Q1.     What is the supported ophthalmologic diagnosis?*
> *Q2.     What vision-related activity limitations/restrictions are supported?*
> *Does the claimant's vision (dis)qualify him from driving a car?*
> *Q3.     If you believe it would be helpful to better understanding this claim,*
> *please contact Dr. Saxerud at 719-594-2020.*

2.     <u>Neuropsychologic</u>.  There are no new records or clinical findings of neuropsychologic evaluation or treatment.  I do not know how informative it would be to have Dr. Belliveau review and comment on the reports by Drs. Ricci and Helffenstein to Attorney Shakeshaft in support of the disability claim.

3.     <u>Neurology</u>.  There is just the one note from Dr. Brinley from 10/19/18, i.e., seven months ago.  She noted the claimant reported symptoms from his concussion, stuttered sometimes, and appeared imbalanced/uncoordinated.  Dr. Brinley prescribed nortriptyline and speech therapy and asked the claimant to return in 2 months.  But, subsequent records (e.g., Dr. Higginbotham's 02/19/19 note) indicate the claimant was not taking nortriptyline, and there are no records of speech therapy or follow-up visits with the neurologist.[1]  The only neurologic findings after 10/19/18 are in Dr. Higginbotham's occupational medicine note, and they are normal.  The available information lacks updated and abnormal clinical findings or treatment records to substantiate functional impairment from a neurologic condition.

The claim is based primarily on post-concussion syndrome from a closed head injury 15 months ago when the claimant states his forehead hit the steering wheel of his car.  There was no loss of consciousness, and instead the claimant took off after the hit-and-run drive and detained him until police came.  There is no definition, test, or diagnostic criteria for postconcussion syndrome.  If someone reports the nonspecific symptoms that fall in the category of postconcussion syndrome, that is considered consistent with postconcussion syndrome.  The syndrome is controversial, especially in its protracted form.  After the first few months, the submitted records include several chiropractic manipulation notes, a neurology consult, and the remainder consisting or reports to the claimant's attorney from Dr. Ricci (09/25/18), Dr. Saxerud (11/21/18), and Dr. Higginbotham (02/14/19).  There are scant records from treating providers beyond the first few months.  This is as expected, since the vast majority of patients have largely recovered from postconcussion syndrome by three months.[i]  The scant records from treating providers fail to support severity and acuity. (If someone is completely incapacitated by a medical condition, there is an expectation that there would be records of evaluation and treatment to try and restore that person to health, especially someone who is not that old.)

From 02/14/18 until as late as 08/14/18, impairment was supported by postconcussion syndrome and a pending optometry appointment.  After 08/14/18, there remained support for impaired vision that required the accommodation of corrective lenses.  There was also

---

[1] Mr. Bunch wrote a statement that his attorney submitted in March 2019.  Mr. Bunch stated that he was still attending occupational and speech therapy.  The available information includes no records of occupational or speech therapy, nor does it identify providers of occupational or speech therapy.

**Lincoln/Bunch 0908**

RE: Mark Bunch                                                                May 11, 2019
Claim 8220685                                                                    Page 3

mention of impaired depth perception through 09/28/18.  This does not preclude driving.
For example, people with just one functioning eye (and thereby impaired depth perception)
are not precluded from driving.

**Records and Impairment Review**

1.      My previous review and 04/23/19 report

In April 2019, I reviewed the claim file and spoke with Dr. Higginbotham.  My 04/23/19
report noted:

- The claimant had a mild traumatic brain injury on 02/13/18.  After that, he began
  and continues to report headache, dizziness, cognitive, and psychological symptoms
  that are feature of postconcussion syndrome.  He also reports visual symptoms that
  are not common features of postconcussion syndrome.

- The record presented scant evaluation/treatment for postconcussion syndrome
  beyond the first few months.  There were no records of evaluation or treatment of
  balance of vision symptoms and no evaluation and treatment by a specialist in
  neurology or headaches.  After 07/31/18 (9½ months ago), the only record of
  evaluation and treatment of postconcussion symptoms was a February 2019 report
  that occupational medicine Dr. Higginbotham prepared for Attorney Shakeshaft for
  the disability claim.

  - The record had multiple, potential indicators of malingering. [ii,iii]   These
    included:

    o    Invalid performance and symptom magnification per
         neuropsychologist Dr. Hilffenstein who saw the claimant (May 2018)
         and Stadenmayer (08/06/18).
    o    The claimant stating that he could not drive a car because of visual
         and other deficits while at the same time he was driving a car, i.e.,
         engaging in activities inconsistent with reported deficits.
    o    Lack of reasonable follow through on treatments.  These included
         referrals, and failure to follow through with referrals, to speech
         therapy, vestibular therapy, for a driving evaluation, and 8 sessions of
         psychotherapy.

  - Postconcussion syndrome rarely lasts more than a few months.

  Postconcussion syndrome is controversial, especially in its protracted form. [iv]  Where
  symptoms of postconcussion syndrome persist, compensation/litigation is a factor,
  but there is little consistent evidence for other predictors. [v]

My 04/23/19 report concluded that while the claimant reported that he was highly
symptomatic, there was a paucity of abnormal clinical findings and records of treatment –
essential no record of evaluation/treatment since 07/31/18 other than the disability

**Lincoln/Bunch 0909**

RE: Mark Bunch                                                                                    May 11, 2019
Claim 8220685                                                                                        Page 4

evaluation by Dr. Higginbotham in February 2019.  Postconcussion syndrome in its protracted form commonly represents psychosocial, nonmedical factors.  The submitted information did not include information to support persistent, medically-based activity limitations/restrictions.

(Dr. Higginbotham responded to my summary of our conversation by writing back that the claimant's problems, including his invalid performance on neuropsychological testing, were due to postconcussion syndrome.)

2.        Additional documents submitted by the claimant's attorney

When I spoke with Dr. Higginbotham last month, I told him that we had received the neuropsychological reports and no other specialists' reports.  Dr. Higginbotham told the claimant's attorney.  That attorney submitted additional medical records and documents. The additional records and documents are from:

- Optometry.  06/30/18 – 09/21/18.  Michael Saxerud, OD.

  o    Visual acuity with corrective lenses: 20/20
  o    Visual field screening:  Normal on the right, "scattered, reduced" on the left.  (This is how Dr. Saxerud describes it.  The visual field test results were not submitted.)
  o    Convergence insufficiency per near point of convergence of 15 (cm?).
  o    Extraocular muscles: "Pursuits, moderate fixation loss." "Underaction" during adduction.

Dr. Saxerud prescribed corrective prism lenses.  Dr. Saxerud's impressions included "convergence insufficiency" and "visual perceptual disorder secondary to a concussion."  Dr. Saxerud wrote on 09/21/18 that the claimant could not work because of inadequate depth perception and eye movements, but within a few months, he could probably return to at least part-time work.  (I did not see an examination of or treatment for the claimant's depth perception.)  Records of evaluation/treatment of vision end with that 09/21/18 note.

On 11/21/18, Dr. Saxerud wrote a letter again stating that the claimant could not work because of inadequate depth perception and eye movements, but within a few months, he could probably return to at least part-time work.

- Neurology.  10/19/18.  Julia Brinley, DO.  Initial evaluation for "brain injury." Abnormal neurologic findings consisted of:

  -    Speech fluent although stuttering at times.
  -    With finger to nose patient will often miss my finger by an inch bilaterally, often has to close one eye.
  -    Romberg was positive, difficulty with tandem [gait].

**Lincoln/Bunch 0910**

RE: Mark Bunch                                                                      May 11, 2019
Claim 8220685                                                                         Page 5

Other neurologic findings were normal.  Dr. Brinley noted the claimant reported symptoms following a concussion and had a history of 'neuropsych testing that demonstrated postconcussive recovery with frontal lobe just executive function."  Dr. Brinley concluded the claimant had postconcussion syndrome and she prescribed nortriptyline, speech therapy, and follow up in 2 months.  (There are no speech therapy records and no other records from Dr. Brinley.)

- Neuropsychology.

  o  09/25/18.  Anthony Ricci, Ph.D.  Evaluation and report to Attorney Shakeshaft supporting the claimant's disability claim based on review of records and several symptom questionnaires that Dr. Ricci had the claimant complete.  Dr. Ricci recommended "self-directed services such as cardiac biofeedback, relaxation training, cognitive therapy, conjoint therapy, conjoint therapy, venting, redirection, education, and support."

  o  03/12/19.  Dennis Helffenstein, Ph.D.  Letter to Attorney Shakeshaft supporting the claimant's disability claim based on his review of the medical and psychology records.  Dr. Helffenstein respects and agrees with the doctors who support the disability claim, and he disagrees with Dr. Polanco who does not support the disability claim.  (The file has no records from Dr. Polanco.)  Dr. Helffenstein believes that the abnormal validity results on the neuropsychological tests that he performed are attributable to the claimant's pain, depression, anxiety, and fatigue.

3.      Consulting neuropsychologist's review

Consulting neuropsychologist Timothy Belliveau, Ph.D., reviewed the neuropsychology records.  These included Dr. Helffenstein's records except for Dr. Helffenstein's 03/12/19 report to Atty Shakeshaft – that letter had not yet been submitted.  Dr. Belliveau's assessment was that the claimant had reported a 02/13/18 concussion/mild traumatic brain injury and the neuropsychological testing did not corroborate cognitive or psychological impairment beyond mid-May 2018.

_____

**_Peer-to-Peer Consultation_**

Julia Brinley, DO.  Neurology.

Call #1.  3:15 p.m. EST 05/10/19 t/c to 719-473-3273.  Bridgette said Dr. Brinley was with a patient.  I l/m for c/b from Dr. Brinley.

On 05/11/19, I faxed to Colorado Springs Neuro Assoc at 719-389-1191 the claimant's signed release form and a cover letter asking for the most recent office note if after

**Lincoln/Bunch 0911**

RE: Mark Bunch                                                                May 11, 2019
Claim 8220685                                                                        Page 6

10/19/18, and the name of the speech therapy provider that Dr. Brinley referred the claimant to on 10/19/18.

---

### *References*

[i] Kashluba S, Paniak C, Blake T, et al.  A longitudinal, controlled study of patient complaints following treated mild traumatic brain injury.  *Arch Clin Neuropsychol.*  2004;19:805.

[ii] Binder L, Rohling M. Money matters: a meta-analytic review of the effects of financial incentives on recovery after closed-head injury.  *Am J Psychiatry.*  1996;153:7.

[iii] Ruff R, Wylie T Tennant W.  Malinginger and malingering-like aspects of mild closed head injury.  *J Head Trauma Rehabil.*  1993;8:60.

[iv] Evans R.  Persistent post-traumatic headache, postconcussion syndrome, and whiplash injuries: the evidence for a non-traumatic basis with an historical review.  Headache.  2010;50:716.

[v] Carroll L, Cassidy J, Peloso P, et al.  Prognosis for mild traumatic brain injury: results of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury.  J Rehabil Med.  2004.

**Lincoln/Bunch 0912**

UPS CampusShip - United States                                                                 Page 1 of 1

**UPS CampusShip: View/Print Label**

1.  Ensure there are no other shipping or tracking labels attached to your package. Select the Print button on the print dialog box that appears. Note: If your browser does not support this function select Print from the File menu to print the label.

2.  Fold the printed label at the solid line below. Place the label in a UPS Shipping Pouch. If you do not have a pouch, affix the folded label using clear plastic shipping tape over the entire label.

3.  **GETTING YOUR SHIPMENT TO UPS**
    **Customers with a Daily Pickup**
    Your driver will pickup your shipment(s) as usual.

    **Customers without a Daily Pickup**
    Take your package to any location of The UPS Store®, UPS Access Point(TM) location, UPS Drop Box, UPS Customer Center, Staples® or Authorized Shipping Outlet near you. Items sent via UPS Return Services(SM) (including via Ground) are also accepted at Drop Boxes. To find the location nearest you, please visit the Resources area of CampusShip and select UPS Locations.
    Schedule a same day or future day Pickup to have a UPS driver pickup all your CampusShip packages.
    Hand the package to any UPS driver in your area.

UPS Access Point™                UPS Access Point™                UPS Access Point™
THE UPS STORE                    JANETOS SUPERETTE                MAIN ST MAILING & COPY
422 CENTRAL AVE                  77 MAIN ST                       54 MAIN ST
DOVER ,NH 03820                  DOVER ,NH 03820                  DURHAM ,NH 03824

*8220685*

FOLD HERE



**Lincoln/Bunch 0913**

# Lincoln Financial Group Consulting Physician Referral
## File Review - Priority

**Physician Specialty:  Occupational and Environmental Medicine**

Office:        0096                                                    Claim #:    8220685

Claimant Name:        MARK  B  BUNCH

Date of Birth:                                                  Claim Status:    DE

Date of Disability:    2/14/2018                                  Date Sent:    4/30/2019

Claimant SSN:                                          Date Benefits Began:    8/15/2018

Product Type:        LTD                                  Paid Through:    1/1/1900

Disability Level:    Own Occupation

Policyholder/Self-Insured Plan Holder:        CHARTER COMMUNICATIONS, INC.

Referred By:        GRYGIEL, COURTNEY  096  8*731-3301

Assigned Nurse Case Manager:

Diagnosis:        F33 Major depressive disorder, recurrent,

**Document Locations**
- ☑ Document List
- ☐ Correspondence
- ☐ Paper File

Questions or Issues for Physician: (Note - If a physician has viewed this claim in the past please detail the physician and the outcome.)

Please assign file to Dr. Swotinksy for an addendum to his 4/23/19 report.  Additional medical records received  dated in EDM as  4/24/19 and 4/25/19 listed as Employee/Attorney also responses received from AP Higginbotham regarding summaries of conversations

Please review as comment on if this alters your prior opinion or supports any additional restrictions or limitations.

**Lincoln/Bunch 0914**

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

SHAKESHAFT-GORMAN LAW FIRM
1935 JAMBOREE DRIVE
SUITE  202
COLORADO SPRINGS CO 80920

**Lincoln/Bunch 0915**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 422-7909

April 30, 2019

Shakeshaft-Gorman Law Firm
1935 JAMBOREE DRIVE
SUITE  202
COLORADO SPRINGS, CO 80920

RE:     Long Term Disability (LTD) Benefits
        Charter Communications, Inc.
        Claim #: 8220685
        Claimant: Mark Bunch

To Whom It May Concern:

As requested, in your correspondence dated April 25, 2019, we have enclosed a true and accurate copy of Mr. Mark Bunch's LTD claim file.  Our records show you previously requested a copy of Mr. Bunch's claim file on November 9, 2018, and a copy was sent to your office via UPS on November 12, 2018 (UPS confirmation contained in copy of claim file).  The copy of the file includes any and all communications (including telephone entries), claim forms, electronic eligibility information (application for benefits), medical reviews, vocational reports, and written correspondence as of April 4, 2019.  The disability insurance records have been compiled and maintained in the normal course of business, within the record keeping procedures of Liberty Life Assurance Company of Boston (now a Lincoln Financial Group Company).

This letter also serves to acknowledge the additional evidence submitted for consideration with Mr. Bunch's appeal on April 25, 2019.  This information will be reviewed as part of this appeal.  We require additional time to render a determination on your client's LTD appeal.  Under the Employee Retirement Income Security Act of 1974 (ERISA), an appeal determination should be rendered within 45 days of receipt of the appeal, unless there are special circumstances which require a delay in making an appeal determination.  If additional time is needed, ERISA allows for a 45-day extension to evaluate and render an appeal decision.

If you have any questions regarding this matter, please contact me.

Sincerely,

Courtney Grygiel
Appeals Consultant
Phone No.: (888) 437-7611 Ext. 13301
Secure Fax No.: (603) 422-7909

1  of  1

**Lincoln/Bunch 0916**

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

SHAKESHAFT-GORMAN LAW FIRM
1935 JAMBOREE DRIVE
SUITE  202
COLORADO SPRINGS CO 80920

**Lincoln/Bunch 0917**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 422-7909

April 30, 2019

Shakeshaft-Gorman Law Firm
1935 JAMBOREE DRIVE
SUITE  202
COLORADO SPRINGS, CO 80920

RE:    Long Term Disability (LTD) Benefits
       Charter Communications, Inc.
       Claim #: 8220685
       Claimant: Mark Bunch

To Whom It May Concern:

As requested, in your correspondence dated April 25, 2019, we have enclosed a true and accurate copy of Mr. Mark Bunch's LTD claim file.  Our records show you previously requested a copy of Mr. Bunch's claim file on November 9, 2018, and a copy was sent to your office via UPS on November 12, 2018 (UPS confirmation contained in copy of claim file).  The copy of the file includes any and all communications (including telephone entries), claim forms, electronic eligibility information (application for benefits), medical reviews, vocational reports, and written correspondence as of April 4, 2019.  The disability insurance records have been compiled and maintained in the normal course of business, within the record keeping procedures of Liberty Life Assurance Company of Boston (now a Lincoln Financial Group Company).

This letter also serves to acknowledge the additional evidence submitted for consideration with Mr. Bunch's appeal on April 25, 2019.  This information will be reviewed as part of this appeal.  We require additional time to render a determination on your client's LTD appeal.  Under the Employee Retirement Income Security Act of 1974 (ERISA), an appeal determination should be rendered within 45 days of receipt of the appeal, unless there are special circumstances which require a delay in making an appeal determination.  If additional time is needed, ERISA allows for a 45-day extension to evaluate and render an appeal decision.

If you have any questions regarding this matter, please contact me.

Sincerely,

Courtney Grygiel
Appeals Consultant
Phone No.: (888) 437-7611 Ext. 13301
Secure Fax No.: (603) 422-7909

1  of  1

**Lincoln/Bunch 0918**

**Clinical Case Review**

| | |
|---|---|
| **Customer Name**: | CHARTER COMMUNICATIONS, INC. |
| **Claim Number**: | 8220685 |
| **Product Type**: | LTD |
| **Claimant Name**: | Mark Bunch |
| **Job Title**: | DIRECT SALES REP |
| **Claimant Date of Birth**: | |
| **Date of Disability**: | 02/14/2018 |
| **Medical Condition**: | concussion |
| **Submitter's Name**: | GRYGIEL, COURTNEY |
| **Submitter's Phone**: | 096  8*731-3301 |
| **Report Date**: | 04/29/2019 |

**Referral Questions:** LTD APPEAL FILE--  claimants date of disability 2/14/18 due to MVA.  LTD BBD 8/15/18.  Assessing functionality from 2/14/18 to 8/14/18 and 8/15/18 and beyond.

Please note all diagnoses supported by the medical evidence (including co-morbids).

Please review the enclosed neuro-psych assessments (neuropsych testing 5/3/18 and 5/18/18 by Dennis A. Helffenstein, Ph.D.) and discuss the findings and validity.  Please indicate whether the assessment substantiates functional impairment that translates to restrictions and limitations, and for what period.

 Please provide your overall assessment of the claimants cognitive capacity based on the totality of information provided in the file and co-morbid complaints.  What is the etiology of the impairment? Does the information reasonably support R/Ls in work capacity secondary to cognitive impairment on a sustained, full-time basis?  Please discuss.  What is the anticipated duration?

**Response to Referral Questions**: The scope of the following analysis is limited to consideration of the claimant's mental health and neuropsychological status. Consideration for any possible impairment related to non-neuropsychological medical conditions is outside the scope of this review.

The medical records available for review include the minimum criterion for the clinical diagnosis of cerebral concussion, which in essence consists of head trauma with a transient alternation of mental status, in this case based on the claimant's subsequent retrospective report rather than documentation of any observation of gross confusion or altered mental status. At the time of his presentation to the emergency department, the Glasgow Coma Scale score was 15, there is no evidence of an extended period of peritraumatic amnesia, no evidence of focal acute neurological findings, and no evidence of acute neuroradiological findings.  Therefore, if the claimant sustained a traumatic brain

**Lincoln/Bunch 0919**

injury on 02/13/18, the severity of such a brain injury would have to have been in the range of cerebral concussion / mild traumatic brain injury. The medical records provide limited but adequate support for a case formulation of post-concussion syndrome for a period of a few months post-injury.  However, by May 2018 the scope and severity of his reported symptoms was unusual at 3 months post-injury, and the results of the neuropsychological examination at that time revealed clear and compelling scientifically-supported findings which do not support ongoing case formulation of cognitive impairment due to traumatic brain injury.  The August 2018 psychological evaluation findings also provide converging scientifically-supported indications that the claimant's aggregate pattern of self-reported symptoms was not a valid representation of his actual psychological status. The assertion that the claimant's repeated failures on performance and symptom validity tests was due to visual problems is untenable considering the nature of these performance validity tasks, and the oral presentation of the August 2018 psychological tests. In summary, the medical record information provides insufficient support, beyond mid-May 2018, for a diagnoses of cognitive impairment due to traumatic brain injury, for the presence of a psychiatric disorder, or for associated need for occupational restrictions or limitations beyond mid-May 2018 on the basis of cognitive or psychological impairment.

**Additional Recommendations**: None.

**Analysis**: The scope of the following analysis is limited to consideration of the claimant's mental health / neuropsychological status.  Consideration for any possible impairment related to non-neuropsychological medical conditions is outside the scope of this review.

Synopsis: The Emergency Department record from Parkview Medical Center (02/13/18) indicates that he presented after a motor vehicle accident in which he was a restrained driver, that his head struck the steering wheel on the left forehead region, and that he denied loss of consciousness. He reported that initially he felt like he had some blurred vision and perhaps left eye pain which had resolved, and that he felt like initially his equilibrium was off. There is a note that he felt "like he has felt previously with sports injuries to the head," and there is a nursing note indicates which indicates that he reported a history of concussion [illegible] years ago. The Glasgow Coma Scale Score is recorded as 15.  The record indicates that a the time of E.D. presentation he no longer felt in disequilibrium or dizzy, but reported having a pounding headache, as well as neck and shoulder pain.  Notes pertaining to exam indicate left scalp tenderness and a mild abrasion. The E.D. record indicates that he was at that time awake, alert, and appropriate, with intact cranial nerves and normal gait.  The radiology report indicates that a CT of the head did not reveal any acute traumatic process.  The E.D. note indicates that his symptoms seemed consistent with concussion.  He was advised to follow-up with his primary care physician about his high blood pressure.

Subsequent records include primary care evaluation / treatment (Wayne Olson, MD), as well as evaluation / treatment (including pharmacological and osteopathic manipulation)

**Lincoln/Bunch 0920**

with multiple specialists including Occupational Medicine (Thomas Higgenbotham, D.O.), physical therapy, optometry, neuropsychological evaluation (Dennis Helffenstein, PhD), psychological evaluation and treatment (Herman Staudenmayer, PhD), and chiropractic treatment.

A primary care note of 02/23/18 (Wayne Olson, MD) indicates that he had "significant eye findings, namely coordination problems. He doesn't exactly have cranial nerve deficits. His eyes have full ROM but the coordination and smoothness of tracking is not present. Romberg also positive." The plan was to obtain an MRI of the brain.

The radiology report for a brain MRI done on 03/21/18 indicates mild white matter disease (mild scattered areas of high signal intensity in the periventricular white matter regions, some of which show a perpendicular pattern suggesting demyelinating white matter disease) possibly from multiple sclerosis.

The primary care record of 04/13/18 (Wayne Olson, MD) indicates that he reported headaches and neck pain, and that a brain MRI showed some white matter change, possibly multiple sclerosis. Dr. Olson opined that he suffered a concussion, that it is very likely that his current symptoms were related to the motor vehicle accident but it was not possible to confirm without additional testing, and that return to work was unknown.  He was referred to neurology and for a clinical neuropsychological evaluation.

The Occupational Medicine "New patient Evaluation / WC" note of 05/03/18 (Thomas Hignbotham, D.O.) indicates that he denied any prior work-related injuries, and denied any prior traumatic brain injuries or loss of consciousness.  Notes pertaining to *Review of Systems* indicate that he endorsed a wide range of symptoms, including pain, numbness and tingling, dizziness, headaches, muscle cramps, depression and nervousness, nausea, visual problems, photophobia, sonophobia with ringing in the ears, marked tiredness, sleep disturbance, mood swings with panic attacks, light and sound sensitivity to florescent lights, as well as change in taste and smell, ringing in the ears, problems seeing at night, left sided weakness, difficulty remembering things, distractibility, word-finding problems, difficulty with arithmetic, and irritability.  Notes pertaining to exam include the following: "He cannot recognize a pencil being in the center of his vision when coming from the periphery of either side," and he is described as having difficulty tracking. [Incidentally, if this description is intended to mean that he was unable to recognize a pencil when it was in his central vision, such an occurrence would be different from his May 2018 report of problems with peripheral vision, would be atypical for post-concussion syndrome, and would be different from what is described in the literature as a visual midline shift syndrome.] The assessment was:
- History of work-related motor vehicle collision
- History of head trauma without loss of consciousness
- Postconcussion sequala with spatial disorientation, imbalance, cervicalgia, headache, tinnitus, cognitive difficulties, and sound and light sensitivity
- Cervical myofascial strain

**Lincoln/Bunch 0921**

- Thoracic myofascial strain
- Right thumb sprain

A report of "Neuropsychological Screening" (Dennis Helffenstein, PhD) indicates 05/03/18 and 05/18/18 as dates of evaluation.  At that time, he reported what are described in the report as "a constellation of physical, fatigue, visual, cognitive and emotional coping deficits consistent with a post-concussive syndrome."  During the clinical interview, he reported a wide range of symptoms, including headaches, dizziness, vertigo, disequilibrium, hypersensitive smell, some changes in food preferences, tinnitus, sensitivity to sound, fatigue, double vision, blurring vision, decrease in peripheral vision when tired, sensitivity to fluorescent lights, problems with eye fatigue and depth perception, that his eyes are slow to refocus, and that he has difficulty with visual scanning.  He reported having cognitive problems, including problems with attention, concentration, multitasking, alternating attention, problems with short-term memory / forgetfulness, distorted recollections of events compared to others' recall of them, a slight problem with recall for remote memories, word-finding problems, paraphasic errors, difficulty with language comprehension, difficulty with reading comprehension, spelling problems, problems with math, difficulty with problem-solving and decision-making, slower speed of information, transposing letters and numbers when writing, spatial disorientation, and problems with initiation.  He reported emotional changes including some depression, feelings of loss, social isolation associate to some degree with fatigue, avoidance due to cognitive or stimulus overload, anhedonia, emotional lability, mood swings, reduced motivation, anxious rumination, intrusive thoughts, sleep disturbance, nightmares, irritability, reduced stress tolerance, and anxiety, particularly on the road.  Dr. Helffenstein's report indicates that the results of the neuropsychological tests were invalid.  Nevertheless, his report indicates that he "does meet the diagnostic criteria for a Post-Concussive Syndrome / Mild Traumatic Brain injury…", that he was "experiencing moderate to perhaps severe feelings of depression," was "reporting symptoms consistent with a Post-Traumatic Stress Disorder related to the accident…" , and was "reporting a variety of vision problems consistent with a Post-Traumatic Vision Syndrome."  The diagnoses are listed as:

- Mild Neurocognitive Disorder due to Traumatic Brain Injury with Behavioral Disturbance (behavioral disturbance includes irritability, reduced stress tolerance, and anger outburst).
- Depressive Disorder due to Traumatic Brain Injury, Mild
- Post-Traumatic Stress Disorder

Recommendations were provided for medication management, cognitive rehabilitation, psychotherapy, and referral to a neuro-optometrist. [Refer to the subsequent report section, "*May 2018 Neuropsychological Exam*" for further analysis.]

A 05/05/18 Occupational Medicine report includes the following description: "He still has evidence of not visualizing items in the midline of his vision," and he is described as having slightly improved imbalance, as well as continued facial pain, difficulty sleeping, and irritability.

**Lincoln/Bunch 0922**

A 05/10/18 Occupational medicine report indicates that he reported headache, neck pain, visual difficulties, imbalance, dizziness, and cognitive issues such as forgetfulness and word-finding problems. It is noted that his visual perception of objects is grossly not centered, had difficulty with gaze to his right, and had a positive Romberg's sign.

A 05/10/18 *Physician's Report of Worker's Compensation Injury* (Thomas Higgenbotham, D.O) indicates diagnoses of: "TBI post MVA; C-strain; [illegible] syndrome."

A 05/22/18 Occupational Medicine report indicates that his gait and stance seemed unremarkable, that he seemed to be more cogent, and had a negative Romberg's maneuver with reasonable balance.  He is described as still having a midline shift on testing, but somewhat improved.

In his 05/30/18 responses to a fax from Landon Wallis, Senior Claims Representative, Dr. Helffenstein indicated diagnoses of: Concussion (moderate); Post Concussive Syndrome; Post Traumatic Stress Disorder; and Major Depression, and he responded to questions about treatment recommendations and driving ability.

The Occupational Medicine report of 06/05/18 indicates an assessment of:
- Concussion with
    - Emotional and behavioral disturbance and changes
    - Neurocognitive disorder
    - Visual difficulties with spatial disorientation
- Cervicalgia
- Cervical strain
- Cephalgia
- Situational adjustment reactions with anxiety and depressed mood

A 06/05/18 *Physician's Report of Worker's Compensation Injury* (Thomas Higgenbotham, D.O) indicates diagnoses of: "Postconcussion, visuospatial disorientation, cervical strain."

A 06/19/18 Occupational Medicine report indicates a positive finding on Romberg and balance testing, but concerns about his coordination and proprioception. He is described as having a visual midline shift which "regressed from the last visit and consistent with our initial visit" which he attributes to a fall in physical therapy.

A 07/03/18 Occupational Medicine report indicates that he reported headaches, photosensitivity, had a slightly unsteady gait, cannot attend to left-sided finger-to-nose testing, has persisting visual midline shift, that he rocked and reeled and caught himself during Romberg testing but this is described as improved. Dr. Higginbotham reported that he had reviewed the report of neuropsychological exam, and opined that it was "likely

**Lincoln/Bunch 0923**

invalid because of his visual difficulties, headaches and inability to concentrate and focus." During Dr. Higginbotham's exam, he complained of double vision and blurred vision, and he is described as being unable to maintain a glance at something to read for more than a couple of seconds.

A 07/17/18 Occupational Medicine report indicates that he had been prescribed corrective lenses by the neuro-optometrist. Dr. Higginbotham provides further opinion that his vision problems undoubtedly affected his initial neuropsychological test results. He is described as being more alert and oriented, with improved headaches but persisting neck stiffness and discomfort. He reported photosensitivity and headache and dizziness in response to motion. His gait is described as essentially improved, and his behavior during Romberg assessment (that he is able to maintain the posture longer but still has a sense of falling backwards) is interpreted as yielding an equivocal finding. Tandem gait with heel-to-toe is described as improving but still marginal.

An 08/06/18 report of Psychological Evaluation (Herman Staudenmayer, PhD) indicates that during the interview he was sad and tearful. His affect is described as being dysphoric yet also blunted. It is noted that his speech was essentially normal. He reported feeling overwhelmed, unhappy, tearful, sad, depressed, anxious, nervous, hostile, angry, frustrated, irritable, short-tempered, and anxious. It is noted that when presented with something to read, while seated he placed the reading material on the floor so that he could see it. He was using corrective lenses. The psychological assessment included administration of a standardized, self-report psychological test (MMPI-2 RF: Minnesota Multiphasic Personality Inventory – 2 Restructured Form), a cognitive screening assessment (MoCA: Montreal Cognitive Assessment), a concussion symptom scale (SCAT2: Sport Concussion Assessment Tool), and a PTSD checklist (PCL-5: Posttraumatic Checklist for DSM-5). The report indicates that the psychological tests were presented orally so that he would not have to read the material. Dr. Staudenmayer's report indicates that:

> "Mental Status Exam suggest exaggeration and adopting the sick role.
> Psychological testing indicates that his self-report reflects over-reporting bias,
> making the self-reported symptoms invalid."

"Psychological factors affecting other medical conditions" is recorded as a "Working Diagnosis." The note indicates that due to the invalid test findings, comprehensive neuropsychological testing was contraindicated, and that he may benefit from psychotherapy. [Refer to the subsequent report section, *August 2018 Psychological Exam* for further analysis.]

An 08/13/18 "Treatment Note" (Herman Staudenmayer, PhD) indicates results of the MMPI-2 RF were reviewed, and that the results were invalid. The note refers to his presentation with unrealistically high levels of symptoms. The note refers to a discussion of previous traumatic experiences, one of which was an incident during childhood when he fell into a dry well and was not rescued until the following day, one of which was when he was stabbed in the leg in 1990, and another during which he was stabbed in the

**Lincoln/Bunch 0924**

abdomen in 1993 while working for the Department of Corrections.  The narrative report indicates, "Based on this updated assessment, he meets criteria for complex PTSD, a diagnosis is not in DSM 5 but is under review for inclusion in the next version of the DSM … It appears that the motor vehicle accident was traumatic enough in its own right, but also rekindled past associated experiences and traumatic symptoms."

A 02/19/19 Occupational Medicine evaluation (Thomas Higginbotham, D.O.) indicates a list of diagnoses, including:
- History of mild traumatic brain with post-concussion with the following sequelae:
  - Emotional and behavioral disturbance / changes
  - Neurocognitive disorder
  - Visual difficulties with spatial disorientation
  - Post traumatic headache
- Cervical strain / sprain
- Thoracic strain
- Ulnar neuritis, left
- Imbalance
- Dysphasia
- Dysphagia
- History of falls
- Generalized anxiety with depressed mood over health status
- Post Traumatic Stress Disorder, chronic
- Situational adjustment reactions with mixed anxiety and depressed mood
- Sleep disturbance
- Overweight
- Hypertension, malignant

Analysis: *Mechanism of injury and acute neurological status*: Dr. Helffenstein's report indicates that at the time of the neuropsychological screening (in May 2018) the claimant described events which occurred immediately prior to the motor vehicle collision. Although he referred to his recollection as "vague" in some respects, the narrative report includes a description of the circumstances around the accident, the brake lights of the other vehicle, and the sound of the collision,   The description that "His memories for the day leading up to the accident are quite vague," would be somewhat atypical with preserved recall of events immediately prior to the accident.  He also reported that immediately after the accident he drove his vehicle for two to three minutes to follow the driver of the other vehicle, which had left the scent of the accident.

At the time of Dr. Helffenstein's assessment, the claimant scribed having felt dazed, confused, "stunned" and/or "woozy" immediately after the accident.  If the claimant had a transient period of being at least dazed, such an alteration of mental status would represent the minimal criterion for the presence of a traumatic brain injury.  However, his capacity to operate a motor vehicle for even short period of time is notable.  The

**Lincoln/Bunch 0925**

Emergency Department medical records indicate that at the time of E.D. presentation he was alert, and that his Glasgow Coma Scale score was 15. If the claimant experienced a transient period of altered mental status, when considered in the context of no evidence of an extended period of peritraumatic amnesia, no evidence of focal acute neurological findings, and no evidence of acute neuroradiological findings, the severity of such a brain injury would have to have been in the range of cerebral concussion / mild traumatic brain injury (e.g., ACRM definition of mild traumatic brain injury, 1993; Ruff et al., 2009; Menon et al., 2010).

*Typical Course of Post-Concussive Recovery*: Decades of scientific research has shown that among groups of individuals who have sustained a cerebral concussion / mild traumatic brain injury, most people experience some post-concussive symptoms during the days to weeks post-injury, and many experience some residual symptoms for months post-injury. However, the scientific literature pertaining to the natural course of recovery after cerebral concussion provides converging evidence that symptom persistence beyond 3 months is atypical, and that while injury-related variables account for more variance in initial post-injury presentation, non-injury related variables account for more variance among those who report long-term persisting symptoms (e.g., Iverson, 2005; McCrea, 2008). Similarly, the World Health Organization's (WHO) Collaborating Centre Task Force on Mild Traumatic Brain Injury published a comprehensive review of the literature on prognosis after mild traumatic brain injury (Carroll et al., 2004), based on 120 studies which contributed to this best-evidence synthesis on prognosis. The Task Force found that the scientific evidence supported the conclusion that concussion symptoms resolved within days to weeks post-injury for the vast majority of mild traumatic brain injury patients. Among its findings, the WHO Task Force concluded that there was consistent and methodologically sound evidence that prognosis was highly favorable, with little evidence of residual / permanent cognitive or behavioral deficits after a single, uncomplicated concussion. This conclusion is similar to results of several meta-analytic studies which have shown that neuropsychological recovery from a single mild traumatic brain injury most often follows a favorable course over a period of days to weeks, with little or no indication of permanent impairment on neuropsychological testing by 3 months post injury in group studies. Meta analyses of data pooled from prospective studies of neuropsychological functioning after concussion (in the absence of litigation) have also shown no significant effect sizes by 3 months post-injury (e.g. Belanger et al., 2005). As summarized by McCrea (2009),

> "… findings from large, prospective studies now illustrate that post-concussion symptoms, cognitive dysfunction, and other functional deficits are most severe during the earliest acute period after MTBI, then follow a gradual, overlapping course of recovery beginning within hours of injury and completely resolve within days to weeks in the overwhelming majority of cases. In the case of neuropsychological recovery, meta-analytic studies demonstrate undetectable effect sizes beyond roughly 2 – 4 weeks after MTBI." :

**Lincoln/Bunch 0926**

More recent research studies have repeatedly replicated the previous empirically-based conclusion that by 3 months post-injury, mild traumatic brain injury is not the strongest predictor of persisting symptoms.  Rather, preinjury physical and/or psychosocial factors (e.g., preinjury mental health, anxiety symptoms, life stressors, pain) are stronger predictors of symptom persistence beyond 3 months, and due to the nonspecific nature of symptoms commonly attributed to concussion, there is a high false positive diagnosis rate at 1 year post injury (Ponsford et al., 2012; Waljas et al., 2015).  Since the natural course of recovery is quite favorable for most individuals who have sustained a single, uncomplicated mild traumatic brain injury, and many neuropsychological symptoms are nonspecific in nature (e.g., Cassidy et al, 2014), there is often a broad differential diagnosis when examining for late effects of mild traumatic brain injury. Objective, scientifically supported measures of structural and functional integrity include neuroimaging studies, EEG, neurological exam, and neuropsychological test data.

The claimant's medical records include a neuropsychological evaluation in May 2018, and a psychological evaluation in August 2018.

*May 2018 Neuropsychological Exam*: The validity of neuropsychological exam results cannot be interpreted with confidence in the absence of objective psychometric indicators of effort and symptom validity.  The importance of this is supported by a *Consensus Conference Statement of the American Academy of Clinical Neuropsychology*[2] and a *National Academy of Neuropsychology Position Paper on symptom validity assessment*[3]:

> "Use of psychometric indicators is the most valid approach to identifying neuropsychological response validity. Stand-alone effort measures and embedded validity indicators should both be employed. The evaluation of self-reported symptoms is best accomplished using psychometric instruments containing proven validity measures. As the number and extent of findings consistent with the absence or presence of response bias increases, confidence in conclusions regarding the validity of the examination is strengthened accordingly."[1]

> "Adequate assessment of response validity is essential in order to maximize confidence both in the results of ability measures and in the diagnoses and recommendations that are based on the results."[2]

The importance of this is supported by a *Consensus Conference Statement of the American Academy of Clinical Neuropsychology* and a *National Academy of Neuropsychology Position Paper on symptom validity assessment*:

> "Use of psychometric indicators is the most valid approach to identifying neuropsychological response validity. Stand-alone effort measures and embedded validity indicators should both be employed. The evaluation of self-reported symptoms is best accomplished using psychometric instruments containing proven validity measures. As the number and extent of findings consistent with

**Lincoln/Bunch 0927**

the absence or presence of response bias increases, confidence in conclusions regarding the validity of the examination is strengthened accordingly."[1]

"Adequate assessment of response validity is essential in order to maximize confidence both in the results of ability measures and in the diagnoses and recommendations that are based on the results."

Such tests were included in the May 2018 neuropsychological exam. The examinee's responses to the Victoria Symptom Validity Test (VSVT) yielded a total score (26/48) which is reported as being in the "questionable" range.  His performance on the "easy" items (20/24) was considered by the examiner to be a passing score.  His performance on the more "hard" items (06/24) was considered by the examiner to be a failing score, and is described as "far below chance which is concerning for intentional lack of effort." Compared to recommended cut-off scores based on known groups design (c.f., Silk-Eglit et al., 2016) this pattern of responses represents a failed validity test.  Furthermore, even in the absence of empirically-derived normative data, and based solely on appreciation of response probabilities for a 24-item test with a multiple-choice format consisting of two options (i.e., a 50/50 chance of correct answers via purely random responses), a score of 06/24 correct is obviously not indicative of effortful responding, extremely improbable in the context of a series even random responses (which would on average yield about 12 correct responses), and is suggestive of suppression of actual ability (i.e., an aggregate pattern of awareness of correct responses and providing incorrect responses).  For a .50 probability of correct/incorrect responses, a score of 12 / 24 represents the Median (i.e., 50th percentile), a score of 10 / 24 is at the 25th percentile, and a score of 06 / 24 (25% correct) is at the 01st percentile of a randomly generated distribution of scores. In other words, among examinees with no perceptual or cognitive abilities who are able to respond randomly, 99 out of 100 would achieve a score higher than 06 / 24.  As tested mathematically, using a Bayesian frequency analysis based on the binomial theorem with no information other than a .50 base rate of correct responses, a null hypothesis that the score 06 / 24 is within the range of at least random responses, and an alternative hypothesis that the score 06/24 is below the range of random responses, the result (Bayes Factor = 9.9) provide moderate to strong evidence for the alternative hypothesis (Table and Plot below). (A Bayes Factor = 10 represents the cusp of the moderate and strong categories of evidence.)

**Bayesian Binomial Test**

|  | Level | Counts | Total | Proportion | BF$_{-o}$ |
|---|---|---|---|---|---|
| VSVT | 0 | 18 | 24 | 0.750 | 0.073 |
|  | 1 | 6 | 24 | 0.250 | 9.899 |

*Note.* For all tests, the alternative hypothesis specifies that the proportion is less than 0.5.

**Lincoln/Bunch 0928**



The examinee was also administered a second performance validity test (TOMM: Test of Memory Malingering). As recognized by the examining neuropsychologist, "His performance on Learning Trial 2 was 27 / 50 correct.  His performance on the Retention Trial was 24/50 correct. These are both failing scores… At that point in time, it was evident that I was not going to be able to obtain valid neuropsychological test scores." The self-report psychological tests administered (BDI-2: Beck Depression Inventory - 2 and PCL-5: Post-traumatic Stress Checklist for DSM-5) do not have embedded symptom validity indices. The report indicates that his responses to the PCL-5 yielded a total score of 79 (out of a maximum score of 80), and that, "In summary, Mr. Bunch is reporting essentially all symptoms of PTSD at a very high level." Considering the extraordinarily broad range, severity, and persistence of the examinee's self-reported symptoms compared to the typical course of post-concussion syndrome, and despite converging objective findings of invalid neuropsychological test data, the examining neuropsychologist's assertion of a May 2018 diagnosis of Mild Neurocognitive Disorder due to traumatic brain injury is inexplicable.

*August 2018 Psychological Exam*: The August 2018 exam did not include any methods for determining performance validity during the cognitive assessment.  The examinee's responses to self-report symptom checklists yielded extremely high scores on scales of post-concussion and post-traumatic stress questionnaires.  However, the psychological evaluation included administration of one psychological test (MMPI-2 RF) which includes embedded symptom validity indices, on which his aggregate pattern of responses was clearly invalid (i.e., F-r = 120).  This finding is interpreted by the examining psychologist as follows: "Elevated scores are associated with over-reporting of a broad range of psychological cognitive, and somatic symptoms. This protocol is invalid." and the recognition that, "The bias to over-report symptoms on the MMPI-2 RF suggests the self-reported symptoms on the PCL-5 and the SCAT2 are not valid."  Although Dr. Staudenmayer's subsequent note of 08/13/18 includes a rationale that further information obtained from the examinee at that time, about a remote history of trauma, led to an updated assessment (i.e., diagnosis of "complex PTSD"), the inference that this or any

**Lincoln/Bunch 0929**

psychiatric condition is present reflects disregard for converging test findings that the obtained neuropsychological test data are not accurate measures of the examinee's actual cognitive or psychological status.

Conclusions: The medical records available for review include the minimum criterion for the clinical diagnosis of cerebral concussion, which in essence consists of head trauma with a transient alternation of mental status, in this case based on the claimant's subsequent retrospective report rather than documentation of any observation of gross confusion or altered mental status. At the time of his presentation to the emergency department, the Glasgow Coma Scale score was 15, there is no evidence of an extended period of peritraumatic amnesia, no evidence of focal acute neurological findings, and no evidence of acute neuroradiological findings.  Therefore, if the claimant sustained a traumatic brain injury on 02/13/18, the severity of such a brain injury would have to have been in the range of cerebral concussion / mild traumatic brain injury. The medical records provide limited but adequate support for a case formulation of post-concussion syndrome for a period of a few months post-injury.  However, by May 2018 the scope and severity of his reported symptoms was unusual at 3 months post-injury, and the results of the neuropsychological examination at that time provide clear and compelling scientifically-supported findings which do not support ongoing case formulation of cognitive impairment due to traumatic brain injury.  The August 2018 psychological evaluation findings also provide converging scientifically-supported indications that the claimant's aggregate pattern of self-reported symptoms was not a valid representation of his actual psychological status. The assertion that the claimant's repeated failures on performance and symptom validity tests was due to visual problems is untenable considering the nature of these performance validity tasks, and the oral presentation of the August 2018 psychological tests. In summary, the medical record information provides insufficient support, beyond mid-May 2018, for a diagnoses of cognitive impairment due to traumatic brain injury, or for the presence of a psychiatric disorder.

**Case Summary**: Medical records of this 55 year-old man indicate that he sustained injuries in a motor vehicle collision on 02/13/18.  Since then, he has reported a wide range of persisting sensory-perceptual, motor, cognitive, and emotional symptoms. Medical records include primary care evaluation / treatment (Wayne Olson, MD), as well as evaluation / treatment (including pharmacological and osteopathic manipulation) with multiple specialists including Occupational Medicine (Thomas Higgenbotham, D.O.), physical therapy, optometry, neuropsychological evaluation (Dennis Helffenstein, PhD), psychological evaluation and treatment (Herman Staudenmayer, PhD), and chiropractic treatment.

**References:**

American Psychiatric Association.  (2013). *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition)*.  Arlington, VA: American Psychiatric Association.

**Lincoln/Bunch 0930**

Belanger, H. et al. (2005). Factors moderating neuropsychological outcomes following mild traumatic brain injury: A meta-analysis. *Journal of the International Neuropsychological Society*, 11, 215-227.

Bush, S.S. et al. (2005). Symptom validity Assessment: Practice issues and medical necessity. NAN Policy and planning committee. *Archives of Clinical Neuropsychology*, 20, 419-426.

Board of Directors (2007). American Academy of Clinical Neuropsychology (AACN) Practice Guidelines for Neuropsychological Assessment and Consultation, *The Clinical Neuropsychologist*, 21, 209-231.

Carroll, L. et al. (2004). Prognosis from mild traumatic brain injury: Results of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury. *Journal of Rehabilitation Medicine*, 43, 84-105.

Cancelliere, C. et al. (2014). Systematic search and review procedures: Results of the International Collaboration on Mild Traumatic Brain Injury Prognosis. *Archives of Physical Medicine and Rehabilitation*, 95(3 Suppl), S101-131.

Cassidy, J. et al. (2014). Systematic review of self-reported prognosis in adults after mild traumatic brain injury: Results of the International Collaboration on Mild Traumatic Brain Injury Prognosis. *Archives of Physical Medicine and Rehabilitation*, 95, (3 Suppl): S132-51.

Heilbronner, R.L. et al., (2009), American Academy of Clinical Neuropsychology Consensus Conference Statement on the Neuropsychological Assessment of Effort, Response Bias, and Malingering. *The Clinical Neuropsychologist*, 23, 1093 – 1129.

Iverson, G.  (2005). Outcome from mild traumatic brain injury.  *Current opinion in psychiatry*, 18, 301-317.

Ponsford, J. et al. (2012). Predictors of postconcussive symptoms 3 months after mild traumatic brain injury.  *Neuropsychology*, 26, 304-313.

McCrea, M. (2008). *Mild traumatic brain injury and postconcussion syndrome: The new evidence base for diagnosis and treatment*.  New York: Oxford University Press.

McCrea, M. et al. (2009). An integrated review of recovery after mild traumatic brain injury (MTSBI): Implications for clinical management. *The Clinical Neuropsychologist*, 23, 1368-1390.

Menon, D. et al. (2010). Special communication: Definition of traumatic brain injury. *Archives of Physical Medicine and Rehabilitation*, 91, 1637 – 1640.

**Lincoln/Bunch 0931**

Mild Traumatic Brain Injury Committee of the Head Injury Interdisciplinary Special Interest Group of the American Congress of Rehabilitation Medicine (1993). Definition of mild traumatic brain injury, *Journal of Head Trauma Rehabilitation*, 8, 86-87.

Ruff, R. et al. (2009). Recommendations for diagnosing a mild traumatic brain injury: A National Academy of Neuropsychology Education Paper. *Archives of Clinical Neuropsychology*, 24, 3-10.

Silk-Eglit, G., et al. (2016). Validation of Victoria Symptom Validity Test Cutoff Scores among mild traumatic brain injury litigants using a known-groups design. *Archives of Clinical Neuropsychology*, 31, 231-245.

Waljas, M. et al. (2015).  A prospective biopsychosocial study of the persistent post-concussion symptoms following mild traumatic brain injury. *Journal of Neurotrauma*, 32, 534-547.

< electronically signed >
Timothy Belliveau, PhD, ABPP
*Board Certified in Clinical Neuropsychology*
*Board Certified in Rehabilitation Psychology*
Consultant, Clinical Support

**Lincoln/Bunch 0932**

# SHAKESHAFT & GORMAN LAW FIRM, LLP

1935 Jamboree Dr. | S 202 | Colorado Springs, CO 80920
Tel 719.635.5886 | Fax 719.635.0966 | www.shakeshaftandgormanlaw.com

### FACSIMILE TRANSMISSION

**DATE**: April 25, 2019

**TO**: **Lincoln Financial Group**

**FROM**: Shakeshaft & Gorman Law Firm, LLP

**PAGES INCLUDING COVER SHEET**: 74

**FAX NUMBER**: 603-422-7909

**REGARDING**: Mark Bunch

**Comments:**          Please find attached correspondence of this date. Please feel free to call or email
                       should you need anything further from our office. Thank you.

IF YOU DO NOT RECEIVE ALL THE PAGES OR IF ANY PART IS ILLEGIBLE, PLEASE CALL (719) 635-5886.

### NOTICE

THIS MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN PRIVILEGED OR CONFIDENTIAL INFORMATION WHICH IS EXEMPT FROM DISCLOSURE PURSUANT TO APPLICABLE LAW.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR IS NOT AN EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERY OF THIS MESSAGE TO THE INTENDED RECIPIENT, DISTRIBUTION, COPYING OR OTHER DISSEMINATION OF THE INFORMATION CONTAINED IN THIS COMMUNICATION IS PROHIBITED.  PLEASE CONTACT (719) 635-5886 AND RETURN THE ORIGINAL MESSAGE TO SHAKESHAFT & GORMAN LAW FIRM, 1935 JAMBOREE DRIVE, STE. 202, COLORADO SPRINGS, CO 80920.

**Lincoln/Bunch 0933**



## SHAKESHAFT-GORMAN
#### ---- LAW FIRM, LLP ----

| | | |
|---|---|---|
| Kenneth J. Shakeshaft | • Attorney at Law | **Main Office** |
| Joseph M. Gorman | • Attorney at Law | Shakeshaft - Gorman Law Firm |
| Cindy Maddox | • Paralegal | 1935 Jamboree Drive, Suite 202 |
| Brandy Newton | • Paralegal | Colorado Springs, CO 80920 |

April 25, 2019

<u>**VIA FACSIMILE: 603-422-7909**</u>

Lincoln Financial Group
P.O. Box 7213
London, KY 40742-7213

**Re:    Long Term Disability (LTD) Benefits**
   **Charter Communications, Inc.**
   **Claim No.: 8220685**
   **Claimant: Mark Bunch**

To Whom It May Concern:

This is to provide some additional records which were apparently not contained within Lincoln's claim file.

The following records are provided:

- Dennis Helffenstein, Ph.D. Report dated March 12, 2019;
- Gleneagle Vision Center – Michael Saxerud, OD;
- Colorado Springs Psychological Center – Anthony Ricci, Ph.D.; and
- CSNA Neurosurgery & Neurology – Julia Brinley, DO.

Further, on November 8, 2018, in a letter via fax I requested a copy of Mr. Bunch's claim file. Our office never received the claim file. Please provide our office a copy of Mr. Bunch's claim file, including correspondence, medical records, etc. at your earliest convenience.

Sincerely,

Kenneth J. Shakeshaft

KJS/jld
*Attachments*

**Lincoln/Bunch 0934**

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Clinical Director

Diana M. Helffenstein, M.A., L.P.C.
Licensed Professional Counselor

Brian D. Reusink, M. Ed.
Director of Operations

COLORADO
Neuropsychological
ASSOCIATES, P.C.



Primary Office
10 Inverness Dr. East
Suite 215
Englewood, CO 80112
(720) 529-0190
(720) 529-1099 Fax

Also serving clients in
Colorado Springs

March 12, 2019

Kenneth J. Shakeshaft, Esq.
1935 Jamboree Drive
Suite 202
Colorado Springs, CO  80920

**RE:**      Mark B. Bunch
**D.O.B.:**

Dear Mr. Shakeshaft:

At your request, I have now had an opportunity to review additional records regarding Mr. Bunch's treatment since I originally saw him.  These include the records of Julia Brinley, D.O., Neurologist; Thomas W. Higginbotham, D.O., Occupational Medicine Specialist; Anthony Ricci,, Ph.D., Licensed Clinical Psychologist; Michael Saxerud, O.D., Neuro-Optometrist; and, Herman Staudenmayer, Ph.D., Licensed Clinical Psychologist.  You also asked that I review an Independent Medical Examination performed by Frank Polanco, M.D.  and then comment on Mr. Bunch's condition based on that review.  You also asked me if information contained in the records has any impact on my prior diagnoses and treatment recommendations.  You also asked if this information helps to explain why I was unable to obtain valid neuropsychological test scores when I attempted testing with Mr. Bunch.  You also asked me to specifically address the issue of malingering and if Mr. Bunch is committing fraud.

As you will recall, I originally saw Mr. Bunch on May 3, 2018 on referral from Steven Olson, M.D.  I now understand from a review of the records that Dr. Olson is Mr. Bunch's primary care physician and may have for a period of time served as his Workers' Compensation Physician.  I attempted neuropsychological testing with Mr. Bunch on May 18, 2018; and, as you will recall, I discontinued the testing based on Mr. Bunch's inconsistent performance on Performance Validity Testing.  Those test scores suggested that I was not going to be able to obtain valid neuropsychological test results.  As noted in my original report, I felt that there were a number of factors that were negatively impacting his performance on the standalone Performance Validity Tests such as pain, depression, fatigue, and possibly an intentional lack of effort.  I also felt that comorbid factors, including pain, depression and fatigue individually, or in combination, could explain most of his suboptimal scores on Performance Validity Testing.  In retrospect, those premorbid symptoms should have been better addressed prior to attempting neuropsychological

**Lincoln/Bunch 0935**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 2

testing with Mr. Bunch. Based on my assessment, I did diagnose Mild Neurocognitive Disorder due to Traumatic Brain Injury with Behavioral Disturbance; Depressive Disorder due to Traumatic Brain Injury; and, Post-Traumatic Stress Disorder related to the motor vehicle accident. In addition, I made a number of treatment recommendations, some of which have now been acted upon.

Following my evaluation with Mr. Bunch, Dr. Olson referred him to Thomas W. Higginbotham, D.O., a specialist in Occupational and Environmental Medicine. Since beginning my practice in Colorado Springs in 1994, I have co-treated many patients with Dr. Higginbotham and have come to respect his diagnostic opinions and recommendations. Based on a review of Dr. Higginbotham's records, it appears that he has taken over as Mr. Bunch's primary care physician for injuries sustained in the work-related motor vehicle accident of February 13, 2018. I reviewed Dr. Higginbotham's May 3, 2018 Initial Evaluation. In this evaluation, he obtains a detailed history of the accident as well as Mr. Bunch's symptoms surrounding the accident including diagnostic criteria associated with a possible Mild Traumatic Brain Injury. This included obtaining data that he sustained a blow to his forehead in the course of the accident; experienced altered consciousness post-accident in the form of being dazed; and, experienced some alteration of his memories post-accident. He also obtained data regarding post-concussive symptoms such as being dizzy and having difficulty standing. He conducted a thorough review of symptoms and documented that Mr. Bunch was experiencing multiple post-accident symptoms clearly suggestive of a Post-Concussive Syndrome/Mild Traumatic Brain Injury including dizziness, headaches, depression, nausea, blurry vision, photophobia, tinnitus, fatigue, sleep disturbance, mood swings, change in sense of taste and smell, problems with attention and concentration, short-term memory, photophobia, phonophobia, problems with word finding, difficulties with math, and irritability/reduced stress tolerance. He ultimately diagnosed Mr. Bunch with a history of head trauma with emotional and behavioral disturbance/changes, Neurocognitive Disorder, visual difficulties with spatial disorientation, as well as light and sound sensitivity. Other diagnoses included post-traumatic headaches, cervicalgia, cervical strain, and thoracic myofascial strain. Regarding his diagnoses, Dr. Higginbotham made a number of referrals including specialty evaluations with a neurologist, clinical psychologist, psychotherapy and neuro-optometrist.

In his September 3, 2018 report, Dr. Higginbotham indicates that he reviewed my Neuropsychological Screening report dated June 1, 2018. He concluded that the results of my attempted testing were "likely invalid because of his visual difficulties, headaches and inability to concentrate and focus." In Dr. Higginbotham's own assessment of Mr. Bunch's functioning, he noted that Mr. Bunch had difficulty reading due to double vision and blurry vision. He noted that he had to move the paper and his neck at various angles in order to correctly visualize what was on the page. Even then, he had difficulty maintaining his focus for more than several seconds. He went on to render the opinions that these visual difficulties alone would likely invalidate any psychometric testing including validity testing. I would note that both of the Performance Validity Tests that I administered to Mr. Bunch as part of the attempted testing did, in fact, have a visual component. Also, as a direct result of Mr. Bunch's visual problems as well

**Lincoln/Bunch 0936**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 3

as other cognitive deficits and limitations, Dr. Higginbotham rendered the opinion that Mr. Bunch was unable to drive; and, therefore, was unable to resume his work (which required extensive driving). He felt that further evaluation and treatment with a neuro-optometrist was critical to Mr. Bunch's overall care and rehabilitation.

I would also note that Dr. Higginbotham appreciated and documented the emotional and psychological symptoms that Mr. Bunch was experiencing associated with the motor vehicle accident. These included depression, nervousness, mood swings and panic attacks. At various times, he diagnosed Situational Adjustment reactions with anxiety and depressed mood; and, Traumatic Brain Injury resulting in emotional and behavioral disturbance/changes. He referred Mr. Bunch for individual psychotherapy with Herman Staudenmayer, Ph.D. Based on a review of my Screening report, he was aware that I had recommended that Mr. Bunch be considered for prescription of an SSRI-type anti-depressant medication. Indeed, Dr. Higginbotham considered prescription of an anti-depressant but made the decision to hold on prescription of an anti-depressant medication until he was evaluated by a neurologist. That evaluation ultimately occurred on October 19, 2018 with Julia Brinley, D.O. Dr. Brinley recommended prescription of nortriptyline (Pamelor), a tricyclic anti-depressant medication. I will discuss this recommendation later when I review her report.

I would note that throughout his records, Dr. Higginbotham documents Mr. Bunch's emotional response to daily surveillance by the Workers' Compensation insurance company. Mr. Bunch clearly found the surveillance to be highly distressing and intrusive. Dr. Higginbotham documented increased depression in response to what appeared to be a long-term surveillance program by the insurance company. I would further note that based on my 39 years of experience, Mr. Bunch's emotional response to this type of intrusive surveillance is quite typical and understandable.

In his November 2018 note, Dr. Higginbotham reviews Mr. Bunch's response to his evaluation with Dr. Polanco. Mr. Bunch noted that Dr. Polanco stated in his report that he spent 40+ minutes in his evaluation with Mr. Bunch. Mr. audio Bunch recorded the assessment. He reported that he had a total of about 11 minutes of recording, 6 of those minutes being spent in face-to-face time with Dr. Polanco. Mr. Bunch felt that there were a number of significant errors and discrepancies with facts of his case in Dr. Polanco's report. In this note, Dr. Higginbotham documents that the nortriptyline prescribed by Dr. Brinley is helping with his sleep.

I reviewed the Neurological Evaluation report, authored by Julia Brinley, D.O. dated October 19, 2018. In my interview with Mr. Bunch, he noted that with regard to memories for some events of the accident, his memories are "vague." He also reported feeling "stunned" immediately post-accident. Perhaps, because of these vague memories, by the time he sees Dr. Brinley he believes that he most likely did lose consciousness for some brief period of time. Based on her assessment and review of records, Dr. Brinley ultimately diagnosed Post-Concussion Syndrome as her primary diagnosis. She also diagnosed intractable chronic migraines and insomnia. She states, "Based on patient's history and exam, I do believe he has continued Post-Concussive

**Lincoln/Bunch 0937**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 4

Syndrome with worsening factors to include mood disturbance." I would note that Dr. Brinley prescribed nortriptyline (Pamelor) 10 mg q h.s. (one time at night) for one week and then increase to 20 mg q h.s. thereafter. She stated, "I am hoping this will help with his headaches in addition to sleep and some mood disturbances." I have several observations regarding this particular prescription. I would first note that the therapeutic dose of Pamelor to address depression is 25 mg three to four times per day for a maximum of 150 mg per day. Therefore, the prescribed dose would not be expected to have any positive impact whatsoever on Mr. Bunch's depression. This is only a level of Pamelor that might be expected to help with sleep. In my clinical experience, it is most common for physicians to prescribe an SSRI-type anti-depressant medication for depression in brain-injured individuals. As noted above, nortriptyline (Pamelor) is a tricyclic anti-depressant and not an SSRI. In my experience, physicians will prescribe low doses of tricyclic anti-depressant medications such as nortriptyline and trazodone to help with sleep. Indeed, as noted above, this medication at 20 mg did help Mr. Bunch somewhat with his sleep.

I reviewed a September 25, 2018 report authored by Anthony M. Ricci, Ph.D., a Diplomate in Rehabilitation Psychology. Over several decades, I have co-treated several hundred patients with Dr. Ricci and have come to respect his diagnostic impressions, opinions and treatment with patients. On Page 15 of his report, Dr. Ricci states, "I agree with Dr. Helffenstein and Dr. Staudenmayer's observations that formal neuropsychological testing is not appropriate at this time. Mr. Bunch presents with specific visual-vestibular changes and with significant elements of anxiety, depression and adjustment to disability which contributes to the cognitive dysfunction and creates a pattern of response which is highly frustrating and confusing. His testing results should be considered in light of his despondence and he should be encouraged, supported and allowed venting and directed towards behavioral and self-directed strategies to improve his circumstances and help him to reestablish personal control." Dr. Ricci further stated, "Mr. Bunch is manifesting a somewhat classic presentation of a post-concussion recovery with frontal lobes dysexecutive function." Dr. Ricci correctly notes that this type of executive dysfunction can significantly confound a patient's recovery. Dr. Ricci further states, "It is my opinion that the current difficulties described by Mr. Bunch are related to his psychological and neuropsychological condition and relate to sequelae of the February 13, 2018 MVA." Dr. Ricci recommends additional individual psychotherapy to include conjoint treatment with his fiancee. Dr. Ricci had previously reviewed Dr. Staudenmayer's reports and opinions that the current trauma related to the motor vehicle accident has "rekindled" some prior trauma experienced when Mr. Bunch was 8 years old. Mr. Bunch reported to Dr. Ricci that he did not find a Dr. Staudenmayer's focus on this prior trauma to be particularly beneficial. Dr. Ricci felt that focus on this prior trauma could "detract from his current post-concussion treatment needs." I would totally agree with Dr. Ricci in this regard. Dr. Ricci's diagnoses were Concussion without Loss of Consciousness; Situational Anxiety; and, Adjustment Disorder with Anxiety and Depression.

With regard to Dr. Ricci's assessment, I would note that Dr. Ricci administered the Beck Depression Inventory – Second Edition (BDI-2) on September 25, 2018. Mr. Bunch's score was 27. This score is notably lower than Mr. Bunch's BDI-2 score obtained by me in May of 2018

Lincoln/Bunch 0938

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 5

which, at that time, was 45. While a score of 27 still reflects a fairly high level of depression, this score would suggest some improvement in his depression from the time of my evaluation with him.

I also reviewed the records of Michael Saxerud, O.D. Dr. Saxerud is also a local provider that I have co-treated patients with on multiple occasions. I have also come to trust his diagnostic impressions, opinions and treatment. It appears that Mr. Bunch first saw Dr. Saxerud on July 13, 2018. Dr. Saxerud documented a number of post-concussive symptoms as well as a wide variety of vision problems suggestive of a Post-Traumatic Vision Syndrome. His impressions include convergence insufficiency, headache, visual-perceptual disorder, pursuit eye movement disorder, focal midline right, dizziness, myopia, astigmatism, diplopia, vertical heterophoria, and bilateral visual discomfort. His diagnoses include Post-Concussion Syndrome, visual distortions of shape and size, chronic post-traumatic headaches intractable, diplopia, dizziness, other irregular eye movements, convergence insufficiency, vertical heterophoria, abnormalities of gait and mobility, visual discomfort bilateral, myopia bilateral, and regular astigmatism right. Dr. Saxerud ultimately prescribed corrective lenses with prism correction. A September 21, 2018 letter states, "Mark is under my care for a visual-perceptual disorder secondary to a concussion. At this time, Mark is not capable of working, as his depth perception and eye movements are not adequate to keep him safe in the workplace."

I also reviewed the records of Herman Staudenmayer, Ph.D. This included a Psychological Evaluation report dated August 6, 2018. I would note that Dr. Staudenmayer re-administered the PCL-5, the same PTSD inventory that I administered as part of my screening with Mr. Bunch. Mr. Bunch's PCL-5 score was 66. This score was notably lower than the score of 79 that he obtained as part of my screening with him. This score remains clinically significant, but suggests some improvement in PTSD symptoms from the time that I saw him. I would note that Dr. Staudenmayer also administered the MMPI-2-RF as part of his evaluation with Mr. Bunch. He noted that Mr. Bunch's F-r Score was 120T, which he felt indicated over reporting of psychiatric, somatic, and cognitive symptoms. He ultimately concluded that the results of the MMPI-2-RF as well as the PCL-5 and the SC AT2 were not valid due to his symptom reporting. In general regarding the issue of over reporting symptoms, scores on tools such as the MMPI-2-RF and PCL-5 can be elevated as a result of the patient's honest report of persisting symptoms associated with actual medical conditions including Post-Concussion Syndrome. Dr. Staudenmayer notes in later records that scores on these types of tools can be elevated as a "cry for help." That is, the patient is in a high level of emotional and/or physical distress and they are reporting symptoms in the hope that the provider can help them in some way. As part of his Psychological Evaluation report, Dr. Staudenmayer states, "Mental status exam suggest exaggeration and adopting the sick role. Psychological testing indicated that his self-report reflects over reporting bias, making these self-reported symptoms invalid. Comprehensive neuropsychological testing is contraindicated at this time." Dr. Staudenmayer's working diagnosis was Psychological Factors Affecting a Medical Condition. Dr. Staudenmayer recommended individual psychotherapy which he then proceeded to provide to Mr. Bunch.

**Lincoln/Bunch 0939**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 6

Dr. Staudenmayer's later Treatment Notes document a prior trauma which Mr. Bunch experienced when he was 8 or 9 years old when he was hiking by himself in the foothills and accidentally fell into a dry well. The well was so deep he could not get out and he spent the night "terrorized" at the bottom of the well. Mr. Bunch thought that at that time he would die. He could not recall how he was rescued, but was apparently was told that he was rescued by fire department personnel. He apparently reported some post-traumatic stress symptoms through his teenage years, but appeared to be symptom-free throughout his adulthood. In his August 13, 2018 note, Dr. Staudenmayer states, "I explained to him the nature of how trauma memories, particularly sensory and emotional memories are stored and how they are interconnected by association pathways such that a recent experience can trigger the others. It appears that the motor vehicle accident was traumatic enough in its own right but also rekindled past associated experiences and traumatic symptoms." I would agree with Dr. Staudenmayer that current traumas can certainly "rekindle" past traumas which have been quite dormant for many years. It is my clinical experience treating many PTSD patients that the focus of treatment should remain on treating the current trauma. As that trauma resolves then past traumas will typically return to their dormant state. I would also note that past traumas can result in a situation where an individual can be more sensitive to and responsive to a more current trauma. That is, the individual is more symptomatic related to the current trauma because they are sensitized to trauma by the past traumas. Again, it is my experience that treating the current trauma should be the first line of treatment.

In brief summary, I would note that Dr. Staudenmayer felt that comprehensive neuropsychological testing was contraindicated due to Mr. Bunch's emotional and psychological status. It would be important to note that the emotional and psychological distress that Mr. Bunch was experiencing at the time of my screening with him was even more pronounced than at the time of Dr. Staudenmayer's evaluation.

I reviewed Dr. Staudenmayer's Review of Records report dated November 17, 2018. Dr. Staudenmayer apparently reviewed an IME report, authored by Dr. Lesnak, dated September 18, 2018. He also reviewed a report generated by Dr. Polanco as well as Dr. Brinley's neurological evaluation. He concluded this note by stating, "I am updating my diagnoses adding (F44.7) Conversion Disorder (Functional Neurologic Symptoms Disorder) with Mixed Symptoms. The most difficult aspect of Conversion Disorder is to identify the specific motivation underlying it including malingering, primary gain or secondary gain. In my experience, it is not secondary gain but primary gain. Under such circumstances, patients with primary gain are extremely difficult to treat because they are vested in their distorted beliefs." This additional diagnosis essentially reinforces Dr. Staudenmayer's initial impression that Mr. Bunch is adopting the "not well role" and that this is a psychological component to his symptom presentation.

I reviewed a Comprehensive Consultation report authored by Frank Polanco, M.D. The date of this report is unclear, but it may be November 6, 2018. Dr. Polanco indicates that the "reason for visit" is that Mr. Bunch is "seeking a primary provider for his industrial injury of February 13, 2018." This statement is inconsistent with a transcript of a recording of this evaluation, which

Lincoln/Bunch 0940

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 7

you also provided to me. Mr. Bunch clearly states to Dr. Polanco when asked why he is there that he is unsure why he is there or who sent him. At this point in time, Mr. Bunch was being treated by Dr. Higginbotham and I see no indication in Dr. Higginbotham's records or any other records that he was dissatisfied with Dr. Higginbotham's care. Dr. Higginbotham does note that there were apparently some efforts on behalf of the insurance company to usurp Mr. Bunch from his care into the care of Dr. Polanco. I would note that when Mr. Bunch stated to Dr. Polanco that he did not know why he was there or who had referred him, Dr. Polanco did not help to clarify the situation or in any other way explain the reason for his evaluation with Mr. Bunch. I would further note that Dr. Polanco indicated that he spent 2-1/2 hours reviewing surveillance video as part of his evaluation with Mr. Bunch. If this was, in fact, an initial treatment assessment, I would find spending 2-1/2 hours reviewing surveillance video to be quite unusual for such an evaluation. On a surface, this appeared to be more of an IME as opposed to a true clinical assessment.

Based on a review of the transcript of the evaluation that you provided, it appears that the medical evaluation conducted by Dr. Polanco was quite minimal. However, as I am not a physician, I cannot comment on the thoroughness of the medical evaluation. I can, however, comment on the thoroughness of Dr. Polanco's concussion assessment, which was minimal and highly inadequate. When discussing the accident, Mr. Bunch spontaneously offered to Dr. Polanco that he did strike his head in the course of the accident and provided a picture to Dr. Polanco documenting that head trauma. Dr. Polanco did ask one follow-up question on Page 3, Line 22, "Did you pass out or anything?" Mr. Bunch's response suggested that he feels he may have lost consciousness, however, as opposed to following up on that response, Dr. Polanco again asked him if he hit his head and again Mr. Bunch responded that he did strike his head in the course of the accident. On Page 4, Lines 21 and 22, Dr. Polanco again asked Mr. Bunch if he passed out. However, this was a compound question and he also asked if Mr. Bunch exited the vehicle, Mr. Bunch's response was, "I don't recall." Dr. Polanco then pursues the issue of if he exited the vehicle as opposed to asking further questions regarding a possible loss of consciousness. On Page 5, Line 6, Mr. Bunch reported that he felt "woozy" post-accident. This response would suggest some alteration of consciousness. This is not a symptom that Dr. Polanco asked about further. Therefore, the only questions related to a possible concussion that Dr. Polanco asked were "did you hit the head" and "did you lose consciousness." I see nowhere in the transcript that Dr. Polanco specifically asked about altered consciousness post-accident such as feeling dazed, confused, or disoriented. I see nowhere in the transcript where Dr. Polanco asked about the alteration of memories surrounding the accident. Therefore, Dr. Polanco's assessment of a possible brain injury was quite inadequate.

Dr. Polanco ultimately states, "The findings in the records do not support a concussion/TBI and the diagnostics do not support a brain injury." As noted above, Dr. Polanco's personal assessment of the brain injury/concussion was inadequate and incomplete. Providers such as Dr. Olson, Dr. Higginbotham, and Dr. Brinley as well as myself did obtain adequate data to make the concussion/brain injury diagnosis. In addition, it is now accepted that medical diagnostics such as CT scans and MRIs are almost always negative in cases of Mild Traumatic Brain Injury.

**Lincoln/Bunch 0941**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 8

These types of medical diagnostics are "rule in" and not "rule out" tests. Dr. Polanco ultimately renders an assessment of PTSD (pre-existing condition not permanently aggravated). By this, Dr. Polanco was referring to Dr. Staudenmayer's perception that a prior trauma sustained at age 8 was aggravated/"rekindled" by the motor vehicle accident. Nowhere in his report does Dr. Polanco address the issue that Mr. Bunch may have PTSD symptoms related to the motor vehicle accident. Based on a review of the transcripts, he did not ever ask Mr. Bunch even one question about possible PTSD symptoms.

I noted a number of misrepresentations in Dr. Polanco's report. He stated that Dr. Staudenmayer did "not support a concussion/TBI diagnosis." Dr. Staudenmayer's report was very clear that he was deferring that diagnosis to Mr. Bunch's other providers and that his assessment did not rule out that diagnosis. In the discussion section of his report, Dr. Staudenmayer states, "It was not until 2-1/2 months later that he complained of a multitude of symptoms, which is inconsistent with concussion or traumatic brain injury." This misrepresents the facts of the case. In fact, Mr. Bunch was reporting multiple post-concussive symptoms early post-accident.

## SUMMARY AND RECOMMENDATIONS:

Based on my review of the above records, I have several observations and treatment recommendations:

1. Mr. Bunch's providers are all in agreement that he has experienced notable feelings of depression post-accident. Following my screening assessment with him, I recommended individual psychotherapy as well as prescription of an SSRI-type anti-depressant medication. While Mr. Bunch has received some individual psychotherapy with Dr. Staudenmayer, he has not been prescribed an SSRI-type anti-depressant medication. He has been prescribed a tricyclic anti-depressant medication (Pamelor) at a subtherapeutic dose for sleep. As I believe a significant component of his depression is organically-based, I would strongly recommend that Dr. Higginbotham consider Mr. Bunch for prescription of an SSRI-type anti-depressant medication such as Cymbalta or its generic, duloxetine. If that medication is ineffective, then I would suggest Zoloft.

2. With regard to individual psychotherapy, it is evident that Mr. Bunch requires additional treatment to address accident-related issues such as depression, reduced stress tolerance and PTSD related to the motor vehicle accident. I would recommend that the focus of any PTSD treatment be on the motor vehicle accident and not on any prior traumas. He would likely be a good candidate for use of EMDR to address his PTSD symptoms as well.

3. With regard to the issue of symptom over reporting and/or malingering, I would note that these are two separate issues in the field of neuropsychology. An individual may over report symptoms for a number of reasons, including experiencing a high level of emotional or psychological distress; a cry for help; or, over reporting of symptoms for some primary or secondary gain reason. At this point, I do not have enough data to render an opinion

**Lincoln/Bunch 0942**

Kenneth J. Shakeshaft, Esq.
RE: Mark B. Bunch
March 12, 2019
Page 9

regarding this issue. It appears that Dr. Staudenmayer is at least considering the possibility that any over reporting of symptoms may relate to a "cry for help." At this point, that appears to be a reasonable working theory. He also believes that, to some degree, Mr. Bunch's over reporting of symptoms relates to his adopting the "sick role." While this explanation is certainly possible, I would want to explore this possibility more fully in therapy with such a patient.

With regard to malingering, again I do not have enough data to render an opinion regarding this issue. I am the only provider that has administered Performance Validity Tests to Mr. Bunch. It remains my opinion that the bulk of his suboptimal scores on Performance Validity Testing are, in fact, explained by his residual high level of pain, depression, anxiety and fatigue at the time of my assessment with him. This is an opinion that seems to be corroborated by a number of his providers and evaluators, including Dr. Higginbotham and Dr. Ricci. At this point, there is only one score from one test that would suggest malingering. That is not enough data for any provider to render the professional opinion (or diagnosis) of malingering.

Should you have any further questions, please feel free to contact me at anytime.

Sincerely,

*Dennis A. Helffenstein, Ph. D.*

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Colorado License # 1484
Certified Rehabilitation Counselor # 00001338
Diplomate, American Board of Vocational Experts # 64073
Certified, Health Service Provider in Psychology National Register # 41454

**Lincoln/Bunch 0943**

## EXAMINATION RECORD

**Gleneagle Vision Center, PC**
15435 Gleneagle Dr
Ste 110
Colorado Springs, CO 80921-2542

**(719) 884-8480 FAX: (719) 884-8483**

**For: Bunch, Mark**
**Exam Date:** 07/13/2018
**Print Date:** 07/13/2018 12:03 pm
**DOB:**            **Age:** 54
**Occupation:** Fiber Optic Communications
**Gender:** Male        **Race:** White

**REASON FOR VISIT**
**EXAMINATION:** Eye Examination  Last examination: 1-2 years ago.
**REFERRED BY:** THOMAS W HIGGINBOTHAM DO
**OCCUPATION:** Fiber Optic Communications

**CHIEF COMPLAINT**
**CHIEF COMPLAINT:** Reports headaches,   Eye Strain / Fatigue,   Neck Pain,   Poor Reading,   Reports photophobia,   Poor Depth Perception,   Poor Concentration.

**HISTORY PRESENT ILLNESS (HPI)**
**VISION COMPLAINT:** With current spectacle correction  A noticeable decline or change in vision is experienced. The change in vision has occurred gradually.  There is a general feeling that vision has changed.  Vision status is characterized as troublesome.  Varied visual tasks are now impaired.  Eyes fatigue easily.  Headaches persist.  Eye-strain is common.  Was hit by another driver in February 2018.  The depth perception is off and avoids stairs because of it.  Double vision is worse the closer it gets.  Crowds are bothersome.  Anxiety with driving.  Visual motion hypersensitivity with fast movement.  Peripheral motion apparent.  Concentration is worse since the accident and memory comes and goes.  Balance is one of the biggest symtoms as well as focus.  Can hear the flourescent lights now.  Used to wear contacts most of the time hasn't been able to since the accident.
**VISUAL SYMPTOMS:** Headaches are common.  Eyes become fatigued easily.  Print seems to move or eyes seem to drift.  Loss of concentration during task performance.  Covers one eye while reading.  Ability to judge depth is poor.  Bumps into objects.  Eyes are reported to be sensitive to light.  Unexplained visual sensations are experienced.  Doubling of vision is experienced with visual tasks.
**DIPLOPIA:** DIPLOPIA: Reporting a new experience with double vision.  Observation is constant or persistent.  Diplopia seems greater when looking at near.  Headaches are reported.
**HEADACHES:** HEADACHE: Reporting continuing experiences with headaches.  Location, frontal aspect.  Location, occipital aspect.  Severity is described as bothersome or discomforting.  Episodes occur on most days.  Onset of symptoms began six months ago.  No common pattern or circumstance exists.  No associated signs or symptoms are reported.  Headache accompanied by dizziness/vertigo.  Light sensitivity is experienced.
**SYSTEMIC SYMPTOMS:** Dizziness.  Fatigue.  Unsteady gait.  Muscle stiffness.

**PATIENT HISTORY**
**DOCUMENTATION OF MEDICATIONS:** Documented medications.
**OCULAR HISTORY:** No ocular history reported except:  OK (None).
**MEDICAL HISTORY:** No medical history reported except:  Concussion,   Motor Vehicle Accident Timeline: 02/2018. ,   Headaches,   Anxiety disorder,   Depression.
**SYSTEMIC SURGICAL HISTORY:** Tonsilectomy  Timeline: 1970. ,   Hernia repair  Timeline: 2017.
**SYSTEMIC FAMILY HISTORY:** No pertinent medical history exists.
**OCULAR SURGICAL HISTORY:** No ocular surgical history reported except:  No pertinent past ocular

1

Sent to OC
08/30/2018
by PM LLC

Lincoln/Bunch 0944

surgical history exists.

**OCULAR FAMILY HISTORY:** Family history is reported to be unremarkable.

**OCULAR MEDICATIONS:** No ocular medications are currently used except:    No known ocular medication allergies,  No reported ocular medications.

**SYSTEMIC MEDICATIONS:** No systemic medications are currently used except:    Aleve,  Aspirin, Tylenol,  Penicillin [ALLERGIC]

**SOCIAL HISTORY:** No tobacco use reported,  Alcohol, infrequent, social use only,  No reported use of narcotics,  No history of sexually-transmitted disease.

**SPECTACLE Rx STATUS:** Single vision general purpose Rx.  Eyewear is not worn.

**CONTACT LENS HISTORY:** Contact lenses were worn in the past.

**REVIEWED HISTORY:** I have reviewed this patient's history encounter form.

### REVIEW OF SYSTEMS

**REVIEW OF SYSTEMS:** No reported disorders or current medical treatment of:  Allergy  Cardiovascular Constitutional  Ears,nose,mouth,throat  Endocrine  Gastrointestinal  Genitourinary  Hematologic / Lymphatic Immunologic  Integumentary / Skin  Musculoskeletal  Neurologic  Psychiatric  Respiratory

**ALLERGY:** See patient history for detailed allergy information.

**MUSCULOSKELETAL:** Muscle pain.

**NEUROLOGICAL:** Headache.

**PSYCHIATRIC:** Anxiety disorder.  Depression.

**REVIEWED ROS:** I have reviewed this patient's ROS encounter form.

### PRESENTING FINDINGS
**UNAIDED ACUITIES:**
 RT:  DVA 20/200
 LT:  DVA 20/200
 BI:  DVA 20/400

### VISION
**K-READINGS:**
 RT:  42.75 @ 164 Steep 43.00 @ 074
 LT:  41.25 @ 067 Steep 42.25 @ 157

**AUTO REFRACTION:**
 RT:    -1.75 -0.50 x 119
 LT:    -1.75 -0.50 x 096
**MANIFEST:**
 RT:    -2.00 -0.50 x 115  DVA: 20/20-
 LT:    -2.25 Sph.  DVA: 20/20-
 BI:    DVA: 20/20-
**FINAL SPECTACLE Rx:**
 RT:    -2.00 -0.50 x 115  DVA: 20/20-
 LT:    -2.25 Sph.  DVA: 20/20-
 BI:    DVA: 20/20-
**ALTERNATE SPECTACLE Rx: (#1)**
 RT:    Plano  Sph.  DVA: 20/20-
 LT:    Plano  Sph.  DVA: 20/20-
 BI:    DVA: 20/20-
 NOTES: OD Prism 0.37 INOS Prism 0.37 OUTPrism taped to safety
**TRIAL CONTACT LENS Rx: #1**
 RT:    BIOFINITY 6PK -2.25  BC: 8.6  Dia: 14.0  Handling Tint
 LT:    BIOFINITY 6PK -2.25  BC: 8.6  Dia: 14.0  Handling Tint

### EXAMINATION
**CUP/DISC RATIO:**
 RT:  Horz .15  Vert .15
 LT:  Horz .15  Vert .15

2

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0945**

04/25/2019  15:22     7196350966

**TONOMETRY:**  RT: 17 mmHg   LT: 18 mmHg   Test: Applanation  Time: 10:20  Category: Examination
**VISUAL FIELDS SCREENING:**  Right Eye: Digital perimetry demonstrates normal threshold values in the programs tested.
   Left Eye: Digital perimetry demonstrates defective or reduced threshold values in the programs tested. Location of the defect:  Scattered.
**CONFRONTATION FIELDS OBSERVATIONS:**  Fields were found to be full in all quadrants, OD,  Fields were found to be full in all quadrants, OS
**EXTERNAL EXAM:**  Confrontation fields are full in all quadrants.  Facial symmetry exists.  Ocular adnexa and nodes normal.  Eyelids and lashes clean, healthy and free of defects.  Extraocular muscle motilities and versions full.  Cover test testing ortho @ primary gaze, distance and near.  Pupils are equal, round and fully reactive to light.
**EXTRAOCULAR MUSCLES:**  Pursuits, moderate fixation loss.   During adduction:  Moderate underaction is noted.
**SLIT-LAMP EXAM:**  Tears demonstrate normal surface qualities.  Corneal epithelium, stroma and endothelium clear and healthy.  Bulbar and palpebral conjunctiva are healthy and white.  Chambers are deep and free of cells and flare.  Iris appears healthy, normal anatomy and convexity.  Lens, both capsules, cortex, and nucleus are normal for age.
**POSTERIOR SEGMENT:**  Vitreous body clear for age and fully attached.  Nerve head well perfused, with good rim tissue.  Healthy macula with no edema or degenerative pigmentation.  Healthy peripheral retinal structures and vasculature.  No drusen, exudate, hemorrhages or evidence of retinopathy.
**DISPOSITION:**  Patient is pleasant and sociable.
**ORIENTATION:**  Patient is fully alert to time, place and person.

**SPECIAL TESTING**
**SENSORIMOTOR EXAM:**  Cover Test.  Maddox Rod.
**IMPRESSION(S):**
Convergence Insufficiency
Headache
Visual perceptual disorder
Pursuit eye movement disorder. Focal midline right. Dizziness
Myopia
Astigmatism
Diplopia
Vertical heterophoria
Bilateral: Visual discomfort

**PLAN**
**SPECTACLE PLAN:**  Postponed spectacle Rx. OD Prism 0.37 IN OS Prism 0.37 OUT Prism taped to safety wear over CL's trials. Wear readers over safety for near +2.00
**CONTACT LENS PLAN:**  Continue current lens modality.   Disposable soft lens.   Sphere.   Trial lens dispensed. Biofinity -2.25 OU

**PATIENT MANAGEMENT**
**COUNSELING / EDUCATION:**  I have verbally discussed my clinical findings and recommendations in detail with this patient and/or parents. They acknowledge that they do not have additional questions.
**ORDERS:**
  Recall on or about 08/13/2018: Examination: Progress Evaluation  Ordered by: Saxerud, OD, Michael H. Entered by: Saxerud, OD, Michael. [Active] on 07/13/2018 By Saxerud, OD, Michael.

**ELECTRONIC SIGNATURE:**  Electronically Signed By: Michael H Saxerud, OD on 07/13/2018 12:03 PM.

**DIAGNOSIS:**
F07.81 Postconcussional syndrome
H53.15 Visual distortions of shape and size
G44.321 Chronic post-traumatic headache, intractable
H53.2 Diplopia

3

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0946**

R42 Dizziness and giddiness
H55.89 Other irregular eye movements
H51.11 Convergence insufficiency
H50.53 Vertical heterophoria
R26.89 Other abnormalities of gait and mobility
H53.143 Visual discomfort, bilateral
H52.13 Myopia, bilateral
H52.221 Regular astigmatism, right eye
**PROCEDURE:**
99204 Exam Comp. New Patient
92015 Exam Refraction
G8427 Verified Meds
1036F Current Tobacco Non-user
G9903 Patient Screened for Tobacco Use, Non Tobacco User
92065 Therapy-Orthoptics

**Completed Exam:** _____      Date: 07/13/2018
                    Michael Saxerud OD

4

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0947**

04/25/2019  15:22    7196350966                                                      PAGE 16/74



**Gleneagle Vision Center** PC

Michael Saxerud, O.D.

Gail Saxerud, O.D.

## TBI PATIENT CHECKLIST

Patient Name *Mark Bunch* DOB

| Policies Form Signed | Yes | No | |
|---|---|---|---|
| Attorney | (Yes) | No | If yes Name and Phone: |

*Shakeshaft*

Referred By Name and Phone:

| | | | |
|---|---|---|---|
| Medical Insurance | Yes | No | Ins. Co Name: |
| Copy of Card | Yes | No | Policy # |
| | | | Group |
| Vision Ins. | Yes | No | Ins. Co. Name: |
| (For glasses only) | | | |
| Auto Ins. Responsible | Yes | No | Ins. Co. Name: |
| | | | Claim # |
| | | | Contact Person Phone # |
| Medical Lien/Finance Co. | Yes | No | |

Co. Name. Contact Person, Phone #

Work Comp Insurance *ESIS*                Claim# *2D338776817591*

Case Worker Name/Number: *Landon Wallis*

Copay/Service Fees: $_____ Materials Fees: $_____ Previous Balance Due: $_____

Total Due: $_____    Total Paid: $_____

Glasses ordered_____ Letter Written_____ Referral Made_____ Billed *7/13/18*

15435 Gleneagle Drive, Suite 110 Colorado Springs, CO 80919

Phone (719) 884-8480  FAX (719) 884-8483  www.gleneaglevision.com

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0948**

**Gleneagle**
**Vision Center**

*vision now worse LEE - 8-10 yrs eg - disposal*
*ū sd. wears sel - hrt sg - has schedule - has glasses - sharper hrt still hard to focus.*

## Auxiliary Testing Form- Initial Visit

Patient: Mark Bunch _____ Date: 7/13/208
Referred by: Higgins William _____ Atty: Shaki Shaft _____
Injury Date: 3/13/20X _____ Injury Type: _____

Hx *Hard to focus - OS > OD*
*- Poor balance, dizziness*
*- Words move, blurry - has to close one eye to try to read*
*- very sensitive to fl. lights*
*- overlapping images to true diplopia*

Start Time: _____

EOM

| | | |
|---|---|---|
| | | |
| | | |

Acuity- Unaided    OD 20/200  OS 20/200  OU 20/400
Acuity- Aided      OD         OS         OU

Pursuit Eye Movements      ☐ Smooth      ☒ 3-4 +losses

Saccadic Eye Movements     ☐ Accurate    ☐ Overshoot    ☐ Undershoot

Near Point of Convergence  16"/ _____  ☐ Normal      ☒ Reduced

Prolonged Cover Test- Vert   Distance  ☒ Normal  ☐ ___ hyper phoria/tropia  *trouble*
                             Near      ☒ Normal  ☐ ___ hyper phoria/tropia  *ē re-fixate*

Maddox Rod    Distance   ☐ No Vertical   ☒ OS hyper phoria/tropia

| Parks | Hyper in Primary | Hyper in Gaze | Hyper on Tilt | Paretic |
|---|---|---|---|---|
| | R | R | R | LIO |
| | R | R | L | RIR |
| | R | L | R | RSO |
| | R | L | L | LSR |
| | L | R | R | RSR |
| | L | R | L | LSO |
| | L | L | R | LIR |
| | L | L | L | RIO |

Suppression Check   Distance  ☐ Fusion  ☐ Int Supp____  ☐ Supp____
                    Near      ☐ Fusion  ☐ Int Supp____  ☐ Supp____

Stereo Acuity       sec arc

Cranial Nerves   III   ☒ Normal Function     ☐ Abnormal
                 IV    ☒ Normal Function     ☐ Abnormal
                 VI    ☒ Normal Function     ☐ Abnormal

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0949**

04/25/2019  15:22    7196350966

Visual Field Screening    ☐ Normal      ☒ Losses

Confrontational Fields    ☐ Full Od and OS    ☐ Abnormal

Binocular   Distance    ☐ Normal   ☐ Abnormal

         Near    ☐ Normal   ☐ Abnormal

Pupils    APD

Motions in a busy pattern    ☒ Present   ☐ Absent

| Bilateral Maddox | Lateral | Vertical |
|---|---|---|
| OD – 10 feet | | ¼ hypo |
| OS – 10 feet | | ¼ hyper |
| OD – 16 inches | | |
| OS – 16 inches | | |

Posture

| | | | |
|---|---|---|---|
| Head Tilt | ☐ None | ☐ Right | ☐ Left |
| Shoulder Drop | ☐ None | ☐ Right | ☐ Left |
| Body Lean | ☐ None | ☐ Right | ☐ Left |
| Gait Heavier | ☐ None | ☐ Right | ☐ Left |
| Gait Drifting | ☐ None | ☐ Right | ☐ Left |

Subjective Refraction    OD   −2.00 −0.50 x 115    20/20

                    OS   −2.25 sph

Prism Trials    OD 0.37 @ In    Bi infinity −2.25 OS

                 OS 0.37 @ out    c tried sticks

Final Rx    OD / OS  7a c above    − good result

Order Prism Glasses    ☐ Yes    ☒ No

Balance Screening    Romberg standard    ☐ Normal   ☐ Abnormal

                        Romberg sharpened    ☐ Normal   ☐ Abnormal

RTC    ☒ 1 mo    ☐ 3 mo    ☐ 6 mo    ☐ 1yr    ☐ Other

End Time:_____

Face to Face Time_____minutes

Time Counseling_____minutes

Procedure Codes:   99203    (99204)    99205    (92015)    92060

                    99212    99213    99214    (92065)

Sent to OC
08/30/2018
by PM LLC

Lincoln/Bunch 0950

04/25/2019   15:22    7196350966                                              PAGE 19/74



Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0951**

# Visual Symptoms

Patient Name: Mark Bunch    Today's Date: 7/4/18
Referred by: _____    Injury Date: _____

| Directions: For each of the following questions, please check the answer that best describes your situation **with your current glasses on.** If any of the following were experienced **prior** to your injury, please place a check mark in the **last column as well.** Daily = Everyday / Frequently = At least 1 time per week / Occasionally = Less than 1 time per week / Never | DAILY | FREQUENTLY | OCCASIONALLY | NEVER | EXISTED BEFORE INJURY |
|---|---|---|---|---|---|
| Do you experience headaches? | ✓ | | | | |
| Do you experience double vision or overlapping (ghost) images? | ✓ | | | | |
| Do you experience blurry vision at distance? | ✓ | | | | |
| Do you experience blurry vision at near? | ✓ | | | | |
| Do words move around the page when you try to read? | ✓ | | | | |
| Do your eyes tire easily while reading or using the computer? | ✓ | | | | |
| Do you blink frequently to clear your vision? | ✓ | | | | |
| Do objects appear suddenly in your peripheral vision? | ✓ | | | | |
| Do you experience dizziness or vertigo? | ✓ | | | | |
| Do you have difficulties with your balance? | ✓ | | | | |
| Do you drift to the left or right while walking? | ✓ | | | | |
| Do you have difficulties with stairs or uneven ground? | ✓ | | | | |
| Do you have neck or shoulder pain/discomfort? | ✓ | | | | |
| Do you experience discomfort in crowded spaces? | ✓ | | | | |
| Does riding in a car cause uneasiness or anxiety? | ✓ | | | | |
| Do you have difficulties driving a car? | ✓ | | | | |
| Are you sensitive to sunlight? | ✓ | | | | |
| Are you sensitive to indoor lights? | ✓ | | | | |

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0952**

04/25/2019  15:22    7196350966                                                    PAGE 21/74



**Gleneagle Vision Center**

## Injury Information

Patient Name: _Mark Bunch_                              Date: _7/2/18_

Please briefly describe the injuries or accident that have led to your current vision problems:
_I was injured in car accident at 13/18 6:30pm_
_collapsed and lost sight in my left eye when I_
_became conscious whiplash_

Did you lose consciousness?    ☑ Yes    ☐ No
If so, for how long? _I don't know_

Please check if this was a:

☐ Motor Vehicle Accident        ☐ Sports Concussion        ☐ Other

**If this was a motor accident,**

Were you a:        ☐ Driver        ☐ Passenger        ☐ Pedestrian

Were you on a:     ☐ Highway       ☐ Street           ☐ Parking lot

**If you were on a highway,**

Were you:          ☐ Entering      ☐ Exiting          ☐ On the highway

Were you:          ☐ Moving        ☐ Stopped

When did you begin to notice difficulties with your vision? _within 10-15 mins_

Please list all previous injuries, concussions, surgeries, or motor vehicle accidents including the year of the occurrence: _concussion in high school football jun 1979_
_tonsillectomy 1970_
_Hernia repair 2017_

Has a vision/eye exam been performed since the injury?    ☐ Yes    ☐ No

If yes, by whom?_____ Date:_____

Doctor Recommendations?_____

15435 Gleneagle Dr., Suite 110 | Colorado Springs, CO 80921

Phone: 719.884.8480 | Fax: 719.884.8483

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0953**

04/25/2019  15:22    7196350966                                                    PAGE 22/74

**Gleneagle Vision Center, P.C.**
**Medical Questionnaire**

Name: _Mark Bunch_                                                    Date: _6 30 2018_

**Reason for Visit:**

    ☐General Eye Exam        ☐Contacts Lens Fitting/Evaluation

    ☐Evaluation after Trauma/Brain Injury/Concussion/Stroke/Neurological Reason

    ☐Referral from _Dr Higgenbotham_

    ☐Other_____

Do you wear glasses?  Yes    No        Do you wear Contacts?  Yes    No

                            Type of Contacts:  Soft    Other

Date of Last Eye Exam:_____    Eye Doctor:_____

Last Medical Exam: _April 2018_    Primary Care Physician: _Dr Olson_

**Medical History**

Current Medications: including contraceptives, over the counter, supplements, vitamins:

_Aleve_
_Tylenol_
_Aspirin_

Allergies to Medications?    Yes    No        If yes, _penicillin_

List any major injuries/motor vehicle accidents/concussions/surgeries/hospitalizations with dates:
_2/13/18 concussion from car accident_

Are you pregnant or nursing?  Yes    No

**Social History**

Do you drive?    Yes  No                 Is driving difficult?    Yes  No

Do you use any tobacco products (circle one)?  >1 year    1-5 years    <5-10 years    Occasional    Never

Do you consume alcohol (circle one)?           Occasional        Frequent          Never

Do you use any recreational drugs (circle one)?  Occasional        Frequent         Never

Have you ever been exposed to or infected with:  AIDS/HIV    Gonorrhea    Hepatitis    Syphilis

Hobbies/Sports: _Reading, traveling, gardens_

Occupation: _____

☐ I would prefer not to discuss my social history.

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0954**

04/25/2019  15:22    7196350966                                    PAGE 23/74

## Review of Systems
Do you currently, or have you ever had problems in the following areas?

**Constitutional**
Yes / No   Fever, weight gain/loss

**Ear/Nose/Throat**
Yes   No   Sinus Congestion
Yes   No   Dry mouth/throat

**Cardiovascular**
Yes / No   Heart Pain
Yes   No   High blood pressure
Yes   No   Vascular disease
Yes   No   Heart surgery

**Respiratory**
Yes   No   Asthma
Yes   No   Chronic bronchitis
Yes   No   Emphysema

**Genitourinary**
Yes   No   Dialysis/kidney failure

**Gastrointestinal**
Yes   No   Diarrhea
Yes   No   Constipation

**Musculoskeletal**
Yes   No   Rheumatoid arthritis
Yes   No   Muscle pain
Yes   No   Joint Pain

**Integumentary (Skin)**
Yes   No   Eczema
Yes   No   Skin cancer
Yes   No   Sinus Congestion

**Neurological**
Yes   No   Headaches
Yes   No   Migraines
Yes   No   Concussion
Yes   No   Stroke

**Psychiatric**
Yes   No   Depression
Yes   No   Anxiety

**Endocrine**
Yes   No   Diabetes
Yes   No   Hyper/Hypo thyroid

**Hematologic/Lymphatic**
Yes   No   Anemia
Yes   No   Bleeding problems

**Allergic/ Immunologic**
Yes   No   Lupus
Yes   No   Hay fever/allergies

Please explain if you have answered yes to any of the conditions above or have any conditions not listed:

Since my concussion I have constant headaches, Anxiety, Sinus congestion, fatigue and blurry/double vision.

## Ocular History
| Yes | No | | Yes | No | |
|---|---|---|---|---|---|
| Yes | No | Glaucoma | Yes | No | Decreased vision |
| Yes | No | Cataracts | Yes | No | Dry eyes |
| Yes | No | Diabetic Retinopathy | Yes | No | Burning eyes |
| Yes | No | Retinal Disease | Yes | No | Itching eyes |
| Yes | No | Eye Injury | Yes | No | Double vision |
| Yes | No | Blindness | Yes | No | Eye pain |
| Yes | No | Cross/turned eye | Yes | No | Floaters |
| Yes | No | Lazy eye/amblyopia | Yes | No | Flashes of light |
| Yes | No | Keratoconus | Yes | No | LASIK/other eye surgeries |

Please explain if you have answered yes to any of the conditions above or have any conditions not listed:

_____

## Family History
| | | | Relationship |
|---|---|---|---|
| Blindness | Yes | No | |
| Cataract | Yes | No | |
| Glaucoma | Yes | No | |
| Macular Degeneration | Yes | No | |
| Retinal Detachment | Yes | No | |
| Cancer | Yes | No | |
| Diabetes | Yes | No | |
| Heart Disease | Yes | No | |
| High Blood Pressure | Yes | No | |

☐ Unknown Family History

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0955**

## EXAMINATION RECORD

**Gleneagle Vision Center, PC**
15435 Gleneagle Dr
Ste 110
Colorado Springs, CO  80921-2542

**(719) 884-8480  FAX: (719) 884-8483**

**For: Bunch,  Mark**
**Exam Date:** 08/17/2018
**Print Date:** 08/17/2018 11:27 am
**DOB:**            Age: 54
**Occupation:** Fiber Optic Communications
**Gender:** Male        **Race:** White

**REASON FOR VISIT**
**EXAMINATION:** Progress Evaluation
**REFERRED BY:** THOMAS W HIGGINBOTHAM DO

**CHIEF COMPLAINT**
**CHIEF COMPLAINT:** Doctor recommended follow up from previous examination,    Reports headaches,
Eye Strain / Fatigue.

**HISTORY PRESENT ILLNESS (HPI)**
**VISION COMPLAINT:** With current spectacle correction  An ongoing problem with vision persists.  Vision
difficulties are long-standing.  Still bothered by bright light. Double vision and overlapping images are on
occassion.  Was able to watch TV. Still not driving. Balance and walking is more comfortable for him. Still
some issues on stairs. Overall feeling better.
**VISUAL SYMPTOMS:** Headaches are common.  Eyes become fatigued easily.  Ability to judge depth is
poor.  Eyes are reported to be sensitive to light.  Doubling of vision is experienced with visual tasks.
Symptoms are lessening.

**PATIENT HISTORY**
**OCULAR HISTORY:** No ocular history exists except:  OK (None).
**MEDICAL HISTORY:** No medical history exists except:  Anxiety disorder,  Concussion,  Depression,
Headaches,  Motor Vehicle Accident, 02/2018.
**SYSTEMIC SURGICAL HISTORY:** No systemic surgical history exists except:  Hernia repair, 2017,
Tonsilectomy, 1970.
**SYSTEMIC FAMILY HISTORY:** No pertinent medical history exists..
**OCULAR SURGICAL HISTORY:** No pertinent past ocular surgical history exists.
**OCULAR FAMILY HISTORY:** No ocular family history exists except:  Family history is reported to be
unremarkable..
**OCULAR MEDICATIONS:** No reported ocular medications.,  No known ocular medication
allergies.[ALLERGIC].
**SYSTEMIC MEDICATIONS:** No systemic medications are currently taken except:  Aleve,  Aspirin,
Tylenol,  Penicillin[ALLERGIC].
**SOCIAL HISTORY:** No tobacco use reported, Alcohol, infrequent, social use only,  No reported use of
narcotics.
**REVIEWED HISTORY:** I have reviewed this patient's previous exam records.
**THERAPEUTIC SIDE-EFFECTS:** Bilateral: No out-of-the-ordinary symptoms are experienced.

**REVIEW OF SYSTEMS**
**REVIEW OF SYSTEMS:** No reported disorders or current medical treatment of:  Allergy  Cardiovascular
Constitutional  Ears,nose,mouth,throat  Endocrine  Gastrointestinal  Genitourinary  Hematologic / Lymphatic
Immunologic  Integumentary / Skin  Musculoskeletal  Neurologic  Psychiatric  Respiratory

1

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0956**

**ALLERGY:** See patient history for detailed allergy information.
**MUSCULOSKELETAL:** Muscle pain.
**NEUROLOGICAL:** Headache.
**PSYCHIATRIC:** Anxiety disorder. Depression.
**REVIEWED ROS:** I have reviewed this patient's ROS encounter form.

### PRESENTING FINDINGS
**PRESENTING CONTACT Rx: (#1)**
RT:    BIOFINITY 6PK -2.25  BC: 8.6  Dia: 14.0  Handling Tint
LT:    BIOFINITY 6PK -2.25  BC: 8.6  Dia: 14.0  Handling Tint

### VISION
**NOTES:** OD Prism 0.37 IN
OS Prism 0.37 OUT
taped to safetys to wear over trial CL's
**FINAL SPECTACLE Rx:**
RT:    Plano  Sph.
LT:    Plano  Sph.
NOTES: OD prism 0.12 @ 165OS prism 0.12 @ 165Taped onto safties and sun

### EXAMINATION
**EXTERNAL EXAM:** Confrontation fields are full in all quadrants.   Facial symmetry exists.   Ocular adnexa and nodes normal.   Eyelids and lashes clean, healthy and free of defects.   Extraocular muscle motilities and versions full.   Cover test testing ortho @ primary gaze, distance and near.   Pupils are equal, round and fully reactive to light.   Unless otherwise noted below.
**EXTRAOCULAR MUSCLES:** Pursuits, moderate fixation loss. During adduction: Severe underaction is noted.
**IMPRESSION(S):**
Convergence insufficiency
Headache
Visual perceptual disorder
Pursuit eye movement disorder
Dizziness
Diplopia
Vertical heterophoria
Condition has improved
Bilateral: Visual discomfort

### PLAN
**SPECTACLE PLAN:** Taped safties and sun, greatly improved pursuits and NPC, much less veering with ambualtion.
**TREATMENT VISUAL EFFICIENCY:** Patient has a visual perceptual disorder. This disorder causes difficulties with eye teaming, focusing, pursuits and saccadic eye movements, and sensory integration. One or more of the following treatment techniques will be utilized. Prism, yoked prism, sensory integration exercises, peripheral occulusion techniques, refractive error correction, and tint. Thumb pursuits with eyes, cat laser tracing.

### PATIENT MANAGEMENT
**COUNSELING:** Counseling has been provided to review this patient's case and discuss options for treatment.
**TIME-ESTIMATE:** Doctor face-to-face with patient   40 minutes. Counseling and/or Coordination of Care, 20+ minutes.
**ORDERS:**
Recall on or about 09/14/2018: Examination: Progress Evaluation  Ordered by: Saxerud, OD, Michael H.
Entered by: Saxerud, OD, Michael. [Active] on 08/17/2018 By Saxerud, OD, Michael.

2

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0957**

**ELECTRONIC SIGNATURE:** Electronically Signed By: Michael H Saxerud, OD on 08/17/2018 11:27 AM.

**DIAGNOSIS:**
F07.81 Postconcussional syndrome
H53.15 Visual distortions of shape and size
G44.321 Chronic post-traumatic headache, intractable
H53.2 Diplopia
R42 Dizziness and giddiness
H55.89 Other irregular eye movements
H51.11 Convergence insufficiency
H50.53 Vertical heterophoria
R26.89 Other abnormalities of gait and mobility
H53.143 Visual discomfort, bilateral
**PROCEDURE:**
99214 Exam Comp. Established
92065 Therapy-Orthopics
1036F Current Tobacco Non-user
G9903 Patient Screened for Tobacco Use, Non Tobacco User

**Completed Exam:** _____        Date: 08/17/2018
            Michael Saxerud OD

3

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0958**

04/25/2019   15:22    7196350966                                    PAGE 27/74


**Gleneagle**
**Vision Center**

## Auxiliary Testing Form- Follow Up

Patient: _Mark Bunch_    Date: _8-17-18_

Referred by:_____    Atty:_____
Injury Date:_____    Injury Type:_____

Hx _(handwritten notes)_    Start Time:_____

Pursuit Eye Movements    ☐ Smooth    ☒ _3-4_ +losses

Near Point of Convergence _17" /_    ☐ Normal    ☒ Reduced

Maddox Rod _(marked)_

Oscillopsia    ☒ Present    ☐ Absent

Prism Trials    OD _0.12 @ 165_ =
                OS _0.12 @ 165_

Final Rx    OD
            OS

Order Prism Glasses ☐ Yes    ☒ No

RTC    ☐ 1 mo    ☐ 3 mo    ☐ 6 mo    ☐ 1yr    ☒ Other _3-4 wk._

End Time:_____
Face to Face Time:_____ minutes

Procedure Codes:    99203    99204    99205    92015    92060
                    99212    99213    (99214)   (92065)

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0959**



## Gleneagle
## Vision Center

## Visual Symptoms -- Follow Up

Patient: Mark Bunch          Date: 8-17-18

| Directions: For each of the following questions, please check the answer that best describes your situation **with your current glasses on.**<br><br>Daily = Everyday<br>Frequently = At least 1 time per week<br>Occasionally = Less than 1 time per week<br>Never | DAILY | FREQUENTLY | OCCASIONALLY | NEVER |
|---|---|---|---|---|
| Do you experience headaches? | | X | | |
| Do you experience double vision or overlapping (ghost) images? | | | X | |
| Do you experience blurry vision at distance? | | | X | |
| Do you experience blurry vision at near? | | X | | |
| Do words move around the page when you try to read? | | | X | |
| Do your eyes tire easily while reading or using the computer? | | X | | |
| Do you blink frequently to clear your vision? | | | X | |
| Do objects appear suddenly in your peripheral vision? | | X | | |
| Do you experience dizziness or vertigo? | | X | | |
| Do you have difficulties with your balance? | | X | | |
| Do you drift to the left or right while walking? | | | X | |
| Do you have difficulties with stairs or uneven ground? | | X | | |
| Do you have neck or shoulder pain/discomfort? | | X | | |
| Do you experience discomfort in crowded spaces? | | X | | |
| Does riding in a car cause uneasiness or anxiety? | | X | | |
| Do you have difficulties driving a car? | X | | | |
| Are you sensitive to sunlight? | | X | | |
| Are you sensitive to indoor lights? | | X | | |

Sent to OC
08/30/2018
by PM LLC

Lincoln/Bunch 0960

(1)
- Clip a cat Taser to a baseball cap
- Point nose at thumb, have Nikki make sure nose is pointing at thumb.
- Adjust the cap so the laser points at the thumb. Now put thumb down.
- Move your head slowly, and watch the laser move on the wall. Do this 1-2 minutes. As you improve, try tracing picture frames, furniture, etc.

(2) Remove cap or laser. Hold your thumb in front of you. Do not move head. Slowly move your thumb, follow with only your eyes. Do this 30-60 seconds.

2x/day

Sent to OC
08/30/2018
by PM LLC

Lincoln/Bunch 0961

04/25/2019  15:22    7196350966                                              PAGE 30/74



**Michael Saxerud, O.D.**
**Gail Saxerud, O.D.**

September 21, 2018

RE: Mark Bunch, DOB

To whom it may concern:

Mark is under my care for a visual perceptual disorder secondary to a concussion. At this time Mark is not capable of working as his depth perception and eye movements are not adequate to keep him safe in the work place. He is making progress with his therapy, and we are hopeful that in the next few months we will have his visual system capable for returning to work, at least part time.

Sincerely,

Michael Saxerud, O.D.

15435 Gleneagle Drive, Suite 110, Colorado Springs, CO 80921
Phone (719) 884-8480   FAX (719) 884-8483   www.gleneaglevision.com

Sent to OC
10/05/2018
by PM LLC

**Lincoln/Bunch 0962**



**Michael Saxerud, O.D.**
**Gail Saxerud, O.D.**

September 21, 2018

RE: Mark Bunch, DOB

To whom it may concern:

Mark is under my care for a visual perceptual disorder secondary to a concussion. At this time Mark is not capable of working as his depth perception and eye movements are not adequate to keep him safe in the work place. He is making progress with his therapy, and we are hopeful that in the next few months we will have his visual system capable for returning to work, at least part time.

Sincerely,

Michael Saxerud, O.D.

15435 Gleneagle Drive, Suite 110, Colorado Springs, CO 80921
Phone (719) 884-8480   FAX (719) 884-8483   www.gleneaglevision.com

**Lincoln/Bunch 0963**

## EXAMINATION RECORD

**Gleneagle Vision Center, PC**
15435 Gleneagle Dr
Ste 110
Colorado Springs, CO  80921-2542

**(719) 884-8480  FAX: (719) 884-8483**

**For: Bunch, Mark**
Exam Date: 09/21/2018
Print Date: 09/21/2018 11:27 am
DOB:          Age: 55
Occupation: Fiber Optic Communications
Gender: Male          Race: White

**REASON FOR VISIT**
**EXAMINATION:** Progress Evaluation
**REFERRED BY:** THOMAS W HIGGINBOTHAM DO
**OCCUPATION:** Fiber Optic Communications

**CHIEF COMPLAINT**
**CHIEF COMPLAINT:** Doctor recommended follow up from previous examination,    Reports headaches, Eye Strain / Fatigue.

**HISTORY PRESENT ILLNESS (HPI)**
**VISION COMPLAINT:** With current spectacle correction  An ongoing problem with vision persists.  Vision difficulties are long-standing.  Eyes fatigue easily.  Headaches persist.  Eye-strain is common.  Able to watch some TV. The Ha's seem better, but still gets them. Double vision at times near to intermediate range. Speech is slowed at times especially when he has a HA. Depth perception is still off a little stairs are still tough. Indoor lights are still bothersome. Crowds are still too busy for him.

**PATIENT HISTORY**
**OCULAR HISTORY:** No ocular history exists except:  OK (None).
**MEDICAL HISTORY:** No medical history exists except:  Anxiety disorder,  Concussion,  Depression, Headaches,  Motor Vehicle Accident, 02/2018.
**SYSTEMIC SURGICAL HISTORY:** No systemic surgical history exists except:  Hernia repair, 2017, Tonsilectomy, 1970.
**SYSTEMIC FAMILY HISTORY:** No pertinent medical history exists..
**OCULAR SURGICAL HISTORY:** No pertinent past ocular surgical history exists.
**OCULAR FAMILY HISTORY:** No ocular family history exists except:   Family history is reported to be unremarkable..
**OCULAR MEDICATIONS:** No reported ocular medications.,  No known ocular medication allergies.[ALLERGIC].
**SYSTEMIC MEDICATIONS:** No systemic medications are currently taken except:  Aleve,  Aspirin, Tylenol,  Penicillin[ALLERGIC].
**SOCIAL HISTORY:** No tobacco use reported,  Alcohol, infrequent, social use only,  No reported use of narcotics.
**REVIEWED HISTORY:** I have reviewed this patient's previous exam records.
**THERAPEUTIC SIDE-EFFECTS:** Bilateral: No out-of-the-ordinary symptoms are experienced.

**REVIEW OF SYSTEMS**
**REVIEW OF SYSTEMS:** No reported disorders or current medical treatment of:  Allergy  Cardiovascular  Constitutional  Ears,nose,mouth,throat  Endocrine  Gastrointestinal  Genitourinary  Hematologic / Lymphatic  Immunologic  Integumentary / Skin  Musculoskeletal  Neurologic  Psychiatric  Respiratory
**ALLERGY:** See patient history for detailed allergy information.

1

**Lincoln/Bunch 0964**

**MUSCULOSKELETAL:** Muscle pain.
**NEUROLOGICAL:** Headache.
**PSYCHIATRIC:** Anxiety disorder. Depression.
**REVIEWED ROS:** I have reviewed this patient's ROS encounter form.

### PRESENTING FINDINGS
**PRESENTING SPECTACLE Rx: (#1)**
 RT:    Plano Sph.
 LT:    Plano Sph.

### VISION
**NOTES:** OD prism 0.12 @ 165
 OS prism 0.12 @ 165
 Taped onto safties and sun
**FINAL SPECTACLE Rx:**
 RT:    Plano Sph.
 LT:    Plano Sph.
 NOTES: Tape 0.50 DOWN OU on safety
**TRIAL CONTACT LENS Rx: #1**
 RT:    BIOFINITY 6PK  -2.25  BC: 8.6  Dia: 14.0  Handling Tint
 LT:    BIOFINITY 6PK  -2.25  BC: 8.6  Dia: 14.0  Handling Tint
**TRIAL CONTACT LENS Rx: #2**
 RT:    BIOFINITY 6PK  -2.00  BC: 8.6  Dia: 14.0  Handling Tint
 LT:    BIOFINITY 6PK  -2.00  BC: 8.6  Dia: 14.0  Handling Tint
 NOTES: Trial fit #2.

### IMPRESSION(S):
Convergence insufficiency
Headache
Pursuit eye movement disorder
Visual perceptual disorder
Dizziness
Diplopia
Vertical heterophoria
Condition has improved
Bilateral: Visual discomfort

### PLAN
**SPECTACLE PLAN:** Tape 0.50 DOWN OU on safety
**CONTACT LENS PLAN:** Continue current lens modality.  Disposable soft lens.  Sphere.  Change distance
power.  Trial lens dispensed.
**TREATMENT VISUAL EFFICIENCY:** Patient has a visual perceptual disorder. This disorder causes
difficulties with eye teaming, focusing, pursuits and saccadic eye movements, and sensory integration. One
or more of the following treatment techniques will be utilized. Prism, yoked prism, sensory integration
exercises, peripheral occulusion techniques, refractive error correction, and tint. Bean bag toss sitting

### PATIENT MANAGEMENT
**COUNSELING:** Counseling has been provided to review this patient's case and discuss options for
treatment.
**TIME-ESTIMATE:** Doctor face-to-face with patient   25 minutes.  Counseling and/or Coordination of Care.
10+ minutes.
**ORDERS:**
 Recall on or about 10/21/2018:  Examination: Progress Evaluation  Ordered by: Saxerud, OD, Michael H.
Entered by: Saxerud, OD, Michael.  [Active] on 09/21/2018 By Saxerud, OD, Michael.

**ELECTRONIC SIGNATURE:** Electronically Signed By: Michael H Saxerud, OD on 09/21/2018 11:27 AM.

2

Sent to OC
10/05/2018
by PM LLC

**Lincoln/Bunch 0965**

**DIAGNOSIS:**
F07.81 Postconcussional syndrome
H53.15 Visual distortions of shape and size
G44.321 Chronic post-traumatic headache, intractable
H53.2 Diplopia
R42 Dizziness and giddiness
H55.89 Other irregular eye movements
H51.11 Convergence insufficiency
H50.53 Vertical heterophoria
R26.89 Other abnormalities of gait and mobility
H53.143 Visual discomfort, bilateral
**PROCEDURE:**
99214 Exam Comp. Established
92065 Therapy-Orthopics
1036F Current Tobacco Non-user
G9903 Patient Screened for Tobacco Use, Non Tobacco User

**Completed Exam:** _____     Date: 09/21/2018
                        Michael Saxerud OD

3

Sent to OC
10/05/2018
by PM LLC

**Lincoln/Bunch 0966**



## Gleneagle Vision Center

## Auxiliary Testing Form- Follow Up

Patient: Mark Bunch　　　　Date: 9-21-18

Referred by:_____　Atty: Ken Shakeshaft

Injury Date:_____　Injury Type:_____

Hx　　　　　　　　　　　　　　Start Time:_____

**Pursuit Eye Movements**　　□ Smooth　　☒ 3 4 +losses

**Near Point of Convergence** 15 L　　□ Normal　　□ Reduced

**Maddox Rod**

**Oscillopsia**　　☒ Present　　□ Absent

**Prism Trials**　　OD 0.5 /\n　　OS 0.5 /\n

**Final Rx**　　OD　　OS Topcal solution

**Order Prism Glasses** □ Yes　　□ No

**RTC**　　☒ 1 mo　　□ 3 mo　　□ 6 mo　　□ 1yr　　□ Other

End Time:_____

Face to Face Time:_____minutes

| Procedure Codes: | 99203 | 99204 | 99205 | 92015 | 92060 |
|---|---|---|---|---|---|
| | 99212 | 99213 | (99214) | (92065) | |

Sent to OC
10/05/2018
by PM LLC

**Lincoln/Bunch 0967**



Glencagle
Vision Center

## Visual Symptoms – Follow Up

Patient: Mark Bunch                    Date: 9-21-18

| Directions: For each of the following questions, please check the answer that best describes your situation **with your current glasses on.**<br><br>Daily = Everyday<br>Frequently = At least 1 time per week<br>Occasionally = Less than 1 time per week<br>Never | DAILY | FREQUENTLY | OCCASIONALLY | NEVER |
|---|---|---|---|---|
| Do you experience headaches? | | ✓ | | |
| Do you experience double vision or overlapping (ghost) images? | | | ✓ | |
| Do you experience blurry vision at distance? | | | ✓ | |
| Do you experience blurry vision at near? | | ✓ | | |
| Do words move around the page when you try to read? | | | ✓ | |
| Do your eyes tire easily while reading or using the computer? | | ✓ | | |
| Do you blink frequently to clear your vision? | | | | ✓ |
| Do objects appear suddenly in your peripheral vision? | | | ✓ | |
| Do you experience dizziness or vertigo? | | | | ✓ |
| Do you have difficulties with your balance? | | | | ✓ |
| Do you drift to the left or right while walking? | | | | ✓ |
| Do you have difficulties with stairs or uneven ground? | | ✓ | | |
| Do you have neck or shoulder pain/discomfort? | | | ✓ | |
| Do you experience discomfort in crowded spaces? | | | | ✓ |
| Does riding in a car cause uneasiness or anxiety? | | | | |
| Do you have difficulties driving a car? | ✓ | | | |
| Are you sensitive to sunlight? | | | ✓ | |
| Are you sensitive to indoor lights? | | ✓ | | |

Sent to OC
10/05/2018
by PM LLC

**Lincoln/Bunch 0968**

04/25/2019  15:22    7196350966

PAGE 37/74

| DOB: | Name: Mark Bunch |
|------|------------------|
| SS #: | Address: |
| Date/Injury: 02/13/18 | |
| ██████████ | Phone:<br>Nikki -- Fiancée |
| ██████████ | Email: |

**Workers' Compensation Carrier**
ESIS
Landon Wallis, Senior Claims Representative
Claim No.: 2D338776817591
P.O. Box 6569
Scranton, PA 18505-6569
Office: 303-728-9013
Fax: 800-208-8281
landon.wallis@esis.com

HGP MVA 2/13/818

Emailed PPW 5/31/18

**Lincoln/Bunch 0969**



**Gleneagle Vision Center, P.C.**
**Registration Form**

**Patient Information**
Patient's Legal Name: Merk Bunch                     Today's Date: 6 20 2018

Nick Name:_____ Date of Birth:_____ ____Age:____ __

Sex: ☑M ☐F     ☐Mr. ☐Ms. ☐Mrs. ☐Miss     SS# (for billing purposes):_____

Street Address:_____

City:_____ State:_____ ____Zip Code:_____

Home Phone #:_____Cell Phone #:_____

Work Phone #:_____Email:_____

Preferred Contact (circle one): Cell  Home   Email   Other

**Insurance Information**
Primary Medical Insurance: work com p

    Subscriber Name:_____ Date of Birth:_____
    SS# (for billing purposes):_____-____-____ Policy #:_____ Group # (optional):_____
    Relationship to Subscriber (circle one):     Self     Spouse     Child     Other

Secondary Medical Insurance:_____

    Subscriber Name:_____Date of Birth:_____
    SS# (for billing purposes):_____-____-____ Policy #:_____ Group # (optional):_____
    Relationship to Subscriber (circle one):     Self     Spouse     Child     Other

Vision Insurance (circle one):     VSP     EYEMED

    Subscriber Name:_____Date of Birth:_____
    SS# (for billing purposes):_____-____-____ Policy #:_____ Group # (optional):_____
    Relationship to Subscriber (circle one):     Self     Spouse     Child     Other

**Release of Information**
I authorize the release of information (including the diagnosis, records, examination rendered to me and claims information) to be released to the following*:
☐Spouse:_____☐Other:_____

☐Child(ren):_____☐DO NOT release my information to anyone

**Messages**
If unable to reach me:
☐You may leave a detailed message
☐You may leave a brief message asking for a call back

*The release information and method to reach me will remain in effect until terminated by me in writing.

Patient/Guardian Signature:_Mark Bunch_____ Date: 6/20/18

Sent to OC
08/30/2018
by PM LLC

Lincoln/Bunch 0970



Michael Saxerud, O.D.
Gail Saxerud, O.D.

## ESTABLISHED TBI PATIENT CHECKLIST

Exam Date __8-17-18__

Patient Name __Mark Bunch__      Date of Birth _____

**Attorney**      Yes      No
Name and Phone _____

**Referred By**
Name and Phone _____

**Payor Source**

**Medical Insurance**      Yes      No
Name _____ Policy # _____ Group # _____

**Vision Insurance** (For glasses only)      Yes      No
Name _____ Policy # _____ Group # _____

**Auto Insurance**      Yes      No
Company Name _____ Claim # _____
Phone _____ Contact Person _____

**Medical Lien/Finance Company**      Yes      No
Company Name _____
Phone _____ Contact Person _____

**Work Comp Insurance**      (Yes)      No
Company Name __ESIS__      Claim # __2D338T7U8M591__
Phone _____ Case Worker __Landon Wallis__

---

**NOTES:** _____
_____
_____

---

**Today's Visit:**

| | | |
|---|---|---|
| Exam/Service Fees: | $_____ | Refraction: | $_____ |
| Copay: | $_____ | Material Fees: | $_____ |
| Past Due Balance: | $_____ | Total Due: | $_____ |
| Total Paid: | $ ∅ | Balance Due: | $_____ |

Check / Cash / Visa / MC / Discover / AmEx

15435 Gleneagle Dr., Suite 110 | Colorado Springs, CO 80921
Phone: 719.884.8480 | Fax: 719.884.8483

Sent to OC
08/30/2018
by PM LLC

**Lincoln/Bunch 0971**



Michael H. Saxerud, O.D.
(719) 594-2020

9475 BRIAR VILLAGE POINT, SUITE 200
COLORADO SPRINGS, CO 80920

WWW.PINECREEKVISION.COM

November 21, 2018

RE: Mark Bunch, DOB

To whom if may concern;

Mark continues to make steady progress under my care for his visual perceptual disorder.
While his depth perception and eye movements are improving, his continues to have
difficulties in these areas.  I am hopeful that in the next couple of months we will be able
to say that Mark will once again be safe to drive a vehicle and to return to work on at
least a part time basis.  Until that time however, Mark is not ready to return to those
activities.  If you should have any questions regarding my care of Mark, please reach out
to me.

Sincerely,

Michael Saxerud, O.D.

**Lincoln/Bunch 0972**



**COLORADO SPRINGS
PSYCHOLOGICAL
CENTER**

ANTHONY M. RICCI, PhD, ABPP, PC
5085 List Dr. Suite 110
Colorado Springs, CO 80919
(719) 594-4407
Fax (719) 594-4409

LICENSED PSYCHOLOGIST. #416
DIPLOMATE, REHABILITATION PSYCHOLOGY
AMERICAN BOARD OF PROFESSIONAL PSYCHOLOGY

PSYCHOTHERAPY AND PSYCHOLOGICAL EVALUATIONS
STRESS AND PAIN MANAGEMENT
VOCATIONAL AND REHABILITATION SERVICES
BIOFEEDBACK • HYPNOSIS • EMDR II • TIR• TFT
DISABILITY EVALUATIONS
SPORTS PSYCHOLOGY

September 25, 2018,

Kenneth J. Shakeshaft, Esq.
Shakeshaft-Gorman Law Firm, LLP
1935 Jamboree Dr., Suite 202
Colorado Springs, CO  80920

RE:    Mark Bunch
DOB:
SSN:
DOI:   MVA 2/13/18

### Initial Rehab Psychology Evaluation and Concussion Review

Dear Mr. Shakeshaft,

Thank you for the referral of Mark Bunch for further evaluation and treatment subsequent to his 2/13/18 MVA.

Mr. Bunch presented for initial interview and completed screening psychological testing. He returned to review the results of the testing to help formulate diagnostic impressions and treatment recommendations, which are enclosed.

We have reviewed a number of prior evaluation and treatment summaries accompanying the referral, and the additional report authored by Thomas Higginbotham, D.O.

Mr. Bunch's brief description of his reason for presentation to our office is "TBI after car accident, emotional changes, bad headaches, double vision, can't sleep, irritability, anxiety".

#### Pertinent Background and Behavioral Observations

Mark Bunch presented for initial interview on 8/30/18. He was driven to the appointment. He wore prism lenses fit into safety goggle glasses. He ambulated slowly and guardedly from the waiting to the interview area, and to the testing area. He appeared to favor

**Lincoln/Bunch 0973**

Kenneth J. Shakeshaft, Esq.
RE: Mark Bunch
9/25/18
Page 2

to the right when walking. His speech was halting, and at times difficult to comprehend, but he was responsive and cooperative during the directed interview. He was oriented in all spheres, and in my opinion a credible informant for available information. He understood the nature of the referral and that therapy would not be provided.

Mr. Bunch reported that the motor vehicle accident occurred on 2/13/18 while he was driving home from Lamar, Colorado in his personal vehicle. He parenthetically indicated that he performs outside sales in various cities throughout Colorado, and it is not atypical for him to travel to Lamar, Durango, Leadville, LaJunta, and Rocky Ford. The accident occurred in the evening while he was driving to Pueblo on I-25, turning onto Highway 50 westbound. Another vehicle also driving on Highway 50 westboud changed lanes, and then backed into his car. His vehicle was impacted, and he recalled stomping on the brakes before impacting his cranium. At the time he was dazed and wasn't quite certain about what had happened. He noted that the light turned green, and then the other driver appeared to leave the scene of the accident, and chased him until he stopped. He then called 911 and parked his vehicle in the Loaf n Jug lot and waited until assistance personnel arrived on the scene. He does not have much additional recall of the following events, and the sequencing appears difficult and incongruous. He did indicate after the Pueblo Police arrived on the scene they called his office, and his employer came to the scene and elected to transport him to the Emergency Department. He was taken by his boss to Parkview Hospital, and at the Emergency Department he collapsed when he exited his vehicle. He recalls that he was assisted into the Emergency Department, and was evaluated with CT-scans (?) of the head and neck, and kept for observation for about 6 to 7 hours.

During the course of our discussion Mr. Bunch continued to present with intermittent speech disarticulation, emotional lability, and difficulty with describing the sequence of events.

At the Emergency Department he is uncertain whether he was provided medication, and also uncertain about treatment. He recalls being advised that he had experienced a moderate concussion, and also had neck symptoms that he couldn't recall.

He noted that his employer drove him home, and his employer's wife drove his car to his house. The next day he was required to present for a drug screening evaluation in Canon City, and this was clean. He notes that even though he was driving his own vehicle he was considered to be at work because this is a normal routine for his employment activity.

After the Emergency Department he initially consulted with Dr. Olson, who made a referral to Dr. Higginbotham and another to Dr. Christianson (chiropractor). He voices frustration in that he has just recently been approved to see Dr. Christianson. He feels that his treatment continuity has been delayed. He is still awaiting other referrals, and he recalls that he started physical therapy in Canon City.

Recently he has been evaluated by Dr. Mike Saxerud (neurooptometry) on referral by Dr. Higginbotham. Dr. Saxerud noted a trauma vision presentation with midline shift and provided prism therapy protocol. He consulted with Dr. Saxerud again, and was provided a second set of prisms about a month ago.

Lincoln/Bunch 0974

Kenneth J. Shakeshaft, Esq.
RE: Mark Bunch
9/25/18
Page 3

He was feeling irritable, emotional, and significantly impaired following the accident, and was referred to Dr. Staudenmayer, a psychologist. He feels that this treatment has not been helpful, in that Dr. Staudenmayer has been focusing on events related to issues when he was 8 years old.

An additional complication is that the day after the accident, on St. Valentine's Day, he was scheduled to fly to Hawaii to marry his fiancé. He couldn't go due to his medical condition, and are still involved in a relationship, but feels that the relationship is now "rocky" due to his changes.

As a part of the evaluation process he was referred to Dr. Helffenstein for neuropsychological testing, and due to his struggles to read, the testing was invalid. He was advised that he may have presented too early for the evaluation. Following the testing failure Dr. Higginbotham referred him for neurooptometry evaluation.

In direct questioning about the issues with Dr. Staudenmayer, he notes that Dr. Staudenmayer has indicated that his current problems are generated from issues secondary to his falling in a well as an 8 year old. He acknowledges that when he was 8 years old he fell into a dry well and fractured his arm. He notes that he hadn't thought about the well incident in decades, and now is frustrated because Dr. Staudenmayer appears to only want to talk about those issues.

Apparently, the Workers' Compensation carrier has also developed a surveillance program, and sent a video of him to your office and to Dr. Higginbotham. He thinks that the medical/legal issues are complicated because his recent wages were high and he has lost a great deal of earning power. He notes that the third party had limited liability coverage, and he has uninsured and underinsured motorist coverage.

Mr. Bunch reported that he has worked for the current employer for about 2 years. Before then he was in healthcare and performed pharmaceutical sales from 1997 to 2007. At that time his mother became ill, and he was her primary care provider, and changed his employment to Health South (Rehabilitation Hospital in 2007) as Marketing Director. His mother worsened, and passed in 2007. She was provided services by Evercare Hospice, and he worked with them as Director of Business Development in sales and marketing. He continued his employment with Evercare until 2014, and was briefly employed at Goodwill Industries in Colorado Springs as a Sales Manager, and then changed jobs to Fiber Optics Communications prior to his current outside sales employment.

He had also previously worked for The State Department of Corrections from 1987 to 1996, and before then he performed a number of odd jobs in the restaurant industry.

Mr. Bunch indicates that he completed his undergraduate degree at USC Pueblo in 1986, and also completed a Masters in Business (Organizational Management) in 2000 at the University of Phoenix.

**Lincoln/Bunch 0975**

Kenneth J. Shakeshaft, Esq.
RE: Mark Bunch
9/25/18
Page 4

He was born in Canon City and attended schools there. He graduated high school in 1982, and attended college in Pueblo. He has an older sister and a brother. His father passed in 2010 under his hospice care. He was initially married in 1990 for about 7 years and divorced. His wife also worked with The Department of Corrections, and she's till employed there.

He has not been involved in other motor vehicle accidents. He played Varsity Football and was a Linebacker. He did not play college football. While at The Department of Corrections he was stabbed by an inmate in the leg and side, and required 20 to 30 stitches. He thinks this event occurred in 1990. He was off work for 3 days at that time. He had other time off for treatment, and returned to work. He did not have any untoward psychological issues associated with that event and did not require psychological or psychiatric treatment. He has never had other psychological or psychiatric care.

He is frustrated at his current circumstances and reported that he feels that the Workers' Compensation carrier is delaying services, and not paying his bills, to try to get him to harm himself. He notes that recently referrals are finally being approved, and he's waiting for a neurology referral requested by Dr. Higginbotham. On direct examination he reported that his outside sales activity requires him to drive his personal vehicle to sometimes distant communities to perform his sales work, and then drive back, usually at night. The activity is very exhausting, and he reiterated that at the time of his current accident he was returning from Lamar in the dark. He now has difficulty with a number of visual processing patterns, and is not able to drive.

**Psychological Test Results**

The screening psychological testing is helpful in specifying Mr. Bunch's clinical presentation, and with differential diagnosis.

Noteworthy is that when completing the Patient Information and Services Agreement Form, Mr. Bunch had difficulty staying within the lines in his writing, and this was also in evidence in his completion of the screening psychological testing. In reviewing and discussing these issues, he noted that despite the vision prism correction he still has difficulty with the process of writing and reading.

**Beck Depression Inventory II**

The BDI-II indicates current occupation as Outside Sales, with current disability status. His education includes B.A. from USC Pueblo, and a Master's in Business from University of Phoenix.

He indicates a total score of 27, and specifies MVA injury considerations. This is an improvement over prior BDI-II testing.

Lincoln/Bunch 0976

Kenneth J. Shakeshaft, Esq.
RE: Mark Bunch
9/25/18
Page 5

He has a feeling of sadness much of the time due to the changes. He's discouraged about his future due to the current situation.

He reports that he gets very little pleasure from the things that he used to enjoy, such as reading and performing a number of physical activities and routines with his fiancé, Nikki, including hiking. He indicates that he can't do hardly any physical routines anymore because he has a feeling of being unsteady.

He reports feeling guilty because he moved the wedding from the 10th of February to the 14th, wanting it to be on Valentine's Day. Since the accident has occurred he has had significant regrets.

He has a feeling of being punished, noting that he feels that the Workers' Compensation carrier wants him to die. He has lost confidence in himself due to the changes. He is more critical and intrapunative in his personal social relationships. He struggles with most routines.

He's more emotional than he used to be, and has a feeling of being restless and agitated to the point that it's hard to stay still. He does not describe formal RLS.

He has less interest in other people or things, and has become reclusive. He has difficulty making decisions. He doesn't consider himself worthwhile and useful due to the changes. He has less energy than he used to have, and he notes that his sleep patterns have been altered with both onset and duration difficulties. He indicates that the Flexeril prescribed by Dr. Higginbotham appears to be helping with onset, but not duration.

He is more irritable than usual. He feels it and Nikki has indicated that this is the case. His appetite is reduced, and he is uncertain about current mass loss. He finds it hard to keep his mind on anything for very long, and is too tired or fatigued to do most of the things that he used to do. He is less interested in sex than he used to be due to his inability to concentrate and focus.

**Beck Anxiety Inventory**

The BAI presents a total score of 23, and specifies a situational anxiety pattern with moderate and mild considerations.

He indicates moderate inability to relax, noting that he currently hates all driving and riding factors. He is currently not driving.

He has a feeling of being dizzy and lightheaded secondary to vision changes, indicating that this is somewhat improved following the prism therapy, but not entirely resolved. He has a feeling of being unsteady on his feet when walking and moving, and also emotionally. He is nervous, and much more so on the road. He has developed a tremulousness with specific left

**Lincoln/Bunch 0977**

Kenneth J. Shakeshaft, Esq.
RE:  Mark Bunch
9/25/18
Page 6

hand movement, noting that there has been some improvement in this condition.    He has a
feeling of being shaky and fear of losing physical control.  He is scared in all road situations.

He indicates mild numbness and tingling sensations, initially in his little and ring finger.
He has hot feelings and wobbliness in the legs due to CNS considerations.

He describes mild heart pounding and racing sensations secondary to anxiety, some
indigestion and abdominal discomfort with headache patterns, face flushing and sweating not
due to heat.

**Pain Questionnaire**

The Pain Questionnaire presents a specific protocol which is usually a positive prognostic
indicator.

He describes the presence of left frontal and top of cranium headache pattern, and the
pain occasionally radiating into his ears.  There is also a headache sensation behind the ears that
is more left sided than right, and he indicates continuous interference with peripheral vision.

He reports cervical pain that also moves into the top of the left shoulder, and he describes
a TOS  type of sensation associated with reaching.  His chiropractor Dr. Mike Christianson just
started treating for the problem.  He reports numbness down the little and ring finger, and
described as an ulnar nerve pattern problem by Dr. Christianson.

He indicates mid thoracic hyperextension pain features, and low back pain without LE
radiating sensation.

He rates his pain perception 5/10.

**Neuropsychological Symptom Checklist**

The NSC indicates his primary care physician as Dr. Olson, which whom he treated
initially, but not recently since being referred to Dr. Higginbotham since the injuries were
determined to be work related.

Mr. Bunch indicates that following the motor vehicle accident he immediately lost vision
at the time of the event, noting that it felt like a T-shirt had been placed over the left eye.  There
has been some improvement, and the vision therapy is helpful, but he still has significant
difficulties now apparently associated with the headache pattern.

**Lincoln/Bunch 0978**

Kenneth J. Shakeshaft, Esq.
RE:  Mark Bunch
9/25/18
Page 7

He indicates the presence of blurred vision, double vision, loss of vision, blank spots and flashing lights in the field of vision, all related to the motor vehicle accident.

Since the MVA he has experienced significant tinnitus, noting that it's hard to tell whether it's left or right sided.

Since the accident he's experienced muscle weakness in the arm, and trouble walking, coordination and balance problems associated with CNS process, and not LE peripheral weakness issues.

He describes the prior reviewed pain and headache patterns, and indicates memory issues related to incidental and working memory difficulties.

It appears to him that he can't think as quickly as before, finds it hard to think clearly, is more easily distracted, can't concentrate, and has trouble with common sense processing. He notes that he has particular difficulty with processing and sequencing events.

It appears to him that he has trouble using tools, remembering the right word when talking, following conversation, particularly in restaurants, specifying that he overhears other people's comments which creates difficulties with concentration. He is describing hyperacusis and confirms this feature in our discussion.

One of the issues that he describes as having trouble with common sense is that he was in his house and it started to rain, and he knew that his fiancé had left her windows open, and even though his standard response would be to close the windows at the start of the rain, he forgot to do this and this created additional difficulties between them.

He describes a number of mood and personality changes, including sadness, depression, stress, tension, anxiety, anger and irritability, worry and guilt, change of attitude, and loss of interest.

He endorses affirmative for head injuries associated with the 2/13/18 MVA. He also acknowledges that fell in a well as an 8 year old and fractured the left arm at the elbow, but he was not diagnosed with concussion. He reiterates that part of his injury pattern is that while he was at DOC he was stabbed in 1990 in several places on the left side.

He is surgically positive for stitches associated with the DOC stabbing; tonsillectomy, and umbilical hernia repair in 2017.

He reports that he has never utilized alcohol nor tobacco, and current prescription and over the counter medication includes Elavil, Flexeril, and a cream that Dr. Higginbotham prescribed for cervical and left upper arm pain.

**Lincoln/Bunch 0979**

Kenneth J. Shakeshaft, Esq.
RE:  Mark Bunch
9/25/18
Page 8

**Mooney Problem Checklist**

The adult form of the Mooney Problem Checklist indicates occupation as Outside Sales, marital status as divorced, and no children. He reports a number of health, self improvement, financial, and personal considerations.

He expresses concerns about having a permanent illness or disability, trouble with headaches, muscular aches and pains, wanting to improve his mind, trouble with is speech, trouble understanding what he reads, sometimes acting childish and immature, feeling blue and moody, unable to discuss problems at home, occasional pressure pain in his head, not getting enough rest or sleep, worried about security in his old age, spending too many evenings at home. Also his mind is constantly wandering. He's constantly worrying. He indicates that he's afraid of losing his job.

He indicates a summary of additional problems as "Since my accident I have double vision, headaches, trouble sleeping, trouble concentrating, loss of memory, agitation, and irritable, trouble eating, constant ringing in the ears".

A summary of what he considers to be his chief problems is "Unsteady walking, difficulty reading, irritable, trouble concentrating and reading, constant ringing in the ears, can't tolerate fluorescent lighting".

He indicates affirmative in reviewing the matters professionally, specifying "Yes please".

**Adult Neuropsychological History Questionnaire**

The brief form of the Adult Neuropsychological History Questionnaire completed by Mr. Bunch indicates his primary language as English, and secondary language includes some Spanish without fluency. He is right hand dominant.

He indicates medical diagnosis as moderate concussion, and cervical sprain.

He indicates referral for this evaluation by your office, noting that "Since the accident I have memory loss, speech and vision problems, ringing in ears, headache, and emotional problems".

He is interested in having the evaluation address issues with concentration, sleeping, and being irritable and anxious.

Mr. Bunch specifies a high number of problem solving, speech and language, concentration, memory, motor coordination, and sensory changes previously specified. He reports that the experience of dizziness, nausea, excessive fatigue, and a feeling of being sad and

**Lincoln/Bunch 0980**

Kenneth J. Shakeshaft, Esq.
RE: Mark Bunch
9/25/18
Page 9

depressed, anxious, nervous, with difficulty sleeping, much more emotional, difficulty being spontaneous, and loss of interest in sexual activity.

He indicates that he feels that there is definitely something wrong with his presentation.

His specification of the problem solving, speech and language, behavioral, concentration and awareness is suggestive of frontal dysexecutive syndrome.

He indicated physical changes associated with headache, dizziness, nausea, and excessive fatigue.

**Review of Prior Evaluation and Treatment Summaries**

The file contains a number of prior evaluation and treatment studies provided by your office.

The file contains a General Admission of Liability signed by Landon Wallis, dated 5 March 2018, specifying that the employer is Charter Communications, with undetermined medical benefits and Temporary Total Disability. Attached to this admission is apparent correspondence directed at the Workers' Compensation carrier from Bob Cortez, Direct Sales Supervisor, indicating that he received a call and drove to the scene of the accident. He noted that the other driver had received a citation, and that when Mark got out of his vehicle he was wobbly on his feet and unsteady. He assisted Mark to the vehicle and drove him to the Emergency Room. He specifies that Mr. Bunch pretty well collapsed when they got him out of my vehicle, and the Emergency Room staff brought a wheelchair up for him.

The file also contains a photograph taken at the scene, apparently by Mr. Bunch's supervisor, specifying the cranial facial injuries.

The file contains a number of summaries, including a New Patient Evaluation compiled by Thomas Higginbotham, D.O.

The New Patient Evaluation completed on 5/3/18 specifies that Mr. Bunch was referred to his office by Steven Olson, M.D. at Centura Health Primary Care. The referral is for evaluation of traumatic brain injury.

Dr. Higginbotham's summary of mechanism of injury is specified and descriptive of events. It is congruent with presentation to our office. He reviews medical records, and past medical history provides a summary of various screening testing, including physical examination.

He provides an assessment of history of work related motor vehicle accident with head trauma without loss of consciousness. He also specifies post concussion sequelae with spatial

**Lincoln/Bunch 0981**

Kenneth J. Shakeshaft, Esq.
RE: Mark Bunch
9/25/18
Page 10

disorientation, imbalance, cervicalgia, headache, tinnitus, cognitive difficulties, and sound and light sensitivity. His plan is to complete the physical examination and process referrals for neurology and neurooptometry review.

Mr. Bunch is also to continue to attend physical therapy, and he plans to obtain a copy of the neuropsychological evaluation. He does not endorse him to drive, and he cannot attend to his usual work responsibilities.

Review of additional documentation by Dr. Higginbotham indicates a neurooptometry request, dated 5/3/18; Physician's Report of Workers' Compensation Injury, dated 5/10/18, specifying medical related diagnoses of TBI post MVA and related medical conditions. A Follow Up Noted, dated 5/10/18, by Dr. Higginbotham indicates pending neurology and neurooptometry consultation and Mr. Bunch is unable to return to work.

A 5/22/18 note by Dr. Higginbotham specifies continuing posttraumatic headache; muscle tension headache; closed head injury with sequelae; visual spatial disorientation; cognitive changes unspecified; cervicalgia; cervical strain; thoracalgia; thoracic strain; and he remains off work.

A 6/5/18 note by Dr. Higginbotham indicates that a number of issues have developed in Mr. Bunch's care with treatment having been stopped by the Workers' Compensation carrier. This appears to be related to confusion in treating providers, and the presentation of video surveillance involving Mr. Bunch driving about half a mile from his home to a grocery store, and back. He was accompanied to the appointment by his fiancé.

There is a feeling by Mr. Bunch and his fiancé that they are victimized, and in an adversarial relationship with the claims adjuster's action and private investigation. There is a significant undertow of distrust.

He is responsive to the anti-inflammatory muscle relaxant medication, and had good result from the osteopathic manipulative treatment. There is a continuing impression of history of head trauma with emotional behavior disturbances and changes; neurocognitive disorder; visual difficulties with spatial disorientation. He also continues to present with cervicalgia, cervical strain, cephalgia in combination with myofascial tension and posttraumatic situational adjustment reaction with anxiety and depressed mood. An attempt to refer directly to Dr. Blair's office was unsuccessful due to Dr. Blair's refusing to work with Workers' Compensation claims secondary to lack of reimbursement.

In Dr. Higginbotham's notes there is an extensive 7/23/18 email generated by Nikki Giordano specifying her concerns about Mr. Bunch's behavior struggles and her perception of his anger, depression, frustration, and despondence. A Follow Up Note by Dr. Higginbotham, dated 7/31/18 indicates Mr. Bunch presenting with his fiancé and having received correspondence from Dr. Staudenmayer, Psychologist, for an appointment to be scheduled on 8/6/2018. He is also awaiting correspondence from neurooptometry review with a phone

**Lincoln/Bunch 0982**

Kenneth J. Shakeshaft, Esq.
RE:  Mark Bunch
9/25/18
Page 11

specification that the symptoms are definitely related to head trauma secondary to the Workers' Compensation MVA.

He is continuing physical therapy and awaiting authorization for speech/cognitive therapy, as well as authorization for neurology. There is a persistence of symptoms, and he is wearing prism lenses with incomplete correction.

He continues with similar diagnostic impressions.

Dr. Higginbotham specifies that on 8/14/18 Mr. Bunch returns for follow up of injuries unaccompanied. He has consulted with Dr. Staudenmayer for initial evaluation, and is scheduled for follow up review. Dr. Higginbotham notes the psychologist's opinion that there is a rekindling of PTSD of prior life experiences from the motor vehicle accident. It was noted that his assessment did not preclude a head injury, and noted this would have to be assessed by his doctors. There is a follow up appointment in one week. There is a discussion with Mr. Bunch about the psychological opinions. Mr. Bunch feels that the testing responses were erroneously interpreted to lead to diagnosis of PTSD for issues secondary to falling in a dry well as an 8 year old.

There is an August 20, 2018 letter to Attorney Eric Pollard, clarifying impressions regarding psychological findings, and unrelated issues. He reiterates the referral for neurology consultation, and a recommendation for psychological/neuropsychological assessment, and an indication of request for further neuropsychological assessment when Mr. Bunch stabilizes with emotional/behavioral experiences related to the injury. The file was recently amended to include an 8/28/18 Follow Up Note authored by Dr. Higginbotham, specifying Mr. Bunch continues with neurocognitive, visual/spatial, and emotional/behavioral sequelae of his injury. Neurocognitive sequelae appears to be somewhat improved, and he continues with complaints of double vision, blurred vision, and spatial disorientation. There is a strong undercurrent of anxiety in recounting his experiences, and he is not in agreement with the psychological recommendation of his problems being related to the trauma as an 8 year old. There is a continuing problem with headaches, photosensitivity, tearing in the eye, and squinting in the left eye, and a continuing request for neurological consultation. Symptoms impression continue as previously indicated.

The file contains a St. Thomas More Outpatient Rehabilitation Center Physical Therapy Evaluation, encounter date of 5/4/2018, specifying that Mr. Mark Bunch has been referred to their office by Steven Wayne Olson, M.D. An objective report by Mr. Bunch is that he presents with cervical pain and stiffness. He was involved in a head- on motor vehicle accident with loss of equilibrium and balance, and nausea. He is currently experiencing constant headache, which has remained since the motor vehicle accident. With headache the vision of the left eye looks as if it's looking through a T-shirt, murky, and light. He also reports tunnel vision and tinnitus. Aggravating factors are fatigue, and lights. Objective assessment is: A 54 year old male presents for therapy with acute and chronic cervical pain, muscle restrictions post MVA. Patient presents with pain dysfunction, decreased strength, decreased range of motion, decreased flexibility, impaired posture/body mechanics. Patient would benefit from skilled physical therapy

Kenneth J. Shakeshaft, Esq.
RE: Mark Bunch
9/25/18
Page 12

addressing impairment of function and limitations listed above. He noted that he had an cranial MRI, dated 3/19/19, with impression of mild white matter disease, possibly from Multiple Sclerosis.

There is a Follow Up Note, dated 5/31/2018, describing treatment and mild improvement of symptoms.

Accompanying the file is an 8-hour neuropsychological screening report, authored by Dennis Helffenstein, Ph.D., dated 6/1/18 for dates of service 5/3/18 and 5/18/18, specifying referral information with similar background history provided to Dr. Higginbotham and our office; an unremarkable background history; and interview, as well as records review.

Dr. Helffenstein attempted testing on 5/18/18 and Mr. Bunch was unable to complete the validity profiles at a level to continue with the testing.

Dr. Helffenstein makes a DSM5 diagnosis of mild neurocognitive disorder due to traumatic brain injury behavioral disturbances, and these include irritability, reduced stress tolerance, and anger outbursts. A secondary diagnosis of depression disorder due to traumatic brain injury is assigned as is posttraumatic stress disorder.

An Initial Psychological Evaluation, authored by Herman Staudenmayer, Ph.D., dated 8/6/18 indicates a congruent history reported to other providers and a review of records by Dr. Higginbotham, and Dr. Helffenstein.

A diagnostic interview is presented, and psychological testing is documented, some of the testing utilized were the MOCA (Montreal Cognitive Assessment) and SCAT 2 (Sport Concussion Assessment Tool 2). The evaluation concurs with a summary that Mr. Bunch was involved in a motor vehicle accident and referred for psychological evaluation and screening for comprehensive neuropsychological testing. He indicates that a mental status examination suggests exaggeration and adopting a "sick role". Psychological testing indicated the self report reflects overreporting bias, making the self reported symptoms invalid. Comprehensive neuropsychological testing is contraindicated at this time, and he may benefit from psychotherapy to address these issues. He provides a current working diagnosis of Psychological factors affecting other medical conditions (F54). He recommends treatment to include cognitive therapy with initial course of 8 1-hour counseling sessions, and scheduled a debriefing evaluation on 8/13/18. The follow up treatment note, authored by Dr. Staudenmayer, dated 8/13/18, indicates a review of testing and an explanation of PTSD trauma rekindling with a request for review of childhood experiences, which led to discussion about the fall into a dry well as an 8 year old. Mr. Bunch indicates a motivation to participate in treatment in order to improve his status.

A Follow Up Treatment Note, dated 8/20/18, and specifying dysphoric mood and concerns by Mr. Bunch regarding loss of income and task performance dysfunction. Dr. Staudenmayer recounts trauma memories, sensory related issues, and reviewed three prior

**Lincoln/Bunch 0984**

Kenneth J. Shakeshaft, Esq.
RE: Mark Bunch
9/25/18
Page 13

traumas, including the fall into the well at age 8, and two stabbing assaults while working at DOC. He introduced a desensitization exposure therapy protocol, and started to develop an imagery treatment program.

A Follow Up Treatment Note, dated 8/27/18, authored by Dr. Staudenmayer specifies continuing dysphoric mood with distressed affect. He notes that fluorescent lights were turned off to accommodate visual difficulties, and specification that mental status indicate a labored and slurred speech and dramatic difficulty with vision. There is an indication about journaling about emotions, and Mr. Bunch's concern about driving in the intersection where the accident occurred. Dr. Staudenmayer presents a stress reaction log, which is a 6-step method of identifying and analyzing negative thoughts, developed by David Burns, M.D. There is an indication that he is attempting to utilize cognitive redirection and attempting to reduce a perception that Mr. Bunch feels guilty about the accident.

The file contains an Examination Record, dated 7/13/2018, authored by Michael Saxerud, O.D., indicating evaluation with Mr. Bunch for chief complaint of headaches, eye strain/fatigue, neck pain, poor reading, photophobia, poor depth perception, poor concentration. There is a related systemic symptom of dizziness, fatigue, unsteady gait, and muscle stiffness. Continuing his review of systems is the presence of anxiety disorder and depression. Dr. Saxerud's findings are positive for visual sensory issues of post concussion syndrome, and he is provided prisms taped to safety glasses to trial. He is continuing to utilize disposable contact lens and readers for near vision. Attached to Dr. Saxerud's evaluation is a Visual Symptoms questionnaire completed by Mr. Bunch with positive daily findings of headaches, visual changes, photophobia, driving/riding anxiety. Interestingly, Mr. Bunch writes his responses and identifying information intersecting midline as he has with our evaluation and testing process.

**Diagnostic Impressions and Treatment Recommendations**

Mark Bunch returned to review the results of the psychological testing on 9/20/18. He was driven to the appointment.

Mr. Bunch clarified that his employment requires him to drive to Colorado communities, perform sales work, and return to Canon City, usually in the dark. The work is, at times, exhausting, and he acknowledges that he has safety concerns related to current driving due to his sequencing difficulty and more specifically the complex vision changes with ongoing visual/vestibular balance issues.

He acknowledged a brief driving effort to a local store to purchase some items, and apparently this was a point of contention in the surveillance video about whether he is therefore capable of driving longer distances. We discussed and reviewed the prior evaluation and treatment summaries, and he acknowledges difficulty with the testing process through Dr. Helffenstein's office, noting that at that time he was having even more symptoms, and sensory overload, and could not adequately function to complete any level of testing information.

Kenneth J. Shakeshaft, Esq.
RE:  Mark Bunch
9/25/18
Page 14

We discussed and reviewed his treatment with Dr. Staudenmayer, and noted that while he appreciates that trauma rekindling aspects of Dr. Staudenmayer's consideration for treatment, he feels that the focus of treatment at this time is misplaced. He doesn't think that addressing the issues that occurred in his fall into a dry well as an 8 year old would be helpful. We also discussed that the DOC stabbing incident had its independent injury and treatment features, and at that time did not result in a trauma rekindling pattern, and he therefore tends to discount trauma related treatment necessity. He is focused on improving his sensory, cognitive, and psychological dysfunction, and would like treatment more specifically focused to address those considerations.

We also reviewed and discussed his fiancé, Nikki, Giordano's email correspondence to Dr. Higginbotham, and he acknowledges that on several occasions he has become overly irritable and hostile toward her, and has resulted in name calling. He expresses concern about her response to his injury status, and worries that their relationship may disintegrate. He also feels guilty and despondent about the fact that he changed their wedding date from February 10th to make it a more romantic setting on St. Valentine's Day, February 14th in Hawaii. Unfortunately, the motor vehicle accident occurred on 2/13/18, canceling those plans.

He is frustrated and angry about his changes, and it also appears that he has displaced those feelings to the Workers' Compensation system and the adjuster, from the perspective of his impression of denial of treatment and interference with treatment continuity. We noted that this dysfunctional response style is unfortunately quite prominent in frontal lobe dysexecutive concussion sequelae, and he appears to accept the brief education.

It is noteworthy that on our testing review on 9/20/18 Mr. Bunch appeared to be reactive to overhead fluorescent lights, and when we reduced the lighting he indicated that he felt more comfortable and had a significant physiologic change, including reduction of anxiety and lowered tachycardic sensation when the lighting was reduced. At that time we also discussed and reviewed the significant hyperacusis issue, which apparently has not yet been addressed, and we discussed his utilization of auditory dampening devices, which he trialed in our office and also seemed to help.

We reviewed the results of the screening psychological testing, and he is accepting of interpretation and impressions.

Based on his clinical presentation, history, including prior evaluation and treatment, and screening psychological testing, it is my opinion within a reasonable degree of psychological certainty that Mr. Bunch is manifesting a somewhat classic presentation of a post concussion recovery with frontal lobe dysexecutive function. Unfortunately, he presents with both psychological and sensory features, which have been identified and partially treated.

In reviewing the presentation at the time of impact, and following evaluations and treatment, it is my opinion that the mechanism of injury is clearly related to the 2/13/18 motor

Lincoln/Bunch 0986

Kenneth J. Shakeshaft, Esq.
RE: Mark Bunch
9/25/18
Page 15

vehicle injury sequelae.    There is no question that he's had confounding issues secondary to his recovery patterns, and his adjustment to disability has been difficult to this point.

I agree with Dr. Helffenstein and Dr. Studenmayer's observations that formal neuropsychological testing is not appropriate at this time. Mr. Bunch presents with specific visual/vestibular changes and with significant elements of anxiety, depression, and adjustment to disability which contributes to the cognitive dysfunction and creates a pattern of response, which is highly frustrating and confusing. His testing results should be considered in light of his despondence, and he should be encouraged, supported, allowed venting, and directed toward behavioral and self directed strategies to improve his circumstances and help him to re-establish personal control His personality style is to overacheive and demonstrated in prior education and employment, and therefor he is much more reactive to changes and loss of function.

At the present time, it is my opinion that in addition to individual and personal treatment services he requires a number of sessions of conjoint treatment with his fiancé to prevent that relationship from becoming the product of caretaker burnout and disintegrating. It is my opinion that the current difficulties described by Mr. Bunch are related to his psychological and neuropsychological condition, and result from sequelae of the 2/13/18 MVA. There is a concern that if Ms. Giordano is not allowed opportunity to understand and vent her frustration, that the relationship may disintegrate and this may result in additional untoward psychological issues. There is also a strong consideration that treatment should be continuous and specific to address his presentation to not allow it to become a life altering process.  Noteworthy is that the uncharacteristic irritability and unclear processing is a condition of frontal lobe injury

While Dr. Staudenmayer's consideration of trauma rekindling is a reasonable consideration, it does not appear that, at this time, Mr. Bunch is seeking or requiring assistance for that presentation, and is concerned that discussion about the childhood issues may detract from his current post concussion treatment needs.

Diagnostic impressions are: Concussion without Loss of Consciousness (S06.OXO); situational anxiety (F41.8); Adjustment Disorder with Anxiety and Depression (F43.23). Psychological Factors Affecting other Medical Conditions (F54) is not precluded since it is a descriptive diagnosis.

Wit respect to prognosis, it is my opinion that with appropriate services and change in treatment focus he would become more goal directed and effective in developing a more activating personal rehabilitation plan.   Currently, he is quire frightened, despondent, and frustrated, and it is my opinion that these issues generated through the process have resulted in a delay in his recovery. He is not at MMI.

He would benefit from behavioral self directed services such as cardiac biofeedback, relaxation training, cognitive therapy, conjoint therapy, venting, redirection, education and support.

Lincoln/Bunch 0987

Kenneth J. Shakeshaft, Esq.
RE:  Mark Bunch
9/25/18
Page 16

The clarification of MRI brain white matter, which has been described as related both to MS and TBI should be addressed as soon as possible.

I hope this information is of assistance in your work with Mark Bunch. Please feel free to call if you have any questions regarding this note or recommendations. I would be pleased to elaborate in any reasonable format. Please advise.

Sincerely Yours,

Anthony M. Ricci, PhD., ABPP (RP), PC
Diplomate, Rehabilitation Psychology
American Board of Professional Psychology

AMR/cb

Lincoln/Bunch 0988

Page 1 of 3



**BUNCH, MARK B**
55 Y old Male, DOB:
Account Number: 206490

Home:
Guarantor: BUNCH, MARK B   Insurance: w ESIS
PCP: STEVEN OLSON, MD    Referring: STEVEN OLSON, MD
Appointment Facility: Colorado Springs Neuro Assoc.

10/19/2018                           Progress Notes: JULIA BRINLEY, DO

## Current Medications
**Taking**
- Flexeril 10 mg Tablet 1 tab tid

## Past Medical History
Bronchitis.
Hernia.
Pneumonia.

## Surgical History
Tonsillectomy
Hernia repair

## Family History
COPD.

## Social History
Alcohol Use
  Did you have a drink containing alcohol in
the past year? *No*
    Points *0*
    Interpretation *Negative*
Tobacco Use
  Status *Never smoked*

## Allergies
penicillin: rash - Drug Allergy

## Review of Systems
General:
   no Fever. Fatigue yes. no Loss of
appetite. no Significant weight loss.
no Weight gain.
Dermatology:
   no Itching. no Redness. no Lumps.
no Rash. no Skin cancer.
Endocrinology:
   no Excessive sweating. no Excessive
thirst. no Temperature intolerance.
no Lactation.
Neurology:
   Headache yes. Memory Problems yes.
no Tremors. Balance difficulty yes.
no Numbness. no Weakness. Speech
problems yes. Dizziness yes. no Seizures.
Ophthalmology:
   Vision loss yes. Blurring of vision yes.
Double vision yes.

## Reason for Appointment
1. Brain injury

## History of Present Illness

General:
   55-year-old gentleman who presents today for evaluation of traumatic brain injury. In February of this year he got an accident. Patient describes that the car in front of them was put in reverse and "stomped on the gas." He was hit rather hard in the front and he reports that he hit his head on the steering wheel. He did lose consciousness, unclear for how long. Directly after he reports that he could not see out of his left eye and it felt as though somebody pulled a shirt over his head. He did have a fall due to balance issue and he reports disorientation, confusion along with neck pain and headache. He did go to the ER for further evaluation and he was diagnosed with concussion and "something else." He has been working with Workmen's Comp. and overall he is undergone physical therapy, psychotherapy, vision therapy and has had neuropsych testing. He reports that overall he has gotten better but is not back to his baseline. He continues to have balance issues, headaches, memory difficulties in addition to speech difficulties and double vision. He is doing vision therapy and is currently wearing prism glasses through Dr. Saxerud. He continues to see a therapist to help with his significant mood symptoms which he feels as though has gotten better. Reviewed neuropsych testing that demonstrated postconcussive recovery with frontal lobe just executive function although there was also mention of symptom validity testing concerning for intentional lack of effort. He also continues to have headaches. He reports that these are bilateral temples, worse on the left side that will radiate everywhere. He also has radiation into his neck, more so on the left and is described as a throbbing pain. This is associated with light and sound sensitivity along with nausea but no vomiting. These are currently lasting 2-3 times per week and can be up to an entire day. His pain skills approximately a 5/10. He reports that he was tried on amitriptyline at one point but this made him feel "weird" and his skin crawl. He does report difficulty with sleeping both difficulty getting to sleep and staying asleep. It is recommended that patient receive massage therapy but he reports that this was never approved. There is also recommended the patient undergo speech therapy due to significant difficulty with communicating, the patient reports that again this was

Patient: BUNCH, MARK B   DOB:         Progress Note: JULIA BRINLEY, DO   10/19/2018
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

http://192.168.60.253:9090/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.jsp?en...   10/31/2018

Sent to OC
11/06/2018
by PM LLC

**Lincoln/Bunch 0989**

Page 2 of 3

Hematology:
no History of transfusion. no Easy bruising.

ENT-Respiratory:
no Hearing loss. Ringing in ears yes. no Shortness of breath. no Sleep apnea. no Cold and cough. no Change in voice. no Difficulty swallowing.

Cardiology:
no Chest pain. no Palpitations/irregular heartbeat. no Leg swelling. no History of heart attack. no Atrial fibrillation.

Musculoskeletal:
no Joint pain. no Joint swelling. no Joint stiffness. no Muscle aches.

Gastroenterology:
no Abdominal pain. no Heartburn. Nausea yes. no Vomiting. no Blood in stool.

Psychology:
Anxiety yes. no Depression. Sleep disturbances yes. no Hyperactivity. Attention Deficit yes.

Genitourinary:
no Difficulty urinating. no Urinary urgency. no Increased urinary frequency. no Urinary incontinence.

has not been approved yet. He denies any of these issues prior to his accident and states that he has never had a focal neurologic issue in the past. An MRI of his brain was done that demonstrated white matter disease, mild, that could be in a pattern compatible with multiple sclerosis.

## Vital Signs

BP sitting 150/90 mm Hg, Pulse sitting 78, Respirations 16, Wt 230 lbs, Height 72 inches, BMI 31.19.

## Examination

General:
General pleasant, in NAD, thin, well-groomed.
Eyes normal lids and conjunctivae, pupils reactive, grossly normal funduscopic exam.
Back nontender to palpation.
Respiratory clear to auscultation, good effort.
Cardiovascular normal auscultation, normal carotid auscultation, no pedal edema.
Musculoskeletal normal tone, no atrophy, no cyanosis or clubbing.

Neurological:
Cortical Functions : normal attention span and concentration, normal recent remote memory, speech fluent although stuttering at times, comprehension and language intact, alert and oriented X 3, general knowledge and judgement within normal variation.
Cranial Nerves : I - Not Tested, II - Pupils 4mms reacting briskly to 2 mms, No afferent pupil defect, III , IV, VI - EOM were full with normal pursuit and saccade, No ptosis or nystagmus, V - Motor V intact, Pinprick, light touch intact in all three divisons, VII - No asymmetry or weakness, VIII - Actuity intact to finger rub bilaterally, IX , X- Palate rose in inidile, XI - Sternocleidomastoid, trapezius strength intact, XII - Tongue protruded midline w/o atrophy or fasciculations.
Motor Strength :  V/ V bilaterally.
Sensory : intact to light touch, temperature and vibration throughout.
Reflexes : bilaterally symmetrical, babinski absent.
Tremors : absent.
Coordination : with finger to nose patient will often miss my finger by an inch bilaterally, often has to close one eye.
Gait and Station : Romberg was positive, difficulty with tandem.

## Assessments

1. Post-concussional syndrome - F07.81 (Primary)
2. Intractable chronic migraine without aura and without status migrainosus - G43.719
3. Diplopia - H53.2
4. Other symptoms and signs involving appearance and behavior - R46.89
5. Other symptoms and signs involving cognitive functions and awareness - R41.89
6. Insomnia, unspecified type - G47.00
7. Imbalance - R26.89

Patient: BUNCH, MARK B    DOB:          Progress Note: JULIA BRINLEY, DO   10/19/2018
*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

Sent to OC
11/06/2018
by PM LLC

**Lincoln/Bunch 0990**

04/25/2019  15:22    7196350966                                                                PAGE 59/74

Page 3 of 3

**Treatment**
**1. Post-concussional syndrome**
Start nortriptyline capsule, 10 mg, 1 to 2 cap(s), orally, qd as directed,
30 day(s), Refills 2
   PROCEDURE: Speech therapy

**Follow Up**
2 Months

Electronically signed by JULIA BRINLEY on 10/31/2018 at
08:55 AM MDT
Sign off status: Pending

---

Colorado Springs Neuro Assoc.
2312 N. Nevada Avenue
Suite 100
Colorado Springs, CO 809075307
Tel: 719-473-3272
Fax: 719-389-1191

Patient: BUNCH, MARK B   DOB:          Progress Note: JULIA BRINLEY, DO   10/19/2018

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

http://192.168.60.253:9090/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.jsp?en...   10/31/2018

Sent to OC
11/06/2018
by PM LLC

**Lincoln/Bunch 0991**

Page 1 of 4



## BUNCH, MARK B
55 Y old Male, DOB:
Account Number: 206490

Home:
Guarantor: BUNCH, MARK B   Insurance: w ESIS
PCP: STEVEN OLSON, MD   Referring: STEVEN OLSON, MD
Appointment Facility: Colorado Springs Neuro Assoc.

10/19/2018                                          Progress Notes: JULIA BRINLEY, DO

### Current Medications
Taking
* Flexeril 10 mg Tablet 1 tab tid

### Past Medical History
Bronchitis.
Hernia.
Pneumonia.

### Surgical History
Tonsillectomy
Hernia repair

### Family History
COPD.

### Social History
Alcohol Use
Did you have a drink containing alcohol in the past year? *No*
Points *0*
Interpretation *Negative*
Tobacco Use
Status *Never smoked*

### Allergies
penicillin: rash - Drug Allergy

### Review of Systems
General:
no Fever. Fatigue yes. no Loss of appetite. no Significant weight loss. no Weight gain.
Dermatology:
no Itching. no Redness. no Lumps. no Rash. no Skin cancer.
Endocrinology:
no Excessive sweating. no Excessive thirst. no Temperature intolerance. no Lactation.
Neurology:
Headache yes. Memory Problems yes. no Tremors. Balance difficulty yes. no Numbness. no Weakness. Speech problems yes. Dizziness yes. no Seizures.
Ophthalmology:
Vision loss yes. Blurring of vision yes. Double vision yes.

### Reason for Appointment
1. Brain injury

### History of Present Illness

General:

55-year-old gentleman who presents today for evaluation of traumatic brain injury. In February of this year he got an accident. Patient describes that the car in front of them was put in reverse and "stomped on the gas." He was hit rather hard in the front and he reports that he hit his head on the steering wheel. He did lose consciousness, unclear for how long. Directly after he reports that he could not see out of his left eye and it felt as though somebody pulled a shirt over his head. He did have a fall due to balance issue and he reports disorientation, confusion along with neck pain and headache. He did go to the ER for further evaluation and he was diagnosed with concussion and "something else." He has been working with Workmen's Comp. and overall he is undergone physical therapy, psychotherapy, vision therapy and has had neuropsych testing. He reports that overall he has gotten better but is not back to his baseline. He continues to have balance issues, headaches, memory difficulties in addition to speech difficulties and double vision. He is doing vision therapy and is currently wearing prism glasses through Dr. Saxerud. He continues to see a therapist to help with his significant mood symptoms which he feels as though has gotten better. Reviewed neuropsych testing that demonstrated postconcussive recovery with frontal lobe just executive function although there was also mention of symptom validity testing concerning for intentional lack of effort. He also continues to have headaches. He reports that these are bilateral temples, worse on the left side that will radiate everywhere. He also has radiation into his neck, more so on the left and is described as a throbbing pain. This is associated with light and sound sensitivity along with nausea but no vomiting. These are currently lasting 2-3 times per week and can be up to an entire day. His pain skills approximately a 5/10. He reports that he was tried on amitriptyline at one point but this made him feel "weird" and his skin crawl. He does report difficulty with sleeping both difficulty getting to sleep and staying asleep. It is recommended that patient receive massage therapy but he reports that this was never approved. There is also recommended the patient undergo speech therapy due to significant difficulty with communicating, the patient reports that again this was

Patient: BUNCH, MARK B   DOB:           Progress Note: JULIA BRINLEY, DO   10/19/2018
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

Sent to OC
11/13/2018
by PM LLC

**Lincoln/Bunch 0992**

Hematology:
    no History of transfusion. no Easy bruising.
ENT-Respiratory:
    no Hearing loss. Ringing in ears yes. no Shortness of breath. no Sleep apnea. no Cold and cough. no Change in voice. no Difficulty swallowing.
Cardiology:
    no Chest pain. no Palpitations/irregular heartbeat. no Leg swelling. no History of heart attack. no Atrial fibrillation.
Musculoskeletal:
    no Joint pain. no Joint swelling. no Joint stiffness. no Muscle aches.
Gastroenterology:
    no Abdominal pain. no Heartburn. Nausea yes. no Vomiting. no Blood in stool.

Psychology:
    Anxiety yes. no Depression. Sleep disturbances yes. no Hyperactivity. Attention Deficit yes.
Genitourinary:
    no Difficulty urinating. no Urinary urgency. no Increased urinary frequency. no Urinary incontinence.

has not been approved yet. He denies any of these issues prior to his accident and states that he has never had a focal neurologic issue in the past. An MRI of his brain was done that demonstrated white matter disease, mild, that could be in a pattern compatible with multiple sclerosis.
    Rehabilitation psychology, Dr. Ricoi, 9/2018 – Diagnostic impression: Concussion without Loss of Consciousness (S06.0X0); Situational Anxiety (F41.8), Adjustment Disorder with Anxiety and Depression (F43.23). Benefit from behavioral self directed services such as cardiac biofeedback, relaxation training, cognitive therapy, conjoint therapy, venting, redirection, education and support.
    Psychological Counseling and Consulting, Dr. Staudenmayer, 2/2018 - Psychological factors affecting other medical conditions (F54).
    - MoCA: 20/30
    - Psychological cognitive and somatic symptoms affecting validity
    Neuropsychological Screening, Dr. Helffenstein, 6/2018 - Meets diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic BRain Injury and Mild Traumatic Brain Injury.
    - Mild Neurocognitive Disorder due to Traumatic BRain Injury with BEhavioral Disturbance (DSM-5 331.83), Depressive Disorder due to Traumatic Brain Injury, Mild (DSM-5 293.83), Post Traumatic Stress Disorder (DSM-5 309.81)
    Parkview ED records: Concussion, HTN. CT head and cervical spine with no evidence for any acute traumatic process.

**Vital Signs**
BP sitting 150/90 mm Hg, Pulse sitting 78, Respirations 16, Wt 230 lbs, Height 72 inches, BMI 31.19.

**Examination**
General:
    General pleasant, in NAD, thin, well-groomed.
    Eyes normal lids and conjunctivae, pupils reactive, grossly normal funduscopic exam.
    Back nontender to palpation.
    Respiratory clear to auscultation, good effort.
    Cardiovascular normal auscultation, normal carotid auscultation, no pedal edema.
    Musculoskeletal normal tone, no atrophy, no cyanosis or clubbing.
Neurological:
    Cortical Functions : normal attention span and concentration, normal recent remote memory, speech fluent although stuttering at times, comprehension and language intact, alert and oriented X 3, general knowledge and judgement within normal variation.
    Cranial Nerves : I - Not Tested, II - Pupils 4mms reacting briskly to 2 mms, No afferent pupil defect, III , IV, VI - EOM were full with normal pursuit and saccade, No ptosis or nystagmus, V - Motor V intact, Pinprick, light touch intact in all three divisons, VII - No asymmetry or weakness, VIII - Actuity intact to finger rub bilaterally, IX , X- Palate rose in midile, XI - Sternocleidomastoid, trapezius strength intact, XII - Tongue protruded midline w/o atrophy or fasciculations.
    Motor Strength : V/V bilaterally.

Patient: BUNCH, MARK B   DOB:        Progress Note: JULIA BRINLEY, DO   10/19/2018
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

http://192.168.60.253:9090/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.jsp?enc...    11/5/2018
Sent to OC
11/13/2018
by PM LLC

Lincoln/Bunch 0993

Page 3 of 4

Sensory : intact to light touch, temperature and vibration throughout.
    Reflexes : bilaterally symmetrical, babinski absent.
    Tremors : absent.
    Coordination : with finger to nose patient will often miss my finger by an inch bilaterally, often has to close one eye.
    Gait and Station : Romberg was positive, difficulty with tandem.

**Assessments**
1. Post-concussional syndrome - F07.81 (Primary)
2. Intractable chronic migraine without aura and without status migrainosus - G43.719
3. Diplopia - H53.2
4. Other symptoms and signs involving appearance and behavior - R46.89
5. Other symptoms and signs involving cognitive functions and awareness - R41.89
6. Insomnia, unspecified type - G47.00
7. Imbalance - R26.89

Patient with concussion and post concussive syndrome from a motor vehicle accident in February of 2018. His most bothersome complaints are double vision, cognitive issues, sleep disturbances, imbalance and headaches. Based on patients history and exam I do believe he has continued post concussive syndrome with worsening factors to include mood disturbances. I feel as though patient would best be served with psychological treatment in addition to more aggressive headache/migraine management. I will start patient on Nortripyline 10mg qhs x 1 week then increase to 20mg qhs thereafter. I am hoping this will help with his headaches in addition to sleep and some mood disturbances. Did discuss potiental side effects with patient. I would also like patient to get into speech therapy to further help with his cognitition in addition to stuttering noted on exam. Lastly, will try and obtain MRI of the brain for further review of the white matter disease, potentially suggestive of MS. Although, his symptoms seem more related to the head injury rather than a demyelinating process. Counselled patient in regards workup and treatment.
60 mintues spent with patient of which greater than 50% of this time was in education and counseling.

**Treatment**
**1. Post-concussional syndrome**
Start nortriptyline capsule, 10 mg, 1 to 2 cap(s), orally, qd as directed, 30 day(s), Refills 2
    PROCEDURE: Speech therapy

**Follow Up**
2 Months

Electronically signed by JULIA BRINLEY on 11/05/2018 at 09:09 AM MST

---

Patient: BUNCH, MARK B   DOB:            Progress Note: JULIA BRINLEY, DO   10/19/2018
Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

Sent to OC
11/13/2018
by PM LLC

**Lincoln/Bunch 0994**

Page 4 of 4

Sign off status: Pending

Colorado Springs Neuro Assoc.
2312 N. Nevada Avenue
Suite 100
Colorado Springs, CO 809075307
Tel: 719-473-3272
Fax: 719-389-1191

Patient: BUNCH, MARK B    DOB:              Progress Note: JULIA BRINLEY, DO    10/19/2018

*Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)*

http://192.168.60.253:9090/mobiledoc/jsp/catalog/xml/printMultipleChartOptions.jsp?enc...    11/5/2018

Sent to OC
11/13/2018
by PM LLC

**Lincoln/Bunch 0995**

Summary View for BUNCH, MARK B | Account Number:206490                Page 1 of 3

**Progress Notes**

Patient: BUNCH, MARK B                                    Provider: JULIA BRINLEY, DO
Account Number: 206490
DOB:              Age: 55 Y  Sex: Male                         Date: 10/19/2018
Phone:
Address:                                          0781
Pcp: STEVEN OLSON, MD

### Subjective:

**Chief Complaints:**
  1. Brain injury

**HPI:**
  General.
     55-year-old gentleman who presents today for evaluation of traumatic brain injury. In February of this year he got an accident. Patient describes that the car in front of them was put in reverse and "stomped on the gas." He was hit rather hard in the front and he reports that he hit his head on the steering wheel. He did lose consciousness, unclear for how long. Directly after he reports that he could not see out of his left eye and it felt as though somebody pulled a shirt over his head. He did have a fall due to balance issue and he reports disorientation, confusion along with neck pain and headache. He did go to the ER for further evaluation and he was diagnosed with concussion and "something else." He has been working with Workmen's Comp and overall he is undergone physical therapy, psychotherapy, vision therapy and has had neuropsych testing. He reports that overall he has gotten better but is not back to his baseline. He continues to have balance issues, headaches, memory difficulties in addition to speech difficulties and double vision. He is doing vision therapy and is currently wearing prism glasses through Dr Saxerud. He continues to see a therapist to help with his significant mood symptoms which he feels as though has gotten better. Reviewed neuropsych testing that demonstrated postconcussive recovery with frontal lobe just executive function although there was also mention of symptom validity testing concerning for intentional lack of effort. He also continues to have headaches. He reports that these are bilateral temples, worse on the left side that will radiate everywhere. He also has radiation into his neck, more so on the left and is described as a throbbing pain. This is associated with light and sound sensitivity along with nausea but no vomiting. These are currently lasting 2-3 times per week and can be up to an entire day. His pain skills approximately a 5/10. He reports that he was tried on amitriptyline at one point but this made him feel "weird" and his skin crawl. He does report difficulty with sleeping both difficulty getting to sleep and staying asleep. It is recommended that patient receive massage therapy but he reports that this was never approved. There is also recommended the patient undergo speech therapy due to significant difficulty with communicating, the patient reports that again this was has not been approved yet. He denies any of these issues prior to his accident and states that he has never had a focal neurologic issue in the past. An MRI of his brain was done that demonstrated white matter disease, mild, that could be in a pattern compatible with multiple sclerosis.
     Rehabilitation psychology, Dr Ricoi, 9/2018 - Diagnostic impression: Concussion without Loss of Consciousness (S06 0X0), Situational Anxiety (F41 8), Adjustment Disorder with Anxiety and Depression (F43.23). Benefit from behavioral self directed services such as cardiac biofeedback, relaxation training, cognitive therapy, conjoint therapy, venting, redirection, education and support.
     Psychological Counseling and Consulting, Dr. Staudenmayer, 2/2018 - Psychological factors affecting other medical conditions (F54).
        - MoCA. 20/30
        - Psychological cognitive and somatic symptoms affecting validity
     Neuropsychological Screening, Dr Helffenstein, 6/2018 - Meets diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic BRain Injury and Mild Traumatic Brain Injury.
        - Mild Neurocognitive Disorder due to Traumatic BRain Injury with BEhavioral Disturbance (DSM-5 331.83), Depressive Disorder due to Traumatic Brain Injury, Mild (DSM-5 293 83), Post Traumatic Stress Disorder (DSM-5 309 81)
     Parkview ED records. Concussion, HTN. CT head and cervical spine with no evidence for any acute traumatic process

**ROS:**
  General
     no Fever. Fatigue yes  no Loss of appetite. no Significant weight loss  no Weight gain
  Dermatology·

http://1...1118312S3012037 20181108 ...talog/xml/printChartOptions.jsp?encounterID...  11/2/2018

Sent to OC
11/15/2018
by PM LLC

Lincoln/Bunch 0996

Summary View for BUNCH, MARK B | Account Number:206490                Page 2 of 3

no Itching   no Redness   no Lumps.   no Rash   no Skin cancer
Endocrinology:
   no Excessive sweating   no Excessive thirst   no Temperature intolerance   no Lactation
Neurology:
   Headache yes   Memory Problems yes   no Tremors   Balance difficulty yes   no Numbness
no Weakness.  Speech problems yes   Dizziness yes   no Seizures
Ophthalmology:
   Vision loss yes.   Blurring of vision yes   Double vision yes
Hematology.
   no History of transfusion   no Easy bruising
ENT-Respiratory:
   no Hearing loss   Ringing in ears yes   no Shortness of breath   no Sleep apnea   no Cold and cough.
no Change in voice   no Difficulty swallowing
Cardiology.
   no Chest pain   no Palpitations/irregular heartbeat   no Leg swelling   no History of heart attack
no Atrial fibrillation
Musculoskeletal:
   no Joint pain   no Joint swelling   no Joint stiffness.   no Muscle aches
Gastroenterology.
   no Abdominal pain   no Heartburn   Nausea yes   no Vomiting   no Blood in stool
Psychology:
   Anxiety yes   no Depression.   Sleep disturbances yes   no Hyperactivity   Attention Deficit yes
Genitourinary
   no Difficulty urinating   no Urinary urgency   no Increased urinary frequency   no Urinary
incontinence.

**Medical History:** Bronchitis, Hernia, Pneumonia.

**Surgical History:** Tonsillectomy , Hernia repair

**Family History:**
COPD

**Social History:**
   Alcohol Use
      Did you have a drink containing alcohol in the past year?  *No*
      Points  *0*
      Interpretation  *Negative*
   Tobacco Use
      Status  *Never smoked*

**Medications:** Taking Flexeril 10 mg Tablet 1 tab tid

**Allergies:** penicillin  rash - Drug Allergy.


**Objective:**

**Vitals:** BP sitting 150/90 mm Hg, Pulse sitting 78, Respirations 16, Wt 230 lbs, Height 72 inches, BMI
31 19

**Examination:**
   General
      General pleasant, in NAD, thin, well-groomed
      Eyes normal lids and conjunctivae, pupils reactive, grossly normal funduscopic exam.
      Back nontender to palpation
      Respiratory clear to auscultation, good effort
      Cardiovascular normal auscultation, normal carotid auscultation, no pedal edema
      Musculoskeletal normal tone, no atrophy, no cyanosis or clubbing
   Neurological:
      Cortical Functions   normal attention span and concentration, normal recent remote memory,
speech fluent although stuttering at times, comprehension and language intact, alert and
oriented X 3, general knowledge and judgement within normal variation
      Cranial Nerves : I - Not Tested, II - Pupils 4mms reacting briskly to 2 mms, No afferent pupil

http://1    1118312S3012037  20181108   talog/xml/printChartOptions.jsp?encounterID..   11/2/2018

000258                                                Sent to OC
                                                                   11/15/2018
                                                                   by PM LLC

**Lincoln/Bunch 0997**

Summary View for BUNCH, MARK B | Account Number:206490                     Page 3 of 3

defect, III , IV, VI - EOM were full with normal pursuit and saccade, No ptosis or nystagmus, V - Motor V intact, Pinprick, light touch intact in all three divisons, VII - No asymmetry or weakness, VIII - Actuity intact to finger rub bilaterally, IX , X- Palate rose in midile, XI - Sternocleidomastoid, trapezius strength intact, XII - Tongue protruded midline w/o atrophy or fasciculations

Motor Strength :  V/ V bilaterally
Sensory · intact to light touch, temperature and vibration throughout
Reflexes . bilaterally symmetrical, babinski absent
Tremors . absent
Coordination · with finger to nose patient will often miss my finger by an inch bilaterally, often has to close one eye.
Gait and Station   Romberg was positive, difficulty with tandem

### Assessment:

**Assessment:**
1  Post-concussional syndrome - F07 81 (Primary)
2  Intractable chronic migraine without aura and without status migrainosus - G43 719
3  Diplopia - H53 2
4  Other symptoms and signs involving appearance and behavior - R46 89
5  Other symptoms and signs involving cognitive functions and awareness - R41 89
6. Insomnia, unspecified type - G47 00
7  Imbalance - R26 89
Patient with concussion and post concussive syndrome from a motor vehicle accident in February of 2018. His most bothersome complaints are double vision, cognitive issues, sleep disturbances, imbalance and headaches  Based on patients history and exam I do believe he has continued post concussive syndrome with worsening factors to include mood disturbances  I feel as though patient would best be served with psychological treatment in addition to more aggressive headache/migraine management. I will start patient on Nortripyline 10mg qhs x 1 week then increase to 20mg qhs thereafter  I am hoping this will help with his headaches in addition to sleep and some mood disturbances. Did discuss potiental side effects with patient I would also like patient to get into speech therapy to further help with his cognitition in addition to stuttering noted on exam. Lastly, will try and obtain MRI of the brain for further review of the white matter disease, potentially suggestive of MS  Although, his symptoms seem more related to the head injury rather than a demyelinating process  Counselled patient in regards workup and treatment.
60 mintues spent with patient of which greater than 50% of this time was in education and counseling

### Plan:

**1. Post-concussional syndrome**
Start nortriptyline capsule, 10 mg, 1 to 2 cap(s), orally, qd as directed, 30 day(s), Refills 2
Procedure  Speech therapy
**Follow Up: 2 Months**

**Provider:** JULIA BRINLEY, DO
**Patient:** BUNCH, MARK B  **DOB:**          **Date:** 10/19/2018

000259

Sent to OC
11/15/2018
by PM LLC

**Lincoln/Bunch 0998**

Summary View for BUNCH, MARK B | Account Number:206490

Page 1 of 3

**Progress Notes**

**Patient:** BUNCH, MARK B
**Account Number:** 206490
**DOB:**           **Age:** 55 Y  **Sex:** Male
**Phone:**
**Address:**
**Pcp:** STEVEN OLSON, MD

**Provider:** JULIA BRINLEY, DO
**Date:** 10/19/2018

## Subjective:

**Chief Complaints:**
  1. Brain injury

**HPI:**
  General.
    55-year-old gentleman who presents today for evaluation of traumatic brain injury. In February of this year he got in accident. Patient describes that the car in front of them was put in reverse and "stomped on the gas." He was hit rather hard in the front and he reports that he hit his head on the steering wheel. He did lose consciousness, unclear for how long. Directly after he reports that he could not see out of his left eye and it felt as though somebody pulled a shirt over his head. He did have a fall due to balance issue and he reports disorientation, confusion along with neck pain and headache. He did go to the ER for further evaluation and he was diagnosed with concussion and "something else." He has been working with Workmen's Comp and overall he is undergone physical therapy, psychotherapy, vision therapy and has had neuropsych testing. He reports that overall he has gotten better but is not back to his baseline. He continues to have balance issues, headaches, memory difficulties in addition to speech difficulties and double vision. He is doing vision therapy and is currently wearing prism glasses through Dr. Saxerud. He continues to see a therapist to help with his significant mood symptoms which he feels as though has gotten better. Reviewed neuropsych testing that demonstrated postconcussive recovery with frontal lobe just executive function although there was also mention of symptom validity testing concerning for intentional lack of effort. He also continues to have headaches. He reports that these are bilateral temples, worse on the left side that will radiate everywhere. He also has radiation into his neck, more so on the left and is described as a throbbing pain. This is associated with light and sound sensitivity along with nausea but no vomiting. These are currently lasting 2-3 times per week and can be up to an entire day. His pain skills approximately a 5/10. He reports that he was tried on amitriptyline at one point but this made him feel "weird" and his skin crawl. He does report difficulty with sleeping both difficulty getting to sleep and staying asleep. It is recommended that patient receive massage therapy but he reports that this was never approved. There is also recommended the patient undergo speech therapy due to significant difficulty with communicating, the patient reports that again this was has not been approved yet. He denies any of these issues-prior to his accident and states that he has never had a focal neurologic issue in the past. An MRI of his brain was done that demonstrated white matter disease, mild, that could be in a pattern compatible with multiple sclerosis.
    Rehabilitation psychology, Dr. Ricol, 9/2018 - Diagnostic impression: Concussion without Loss of Consciousness (S06 0X0), Situational Anxiety (F41 8), Adjustment Disorder with Anxiety and Depression (F43.23). Benefit from behavioral self directed services such as cardiac biofeedback, relaxation training, cognitive therapy, conjoint therapy, venting, redirection, education and support.
    Psychological Counseling and Consulting, Dr. Staudenmayer, 2/2018 - Psychological factors affecting other medical conditions (F54).
    - MoCA. 20/30
    - Psychological cognitive and somatic symptoms affecting validity
    Neuropsychological Screening, Dr. Helffenstein, 6/2018 - Meets diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic BRain Injury and Mild Traumatic Brain Injury.
    - Mild Neurocognitive Disorder due to Traumatic BRain Injury with BEhavioral Disturbance (DSM-5 331.83), Depressive Disorder due to Traumatic Brain Injury, Mild (DSM-5 293 83), Post Traumatic Stress Disorder (DSM-5 309 81)
    Parkview ED records. Concussion, HTN. CT head and cervical spine with no evidence for any acute traumatic process

  **ROS:**
  General
    no Fever. Fatigue yes  no Loss of appetite. no Significant weight loss  no Weight gain
  Dermatology·

Lincoln/Bunch 0999

Summary View for BUNCH, MARK B | Account Number:206490                    Page 2 of 3

no Itching   no Redness   no Lumps.  no Rash   no Skin cancer
Endocrinology·
   no Excessive sweating   no Excessive thirst   no Temperature intolerance   no Lactation
Neurology:
   Headache yes   Memory Problems yes   no Tremors   Balance difficulty yes   no Numbness
no Weakness.  Speech problems yes   Dizziness yes   no Seizures
Ophthalmology·
   Vision loss yes.  Blurring of vision yes   Double vision yes
Hematology.
   no History of transfusion   no Easy bruising
ENT-Respiratory·
   no Hearing loss   Ringing in ears yes   no Shortness of breath   no Sleep apnea   no Cold and-cough.
no Change in voice   no Difficulty swallowing
Cardiology.
   no Chest pain   no Palpitations/irregular heartbeat   no Leg swelling   no History of heart attack
no Atrial fibrillation
Musculoskeletal·
   no Joint pain   no Joint swelling   no Joint stiffness.  no Muscle aches
Gastroenterology.
   no Abdominal pain   no Heartburn   Nausea yes   no Vomiting   no Blood in stool
Psychology·
   Anxiety yes   no Depression.  Sleep disturbances yes   no Hyperactivity   Attention Deficit yes
Genitourinary
   no Difficulty urinating   no Urinary urgency   no Increased urinary frequency   no Urinary
incontinence.

**Medical History:** Bronchitis, Hernia, Pneumonia.

**Surgical History:** Tonsillectomy , Hernia repair

**Family History:**
COPD

**Social History:**
   Alcohol Use
      Did you have a drink containing alcohol in the past year?  *No*
      Points  *0*
      Interpretation  *Negative*
   Tobacco Use
      Status  *Never smoked*

**Medications:** Taking Flexeril 10 mg Tablet 1 tab tid

**Allergies:** penicillin   rash - Drug Allergy.

**Objective:**

**Vitals:** BP sitting 150/90 mm Hg, Pulse sitting 78, Respirations 16, Wt 230 lbs, Height 72 inches, BMI
31 19

**Examination:**
   General
      General pleasant, in NAD, thin, well-groomed
      Eyes normal lids and conjunctivae, pupils reactive, grossly normal funduscopic exam.
      Back nontender to palpation
      Respiratory clear to auscultation, good effort
      Cardiovascular normal auscultation, normal carotid auscultation, no pedal edema
      Musculoskeletal normal tone, no atrophy, no cyanosis or clubbing
   Neurological·
      Cortical Functions   normal attention span and concentration, normal recent remote memory,
speech fluent although stuttering at times, comprehension and language intact, alert and
oriented X 3, general knowledge and judgement within normal variation
         Cranial Nerves : I - Not Tested, II - Pupils 4mms reacting briskly to 2 mms, No afferent pupil

**Lincoln/Bunch 1000**

Summary View for BUNCH, MARK B | Account Number:206490                    Page 3 of 3

defect, III , IV, VI - EOM were full with normal pursuit and saccade, No ptosis or nystagmus, V - Motor V intact, Pinprick, light touch intact in all three divisons, VII - No asymmetry or weakness, VIII - Actuity intact to finger rub bilaterally, IX , X- Palate rose in midile, XI - Sternocleidomastoid, trapezius strength intact, XII - Tongue protruded midline w/o atrophy or fasciculations

Motor Strength :  V/ V bilaterally
Sensory · intact to light touch, temperature and vibration throughout
Reflexes . bilaterally symmetrical, babinski absent
Tremors . absent
Coordination · with finger to nose patient will often miss my finger by an inch bilaterally, often has to close one eye.
Gait and Station   Romberg was positive, difficulty with tandem

## Assessment:

### Assessment:
1  Post-concussional syndrome - F07 81 (Primary)
2  Intractable chronic migraine without aura and without status migrainosus - G43 719
3  Diplopia - H53 2
4  Other symptoms and signs involving appearance and behavior - R46 89
5  Other symptoms and signs involving cognitive functions and awareness - R41 89
6. Insomnia, unspecified type - G47 00
7  Imbalance - R26 89
Patient with concussion and post concussive syndrome from a motor vehicle accident in February of 2018. His most bothersome complaints are double vision, cognitive issues, sleep disturbances, imbalance and headaches  Based on patients history and exam I do believe he has continued post concussive syndrome with worsening factors to include mood disturbances  I feel as though patient would best be served with psychological treatment in addition to more aggressive headache/migraine management. I will start patient on Nortripyline 10mg qhs x 1 week then increase to 20mg qhs thereafter  I am hoping this will help with his headaches in addition to sleep and some mood disturbances. Did discuss potiental side effects with patient I would also like patient to get into speech therapy to further help with his cognitition in addition to stuttering noted on exam. Lastly, will try and obtain MRI of the brain for further review of the white matter disease, potentially suggestive of MS  Although, his symptoms seem more related to the head injury rather than a demyelinating process  Counselled patient in regards workup and treatment.
60 mintues spent with patient of which greater than 50% of this time was in education and counseling

## Plan:

**1. Post-concussional syndrome**
Start nortriptyline capsule, 10 mg, 1 to 2 cap(s), orally, qd as directed, 30 day(s), Refills 2
  Procedure  Speech therapy
**Follow Up:** 2 Months

**Provider:** JULIA BRINLEY, DO
**Patient:** BUNCH, MARK B  **DOB:**              **Date:** 10/19/2018

Lincoln/Bunch 1001

04/25/2019  15:22    7196350966                                    PAGE 70/74

NAME Bunch Mark ___ M ✓ F ___ DATE 10-1-18 DR. WIC

STREET _____ CITY _____ ST. ___ ZIP. _____

TELE. ___ OCCUPATION _____ MARITAL _____

BIRTH DATE ___ AGE ___ REF. BY _____

SYMPTOMS _____

INJURY _____

1118302S1047011 20181029

Lincoln/Bunch 1002

04/25/2019   15:22     7196350966                                    PAGE 71/74

| D.O.B. | NAME |
| --- | --- |
| | *Mark Bunch* |
| DATE | VISITS & FINDINGS |
| 10-1-18 | *Didn't go to bed this last week. Started to have Upper Back and some Mid Back tension and Pressure. Along with some headaches. Had the last 3 days. Was doing some yard work, mowing and weed eating.*<br><br>*Found Mid Back pressure at the T11,12 area upon Bi-Lateral Rotation. The T4,5 area was upon Palpation and Left Rotation. The C-Spine showed Decreased Range of Motion at the C5,6,7 area with tenderness.*<br><br>*Treatment was done of the T4,5,11,12 area in the Prone Position. The C4,6,7 area were done in the Supine position. Then an Anterior was done Bi-Lateral at the T4,5 area.*<br><br>*Because the patient didn't go to bed, I will see the patient again in 1 week.* |
| 10-8-18 | *Hasn't gone to bed since his last treatment. Has had a couple headaches. Just not like before. The weather has gotten cooler the last few days, so he has been here stiff the last couple days. More in the upper back and neck region on the Left Side.*<br><br>*Found him to have tension in the upper back area, at the T4,5 area. Found with Bi-Lateral T-Spine Rotation. There is also tenderness at the C6,7 area upon C-spine rotation to the Left. The Low Back and Pelvis are not bad.*<br><br>*Treatment was done of the T4,5,10,11 area in the Prone Position. Done a Sacral Base. Doing the C2,5,6 area were done Supine. Then an Anterior was done of the T4,5 region Bi-Lateral.*<br><br>*Has done Better now. So again will see him in 1 week.* |
| 10-15-18 | *Has done much better since the last treatment. The Headaches are getting less. The Left upper back and neck region feel much better. Has noticed some stiffness the last couple days, because of the Colder weather.*<br><br>*Found T-spine tenderness at the T4,5 and T11,12 area, upon Palpation and Bi-Lateral Rotation. He shows a Low Left Hip. The C-Spine shows tenderness at the C6,7 area upon Left Lateral Flexion. The C3,4 was upon Palpation.*<br><br>*Treatment was done on the T5,6 and T11,12 area in the Prone Position. Done a Sacral Base Pump. The C6,7 and C3,4 area were done Supine. The Left Hip was done on the side. Then an Anterior was done of the T4,5 area Bi-Lateral.*<br><br>*I will keep the once weekly programs for a short time as of yet. So will see him in 1 week.* |

1118302S1047011   20181029

**Lincoln/Bunch 1003**

| D.O.B. | NAME |
| --- | --- |
| | Mark Busch |
| | VISITS & FINDINGS |

10-25-18    Hasn't done to bad since the last treatment.
Has been noticing some changes of the way
he feels with the climate changes, he getting
used with the change. Has noticed he has
greater range of movement in the Neck and upper
Back area. But is still limited. The headaches
are some better. Is seeing a specialist for his
eyes yet.

Found T-spine decreased range of movement
Bi-Laterally at the T4,5 region. There is some
tenderness. The C-spine shows decreased move-
ment at the C5,6 and C1,2 area. More to the
Left. There is also tenderness upon Left Lateral
Flexion.

Treatment was done of the T4,5,10,11 area
in the Prone Position. Thru a basic Base Drop.
The C-spine was done in the Supine Position at the
C2,4,6 area. Then an anterior was done of the
T4,5 region Bi-Lateral.

I will see the patient again in Twk.

1118302S1047011  20181029

Lincoln/Bunch 1004

04/25/2019  15:22   7196350966                                        PAGE 73/74



NAME Burch, Mark        M ☑   F_____  DATE 10-23-18   DR._____

STREET _____ CITY _____   __ ST. __   __ ZIP. _____

TELE. _   ___ OCCUPATION _____ MARITAL _____

BIRTH DATE ___ . ___ AGE _____ REF. BY_____

SYMPTOMS _____

INJURY _____

1118308S2145007  20181103

**Lincoln/Bunch 1005**

04/25/2019  15:22    7196350966                                        PAGE 74/74

| D.O.B. | NAME |
| --- | --- |
|  | Mark Busch |
|  | VISITS & FINDINGS |

**10-25-18** — Asn't done to bad since the last treatment. Has been noticing some changes of the way he feels with the climate changes. Is acting more with the changes. Has noticed he has greater range of movement in the neck and upper back areas. But is still limited. The headaches are some better. Is seeing a Specialist for his eyes yet.

Found T-Spine decreased range of movement Bi-Laterally at the T4,5 region. There is some tenderness. The C-Spine shows decreased movement at the C5,6 and C1,2 areas. More to the left. There is also tenderness upon Left Lateral flexion.

Treatment was done of the T4,5,10,11 areas in the Prone Position. Done a Rising Rise drop. The C-Spine was done in the Supine Position at the C2,4,6 areas. Then an Anterior was done of the T4,5 region Bi-Lateral.

I will see the patient again in 1 wk.

**10-30-18** — Hasn't done to bad since the last treatment. Has only had 1 headache since last time. The weather is affecting him somewhat. Has some aching of the upper back on the Left side. There is also neck pressure on the Left side. Low Back is Good.

Found T-Spine tension of the T10,11 upon palpation. There is also Tenderness of the T4,5 region more on the Left. There with Palpation and bi-Lateral Rotation. The C2,6 region is tender more upon Palpation. The Left hip is low with a Pelvic twist.

Treatment was done of the Pelvic involvement with a Pelvic Drop. The T4,5,10,11 areas were done in the Prone Position. The C2,6 areas were done Supine. Then an Anterior was done of the T4,5 region Bi-Lateral.

I will again see the patient in 1 wk.

1118308S2145007  20181103

**Lincoln/Bunch 1006**

CONFIDENTIAL FAX COVER SHEET

DATE: 4/24/2019

**ATTN TO**: liberty mutual

**FAX**: 603-422-7909

**PHONE**:

**FROM**:Brianna K Rowell, MA
FAX:
PHONE:

This fax was sent to you regarding a patient seen at a Centura Facility.
.

**STATEMENT OF CONFIDENTIALITY**: The medical information in this FAX message is confidential
and protected by both State and Federal Law. It is unlawful for unauthorized persons to review, copy,
disclose or disseminate confidential medical information. If you have received this FAX in error, please
notify us immediately at (303) 643-4200 and either destroy these documents or return the originals to us
by mail. Thank you.



Lincoln/Bunch 1007

Bunch, Mark Bryan ( CEUL0963303) DOB:                          Encounter Date: 04/04/2018
  Office Visit on 4/4/2018

## Bunch, Mark Bryan                                              MRN: CEUL0963303

Steven Wayne Olson, MD              Progress Notes              Encounter Date:  4/4/2018
Physician                           Addendum
Family Medicine

**Assessment/Plan:**

**Problem List Items Addressed This Visit**

None

**Visit Diagnoses**

**Chronic neck pain   -  Primary**
Relevant Orders
    Ambulatory Referral to Chiropractic
    Ambulatory Referral to Physical Therapy

**Traumatic injury of head, sequela**


Patient is here for follow up TBI.  He had significant eye findings but these have resolved.  For symptoms to be present after an accident seems coincidental for MS without previous symptoms.  More likely the changes are secondary to the trauma.  Referral already done for Neurology to evaluate.  He is requesting PT and chiropractor for help with the chronic neck pain.  I think that is reasonable as CT scan was negative.  He is unable to work in the short term.

1.  Mr. Bunch did suffer a concussion
2.  Are current symptoms related to the MVA - very likely but unable to confirm without additional testing - ordered referral to Neurology
3.  Return to work - Unknown

25 minutes spent in patient encounter with 15 minutes spent face to face counseling physical activity, reviewing medications, chart review

**Subjective:**

**Subjective**   Mark Bryan Bunch is a 54 y.o. male here for follow up car accident.  CT scan at the time was negative.  He was diagnosed with a concussion and sent home.  He continues to have headaches and neck pain.  Given the positive findings on exam from last visit, Brain MRI was done showing some white matter change, possibly MS.  There was no previous history of neuro deficits before the trauma.  He continues to have neck pain.

The following portions of the patient's history were reviewed and updated as appropriate: allergies, current medications, past family history, past medical history, past social history, past surgical history and problem list.

**Review of Systems**

**General:** No fevers, chills
**Psychological:** Mood normal, no anxiety or depression
**Respiratory:** Denies cough, shortness of breath, wheezing
**Cardiovascular:** No chest pain, peripheral edema, palpitations

Bunch, Mark Bryan DOB:              Printed at 4/24/19 10:36 AM                    Page 1 of 2

**Lincoln/Bunch 1008**

Bunch, Mark Bryan ( CEUL0963303) DOB:                          Encounter Date: 04/04/2018

**Gastrointestinal:** Denies abdominal pain, constipation, bloody stools
**Musculoskeletal:** neck pain
**Neurological:** headaches
**Dermatological:** Denies rashes, lesions, pruritis

**Objective:**

**EXAM:**

**Vital Signs**
BP                  (!) 180/122
Pulse               82
Temp                36.5 °C (97.7 °F) (Tympanic)
Resp                18
Ht                  182.9 cm (6')
Wt                  106 kg (234 lb)
SpO2                95%
BMI                 31.74 kg/m²

**General Appearance:** Alert, cooperative, no distress, comfortable
**Lungs:** Clear to auscultation bilaterally, respirations unlabored
**Heart:** Regular rate and rhythm, S1 and S2 normal, no murmur
**Neurologic:** Speech fluent, answers questions appropriately.  Romberg
positive.  Eye movement is more fluid today

**Psych:** Pleasant, cooperative, affect normal, judgement normal

Current Outpatient Prescriptions:
• acetaminophen (TYLENOL) 500 MG tablet, Take 500 mg by mouth every 6 (six) hours as needed for mild pain., Disp: , Rfl:
• cyclobenzaprine (FLEXERIL) 10 MG tablet, Take 1 tablet (10 mg total) by mouth 2 (two) times a day as needed for muscle spasms., Disp: 60 tablet, Rfl: 11

Steven Wayne Olson, MD

Electronically signed by Steven Wayne Olson, MD at 4/9/2018 11:32 AM

**Lincoln/Bunch 1009**

HPR-24-2019(WED) 09:47    DR HIGGINBOTHAM                (FAX)719 260 6086        P.001/003

# Occupational
# And
# Environmental Health Services

Thomas W. Higginbotham, DC
Board Certified
Occupational And
Environmental Medicine

FAX COVER SHEET

SGC - 441 - 1415

TO: _____    FAX NO. _235-6964_

FROM: ____Thomas Higginbotham, D.O.____    FAX NO. ____(719) 260-6086____

DATE: _4/24/19_ NO. OF PAGES _____    (INCLUDES COVER SHEET)

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CONTACT US AS SOON AS
POSSIBLE FOR RE-TRANSMISSSION.

*Re: Mark Bunch*
*DOB*

The information contained in this facsimile transmission is intended solely for the
addressee(s) named above and is privileged and/or confidential. If the reader of this
message is not the intended recipient or the person responsible to deliver it to the
intended recipient, you are prohibited from reading or disclosing the information
contained in this transmission. Any examination, use, dissemination, distribution, or
copying of this communication is strictly prohibited. If you have received this
communication in error, please notify us immediately by phone for instructions.

1430 South 21ⁿ Street, Suite 101
Colorado Springs, CO  80904
(719)260-8190
FAX 260-6086

Lincoln/Bunch 1010

APR-24-2019(WED) 09:47    DR HIGGINBOTHAM                (FAX)719 260 6086        P. 002/003
   Rx late/Time      APR-23-2019(TUE) 08:49                                      P. 002

Apr 23 2019 11:53:26 EDT Liberty Mutual Insur.       MSG# 1523921621-006-1    Page 002 OF 004



Liberty Life Assurance
Company of Boston, a Lincoln
Financial Group company

Group Benefits Disability Claim
P.O. Box 7206
London, KY 40742-7206
Secure Fax 866-841-1415

April 23, 2019

Thomas Higginbotham DO
1430 South 21st Street, Suite 101
Colorado Springs, CO 80904
By fax: 719-260-6086

Re: Disability Benefits
Claimant Name: Mark Bunch
Claimant DOB:
Claim Number: 8220685

Dear Dr. Higginbotham:

Thank you for taking my call earlier today. I am the physician who was asked by Lincoln Financial Group to review the medical records Mr. Bunch submitted in support of his request for disability benefits. I appreciated the chance to speak with you and I'm writing to summarize my understanding of our conversation. My questions, and your responses, were:

*Q1.   Did you see this patient between 08/13/18 and 02/18/19?*
A1.   No. I saw him as part of a contested workers compensation claim. My understanding was that the claim had settled, the patient could not return to work, and he was applying for disability, Social Security ~~claim~~ *[handwritten] 11/20/18  11/6/2018*

*Q2.   Have you seen this patient since 02/19/19?*
A2.   No. I had conferences with the attorney in November and December 2018. And, I saw the patient on 02/19/19 for a report, ~~claim~~ for his Social Security disability claim.

*Q3.   Your 02/19/19 report lists recommendations for vestibular therapy, occupational therapy, and physical therapy. Has the patient gone on to see these therapists?*
A3.   I don't know.

*Q4.   The patient is off work based on postconcussion syndrome. The records that were sent to the insurer consist of the PCP notes, some physical therapy notes for a neck strain per the PCP, your notes, some chiropractic notes, and two neuropsychological evaluations, each deemed invalid. Typically, if someone is severely impaired by postconcussion syndrome, the expectation would be that they'd see a neurologist, undergo diagnostic workup for their symptoms (vestibular, eye, etc.), and if the symptoms continue be seen at a headaches center, a tertiary care provider. The records that were sent to the insurer include no neurology evaluation, and no records from vestibular, vision, or other specialists.*
A4.   Many of the referrals got held up by insurance coverage issues. The patient had seen occupational medicine Dr. Frank Polanco, who treated this like he was doing an IME for the insurance company, and dismissed the patient. The insurer then started questioning further referrals. The

**Lincoln/Bunch 1011**

Re: Mark Bunch                                                   April 23, 2019
                                                                Page 2

patient did see neurologist Dr. Brinley in Colorado Springs on 10/19/18, and she recognized he had ongoing postconcussion symptoms and suggested vestibular therapy. I also have a paragraph that the neuro-optometrist wrote on 11/21/18 stating the patient has perception problems. I think the neuropsychological tests were compromised because the patient had vision and balance problems. *and a other medical conditions, i.e post concussion syndrome*

Q5.    *I understand the patient reports vision and balance problems. But, we've not received any vision test result, balance test results, or records of treatment for vision or balance problems.*
A5.    It sounds like you need to gather those records.

Q6.    *The disability insurance company probably already asked the patient to provide all of the records. I'm not sure how much more record gathering takes place at this appeal stage of the claim.*

---

To ensure that I have accurately summarized our conversation, please make any corrections or comments to this letter if necessary, sign below in the space provided, and fax this letter to Lincoln Financial at the toll free and secure return fax number (866) 841-1415.

Thank you for your help. Lincoln Financial is willing to reimburse you for any reasonable costs incurred in responding to requests for information.

Respectfully yours,

-Electronically Signed-

Robert Swotinsky MD
Consulting Physician
Board Certified, Occupational Medicine
978 337 4479 c, 866 81 1415 f

___ No changes/comments, OR
_✓_ With changes/comments as noted above

Thomas Higginbotham, DO          Date    4/24/19

*Please fax to 866 841 1415*

Enclosure: Signed release form

cc. Atty K. Shufesh-ft

*4/24/19
reviewed record & report
Q1: I saw Mr Bunch
on 11/6/19 & 12/20/18*

Liberty Mutual Insurance

**Lincoln/Bunch 1012**

HPR-24-2019(WED) 05:58    DR HIGGINBOTHAM                    (FAX)719 260 6086         P. 001/004

## Occupational
## And
## Environmental Health Services

Thomas W. Higginbotham, DC
Board Certified
Occupational And
Environmental Medicine

FAX COVER SHEET

*Dr Swatinsky*                                    *SGC - 041 - 1415*

TO: *Atty Shakeshaft*                    FAX NO. *235-6966*

FROM: ___Thomas Higginbotham, D.O.___    FAX NO. ___(719) 260-6086___

DATE: *4/24/19*  NO. OF PAGES _____    (INCLUDES COVER SHEET)

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CONTACT US AS SOON AS
POSSIBLE FOR RE-TRANSMISSSION.

*Re: Mark Bunch*
*DOB*

The information contained in this facsimile transmission is intended solely for the
addressee(s) named above and is privileged and/or confidential. If the reader of this
message is not the intended recipient or the person responsible to deliver it to the
intended recipient, you are prohibited from reading or disclosing the information
contained in this transmission. Any examination, use, dissemination, distribution, or
copying of this communication is strictly prohibited. If you have received this
communication in error, please notify us immediately by phone for instructions.

1430 South 21ˢᵗ Street, Suite 101
Colorado Springs, CO 80904
(719)260-8190
FAX 260-6086

Lincoln/Bunch 1013

APR-24-2019(WED) 05:58    DR HIGGINBOTHAM              (FAX)719 260 6086         P. 002/004

Rx Date/Time      APR-23-2019(TUE) 08:49                                        P. 002

Apr 23 2019 11:53:26 EDT Liberty Mutual Insur       MSG# 1523921621-006-1    Page 002 Of 004

Liberty Life Assurance
Company of Boston, a Lincoln
Financial Group company

**Lincoln**
Financial Group®

Group Benefits Disability Claim
P.O. Box 7206
London, KY 40742-7206
Secure Fax 866-841-1415

April 23, 2019

Thomas Higginbotham DO
1430 South 21ˢᵗ Street, Suite 101
Colorado Springs, CO 80904
By fax: 719-260-6086

Re: Disability Benefits
Claimant Name: Mark Bunch
Claimant DOB:
Claim Number: 8220685

Dear Dr. Higginbotham:

Thank you for taking my call earlier today. I am the physician who was asked by Lincoln Financial Group to review the medical records Mr. Bunch submitted in support of his request for disability benefits. I appreciated the chance to speak with you and I'm writing to summarize my understanding of our conversation. My questions, and your responses, were:

*Q1.    Did you see this patient between 08/13/18 and 02/18/19?*
A1.    No. I saw him as part of a contested workers compensation claim. My understanding was that the claim had settled, the patient could not return to work, and he was applying for disability, Social Security ~~I think~~ *not*

*Q2.    Have you seen this patient since 02/19/19?*
A2.    No. I had conferences with the attorney in November and December 2018. And, I saw the patient on 02/19/19 for a report, ~~I think~~ for his Social Security disability claim.

*Q3.    Your 02/19/19 report lists recommendations for vestibular therapy, occupational therapy, and physical therapy. Has the patient gone on to see these therapists?*
A3.    I don't know.

*Q4.    The patient is off work based on postconcussion syndrome. The records that were sent to the insurer consist of the PCP notes, some physical therapy notes for a neck strain per the PCP, your notes, some chiropractic notes, and two neuropsychological evaluations, each deemed invalid. Typically, if someone is severely impaired by postconcussion syndrome, the expectation would be that they'd see a neurologist, undergo diagnostic workup for their symptoms (vestibular, eye, etc.), and if the symptoms continue be seen at a headaches center, a tertiary care provider. The records that were sent to the insurer include no neurology evaluation, and no records from vestibular, vision, or other specialists.*
A4.    Many of the referrals got held up by insurance coverage issues. The patient had seen occupational medicine Dr. Frank Polanco, who treated this like he was doing an IME for the insurance company, and dismissed the patient. The insurer then started questioning further referrals. The

**Lincoln/Bunch 1014**

Re: Mark Bunch                                                      April 23, 2019
                                                                    Page 2

patient did see neurologist Dr. Brinley in Colorado Springs on 10/19/18, and she recognized he had ongoing postconcussion symptoms and suggested vestibular therapy. I also have a paragraph that the neuro-optometrist wrote on 11/21/18 stating the patient has perception problems. I think the neuropsychological tests were compromised because the patient had vision and balance problems. *and other medical conditions, ie post concussion syndrome*

Q5.    *I understand the patient reports vision and balance problems. But, we've not received any vision test result, balance test results, or records of treatment for vision or balance problems.*
A5.    It sounds like you need to gather those records.

Q6.    *The disability insurance company probably already asked the patient to provide all of the records. I'm not sure how much more record gathering takes place at this appeal stage of the claim.*

_____

To ensure that I have accurately summarized our conversation, please make any corrections or comments to this letter if necessary, sign below in the space provided, and fax this letter to Lincoln Financial at the toll free and secure return fax number (866) 841-1415.

Thank you for your help. Lincoln Financial is willing to reimburse you for any reasonable costs incurred in responding to requests for information.

Respectfully yours,

-Electronically Signed-

Robert Swotinsky MD
Consulting Physician
Board Certified, Occupational Medicine
978 337 4479 c, 866 81 1415 f

___ No changes/comments, OR
_✓_ With changes/comments as noted above

Thomas Higginbotham, DO          Date
        *Please fax to 866 841 1415*

Enclosure: Signed release form

cc, Atty K. Shukershoft

Liberty Mutual Insurance

**Lincoln/Bunch 1015**



| | |
|---|---|
| | Liberty Life Assurance Company of Boston |
| | Group Benefits Disability Claims |
| | P.O. Box 7207 |
| | London, KY 40742-7207 |
| | Phone No.: (844) 384-5858 |
| | Secure Fax No.: (603) 559-9400 |

## AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

**I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:**

Person(s) or group(s) of persons authorized to use or disclose the information:   Any physicians, medical practitioners, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

Person(s) or group(s) of persons authorized to collect or otherwise receive the information: The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employees, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

Description of the information that may be used or disclosed: This Authorization specifically includes the release of all information related to:

* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatments, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including HIV/AIDS.
* Job duties, earnings, personnel records and other work related information and credit reports, bank records, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents

The information will be used or disclosed only for the following purpose(s): For purposes of investigating, evaluating and processing my claim, and/or for insurance-related functions.

**STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:**

I understand that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

I understand that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

I understand that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization.  If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration.  The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print) _Frank Bunch_

Name of legal representative, if applicable (print) _Ken Shakeshaft_         Relationship _Attorney_

Signature of claimant or legal representative _Ken Shakeshaft_

Date of Birth: _____   Claim Number: _8220685_   Date: _____

**A copy of this authorization will be considered as valid as the original.**

pg. 1 Authorization-Standard-2016

Lincoln/Bunch 1016



# FAX COVER SHEET

**Date:** Tuesday, April 23, 2019

**To:**    Thomas Higginbotham DO

**Fax #:** 719-260-6086

**From:** Robert Swotinsky MD

**Phone #:** 978 337 4479

**Fax #:** 866 841 1415

**Pages
(including cover):**    04

**Notes:**

*This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me via return fax or via telephone and permanently delete the original and any copy of any fax and any printout thereof.*

**Lincoln/Bunch 1017**



Liberty Life Assurance
Company of Boston, a Lincoln
Financial Group company

Group Benefits Disability Claim
P.O. Box 7206
London, KY 40742-7206
Secure Fax 866-841-1415

April 23, 2019

Thomas Higginbotham DO
1430 South 21st Street, Suite 101
Colorado Springs, CO  80904
By fax: 719-260-6086

Re: Disability Benefits
Claimant Name: Mark Bunch
Claimant DOB:
Claim Number: 8220685

Dear Dr. Higginbotham:

Thank you for taking my call earlier today. I am the physician who was asked by Lincoln Financial Group to review the medical records Mr. Bunch submitted in support of his request for disability benefits. I appreciated the chance to speak with you and I'm writing to summarize my understanding of our conversation.  My questions, and your responses, were:

*Q1.    Did you see this patient between 08/13/18 and 02/18/19?*
A1.    No.  I saw him as part of a contested workers compensation claim.  My understanding was that the claim had settled, the patient could not return to work, and he was applying for disability, Social Security I think.

*Q2.    Have you seen this patient since 02/19/19?*
A2.    No.  I had conferences with the attorney in November and December 2018.  And, I saw the patient on 02/19/19 for a report, I think for his Social Security disability claim.

*Q3.    Your 02/19/19 report lists recommendations for vestibular therapy, occupational therapy, and physical therapy.  Has the patient gone on to see these therapists?*
A3.    I don't know.

*Q4.    The patient is off work based on postconcussion syndrome.  The records that were sent to the insurer consist of the PCP notes, some physical therapy notes for a neck strain per the PCP, your notes, some chiropractic notes, and two neuropsychological evaluations, each deemed invalid.  Typically, if someone is severely impaired by postconcussion syndrome, the expectation would be that they'd see a neurologist, undergo diagnostic workup for their symptoms (vestibular, eye, etc.), and if the symptoms continue be seen at a headaches center, a tertiary care provider.  The records that were sent to the insurer include no neurology evaluation, and no records from vestibular, vision, or other specialists.*
A4.    Many of the referrals got held up by insurance coverage issues.  The patient had seen occupational medicine Dr. Frank Polanco, who treated this like he was doing an IME for the insurance company, and dismissed the patient.  The insurer then started questioning further referrals.  The

Re: Mark Bunch                                                                  April 23, 2019
                                                                                      Page 2

patient did see neurologist Dr. Brinley in Colorado Springs on 10/19/18, and she recognized he had ongoing postconcussion symptoms and suggested vestibular therapy. I also have a paragraph that the neuro-optometrist wrote on 11/21/18 stating the patient has perception problems. I think the neuropsychological tests were compromised because the patient had vision and balance problems.

*Q5.     I understand the patient reports vision and balance problems. But, we've not received any vision test result, balance test results, or records of treatment for vision or balance problems.*
A5.     It sounds like you need to gather those records.

*Q6.     The disability insurance company probably already asked the patient to provide all of the records. I'm not sure how much more record gathering takes place at this appeal stage of the claim.*

—————————

To ensure that I have accurately summarized our conversation, please make any corrections or comments to this letter if necessary, sign below in the space provided, and fax this letter to Lincoln Financial at the toll free and secure return fax number (866) 841-1415.

Thank you for your help. Lincoln Financial is willing to reimburse you for any reasonable costs incurred in responding to requests for information.

Respectfully yours,

-Electronically Signed-

Robert Swotinsky MD
Consulting Physician
Board Certified, Occupational Medicine
978 337 4479 c, 866 81 1415 f

____ No changes/comments, OR
____ With changes/comments as noted above

_____  _____
Thomas Higginbotham, DO              Date

*Please fax to 866 841 1415*

Enclosure: Signed release form

                                                                                Page **2** of **2**

Liberty Mutual Insurance

**Lincoln/Bunch 1019**

3W212180030


Liberty Mutual.
INSURANCE

> Liberty Life Assurance Company of Boston
> Group Benefits Disability Claims
> P.O. Box 7207
> London, KY 40742-7207
> Phone No.: (844) 384-5858
> Secure Fax No.: (603) 559-9400

## AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:

**Person(s) or group(s) of persons authorized to use or disclose the information:** Any physicians, medical practitioners, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

**Person(s) or group(s) of persons authorized to collect or otherwise receive the information:** The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employees, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

**Description of the information that may be used or disclosed:** This Authorization specifically includes the release of all information related to:

* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatments, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including HIV/AIDS.
* Job duties, earnings, personnel records and other work related information and credit reports, bank records, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents

**The information will be used or disclosed only for the following purpose(s):** For purposes of investigating, evaluating and processing my claim, and/or for insurance-related functions.

### STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:

I understand that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

I understand that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

I understand that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization. If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration. The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print)  ALan K Bunch

Name of legal representative, if applicable (print)  Ken Shakeshaft        Relationship  Attorney

Signature of claimant or legal representative  _____

Date of Birth: _____      _____  Claim Number: __8220685__  Date: _____

A copy of this authorization will be considered as valid as the original.

pg. 1 Authorization-Standard-2016

Lincoln/Bunch 1020

```
From: RightFax E-mail Gateway  <RightFaxE-mailGate@LibertyMutual.com>
Sent: Tuesday, April 23, 2019 11:56 AM
To:  Swotinsky, Robert
Subject:   Your fax has been successfully sent to Thomas Higginbotham DO
at 719-
260-6086. RE:

Your fax has been successfully sent to Thomas Higginbotham DO at 719-260-
6086. RE:
-------------------------------------------------------------
From: Robert Swotinsky MD
Account: 8220685
-------------------------------------------------------------
4/23/2019 11:52:52 AM Transmission Record
     Sent to 719-260-6086 with remote ID "7192606086"
     Result: (0) Success
     Page record: 1 - 4
     Elapsed time: 02:32 on channel 36
```

**Lincoln/Bunch 1021**

| Plan Holder | Claimant  Name (Last, First) | Claim # |
|---|---|---|
| Charter Communications | Bunch, Mark | 8220685 |

| | |
|---|---|
| **Referred by:** | Courtney Grygiel |
| **Report Date:** | 04/23/2019 |
| **CP Reviewer and Specialty:** | R Swotinsky MD; Occupational Medicine |
| **Claimant DOB:** | |
| **Job Title/Occupation**: | Direct Sales Representative |
| **DOD**: | 02/14/2018 |
| **Diagnosis:** | Postconcussion syndrome, history of |
| **Type of Claim:** | LTD |

## Appeal Review

### *Responses to Questions*

*Q1.    What diagnoses are supported by the medical evidence?*

A1.    <u>Diagnosis</u>                                                                                  <u>ICD-10 code</u>

1.    Primary (essential) hypertension                                          I10
2.    Postconcussion syndrome, history of                                F07.81
3.    Persistent mood [affective] disorder, unspecified             F34.9
4.    Post-traumatic stress disorder                                             F43.10

*Q2.    Does the medical evidence support any diagnoses causing functional impairment from 2/14/18 to 8/14/18 and 8/15/18 to the present? Please explain your medical rationale as to why or why not.*

A2.    From 02/14/18 until as late as 08/14/18, impairment is supported by postconcussion syndrome and a pending neuro-optometry appointment.  There is not support for a diagnosis causing functional impairment from 08/15/18 to the present.

*Q3.    If functional impairment is supported, please describe how that translates into re-strictions or limitations and for what period(s) of time. Please define in terms of frequency (nev-er, occasional, frequent, constant) and task (sit, stand, lift/carry, type, etc.). Please explain your medical rationale for any restrictions or limitations or why restrictions or limitations are not supported.*

A3.    The submitted information is too nonspecific to define the activity limita-tions/restrictions during 02/14/18 – 08/14/18.  The support that I find in the record for im-pairment (perhaps sufficient to preclude full duty) is based on the diagnosis and the estimated mid-August return-to-work date after the neuro-optometry visit as per occupational medicine Dr. Higginbotham.

*Q4.    Are there any reported or observed cognitive and/or physical side effects attributed to claimant's medications?  If yes, do the side effects contribute to claimant's impairment? Please explain your medical rationale.*

**Lincoln/Bunch 1022**

Ms. Courtney Grygiel                          Claimant:  Mark Bunch
April 23, 2019                                Claim #8220685
Page 2

A4.      The submitted information indicates antihypertensive medication, only.   It does not in-
dicate side effects from that medication.

*Q5.      Does the (overall functional and ) medical evidence support the claimant can sustain full-
time capacity (8 hours/day, five days/week) within the identified restrictions and limitations
from 2/14/18 to 8/14/18 and 8/15/18 to present?  Please explain your medical rationale.*
A5.      The diagnoses and clinical findings do not correlate with ability to work only part-time,
instead of full-time, during either interval.

*Q6.      When contacting treating provider Dr. Higginbotham, please discuss the claimant's con-
dition, treatment, and functional capacity. Please indicate the information reviewed and indi-
cate whether or not you reached consensus with the treating provider. If not, please discuss
your final assessment after the call.*
A6.      Dr.  Higginbotham and I spoke on 04/23/19.  Dr. Higginbotham said he saw the claimant
as part of a workers' compensation claim and his involvement ended once that claim got set-
tled, except for the February 2019 report that the claimant's attorney request for the disability
claim.  The end of this report summarizes my discussion with Dr. Higginbotham further.

### *Impairment Review*

1.      Primary (essential) hypertension

The claimant's hypertension is treated with antihypertensive medication.  This diagnosis poses
a risk of end-organ damage, e.g., stroke, heart attack, etc.  If end-organ damage occurs, it may
be a source of functional impairment.

Dr. Higginbotham cites "malignant hypertension."  The term "malignant hypertension" entered
the medical lexicon in 1928 because, at that time, patients had a prognosis that was similar to
patients with many cancers.  The term is not currently relevant because antihypertensive ther-
apies can quickly and safely lower blood pressures and improve outcomes.

2.      Postconcussion syndrome

       a.      The symptoms are consistent with postconcussion syndrome

       The claimant reports headache, dizziness, cognitive impairment, and psychological
       symptoms after a mild traumatic brain injury (TBI) on 02/13/18.  These are symptoms of
       postconcussion syndrome.

       b.      The prolonged symptoms and related factors are consistent with a nonmedical
               cause

**Lincoln/Bunch 1023**

Ms. Courtney Grygiel                         Claimant:  Mark Bunch
April 23, 2019                               Claim #8220685
Page 3

The vast majority of patients have largely recovered from postconcussion syndrome by three months.[i] Litigation and compensation issues are a strong consistent risk factor for persistent symptoms and disability after mild TBI.[ii] While Attorney Shakeshaft states that the claimant's condition is physical and not psychologic/psychiatric, treatment guidelines advise that in patient with persistent post-concussive symptoms which have been refractory to treatment, consideration should be given to other factors including psychiatric disorders, lack of psychosocial support, and compensation/litigation.[iii]

Potential indicators of malingering include inconsistencies in neuropsychological test performance, financial stressors, lack of reasonable follow-through on treatments, and engaging in activities inconsistent with reported deficits.[iv,v] These indicators are present. For example:

- Inconsistencies in neuropsychological test performance per Dr. Helffenstein (May 2018) and Dr. Staudenmayer (August 2018).
- Financial stress as reported by the claimant to Dr. Helffenstein (May 2018) and Dr. Staudenmayer (August 2018).
- Lack of follow-through on treatments. For example:
  - Dr. Higginbotham made referrals to about seven therapists. The submitted records are from just one of these, neuropsychologist Dr. Staudenmayer.[1]
  - Dr. Staudenmayer suggested an initial course of eight, 1-hour therapy sessions. The submitted records are from just one completed therapy session.
- Engaging in activities inconsistent with reported deficits. On 05/03/18, the claimant stated he was not driving and could not drive. On 07/25/18, he stated he was legally blind. In contrast:
  - On 05/03/18, surveillance filmed him driving.
  - On 05/22/18, Dr. Higginbotham noted, "He drove himself to this visit."
  - In May 2018, the claimant told Dr. Helffenstein that he was driving.

c.      Scant records of evaluation and treatment for postconcussion syndrome

Treatment of postconcussion syndrome should be individualized to the patient's particular complaints. For example, for headaches, amitryptilline is a first-line drug treatment. For psychologic and cognitive symptoms, treatments include cognitive rehabilitation, supportive psychotherapy, antidepressant and anxiolytic medications, and perhaps donepezil. For balance symptoms, neuro-otologic evaluation is recommended and, if the evaluation is positive, referral to clinicians with experience in balance training. For vision symptoms, a comprehensive vision evaluation is recommended and, if positive, treatment.[iii,vi]

---

[1] Dr. Higginbotham's notes indicate that the claimant also saw an optometrist and got updated corrective lenses. The records from that optometrist were not submitted.

**Lincoln/Bunch 1024**

Ms. Courtney Grygiel                                Claimant:  Mark Bunch
April 23, 2019                                      Claim #8220685
Page 4

The claimant's records present scant evaluation/treatment for postconcussion syn-
drome.  The evaluation has not been managed by a specialist with expertise in postcon-
cussion syndrome.  The treatment that Dr. Higginbotham has prescribed for the claim-
ant's postconcussion symptoms has consisted of 5/22/18 prescriptions for three pain
medications – indomethacin, Robaxin, and betamethasone  - and recommendations for
nutritional supplements and self-help brain (e.g., memory) exercises.  (Nutritional sup-
plements and self-help brain exercises are not established in the evidence-based medi-
cal literature as effective and recommended treatments for postconcussion syndrome.)
The file has no records from the various referrals made by Dr. Higginbotham, with the
exception of the session with psychologist Dr. Staudenmayer.  Records have not been
submitted that present:

- Evaluation and treatment by a specialist in neurology or in postconcussion
  headaches.
- Treatment for psychological and cognitive symptoms, with the exception of the
  session with psychologist Dr. Staudenmayer.
- Evaluation or treatment of balance symptoms.
- Evaluation or treatment of vision symptoms.

The 07/31/18 visit with Dr. Higginbotham marked the end of the records of evalua-
tion/treatment of postconcussion syndrome, with the exception of the 02/14/19 ap-
pointment that Atty Shakeshaft arranged with Dr. Higginbotham for a disability report.
The absence of documented medical care for postconcussion syndrome since 07/31/18
fails to support the acuity/severity of this condition.

d.      Summary: Lack of support for current impairment from postconcussion syn-
        drome

The claimant had a mild TBI on 02/13/18.  He reports postconcussion symptoms a year
later.  He has not been evaluated or treated by a specialist in postconcussion syndrome.
The records present scant evidence of evaluation/treatment for postconcussion syn-
drome, and no evaluation or treatment at all after 07/31/18 (until Atty Shakeshaft sent
the claimant back to Dr. Higginbotham in February 2019).  The diagnostic findings do
not define a brain injury.  Instead, multiple factors in the record point to nonmedical
basis (bases) for the symptoms that the claimant reports.

e.   02/14/18 – 08/14/18; 08/15/18 to the present.

During 02/14/18 – 08/14/18, the record indicates evaluation/treatment of postconcus-
sion syndrome by PCP Dr. Olson and occupational medicine Dr. Higginbotham.  The
evaluation was fairly nonspecific (e.g., anti-inflammatory medication) and nonspecial-
ized.  And, the symptoms and submitted exam findings were nonspecific as well.  The
claimant was driving as early as May 2018, which suggests some degree of capacity with

**Lincoln/Bunch 1025**

Ms. Courtney Grygiel                          Claimant:  Mark Bunch
April 23, 2019                                Claim #8220685
Page 5

regard to vision, cognition, and use of the upper extremities/upper body.  The submit-
ted information is too nonspecific to further define the claimant's impairments during
that period.  The medical literature supports some degree of impairment during the
first approximately three months after the 02/13/18 accident, i.e., until 05/13/18.  And,
Dr. Higginbotham made some referrals that were not yet complete at that time, so this
could perhaps support a longer absence pending those referrals.  Dr. Higginbotham had
anticipated return to work in mid-August after the neuro-optometry visit.  This was not
unreasonable.

Since no records of evaluation/treatment of postconcussion syndrome after 07/31/18
were submitted, the information does not document clinical findings to substantiate
ongoing impairment from postconcussion syndrome, including from 08/15/18 to the
present.  (The February 2019 visit with Dr. Higginbotham was per referral from Dr.
Shakeshaft for purposes of the appeal.  There are not records that Dr. Higginbotham
has been treating the claimant for postconcussion syndrome after 07/31/18.)

3.      Mood disorder, unspecified
4.      Post-traumatic stress disorder

The records refer to symptoms of anxiety, depression, and PTSD.  I am not a psychiatrist.  The
record has just one assessment of impairment by a psychiatrist (Dr. Young) and I defer to that
assessment.

5.      Cognitive impairment, r/o

The neuropsychology evaluations by Dr. Helffenstein (May 2018) and Dr. Staudenmayer (Au-
gust 2018) each reported inconsistencies in neuropsychological test performance.  The records
lack valid measures of cognitive impairment.  The record lacks physical findings of brain dam-
age.  No treatment records for cognitive disorder(s) were submitted.  Since there are no valid
measures of cognitive impairment, no clinical findings relevant to cognitive impairment, and no
records of treatment for cognitive impairment, the information does not document clinical ev-
idence to substantiate cognitive impairment.

6.      Vision impairment, r/o

Since no records of evaluation/treatment of vision were submitted, the information does not
document clinical findings to substantiate vision impairment.

7.      Ulnar neuropathy, r/o

Dr. Higginbotham noted on his 02/14/19 report to Atty Shakeshaft that the claimant had
"weakly positive Tinel's at the right cubital tunnel," and "He complains of numbness and tin-
gling sensations about the ulnar aspect of the left hand and distal forearm."  Dr. Hig-

**Lincoln/Bunch 1026**

Ms. Courtney Grygiel                              Claimant:  Mark Bunch
April 23, 2019                                    Claim #8220685
Page 6

ginbotham's conclusion that the claimant has "ulnar neuritis, left" is unsupported by the sub-
mitted medical evidence because there are not:

    a.    Clinical findings of a left ulnar neuropathy.  (Dr. Higginbotham's records have no clinical findings about the left ulnar nerve.)

    b.    Electrodiagnostic tests demonstrating an ulnar neuropathy.  (Nerve conduction studies are the usual diagnostic test to verify the presence and severity of an ulnar neuropathy.)

    c.    Records of referral to a neurologist or hand orthopedist for this condition.  (These are the types of specialist who evaluate and treat ulnar neuropathy.)

    d.    Records of treatment for ulnar neuropathy.

8.    Cervical spine injury, r/o
9.    Thoracic spine injury, r/o

While the claimant reported pain on 02/14/19, the information in the file lacks clinical findings to support pathology of the cervical or thoracic spine.  Records of treatment for a cervical or thoracic strain/sprain end with the 09/24/18 chiropractic adjustments.

### *Records Review*

The claimant is a 55-year-old travelling salesman.  The policy's disability test changes to "any occupation" on ~08/14/2020.

On 02/13/18, the claimant had a car accident at work.  The claimant has remained off work.

A.    Clinical information

In the car accident, the claimant's forehead struck the steering wheel.  He did not lose consciousness.  The claimant drove after the hit-and-run driver who had struck his car and got that driver to pull over until police came.

- 02/13/18.  Emergency room.  CT scan: No visible intracranial pathology.

- 04/13/18.  Steven Olson, MD.  Family practice.  The claimant had reported problems with his vision, but this has resolved.  He wants referrals to physical therapy and to a chiropractor for neck pain.  I am also referring him to neuropsychologist Dr. Helffenstein.  On exam: BP 150/90.  "Eye movement is intact but he is not fluidly tracking."  Other exam findings were normal.

- 05/03/18.  Thomas Higginbotham, DO.  Occupational medicine.  Initial visit; office note sent to claimant's Attorney Shakeshaft.  The claimant reports constant headaches accompanied by tunnel vision, dizziness, and sensitivity to sound and light.  On exam: BP

**Lincoln/Bunch 1027**

Ms. Courtney Grygiel                          Claimant:  Mark Bunch
April 23, 2019                                Claim #8220685
Page 7

188/100.  The claimant appears imbalanced (positive Romberg's test, gets dizzy with ex-tension of the head) and he reports pain (tenderness) over the "cervical anterior and posterior musculature."  I am referring him to a neurologist and neuro-optometrist,[2] and I hope to get a copy of the neuropsychological report.  I do not endorse him to drive; hence, he cannot do his job.

- 05/03/18 and 05/18/18.  Dennis Helffenstein, Ph.D.  Neuropsychological testing.  The claimant reports "significant financial stressors."  The claimant reports that he drives.  By history, he has a post-concussive syndrome/mild traumatic brain injury and would not be expected to have reached maximal medical improvement, yet.  "Based on his suboptimal performance on two standalone Performance Validity Tests, I made the decision to discontinue his testing as it was evidence that we were not going to be able to obtain valid neuropsychological test results."

- 05/22/18.  Dr. Higginbotham.  "He drove himself to this visit… He has negative Romberg's maneuver.  Balance is reasonable.."  My impression is this patient has posttraumatic and tension headache, visuospatial disorientation, unspecified cognitive changes, and strain and sprain injuries.  Treatment includes osteopathic manipulations.  Treatment consists of indomethacin, Robaxin, and betamethasone.

- 06/08/18.  Dr. Higginbotham.  I expect that, after he sees a neuro-optometrist and is treated, the claimant will be able to return to work in mid-August 2018.

- 06/11/18.  Physical therapy visit #8 for neck pain, per order by PCP Dr. Olson.  (There are no physical therapy records after 06/11/18.)

- 07/17/18.  Dr. Higginbotham.  "Mr. Bunch had his neuro-optometry evaluation yesterday.  He was provided corrective lenses… He has noted marked improvement with the corrective lenses."  Treatment consists of "memory improving exercises."

Dr. Higginbotham saw the claimant periodically until 07/31/18.  Treatment provided by Dr. Higginbotham consisted of recommendations for nutritional supplements and self-help brain (e.g., memory) exercises.   Dr. Higginbotham watched a surveillance video from an insurer showing the claimant driving ~1 mile in May 2018.   Dr. Higginbotham corresponded with the claimant's Attorney Shakeshaft.  Dr. Higginbotham's notes indicate he referred the claimant for:

- Cognitive behavioral therapy

---

[2] The file includes a reference to Michael Saxerud, OD.  He used to practice at Gleneagle Vision in Colorado Springs.  That practice appears to have closed.

**Lincoln/Bunch 1028**

Ms. Courtney Grygiel                          Claimant:  Mark Bunch
April 23, 2019                                Claim #8220685
Page 8

- Physical therapy[3]
- Driving evaluation
- Neurology
- Speech therapy
- Vestibular therapy

The file has no records from providers of the above-listed services.  The file does include a report by neuropsychologist Dr. Staudenmayer:

- 08/06/18.  Herman Staudenmayer Ph.D.  The claimant reports financial stress.  "Mental status exam suggest exaggeration and adopting the sick role.  Psychological testing indicated that his self-report reflects over-reporting bias, making the self-reported symptoms invalid.  Comprehensive neuropsychological testing is contraindicated at this time.  He may benefit from psychotherapy to address these issues."  Dr. Staudenmayer recommended an initial course of 8, 1-hour sessions.  The submitted documents indicate the claimant had one session, on 08/13/18, for a visit at which the claimant recounted traumatic childhood events and was thought to have PTSD.

There are chiropractic notes through 09/24/18 for adjustments of the cervical and thoracic spine.  The chiropractic notes refer to "decreased range of motion" and tension."  After 09/24/18, the next record of evaluation/treatment is on 02/14/19, when the claimant returned to Dr. Higginbotham for evaluation and a report to Atty Shakeshaft.  Dr. Higginbotham noted abnormal findings on exam of "an equivocally positive Romberg's sign," "balance is poor," a "weakly positive Tinels at the right cubital tunnel," and "gait is abnormal as it is slow and cautious but without assistance."  Dr. Higginbotham stated these were the diagnoses:

1. History of motor vehicle accident
2. History of a mild traumatic brain injury
3.  Emotional and behavioral disturbance/changes
4. Neurocognitive disorder
5. Visual difficulties with spatial disorientation
6. Post traumatic headache
7. Cervical strain/sprain
8. Thoracic strain
9. Ulnar neuritis, left
10. Imbalance
11. Dysphasia
12. Dysphagia
13. History of falls
14. Generalized anxiety with depressed mood
15. PTSD
16. Situational adjustment reactions
17. Sleep disturbance
18. Overweight
19. Hypertension, malignant

---

[3] The claimant attended physical therapy through 06/11/18 visit #8 per referral by PCP Dr. Olson for neck pain.

**Lincoln/Bunch 1029**

Ms. Courtney Grygiel                          Claimant:  Mark Bunch
April 23, 2019                                Claim #8220685
Page 9

Dr. Higginbotham recommended antihypertensive medication, speech therapy, physical thera-
py, and vestibular therapy.  The record does not indicate that Dr. Higginbotham made referrals
to any of these providers, not does the file include records from speech therapy, physical ther-
apy, or vestibular therapy providers as recommended by Dr. Higginbotham on 02/14/19.[4]

B.      Work fitness opinions and related information

1.      05/03/18.  Video surveillance.  The claimant was filmed driving ~1 mile to and
        from a store, opening and closing a gate, walking shorts distances unencum-
        bered.

2.      05/03/18.  Dr. Higginbotham.  "He relates that he is not driving, as he is disori-
        ented with visual difficulties and with headache… I do not endorse him to drive,"
        so he can't work.

3.      07/25/18.  Claimant.  I cannot work because I am legally blind since the car acci-
        dent, I have "horrible headaches, double vision, ringing in my ears, unable to
        sleep or concentrate…"

4.      09/01/18.  Dr. Markovitz.  Consulting Neurologist, Physician, Lincoln Financial
        Group.  There has been no evaluation by a neurologist.  The claimant reports
        feeling anxious, depressed, and posttraumatic stress disorder.  The information
        does not support a neurologic diagnosis, but the claimant may have psychiatric
        impairment – I defer to a consulting psychiatrist.

5.      09/10/18.  John Young, MD.  Consulting Psychiatrist, Lincoln Financial Group.
        The information does not support a need for psychiatrically-based work limita-
        tions or restrictions.

6.      09/13/18.  Insurer.  Letter to the claimant notifying him that the disability claim
        was being closed.  If appealing, please send us any new/updated medical rec-
        ords beyond August 2018.

7.      03/12/19.  Attorney Shakeshaft.  Appeal for disability benefits.  The appeal in-
        cludes Dr. Higginbotham's report to the attorney re: a 02/14/19  evaluation.
        Attorney Shakeshaft states that, per Dr. Higginbotham's restrictions, the claim-
        ant cannot work in any occupation.  Per Attorney Shakeshaft, the claimant's im-
        pairments are physical and caused by the -2/13/18 car accident.

---

[4]The claimant attended physical therapy through 06/11/18 visit #8 per referral by PCP Dr. Olson for neck pain.

**Lincoln/Bunch 1030**

Ms. Courtney Grygiel                          Claimant:  Mark Bunch
April 23, 2019                                Claim #8220685
Page 10

***Peer-to-Peer Consultation***

Thomas Higginbotham, DO.  Occupational medicine.  719-260-8190.  We spoke at 10:45 a.m.
EST 04/23/19.  My questions, and Dr. Higginbotham's responses, were:

*Q1.     Did you see this patient between 08/13/18 and 02/18/19?*
A1.     No.  I saw him as part of a contested workers compensation claim.  My understanding
was that the claim had settled, the patient could not return to work, and he was applying for
disability, Social Security I think.

*Q2.     Have you seen this patient since 02/19/19?*
A2.     No.  I had conferences with the attorney in November and December 2018.  And, I saw
the patient on 02/19/19 for a report, I think for his Social Security disability claim.

*Q3.     Your 02/19/19 report lists recommendations for vestibular therapy, occupational thera-
py, and physical therapy.  Has the patient gone on to see these therapists?*
A3.     I don't know.

*Q4.     The patient is off work based on postconcussion syndrome.  The records that were sent
to the insurer consist of the PCP notes, some physical therapy notes for a neck strain per the
PCP, your notes, some chiropractic notes, and two neuropsychological evaluations, each
deemed invalid.  Typically, if someone is severely impaired by postconcussion syndrome, the ex-
pectation would be that they'd see a neurologist, undergo diagnostic workup for their symptoms
(vestibular, eye, etc.), and if the symptoms continue be seen at a headaches center, a tertiary
care provider.  The records that were sent to the insurer include no neurology evaluation, and no
records from vestibular, vision, or other specialists.*
A4.     Many of the referrals got held up by insurance coverage issues.  The patient had seen
occupational medicine Dr. Frank Polanco, who treated this like he was doing an IME for the in-
surance company, and dismissed the patient.  The insurer then started questioning further re-
ferrals.  The patient did see neurologist Dr. Brinley in Colorado Springs on 10/19/18, and she
recognized he had ongoing postconcussion symptoms and suggested vestibular therapy.  I also
have a paragraph that the neuro-optometrist wrote on 11/21/18 stating the patient has per-
ception problems.  I think the neuropsychological tests were compromised because the patient
had vision and balance problems.

**Lincoln/Bunch 1031**

Ms. Courtney Grygiel                           Claimant:  Mark Bunch
April 23, 2019                                 Claim #8220685
Page 11

*Q5.    I understand the patient reports vision and balance problems.  But, we've not received any vision test result, balance test results, or records of treatment for vision or balance problems.*
A5.    It sounds like you need to gather those records.

*Q6.    The disability insurance company probably already asked the patient to provide all of the records.  I'm not sure how much more record gathering takes place at this appeal stage of the claim.*

<electronically signed>

Robert Swotinsky, MD
Consulting Physician, Lincoln Financial Group
Bd Cert, Occupational Medicine

## References

[i] Kashluba S, Paniak C, Blake T, et al. A longitudinal, controlled study of patient complaints following treated mild traumatic brain injury.  *Arch Clin Neuropsychol*.  2004;19:805.

[ii] Carroll L, Cassidy J, Peloso P, et al. Prognosis for mild traumatic brain injury: results of the WHO Collaborating Centre Task Force on Mild Traumatic Brain Injury.  *J Rehabil Med.*  2004

[iii] *VA/DoD Clinical Practice Guideline for the Management of Concussion-mild Traumatic Brain Injury, Version 2.0.*  Washington, DC: Department of Defense.  February 2016.

[iv] Binder L, Rohling M.  Money matters: a meta-analytic review of the effects of financial incentives on recovery after closed-head injury.  *Am J Psychiatry*.  1996;153:7.

[v] Ruff R, Wylie T, Tennant W.  Malingering and malingering-like aspects of mild closed head injury.  *J Head Trauma Rehabil*.  1993;8:60.

[vi] Division of Workers' Compensation.  Mild traumatic brain injury.  Medical Treatment Guideline.  Colorado Department of Labor & Employment.  Rev. 12/07/2018.

**Lincoln/Bunch 1032**

```
From: RightFax E-mail Gateway  <RightFaxE-mailGate@LibertyMutual.com>
Sent: Monday, April 22, 2019 3:16 PM
To:  Robert.Swotinsky@LibertyMutual.com
Subject:   Fax to Thomas Higginbotham DO abandoned after 1 attempts.

Fax to Thomas Higginbotham DO abandoned after 1 attempts.
---------------------------------------------------------------
From: Robert Swotinsky MD
Account: 8220685
---------------------------------------------------------------
4/22/2019 3:14:39 PM Transmission Record
     Sent to 719-260-6068 with remote ID "7192606068"
     Result: (1902) ISDN Q850 Cause code 1: Unallocated (unassigned)
number
     Page record: NONE SENT
     Elapsed time: 00:00 on channel 38
```

**Lincoln/Bunch 1033**

**From:**   swotinsky@comcast.net
**Sent:**   8/30/2005 9:47:16 AM
**To:**    Swotinsky; Robert
**Subject:** 2nd attempt to fax to occ med higginbotham

***This email is from an external source. Only open links and attachments from a Trusted Sender.***

From: webfax@innoport.com <webfax@innoport.com>
Sent: Monday, April 22, 2019 3:28 PM
To: swotinsky@comcast.net
Subject: Innoport Webfax Notification

Transaction ID: 195529979494

Reference Code 1: 8220685

Request source: web (Note: You can now send faxes via email. For detailed instructions, pleas

**Lincoln/Bunch 1034**

e refer to the Email-To-Fax Guide, which may be found by clicking on the link for "Guides" in the "support" section of the "help" menu.)

Recipient: 17192606068

Total number of page(s) transmitted: 0

**Lincoln/Bunch 1035**

Total duration: 0 minute(s)

Total cost: $ 0.00

Statistics: success: 0/1 (0.0%) failed: 0/1 (0.0%) busy: 0/1 (0.0%) no answer: 1/1 (100.0%)

To resend this transaction to some or all of the recipients ,

**Lincoln/Bunch 1036**

please go to the details for this Transaction ID in your outbound fax Activity Log.

To change your notification preferences, please go to the "Fax Sending" tab in your account profile.

Comments: A transmission may be

**Lincoln/Bunch 1037**

unsuccessful for various reasons, including the destination number being busy, telephone line error, fax tone undetected (e.g. human voice or voice mail reached) or other technical problems with the remote fax. If the transmissi

**Lincoln/Bunch 1038**

on failed after the connection to the remote fax was established, it is possible that some pages were successfully delivered. If the destination number is a voice number instead of a fax and the call was connected, you will

**Lincoln/Bunch 1039**

notice a charge even though no pages were transferred. If your transmission included multiple destination numbers, one or more destination numbers may have experienced a transmission failure. For a detailed listing of the trans

**Lincoln/Bunch 1040**

mission log, please review the "activity log" section of your account, which can be found underneath the "messaging" menu option when you are logged in to your account at http://www.innoport.com. The number

**Lincoln/Bunch 1041**

of successfully delivered pages are reflected above.

The attached file contains the document that was faxed. If the transaction was sent to multiple recipients, the attached PDF file will only display the fax which was deliv

**Lincoln/Bunch 1042**

ered
to
the
first
recip
ient.

**Lincoln/Bunch 1043**



# *FAX COVER SHEET*

**Date:** Monday, April 22, 2019

**To:**  Steven Olson MD

**Fax #:** 719-285-2975

**From:** Robert Swotinsky MD

**Phone #:** 978 337 4479

**Fax #:** 866 841 1415

**Pages
(including cover):**  03

**Notes:** Please fax the most recent office note to Lincoln Financial Group at
866 841 1415.

*This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and
may contain legally privileged and/or confidential information. If you are not the intended recipient of
this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any
attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me via
return fax or via telephone and permanently delete the original and any copy of any fax and any
printout thereof.*

**Lincoln/Bunch 1044**



Liberty Life Assurance Company of
Boston, a Lincoln Financial Group
company

Disability Claims
P.O. Box 1525
Dover, NH 03821 -1525
Phone No.: 888-437-7611
Fax No.: (603) 422-7909

April 22, 2019

St. Thomas More Physician Clinic
1338 Phay Avenue
Canon City, CO 81212

By fax:    719-285-2975

**RE:  Claimant Name:** Mark Bunch
**Date of Birth:**
**Claim #:**    8220685

To St. Thomas More Physician Clinic:

In my capacity as a consulting physician for Lincoln Financial Group, I am currently
reviewing the case file for this disability claim. To assist with the assessment, I am
asking for the most recent office note re: Mark Bunch, a patient followed by Dr. Steven
Olson.

Mr. Bunch's signed release form is enclosed. **Please fax the most recent office note
to Lincoln Financial Group's secure and confidential fax number, 866-841-1415.**
Lincoln Financial Group is willing to reimburse you for the cost of responding to this
request. Please contact the Lincoln Case Manager for this case, Courtney Grygiel, at
888-437-7611 x13301 for any questions regarding reimbursement. Thank you in
advance for your attention to this matter.


*ELECTRONICALLY SIGNED*

Robert Swotinsky MD
Consulting Physician, Occupational Medicine
978 337 4479 c, **866 841 1415 f**


Enclosure: Signed release form

Member of Lincoln Financial Group

**Lincoln/Bunch 1045**

3W212180030



**Liberty Mutual.**
INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

## AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

**I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:**

**Person(s) or group(s) of persons authorized to use or disclose the information:** Any physicians, medical practitioners, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

**Person(s) or group(s) of persons authorized to collect or otherwise receive the information:** The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employees, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

**Description of the information that may be used or disclosed:** This Authorization specifically includes the release of all information related to:

* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatments, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including HIV/AIDS.
* Job duties, earnings, personnel records and other work related information and credit reports, bank records, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents

**The information will be used or disclosed only for the following purpose(s):** For purposes of investigating, evaluating and processing my claim, and/or for insurance-related functions.

## STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:

I understand that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

I understand that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

I understand that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization. If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration. The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print)   *Alan K Bunch*

Name of legal representative, if applicable (print) *Ken Stakeshaft*   Relationship *Attorney*

Signature of claimant or legal representative   *Alan Bunch*

Date of Birth: ___        _____ Claim Number: __8220685__ Date: _____

**A copy of this authorization will be considered as valid as the original.**

pg. 1 Authorization-Standard-2016

Lincoln/Bunch 1046

From: RightFax E-mail Gateway  <RightFaxE-mailGate@LibertyMutual.com>
Sent: Monday, April 22, 2019 3:58 PM
To:  Robert.Swotinsky@LibertyMutual.com
Subject:   Your fax has been successfully sent to Steven Olson MD at
719-285-2975.
RE:

Your fax has been successfully sent to Steven Olson MD at 719-285-2975.
RE:
--------------------------------------------------------------
From: Robert Swotinsky MD
Account: 8220685
--------------------------------------------------------------
4/22/2019 3:48:32 PM Transmission Record
      Sent to 719-285-2975 with remote ID "7192852975"
      Result: (0) Success
      Page record: 1 - 3
      Elapsed time: 08:25 on channel 11

**Lincoln/Bunch 1047**



# *FAX COVER SHEET*

**Date:** Monday, April 22, 2019

**To:**   Thomas Higginbotham DO

**Fax #:** 719-260-6086

**From:** Robert Swotinsky MD

**Phone #:** 978 337 4479

**Fax #:** 866 841 1415

**Pages**
**(including cover):**   03

**Notes:** Please call me at 978 337 4479 about Mark Bunch. /Robert Swotinsky MD

*This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me via return fax or via telephone and permanently delete the original and any copy of any fax and any printout thereof.*

**Lincoln/Bunch 1048**



Liberty Life Assurance Company of
Boston, a Lincoln Financial Group
company

Disability Claims
P.O. Box 1525
Dover, NH 03821 -1525
Phone No.: 888-437-7611
Fax No.: (603) 422-7909

April 22, 2019

Thomas Higginbotham, DO
Occupational and Environmental Health Services
1430 South 21st Street, Suite 101
Colorado Springs, CO  80904

**RE:**  **Claimant Name:**  Mark Bunch
        **Date of Birth:**
        **Claim #:**        8220685

Dear Dr. Higginbotham:

Please call me at 978 337 4479 about Mark Bunch and concerns in the medical records
that he submitted to Lincoln Financial in support of his disability claim.  This letter
follows the message that I left on your office voice mail at 12:30 p.m. CST today.  This
letter has Mr. Bunch's signed release form.

Lincoln Financial Group is willing to reimburse you for the cost of responding to this
request.  Please contact the Lincoln Case Manager for this case, Courtney Grygiel at
888-437-7611 x13301 with any questions regarding reimbursement.   Thank you in
advance for your attention to this matter.

*ELECTRONICALLY SIGNED*

Robert Swotinsky MD
Consulting Physician, Occupational Medicine
**978 337 4479 c,** 866 841 1415 f

Enclosure: Signed release form

Lincoln/Bunch 1049

3W212180030



**Liberty Mutual.**
INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

### AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

**I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:**

**Person(s) or group(s) of persons authorized to use or disclose the Information:** Any physicians, medical practitioners, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

**Person(s) or group(s) of persons authorized to collect or otherwise receive the information:** The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employees, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

**Description of the information that may be used or disclosed:** This Authorization specifically includes the release of all information related to:

* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatments, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including HIV/AIDS.
* Job duties, earnings, personnel records and other work related information and credit reports, bank records, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents

**The information will be used or disclosed only for the following purpose(s):** For purposes of investigating, evaluating and processing my claim, and/or for insurance-related functions.

**STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:**

I understand that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

I understand that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

I understand that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization. If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration. The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print)  *Alan K Bunch*

Name of legal representative, if applicable (print) *Ken stokeshnef*   Relationship *Attorney*

Signature of claimant or legal representative  *Alan Bunch*

Date of Birth: _____   _____  Claim Number: _8220685_  Date: _____

**A copy of this authorization will be considered as valid as the original.**

pg. 1 Authorization-Standard-2016

**Lincoln/Bunch 1050**

```
From: RightFax E-mail Gateway  <RightFaxE-mailGate@LibertyMutual.com>
Sent: Monday, April 22, 2019 4:23 PM
To:  Robert.Swotinsky@LibertyMutual.com
Subject:   Your fax has been successfully sent to Thomas Higginbotham DO
at 719-
260-6086. RE:

Your fax has been successfully sent to Thomas Higginbotham DO at 719-260-
6086. RE:
-------------------------------------------------------------
From: Robert Swotinsky MD
Account: 8220685
-------------------------------------------------------------
4/22/2019 4:20:45 PM Transmission Record
     Sent to 719-260-6086 with remote ID "7192606086"
     Result: (0) Success
     Page record: 1 - 3
     Elapsed time: 01:52 on channel 33
```

**Lincoln/Bunch 1051**

# Lincoln Financial Group Consulting Physician Referral
## File Review - Priority

**Physician Specialty:  Neuropsychology**

Office:        0096                                      Claim #:    8220685

Claimant Name:        MARK  B  BUNCH

Date of Birth:                                      Claim Status:    DE

Date of Disability:    2/14/2018                      Date Sent:    4/17/2019

Claimant SSN:                                 Date Benefits Began:    8/15/2018

Product Type:        LTD                      Paid Through:    1/1/1900

Disability Level:    Own Occupation

Policyholder/Self-Insured Plan Holder:        CHARTER COMMUNICATIONS, INC.

Referred By:        GRYGIEL, COURTNEY  096  8*731-3301

Assigned Nurse Case Manager:

Diagnosis:        F33 Major depressive disorder, recurrent,

**Document Locations**
- ☑ Document List
- ☐ Correspondence
- ☐ Paper File

Questions or Issues for Physician: (Note - If a physician has viewed this claim in the past please detail the physician and the outcome.)

LTD APPEAL FILE-- claimants date of disability 2/14/18 due to MVA.  LTD BBD 8/15/18.  Assessing functionality from 2/14/18 to 8/14/18 and 8/15/18 and beyond.

Please note all diagnoses supported by the medical evidence (including co-morbids).

Please review the enclosed neuro-psych assessments (neuropsych testig 5/3/18 and 5/18/18 by Dennis A. Helffenstein, Ph.D.) and ) and discuss the findings and validity.  Please indicate whether the assessment substantiates functional impairment that translates to restrictions and limitations, and for what period.

 Please provide your overall assessment of the claimant's cognitive capacity based on the totality of information provided in the file and co-morbid complaints.  What is the etiology of the impairment? Does the information reasonably support R/L's in work capacity secondary to cognitive impairment on a sustained, full-time basis?  Please discuss.  What is the anticipated duration?

**Lincoln/Bunch 1052**

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

SHAKESHAFT-GORMAN LAW FIRM
1935 JAMBOREE DRIVE
SUIT 202
COLORADO SPRINGS CO 80920

**Lincoln/Bunch 1053**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 422-7909

April 17, 2019

Shakeshaft-Gorman Law Firm
1935 JAMBOREE DRIVE
SUIT 202
COLORADO SPRINGS, CO 80920

RE:    Long Term Disability (LTD) Benefits
       Charter Communications, Inc.
       Claim #: 8220685
       Claimant: Mark Bunch

To Whom It May Concern:

Liberty Life Assurance Company of Boston (now a Lincoln Financial Group Company) is responsible for managing claims for benefits under the Charter Communications long term disability (LTD) policy.

The purpose of this letter is to inform you that we require additional time to render a determination on your client's LTD appeal.   Under the Employee Retirement Income Security Act of 1974 (ERISA), an appeal determination should be rendered within 45 days of receipt of the appeal, unless there are special circumstances which require a delay in making an appeal determination.   If additional time is needed, ERISA allows for a 45-day extension to evaluate and render an appeal decision.

Mr. Mark Bunch's file has been referred for further medical review and assessment based on the information currently contained in his file.   Upon receipt of the completed medical review, we will proceed with the assessment of this appeal.   We will make every effort to render a determination as soon as possible, but no later than June 9, 2019.

Should you have any questions pertaining to the status of your appeal, please contact me at the telephone number below.   Please include the claim number listed above in all communications.

If you have any questions regarding this matter, please contact me.

Sincerely,

Courtney Grygiel
Appeals Consultant

1  of  2

**Lincoln/Bunch 1054**

Phone No.: (888) 437-7611 Ext. 13301
Secure Fax No.: (603) 422-7909

2  of  2

**Lincoln/Bunch 1055**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 422-7909

| | |
|---|---|
| Date: April 17, 2019 | |
| To: | SHAKESHAFT-GORMAN LAW FIRM<br>1935 JAMBOREE DRIVE<br>SUIT 202<br>COLORADO SPRINGS CO 80920 |
| Attn: | |
| Fax: | (719) 635-0966 |
| From: | Courtney Grygiel<br>Appeals Consultant<br>Phone No.: Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 427-2110 |
| Total Pages<br>(Including Cover):   3 | |
| RE:<br><br>Claim #:   8220685<br>Claimant:   Mark Bunch<br><br>Charter Communications, Inc. | |

**Welcome to Lincoln Financial Group.**

Effective May 1, 2018, Liberty Life Assurance Company of Boston was acquired by The Lincoln National Life Insurance Company, a Lincoln Financial Group company. During the transition, you may receive communications from both companies. Please open and read all correspondence you receive about your benefits.
Thank you.

**Bienvenido a Lincoln Financial Group.**

A partir del 1 de mayo de 2018, Liberty Life Assurance Company of Boston pasó a pertenecer a The Lincoln National Life Insurance Company, una compañía de Lincoln Financial Group. Durante la transición, es posible que reciba comunicados de ambas compañías. Abra y lea toda la correspondencia que reciba sobre sus beneficios.
Muchas gracias.

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

**Lincoln/Bunch 1056**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 422-7909

April 17, 2019

Shakeshaft-Gorman Law Firm
1935 JAMBOREE DRIVE
SUIT 202
COLORADO SPRINGS, CO 80920

RE:     Long Term Disability (LTD) Benefits
        Charter Communications, Inc.
        Claim #: 8220685
        Claimant: Mark Bunch

To Whom It May Concern:

Liberty Life Assurance Company of Boston (now a Lincoln Financial Group Company) is responsible for managing claims for benefits under the Charter Communications, Inc. long-term disability (LTD) policy.

The purpose of this letter is to inform you that we require additional time to render a determination on your client's LTD appeal.   Under the Employee Retirement Income Security Act of 1974 (ERISA), an appeal determination should be rendered within 45 days of receipt of the appeal, unless there are special circumstances which require a delay in making an appeal determination.   If additional time is needed, ERISA allows for a 45-day extension to evaluate and render an appeal decision.

Mr. Mark Bunch's file is currently being reviewed in the Appeal Review Unit and has been referred for further medical review and assessment.   Upon receipt of the completed medical review, we will proceed with the assessment of this appeal. We will make every effort to render a determination as soon as possible, but no later than June 9, 2019.

Should you have any questions pertaining to the status of this appeal, please contact me at the telephone number below.   Please include the claim number listed above in all communications.

If you have any questions regarding this matter, please contact me.

Sincerely,

Courtney Grygiel
Appeals Consultant

1  of  2

**Lincoln/Bunch 1057**

Phone No.: (888) 437-7611 Ext. 13301
Secure Fax No.: (603) 427-2110

2  of  2

**Lincoln/Bunch 1058**

# Lincoln Financial Group Consulting Physician Referral
## File Review - Priority

**Physician Specialty:  Occupational and Environmental Medicine**

Office:        0096                                    Claim #:      8220685

Claimant Name:        MARK  B  BUNCH

Date of Birth:                                         Claim Status:    DE

Date of Disability:      2/14/2018                     Date Sent:    4/12/2019

Claimant SSN:                                          Date Benefits Began:    8/15/2018

Product Type:        LTD                               Paid Through:    1/1/1900

Disability Level:      Own Occupation

Policyholder/Self-Insured Plan Holder:        CHARTER COMMUNICATIONS, INC.

Referred By:        GRYGIEL, COURTNEY  096  8*731-3301

Assigned Nurse Case Manager:

Diagnosis:        F33 Major depressive disorder, recurrent,

Document Locations
- ☑ Document List
- ☐ Correspondence
- ☐ Paper File

Questions or Issues for Physician: (Note - If a physician has viewed this claim in the past please detail the physician and the outcome.)

LTD APPEAL File--please revie all documents listed under  MEDICAL and APPEAL and ATTORNEY in EDM.

What diagnoses are supported by the medical evidence?

Does the medical evidence support any diagnoses causing functional impairment from 2/14/18 to 8/14/18 and 8/15/18 to the present? Please explain your medical rationale as to why or why not.

If functional impairment is supported, please describe how that translates into restrictions or limitations and for what period(s) of time. Please define in terms of frequency (never, occasional, frequent, constant) and task (sit, stand, lift/carry, type etc). Please explain your medical rationale for any restrictions or limitations or why restrictions or limitations are not supported.

Are there any reported or observed cognitive and/or physical side effects attributed to clmnt's medications?  If yes, do the side effects contribute to claimant's impairment? Please explain your medical rationale.

Does the (overall functional and ) medical evidence support the claimant has the ability to sustain full time capacity (8/hours/day 5 days/ week) within the identified restrictions and limitations from 2/14/18 to 8/14/18 and 8/15/18 to present?  Please explain your medical rationale.

When contacting the treating provider (Dr. Higginbotham) please discuss the claimant's condition, treatment, and functional capacity. Please indicate the information reviewed and indicate whether or not you reached consensus with the treating provider. If not, please discuss your final assessment after the call.

**Lincoln/Bunch 1059**



**Confidential**

| Instructions |
|---|
| **HR:**  Complete template by deleting or overwriting each section description and including specific information regarding the job.  Scan completed documents and email to EmployeeServicesCenter@charter.com |

# ADA - JOB DESCRIPTION AND ESSENTIAL FUNCTIONS

| PSID#: (HR Use Only) | | EID#: | | Date: | 1/3/19 |
|---|---|---|---|---|---|
| **Employee Name:** | Billy Daniels | **Supervisor:** | Ron Totten | | |
| **Position Title:** | Direct Sales Representative | **Job Code:** | SDT250 | | |
| **FLSA Status:** | Exempt | **Supervises:** | N/A | | |
| **Line of Business:** | Marketing | **Prepared by:** | Amy Olivera | | |

**Essential Job Function(s)** must meet at least <u>one</u> of the following criteria:

1. The reason the position exists is to perform this duty. Removing this function would fundamentally change this position.
2. A limited number of employees are available to do the function.
3. The person must have expertise to perform this duty.

**Position Summary:**

Direct Sales Representatives make door-to door sales presentations to sell products and services in assigned territory.

**Essential Duties and Responsibilities:**    __90_____%

- Make door-to-door sales presentations.
- Conduct quality face to face in-home sales presentations to new customers.
- Identify customer needs, wants, and desires in conversation and match with company products and diplomatically handle interactions with potential customers
- Reconcile daily sales orders with cash taken in and keep documentation of sales orders.
- Attend sales meetings in person and training sessions as directed by management.
- Achieve established sales goals and quotas.
- Work independently to promote and sell residential products and services.

**Other Duties and Responsibilities:**    ___10____%

Attend regular sales meetings and training as required based on business needs

**Job Related Qualification Standards:**

- Maintain proper appearance/attitude at all times to represent Charter in the community
- Must be able to walk for extensive periods of time
- Must demonstrate strong written and verbal communication skills.
- Experience in a customer service or sales role; sales experience a plus
- Must be able to work flexible hours, including-evenings and weekends
- Must have a valid driver's license, car insurance, a satisfactory driving record and use of a reliable personal vehicle
- Motivation to sell door to door in residential areas
- Ability to work outdoors in adverse weather conditions
- Engaging communication skills to build relationships with prospective customers

**Lincoln/Bunch 1060**



| Equipment Use and Frequency | Never | Rarely (1-15%) | Occasionally (16-45%) | Frequently (46-100%) |
|---|---|---|---|---|
| Telephone | | | | X |
| Computer | | | | X |
| Copier | | X | | |
| Fax Machine | | X | | |
| Use of Vibrating Machinery | X | | | |
| Operate Machinery | X | | | |
| Keyboard Right Hand | | | | X |
| Keyboard Left Hand | | | | X |
| Mouse | | | | X |
| Other (please add): Cell Phone, IPad/Tablet | | | | X |

| Physical Demands | Never | Rarely (1-15%) | Occasionally (16-45%) | Frequently (46-100%) |
|---|---|---|---|---|
| Bending/Stooping/Crouching | | | X | |
| Lifting up to _____ lbs ( min) | | X | | |
| Lifting up to __25____ lbs (max) | | X | | |
| Performing Manual Tasks | | x | | |
| Reaching at Shoulder Level | | X | | |
| Reaching Above Shoulder Level | | X | | |
| Reading | | | | X |
| Seeing | | | | X |
| Sitting | | | | X |
| Speaking | | | | X |
| Standing | | | | X |
| Walking | | | | X |
| Pulling | | x | | |
| Driving (for work) | | | | X |
| Push/Pulling | | x | | |
| Typing | | | | X |
| Kneeling | | x | | |
| Climbing Ladders | X | | | |
| Climbing Poles | X | | | |
| Climbing Stairs | | | | X |
| Crawling | | X | | |
| Flexing/Extending Neck | | | X | |

**Lincoln/Bunch 1061**



| Physical Demands | Never | Rarely (1-15%) | Occasionally (16-45%) | Frequently (46-100%) |
|---|---|---|---|---|
| Twisting Upper Body | | | x | |
| Walking on Uneven Ground | | | | X |
| Balancing | | | | X |
| Using Hands Repetitively | | | | X |
| Hand Use:  Power Grasping/Gripping/Turning | | x | | |
| Other:  (please add) | | | | |

| Mental Demands | Never | Rarely (1-15%) | Occasionally (16-45%) | Frequently (46-100%) |
|---|---|---|---|---|
| Problem Solving | | | | x |
| Decision Making | | | | x |
| Supervising | | X | | |
| Interpreting Data | | | | X |
| Organizing | | | | x |
| Writing | | | | x |
| Planning | | | | X |
| Concentrating | | | | X |
| Other:  (please add) | | | | |

| Working Conditions | Never | Rarely (1-15%) | Occasionally (16-45%) | Frequently (46-100%) |
|---|---|---|---|---|
| Indoor | | | | X |
| Outdoor | | | | X |
| Hot Temperatures | | | | X |
| Cold Temperatures | | | | X |
| Loud Noise | | | X | |
| Fumes | | X | | |
| Exposure to VDT Screens | | | X | |
| Working at Heights | X | | | |
| Other:  (please add) | | | | |

_____

**Management reserves the right to add or change job duties and requirements at any time.**

**The above information has been designed to indicate the general nature and level of work performed by employees within this classification.  It is not designed to contain, or be interpreted as, a comprehensive inventory of all duties, responsibilities and qualifications required of employees assigned to this job.**

**Lincoln/Bunch 1062**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5121

| | |
|---|---|
| Date: | April 4, 2019 |
| To: | SHAKESHAFT-GORMAN LAW FIRM<br>1935 JAMBOREE DRIVE<br>SUIT 202<br>COLORADO SPRINGS CO 80920 |
| Attn: | |
| Fax: | (719) 635-0966 |
| From: | Megan Gauthier<br>Appeals Examiner II<br>Phone No.: Phone No.: (888) 437-7611<br>Secure Fax No.: (603) 334-5121 |
| Total Pages<br>(Including Cover): | 3 |
| RE:<br><br>Claim #:    8220685<br>Claimant:   Mark Bunch<br><br>Charter Communications, Inc. | |

**Welcome to Lincoln Financial Group.**
Effective May 1, 2018, Liberty Life Assurance Company of Boston was acquired by The Lincoln National Life Insurance Company, a Lincoln Financial Group company. During the transition, you may receive communications from both companies. Please open and read all correspondence you receive about your benefits.
Thank you.

**Bienvenido a Lincoln Financial Group.**
A partir del 1 de mayo de 2018, Liberty Life Assurance Company of Boston pasó a pertenecer a The Lincoln National Life Insurance Company, una compañía de Lincoln Financial Group. Durante la transición, es posible que reciba comunicados de ambas compañías. Abra y lea toda la correspondencia que reciba sobre sus beneficios.
Muchas gracias.

This fax, and any attachments thereto, is intended only for the use of the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this fax, you are hereby notified that any dissemination, distribution or copying of this fax, and any attachments thereto, is strictly prohibited. If you have received this fax in error, please notify me by telephone at (888) 437-7611 and permanently shred the original and any copy of any fax and any printout thereof.

**Lincoln/Bunch 1063**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213
Phone No.: (888) 437-7611
Secure Fax No.: (603) 334-5121

April 4, 2019

Shakeshaft-Gorman Law Firm
1935 JAMBOREE DRIVE
SUIT 202
COLORADO SPRINGS, CO 80920

RE:    Long Term Disability (LTD) Benefits
       Charter Communications, Inc.
       Claim #: 8220685
       Claimant: Mark Bunch

To Whom It May Concern:

Liberty Life Assurance Company of Boston, now a Lincoln Financial Group company is responsible for managing claims for Long Term Disability (LTD) benefits under Charter Communications, Inc. 's Group Disability Policy.  We are writing in reference to Mark Bunch's claim for LTD benefits under the Policy.

We have received your request for review of the recent claim determination on Mark Bunch's Long Term Disability (LTD) claim.

Mr. Bunch's file is being forwarded to Lincoln Financial Group's Appeal Review Unit for an independent review of his claim eligibility.  His claim will be assigned to an Appeal Consultant who will contact you when they have completed a review of the appeal.  If you have any questions regarding the status of the appeal prior to hearing from the Appeal Consultant, you may contact the Appeal Review Unit at 1-888-437-7611 during the hours of 8am to 5pm Eastern Standard Time.

In accordance with the Employee Retirement Income Security Act of 1974 (ERISA), under normal circumstances, you will be notified in writing of a final decision within 45 days from the date your request for review was received.

If there are special circumstances requiring a delay in Lincoln Financial Group's response, you will be notified of our decision no later than 90 days after the request for review was received.

If you have any questions regarding this correspondence, please contact me.

1  of  2

**Lincoln/Bunch 1064**

Sincerely,

Megan Gauthier
Appeals Examiner II
Phone No.: (888) 437-7611 Ext. 18205
Secure Fax No.: (603) 334-5121

**Lincoln/Bunch 1065**

# Lincoln Financial Group Appeal Referral

**Appeal Referral From:    CHARLOTTE**

| | | | |
|---|---|---|---|
| Office: | 88D | Manager: BOVENDER, ANNA | Case Mgr: CARTER, KAYLA |

Claimant Name: MARK  B  BUNCH    Claim #: 8220685

Occupation (Job Title): SALES REP    Date Sent: 4/2/2019

Diagnosis: F33 Major depressive disorder, recurrent,

Date of Disability: 2/14/2018    Date Benefits Began: 8/15/2018

Maximum Duration: 9/16/2030    Paid Through: 1/1/1900

Date of Denial or (DB451): 9/17/2018    Date Appeal Received: 3/12/2019

*This is the date that the full appeal was received by the Field Claim Office*

Policyholder/Self-Insured Plan Holder: CHARTER COMMUNICATIONS, INC.

Product: LTD    Funding: CON

Is Claimant Eligible for LTD? Y

Erisa or Non-Erisa? NON - ERISA Plan

Document Locations
- ☑ Paperless
- ☐ Bilingual - translation complete
- ☐ Paper File
- ☐ Surveillance disk(s)

*Please be sure to send all claim paper files & all surveillance disks to the ARU.*

ER Contacts/CC (if applicable):

Charter.ESCLeaves@charter.com

ER Contact Addresses (including email address):

Charter.ESCLeaves@charter.com

Phone No. 0000000000    FAX No. 0000000000

Account Specific or Unique Contract Issues / Additional Info:

LTD Appeals:    Service Level (for ASO see the listing below): FI    Appeal Receipt Timeline (non-ERISA): 180 days    Appeal  Decision Timeline (non-ERISA): 45+45 days    Employer Communications (please note if email or copy of the letter):  o Receipt: None  o Decision: None

**Lincoln/Bunch 1066**

# SHAKESHAFT & GORMAN LAW FIRM, LLP

1935 Jamboree Dr. | Suite 202 | Colorado Springs, CO 80920
Tel 719.635.5886 | Fax 719.635.0966 | www.shakeshaftlawfirm.com

### FACSIMILE TRANSMISSION

**DATE:**        March 12, 2019

**TO:**          **Liberty Life Assurance Company**

**FROM:**        Brandy Newton| Paralegal

**PAGES INCLUDING COVER SHEET:**   26

**FAX NUMBER:**  603-559-9400

**REGARDING:**   Mark Bunch

**Comments:**    Claim Number: 8220685

Please see the following Appeal on behalf of Mark Bunch along with supporting documents.

IF YOU DO NOT RECEIVE ALL THE PAGES OR IF ANY PART IS ILLEGIBLE, PLEASE CALL (719) 635-5886.

### NOTICE

THIS MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN PRIVILEGED OR CONFIDENTIAL INFORMATION WHICH IS EXEMPT FROM DISCLOSURE PURSUANT TO APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR IS NOT AN EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERY OF THIS MESSAGE TO THE INTENDED RECIPIENT, DISTRIBUTION, COPYING OR OTHER DISSEMINATION OF THE INFORMATION CONTAINED IN THIS COMMUNICATION IS PROHIBITED. PLEASE CONTACT (719) 635-5886 AND RETURN THE ORIGINAL MESSAGE TO SHAKESHAFT LAW FIRM, 1935 JAMBOREE DRIVE, STE. 202, COLORADO SPRINGS, CO 80920.

**Lincoln/Bunch 1067**



**SHAKESHAFT-GORMAN**
— LAW FIRM, LLP —

| | | |
|---|---|---|
| **Kenneth J. Shakeshaft** | • Attorney at Law | **Main Office** |
| **Joseph M. Gorman** | • Attorney at Law | Shakeshaft - Gorman Law Firm |
| Cindy Maddox | • Paralegal | 1935 Jamboree Drive, Suite 202 |
| Brandy Newton | • Paralegal | Colorado Springs, CO 80920 |

March 12, 2019

<u>**Sent Via Facsimile: 603-559-9400**</u>

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
Adjuster -Kayla Carter
P.O. Box 7207
London, KY  40742-7207

RE:  **Claimant:  Mark Bunch**
     **Employer:  Charter Communications, Inc.**
     **Claim No.:  8220685**

To Whom It May Concern:

This is an Appeal of Liberty Mutual's denial of Mr. Bunch's claim for long term disability benefits dated September 14, 2018.

With this correspondence we are providing additional information as support for Mr. Bunch's appeal.

Attached is a statement from Dr. Thomas Higginbotham dated February 19, 2019.  Dr. Higginbotham is a board certified occupational medicine physician who has been treating Mr. Bunch. Dr. Higginbotham confirms Mr. Bunch has physical injuries including post-concussion sequela, cervical and thoracic sprains along with left sided ulnar neuritis.

Dr. Higginbotham confirms Mr. Bunch has not reached Maximum Medical Improvement. Additionally, Dr. Higginbotham finds Mr. Bunch is unable to return to work at his prior occupation or any occupation, and, in fact has enacted very specific restrictions, which prevent Mr. Bunch from engaging in any occupation at this time.

Also attached is a statement from Mr. Bunch himself.  Mr. Bunch confirms he has not returned to work since the motor vehicle accident he was involved in on February 13, 2018.  Mr. Bunch confirms he continues to have ongoing problems from his post-concussion syndrome along with his physical injuries which prevent him from performing most daily activities let alone work activities.

PHONE 719.635.5886 - FAX 719.635.0966 - TOLL FREE 1.800.383.5886
WWW.SHAKESHAFTANDGORMANLAW.COM - OFFICE@SHAKESHAFTANDGORMANLAW.COM

**Lincoln/Bunch 1068**

Liberty Mutual denied this claim based on a diagnosis of depression. Mr. Bunch's medical conditions do not revolve around depression. Rather, injuries from a motor vehicle collision have cost Mr. Bunch his employment, leading to a lack of income. Mr. Bunch is also essentially housebound. He is unable to drive. He is unable to perform most regular activities around his home. Any depression which Mr. Bunch may have is situational based strictly on his injuries, the effects of his injuries and dramatic impact on his life.

This is to request Liberty Mutual reverse its decision and reinstate Mr. Bunch long term disability until he has been released to employment.

If you need further information please let us know.

Sincerely,

Kenneth J. Shakeshaft
KJS/bn
Enclosures

Lincoln/Bunch 1069

# Occupational
# And
# Environmental Health Services

Thomas W. Higginbotham, DO
Board Certified,
Occupational And
Environmental Medicine

February 19, 2019

Kenneth Shakeshaft, Esq.
1935 Jamboree Drive, Suite 202
Colorado Springs, Colorado 80920

Dear Atty. Shakeshaft:

I received your letter of 02/07/2019 requesting an updated evaluation/report as to Mr. Bunch's medical condition and workability. Mr. Bunch was seen for follow-up on 02/14/2019. The following addresses the questions you posed.

## I.  COMPLAINTS

1.  **Please describe or list Mr. Bunch's current complaints.**
Mr. Bunch continues with neck discomfort, pains and diminished range of motion. This has improved since initially seeing him on 05/03/2018. He recently was assessed with a swallow study which was abnormal and lent to the impression of him having significant anterior muscle myotonia.

He continues with right scapulothoracic and anterior shoulder tension of a mild-moderate degree. This has improved since initially seeing him on 05/03/2018.

His memory is moderately compromised. His judgment is affected as well. His significant other takes over balancing the checkbook, although he is aware of having to pay bills. He makes frequent arithmetic mistakes and judgments in the timing of paying bills and the amount of the bills.

His speech is improved, but he still has difficulty with prosody. He has difficulties with word finding. He stutters at times. He speaks deliberately and slowly being ever so conscious about his difficulties with pronunciation. His pauses are inappropriate and as if he is waiting for the next item to come to mind.

He continues to have headaches, although they have improved over the year. He endorses tinnitus but it does not prevent activity and rarely interferes with it. It sometimes is forgotten.

1430 South 21st Street, Suite 101
Colorado Springs, CO 80904
(719)260-8190
FAX: 260-6086

**Lincoln/Bunch 1070**

03/12/2019  16:14    7196350966                                                    PAGE 05/26

Page 2
Re:  Mark Bunch

He still has difficulty with balance. He relates of intermittent dizziness.  He is frequently overwhelmed with noises, bright lights, and crowds.  He is affected visually by fast moving things like watching TV or being in the public or riding in a vehicle.  It worsens his dizziness and his visual spatial disorientation.

He relates of having good days and bad days, but these are relative to his initial and early presentations after his motor vehicle collision. A good day is not a very functional day.  A bad day is a day of prostration. Given his degree of function at his prior employ before this motor vehicle collision, his physical functionality is about 50% and his mental functionality is about 50% of his norms.

He independently is capable of toilet functions, bathing, hair care, eating and dressing, although the activities are generally much slower than usual since his motor vehicle collision.

He attempts to organize his day, but he is forgetful of what he has planned to do.  He will attempt to write things down but then forgets where he has written them or forgets to review his planner.  Much of the time is spent 'muttering' around the house doing 'no-nothings'. He can't read because he cannot follow the lines, and this causes headache and dizziness and frustrates him. He cannot watch most TV programs particularly action-oriented programs.  He attempts to do light dusting and laundry and cleaning, but his stamina is moderately affected.

He may prepare a microwave meal, but at times he'll forget the meal is in the microwave. His fiancée does much of the meal preparation.  He needs assistance with vacuuming and sweeping. He has messed up some laundry by adding bleach instead of detergent. He does not organize the household.  Someone else attends to outdoor maintenance, such as mowing the lawn or shoveling snow or gardening.  Someone else attends to car maintenance.  He needs assistance with grocery shopping and sometimes must leave the store when there is too much noise or commotion.  Most the time, they do grocery shopping at odd hours.  He has some difficulty carrying groceries in and out of the car.

He may walk about a block before sensory overload affects him, and he gets too dizzy and imbalanced.  He does not run.

**Lincoln/Bunch 1071**

Page 3
Re: Mark Bunch

He has difficulty climbing stairs particularly going downstairs because of depth perception; he has fallen because of this. He does not drive.

His writing has worsened. Although his speaking is better, it is still slow and deliberate but nowhere near preinjury function. He does not use a keyboard because the DVT screen affects him.

## II. PHYSICAL EXAMINATION

1. **Please list any recent examinations performed and findings of the examinations.**

Mr. Bunch is a 55 y/o Caucasian male of stated age. He is accompanied by his fiancée. He stands 5'11" tall with boots, but he can be coached to stand erect at 6'. He had difficulty standing on the old-fashioned floor scale as the foot pad shifts. He had to grope the walls to balance himself. He weighs 230 lbs. with a BMI of ~31. Vital signs are as follows: BP: 170/112, heart rate: 91, pulse oximetry: 95% O2 on room air. Heart is of regular rate and rhythm with a 1/6 systolic ejection murmur. Lungs are clear to auscultation. Thoracic expansion is fair-poor. There are no carotid bruits. There is no lymphadenopathy or thyromegalia. Abdomen is soft and obese without masses or tenderness. There is an equivocally positive Romberg's sign in that he reels back and forth and sometimes side to side but doesn't fall. Pupils are equal and symmetrical to light and accommodation, but he is photosensitive.

Extraocular muscles are intact, but he has difficulty with upward gaze and reels backwards when sitting during the exam. Midline vision is abnormal, and he still remains about an inch off-centered bilaterally. Temporomandibular joint (TMJ) motion is near full with deviation to the left with right-sided TMJ clicking. There is no palpatory pain about the TMJ. There is mild scalloping of the tongue with linea alba about both buccomucosa. These are two signs that shed light on bruxism. He has had extensive dental work with bridging.

There are no notable pain behaviors. He is cooperative during the examination. He can get on and off the exam table, walk and stand up but with balance difficulties. Sitting tolerance on the exam table/chair and positioning is reasonable. There is no facial grimacing associated with movements during the examination.

**Lincoln/Bunch 1072**

Page 4
Re: Mark Bunch

There are negative Waddell's signs such as no superficial tenderness from light touch and skin rolling; or overreactions such as moaning and groaning, sighing or shaking of an extremity, or slapping the table when doing the examination because of pain, or grabbing at examiner's hand during examination; or regional disturbance such as non-dermatomal sensations and widespread weakness; or pain with stimulation testing such as with axial compression and truncal rotation; or give-way weakness.

Upper extremity evaluation reveals a positive Adson's maneuver bilaterally but after 10 seconds of holding the position, there is no longer any loss of pulse or blanching of the hand or tingling of the hands. He does encounter glove-like tingling in the hands at times when sleeping. Pulses are symmetrical. Deep tendon reflexes are 1/2 and symmetrical. There is a weakly positive Tinel's at the right cubital tunnel. There is negative Finkelstein's test bilaterally. There is no lateral or medial epicondylar tenderness on moderate pressure palpation. There is no tenderness about the forearm extensor or flexor muscle masses on moderate pressure palpation bilaterally. There is no tenderness about the triceps or deltoid muscles bilaterally. There are no signs of shoulder impingement. There are no neurosensory deficits to light touch. Manual grip strength is normal and symmetrical. Skin tone and color is normal. Wrist range of motion (ROM) is normal and symmetrical bilaterally. Elbow ROM is symmetrical and normal for flexion; left elbow extension is 0° right elbow extension is about 5° shy of normal. Shoulder ROM is near normal and symmetrical bilaterally and without pain. There is mild left-sided AC joint tenderness on moderate pressure palpation. There is no bicipital groove tenderness bilaterally. There is no crepitus with joint motion. He is right hand dominant.

On postural examination, the pelvic crests are slightly dislevel with the left being higher than the right and with a slight pelvic side shift to the left. The shoulders are dislevel with the left being slightly higher than the right. Both shoulders are forward-rolled. He forward-flexes his head about 30° in resting posture. This posturing creates a sloping mid thoracic kyphosis that he can correct if he stands erect. He is capable of standing in a military-type posture, but he cannot maintain that posture when walking because of becoming imbalanced. There is no gross scoliotic curve or lordosis. The chest is non-tender. There is negative tripod sign. There are negative axial loading and Spurling's maneuvers bilaterally.

**Lincoln/Bunch 1073**

Page 5
Re:  Mark Bunch

On palpatory examination, there is tenderness about the following areas:

| | |
|---|---|
| Cervical midline: | None |
| Cervical anterior muscles: | mild left SCM |
| Cervical paraspinal muscles: | moderate left |
| Suboccipitals: | moderate left |
| Thoracic midline: | None |
| Thoracic paraspinal: | mild left with tender points about the middle trapezius, rhomboid and infraspinatus musculature |
| Anterior chest: | none |
| Lumbar midline: | none |
| Lumbar paraspinal: | none |
| Sacroiliac: | none |
| Iliolumbar (glutei): | tense about the left hip rotators, without tenderness |
| Sciatic notch (piriformis): | none |
| Iliofemoral (ITB): | none |
| Trochanters: | None |

Scalp tone is tense. There is no muscle tone asymmetry or spasm. He can weight-bear bilaterally. Balance is poor, especially when balancing on the right side. He can come up on toes, but not for more than a moment or so. There are signs of psoas muscle tension bilaterally. Cervical spine ROM is as follows:

| Motion | Actual | Norms |
|---|---|---|
| **Cervical** | | |
| Flexion | 65/30° (35°) | 60° |
| Extension | 15/02° (13°) | 75° |
| Side bending right | 40/10° (30°) | 45° |
| Side bending left | 40/10° (30)° | 45° |
| Rotation right | 70° | 80° |
| Rotation left | 35° | 80° |

There is negative slump test. He gets up from sitting slowly.

Lower extremity examination reveals symmetrical pulses. Deep tendon reflexes are 1/2 for the patellae and Achilles and symmetrical. There are no neurosensory or neuromotor deficits. Manual strength testing is normal and symmetrical for the thigh muscles, foot dorsiflexors, and great toe extensors bilaterally. There is no sign of atrophy. Sitting straight leg raising is full. There is no pedal edema. Gait is abnormal as it is slow and cautious but without assistance.

**Lincoln/Bunch 1074**

Page 6
Re:  Mark Bunch

2. **What subjective complaints did Mr. Bunch have?**
Enclosed is a clinical pain picture diagram completed by Mr. Bunch on 02/14/2019. He identifies pain about the left side of the neck and left scapulothoracic and supraclavicular areas as well as the left shoulder. He complains of numbness and tingling sensations about the ulnar aspect of the left hand and distal forearm. Please note his handwriting of his name and date. It is not on the line and it is 'jerky', somewhat indicative of his visual-spatial disorientation.

III.  **DIAGNOSIS**
1. **What is/are your diagnosis of Mr. Bunch's injuries, disease or disorder?**
History of motor vehicle accident V53.5XXS

History of a mild traumatic brain injury with post-concussion with the following sequelae:
    Emotional and behavioral disturbance/changes F59
    Neurocognitive disorder G31.84
    Visual difficulties with spatial disorientation H53.30
    Post traumatic headache, not intractable G44.309

Cervical strain/sprain S16.1XXD
Thoracic strain S23.5XXD
Ulnar neuritis, left G56.22

Imbalance R26.2
Dysphasia R47.02
Dysphagia R13.10
History of falls W03.XXXA

Generalized anxiety with depressed mood over health status F43.23
PTSD, chronic F43.12
Situational adjustment reactions with mixed anxiety and depressed mood F43.23
Sleep disturbance G47.9
Overweight E66.3
Hypertension, malignant I10

2. **Diagnosis of injuries**
A. **Basis of diagnosis— what is it based on?**
The post-concussion sequelae and cervicothoracic strains/sprains and left-sided ulnar neuritis stemmed from a motor vehicle collision of 02/13/2018.

**Lincoln/Bunch 1075**

Page 7
Re:  Mark Bunch

The mental health diagnoses were not evident until after the motor vehicle collision.

The imbalance with subsequent falls were not evident until after the motor vehicle collision.

The dysphasia (difficulty speaking) and dysphagia (difficult swallowing) are sequelae from the motor vehicle collision.

The sleep disturbance is a consequence of his psychologic state and physical and postconcussion sequelae that were unrecognized until after the motor vehicle collision.

His weight recorded on 02/13/2018 was 229 lbs. with a BMI of 31. A year later on 02/14/2019, his weight is 230 lbs. with still a BMI of about 31 which is classified as being obese.

The earliest primary care provider blood pressure reading was on 02/23/2018 and it was 150/90. On 04/13/2018 it was 180/122. Mr. Bunch has been without a primary care provider since around April 2018. His present blood pressure is 170/112.  His high blood pressure is pre-existing.

**B. Are the diagnoses consistent with the exam findings or testing?** Yes.

**C. Are Mr. Bunch's symptoms consistent with exam findings and diagnoses?**
Yes. His psychologic assessment of 11/17/2018 was psychologic factors affecting other medical conditions (F54), PTSD and conversion disorder with mixed symptoms and with psychological stressor (MVA) (F44.7).

**D. Are Mr. Bunch's objective findings consistent with subjective complaints?** Yes.

IV.  CLINICAL COURSE SUMMARY

1. **Treatment — what treatment is currently recommended and the reasons?**
Speech therapy for documented dysphagia and dysphasia;

Physical therapy for ongoing cervicothoracic myofascial strain with a muscle tension component;

**Lincoln/Bunch 1076**

Page 8
Re:  Mark Bunch

     Vestibular therapy including corrective lenses for visual-spatial disorientation; and,

     Primary care evaluation and management of hypertension.

  2.  **Types of medications used:**

    **A.  Purposes**
    Micardis 40 mg daily and clonidine 0.1 mg twice a day for hypertension

    **B.  Potential side effects**
    Postural hypotension

**V.  WORKABILITY**

  1.  **Has Mr. Bunch's condition reached pre-injury status?**
    Mr. Bunch has not reached pre-motor vehicle collision injury status.

  2.  **Is Mr. Bunch able to return to pre-loss activity levels, including occupational duties?**
    Mr. Bunch is unable to return to pre-loss activity levels including occupational duties since the motor vehicle collision.

  3.  **If there are restrictions on Mr. Bunch's activities, please fill out the attached form.** Restrictions are appropriate.

**VI.  SPECIFIC INTERROGATORIES**

  1.  **Was Mr. Bunch credible and cooperative with you?**
    Yes.

**VII.  PROFESSIONAL INFORMATION**

  1.  **Please list your qualifications or attach your Curriculum Vitae.**
    Enclosed.

  2.  **Please describe the practice you have.**
    Solo practice; specializing in occupational medicine and disability evaluations; general practice; chronic pain management; osteopathic manipulative therapy.

  3.  **Are your medical opinions given based on a degree of medical probability?**
    Yes.

**Lincoln/Bunch 1077**

Page 9
Re:  Mark Bunch

If any further clarification is needed, please contact me as soon as possible.

Sincerely,

Thomas W. Higginbotham D.O.
Board Certified in Occupational Medicine
Fellow, American Academy of Disability Evaluating Physicians

cc:  Mr. Bunch

Encl: Pain diagram
      Physical Capacities Chart
      Curriculum vitae

**Lincoln/Bunch 1078**



## Clinical Pain Picture

Patient: _Mark Bunch_        Date: _2/14 2019_

Mark the area on your body where you feel the described sensation.
Use the appropriate symbol and include all the affected areas.

Use the following symbols:
Pain . . . . . . . . . .     XXX
Numbness . . . . . . . .     OOO

**Lincoln/Bunch 1079**

03/12/2019   16:14    7196350966                                         PAGE  14/26

Rx Date/Time         FEB-07-2019(THU) 13:38
 02/07/2019  15:42    7196350966                    7196350966
                                                                          P. 005
                                                                    PAGE.05/07

# PHYSICAL CAPACITIES CHART

Patient Name: Mark Bunch

Diagnoses: *Hx MVC; TBIE Post Concussion syndrome . C-T myofacial strain/sprain . Vusuospatial disorder, Cephastia . dysphagia . imbalance . PTSD, Conversion disorder*

Do you expect any recovery from the listed medical conditions? ___✓ YES  ___ NO

IN FILLING OUT THE PHYSICAL LIMITATIONS, PLEASE STATE THEM CONSIDERING THE BEST
INTERESTS OF THE PATIENT AND THE EFFECT ON THE PATIENT'S MEDICAL CONDITIONS
THROUGH PHYSICAL ACTIVITIES.

## I.

## TOTAL DISABILITY

Is Mr. Bunch still on temporary total disability?    ___✓ Yes  or ___ No

**If no, please fill out the remaining section of this form.**

## II.

|  | YES | NO |
|---|---|---|
| Need for Mr. Bunch to select pace of activities | ✓ |  |
| Need for Mr. Bunch to avoid or reduce activities on days when his symptoms flare up | ✓ |  |
| Need for Mr. Bunch to take breaks as needed to avoid flare-up of symptoms | ✓ |  |
| Is it reasonable to expect Mr. Bunch's symptoms from his medical conditions will fluctuate on a regular basis? | ✓ |  |

1

**Lincoln/Bunch 1080**

03/12/2019  16:14    7196350966                                      PAGE 15/26

Rx Date/Time        FEB-07-2019(THU) 13:38            7196350966              P. 006
.02/07/2019. .15:42 . .7196350966 .                                 ........ PAGE .06/07 . ..

*Mark Bunch*
*DO*

## III.

| Please state how long Mr. Bunch can perform the following at one time without interruption or need for a break. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Positions | < 1 Hr. | 1 Hr. | 2 Hrs. | 3 Hrs. | 4 Hrs. | 5 Hrs. | 6 Hrs. | 7 Hrs. | 8 Hrs. |
| Sit | ✓ | | | | | | | | |
| Stand | ✓ | | | | | | | | |
| Walk | ✓ | | | | | | | | |

| | Never | Occasionally (1-3 X Hr.) | Frequently (4-15 X Hr.) | Continuously (Over 15 X Hr.) | Other |
|---|---|---|---|---|---|
| Lift & Carry (Unassisted) 1-5 lbs. | | | | ✓ | |
| 6-10 lbs. | | | | ✓ | |
| 11-20 lbs. | | | ✓ | | |
| 21-50 lbs. | | ✓ | | | |
| Reaching Over Head (Above Shoulder) | | ✓ | | | |

Does Mr. Bunch need the ability to lie down as needed during the day? __✓__ YES _____ NO

## IV.

| Sustained Concentration and Persistence | Not Significantly Limited | Moderately Limited | Markedly Limited | No Evidence of Limitation | Not Ratable on Available Evidence |
|---|---|---|---|---|---|
| The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances | | | ✓ | | |
| The ability to complete a normal workday and workweek without interruptions from symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. | | | ✓ | | |

2

**Lincoln/Bunch 1081**

Rx Date/Time        FEB-07-2019(THU) 13:38              7196350966                P. 007
 02/07/2019  15:42   7196350966                                                  PAGE 07/07

*Mark Bunch*
203

| Patient is able to: | Avoid | Occasionally | Frequently |
|---|---|---|---|
| Bend | ✓ | | |
| Squat | ✓ | — | |
| Climb stairs | ✓ | | |
| Climb ladders, scaffolds, etc. | ✓ | | |
| Twisting low back side to side | | ✓ | |
| Turning neck and head from side to side and/or up and down | | ✓ | |

| Other Restrictions: | Avoid | Occasionally | Unrestricted |
|---|---|---|---|
| Unprotected Heights | ✓ | | |
| Working around moving machinery | ✓ | | |
| Exposure to marked changes in humidity and temperature | | ✓ | |
| Work requiring substantial outside activity in cold or rainy weather | ✓ | | |
| Driving automotive equipment | ✓ | | |
| Exposure to dust, fumes or gases | ✓ | | |

Are Mr. Bunch's symptoms credible and consistent with the diagnosis and objective findings?
____✓ YES    ____ NO

Is it predictable when Mr. Bunch will have a day in which his pain and symptoms flare up?
____✓ YES    ____ NO

Can Mr. Bunch's symptoms or flare up of his symptoms interfere with his attention or concentration abilities?
____✓ YES    ____ NO

Date: _____2·18·15_____          _____
                                Physician's signature – Thomas Higginbotham, D.O.

FORM NO. 12

3

Lincoln/Bunch 1082

## STATEMENT OF MARK BUNCH

1- I am not working at this time and have not worked since February 13, 2018 when injured in car accident

2- I cannot drive and my job with Charter as a Direct Sales Representative or DSR, I drove in excess of 70,000 miles each year just to get into my territory and had to then drive back home. My territory consisted of such fine places as Lamar, La Junta, Walsenburg, Salida, Buena Vista, Leadville, Gunnison, Durango, Crested Butte, Teluride, Rocky Ford, Fowler, Swink. Charter at the time refused to pay for hotels, so you literally had to drive several hours to get to your territory, then work a minimum of 8 hours per day, then drive home hundreds of miles after it was already dark.

The day I was injured I had left my house at 7:00 a.m., drove to Lamar, approximately 175 miles one way, worked till 2 pm, drove back to La Junta, another 75 miles, worked 2.5 more hours there, then left to drive home, another 105 miles to my home and was hit leaving Pueblo headed back to my house in Canon City Colorado at around 6:20 PM, or roughly 11 and ½ hours after I started my work day. This was a typical day for me and for everyone else on the team, and we are required to do this schedule 6 days per week regardless of weather conditions, which I am simply unable to do anymore.

My job entailed going door to door knocking on every door in my assigned address pool, and being able to find or investigate on each street to find which addresses were in existence still and those that were no longer valid since very few addresses are actually marked and visible. This resulted in walking many miles daily on uneven terrain, in wind, rain, snow and heat. I also had to be able to do impromptu sales calls and deal with angry/irate customers who would follow me around to complain about their bill or their services. I had to be able to handle and collect money and complete financial transactions on the fly and stay motivated to meet a minimum doors knocked of 60 per day, 20 contacts, 10 actual sales presentations, and a minimum of 3 sales each day on top of driving hundreds of miles in to and from my work territory. During my two plus years of doing this job, I have been bitten by and chased by numerous dogs, threatened by irate former customers, had things thrown at me and on me, and been stranded on the side of the road broke down more times than I can remember.

Reps are GPS tracked and constantly micromanaged and harassed by management so clock and territory management is micromanaged to the Nth degree. We also had to field troubleshoot all installs and cancellations and if we did not meet a minimum of 25 or more sales per month, and a minimum of 12 installs or more per month, we were written up for failing to meet our quota.

This job, while lucrative was probably the most demanding job mentally and physically that I have ever had in my life, and almost always 12 hours or more per day x 6 days per week with at least half my days travel occurring after dark oftentimes in adverse and dangerous weather conditions for hundreds of miles each day. I no longer have the ability to focus or concentrate very well, I still have issues with my balance and speech, especially when I am nervous, excited

**Lincoln/Bunch 1083**

## STATEMENT OF MARK BUNCH

or upset. I have great difficulty in reading anything and my writing is very difficult to read still as I have double vision and headaches daily as well as ringing in my ears which I have been told will never stop.

3- I am still receiving treatment for speech therapy and occupational therapy and still using my prescribed prism glasses daily.

4- I am not released to work. I could not work in any occupation as I cannot maintain a regular schedule. I have to take a lot of breaks each day, and, I cannot maintain focus or attention for any real length of time on a daily basis.


Mark Bunch

**Lincoln/Bunch 1084**

05.505.5

# Duties Under Duress

Have you continued to do any of the following activities despite the pain caused by your collision?

☐ *Work*

  Why have you continued to work?
      ☐ I would lose my job if I took time off.
      ☐ I couldn't support my family otherwise.
      ☐ I don't believe in taking time off even when I am injured or in pain.
      ☐ My business would fail if I did not work.
      ☐ I cannot take time off because I care for my own children.
      ☑ Other: *I have not been able to work since 2/13/18*

☑ I have experienced the following changes in my ability to perform at work: *2/13/18*

      a.  ☐ Mobility/Stability Problems
              i.    ☑ Climbing
              ii.   ☑ Kneeling
              iii.  ☑ Lifting
              iv.   ☑ Walking for Long Periods
      b.  ☐ Dexterity Problems
              i.    ☑ Finger Movements
              ii.   ☐ Wrist Movements
      c.  ☑ Problems with Fatigue
      d.  ☐ Postural Difficulties
              i.    ☐ Bending
              ii.   ☑ Sitting for Long Periods
              iii.  ☑ Standing for Long Periods
              iv.   ☑ Stooping
      e.  ☑ Problems with Anxiety/Depression
      f.  ☑ Problems with Vertigo or Spinning Sensations
              i.    ☑ Dizziness
              ii.   ☐ Giddiness
              iii.  ☐ Sensation of Irregular Motion
              iv.   ☑ Sensation of Whirling Motion
      g.  ☑ Problems with Tinnitus or Ringing in the Ears
      h.  ☑ Problems with Reduced Concentration
              i.    ☑ Can't Concentrate
              ii.   ☑ Can't Think Properly
              iii.  ☑ Making Mistakes
      i.  ☑ Pain
              i.    ☐ Where? *headaches*

☐ Duration of Symptoms
      a.  ☐ I experienced problems doing my normal work activities for __ weeks.
      b.  ☑ My doctors have instructed me that my inability to perform my normal
             pre-accident work activities without pain is a permanent condition.
      c.  ☐ My problems in performing my normal work activities is ongoing, but
             my doctors have not instructed me that the condition is permanent.

1

Lincoln/Bunch 1085

☑ *Domestic Duties*

☑ I have experienced pain while performing the following activities *inside* my home, but have done them anyway:
   a. ☐ Laundry
   b. ☐ Dishwashing
   c. ☑ Vacuuming
   d. ☑ Washing Windows
   e. ☐ Cleaning
   f. ☐ Preparing Meals

☐ Due to my injuries, I have brought in the following assistance:
   a. ☑ Paid Housekeeper
   b. ☐ Unpaid Housekeeper
   c. ☐ None

☐ My family status would be best described as:
   a. ☑ Single
   b. ☐ Single Parent at Home
   c. ☐ Spouse Only
   d. ☐ Spouse and Children in Home

☐ I have the following number of children:
   a. ☐ 1
   b. ☐ 2
   c. ☐ 3
   d. ☐ 4
   e. ☐ 5
   f. ☑ 0

☐ The number of children in the following age category is:
   a. ☐ Number of children 0 to 5 years: _____
   b. ☐ Number of children 5 to 11 years: _____
   c. ☐ Number of children older than 11: _____

☐ Domestic Assistance:
   a. ☑ I do receive domestic assistance
   b. ☐ I do not receive domestic assistance

☐ Duration of Symptoms:
   a. ☐ I experience problems doing my normal domestic activities for ___ weeks.
   b. ☑ My doctors have instructed me that my inability to perform my normal pre-accident domestic activities without pain is a permanent condition.
   c. ☐ My problems in performing my normal domestic activities is ongoing, but my doctors have not instructed me that the conditions are permanent.

2

**Lincoln/Bunch 1086**

☑ *Household*

☐ I have experienced problems with the following activities *outside* my home:
a. ☐ Painting the Outside of the House
b. ☐ Landscaping
c. ☑ Mowing the Grass
d. ☐ Trimming the Bushes/Trees
e. ☐ Washing Windows
f. ☐ Gardening
g. ☐ Taking Out the Trash
h. ☐ Washing the Cars
i. ☑ Maintaining the Cars
j. ☐ Maintaining Yard Equipment
k. ☐ Doing Other External House Work; Specify: _____

☐ Duration of Symptoms:
a. ☐ I experienced problems doing my normal household activities for __ weeks.
b. ☐ My doctors have instructed me that my inability to perform my normal pre-accident household activities without pain is a permanent condition.
c. ☐ My problems in performing my normal household activities is ongoing, but my doctors have not instructed me that the condition is permanent.

3

**Lincoln/Bunch 1087**

# DAILY ACTIVITIES QUESTIONNAIRE

## GENERAL INFORMATION

1.  Where do you currently live?
    ☑ House     ☐ Apt.     ☐ Boarding House  ☐ Nursing Home     ☐ Other
    If other, please explain.

2.  With whom do you live?
    ☑ Alone     ☐ With family     ☐ With friends     ☐ Board & care     ☐
                                                                      Other
    If other, please explain.

## ACTIVITIES OF DAILY LIVING

1.  Describe how your daily activities have changed since your condition began.  List
    month/year. I cant do what I used to be able to do
    Headaches, Blurrey vision, lack of concentration
    truble concentrating and making decisions, vertigo
    Balence problems, Ringing in my ears

2.  a.  What household chores do you do? _____
        Feed cats
        wash dishes

    b.  Describe your ability to complete these chores. _____
        I'm slow

3.  What type of activities or hobbies do you currently enjoy and spend time doing?
    None

1

**Lincoln/Bunch 1088**

4.  a.  What types of TV or radio programs do you watch and listen to?

Listen to news

b.  Describe your ability to remember and understand these programs.

Fair

5.  a.  What do you read?

Nothing

b.  Describe your ability to remember and understand what you read.

I have vision problems so I don't read much anymore

6.  a.  How often and what type of foods to you prepare?

Microwave only

b.  If you do not prepare food, explain why.

7.  a.  What shopping do you do and how often?

I don't shop much, the lights and exposure bothers me

b.  Do you pay your bills and manage the checking and/or savings account(s)?

A little yes

2

Lincoln/Bunch 1089

8.  Describe your sleeping habits.

_I haven't been able to sleep since my accident_

9.  Describe your ability to care for your personal needs (grooming, dressing, etc.)

_ok I think_

## SOCIAL FUNCTIONING

1.  Describe how your social activities have changed since your condition began?
    List month/year.

    _I don't go out much or have anyone over_

2.  a.  How frequently do you go out of your home? _once a week_

    b.  Where do you generally go?

    _Speech therapy_

    c.  When you go out, do you  ☐ Walk    ☐ Ride bus  ☐ Drive car  ☐
                                                                Other ✓
        If other, please explain. _get driven to appointments_

    a.  Do you go out by yourself? _no_

3.  Describe how you get along with family, friends, neighbors, coworkers and
    others. _I haven't interacted much_

3

**Lincoln/Bunch 1090**

4.    a.    How often do you visit family or friends, or have them in to visit?

_Not in months_

   b.    What do you do during visits?

_____

_____

_____

_____

5.    How often do you talk to friends and relatives on the telephone? _____

_Once a week_

6.    a.    Are you active in any community, sports or social groups?_____

_not any more_

   b.    How do you participate?_____

_____

7.    a.    How often do you attend movies, concerts, or other entertainment
      activities?    _I haven't_

_____

   b.    Do you go alone or with others?_____

_____

## PERSONAL INFORMATION

1.    Describe your ability to concentrate _____

_Sometimes uk but currently poor since accident_

4

**Lincoln/Bunch 1091**

2.    Describe your ability to complete tasks and chores once you begin them _____

_____ have hard time finishing things _____

3.    Describe your ability to follow written or verbal instructions (e.g., following recipes or someone giving directions). _____ Sometimes I do ok

4.    a.    What medications do you take for your condition? _____ Flexeril, 20 buel

b.    Do you take it yourself or does someone give it to you?

_____ I take it

5.    a.    Have you been told by a doctor to use an assistive device (cane, crutch, oxygen, etc.)? _____ Cane

b.    If so, give the name and address of the doctor and when it was prescribed _____ Dr thssinb uthan

6.    a.    Is anyone dependent other than financially upon you for care (spouse, children, parents, pets, etc.)? _____ Pets

b.    If so, who and what assistance do you provide? _____ I fed them

7.    Have you ever lost a job as a result of your condition? Please explain. yes _____ Chanthe made me resign

Lincoln/Bunch 1092



**Lincoln/Bunch 1093**

# SHAKESHAFT & GORMAN LAW FIRM, LLP

1935 Jamboree Dr. | Suite 202 | Colorado Springs, CO 80920
Tel 719.635.5886 | Fax 719.635.0966 | www.shakeshaftlawfirm.com

## FACSIMILE TRANSMISSION

**DATE:**   November 8, 2018

**TO:**   **Liberty Life Assurance Company of Boston**

**FROM:**   Brandy Newton| Paralegal

**PAGES INCLUDING COVER SHEET:**   3

**FAX NUMBER:**   603-559-9400

**REGARDING:**   Mark Bunch
Claim No.: 8220685

**Comments:**   Please see attached correspondence regarding Mr. Bunch.

IF YOU DO NOT RECEIVE ALL THE PAGES OR IF ANY PART IS ILLEGIBLE, PLEASE CALL (719) 635-5886.

### NOTICE

THIS MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN PRIVILEGED OR CONFIDENTIAL INFORMATION WHICH IS EXEMPT FROM DISCLOSURE PURSUANT TO APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR IS NOT AN EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERY OF THIS MESSAGE TO THE INTENDED RECIPIENT, DISTRIBUTION, COPYING OR OTHER DISSEMINATION OF THE INFORMATION CONTAINED IN THIS COMMUNICATION IS PROHIBITED. PLEASE CONTACT (719) 635-5886 AND RETURN THE ORIGINAL MESSAGE TO SHAKESHAFT LAW FIRM, 1935 JAMBOREE DRIVE, STE. 202, COLORADO SPRINGS, CO 80920.

**Lincoln/Bunch 1094**



## SHAKESHAFT-GORMAN
--- LAW FIRM, LLP ···

| | | |
|---|---|---|
| Kenneth J. Shakeshaft | • Attorney at Law | **Main Office** |
| Joseph M. Gorman | • Attorney at Law | Shakeshaft - Gorman Law Firm |
| Cindy Maddox | • Paralegal | 1935 Jamboree Drive, Suite 202 |
| Brandy Newton | • Paralegal | Colorado Springs, CO 80920 |

November 9, 2018

**Sent Via Facsimile:603-559-9400**

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
Adjuster -Kayla Carter
P.O. Box 7207
London, KY 40742-7207

RE:   **Claimant:    Mark Bunch**
      **Employer:    Charter Communications, Inc.**
      **Claim No.:    8220685**

Dear Ms. Carter,

   Please be advised we have been retained to represent the Claimant, Mark Bunch, in the claim for long-term disability benefits with Liberty Life Assurance Company of Boston.

   We are in receipt of Liberty Life's correspondence of September 14, 2018 denying Mark Bunch's claim for LTD benefits.

   If Liberty Life asserts Mr. Bunch's claim is governed by ERISA then please provide the legal and contractual basis for this claim.

   Enclosed for your file is a Consent for Disclosure of confidential information signed by Mr. Bunch.

   At this time I want to confirm that the appeal, on behalf of Mark Bunch, is due within 180 days of Mr. Bunch's receipt of the September 14, 2018 letter. We are in the process of putting together additional information to support Mr. Bunch's appeal.

   Additionally, I would request a complete copy of Mark Bunch's claim file, including correspondence, medical records, etc.

Sincerely,

Kenneth J. Shakeshaft
KJS/bn
Enclosures

**Lincoln/Bunch 1095**

11/08/2018   11:45   7196350966                                        PAGE 03/03

## CONSENT & AUTHORIZATION FOR DISCLOSURE OF CONFIDENTIAL INFORMATION

I, _mark Bnglt_ (SSN: _____   DOB: _____ ) DO HEREBY CONSENT TO THE
DISCLOSURE By:

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742

to the following:

**SHAKESHAFT & GORMAN LAW FIRM, LLP**
1935 Jamboree Dr., Suite 202
Colorado Springs, CO 80920
Telephone 719.635.5886
Facsimile 719.635.0966
E-mail: office@shakeshaftandgormanlaw.com

my attorney, of the hereinafter described information, which is protected from disclosure by virtue of the provisions of Federal Regulations (42 C.F.R., Part 2), as well as Colorado Revised Statutes, and/or applicable State law. The extent or nature of the information to be disclosed is as follows:

*All Records and Information, including the following:*

| | | |
|---|---|---|
| ✓ Psychotherapy Notes | ✓ History & Physical | ✓ Radiology Reports |
| ✓ Mental Health Records | ✓ Consultation Reports | ✓ Alcohol & Drug |
| ✓ Entire Medical Record | ✓ Laboratory Reports | Related Records |
| ✓ Pathology Report | ✓ Radiology Films | ✓ Operation Report |
| ✓ EKG Reports | ✓ Physician's Orders | ✓ Discharge Summary |
| ✓ All insurance records | ✓ Medical Bills, Statements, Payment Information, Write-offs, | |
| ✓ Correspondence, Notes | Insurance Information and Payment Information, Balance Due, Etc. | |
| MRI, X-Ray Films, CDs, including any Electronic Images and Reports | | |

The purpose of this Consent is for evaluation and presentation of the undersigned legal and insurance claims. I make this Consent pursuant to the authority granted by me. Oral disclosure is specifically permitted pursuant to this release. *I understand that pursuant to the HIPAA Privacy Regulation a covered entity cannot condition the provision of treatment, payment of health plan benefits, or eligibility for such benefits on the signing of an authorization. No such conditioning has occurred regarding this authorization.*

I have read this consent for disclosure of confidential information and I acknowledge I am familiar with and fully understand the terms and conditions of this consent, and direct the information requested by my attorney be released forthwith. A photocopy of this document may be used in place of the original. *This authorization shall expire upon either (a) termination of attorney, Kenneth J. Shakeshaft/Joseph M. Gorman, as my legal representative or (b) one year after the date of signature.* I acknowledge I have the right to revoke this authorization in writing at any point in time, except to the extent the provider has taken action in reliance of this authorization.

I understand if the provider is covered by the HIPAA Privacy Regulation, once the provider discloses the protective health information, it may no longer be protected by the regulation. The information disclosed pursuant to the authorization may be re-disclosed by the recipient and no longer protected by the federal privacy regulations. Privacy Rule 45 C.F.R. § 164.508(c)(2).

I understand I may inspect or copy the information to be used or disclosed, that I may refuse to sign the authorization and that the use or disclosure will result in payment to the facility by a third party payor, if applicable.

DATE SIGNED: October 30, 2018   CLIENT SIGNATURE: _____

**Medical Record Overview**

 **ReleasePoint**

**Date:**      September 30, 2018

**Patient Name:**     BUNCH, MARK

**Records From:**    Dr. Michael Christiansen

, 
(719) 275-8109

**Request Scope:**   From February 1, 2018 to Present

**Chart Range:**     07/30/2018 - 09/20/2018

**RP ID:** 4402351

**Client ID:** 8220685

**Source:** LIBMT3

**Req By:** K Carter
Kayla Carter

**SSN:**

| Classification | From | To | Total | Starts on Page |
|---|---|---|---|---|
| Progress Notes | Jul 30 2018 | Sep 20 2018 | 15 | 2 |
| Other Records | | | 16 | 17 |
| Request Corr. | | | 6 | 33 |

**Total Page Count:**     37

**Notes From QC:**

scanned in the best quality possible

**Lincoln/Bunch 1097**

Progress Notes - 09/20/2018

| D.O.B. | NAME |
| --- | --- |
| | *Mark Bunch* |
| DATE | VISITS & FINDINGS |

**9-17-18** — Has done some better over the weekend. Has been X-ercising and all with better response. The Right side of the Neck has been Better, along with the Left Has had less Headaches. So the Neck region has been more even on Both Sides. There is aching of the upper Back area on Both sides also.

Found Tenderness of the T-4,5 region upon Bi-Lateral Rotation. There is also tension of the T 9,10 area. The C-Spine shows tension of the C-2, 6,7 area upon Palpation and Bi-Lateral Rotation.

Treatment was done of the T4,5, 9,10 areas in the Prone Position. The C-2,6,7 areas were done in the Supine Position. Then an Anterior was done of the T4,5 region Bi-Lateral. The Patient responded well after.

I will again see the patient in 3 days, with the Hope to extend the Treatment in the next couple weeks.

**9-20-18** — Has felt some Better after Last treatment. Hasn't had as much problem on the Right side of the Neck as before. Has noticed some problem sleeping, where he has had more Neck and upper Back tension.

Found C-spine tenderness Bi-Lateral upon Lateral Flexion. Again not as bad. Found more at the C5,6 area on the Left, and C3,4 on the Right. There is also tension of the T4,5 area Bi-Lateral. Upon Rotation.

Treatment was done of the T4,5 and T10,11 areas in the Prone Position. The C2,4,6 areas were done Supine. Then done on Anterior of the T4,5 areas. Done Bi-Lateral. He could move easier after treatment.

I will see the Patient again in 4 days.

**9-24-18** — Did fall on 9-21-18, going up the stairs at home. Skinned his right knee, and hurt the 2nd and 3rd Metatarsal bone structures. Did Not hurt the Neck or Left upper back Regions Has had slight tension in these areas though.

Found a slight Right Hip twist. There is tension of the upper Back somewhat Bi-Lateral at the T4,5 region. The C-Spine showed decreased Range of Motion at the C4,6 areas upon rotation and Lateral Tilt. He also had a slight Right hip twist.

Treatment was done of the T4,5, 9 areas in the Prone Position. Done the Right Hip as on 45 with the Drop. The C2,4,6 areas were done Supine. Then on Anterior was done of the T4,5 region Bi-Lateral.

I'm extending the treatment to a week now as a test. To see if he can maintain his condition. So will see him in 1 week.

**Lincoln/Bunch 1098**

Progress Notes - 09/17/2018

| D.O.B. | NAME |
| --- | --- |
| | Mark Bunch |
| DATE | VISITS & FINDINGS |
| 9-17-18 | Has done some better over the weekend. Has been X-ercising and all with better response. The right side of the neck has been better, along with the Left. Has had less headaches. So the Neck region has been more even on Both Sides. There is aching of the upper Back area on Both sides also.
Found Tenderness of the T-4,5 region upon Bi-Lateral Rotation. There is also tension of the T 9,10 area. The C-Spine shows tension of the C 2,6,7 area upon Palpation and Bi-Lateral Rotation.
Treatment was done of the T 4,5, 9,10 areas in the Prone Position. The C 2,6,7 area was done in the Supine Position. Then an Anterior was done of the T 4,5 region Bi-Lateral. The Patient responded well after.
I will again see the patient in 3 days with the Hope to extend the Treatment in the next couple weeks. |

**Lincoln/Bunch 1099**

**Progress Notes - 09/13/2018**

| D.O.B. | NAME |
|--------|------|
|  | Mark Bunch |
| DATE | VISITS & FINDINGS |
| 9-6-18 | Hasn't done Bad since last treatment. Has been sitting different and all. Hasn't noticed a lot of change. Has had Neck & Left upper Back Involvement. Maybe not as bad though. Is still Exercising as well.

Found C-Spine tenderness at the C5,6 region upon Left Lateral Flexion. There is tightness of the T4,5 area on the Left, upon Palpation and Left Rotation. The Left Shoulder is affected some.

Treated the T4, 5, 10, 11 areas in the Prone Position. Done a Sacral Base Drop. The C2, 6 areas were done supine. Then the Left Hip was done on the side. Did Do an Anterior of the T4,5 region on the Left. Done better after treatment.

Checked the sensitivity of the Left Hand after treatment. Still affected on the Tip of the Little finger some.

Because of his better response, I will Keep him at the twice weekly program. So will see him in 4 days. |
| 9-10-18 | Has improved a little again. The Left Side of the neck is not as bad as before. There is a little more on the Right Side today. Still has a problem w/ the Left upper Back region.

Found C-Spine tension Bi-Lateral at the C5,6 area. Found with Bi-Lateral Flexion of the C-Spine. There is tension of the T3,4,5 area on the Left upon Palpation and Rotation to the Left. The Left Hip is slight.

Treatment was done of the T4, 5, 9, 10 areas in the Prone Position. Done a Sacral Base Drop. The C-Spine was done at the C2,6 area in the Supine Position. The Left Hip was done on the side. Then an Anterior was done of the T4,5 area on the Left.

I will see the patient again in 3 days. |
| 9-13-18 | Patient stated that he is still doing better. The Left Side of the Neck has improved. Even has better range of Motion. The Right Side is still a little more than the Left. The Left arm movement is better, and his headaches off & on as of yet. He is changing his positions.

Found C-Spine Rotation Improvement with tenderness at the C5,6 area on the Left, and C3,4 on the Right. There is some pain upon Lateral Flexion, but better. There is also tension of the T4,5 area, with Bi-Lateral Rotation.

Treatment was done of the T4,5,9,10 areas in the Prone Position. The C2,4,6 areas were done in the Supine Position. The Left Hip was done on the side. Then done an Anterior of the T4,5 region Bi-Lateral.

As we are still seeing Improvement I will see the Patient in 4 days. |

**Lincoln/Bunch 1100**

Progress Notes - 09/06/2018

| D.O.B. | NAME |
| --- | --- |
| | *Mark Bunch* |
| DATE | VISITS & FINDINGS |
| 9-6-18 | Hasn't done bad since last treatment. Has been sitting different and all. Hasn't noticed a lot of change. Has had Neck & Left upper Back involvement. Maybe not as bad though. Is still Exercising as well.

Found C-Spine tenderness at the C5,6 region upon Left Lateral Flexion. There is tightness of the T4,5 area on the Left. Upon Palpation and Left Rotation, the Left Shoulder is affected some.

Treated the T4,5,10,11 areas in the Prone Position. Done a Sacral Base Drop. The C2,6 areas were done supine. Then the Left Hip was done on the Side. Did Do an Anterior of the T4,5 region on the Left. Done better after treatment.

Checked the Sensativity of the Left Hand after treatment. Still affected on the Tip of the little finger some.

Because of his better response, I will keep him at the three weekly program. So will see him in 4 days. |
| 9-10-18 | Has improved a little again. The Left Side of the neck is not as bad as before. There is a little more on the Right Side today. Still has a problem w/ the Left upper Back region.

Found C-Spine tension Bi-Lateral at the C5,6 area. Found with Bi-Lateral Flexion of the C-Spine. There is tension of the T3,4,5 area on the Left upon Palpation and Rotation to the Left. The Left Hip is slight.

Treatment was done of the T4,5,9,10 areas in the Prone Position. Done a Sacral Base Drop. The C-Spine was done at the C2,6 area in the Supine Position. The Left Hip was done on the Side. Then an Anterior was done of the T4,5 area on the Left.

I will see the patient again in 3 days. |

**Lincoln/Bunch 1101**

| D.O.B. | NAME |
| --- | --- |
| | Mark Bunch |
| DATE | VISITS & FINDINGS |

| 8-27-18 | Has been feeling some better this time. Can move the Left arm better. Has less pain when moving the C-Spine and upper back regions. Has been doing his Exercises and using a rolled Towel for the T-Spine. Noticed he is not slumped as much. So all is still improving each time. |
| | Found a slight Low Lt. Hip. There is some decreased Range of Motion to the T-Spine, Bi-Lateral. There is a slight stabbing pain of the C-Spine at the C6,7 level. More with Left Lateral Tilt of the C-Spine with Compression. There is also tension of the C6,4 area upon Palpation. |
| | Treatment was done of the T 4,5, 9, 10 area in the Prone Position. The C 2, 4, 6, 7 area were done Supine. Then an Anterior was done of the T 4,5 region on the Left Side. The Left Hip was done on the Side. |
| | The Treatment has been working for the Patient. So I will keep him at the Twice weekly program. Maybe for a couple weeks. Then hopefully can change it. |

Lincoln/Bunch 1102

**Progress Notes - 08/27/2018**

| D.O.B. | NAME |
| --- | --- |
| | Mark Bunch |
| DATE | VISITS & FINDINGS |
| 8-27-18 | Has been feeling some better this time. Can move the Left Arm better. Has less pain when moving the C-Spine and upper Back regions. Has been doing his Exercises and using a rolled Towel for the T-Spine. Noticed he is not slumped as much. So all is still improving each time. Found a slight Low Lt. Hip. There is some decreased Range of Motion to the T-Spine, Bi-Lateral. There is a slight stabbing pain of the C-Spine at the C6,7 level. More with Left Lateral Tilt of the C-Spine with Compression. There is also tension of the C2,4 area upon Palpation. Treatment was done of the T4,5,9,10 area in the Prone Position. The C2,4,6,7 areas were done Supine. Then an Anterior was done of the T4,5 region on the Left Side. The Left Hip was done on the Side. The Treatment has been working for the Patient, so I will keep him at the Twice weekly program. Maybe for a couple weeks. Then hopefully can change it. |
| 8-30-18 | Patient stated that he thinks he feels better over all. Has been using the Towel in the T-Spine area. Has been X-ercising the Neck and upper Back as he has been instructed. Has some Left upper Back and Left Sided Neck pain. But again, some better. Found tenderness at the T4,5 region on the Left upon Palpation and Rotation to the Left. The C-Spine shows tenderness upon Left Lateral Tilt and not so much to the Right. At the C5,6,7 areas. There is also tension of the T9,10 area upon palpation. Treatment was done of the T4,5,9,10 areas in the Prone Position. The C2,5,6 areas were done Supine. The Left Hip was done on the Side. Then an Anterior was done of the T4,5 region on the Left. He could move better after. I will again see him in 4 days. |
| 9-4-18 | Hasn't done terribly bad. Has had some Neck and Lt. Shoulder Issues though. More the last couple days. Still more on the Left Side. The headaches were not as bad. Has been doing the Exercises given, plus the Towel on the T-Spine. Found him to have less Head drop when sitting. Showed tension of the T9,10 and T4,5 regions upon Palpation and Rotation. The C-Spine shows tenderness at the C5,6 area upon Left Lateral Flexion. Treatment was done of the T4,5,9,10 areas in the Prone Position. The C5,6 and C2,3 areas were done supine. Then an Anterior was done of the T9,10 region on the Right, and T4,5 on the Left. We but over some of his sitting Positions. I will now see the patient in a couple days. |

**Lincoln/Bunch 1103**

| D.O.B. | NAME |
|--------|------|
|        | Mark Bunch |

| DATE | VISITS & FINDINGS |
|------|-------------------|

**8-16-18 Cont'd**

Found a slight Low Left Hip with slight pressure. There is tenderness of the T3, 4 and T12 area upon Bi-Lateral Rotation. There is tension of the C2, 5, 6, 7 Block upon Left Lateral Tilt and upon Palpation. Not as much pain.

Treatment was done of the T4, 5, 10, 11 area in the Prone Position. Then done a Sacral Base Drop. The C6, 7 and C2 areas were done in the Supine Position. The Left hip was done on the side. Then an Anterior was done of the T3, 4 area on the Left. Could move better after the treatment.

I will yet see the Patient in 4 days.

**8-20-18**

The Neck and upper Back with the Left shoulder has felt better this time. For a longer time. The Neck X-ercise given him has been working well so far. So sore as of yet. But not near as bad. Has not been real active to hurt himself.

Found Left Hip some (Low). The T-Spine shows tension of the T10, 11 area upon Palpation. The T-4, 5 area is sore upon Palpation and Lt. Rotation. Has pain of the C6, 7 area upon Right and Left Lateral Extension. Then the Left arm has better range of motion.

Treatment was done of the T5 and T10, 11 areas in the Prone Position. The C6, 7 area was done Supine, along with C2 too. Done an Anterior of the T4, 5 regions Bi-Lateral.

Gave the Patient an Exercise for the upper Back. (Rhomboid area). The Left little finger was still there.

I am staying with the 2X's / week treatment program, as it is working well for now. So I will see the patient in 3 days.

**8-23-18**

Has done some Better this time. Hasn't had as much sharp pain in the upper Back and Left side of the neck. The arm movement has been some better also. Has been more careful with his activities. There has also had a slight headache off & on. States that he has been doing the exercise.

Found T-Spine tenderness of the T4, 5 and T9, 10 areas upon Bi-Lateral Rotation. Has a Low Lt. Hip slight. There is tenderness upon the C4, 5 area to day upon Left Lateral Flexion. So this is a change somewhat.

Treatment was done of the T4, 5 and T9, 10 areas in the Prone Position. The C2, 4, 5 areas were done Supine. The Left Hip was done on the side. Then an Anterior was done of the T4, 5 regions Bi-Lateral.

There has been change to day with the Change. I will still see the patient in 4 days.

Lincoln/Bunch 1104

**Progress Notes - 08/06/2018**

| D.O.B. | NAME |
|--------|------|
|  | Bunch Mark. |

| DATE | VISITS & FINDINGS |
|------|-------------------|
| 8-6-18 Cont'd | Treatment was done of the T9, 10 and T5, 6 areas in the Prone Position. Then done a Sacral Base Drop. The C5, 6 area was done Supine. I also done an Anterior of the T3, 4 area on the Left. Pain was diminished after treatment. I will see the Patient in 3 days to stay with the Assessment. |

**Lincoln/Bunch 1105**

Progress Notes - 07/30/2018

# PERSONAL HISTORY

Date 1/30/18    Birthdate ___    Age 54    SS# _____

Name Mark Bunch    Address _____

City ___    Stat ___ Zip ___    Email _____

Home Ph ___    Work Ph _____    Cell Ph _____

☑ Male    ☐ Female    Height 6    Weight 235    Number of Children 0

Referred by Dr Olson    Emergency Contact &/Ph # _____

Marital Status:    ☑ Married    ☐ Single    ☐ Divorced    ☐ Widowed    ☐ Separated

Education:    # of Years Completed 15    Presently a Student? (No    ☐ Part Time    ☐ Full Time

Business/Employer: Charter Communications    ☐ Part Time    ☐ Full Time

Job Satisfaction:    ☑ Very Satisfied    ☐ Satisfied    ☐ Unsatisfied    Years Employed: 3

☐ Working With Restrictions    ☐ Working Without Restrictions    ☐ Not Working Since _____

Job Description Outside Sales

Who is Responsible For Your Bill:    ☐ Self ☐ Spouse ☐ Workers Compensation ☐ Medicare ☐ Auto Insurance

☐ Personal Health Ins. ☐ Other _____    X _____ Patient Signature

# PAST HEALTH HISTORY

Have You Ever Been to a Chiropractor?    ☑ No ☐ Yes    Name & Date of Last Service _____

Family Doctor Dr Olson

Have You Gained or Lost More Than 10 lbs in the Last 6 Months:    ☐ Gained    ☐ Lost    ☑ Neither

Pregnant? ☐ No ☐ Yes ☑ N/A    Date of Last Cycle ___    Started Menopause? ☑ No ☐ Yes  When ___

Overall, How Would You Rate Your Health:    ☐ Excellent ☑ Average ☐ Poor ☐ other _____

## HOSPITALIZATIONS, OPERATIONS / WORK, AUTO OR PERSONAL ACCIDENTS OR INJURIES
(Please be Specific, Include Dates, Areas Involved, and Treatment Received)

1. Hernia Repair May 2017
2. Tonsilectomy 1970
3.
4.
5.
6.

## SERIOUS ILLNESSES
(List Current and Past Illnesses Not Mentioned Above, Including Cancer, Diabetes etc, and Include Dates)

1. N/A
2.
3.
4.
5.
6.

**Lincoln/Bunch 1106**

Progress Notes - 07/30/2018

Name: _Mark Bunch_ DOB: _____ Date: 7/30/18

ALLERGIES: Please list all known allergies, especially to medicines. _penicillin and stupid people_

MEDICINES: Please list all currently used medicines, prescription or non-prescription, vitamins and herbs.

HOBBIES OR INTERESTS: _Reading, four riding, biking, gardening_

ARE YOU: ☑ Right-handed ☐ Left-Handed ☐ Ambidextrous

## CURRENT HEALTH CONDITION

### MAJOR COMPLAINTS

1. _Neck and upper back pain loss of range of motion_
2. _left shoulder pain loss of range of motion_
3. _left hip._
4. _____

No Pain 0 1 2 3 4 ⑤ 6 7 8 9 10 Severe Pain

1. When did this Condition Begin? _2/13/18_ 2. Cause of Condition _Car accident_
3. Condition is Related to: ☑ Auto Accident ☑ Work ☐ Sports Injury ☐ Personal Injury ☐ Other _____
4. Is this Condition: ☑ Getting Worse ☐ Getting Better ☐ Staying the Same
5. What Movements or Positions Aggravate this Condition? _laying down, lifting any things_
6. Is the Condition Worse: ☐ In the Morning ☑ In the Afternoon ☑ In the Evening ☑ Same all Day
7. Does Anything Relieve the Pain? ☐ No ☐ Yes (explain) _Pain pills help_
8. Have You Been Treated for Present Condition? ☐ No ☑ Yes When _May 18 ?_
9. Who Treated you? _PT Ethan_ City _____ State _____ Phone _____
10. Type of Treatment Received: _Balance issues, vestibular problems, neck shoulder pain_
11. Reason for Changing Care: _____
12. Ever Had Similar Condition? ☑ No ☐ Yes When? _____ Were you Treated? ☐ No ☐ Yes
13. Who Treated You? _____ City _____ State _____ Phone _____
14. Treatment Received: _____
15. Has Anyone in Your Family had Similar Condition? ☑ No ☐ Yes Who? _____
16. Are You off Work Due to This Condition? ☐ No ☑ Yes If Yes, date you last worked _2/13/18_

**Lincoln/Bunch 1107**

Progress Notes - 07/30/2018

NAME: _Mark Rowe_    DOB: ____    DATE: _7/30/18_

CC #1: _Neck pain_    Date of Onset: _2/13/18_
Condition related to ☑work ☐auto ☐other incident ☐other _____
Dates of similar symptoms: _____
Condition is: ☐same ☐better ☑worse (since onset)
Provoked by: ☑sitting ☑standing ☑laying ☑reaching ☑bending ☐walking ☐other _____
Relieved by: ☐ice ☑heat ☐sleep ☐sitting ☐standing ☐laying ☐walking ☑pain killers, muscle relaxants, anti-inflammatories ☐other _____
Quality is: ☐mild ☑moderate ☐severe ☐very severe
Pain scale: no pain 0 1 2 3 4 ⑤ 6 7 8 9 10 severe pain
Pain radiates into: _shoulder Arm back_
Is complaint worse in: ☐am ☑pm ☑afternoon ☐same all day
Medical treatment or diagnosis: _Cervical sprain, whiplash_
Results: _helped by PT_
Reviewed outside records: ☐yes ☐no    S B W

CC #2: _Stiff Back / shoulder (left)_    Date of Onset: _2/13/18_
Condition related to ☑work ☐auto ☐other incident ☐other _____
Dates of similar symptoms: _____
Condition is: ☑same ☐better ☐worse (since onset)
Provoked by: ☐sitting ☑standing ☑laying ☑reaching ☑bending ☐walking ☐other _____
Relieved by: ☐ice ☑heat ☑sleep ☐sitting ☐standing ☐laying ☐walking ☐pain killers, muscle relaxants, anti-inflammatories ☐other _____
Quality is: ☐mild ☑moderate ☐severe ☐very severe
Pain scale: no pain 0 1 2 3 4 5 6 7 8 9 10 severe pain
Pain radiates into: _Neck Arm shoulder And left hip_
Is complaint worse in: ☐am ☑pm ☑afternoon ☐same all day
Medical treatment or diagnosis: _Cervical sprain_
Results: _____
Reviewed outside records: ☐yes ☐no    S B W

Social History/Comorbidity Factors:

☐ smoker          ☐ cancer              E-edema
☐ alcohol         ☐ diabetes            P-pain
☐ coffee/tea      ☐ heart disease       T-tenderness
☐ drug use (street) ☐ proceed w/chiro. Exam   N-numbing
☑ exercise        ☐ refer out           H-hypoasthesia
                                        S-spasm

Complications: _____
Any Activities Limits: _____
Surgeries: ☐ see entry form _____
D.C. History: ☐ see entry form _____
Medications Presently Taking: ☐see entry form _____
History of Accidents: ☐ see entry form _____

**Lincoln/Bunch 1108**

Progress Notes - 07/30/2018

NAME _Mark Bunch_ DOB _____ DATE _7-30-18_

**DNP—Did Not Perform**

※※ (more on the Left arm & Hand)

**Sensation**
1 Good
2 More
3 Less

**Upper Dermatomes:**
___ C-4 Lat. Aspect of Shoulder
___ C-5 Lat. Aspect of Upper Arm
_3_ C-6 Lat. Aspect of Lower Arm & Thumb
_3_ C-7 First Finger
_2_ C-8 Middle Finger & 1/2 Ring Finger
___ T-1 1/2 Ring Finger, Pinky & Medial Forearm
___ T-2 Medial Upper Arm

**Lower Dermatomes:**
___ L-2 Anterior & Medial Thigh
___ L-3 Ant & Medial Thigh & Leg
___ L-4 Medial Leg & Foot
___ L-5 Anterior Leg & Foot
___ S-1 Outside of Foot
___ S-2 Post & Lat Thigh & Leg

**DNP—Did Not Perform**

**PATIENT SITTING**
Blood Pressure: _____ systolic _____ diastolic _____ pulse pressure
Pulse rate: ☐ high ☐ low ☐ normal at _____ per minute
Chest Expansion was _____ inches
Neck Flexion            (45) _Pos._ restricted at _____ degrees
Neck Extension          (55) _Pos._ restricted at _____ degrees
Neck R. Lat Flexion     (60) _Pos._ restricted at _____ degrees
Neck L. Lat Flexion     (60) _Pos._ restricted at _____ degrees
Neck R. Rotation        (70) _Pos._ restricted at _____ degrees
Neck L. Rotation        (70) _Pos._ restricted at _____ degrees
Foramina Comp: ☐ no increase ☒ increase in pain ☐ rt ☒ lt arm/neck/shoulder
Shoulder Comp: ☐ no increase ☒ increase in pain ☐ rt ☒ lt arm/neck/shoulder
Adson's Sign or Scalenus Anticus Syndrome: ☒ no evidence ☐ evidence of brachial
         irritation on the ☐ right side ☐ left side
Pupil Reflex Response to Light: ☐ normal ☐ abnormal on ☐ right ☐ left ☐ both
Patellar Reflex right:        ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Patellar Reflex left:         ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Biceps Reflex in the Right Arm: ☐ exaggerated ☒ normal ☐ sluggish ☐ not present
Biceps Reflex in the Left Arm:  ☐ exaggerated ☒ normal ☐ sluggish ☐ not present
Triceps Reflex in the Right Arm: ☐ exaggerated ☒ normal ☐ sluggish ☐ not present
Triceps Reflex in the Left Arm:  ☐ exaggerated ☒ normal ☐ sluggish ☐ not present
Dejerines Triad: ☐ none ☐ cough ☐ sneeze ☐ laugh
Hyper Extension Comp: ☐ rt ☒ lt ☒ base of neck ☒ shoulder ☐ arm
Lhermitte's Sign: ☐ positive ☐ negative
Valsalva: ☐ increase ☐ no increase in thecal pressure

Patient Is
Rt.    Lt.
___ Lbs. ___ Lbs.
___ Lbs. ___ Lbs.
Patellar                 Grip Test

Foramina Compression        Shoulder Compression

Cervical Flexion Extension   Lateral Flexion

BICEPS
TRICEPS                     Lateral Rotation

Notes: _____

**Lincoln/Bunch 1109**

**Progress Notes - 07/30/2018**

NAME _Mark Bruneh_ DOB _____ DATE _7-30-18_

**DNP—Did Not Perform**

**PATIENT SUPINE**

Apparent short leg: ☑ left _¼"_ ☐ right _____
True short leg: ☐ left _____ ☐ right _____
Umbilicus: ☐ left ☐ right
Soto-Hall: ☐ none   nerve irritation in the ☐ neck ☐ mid back ☐ low back (Pain) ✱✱
Neck flexors: ☐ good ☐ moderate ☐ fair ☑ poor
Trunk flexors: ☐ good ☐ moderate ☐ fair ☐ poor
Pelvic elevators: ☐ good ☐ moderate ☐ fair ☐ poor
Goldthwait's: ☐ none ☐ nerve irr. in ☐ lumbo-sacral ☐ sacro-iliac joints ☐ lt ☐ rt
Lasegue's: ☐ none ☐ sciatic nerve pressure in the ☐ right leg ☐ left leg
Braggard's: ☐ none ☐ sciatic nerve irritation in the ☐ right leg ☐ left leg
Patrick's: ☐ none ☐ restricted hip movement on the ☐ right ☐ left ☐ low back
Leg drop: ☐ none ☐ disc compression at lumbo-sacral joint. ☐ left ☐ right
Bilat. Leg Lowering: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt
Straight Leg Raise: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt

| Test | Box |
|---|---|
| ☐ RT ☐ LT ☐ POS ☐ NEG — PSOAS | |
| Soto-Hall | |
| Goldthwait Test | |
| ☐ POS ☐ NEG — Naffziger Test | |
| Braggard Test | |
| Lasegue's Sign | |
| ☐ POS ☐ NEG — Hoover Sign | |
| Leg Drop Test | |
| Fabere-Patrick Test | |
| Babinski | |

**SPINAL ANALYSIS**

| Sub/Phase | Spasms | Incr. Temp | Palp. Listing | | Palp. Listing | Incr. Temp | Spasms | Sub/Phase |
|---|---|---|---|---|---|---|---|---|
| | | | | Oc | | | | |
| | | | | A1 | | | | |
| | | | | Ax | | | | |
| | | | | 3C | | | | |
| | | | | 4 | | | | |
| | | | | 5 | | | | |
| | | | | 6 | | | | |
| | | | | 7 | | | | |
| | | | | 1T | | | | |
| | | | | 2 | | | | |
| | | | | 3 | | | | |
| | | | | 4 | | | | |
| | | | | 5 | | | | |
| | | | | 6 | | | | |
| | | | | 7 | | | | |
| | | | | 8 | | | | |
| | | | | 9 | | | | |
| | | | | 10 | | | | |
| | | | | 11 | | | | |
| | | | | 12 | | | | |
| | | | | 1L | | | | |
| | | | | 2 | | | | |
| | | | | 3 | | | | |
| | | | | 4 | | | | |
| | | | | 5 | | | | |

**PATIENT PRONE**

Bending of the neck backward: ☐ good ☐ moderate ☐ fair ☑ poor (Pain) ✱✱
Bending of the trunk backward: ☐ good ☐ moderate ☐ fair ☐ poor
Left achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Right achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Babinski: ☐ none ☐ extension of toes instead of flexion on simulation of the sole of foot
& indicated ☐ no ☐ an organic ☐ a spinal cord lesion of central nervous system
Ely's sign of heel-to-buttock test: ☐ no ☐ a sacro-iliac disorder

Sacral-Apex PR    Achilles    Ely's Test

Notes:_____
_____
_____

**Lincoln/Bunch 1110**

Progress Notes - 07/30/2018

NAME _Mark Bunch_____ DOB_____ DATE _7-30-18_

**DNP—Did Not Perform**

**PATIENT STANDING**

Height ___6___ feet, _____ inches.    Weight _235_ lbs.

Weight distribution: Patient carries_____ lbs. more on    right _____ left_____

General appearance: ☐ well nourished ☐ strong ☑ good ☐ fair ☐ run down ☐ poor

Posture: ☐ good ☑ fair ☐ poor

Gait: ☑ regular ☐ irregular_____

Head Tilt: ☐ right ear lower than left ☑ left ear lower than right

Neck: ☑ no curvature ☐ curvature to the ☐ left ☐ right

Muscle Tension: ☐ not present ☑ present in the ☑ neck ☑ rt ☑ lt
          shoulder ☐ rt ☑ lt ☐ middle back ☐ rt ☑ lt ☐ lower back ☐ rt ☐ lt

Shoulder Tilt: ☑ left shoulder lower ☐ right shoulder lower

The middle back or thorax: ☑ no curvature ☐ showed side curvature ☐ left ☐ right

Abnormal backward curvature or kyphosis: ☑ not present ☐ present in the
          ☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Abnormal forward curvature or lordosis: ☑ not present ☐ present in the
          ☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Hip Level: ☐ normal ☑ not normal and showed ☐ left ☑ right illum higher

The lower back: ☑ no side curvature ☐ showed side curvature to the ☐ left ☐ right

| | | | |
|---|---|---|---|
| Flexion | (90) | _____ restricted at_____ | degrees |
| Extension | (20) | _____ restricted at_____ | degrees |
| R. Lat Flexion | (40) | _____ restricted at_____ | degrees |
| L. Lat Flexion | (40) | _____ restricted at_____ | degrees |
| R. Rotation | (45) | _____ restricted at_____ | degrees |
| L. Rotation | (45) | _____ restricted at_____ | degrees |

Trendelenberg's test: ☐ no hip weakness ☐ hip weakness on the ☐ right ☐ left

Romberg's test: ☐ no ☐ some ☐ much body swaying

Balance test: ☐ none ☐ some ☐ much instability on ☐ left ☐ right ☐ both feet
          (eyes closed, standing on one foot)

Coordination tests: ☐ heel walk ☐ toe walk ☐ finger to finger ☐ finger to nose
          toe to shin were abnormal on the ☐ right side ☐ left side ☐ normal

Lewin : Standing ☐ Pos ☐ Neg ☐ rt ☐ lt ☐ Bending ☐ Pos ☐ Neg ☐ rt ☐ lt

Kemps | Posture
Lewin Test | Lateral Flexion
Dorsal Flexion Extension | Lewin Sign

**CRANIAL NERVES**

| | Normal | Impaired |
|---|---|---|
| 1. OLFACTORY— Smell | | |
| 2. OPTIC — Acute, perimetry, fundus | | |
| 3. OCC.-MOT — Eye movement, accom. to light | | |
| 4. TROCHLEAR — Eye Movements | | |
| 5. TRIGEMINAL—Sensation, wink, mus. | | |
| 6. ABDUCENS — Eye movements | | |
| 7. FACIAL —Smile, taste, tongue | | |
| 8. ACOUSTIC — A. Cochlear B. Vestibular | | |
| 9. GLOSSOPHARYNGEAL — Gag, taste | | |
| 10. VAGUS — Voice, swallow | | |
| 11. SPINAL ACCESSORY — Shoulder shrug | | |
| 12. HYPOGLOSSAL—Tongue movements | | |

| GAIT | Left | Right |
|---|---|---|
| Limping | ☐ | ☐ |
| Painful | ☐ | ☐ |
| Shortening | ☐ | ☐ |
| Deformity | ☐ | ☐ |
| Paralysis | ☐ | ☐ |
| Ataxia | ☐ | ☐ |
| None | | |

| SKIN APPEARANCE | Left | Right | Ant | Post |
|---|---|---|---|---|
| Redness | ☐ | ☐ | ☐ | ☐ |
| Indications Infection/Heat Pad Use | | | | |
| Lipomata | ☐ | ☐ | ☐ | ☐ |
| Indications Spina Bifida/Bone Pathology | | | | |
| Hairy patches | ☐ | ☐ | ☐ | ☐ |
| Café Au-Lait | ☐ | ☐ | ☐ | ☐ |
| Birth Marks | ☐ | ☐ | ☐ | ☐ |
| Port Wine Marks | ☐ | ☐ | ☐ | ☐ |
| Fauns Beard | Yes ☐ | | No ☐ | |
| Gibbus Deformity | Yes ☐ | | No ☐ | |
| ☐ None | | | | |

Notes:_____

**Progress Notes - 07/30/2018**

| D.O.B. | NAME Burch, Mark |
|---|---|
| DATE | VISITS & FINDINGS |

**7-30-18** — Has had upper, bk. and neck pains on the Lt. Side. Was in an accident 2-13-18. Was the driver of an auto that was hit head on. Other driver was driving in reverse. Impact was on Drivers Side, Front. Upon impact his head hit the steering wheel. Has some visual issues & is being treated. After was nauseated and did vomit. Has a problem with headaches in the Temporals. Had a moderate concussion. Has more neck, upper bk. and maybe Low bk. Had a CT scan done and supposedly good. Had an MRI done and has some Brain Issues. (?)

Did do an Exam of the Patient and Charted the Results on the Exam Form.

Treatment was done of the Left Hip as a P.I. using the Drops. The T-5,6 and T-10,11 areas were done Prone. Done C 2,6 in the Supine Position. Then done an Anterior of the T 4,5 area on the Left. Patient felt a lot better after treatment.

The assessment is to see the patient 2x's/wk for the next month.

So I will see the Patient in 3 days.

**8-2-18** — Patient noticed that he was a little sore the evening after treatment. Then was some better afterward for a short time. Then his condition came back again. The headaches calmed down some also, but still there some.

Exam showed a slight Low Left Hip. There is decreased range of motion to the T-Spine at the T 10,11 and T 3,4 levels. Upon rotation to the Left. There is C-spine pain at the C 5,6,7 area, upon Left lateral Tilt. There is lesser pain on the Right. There is also tenderness of the C 1,2 area upon Palpation.

Treatment was done of the T 10,11 and T 4,5 area in the Prone Position. The C 2,6,7 areas were done Supine. The Left Hip was done on the Side. Then an Anterior was done of the T 3,4 area on the Left.

His ability to move his Neck and Left arm were better after treatment.

I will see the patient again in 4 days.

**8-6-18** — Patient stated that he felt some better for a longer time period. It only lasted for about a day before coming back. He now has the original pain in the upper back and neck. More on the Left side as usual. Also Left Arm. Headaches are still some.

Found the patient to have the slight Low Left Hip with tension. There is tenderness of the T 9,10 area upon palpation. The T 3,4 area is painful on the Left. Not as much on the Right, and less than before. Found upon Lateral Head Tilt the C 2,6 area was tender upon Palpation and C-Spine Rotation bi-Lateral. The Left arm has diminished movement.

Lincoln/Bunch 1112

Other Records

## INFORMED CONSENT FOR CHIROPRACTIC CARE

I hereby request and consent to the performance of chiropractic adjustments and other chiropractic procedures, including various modes of physical therapy and diagnostic x-rays, on me (or the patient named below, for whom I am legally responsible) by the doctor of chiropractic named below, other licensed doctors of chiropractic, or other staff members who now or in the future work at the office listed below or any other associated office.    If participating in the NRCT program,   I further understand that this technique has not been approved by the Colorado Board of Examiners and may be considered experimental. ____ MMS (initials)

I understand and am informed that, as in the practice of medicine, the chiropractic adjustments or other clinical procedures are usually beneficial and seldom cause any problems.  There are some risks to treatment, including but not limited to fractures, disc injuries, strokes, dislocations and sprains.  I do not expect the doctor to be able to anticipate and explain all risks and complications, and I wish to rely upon the doctor to exercise judgment during the course of the procedure which the doctor feels at the time, based upon the facts then known to him, is in my best interest.    It is my responsibility to make known any conditions that might not come to the attention of the doctor.   There has been no promise, implied or otherwise, of a cure for any symptom, disease or condition as a result of treatment in this clinic, and I understand that results are not guaranteed. ____ MR ____ (initials)

Chiropractic is a science, philosophy and art which concerns itself with the relationship between structure (primarily the spine) and function (primarily the nervous system) relative to range of motion, muscular and neurological aspects, as the relationship may affect the restoration and preservation of health.  Health is a state of optimal physical, mental and social well-being, not merely the absence of disease, pain or infirmity.   I understand that the chiropractor will use his hands or a mechanical device upon my body to adjust a joint, which may cause an audible "pop" or "click". ____ MR ____ (initials)

Neither the practice of chiropractic or medicine is an exact science, but relies upon information related by the patient, information gathered during examination, and the doctor's interpretation thereof, as well as the doctor's judgment and expertise in working with like cases.   If during the course of care, we encounter non-chiropractic or unusual findings, we will advise you of those findings and recommend that you seek the services of another health care provider. ____ MR ____ (initials)

I understand that my consent need only be obtained one time for my present condition and any future condition(s) for which I may seek treatment.  I also understand that I can revoke this consent at any time in writing for all future procedures.  I also understand that any video or photographic material I may appear in, may be used for documentation and for any way this office sees fit to further research and awareness.  If I decline to sign this consent this office has the right to refuse to render care. ____ MR ____ (initials)

I have read, or have had read to me, this Informed Consent for Chiropractic Care.   I have had the opportunity to ask questions about its content, and have had my questions explained to my satisfaction in a way that I can understand. By voluntarily signing below I agree to the above named procedures regarding my care in this office and am authorizing them to proceed with any treatment they may deem necessary in my case. ____ MR ____ (initials)

PREGNANCY RELEASE:  This is to certify that to the best of my knowledge, I am not pregnant and the above doctor (and associates) has my permission to perform an x-ray evaluation if deemed necessary.
I have been advised that x-ray can be hazardous to an unborn child.
        Date of last Menstrual Cycle: _____ N/A _____ Initials: __ MR __

I authorize the Doctor's office to release personal, financial &/or health information, if requested, to:

___Nikki Giordano  447-5991_____    ___Fiance_____
                                         Relationship

_____        ___Mark Bunch_____       _____
Signature of Legal Representative        Patient Name               Witness
(Attorney-in-fact, guardian, parent if minor)


_____        _____     _____       _____
Name (printed)                   DOB          Signature           Date

**Lincoln/Bunch 1113**

Other Records



# Arkansas Valley Chiropractic Center

760 Piedra                          Canon City, Colorado 81212                          275-8109

DR. M. V. CHRISTIANSEN                          FINANCIAL POLICY

This is an agreement between Arkansas Valley Chiropractic of Canon City, as creditor, and the Patient/Debtor named on this form.

In this agreement the words "you," "your," and "yours" mean the account that has been established in your name to which charges are made and payments are credited. The words "we," "us," and "our," refer to Arkansas Valley Chiropractic.

**STATEMENTS:** If you have a balance on your account, we will send you a statement each month. It will show separately the previous balance, any new charges to the account, the finance charge, if any, and any payments or credits applied to your account during the month.

**PAYMENTS:** Unless other arrangements are approved by us in writing, the balance on your statement is due and payable when the statement is issued, and is past due if not paid by the end of the month.

**CHARGES TO ACCOUNT:** We shall have the right to cancel your privilege to make charges against your account in the event that your account becomes delinquent. Future visits would then need to be paid at the time of service.

**PAYMENT OPTIONS:** Payment methods accepted by this office include cash, check, or money order. Our office also accepts credit card payments at this time.

**INSURANCE:** Insurance is a contract between you and your insurance company. We are NOT a party to this contract, in most cases. We will bill your primary insurance. It is the insurance company that makes the final determination of your eligibility. You agree to pay any portion of the charges not covered by insurance. It is your responsibility to notify our office any time a change is made to your insurance coverage. We ask that you have your insurance card (s) available for our staff to photocopy for billing purposes.

**DIVORCE:** In the case of divorce or separation, the party responsible for the account prior to the divorce or separation remains responsible for the account.

**FINANCE CHARGE:** A finance charge may be imposed on each item of your account which has not been paid within thirty (30) days of the time the item was added to the account as a patient responsibility. The FINANCE CHARGE will be computed at the rate of one percent (1%) per month or an ANNUAL PERCENTAGE RATE of twelve percent (12%). The finance charge on your account is computed by applying the periodic rate (1%) to the "overdue" balance of your account. The "overdue" balance of your account is calculated by taking the balance owed thirty (30) days ago, and then subtracting any payments or credits applied to the account during that time. The minimum Finance Charge is $50.00.

**Lincoln/Bunch 1114**

Other Records

**PAST DUE ACCOUNTS:** If your account becomes past due, we will take necessary steps to collect this debt. If we have to refer your account to a collection agency, you agree to pay all of the collection costs which are incurred.
If we have to refer collection of the balance to a lawyer, you agree to pay all lawyer' fees which we incur plus all court costs. In case of suit, you agree the venue shall be in Fremont County, Colorado.

**RETURNED CHECKS:** There is a $15.00 fee for any returned by the bank.

**MISSED APPOINTMENTS:** Patients with three missed appointments that were not previously cancelled or rescheduled may be asked to transfer their records to another doctor.

**WAIVER OF CONFIDENTIALITY:** You understand if this account is submitted to an attorney or collection agency, if we have to litigate in court or if your past due status is reported to a credit reporting agency, the fact that your received treatment at our office may become a matter of public records.

**TRANSFERRING OF RECORDS;** Any request to release records must be in writing.

**WORKERS COMPENSATION:** We require written approval/authorization by your employer and/or worker's compensation carrier prior to your initial visit. If your claim is denied, you will be responsible for payment in full.

**PERSONAL INJURY:** If you are being treated as part of a personal injury lawsuit or claim, we require verification from your attorney prior to your initial visit. In addition to this verification, we require that you allow us to bill your health insurance. In the absence of insurance, other financial arrangements may be discussed. Payment of the bill remains the patients responsibility. We cannot bill your attorney for charges incurred due to a personal injury case.

**EFFECTIVE DATE:** Once you have signed this agreement, you agree to all the terms and conditions contained herein and the agreement will be in full force and effect.

By signature below, I acknowledge that I have read the entire financial agreement and understand the terms contained in this FINANCIAL POLICY.

_____          _____
Patient's Name (Please Print)          Responsible Party

_____          ___7/30/18_____
Signature of Responsible Party          Date Signed

**Lincoln/Bunch 1115**



NAME Bunch, Mark    M ✓   F _____   DATE 7/30/3?⁽¹⁰⁾  R. W/C

STREET _____   _____ CITY _____ ST. _ __ ZIP.

TELE. _  .    OCCUPATION Sales _____ MARITAL M

BIRTH DATE _  . __ AGE 54 REF. BY _____

SYMPTOMS _____

INJURY _____

Lincoln/Bunch 1116

cords ⌐⌐ェェ▀◢

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02-12

PICA            PICA

| 1. MEDICARE   MEDICAID   TRICARE   CHAMPVA   GROUP HEALTH PLAN   FECA BLK LUNG   OTHER | 1a. INSURED'S I.D. NUMBER    (For Program in Item 1) |
|---|---|
| (Medicare#) ☐ (Medicaid#) ☐ (ID#/DoD#) ☐ (Member ID#) ☐ (ID#) ☐ (ID#) ☐ (ID#) ☒ | |

**2. PATIENT'S NAME** (Last Name, First Name, Middle Initial)
**Bunch, Mark**

3. BIRTH DATE   SEX   M ☒   F ☐

**4. INSURED'S NAME** (Last Name, First Name, Middle Initial)
**Bunch, Mark**

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED   Self ☐ Spouse ☐ Child ☐ Other ☒

7. INSURED'S ADDRESS (No., Street)

CITY      STATE

8. RESERVED FOR NUCC USE

CITY      STATE

ZIP CODE    TELEPHONE (Include Area Code)

ZIP CODE    TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

**11. INSURED'S POLICY GROUP OR FECA NUMBER**
**8220685     4402351**

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)   ☒ YES   ☐ NO

a. INSURED'S DATE OF BIRTH   MM DD YY   SEX   M ☒   F ☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?   ☐ YES   ☒ NO   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?   ☐ YES   ☒ NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
**Liberty Mutual Insurance**

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?   ☐ YES   ☐ NO   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   **SOF**    DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   **SOF**

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY **02 13 18** QUAL. **431** | 15. OTHER DATE QUAL. MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION MM DD YY FROM   TO   MM DD YY |
|---|---|---|

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE   17a.   17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES MM DD YY FROM   TO   MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?   ☐ YES   ☐ NO    $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind. **1 0**

A. **V43.52xA**   B. **S13.4xxA**   C. **M54.2**   D. **M79.2**
E. **M25.512**   F.   G.   H.
I.   J.   K.   L.

22. RESUBMISSION CODE    ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY — To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS — MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 08 23 18 08 23 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 2 | 08 27 18 08 27 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 3 | | | | | | | | | NPI | |
| 4 | | | | | | | | | NPI | |
| 5 | | | | | | | | | NPI | |
| 6 | | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER   SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|
| **84-6140753** ☒ | | ☒ YES ☐ NO | $ **135 06** | $ | **135 06** |

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

*M.V.Christiansen DC*

SIGNED **8-28-18** DATE

32. SERVICE FACILITY LOCATION INFORMATION
**Dr. Michael V. Christiansen, D.C.**
**760 Piedra Street**
**Cañon City, CO 81212**
a. 1669531018 b.

33. BILLING PROVIDER INFO & PH # **(719) 275-8109**
**Dr. Michael V. Christiansen, D.C.**
**760 Piedra Street**
Cañon City, CO 81212
a. 1669531018 b.

NUCC Instruction Manual available at: www.nucc.org    **PLEASE PRINT OR TYPE**    APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1117**

Other Records

ecords



DATE | VITAMINS | # Tabs. | Amt. Daily

NAME Bunch, Mark ____ M ✓ F ____ DATE 8-16-18 DR. W|C

STREET ____ CITY ____ ST. ____ ZIP ____

TELE. ____ OCCUPATION ____ MARITAL M

BIRTH DATE ____ AGE ____ REF. BY ____

SYMPTOMS ____

INJURY ____

SPINAL ANALYSIS

DATE | CON | AT | AX | C3 | 4 | 5 | 6 | 7 | T1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | L1 | 2 | 3 | 4 | 5 | (L6) | Sac | R Ili | L Ili | Coc

X-RAY RECORD

DATE | VIEWS | POST

NOTE:

Other Records



# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| | PICA | | | | | | | | PICA | |

| 1. MEDICARE (Medicare#) | MEDICAID (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER [X] (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

**2. PATIENT'S NAME (Last Name, First Name, Middle Initial)**
Bunch, Mark

**3. PATIENT'S BIRTH DATE**   **SEX** M [X] F [ ]

**4. INSURED'S NAME (Last Name, First Name, Middle Initial)**
Bunch, Mark

**5. PATIENT'S ADDRESS (No., Street)**

**6. PATIENT RELATIONSHIP TO INSURED**
Self [ ]  Spouse [ ]  Child [ ]  Other [X]

**7. INSURED'S ADDRESS (No., Street)**

CITY          STATE

CITY          STATE

ZIP CODE   TELEPHONE (Include Area Code)

**8. RESERVED FOR NUCC USE**

ZIP CODE   TELEPHONE (Include Area Code)

**9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)**

**10. IS PATIENT'S CONDITION RELATED TO:**

**11. INSURED'S POLICY GROUP OR FECA NUMBER**
8220685      4402351

**a. OTHER INSURED'S POLICY OR GROUP NUMBER**

**a. EMPLOYMENT? (Current or Previous)**
[X] YES   [ ] NO

**a. INSURED'S DATE OF BIRTH**   **SEX** M [X] F [ ]

**b. RESERVED FOR NUCC USE**

**b. AUTO ACCIDENT?**   PLACE (State)
[ ] YES   [X] NO

**b. OTHER CLAIM ID (Designated by NUCC)**

**c. RESERVED FOR NUCC USE**

**c. OTHER ACCIDENT?**
[ ] YES   [X] NO

**c. INSURANCE PLAN NAME OR PROGRAM NAME**
Liberty Mutual Insurance

**d. INSURANCE PLAN NAME OR PROGRAM NAME**

**10d. CLAIM CODES (Designated by NUCC)**

**d. IS THERE ANOTHER HEALTH BENEFIT PLAN?**
[ ] YES   [ ] NO   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
**12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED   SOF          DATE _____

**13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE** I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED   SOF

**14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)**
02 13 18   QUAL. 431

**15. OTHER DATE** QUAL. | MM DD YY

**16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION**
FROM           TO

**17. NAME OF REFERRING PROVIDER OR OTHER SOURCE**
17a.
17b. NPI

**18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES**
FROM           TO

**19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)**

**20. OUTSIDE LAB?**   $ CHARGES
[ ] YES   [ ] NO

**21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY** Relate A-L to service line below (24E)   ICD Ind. 10

A. V43.52xA   B. S13.4xxA   C. M54.2   D. M79.2
E. M25.512   F.           G.           H.
I.           J.           K.           L.

**22. RESUBMISSION CODE**   ORIGINAL REF. NO.

**23. PRIOR AUTHORIZATION NUMBER**

| 24. A. DATE(S) OF SERVICE From — To | | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS \| MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 08 30 18  08 30 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 2 | 09 04 18  09 04 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 3 | 09 06 18  09 06 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 4 | 09 10 18  09 10 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 5 | | | | | | | | | NPI | |
| 6 | | | | | | | | | NPI | |

**25. FEDERAL TAX I.D. NUMBER**   SSN EIN
84-6140753   [X]

**26. PATIENT'S ACCOUNT NO.**

**27. ACCEPT ASSIGNMENT?** (For govt. claims, see back)
[X] YES   [ ] NO

**28. TOTAL CHARGE**
$ 270 12

**29. AMOUNT PAID**
$

**30. Rsvd for NUCC Use**
270 12

**31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS** (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED  M.V. Christiansen, D.C.   09-13-18   DATE

**32. SERVICE FACILITY LOCATION INFORMATION**
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018   b.

**33. BILLING PROVIDER INFO & PH#**   (719) 275-8109
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018   b.

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1120**

**Other Records**

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**REFERS TO GOVERNMENT PROGRAMS ONLY**

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

**BLACK LUNG AND FECA CLAIMS**

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

**SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)**

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active-duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

**NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)**

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

**MEDICAID PAYMENTS (PROVIDER CERTIFICATION)**

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

**Lincoln/Bunch 1121**



NAME **BUNCH, MARK** ___ M ✓ ___ F ___ DATE ___ DR. **w/c**

STREET ___

TELE.. ___ OCCUPATION ___ MARITAL **M**

BIRTH DATE ___ AGE ___ REF. BY ___

SYMPTOMS ___

INJURY ___

**Lincoln/Bunch 1122**

Other Records

4402351

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| | PICA | | | | | | | | PICA | | |

| 1. MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |
|---|---|---|---|---|---|---|---|---|
| (Medicare#) | (Medicaid#) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | X (ID#) | | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE / SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|
| Bunch, Mark | M X  F | Bunch, Mark |

5. PATIENT'S ADDRESS (No., Street)  |  6. PATIENT RELATIONSHIP TO INSURED  |  7. INSURED'S ADDRESS (No., Street)

6. Self [ ] Spouse [ ] Child [ ] Other [X]

STATE   8. RESERVED FOR NUCC USE

ZIP CODE    TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)  |  10. IS PATIENT'S CONDITION RELATED TO:  |  11. INSURED'S POLICY GROUP OR FECA NUMBER
8220685    4402351

a. OTHER INSURED'S POLICY OR GROUP NUMBER  |  a. EMPLOYMENT? (Current or Previous)  [X] YES  [ ] NO  |  a. INSURED'S DATE OF BIRTH   SEX   M [X]  F [ ]

b. RESERVED FOR NUCC USE  |  b. AUTO ACCIDENT?  [ ] YES  [X] NO   PLACE (State)  |  b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE  |  c. OTHER ACCIDENT?  [ ] YES  [X] NO  |  c. INSURANCE PLAN NAME OR PROGRAM NAME
Liberty Mutual Insurance

d. INSURANCE PLAN NAME OR PROGRAM NAME  |  10d. CLAIM CODES (Designated by NUCC)  |  d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  [ ] YES  [ ] NO   If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED ___SOF___    DATE _____

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED ___SOF___

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) | 15. OTHER DATE | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION |
|---|---|---|
| 02 13 18  QUAL. 431 | QUAL. MM DD YY | FROM     TO |

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE  |  17a.  |  17b. NPI  |  18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM     TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)  |  20. OUTSIDE LAB?  [ ] YES  [ ] NO    $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)   ICD Ind. 0

A. V53.52xA   B. S13.4xxA   C. M54.2   D. M79.2
E. M25.512   F.    G.    H.
I.    J.    K.    L.

22. RESUBMISSION CODE ___   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From / To | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS / MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 09 13 18  09 13 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 09 17 18  09 17 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER  SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? | 28. TOTAL CHARGE | 29. AMOUNT PAID | 30. Rsvd for NUCC Use |
|---|---|---|---|---|---|
| 84-6140753  [ ] [X] | | [X] YES  [ ] NO | $ 135 06 | $ | 135 06 |

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

*M.V. Christiansen, D.C.*
SIGNED  9-18-18  DATE

32. SERVICE FACILITY LOCATION INFORMATION
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018   b.

33. BILLING PROVIDER INFO & PH # (719) 275-8109
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018   b.

NUCC Instruction Manual available at: www.nucc.org    **PLEASE PRINT OR TYPE**    APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1123**

**Other Records**

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

**Lincoln/Bunch 1124**



NAME BUNCH MARK M ✓ F_____ DATE_____ DR. w|c

STREET _____ CITY _____ ST._ _____ ZIP_ ___

TELE._ _ _ _ OCCUPATION _____ MARITAL M

BIRTH DATE _ _ _ _ AGE 54 REF. BY_____

SYMPTOMS _____

INJURY _____

**Lincoln/Bunch 1125**

Other Records

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| | PICA | | | | PICA | |

| 1. MEDICARE (Medicare#) MEDICAID (Medicaid#) TRICARE (ID#/DoD#) CHAMPVA (Member ID#) GROUP HEALTH PLAN (ID#) FECA BLK LUNG (ID#) OTHER [X] (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE MM DD YY | SEX M [X] F [ ] | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |

**Bunch, Mark** — — **Bunch, Mark**

5. PATIENT'S ADDRESS (No., Street) — 6. PATIENT RELATIONSHIP TO INSURED — Self [ ] Spouse [ ] Child [ ] Other [X] — 7. INSURED'S ADDRESS (No., Street)

CITY ____ STATE ____ | 8. RESERVED FOR NUCC USE | CITY ____ STATE ____

ZIP CODE ____ TELEPHONE (Include Area Code) ____ | ZIP CODE ____ TELEPHONE (Include Area Code) ____

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER

**8220685    4402351**

a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) [X] YES [ ] NO | a. INSURED'S DATE OF BIRTH MM DD YY SEX M [X] F [ ]

b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? [ ] YES [X] NO  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? [ ] YES [X] NO | c. INSURANCE PLAN NAME OR PROGRAM NAME

**Liberty Mutual Insurance**

d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? [ ] YES [ ] NO  If yes, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED ___ SOF ___ DATE ___

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED ___ SOF ___

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY **02 13 18** QUAL. **431** | 15. OTHER DATE QUAL. ___ MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM ___ TO ___

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. ___ 17b. NPI ___ | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM ___ TO ___

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB? [ ] YES [ ] NO  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind. **0**

A. **V43.52xA**  B. **S13.4xxA**  C. **M54.2**  D. **M79.2**
E. **M25.512**  F. ___  G. ___  H. ___
I. ___  J. ___  K. ___  L. ___

22. RESUBMISSION CODE ___ ORIGINAL REF. NO. ___

23. PRIOR AUTHORIZATION NUMBER ___

| 24. A. DATE(S) OF SERVICE From MM DD YY To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 09 20 18 09 20 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 2 | 09 24 18 09 24 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 3 | | | | | | | | | NPI | |
| 4 | | | | | | | | | NPI | |
| 5 | | | | | | | | | NPI | |
| 6 | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER **84-6140753** SSN [ ] EIN [X] | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back) [X] YES [ ] NO | 28. TOTAL CHARGE $ **135 06** | 29. AMOUNT PAID $ ___ | 30. Rsvd for NUCC Use **135 06**

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

*M W Christiansen DC*

SIGNED **9-25-18**  DATE

32. SERVICE FACILITY LOCATION INFORMATION
**Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212**
a. 1669531018  b.

33. BILLING PROVIDER INFO & PH # (719) 275-8109
**Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212**
a. 1669531018  b.

NUCC Instruction Manual available at: www.nucc.org    **PLEASE PRINT OR TYPE**    APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1126**

Other Records

**BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.**

**NOTICE:** Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**REFERS TO GOVERNMENT PROGRAMS ONLY**

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

**BLACK LUNG AND FECA CLAIMS**

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

**SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)**

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

**NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)**

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed.Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

**MEDICAID PAYMENTS (PROVIDER CERTIFICATION)**

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

**Lincoln/Bunch 1127**



**Other Records**

NAME Bunch, Mark    M X    F    DATE_____ DR. W/C

STREET _____ CITY _____

TELE. _____ OCCUPATION _____ MARITAL _____

BIRTH DATE _____ AGE _____ REF. BY _____

SYMPTOMS _____

INJURY _____

**Lincoln/Bunch 1128**

**Request Corr.**

# Additional Records Received
# 08/31/2018

**Lincoln/Bunch 1129**

**Request Corr.**

# Additional Records Received
## 09/17/2018

**Lincoln/Bunch 1130**

**Request Corr.**

 

## NO COVER SHEET RECEIVED WITH CHART

RP Number: _____ 4402351_____

Patient Last Name: _____ bunch _____

Patient First Name: _____ mark _____

DOB or Last 4 SSN #: _____

Sender/Facility: _____

| Special Chart Notes: |
| --- |
| ☐ Blurry |
| ☐ Light |
| ☐ Dark |
| ☐ Multiple RP#'s |

Reserved for CD/USB notes:

**Lincoln/Bunch 1131**

**Request Corr.**

# Additional Records Received
# 09/25/2018

**Lincoln/Bunch 1132**

**Request Corr.**

# Additional Records Received
# 09/28/2018

**Lincoln/Bunch 1133**

**Request Corr.**

 

| NO COVER SHEET RECEIVED WITH CHART |
|---|

RP Number: _____ 4402351

Patient Last Name: _____ Bunch

Patient First Name: _____ Mark

DOB or Last 4 SSN #:_____

Sender/Facility: _____

Special Chart Notes:

☐ Blurry
☐ Light
☐ Dark
☐ Multiple RP#'s

Reserved for CD/USB notes:

**Lincoln/Bunch 1134**

# Quality Assurance Report

## Request Information

Report Date:    September 30, 2018                    **RP ID: 4402351**

Patient Name:   BUNCH, MARK

Provider Name: CHRISTIANSEN, DR MICHAEL

## Quality Assurance Information

Scope Requested: **From February 1, 2018 to Present**

Special Request:
    Seen by: Dr. Michael Christiansen

Special Request Included? YES

Secondary Request Confirmed? YES

QC Notes:
    scanned in the best quality possible

Chart Reviewed By:  KCHIO

**Lincoln/Bunch 1135**

⊕ **ReleasePoint**

**Medical Record Overview**

**Date:**       September 25, 2018

**Patient Name:**    BUNCH, MARK

**Records From:**    Dr. Michael Christiansen                                         **RP ID:** 4402351

                                         ,
                                         (719) 275-8109                              **Client ID:** 8220685

**Request Scope:**    From February 1, 2018 to Present                 **Source:** LIBMT3

**Chart Range:**    07/30/2018 - 09/17/2018                              **Req By:** K Carter
                                                                                      Kayla Carter

**SSN:**

|                  |              |             |           | **Starts on** |
| ---------------- | ------------ | ----------- | --------- | ------------- |
| **Classification** | **From**     | **To**      | **Total** | **Page**      |
| Progress Notes   | Jul 30 2018  | Sep 17 2018 | 14        | 2             |
| Other Records    |              |             | 13        | 16            |
| Request Corr.    |              |             | 4         | 29            |

**Total Page Count:**    31

**Notes From QC:**

scanned in the best quality possible

**Lincoln/Bunch 1136**

**Progress Notes - 09/17/2018**

| D.O.B. | NAME |
| --- | --- |
| | *Mark Bunch* |
| DATE | VISITS & FINDINGS |

9-17-18 — Has done some better over the weekend. Has been X-ercising and all with better response. The right side of the neck has been better, along with the Left. Has had less Headaches. So the Neck region has been more even on Both Sides. There is aching of the upper Back area on Both sides also.

Found Tenderness of the T-4, 5 region upon Bi-Lateral Rotation. There is also tension of the T-9, 10 area. The C-Spine shows tension of the C- 2, 6, 7 area upon Palpation and Bi-Lateral Rotation.

Treatment was done of the T 4, 5, 9, 10 areas in the Prone Position. The C 2, 6, 7 area was done in the Supine Position. Then an Anterior was done of the T 4, 5 region Bi-Lateral. The Patient responded well after.

I will again see the patient in 3 days, with the Hope to extend the Treatment in the next couple weeks.

**Lincoln/Bunch 1137**

Progress Notes - 09/13/2018

| D.O.B. | NAME |
| --- | --- |
| | *Mark Bunch* |
| DATE | VISITS & FINDINGS |

**9-6-18** — Hasn't done bad since last treatment. Has been sitting different and all. Hasn't noticed a lot of change. Has had Neck & Left upper Back involvement. Maybe not as bad though. Is still Exercising as well.

Found C-Spine tenderness at the C5, 6 region upon Left Lateral Flexion. There is tightness of the T4, 5 area on the Left, upon Palpation and Left Rotation. The Left Shoulder is affected some.

Treated the T4, 5, 10, 11 areas in the Prone Position. Done a Sacral Base Drop. The C2, 6 areas were done supine. Then the Left Hip was done on the Side. Did Do an Anterior of the T4, 5 region on the Left. Done better after treatment.

Checked the Sensitivity of the Left Hand after treatment. Still affected on the Tip of the Little finger some.

Because of his better response, I will keep him at the twice weekly program. So will see him in 4 days.

**9-10-18** — Has improved a little again. The Left Side of the neck is not as bad as before. There is a little more on the Right Side today. Still has a problem w/ the Left upper Back region.

Found C-Spine tension Bi-Lateral at the C5, 6 area. Found with Bi-Lateral Flexion of the C-Spine. There is tension of the T3, 4, 5 area on the Left upon Palpation and Rotation to the Left. The Left Hip is slight.

Treatment was done of the T4, 5, 9, 10 areas in the Prone Position. Done a Sacral Base Drop. The C-Spine was done at the C2, 6 area in the Supine Position. The Left Hip was done on the Side. Then an Anterior was done of the T4, 5 area on the Left.

I will see the patient again in 3 days.

**9-13-18** — Patient stated that he is still doing better. The Left Side of the Neck has improved. Even has better range of Motion. The Right Side is still a little more than the Left. The Left arm movement is better, and his headaches off & on as of yet. He is changing his positions.

Found C-Spine Rotation Improvement with tenderness at the C5, 6 area on the Left, and C3, 4 on the Right. There is some pain upon Lateral Flexion, but better. There is also tension of the T4, 5 area, with Bi-Lateral Rotation.

Treatment was done of the T4, 5, 9, 10 areas in the Prone Position. The C2, 4, 6 areas were done in the Supine Position. The Left Hip was done on the Side. Then done an Anterior of the T4, 5 region Bi-Lateral.

As we are still seeing Improvement I will see the Patient in 4 days.

**Lincoln/Bunch 1138**

Progress Notes - 09/06/2018

| D.O.B. | NAME |
| --- | --- |
| | *Mark Bunch* |
| DATE | VISITS & FINDINGS |
| 9-6-18 | Hasn't done bad since last treatment. Has been sitting different and all. Hasn't noticed a lot of change. Has had Neck & Left upper Back Involvement. Maybe not as bad though. Is still Exercising as well.<br><br>Found C-Spine tenderness at the C5,6 region upon Left Lateral Flexion. There is tightness of the T4,5 area on the Left upon Palpation and Left Rotation. The Left Shoulder is affected some.<br><br>Treated the T4,5,10,11 areas in the Prone Position. Done a Sacral Base Drop. The C2,6 areas were done Supine. Then the Left Hip was done on the Side. Did Do an Anterior of the T4,5 region on the Left. Done better after treatment.<br><br>Checked the Sensitivity of the Left Hand after treatment. Still affected on the Tip of the little finger some.<br><br>Because of his better response, I will keep him at the three weekly program. So will see him in 4 days. |
| 9-10-18 | Has improved a little again. The Left Side of the neck is not as bad as before. There is a little more on the Right side today. Still has a problem w/ the Left upper Back region.<br><br>Found C-Spine tension Bi-Lateral at the C5,6 area. Found with Bi-Lateral Flexion of the C-Spine. There is tension of the T3,4,5 area on the Left upon Palpation and Rotation to the Left. The Left Hip is slight.<br><br>Treatment was done of the T4,5,9,10 areas in the Prone Position. Done a Sacral Base Drop. The C-Spine was done at the C2,6 area in the Supine Position. The Left Hip was done on the Side. Then an Anterior was done of the T4,5 area on the Left.<br><br>I will see the patient again in 3 days. |

**Lincoln/Bunch 1139**

| D.O.B. | NAME |
|--------|------|
| | Mark Bunch |
| DATE | VISITS & FINDINGS |

| 8-27-18 | Has been feeling some better this time. Can move the Left arm better. Has less pain when moving the C-spine and upper back regions. Has been doing his Exercises and using a rolled Towel for the T-spine. Noticed he is not slumped as much. So all is still improving each time. |

Found a slight Low Lt. hip. There is some decreased Range of Motion to the T-spine, Bi-Lateral. There is a slight stabbing pain of the C-spine at the C6,7 level. More with Left Lateral Tilt of the C-spine with Compression. There is also tension of the C3,4 area upon Palpation.

Treatment was done of the T4,5,9,10 area in the Prone Position. The C2,4,6,7 area were done Supine. Then an Anterior was done of the T4,5 region on the Left Side. The Left Hip was done on the Side.

The Treatment has been working for the Patient. So I will keep him at the Twice weekly program. Maybe for a couple weeks. Then hopefully can change it.

Lincoln/Bunch 1140

Progress Notes - 08/27/2018

| D.O.B. | NAME |
| --- | --- |
| | Mark Bunch |
| DATE | VISITS & FINDINGS |
| 8-27-18 | Has been feeling some better this time. Can move the Left arm better. Has less pain when moving the C-spine and upper Back regions. Has been doing his Exercises and using a rolled Towel for the T-Spine. Noticed he is not slumped as much. So all is still improving each time.<br><br>Found a slight Low Lt. Hip. There is some decreased Range of Motion to the T-spine, Bi-Lateral. There is a slight stabbing pain of the C-spine at the C6, 7 level. More with Left Lateral Tilt of the C-spine with Compression. There is also tension of the C2, 4 area upon Palpation.<br><br>Treatment was done of the T4, 5, 9, 10 area in the Prone Position. The C2, 4, 6, 7 areas were done Supine. Then an Anterior was done of the T4, 5 region on the Left side. The Left Hip was done on the side.<br><br>The Treatment has been working for the Patient. So I will keep him at the twice weekly program. Maybe for a couple weeks. Then hopefully can change it. |
| 8-30-18 | Patient stated that he thinks he feels better over all. Has been using the Towel in the T-Spine area. Has been X-ercising the Neck and upper Back as he has been instructed. Has some Left upper Back and Left sided Neck pain. But again, some better.<br><br>Found tenderness at the T4, 5 region on the Left upon Palpation and Rotation to the Left. The C-spine shows tenderness upon Left Lateral Tilt, and not so much to the Right. At the C5, 6, 7 areas. There is also tension of the T9, 10 area upon palpation.<br><br>Treatment was done of the T4, 5, 9, 10 areas in the Prone Position. The C2, 5, 6 areas were done Supine. The Left Hip was done on the side. Then an Anterior was done of the T4, 5 region on the Left. He could move better after.<br><br>I will again see him in 4 days. |
| 9-4-18 | Hasn't done terribly bad. Has had some Neck and Lt. Shoulder Issues though. More the last couple days. Still more on the Left side. The headaches were not as bad. Has been doing the Exercises given, plus the Towel on the T-spine.<br><br>Found him to have less Head drop when sitting. Showed tension of the T9, 10 and T4, 5 regions upon Palpation and Rotation. The C-spine shows tenderness at the C5, 6 area upon Left Lateral Flexion.<br><br>Treatment was done of the T4, 5, 9, 10 areas in the Prone Position. The C5, 6 and C2, 3 areas were done supine. Then an Anterior was done of the T9, 10 region on the Right, and T4, 5 on the Left. Worked over some of his sitting positions.<br><br>I will now see the patient in a couple days. |

**Lincoln/Bunch 1141**

| D.O.B. | NAME |
|---|---|
| | Mark Bunch |

| DATE | VISITS & FINDINGS |
|---|---|
| 8-16-18 Cont'd | Found a slight Low Left Hip with slight pressure. There is tenderness of the T3, 4 and T12, 1 area upon Bi-Lateral Rotation. There is tension of the C2, 5, 6, 7 Block upon Left Lateral Tilt and upon Palpation. Not as much pain. Treatment was done of the T4, 5, 10, 11 areas in the Prone Position. Then done a Sacral Base Drop. The C6, 7 and C2 areas were done in the Supine Position. The Left hip was done on the side. Then an Anterior was done of the T3, 4 area on the Left. Could move better after the treatment. I will yet see the Patient in 4 days. |
| 8-20-18 | The Neck and upper Back with the Left shoulder has felt better this time. For a longer time. The Neck x-ercise given him has been working well so far. Is sore as of yet. But not near as bad. Has not been real active to hurt himself. Found Left Hip some (Low). The T-Spine shows tension of the T10, 11 area upon Palpation. The T-4, 5 area is sore upon Palpation and Lt. Rotation. Has pain of the C6, 7 area upon Right and Left Lateral Extension. Then the Left arm has better range of motion. Treatment was done of the T5 and T10, 11 areas in the Prone Position. The C6, 7 area was done Supine, along with C2 too. Done an Anterior of the T4, 5 regions Bi-Lateral. Gave the Patient an Exercise for the upper Back. (Rhomboid Area). The Left little finger was still there. I am staying with the 2X's / week treatment program, as it is working well for now. So I will see the patient in 3 days. |
| 8-23-18 | Has done some Better this time. Hasn't had as much sharp pain in the upper Back and Left side of the neck. The arm movement has been some better also. Has been more careful with his activities. There has also had a slight headache off & on. States that he has been doing the exercise. Found T-Spine tenderness of the T4, 5 and T9, 10 areas upon Bi-Lateral Rotation. Has a Low Lt. Hip slight. There is tenderness upon the C4, 5 area to day upon Left Lateral Flexion. So this is a change somewhat. Treatment was done of the T4, 5 and T9, 10 areas in the Prone Position. The C2, 4, 5 areas were done Supine. The Left Hip was done on the side. Then an Anterior was done of the T4, 5 regions Bi-Lateral. There has been change. So to day with the Change. I will still see the patient in 4 days. |

Lincoln/Bunch 1142

Progress Notes - 08/06/2018

| D.O.B. | NAME Bunch Mark. |
|---|---|
| DATE | VISITS & FINDINGS |
| 8-6-18 cont'd | Treatment was done of the T 9, 10 and T 5, 6 areas in the Prone Position. Then done a Sacral Base Diag. The C 5, 6 area was done Supine. I also done an Anterior of the T 3, 4 area on the Left. Pain was diminished after treatment. I will see the Patient in 3 days to stay with the Assessment. |

**Lincoln/Bunch 1143**

Progress Notes - 07/30/2018

# PERSONAL HISTORY

Date 7/30/18 Birthdate ___ Age 54 SS# ___

Name Mark Bunch ___ Address ___

City ___ Stat ___ Zip ___ Email ___

Home Ph ___ Work Ph ___ Cell Ph ___

☑ Male  ☐ Female  Height 6  Weight 235  Number of Children 0

Referred by Dr Olson ___ Emergency Contact &/Ph # ___

Marital Status:  ☑ Married  ☐ Single  ☐ Divorced  ☐ Widowed  ☐ Separated

Education:  # of Years Completed 15 ___ Presently a Student? No  ☐ Part Time  ☐ Full Time

Business/Employer: Charter Communications ___ ☐ Part Time  ☐ Full Time

Job Satisfaction:  ☑ Very Satisfied  ☐ Satisfied  ☐ Unsatisfied  Years Employed: 3

☐ Working With Restrictions  ☐ Working Without Restrictions  ☐ Not Working Since ___

Job Description Outside sales ___

Who is Responsible For Your Bill:  ☐ Self  ☐ Spouse  ☐ Workers Compensation  ☐ Medicare  ☐ Auto Insurance

☐ Personal Health Ins.  ☐ Other ___  X ___ Patient Signature

# PAST HEALTH HISTORY

Have You Ever Been to a Chiropractor?  ☑ No  ☐ Yes  Name & Date of Last Service ___

Family Doctor Dr Olson ___

Have You Gained or Lost More Than 10 lbs In the Last 6 Months:  ☐ Gained  ☐ Lost  ☑ Neither

Pregnant?  ☐ No  ☐ Yes  ☑ N/A  Date of Last Cycle ___ Started Menopause?  ☑ No  ☐ Yes  When ___

Overall, How Would You Rate Your Health:  ☐ Excellent  ☑ Average  ☐ Poor  ☐ other ___

## HOSPITALIZATIONS, OPERATIONS / WORK, AUTO OR PERSONAL ACCIDENTS OR INJURIES
### (Please be Specific, Include Dates, Areas Involved, and Treatment Received)

1. Hernia Repair May 2017
2. Tonsilectomy 1970
3. ___
4. ___
5. ___
6. ___

## SERIOUS ILLNESSES
### (List Current and Past Illnesses Not Mentioned Above, Including Cancer, Diabetes etc, and Include Dates)

1. N/A
2. ___
3. ___
4. ___
5. ___
6. ___

**Lincoln/Bunch 1144**

Progress Notes - 07/30/2018

Name: _Mark Bunch_  DOB: _____  Date: _7/30/18_

ALLERGIES: Please list all known allergies, especially to medicines. _penicillin and stupid people_

MEDICINES: Please list all currently used medicines, prescription or non-prescription, vitamins and herbs.

HOBBIES OR INTERESTS: _Reading, ATV Riding, biking, gardening_

ARE YOU:  ☑ Right-handed   ☐ Left-Handed   ☐ Ambidextrous

## CURRENT HEALTH CONDITION

### MAJOR COMPLAINTS

1. _Neck and upper back pain loss of range of motion_
2. _left shoulder pain loss of range of motion_
3. _left hip._
4. _____

No Pain 0  1  2  3  4 ⑤ 6  7  8  9  10 Severe Pain

1. When did this Condition Begin? _2/13/18_   2. Cause of Condition _Car accident_
3. Condition is Related to: ☑ Auto Accident ☑ Work ☐ Sports Injury ☐ Personal Injury ☐ Other _____
4. Is this Condition: ☑ Getting Worse   ☐ Getting Better,   ☐ Staying the Same
5. What Movements or Positions Aggravate this Condition? _laying down, lifting anything_
6. Is the Condition Worse:  ☐ In the Morning  ☑ In the Afternoon  ☑ In the Evening  ☑ Same all Day
7. Does Anything Relieve the Pain? ☐ No ☐ Yes (explain) _pain pills help_
8. Have You Been Treated for Present Condition?   ☐ No ☑ Yes   When _May, Jun_
9. Who Treated you? _PT Ethan_   City _____  State _____  Phone _____
10. Type of Treatment Received: _Balance issues, vestibular problems, neck shoulder pain_
11. Reason for Changing Care: _____
12. Ever Had Similar Condition? ☑ No ☐ Yes   When? _____  Were you Treated? ☐ No ☐ Yes
13. Who Treated You? _____  City _____  State _____ Phone _____
14. Treatment Received: _____
15. Has Anyone in Your Family had Similar Condition? ☑ No ☐ Yes  Who? _____
16. Are You off Work Due to This Condition? ☐ No ☑ Yes  If Yes, date you last worked _2/13/18_

**Lincoln/Bunch 1145**

**Progress Notes - 07/30/2018**

NAME: _Mark Rowel_    DOB: _____    DATE: _7/30/18_

**CC #1:** _Neck pain_    Date of Onset: _2/13/18_

Condition related to ☑ work ☐ auto ☐ other incident ☐ other _____

Dates of similar symptoms: _____

Condition is: ☐ same ☐ better ☑ worse (since onset)

Provoked by: ☐ sitting ☐ standing ☐ laying ☑ reaching ☑ bending ☐ walking ☐ other ___

Relieved by: ☐ ice ☑ heat ☐ sleep ☐ sitting ☐ standing ☐ laying ☐ walking ☑ pain killers, muscle relaxants, anti-inflammatories ☐ other

Quality is: ☐ mild ☑ moderate ☐ severe ☐ very severe

Pain scale: no pain  0  1  2  3  4 ⑤ 6  7  8  9  10  severe pain

Pain radiates into: _shoulder arm back_

Is complaint worse in: ☐ am ☑ pm ☑ afternoon ☐ same all day

Medical treatment or diagnosis: _cervical sprain, whiplash_

Results: _helped by PT_

Reviewed outside records: ☐ yes ☐ no    S B W

**CC #2:** _Stiff back + shoulder (left)_    Date of Onset: _2/13/18_

Condition related to ☑ work ☐ auto ☐ other incident ☐ other _____

Dates of similar symptoms: _____

Condition is: ☑ same ☐ better ☐ worse (since onset)

Provoked by: ☐ sitting ☑ standing ☐ laying ☑ reaching ☑ bending ☐ walking ☐ other

Relieved by: ☐ ice ☑ heat ☑ sleep ☐ sitting ☐ standing ☐ laying ☐ walking ☐ pain killers, muscle relaxants, anti-inflammatories ☐ other

Quality is: ☐ mild ☑ moderate ☐ severe ☐ very severe

Pain scale: no pain  0  1  2  3  4  5  6  7  8  9  10  severe pain

Pain radiates into: _neck and shoulder and left hip_

Is complaint worse in: ☐ am ☑ pm ☑ afternoon ☐ same all day

Medical treatment or diagnosis: _cervical sprain_

Results: _____

Reviewed outside records: ☐ yes ☐ no    S B W

**Social History/Comorbidity Factors:**

☐ smoker
☐ alcohol
☐ coffee/tea
☐ drug use (street)
☑ exercise

☐ cancer
☐ diabetes
☐ heart disease
☐ proceed w/chiro. Exam
☐ refer out

E-edema
P-pain
T-tenderness
N-numbing
H-hypoasthesia
S-spasm

Complications: _____
Any Activities Limits: _____
Surgeries: ☐ see entry form _____
D.C. History: ☐ see entry form _____
Medications Presently Taking: ☐ see entry form _____
History of Accidents: ☐ see entry form _____

**Lincoln/Bunch 1146**

Progress Notes - 07/30/2018

NAME _Mark Bunch_ DOB_____ DATE _7-30-18_

**DNP—Did Not Perform**

(more on the Left arm & Hand)

**Sensation**
1 Good
2 More
3 Less

**Upper Dermatomes:**
___ C-4 Lat. Aspect of Shoulder
___ C-5 Lat. Aspect of Upper Arm
_3_ C-6 Lat. Aspect of Lower Arm & Thumb
_3_ C-7 First Finger
_2_ C-8 Middle Finger & 1/2 Ring Finger
___ T-1 1/2 Ring Finger, Pinky & Medial Forearm
___ T-2 Medial Upper Arm

**Lower Dermatomes:**
___ L-2 Anterior & Medial Thigh
___ L-3 Ant & Medial Thigh & Leg
___ L-4 Medial Leg & Foot
___ L-5 Anterior Leg & Foot
___ S-1 Outside of Foot
___ S-2 Post & Lat Thigh & Leg

**DNP—Did Not Perform**

**PATIENT SITTING**
Blood Pressure: _____ systolic _____ diastolic _____ pulse pressure
Pulse rate: ☐ high ☐ low ☐ normal at _____ per minute
Chest Expansion was _____ inches
Neck Flexion            (45) _Pos._ restricted at _____ degrees
Neck Extension          (55) _Pos._ restricted at _____ degrees
Neck R. Lat Flexion     (60) _Pos._ restricted at _____ degrees
Neck L. Lat Flexion     (60) _Pos._ restricted at _____ degrees
Neck R. Rotation        (70) _Pos._ restricted at _____ degrees
Neck L. Rotation        (70) _Pos._ restricted at _____ degrees
Foramina Comp: ☐ no increase ☑ increase in pain ☐ rt ☑ lt arm/neck/shoulder
Shoulder Comp: ☐ no increase ☑ increase in pain ☐ rt ☑ lt arm/neck/shoulder
Adson's Sign or Scalenus Anticus Syndrome: ☑ no evidence ☐ evidence of brachial irritation on the ☐ right side ☐ left side
Pupil Reflex Response to Light: ☐ normal ☐ abnormal on ☐ right ☐ left ☐ both
Patellar Reflex right: ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Patellar Reflex left: ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Biceps Reflex in the Right Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Biceps Reflex in the Left Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Triceps Reflex in the Right Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Triceps Reflex in the Left Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Dejerines Triad: ☐ none ☐ cough ☐ sneeze ☐ laugh
Hyper Extension Comp: ☐ rt ☑ lt ☑ base of neck ☑ shoulder ☐ arm
Lhermitte's Sign: ☐ positive ☐ negative
Valsalva: ☐ increase ☐ no increase in thecal pressure

Notes:_____

| | Patient is Rt. Lt. |
|---|---|
| Patellar | ___ Lbs. ___ Lbs. ___ Lbs. ___ Lbs. Grip Test |
| Foramina Compression | Shoulder Compression |
| Cervical Flexion Extension | Lateral Flexion |
| BICEPS TRICEPS | Lateral Rotation |

**Lincoln/Bunch 1147**

**Progress Notes - 07/30/2018**

NAME _Mark Brunell_    DOB _____    DATE _7-30-18_

**DNP—Did Not Perform**

**PATIENT SUPINE**

Apparent short leg: ☑ left _¼"_    ☐ right _____
True short leg: ☐ left _____    ☐ right _____
Umbilicus: ☐ left    ☐ right
Soto-Hall: ☐ none    nerve irritation in the ☐ neck  ☐ mid back  ☐ low back
Neck flexors: ☐ good ☐ moderate ☐ fair ☑ poor    (Pain) ✳✳
Trunk flexors: ☐ good ☐ moderate ☐ fair ☐ poor
Pelvic elevators: ☐ good ☐ moderate ☐ fair ☐ poor
Goldthwait's: ☐ none ☐ nerve irr. in ☐ lumbo-sacral ☐ sacro-iliac joints ☐ lt ☐ rt
Lasegue's: ☐ none ☐ sciatic nerve pressure in the ☐ right leg ☐ left leg
Braggard's: ☐ none ☐ sciatic nerve irritation in the ☐ right leg ☐ left leg
Patrick's: ☐ none ☐ restricted hip movement on the ☐ right ☐ left ☐ low back
Leg drop: ☐ none ☐ disc compression at lumbo-sacral joint ☐ left ☐ right
Bilat. Leg Lowering: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt
Straight Leg Raise: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt

| ☐ RT  ☐ LT  ☐ POS  ☐ NEG  PSOAS | Soto-Hall | Goldthwait Test | ☐ POS  ☐ NEG  Naffziger Test | Braggard Test |
|---|---|---|---|---|
| Lasegue's Sign | ☐ POS  ☐ NEG  Hoover Sign | Leg Drop Test | Fabere-Patrick Test | Babinski |

**PATIENT PRONE**

Bending of the neck backward: ☐ good ☐ moderate ☐ fair ☑ poor (Pain) ✳✳
Bending of the trunk backward: ☐ good ☐ moderate ☐ fair ☐ poor
Left achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Right achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Babinski: ☐ none ☐ extension of toes instead of flexion on simulation of the sole of foot
& indicated ☐ no ☐ an organic ☐ a spinal cord lesion of central nervous system
Ely's sign of heel-to-buttock test: ☐ no ☐ a sacro-iliac disorder

| Sacral-Apex PR | Achilles | Ely's Test |
|---|---|---|

**SPINAL ANALYSIS**

| Sub/Phase | Spasms | Incr. Temp | Palp. Listing | | | Palp. Listing | Incr. Temp | Spasms | Sub/Phase |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Oc | | | | | |
| | | | | A1 | | | | | |
| | | | | Ax | | | | | |
| | | | | 3C | | | | | |
| | | | | 4 | | | | | |
| | | | | 5 | | | | | |
| | | | | 6 | | | | | |
| | | | | 7 | | | | | |
| | | | | 1T | | | | | |
| | | | | 2 | | | | | |
| | | | | 3 | | | | | |
| | | | | 4 | | | | | |
| | | | | 5 | | | | | |
| | | | | 6 | | | | | |
| | | | | 7 | | | | | |
| | | | | 8 | | | | | |
| | | | | 9 | | | | | |
| | | | | 10 | | | | | |
| | | | | 11 | | | | | |
| | | | | 12 | | | | | |
| | | | | 1L | | | | | |
| | | | | 2 | | | | | |
| | | | | 3 | | | | | |
| | | | | 4 | | | | | |
| | | | | 5 | | | | | |

Notes: _____
_____
_____

Lincoln/Bunch 1148

NAME _Marck Bunch_  DOB _____ DATE _7-30-18_

**DNP—Did Not Perform**

**PATIENT STANDING**

Height ___b___ feet, _____ inches.  Weight _235_ lbs.

Weight distribution: Patient carries _____ lbs. more on  right _____ left _____

General appearance: ☐ well nourished ☐ strong ☑ good ☐ fair ☐ run down ☐ poor

Posture: ☐ good ☑ fair ☐ poor

Gait: ☑ regular ☐ irregular_____

Head Tilt ☐ right ear lower than left ☑ left ear lower than right

Neck: ☑ no curvature ☐ curvature to the ☐ left ☐ right

Muscle Tension: ☐ not present ☑ present in the ☑ neck ☑ rt ☑ lt shoulder ☐ rt ☑ lt ☐ middle back ☐ rt ☑ lt ☐ lower back ☐ rt ☐ lt

Shoulder Tilt ☑ left shoulder lower ☐ right shoulder lower

The middle back or thorax: ☑ no curvature ☐ showed side curvature ☐ left ☐ right

Abnormal backward curvature or kyphosis: ☑ not present ☐ present in the ☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Abnormal forward curvature or lordosis: ☑ not present ☐ present in the ☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Hip Level: ☐ normal ☑ not normal and showed ☐ left ☑ right illum higher

The lower back: ☑ no side curvature ☐ showed side curvature to the ☐ left ☐ right

Flexion (90) _____ restricted at_____ degrees

Extension (20) _____ restricted at_____ degrees

R. Lat Flexion (40) _____ restricted at_____ degrees

L. Lat Flexion (40) _____ restricted at_____ degrees

R. Rotation (45) _____ restricted at_____ degrees

L. Rotation (45) _____ restricted at_____ degrees

Trendelenberg's test ☐ no hip weakness ☐ hip weakness on the ☐ right ☐ left

Romberg's test ☐ no ☐ some ☐ much body swaying

Balance test: ☐ none ☐ some ☐ much instability on ☐ left ☐ right ☐ both feet (eyes closed, standing on one foot)

Coordination tests: ☐ heel walk ☐ toe walk ☐ finger to finger ☐ finger to nose toe to shin were abnormal on the ☐ right side ☐ left side ☐ normal

Lewin : Standing ☐ Pos ☐ Neg ☐ rt ☐ lt ☐ Bending ☐ Pos ☐ Neg ☐ rt ☐ lt

| | Kemps | Posture |
| --- | --- | --- |
| | Lewin Test | Lateral Flexion |
| | Dorsal Flexion Extension | Lewin Sign |

**CRANIAL NERVES**

|  | Normal | Impaired |
| --- | --- | --- |
| 1. OLFACTORY— Smell | | |
| 2. OPTIC — Acute, perimetry, fundus | | |
| 3. OCC.-MOT — Eye movement, accom. to light | | |
| 4. TROCHLEAR — Eye Movements | | |
| 5. TRIGEMINAL—Sensation, wink, mus. | | |
| 6. ABDUCENS — Eye movements | | |
| 7. FACIAL —Smile, taste, tongue | | |
| 8. ACOUSTIC — A. Cochlear B. Vestibular | | |
| 9. GLOSSOPHARYNGEAL — Gag, taste | | |
| 10. VAGUS — Voice, swallow | | |
| 11. SPINAL ACCESSORY — Shoulder shrug | | |
| 12. HYPOGLOSSAL—Tongue movements | | |

**GAIT**

| | Left | Right |
| --- | --- | --- |
| Limping | ☐ | ☐ |
| Painful | ☐ | ☐ |
| Shortening | ☐ | ☐ |
| Deformity | ☐ | ☐ |
| Paralysis | ☐ | ☐ |
| Ataxia | ☐ | ☐ |
| None | | |

**SKIN APPEARANCE**

| | Left | Right | Ant | Post |
| --- | --- | --- | --- | --- |
| Redness | ☐ | ☐ | ☐ | ☐ |
| Indications Infection/Heat Pad Use | ☐ | ☐ | ☐ | ☐ |
| Lipomata | | | | |
| Indications Spina Bifida/Bone Pathology | | | | |
| Hairy patches | ☐ | ☐ | ☐ | ☐ |
| Café Au-Lait | ☐ | ☐ | ☐ | ☐ |
| Birth Marks | ☐ | ☐ | ☐ | ☐ |
| Port Wine Marks | ☐ | ☐ | ☐ | ☐ |
| Fauns Beard | Yes ☐ | | No ☐ | |
| Gibbus Deformity | Yes ☐ | | No ☐ | |
| ☐ None | | | | |

Notes:_____

Lincoln/Bunch 1149

**Progress Notes - 07/30/2018**

| D.O.B. | NAME Burch, Mark |
|---|---|
| DATE | VISITS & FINDINGS |
| 7-30-18 | Has had upper, the and Neck pains on the Lt. Side. Was in an Accident on 2-13-18. Was the driver of an Auto that was hit headon. Other driver was driving in Reverse. Impact was on Drivers Side Front. Upon impact his head hit the steering wheel. Has some Visual Issues & is being treated. After was nauseated and did Vomit. Has a problem with headaches in the Temporals. Had a Moderate concussion. Has more Neck, upper th. and maybe Low th. Had a CT scan Done and supposedly Good. Had an MRI done and has some Brain Issues. (?) <br> Did do an Exam of the Patient and Charted the Results on the Exam Form. <br> Treatment was done of the Left Hip as a P.I. Using the Drops. The T-5,6 and T 10,11 areas were done Prone. Done C 2, 6 in the Supine Position. Then done an Anterior of the T 4, 5 area on the Left. Patient felt a lot better after treatment. <br> The Assessment is to see the patient 2x's/wk for the next month. <br> So I will see the Patient in 3 days. |
| 8-2-18 | Patient noticed that he was a little sore the evening after treatment. Then was some better afterward for a short time. Then his condition came Back again. The headaches calmed down some also, but still there some. <br> Exam showed a slight Low Left Hip. There is decreased Range of motion to the T-Spine at the T 10,11 and T 3,4 levels. Upon rotation to the Left. There is C-Spine Pain at the C 5, 6, 7 area, upon Left Lateral Tilt. There is lesser pain on the Right. There is also Tenderness of the C 1, 2 area upon Palpation. <br> Treatment was done of the T 10,11 and T 4, 5 area in the Prone Position. The C 2, 6, 7 areas were done Supine. The Left Hip was done on the Side. Then an Anterior was done of the T 3, 4 area on the Left. <br> His ability to move his Neck and Left arm were better after treatment. <br> I will see the patient again in 4 days. |
| 8-6-18 | Patient stated the he felt some better for a longer time period. It was lasted for about a day before, coming Back. He now has the original Pain in the upper Back and Neck. More on the Left side as usual. Also Left Arm. headaches are still some. <br> Found the patient to have the slight Low Left Hip with tension. There is tenderness of the T-9, 10 area upon palpation. The T 3, 4 area is painful on the Left. Not as much on the Right, and less than before. Found upon Lateral Head Tilt The C 2, 6 area was tender upon Palpation and C-Spine Rotation bi-Lateral. The Left arm has diminished movement. |

**Lincoln/Bunch 1150**

Other Records

## INFORMED CONSENT FOR CHIROPRACTIC CARE

I hereby request and consent to the performance of chiropractic adjustments and other chiropractic procedures, including various modes of physical therapy and diagnostic x-rays, on me (or the patient named below, for whom I am legally responsible) by the doctor of chiropractic named below, other licensed doctors of chiropractic, or other staff members who now or in the future work at the office listed below or any other associated office.      If participating in the NRCT program,   I further understand that this technique has not been approved by the Colorado Board of Examiners and may be considered experimental. ____ MRS (initials)

I understand and am informed that, as in the practice of medicine, the chiropractic adjustments or other clinical procedures are usually beneficial and seldom cause any problems.  There are some risks to treatment, including but not limited to fractures, disc injuries, strokes, dislocations and sprains.  I do not expect the doctor to be able to anticipate and explain all risks and complications, and I wish to rely upon the doctor to exercise judgment during the course of the procedure which the doctor feels at the time, based upon the facts then known to him, is in my best interest.   It is my responsibility to make known any conditions that might not come to the attention of the doctor.   There has been no promise, implied or otherwise, of a cure for any symptom, disease or condition as a result of treatment in this clinic, and I understand that results are not guaranteed.   MB____ (initials)

Chiropractic is a science, philosophy and art which concerns itself with the relationship between structure (primarily the spine) and function (primarily the nervous system) relative to range of motion, muscular and neurological aspects, as the relationship may affect the restoration and preservation of health.  Health is a state of optimal physical, mental and social well-being, not merely the absence of disease, pain or infirmity.   I understand that the chiropractor will use his hands or a mechanical device upon my body to adjust a joint, which may cause an audible "pop" or "click".   MB____ (initials)

Neither the practice of chiropractic or medicine is an exact science, but relies upon information related by the patient, information gathered during examination, and the doctor's interpretation thereof, as well as the doctor's judgment and expertise in working with like cases.   If during the course of care, we encounter non-chiropractic or unusual findings, we will advise you of those findings and recommend that you seek the services of another health care provider.   MB____ (initials)

I understand that my consent need only be obtained one time for my present condition and any future condition(s) for which I may seek treatment.  I also understand that I can revoke this consent at any time in writing for all future procedures.  I also understand that any video or photographic material I may appear in, may be used for documentation and for any way this office sees fit to further research and awareness.  If I decline to sign this consent this office has the right to refuse to render care.   MB____ (initials)

I have read, or have had read to me, this Informed Consent for Chiropractic Care.   I have had the opportunity to ask questions about its content, and have had my questions explained to my satisfaction in a way that I can understand. By voluntarily signing below I agree to the above named procedures regarding my care in this office and am authorizing them to proceed with any treatment they may deem necessary in my case.   MB____ (initials)

**PREGNANCY RELEASE:**  This is to certify that to the best of my knowledge, I am not pregnant and the above doctor (and associates) has my permission to perform an x-ray evaluation if deemed necessary.
I have been advised that x-ray can be hazardous to an unborn child.
        Date of last Menstrual Cycle: ____ N/A ____     Initials: MB____

I authorize the Doctor's office to release personal, financial &/or health information, if requested, to:

Nikki Giordano   447-5991              Fiance
_____       _____
                                      Relationship

_____       MARK Bunch_____       _____
Signature of Legal Representative      Patient Name                Witness
(Attorney-in-fact, guardian, parent if minor)


_____       _____   _____       _____
Name (printed)                        DOB        Signature                Date

**Lincoln/Bunch 1151**

Other Records



# Arkansas Valley Chiropractic Center

760 Piedra                        Canon City, Colorado 81212                        275-8109

DR. M. V. CHRISTIANSEN                        FINANCIAL POLICY

This is an agreement between Arkansas Valley Chiropractic of Canon City, as creditor, and the Patient/Debtor named on this form.

In this agreement the words "you," "your," and "yours" mean the account that has been established in your name to which charges are made and payments are credited. The words "we," "us," and "our," refer to Arkansas Valley Chiropractic.

**STATEMENTS:** If you have a balance on your account, we will send you a statement each month. It will show separately the previous balance, any new charges to the account, the finance charge, if any, and any payments or credits applied to your account during the month.

**PAYMENTS:** Unless other arrangements are approved by us in writing, the balance on your statement is due and payable when the statement is issued, and is past due if not paid by the end of the month.

**CHARGES TO ACCOUNT:** We shall have the right to cancel your privilege to make charges against your account in the event that your account becomes delinquent. Future visits would then need to be paid at the time of service.

**PAYMENT OPTIONS:** Payment methods accepted by this office include cash, check, or money order. Our office also accepts credit card payments at this time.

**INSURANCE:** Insurance is a contract between you and your insurance company. We are NOT a party to this contract, in most cases. We will bill your primary insurance. It is the insurance company that makes the final determination of your eligibility. You agree to pay any portion of the charges not covered by insurance. It is your responsibility to notify our office any time a change is made to your insurance coverage. We ask that you have your insurance card(s) available for our staff to photocopy for billing purposes.

**DIVORCE:** In the case of divorce or separation, the party responsible for the account prior to the divorce or separation remains responsible for the account.

**FINANCE CHARGE:** A finance charge may be imposed on each item of your account which has not been paid within thirty (30) days of the time the item was added to the account as a patient responsibility. The FINANCE CHARGE will be computed at the rate of one percent (1%) per month or an ANNUAL PERCENTAGE RATE of twelve percent (12%). The finance charge on your account is computed by applying the periodic rate (1%) to the "overdue" balance of your account. The "overdue" balance of your account is calculated by taking the balance owed thirty (30) days ago, and then subtracting any payments or credits applied to the account during that time. The minimum Finance Charge is $50.00.

**Lincoln/Bunch 1152**

Other Records

**PAST DUE ACCOUNTS:** If your account becomes past due, we will take necessary steps to collect this debt. If we have to refer your account to a collection agency, you agree to pay all of the collection costs which are incurred.
If we have to refer collection of the balance to a lawyer, you agree to pay all lawyer' fees which we incur plus all court costs. In case of suit, you agree the venue shall be in Fremont County, Colorado.

**RETURNED CHECKS:** There is a $15.00 fee for any returned by the bank.

**MISSED APPOINTMENTS:** Patients with three missed appointments that were not previously cancelled or rescheduled may be asked to transfer their records to another doctor.

**WAIVER OF CONFIDENTIALITY:** You understand if this account is submitted to an attorney or collection agency, if we have to litigate in court or if your past due status is reported to a credit reporting agency, the fact that your received treatment at our office may become a matter of public records.

**TRANSFERRING OF RECORDS;** Any request to release records must be in writing.

**WORKERS COMPENSATION:** We require written approval/authorization by your employer and/or worker's compensation carrier prior to your initial visit. If your claim is denied, you will be responsible for payment in full.

**PERSONAL INJURY:** If you are being treated as part of a personal injury lawsuit or claim, we require verification from your attorney prior to your initial visit. In addition to this verification, we require that you allow us to bill your health insurance. In the absence of insurance, other financial arrangements may be discussed. Payment of the bill remains the patients responsibility. We cannot bill your attorney for charges incurred due to a personal injury case.

**EFFECTIVE DATE:** Once you have signed this agreement, you agree to all the terms and conditions contained herein and the agreement will be in full force and effect.

By signature below, I acknowledge that I have read the entire financial agreement and understand the terms contained in this FINANCIAL POLICY.

_____          _____
Patient's Name (Please Print)                    Responsible Party

_____          7/30/18
Signature of Responsible Party                   Date Signed

**Lincoln/Bunch 1153**



NAME Bunch, Mark          M ✓  F _____ DATE 7/30/3(?)  R. W/C

STREET _____ _____ CITY _____ ST. _ _ ZIP.

TELE. _  _                OCCUPATION Sales _____ MARITAL M

BIRTH DATE _  _  _ AGE 54 REF. BY _____

SYMPTOMS _____

INJURY _____

cords

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

PICA | PICA

| 1. MEDICARE  MEDICAID  TRICARE  CHAMPVA  GROUP HEALTH PLAN  FECA BLK LUNG  OTHER [X] | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |
|---|---|

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE / SEX  M [X]  F | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
|---|---|---|
| Bunch, Mark | | Bunch, Mark |

5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED  Self [ ] Spouse [ ] Child [ ] Other [X] | 7. INSURED'S ADDRESS (No., Street)

CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE

ZIP CODE | TELEPHONE (Include Area Code) | ZIP CODE | TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER
**8220685    4402351**

a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous)  [X] YES  [ ] NO | a. INSURED'S DATE OF BIRTH  SEX  M [X]  F [ ]

b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT?  [ ] YES  [X] NO  PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT?  [ ] YES  [X] NO | c. INSURANCE PLAN NAME OR PROGRAM NAME
**Liberty Mutual Insurance**

d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  [ ] YES  [ ] NO  If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  **SOF**  DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  **SOF**

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  MM DD YY  **02 13 18**  QUAL. **431** | 15. OTHER DATE  QUAL.  MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM  TO |
|---|---|---|

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a.  17b. NPI | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM  TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB?  [ ] YES  [ ] NO  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)  ICD Ind. **1 0**
A. **V43.52xA**  B. **S13.4xxA**  C. **M54.2**  D. **M79.2**
E. **M25.512**  F.  G.  H.
I.  J.  K.  L.

22. RESUBMISSION CODE  ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From / To  MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES  CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 08 23 18  08 23 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 08 27 18  08 27 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER  SSN EIN  **84-6140753** [X] | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT?  [X] YES  [ ] NO | 28. TOTAL CHARGE  $ **135 06** | 29. AMOUNT PAID  $ | 30. Rsvd for NUCC Use  **135 06** |
|---|---|---|---|---|---|

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED  **8-28-18**  DATE

32. SERVICE FACILITY LOCATION INFORMATION
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018  b.

33. BILLING PROVIDER INFO & PH #  **(719) 275-8109**
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018  b.

NUCC Instruction Manual available at: www.nucc.org  **PLEASE PRINT OR TYPE**  APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1155**



NAME Bunch, Mark   M ✓   F _____   DATE 8-16-18   DR. W/C

STREET _____ CITY _____ ST. _____ ZIP _____

TELE. _____   OCCUPATION _____ MARITAL M

BIRTH DATE _____ AGE _____ REF. BY _____

SYMPTOMS _____

INJURY _____

Other Records



# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| | PICA | | | | | | | | PICA | |

1. MEDICARE ☐ (Medicare#)  MEDICAID ☐ (Medicaid#)  TRICARE ☐ (ID#/DoD#)  CHAMPVA ☐ (Member ID#)  GROUP HEALTH PLAN ☐ (ID#)  FECA BLK LUNG ☐ (ID#)  OTHER ☒ (ID#)

1a. INSURED'S I.D. NUMBER   (For Program in Item 1)

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
**Bunch, Mark**

3. PATIENT'S BIRTH DATE   SEX   M ☒  F ☐

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
**Bunch, Mark**

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED   Self ☐  Spouse ☐  Child ☐  Other ☒

7. INSURED'S ADDRESS (No., Street)

CITY   STATE

8. RESERVED FOR NUCC USE

CITY   STATE

ZIP CODE   TELEPHONE (Include Area Code)

ZIP CODE   TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
**8220685    4402351**

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)   ☒ YES   ☐ NO

a. INSURED'S DATE OF BIRTH   SEX   M ☒  F ☐

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?   ☐ YES   ☒ NO   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?   ☐ YES   ☒ NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
**Liberty Mutual Insurance**

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?   ☐ YES   ☐ NO   If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED **SOF**   DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED **SOF**

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)   MM 02 DD 13 YY 18   QUAL. 431

15. OTHER DATE   QUAL.   MM DD YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION   FROM MM DD YY   TO MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE

17a.   17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES   FROM MM DD YY   TO MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?   ☐ YES   ☐ NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)   ICD Ind. **10**

A. **V43.52xA**   B. **S13.4xxA**   C. **M54.2**   D. **M79.2**
E. **M25.512**   F.   G.   H.
I.   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08 30 18 | 08 30 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 09 04 18 | 09 04 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 09 06 18 | 09 06 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 09 10 18 | 09 10 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| | | | | | | | | | | NPI | |
| | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER   **84-6140753**   SSN ☐ EIN ☒

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)   ☒ YES   ☐ NO

28. TOTAL CHARGE   $ 270 12

29. AMOUNT PAID   $

30. Rsvd for NUCC Use   270 12

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED *M. V. Christiansen, D.C.*   DATE 09-13-18

32. SERVICE FACILITY LOCATION INFORMATION
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018   b.

33. BILLING PROVIDER INFO & PH # (719) 275-8109
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018   b.

NUCC Instruction Manual available at: www.nucc.org   *PLEASE PRINT OR TYPE*   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1158**

**Other Records**

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active-duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

**Lincoln/Bunch 1159**

**Other Records**



NAME BUNCH, MARK    M ✓    F ____ DATE _____ DR. W/C

STREET

TELE. ____    OCCUPATION _____ MARITAL M

BIRTH DATE ____    AGE ____ REF. BY _____

SYMPTOMS _____

INJURY _____

Lincoln/Bunch 1160

Other Records

4402351

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| | PICA | | | | | | | PICA | |

| 1. MEDICARE | MEDICAID | TRICARE | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (For Program in Item 1) |
| (Medicare#) | (Medicaid#) | (ID#/DoD#) | (Member ID#) | (ID#) | (ID#) | X (ID#) | | |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE MM DD YY | SEX | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |
| Bunch, Mark | | M X  F | Bunch, Mark |

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED | 7. INSURED'S ADDRESS (No., Street) |
| | Self [ ]  Spouse [ ]  Child [ ]  Other [X] | |

STATE / STATE

ZIP CODE   TELEPHONE (Include Area Code)   TELEPHONE (Include Area Code)

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER |
| | | 8220685    4402351 |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) [X] YES [ ] NO | a. INSURED'S DATE OF BIRTH MM DD YY   SEX M [X]  F [ ] |

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT?  PLACE (State) [ ] YES [X] NO | b. OTHER CLAIM ID (Designated by NUCC) |

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? [ ] YES [X] NO | c. INSURANCE PLAN NAME OR PROGRAM NAME Liberty Mutual Insurance |

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? [ ] YES [ ] NO  If yes, complete items 9, 9a, and 9d. |

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED  SOF   DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED  SOF

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY  02 13 18  QUAL. 431 | 15. OTHER DATE QUAL. MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM MM DD YY  TO MM DD YY |

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. 17b. NPI | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM MM DD YY  TO MM DD YY |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | 20. OUTSIDE LAB? [ ] YES [ ] NO    $ CHARGES |

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)   ICD Ind. 0

A. V53.52xA   B. S13.4xxA   C. M54.2   D. M79.2
E. M25.512   F.   G.   H.
I.   J.   K.   L.

| 22. RESUBMISSION CODE   ORIGINAL REF. NO. |
| 23. PRIOR AUTHORIZATION NUMBER |

| 24. A. DATE(S) OF SERVICE From MM DD YY  To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 09 13 18  09 13 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 09 17 18  09 17 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER  SSN EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? [X] YES [ ] NO | 28. TOTAL CHARGE $ 135 06 | 29. AMOUNT PAID $ | 30. Rsvd for NUCC Use 135 06 |
| 84-6140753  [ ] [X] | | | | | |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) | 32. SERVICE FACILITY LOCATION INFORMATION | 33. BILLING PROVIDER INFO & PH # (719) 275-8109 |
| M.V. Christiansen D.C. | Dr. Michael V. Christiansen, D.C. 760 Piedra Street Cañon City, CO 81212 | Dr. Michael V. Christiansen, D.C. 760 Piedra Street Cañon City, CO 81212 |
| SIGNED 9-18-18  DATE | a. 1669531018  b. | a. 1669531018  b. |

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1161**

**Other Records**

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section.For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

**Lincoln/Bunch 1162**



NAME BUNCH    MARK    M ✓  F ____ DATE _____ DR. W|C

STREET ____ ____ _____ CITY ____ ST. ___ |___ ZIP ____

TELE. ____ ____ ____ OCCUPATION _____ MARITAL M

BIRTH DATE ____ ____ AGE 54 ____ REF. BY _____

SYMPTOMS _____

INJURY _____

Lincoln/Bunch 1163

**Request Corr.**

# Additional Records Received
# 08/31/2018

**Lincoln/Bunch 1164**

**Request Corr.**

# Additional Records Received
# 09/17/2018

**Lincoln/Bunch 1165**

**Request Corr.**

 

## NO COVER SHEET RECEIVED WITH CHART

RP Number: _____ 4402351 _____

Patient Last Name: _____ bunch _____

Patient First Name: _____ mark _____

DOB or Last 4 SSN #: _____

Sender/Facility: _____

Special Chart Notes:

☐ Blurry
☐ Light
☐ Dark
☐ Multiple RP#'s

Reserved for CD/USB notes:

**Lincoln/Bunch 1166**

**Request Corr.**

# Additional Records Received
# 09/25/2018

**Lincoln/Bunch 1167**

# Quality Assurance Report

**Request Information**

Report Date:     September 25, 2018                    **RP ID:** 4402351

Patient Name:   BUNCH, MARK

Provider Name: CHRISTIANSEN, DR MICHAEL

**Quality Assurance Information**

Scope Requested: **From February 1, 2018 to Present**

Special Request:
    Seen by: Dr. Michael Christiansen

Special Request Included? YES

Secondary Request Confirmed? YES

QC Notes:
    scanned in the best quality possible

Chart Reviewed By: KCHIO

**Lincoln/Bunch 1168**

 **ReleasePoint**

## Medical Record Overview

**Date:**   September 17, 2018

**Patient Name:**   BUNCH, MARK

**Records From:**   Dr. Michael Christiansen

,
(719) 275-8109

**Request Scope:**   From February 1, 2018 to Present

**Chart Range:**   07/30/2018 - 09/06/2018

**RP ID:** 4402351

**Client ID:** 8220685

**Source:** LIBMT3

**Req By:** K Carter
Kayla Carter

**SSN:**

| Classification | From | To | Total | Starts on Page |
|---|---|---|---|---|
| Progress Notes | Jul 30 2018 | Sep 6 2018 | 12 | 2 |
| Other Records | | | 10 | 14 |
| Request Corr. | | | 3 | 24 |

**Total Page Count:**   25

**Notes From QC:**

scanned in the best quality possible

**Lincoln/Bunch 1169**

Progress Notes - 09/06/2018

| D.O.B. | NAME |
| --- | --- |
| | *Mark Bunch* |
| DATE | VISITS & FINDINGS |
| 9-6-18 | Hasn't done bad since last treatment. Has been acting different and all. Hasn't noticed a lot of change. Has mostly neck & left upper back involvement. Maybe not as bad though. Is still exercising as well. |
| | Found C-Spine tenderness at the C5, 6 region upon left lateral flexion. There is tightness of the T4, 5 area on the left upon palpation and left rotation. The left shoulder is affected some. |
| | Treated the T4, 5, 10, 11 areas in the prone position. Done a sacral base drop. The C2, 6 areas were done supine. Then the left hip was done on the side. Did do an anterior of the T4, 5 region on the left. Done better after treatment. |
| | Checked the sensitivity of the left hand after treatment. Still affected on the tip of the little finger some. |
| | Because of his better response, I will keep him at the three weekly program. So will see him in 4 days. |
| 9-10-18 | Has improved a little again. The left side of the neck is not as bad as before. There is a little more on the right side today. Still has a problem w/ the left upper back region. |
| | Found C-Spine tension Bi-Lateral at the C5, 6 area. Found with Bi-Lateral flexion of the C-Spine. There is tension of the T3, 4, 5 area on the left upon palpation and rotation to the left. The left hip is slight. |
| | Treatment was done of the T4, 5, 9, 10 areas in the prone position. Done a sacral base drop. The C-Spine was done at the C2, 6 area in the supine position. The left hip was done on the side. Then an anterior was done of the T4, 5 area on the left. |
| | I will see the patient again in 3 days. |

**Lincoln/Bunch 1170**

| D.O.B. | NAME |
|---|---|
|  | Mark Bunch |

| DATE | VISITS & FINDINGS |
|---|---|
| 8-27-18 | Has been feeling some better this time. Can move the Left arm better. Has less pain when moving the C-Spine and upper back regions. Has been doing his Exercises and using a rolled towel for the T-Spine. Noticed he is not slumped as much. So all is still improving each time. Found a slight Low Lt Hip. There is some decreased Range of Motion to the T-Spine, Bi-Lateral. There is a slight stabbing pain of the C-Spine at the C6,7 level. More with Left Lateral Tilt of the C-Spine with Compression. There is also tension of the C6,4 area upon Palpation. Treatment was done of the T 4,5, 9, 10 areas in the Prone Position. The C 2,4,6,7 areas were done Supine. Then an Anterior was done of the T 4,5 region on the Left Side. The Left Hip was done on the side. The Treatment has been working for the Patient. So I will keep him at the Twice weekly program. Maybe for a couple weeks. Then hopefully can change it. |

Lincoln/Bunch 1171

**Progress Notes - 08/27/2018**

| D.O.B. | NAME |
| --- | --- |
| | *Mark Bunch* |
| DATE | VISITS & FINDINGS |
| 8-27-18 | *[handwritten clinical notes]* |
| 8-30-18 | *[handwritten clinical notes]* |
| 9-4-18 | *[handwritten clinical notes]* |

**Lincoln/Bunch 1172**

| D.O.B. | NAME |
|---|---|
| | Mark Bunch |
| DATE | VISITS & FINDINGS |

**8-16-18 Cont'd** — Found a slight Low Left Hip with slight pressure. There is tenderness of the T3, 4 and T12, areas upon Bi-Lateral Rotation. There is tension of the C2, 5, 6, 7 Block upon Left Lateral Tilt and upon Palpation. Not as much pain.

Treatment was done of the T4, 5, 10, 11 areas in the Prone Position. Then done a Sacral Base Drop. The C6, 7 and C2 areas were done in the Supine Position. The Left Hip was done on the side. Then an Anterior was done of the T3, 4 area on the Left. Could move better after the treatment.

I will yet see the Patient in 4 days.

**8-20-18** — The Neck and upper Back with the Left shoulder has felt better this time. For a longer time. The Neck Exercise given him has been working well so far. So done so if yet. But not near as bad. Has not been real active to hurt himself.

Found Left Hip some (Low). The T-Spine shows tension of the T10, 11 area upon Palpation. The T-4, 5 area is sore upon Palpation and Lt. Rotation. Has pain of the C6, 7 area upon Right and Left Lateral Extension. Then the Left Arm has better range of Motion.

Treatment was done of the T5 and T10, 11 areas in the Prone Position. The C6, 7 area was done Supine, along with C2 too. Done an Anterior of the T4, 5 regions Bi-Lateral.

Gave the Patient an Exercise for the upper Back. (Rhomboid Area). The Left Little finger was still there.

I am staying with the 2X's / week treatment program, as it is working well for now. So I will see the patient in 3 days.

**8-23-18** — Has done some Better this time. Hasn't had as much sharp pain in the upper Back and Left side of the neck. The Arm movement has been some, better also. Has been more careful with his activities. There has also had a slight headache off & on. States that he has been doing his exercise.

Found T-Spine tenderness of the T4, 5 and T9, 10 areas upon Bi-Lateral Rotation. Has a Low Lt. Hip slightly. There is tenderness upon the C4, 5 area today upon Left Lateral Flexion. So this is a Change, somewhat.

Treatment was done of the T4, 5 and T9, 10 areas in the Prone Position. The C2, 4, 5 areas were done Supine. The Left Hip was done on the side. Then an Anterior was done of the T4, 5 regions Bi-Lateral.

There has been change, So today with the Change. I will still see the patient in 4 days.

Lincoln/Bunch 1173

**Progress Notes - 08/06/2018**

| D.O.B. | NAME |
|--------|------|
|        | Bunch Mark. |
| DATE | VISITS & FINDINGS |
| 8-6-18 cont'd | Treatment was done of the T9, 10 and T5, 6 areas in the Prone Position. Then done a Sacral Base Drop. The C5, 6 area was done Supine. I also done an Anterior of the T3, 4 area on the Left. Pain was diminished after treatment. I will see the Patient in 3 days to stay with the Assessment. |

**Lincoln/Bunch 1174**

Progress Notes - 07/30/2018

# PERSONAL HISTORY

Date ___7/30/18___ Birthdate ___9/17/63___ Age ___54___ SS# _____

Name ___Mark King___ Address _____

City _____ State _____ Zip _____ Email _____

Home Ph _____ Work Ph _____ Cell Ph _____

☑ Male  ☐ Female  Height ___6___ Weight ___235___ Number of Children ___0___

Referred by ___Dr Olson___ Emergency Contact &/Ph # _____

Marital Status:   ☑ Married   ☐ Single   ☐ Divorced   ☐ Widowed   ☐ Separated

Education:   # of Years Completed ___15___   Presently a Student? (No)  ☐ Part Time  ☐ Full Time

Business/Employer: ___Charter Communications___    ☐ Part Time  ☐ Full Time

Job Satisfaction:   ☑ Very Satisfied   ☐ Satisfied   ☐ Unsatisfied   Years Employed: ___3___

☐ Working With Restrictions   ☐ Working Without Restrictions   ☐ Not Working Since _____

Job Description ___Outside Sales___

Who is Responsible For Your Bill:  ☐ Self ☐ Spouse ☐ Workers Compensation ☐ Medicare ☐ Auto insurance

☐ Personal Health Ins. ☐ Other _____    X _____ Patient Signature

# PAST HEALTH HISTORY

Have You Ever Been to a Chiropractor?  ☑ No ☐ Yes  Name & Date of Last Service _____

Family Doctor ___Dr Olson___

Have You Gained or Lost More Than 10 lbs in the Last 6 Months:  ☐ Gained  ☐ Lost  ☑ Neither

Pregnant? ☐ No ☐ Yes ☑ N/A  Date of Last Cycle _____ Started Menopause? ☑ No ☐ Yes  When _____

Overall, How Would You Rate Your Health:  ☐ Excellent ☑ Average ☐ Poor ☐ other _____

## HOSPITALIZATIONS, OPERATIONS / WORK, AUTO OR PERSONAL ACCIDENTS OR INJURIES
### (Please be Specific, Include Dates, Areas Involved, and Treatment Received)

1. ___Hernia Repair May 2017___
2. ___Tonsillectomy 1970___
3.
4.
5.
6.

## SERIOUS ILLNESSES
### (List Current and Past Illnesses Not Mentioned Above, Including Cancer, Diabetes etc, and Include Dates)

1. ___N/A___
2.
3.
4.
5.
6.

**Lincoln/Bunch 1175**

Progress Notes - 07/30/2018

Name: _Mark Bunch_    DOB: _____    Date: 7/30/18

**ALLERGIES:** Please list all known allergies, especially to medicines. _penicillin and stupid people_

**MEDICINES:** Please list all currently used medicines, prescription or non-prescription, vitamins and herbs.

**HOBBIES OR INTERESTS:** _Reading, ATV Riding, biking, geocaching_

**ARE YOU:** ☑ Right-handed    ☐ Left-Handed    ☐ Ambidextrous

## CURRENT HEALTH CONDITION

**MAJOR COMPLAINTS**

1. Neck and upper back pain loss of range of motion
2. left shoulder pain loss of range of motion
3. left hip.
4.

No Pain 0  1  2  3  4 (5) 6  7  8  9  10 Severe Pain

1. When did this Condition Begin? 2/13/18    2. Cause of Condition Car accident
3. Condition is Related to: ☑ Auto Accident ☑ Work ☐ Sports Injury ☐ Personal Injury ☐ Other ____
4. Is this Condition: ☑ Getting Worse    ☐ Getting Better,    ☐ Staying the Same
5. What Movements or Positions Aggravate this Condition? laying down, lifting anything
6. Is the Condition Worse: ☐ In the Morning  ☑ In the Afternoon  ☑ In the Evening  ☐ Same all Day
7. Does Anything Relieve the Pain? ☐ No ☐ Yes (explain) Pain pills help
8. Have You Been Treated for Present Condition?  ☐ No ☑ Yes    When may, Jcp
9. Who Treated you? PT Ethan    City ____ State ____ Phone ____
10. Type of Treatment Received: Balance issues, vestibular problems, neck shoulder pain
11. Reason for Changing Care: ____
12. Ever Had Similar Condition? ☑ No ☐ Yes  When? ____    Were you Treated? ☐ No ☐ Yes
13. Who Treated You? ____    City ____ State ____ Phone ____
14. Treatment Received: ____
15. Has Anyone in Your Family had Similar Condition? ☑ No ☐ Yes  Who? ____
16. Are You off Work Due to This Condition? ☐ No  ☑ Yes  If Yes, date you last worked 2/13/18

**Lincoln/Bunch 1176**

Progress Notes - 07/30/2018

NAME: _Mark Rowe_   DOB: _____   DATE: _7/30/18_

CC #1: _Neck pain_                      Date of Onset: _2/13/18_
Condition related to ☑work ☐auto ☐other incident ☐other _____
Dates of similar symptoms:
Condition is: ☐same ☐better ☑worse (since onset)
Provoked by: ☐sitting ☐standing ☐laying ☑reaching ☑bending ☐walking ☐other
Relieved by: ☐ice ☑heat ☐sleep ☐sitting ☐standing ☐laying ☐walking
☑pain killers, muscle relaxants, anti-inflammatories ☐other
Quality is: ☐mild ☑moderate ☐severe ☐very severe
Pain scale: no pain 0 1 2 3 4 ⑤ 6 7 8 9 10 severe pain
Pain radiates into: _Shoulder Arm Back_
Is complaint worse in: ☐am ☑pm ☑afternoon ☐same all day
Medical treatment or diagnosis: _Cervical Sprain, whiplash_
Results: _helped by PT_
Reviewed outside records: ☐yes ☐no                    S B W

CC #2: _Stiff Back / Shoulder (left)_  Date of Onset: _2/13/18_
Condition related to ☑work ☐auto ☐other incident ☐other _____
Dates of similar symptoms:
Condition is: ☑same ☐better ☐worse (since onset)
Provoked by: ☐sitting ☑standing ☐laying ☑reaching ☐bending ☐walking ☐other
Relieved by: ☐ice ☑heat ☑sleep ☐sitting ☐standing ☐laying ☐walking
☐pain killers, muscle relaxants, anti-inflammatories ☐other
Quality is: ☐mild ☑moderate ☐severe ☐very severe
Pain scale: no pain 0 1 2 3 4 5 6 7 8 9 10 severe pain
Pain radiates into: _Neck and Shoulder And left hip_
Is complaint worse in: ☐am ☑pm ☑afternoon ☐same all day
Medical treatment or diagnosis: _Cervical sprain_
Results: _____
Reviewed outside records: ☐yes ☐no                    S B W

Social History/Comorbidity Factors:

| | | |
|---|---|---|
| ☐ smoker | ☐ cancer | E-edema |
| ☐ alcohol | ☐ diabetes | P-pain |
| ☐ coffee/tea | ☐ heart disease | T-tenderness |
| ☐ drug use (street) | ☐ proceed w/chiro. Exam | N-numbing |
| ☑ exercise | ☐ refer out | H-hypoasthesia |
| | | S-spasm |

Complications: _____
Any Activities Limits: _____
Surgeries: ☐ see entry form _____
D.C. History: ☐ see entry form _____
Medications Presently Taking: ☐ see entry form _____
History of Accidents: ☐ see entry form _____

**Lincoln/Bunch 1177**

Progress Notes - 07/30/2018

NAME *Mark Bunch*          DOB_____          DATE 7-30-18



**DNP—Did Not Perform**

(more on the Left arm & Hand)

**Sensation**
1 Good
2 More
3 Less

**Upper Dermatomes:**
___ C-4 Lat. Aspect of Shoulder
___ C-5 Lat. Aspect of Upper Arm
3 C-6 Lat. Aspect of Lower Arm & Thumb
3 C-7 First Finger
2 C-8 Middle Finger & 1/2 Ring Finger
___ T-1 1/2 Ring Finger, Pinky & Medial Forearm
___ T-2 Medial Upper Arm

**Lower Dermatomes:**
___ L-2 Anterior & Medial Thigh
___ L-3 Ant & Medial Thigh & Leg
___ L-4 Medial Leg & Foot
___ L-5 Anterior Leg & Foot
___ S-1 Outside of Foot
___ S-2 Post & Lat Thigh & Leg

**DNP—Did Not Perform**

**PATIENT SITTING**
Blood Pressure: _____ systolic _____ diastolic _____ pulse pressure
Pulse rate: ☐ high ☐ low ☐ normal at _____ per minute
Chest Expansion was _____ inches
Neck Flexion          (45) _Pos._ restricted at _____ degrees
Neck Extension        (55) _Pos._ restricted at _____ degrees
Neck R. Lat Flexion   (60) _Pos._ restricted at _____ degrees
Neck L. Lat Flexion   (60) _Pos._ restricted at _____ degrees
Neck R. Rotation      (70) _Pos._ restricted at _____ degrees
Neck L. Rotation      (70) _Pos._ restricted at _____ degrees
Foramina Comp: ☐ no increase ☑ increase in pain ☐ rt ☑ lt arm/neck/shoulder
Shoulder Comp: ☐ no increase ☑ increase in pain ☐ rt ☑ lt arm/neck/shoulder
Adson's Sign or Scalenus Anticus Syndrome: ☑ no evidence ☐ evidence of brachial
          irritation on the ☐ right side ☐ left side
Pupil Reflex Response to Light: ☐ normal ☐ abnormal on ☐ right ☐ left ☐ both
Patellar Reflex right: ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Patellar Reflex left: ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Biceps Reflex in the Right Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Biceps Reflex in the Left Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Triceps Reflex in the Right Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Triceps Reflex in the Left Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Dejerines Triad: ☐ none ☐ cough ☐ sneeze ☐ laugh
Hyper Extension Comp: ☐ rt ☑ lt ☑ base of neck ☑ shoulder ☐ arm
Lhermitte's Sign: ☐ positive ☐ negative
Valsalva: ☐ increase ☐ no increase in thecal pressure

Patient is
Rt.      Lt.
___ Lbs. ___ Lbs.
___ Lbs. ___ Lbs.
Grip Test

Patellar

Foramina Compression

Shoulder Compression

Cervical Flexion Extension

Lateral Flexion

BICEPS

TRICEPS

Lateral Rotation

Notes:_____

Lincoln/Bunch 1178

**Progress Notes - 07/30/2018**

NAME _Mark Bunch_     DOB _____ DATE _7-30-18_

### DNP—Did Not Perform

**PATIENT SUPINE**

Apparent short leg: ☑ left _1/4"_ ☐ right _____
True short leg: ☐ left _____ ☐ right _____
Umbilicus: ☐ left ☐ right
Soto-Hall: ☐ none   nerve irritation in the ☐ neck ☐ mid back ☐ low back (Pain) ✱✱
Neck flexors: ☐ good ☐ moderate ☐ fair ☑ poor
Trunk flexors: ☐ good ☐ moderate ☐ fair ☐ poor
Pelvic elevators: ☐ good ☐ moderate ☐ fair ☐ poor
Goldthwait's: ☐ none ☐ nerve irr. in ☐ lumbo-sacral ☐ sacro-iliac joints ☐ lt ☐ rt
Lasegue's: ☐ none ☐ sciatic nerve pressure in the ☐ right leg ☐ left leg
Braggard's: ☐ none ☐ sciatic nerve irritation in the ☐ right leg ☐ left leg
Patrick's: ☐ none ☐ restricted hip movement on the ☐ right ☐ left ☐ low back
Leg drop: ☐ none ☐ disc compression at lumbo-sacral joint. ☐ left ☐ right
Bilat. Leg Lowering: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt
Straight Leg Raise: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt

| | | | |
|---|---|---|---|
| ☐ RT ☐ LT ☐ POS ☐ NEG **PSOAS** | **Soto-Hall** | **Goldthwait Test** | ☐ POS ☐ NEG **Naffziger Test** | **Braggard Test** |

| | | | | |
|---|---|---|---|---|
| **Lasegue's Sign** | ☐ POS ☐ NEG **Hoover Sign** | **Leg Drop Test** | **Fabere-Patrick Test** | **Babinski** |

**PATIENT PRONE**

Bending of the neck backward: ☐ good ☐ moderate ☐ fair ☑ poor (Pain) ✱✱
Bending of the trunk backward: ☐ good ☐ moderate ☐ fair ☐ poor
Left achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Right achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Babinski: ☐ none ☐ extension of toes instead of flexion on simulation of the sole of foot
    & indicated ☐ no ☐ an organic ☐ a spinal cord lesion of central nervous system
Ely's sign of heel-to-buttock test: ☐ no ☐ a sacro-iliac disorder

| | | |
|---|---|---|
| **Sacral-Apex PR** | **Achilles** | **Ely's Test** |

**SPINAL ANALYSIS**

| Sub/Phase | Spasms | Incr. Temp | Palp. Listing | | | Palp. Listing | Incr. Temp | Spasms | Sub/Phase |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Oc | | | | |
| | | | | | A1 | | | | |
| | | | | | Ax | | | | |
| | | | | | 3C | | | | |
| | | | | | 4 | | | | |
| | | | | | 5 | | | | |
| | | | | | 6 | | | | |
| | | | | | 7 | | | | |
| | | | | | 1T | | | | |
| | | | | | 2 | | | | |
| | | | | | 3 | | | | |
| | | | | | 4 | | | | |
| | | | | | 5 | | | | |
| | | | | | 6 | | | | |
| | | | | | 7 | | | | |
| | | | | | 8 | | | | |
| | | | | | 9 | | | | |
| | | | | | 10 | | | | |
| | | | | | 11 | | | | |
| | | | | | 12 | | | | |
| | | | | | 1L | | | | |
| | | | | | 2 | | | | |
| | | | | | 3 | | | | |
| | | | | | 4 | | | | |
| | | | | | 5 | | | | |

**Notes:** _____
_____
_____

**Lincoln/Bunch 1179**

Progress Notes - 07/30/2018

NAME _Mark Bunch_ DOB _____ DATE _7-30-18_

**DNP—Did Not Perform**

**PATIENT STANDING**

Height ___6___ feet, _____ inches. Weight _235_ lbs.

Weight distribution: Patient carries _____ lbs. more on right _____ left _____

General appearance: ☐ well nourished ☐ strong ☑ good ☐ fair ☐ run down ☐ poor

Posture: ☐ good ☑ fair ☐ poor

Gait: ☑ regular ☐ irregular_____

Head Tilt: ☐ right ear lower than left ☑ left ear lower than right

Neck: ☑ no curvature ☐ curvature to the ☐ left ☐ right

Muscle Tension: ☐ not present ☑ present in the ☑ neck ☑ rt ☑ lt shoulder ☐ rt ☑ lt ☐ middle back ☐ rt ☑ lt ☐ lower back ☐ rt ☐ lt

Shoulder Tilt: ☑ left shoulder lower ☐ right shoulder lower

The middle back or thorax: ☑ no curvature ☐ showed side curvature ☐ left ☐ right

Abnormal backward curvature or kyphosis: ☑ not present ☐ present in the ☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Abnormal forward curvature or lordosis: ☑ not present ☐ present in the ☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Hip Level: ☐ normal ☑ not normal and showed ☐ left ☑ right illum higher

The lower back: ☑ no side curvature ☐ showed side curvature to the ☐ left ☐ right

Flexion (90) _____ restricted at_____ degrees

Extension (20) _____ restricted at_____ degrees

R. Lat Flexion (40) _____ restricted at_____ degrees

L. Lat Flexion (40) _____ restricted at_____ degrees

R. Rotation (45) _____ restricted at_____ degrees

L. Rotation (45) _____ restricted at_____ degrees

Trendelenberg's test: ☐ no hip weakness ☐ hip weakness on the ☐ right ☐ left

Romberg's test: ☐ no ☐ some ☐ much body swaying

Balance test: ☐ none ☐ some ☐ much instability on ☐ left ☐ right ☐ both feet (eyes closed, standing on one foot)

Coordination tests: ☐ heel walk ☐ toe walk ☐ finger to finger ☐ finger to nose toe to shin were abnormal on the ☐ right side ☐ left side ☐ normal

Lewin : Standing ☐ Pos ☐ Neg ☐ rt ☐ lt ☐ Bending ☐ Pos ☐ Neg ☐ rt ☐ lt

| Kemps | Posture |
|---|---|
| Lewin Test | Lateral Flexion |
| Dorsal Flexion Extension | Lewin Sign |

**CRANIAL NERVES**

| | Normal | Impaired |
|---|---|---|
| 1. OLFACTORY— Smell | | |
| 2. OPTIC — Acute, perimetry, fundus | | |
| 3. OCC.-MOT — Eye movement, accom. to light | | |
| 4. TROCHLEAR — Eye Movements | | |
| 5. TRIGEMINAL—Sensation, wink, mus. | | |
| 6. ABDUCENS — Eye movements | | |
| 7. FACIAL —Smile, taste, tongue | | |
| 8. ACOUSTIC — A. Cochlear B. Vestibular | | |
| 9. GLOSSOPHARYNGEAL — Gag, taste | | |
| 10. VAGUS — Voice, swallow | | |
| 11. SPINAL ACCESSORY — Shoulder shrug | | |
| 12. HYPOGLOSSAL—Tongue movements | | |

| GAIT | Left | Right |
|---|---|---|
| Limping | ☐ | ☐ |
| Painful | ☐ | ☐ |
| Shortening | ☐ | ☐ |
| Deformity | ☐ | ☐ |
| Paralysis | ☐ | ☐ |
| Ataxia | ☐ | ☐ |
| None | | |

| SKIN APPEARANCE | Left | Right | Ant | Post |
|---|---|---|---|---|
| Redness | ☐ | ☐ | ☐ | ☐ |
| Indications Infection/Heat Pad Use | | | | |
| Lipomata | ☐ | ☐ | ☐ | ☐ |
| Indications Spina Bifida/Bone Pathology | | | | |
| Hairy patches | ☐ | ☐ | ☐ | ☐ |
| Café Au-Lait | ☐ | ☐ | ☐ | ☐ |
| Birth Marks | ☐ | ☐ | ☐ | ☐ |
| Port Wine Marks | ☐ | ☐ | ☐ | ☐ |
| Fauns Beard | Yes ☐ | | No ☐ | |
| Gibbus Deformity | Yes ☐ | | No ☐ | |
| ☐ None | | | | |

Notes:_____

**Progress Notes - 07/30/2018**

| D.O.B. | NAME Burch, Mark |
|--------|------------------|
| **DATE** | **VISITS & FINDINGS** |

**7-30-18** — Has had upper bk. and Neck pains on the Lt. Side. Was in an accident on 2-13-18. Was the driver of an auto that was hit head on. Other driver was driving in reverse. Impact was on drivers side, front. Upon impact his head hit the steering wheel. Has some visual issues & is being treated. After was nauseated and did vomit. Has a problem with headaches in the Temporal. Had a moderate concussion. Has more neck, upper bk. and maybe low bk. Had a CT scan done and supposedly good. Had an MRI done and has some Brain Issues. (?)

Did do an Exam of the Patient and charted the Results on the Exam Form.

Treatment was done of the Left hip as a P.I. using the Drops. The T-5, 6 and T 10, 11 areas were done Prone. Done C 2, 6 in the Supine Position. Then done an anterior of the T 4, 5 area on the Left. Patient felt a lot better after treatment.

The assessment is to see the patient 2x's/wk for the next month.

So I will see the Patient in 3 days.

**8-2-18** — Patient noticed that he was a little sore the evening after treatment. Then was some better afterward for a short time. Then his condition came back again. The headaches calmed down some also, but still there some.

Exam showed a slight Low Left Hip. There is decreased range of motion to the T-spine at the T 10, 11 and T 3, 4 levels. Upon rotation to the Left. There is C-spine pain at the C 5, 6, 7 area, upon Left lateral tilt. There is lesser pain on the Right. There is also tenderness of the C 1, 2 area upon palpation.

Treatment was done of the T 10, 11 and T 4, 5 area in the Prone Position. The C 2, 6, 7 areas were done Supine. The Left hip was done on the side. Then an anterior was done of the T 3, 4 area on the Left.

His ability to move his Neck and Left arm were better after treatment.

I will see the patient again in 4 days.

**8-6-18** — Patient stated that he felt some better for a longer time period. It was lasted for about a day before coming back. He now has the original pain in the upper back and Neck. More on the Left side as usual. Also Left arm. Headaches are still some.

Found the patient to have the slight Low Left Hip with tension. There is tenderness of the T-9, 10 area upon palpation. The T 3, 4 area is painful on the Left. Not as much on the Right, and less than before. Found upon Lateral Head Tilt The C 2, 6 area was tender upon Palpation and C-spine Rotation bi-Lateral. The Left arm has diminished movement.

Lincoln/Bunch 1181

Other Records

## INFORMED CONSENT FOR CHIROPRACTIC CARE

I hereby request and consent to the performance of chiropractic adjustments and other chiropractic procedures, including various modes of physical therapy and diagnostic x-rays, on me (or the patient named below, for whom I am legally responsible) by the doctor of chiropractic named below, other licensed doctors of chiropractic, or other staff members who now or in the future work at the office listed below or any other associated office.    If participating in the NRCT program,    I further understand that this technique has not been approved by the Colorado Board of Examiners and may be considered experimental. _____ (initials)

I understand and am informed that, as in the practice of medicine, the chiropractic adjustments or other clinical procedures are usually beneficial and seldom cause any problems. There are some risks to treatment, including but not limited to fractures, disc injuries, strokes, dislocations and sprains. I do not expect the doctor to be able to anticipate and explain all risks and complications, and I wish to rely upon the doctor to exercise judgment during the course of the procedure which the doctor feels at the time, based upon the facts then known to him, is in my best interest.    It is my responsibility to make known any conditions that might not come to the attention of the doctor.    There has been no promise, implied or otherwise, of a cure for any symptom, disease or condition as a result of treatment in this clinic, and I understand that results are not guaranteed. _____ (initials)

Chiropractic is a science, philosophy and art which concerns itself with the relationship between structure (primarily the spine) and function (primarily the nervous system) relative to range of motion, muscular and neurological aspects, as the relationship may affect the restoration and preservation of health. Health is a state of optimal physical, mental and social well-being, not merely the absence of disease, pain or infirmity.   I understand that the chiropractor will use his hands or a mechanical device upon my body to adjust a joint, which may cause an audible "pop" or "click". _____ (initials)

Neither the practice of chiropractic or medicine is an exact science, but relies upon information related by the patient, information gathered during examination, and the doctor's interpretation thereof, as well as the doctor's judgment and expertise in working with like cases.    If during the course of care, we encounter non-chiropractic or unusual findings, we will advise you of those findings and recommend that you seek the services of another health care provider. _____ (initials)

I understand that my consent need only be obtained one time for my present condition and any future condition(s) for which I may seek treatment.  I also understand that I can revoke this consent at any time in writing for all future procedures.  I also understand that any video or photographic material I may appear in, may be used for documentation and for any way this office sees fit to further research and awareness.  If I decline to sign this consent this office has the right to refuse to render care. _____ (initials)

I have read, or have had read to me, this Informed Consent for Chiropractic Care.   I have had the opportunity to ask questions about its content, and have had my questions explained to my satisfaction in a way that I can understand. By voluntarily signing below I agree to the above named procedures regarding my care in this office and am authorizing them to proceed with any treatment they may deem necessary in my case. _____ (initials)

PREGNANCY RELEASE:  This is to certify that to the best of my knowledge, I am not pregnant and the above doctor (and associates) has my permission to perform an x-ray evaluation if deemed necessary.
I have been advised that x-ray can be hazardous to an unborn child.
         Date of last Menstrual Cycle: _____ Initials: _____

I authorize the Doctor's office to release personal, financial &/or health information, if requested, to:

_Nikki Giordano   447-5991_          _France_
                                        Relationship

_Mark Black_                   _Mark Black_
Signature of Legal Representative     Patient Name                     Witness
(Attorney-in-fact, guardian, parent if minor)


Name (printed)          DOB        Signature              Date

**Lincoln/Bunch 1182**

Other Records



## Arkansas Valley Chiropractic Center

760 Piedra                    Canon City, Colorado 81212                    275-8109

DR. M. V. CHRISTIANSEN                    FINANCIAL POLICY

This is an agreement between Arkansas Valley Chiropractic of Canon City, as creditor, and the Patient/Debtor named on this form.

In this agreement the words "you," "your," and "yours" mean the account that has been established in your name to which charges are made and payments are credited. The words "we," "us," and "our," refer to Arkansas Valley Chiropractic.

**STATEMENTS:** If you have a balance on your account, we will send you a statement each month. It will show separately the previous balance, any new charges to the account, the finance charge, if any, and any payments or credits applied to your account during the month.

**PAYMENTS:** Unless other arrangements are approved by us in writing, the balance on your statement is due and payable when the statement is issued, and is past due if not paid by the end of the month.

**CHARGES TO ACCOUNT:** We shall have the right to cancel your privilege to make charges against your account in the event that your account becomes delinquent. Future visits would then need to be paid at the time of service.

**PAYMENT OPTIONS:** Payment methods accepted by this office include cash, check, or money order. Our office also accepts credit card payments at this time.

**INSURANCE:** Insurance is a contract between you and your insurance company. We are NOT a party to this contract, in most cases. We will bill your primary insurance. It is the insurance company that makes the final determination of your eligibility. You agree to pay any portion of the charges not covered by insurance. It is your responsibility to notify our office any time a change is made to your insurance coverage. We ask that you have your insurance card (s) available for our staff to photocopy for billing purposes.

**DIVORCE:** In the case of divorce or separation, the party responsible for the account prior to the divorce or separation remains responsible for the account.

**FINANCE CHARGE:** A finance charge may be imposed on each item of your account which has not been paid within thirty (30) days of the time the item was added to the account as a patient responsibility. The FINANCE CHARGE will be computed at the rate of one percent (1%) per month or an ANNUAL PERCENTAGE RATE of twelve percent (12%). The finance charge on your account is computed by applying the periodic rate (1%) to the "overdue" balance of your account. The "overdue" balance of your account is calculated by taking the balance owed thirty (30) days ago, and then subtracting any payments or credits applied to the account during that time. The minimum Finance Charge is $50.00.

Lincoln/Bunch 1183

Other Records

**PAST DUE ACCOUNTS:** If your account becomes past due, we will take necessary steps to collect this debt. If we have to refer your account to a collection agency, you agree to pay all of the collection costs which are incurred.
If we have to refer collection of the balance to a lawyer, you agree to pay all lawyer' fees which we incur plus all court costs. In case of suit, you agree the venue shall be in Fremont County, Colorado.

**RETURNED CHECKS:** There is a $15.00 fee for any returned by the bank.

**MISSED APPOINTMENTS:** Patients with three missed appointments that were not previously cancelled or rescheduled may be asked to transfer their records to another doctor.

**WAIVER OF CONFIDENTIALITY:** You understand if this account is submitted to an attorney or collection agency, if we have to litigate in court or if your past due status is reported to a credit reporting agency, the fact that your received treatment at our office may become a matter of public records.

**TRANSFERRING OF RECORDS;** Any request to release records must be in writing.

**WORKERS COMPENSATION:** We require written approval/authorization by your employer and/or worker's compensation carrier prior to your initial visit. If your claim is denied, you will be responsible for payment in full.

**PERSONAL INJURY:** If you are being treated as part of a personal injury lawsuit or claim, we require verification from your attorney prior to your initial visit. In addition to this verification, we require that you allow us to bill your health insurance. In the absence of insurance, other financial arrangements may be discussed. Payment of the bill remains the patients responsibility. We cannot bill your attorney for charges incurred due to a personal injury case.

**EFFECTIVE DATE:** Once you have signed this agreement, you agree to all the terms and conditions contained herein and the agreement will be in full force and effect.

By signature below, I acknowledge that I have read the entire financial agreement and understand the terms contained in this FINANCIAL POLICY.

_____        _____
Patient's Name (Please Print)           Responsible Party

_____        _____7/30/18_____
Signature of Responsible Party          Date Signed

**Lincoln/Bunch 1184**



NAME Bunch, Mark    M ✓    F _____    DATE 7/30/3(?)    R. W/C

STREET _____ CITY _____ ST. __ __ ZIP.

TELE. _____ OCCUPATION Sales _____ MARITAL M

BIRTH DATE _____ AGE 54 REF. BY _____

SYMPTOMS _____

INJURY _____

cords

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

PICA | PICA

| 1. MEDICARE ☐ (Medicare#) MEDICAID ☐ (Medicaid#) TRICARE ☐ (ID#/DoD#) CHAMPVA ☐ (Member ID#) GROUP HEALTH PLAN ☐ (ID#) FECA BLK LUNG ☐ (ID#) OTHER ☒ (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

| 2. PATIENT'S NAME (Last Name, First Name, Middle Initial) | 3. PATIENT'S BIRTH DATE / SEX M ☒ F ☐ | 4. INSURED'S NAME (Last Name, First Name, Middle Initial) |

**Bunch, Mark** | | **Bunch, Mark**

| 5. PATIENT'S ADDRESS (No., Street) | 6. PATIENT RELATIONSHIP TO INSURED Self ☐ Spouse ☐ Child ☐ Other ☒ | 7. INSURED'S ADDRESS (No., Street) |

| CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE |

| ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (Include Area Code) |

| 9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial) | 10. IS PATIENT'S CONDITION RELATED TO: | 11. INSURED'S POLICY GROUP OR FECA NUMBER **8220685    4402351** |

| a. OTHER INSURED'S POLICY OR GROUP NUMBER | a. EMPLOYMENT? (Current or Previous) ☒ YES ☐ NO | a. INSURED'S DATE OF BIRTH / SEX M ☒ F ☐ |

| b. RESERVED FOR NUCC USE | b. AUTO ACCIDENT? ☐ YES ☒ NO   PLACE (State) | b. OTHER CLAIM ID (Designated by NUCC) |

| c. RESERVED FOR NUCC USE | c. OTHER ACCIDENT? ☐ YES ☒ NO | c. INSURANCE PLAN NAME OR PROGRAM NAME **Liberty Mutual Insurance** |

| d. INSURANCE PLAN NAME OR PROGRAM NAME | 10d. CLAIM CODES (Designated by NUCC) | d. IS THERE ANOTHER HEALTH BENEFIT PLAN? ☐ YES ☐ NO   If yes, complete items 9, 9a, and 9d. |

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED **SOF**   DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED **SOF**

| 14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP) MM DD YY **02  13  18** QUAL. **431** | 15. OTHER DATE QUAL. MM DD YY | 16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION FROM MM DD YY TO MM DD YY |

| 17. NAME OF REFERRING PROVIDER OR OTHER SOURCE | 17a. 17b. NPI | 18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES FROM MM DD YY TO MM DD YY |

| 19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) | | 20. OUTSIDE LAB? ☐ YES ☐ NO   $ CHARGES |

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind **10**

A. **V43.52xA**  B. **S13.4xxA**  C. **M54.2**  D. **M79.2**
E. **M25.512**  F.   G.   H.
I.   J.   K.   L.

| 22. RESUBMISSION CODE | ORIGINAL REF. NO. |
| 23. PRIOR AUTHORIZATION NUMBER |

| 24. A. DATE(S) OF SERVICE From MM DD YY  To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS  MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 08 23 18 08 23 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 08 27 18 08 27 18 | 11 | | 98940 | abcde | 67 53 | 1 | | NPI | 1669531018 |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |
| | | | | | | | | NPI | |

| 25. FEDERAL TAX I.D. NUMBER **84-6140753**  SSN ☐ EIN ☒ | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? ☒ YES ☐ NO | 28. TOTAL CHARGE $ **135 06** | 29. AMOUNT PAID $ | 30. Rsvd for NUCC Use **135 06** |

| 31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.) SIGNED *M.V. Christiansen DC*  DATE **8-28-18** | 32. SERVICE FACILITY LOCATION INFORMATION **Dr. Michael V. Christiansen, D.C. 760 Piedra Street Cañon City, CO 81212** a. 1669531018  b. | 33. BILLING PROVIDER INFO & PH # **(719) 275-8109 Dr. Michael V. Christiansen, D.C. 760 Piedra Street Cañon City, CO 81212** a. 1669531018  b. |

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1186**

ecords



NAME Bunch, Mark  M ✓  F_____ DATE 8-16-18  DR. W/C

STREET _____ L _____ CITY _____ ST. _____ ZIP _____

TELE. _____ OCCUPATION _____ MARITAL M

BIRTH DATE ____ AGE ____ REF. BY _____

SYMPTOMS _____

INJURY _____

Other Records



# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

| PICA | | PICA |
|---|---|---|

| 1. MEDICARE (Medicare#) | MEDICAID (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER [X] (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
**Bunch, Mark**

3. PATIENT'S BIRTH DATE   SEX   M [X]  F [ ]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
**Bunch, Mark**

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self [ ]  Spouse [ ]  Child [ ]  Other [X]

7. INSURED'S ADDRESS (No., Street)

CITY   STATE   8. RESERVED FOR NUCC USE   CITY   STATE

ZIP CODE   TELEPHONE (Include Area Code)   ZIP CODE   TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
**8220685   4402351**

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)  [X] YES  [ ] NO

a. INSURED'S DATE OF BIRTH   SEX   M [X]  F [ ]

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?  [ ] YES  [X] NO   PLACE (State)

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?  [ ] YES  [X] NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
**Liberty Mutual Insurance**

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
[ ] YES  [ ] NO   *If yes*, complete items 9, 9a, and 9d.

**READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.**
12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED **SOF**   DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED **SOF**

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)  MM **02** DD **13** YY **18**  QUAL. **431**

15. OTHER DATE  QUAL.   MM  DD  YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM MM DD YY  TO MM DD YY

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
17a.
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM MM DD YY  TO MM DD YY

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  [ ] YES  [ ] NO   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)   ICD Ind. **10**

A. **V43.52xA**   B. **S13.4xxA**   C. **M54.2**   D. **M79.2**
E. **M25.512**   F.   G.   H.
I.   J.   K.   L.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY | To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID. QUAL. | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 08 30 18 | 08 30 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 09 04 18 | 09 04 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 09 06 18 | 09 06 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 09 10 18 | 09 10 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| | | | | | | | | | | NPI | |
| | | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  **84-6140753**  SSN [ ]  EIN [X]

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  [X] YES  [ ] NO

28. TOTAL CHARGE  $ **270 12**

29. AMOUNT PAID  $

30. Rsvd for NUCC Use  **270 12**

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
*M.V. Christiansen, D.C.*
SIGNED  **09-13-18**  DATE

32. SERVICE FACILITY LOCATION INFORMATION
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018  b.

33. BILLING PROVIDER INFO & PH# **(719) 275-8109**
Dr. Michael V. Christiansen, D.C.
760 Piedra Street
Cañon City, CO 81212
a. 1669531018  b.

NUCC Instruction Manual available at: www.nucc.org   **PLEASE PRINT OR TYPE**   APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1189**

**Other Records**

BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND TRICARE PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or TRICARE participation cases, the physician agrees to accept the charge determination of the Medicare carrier or TRICARE fiscal intermediary as the full charge and the patient is responsible only for the deductible, coinsurance and non-covered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or TRICARE fiscal intermediary if this is less than the charge submitted. TRICARE is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned "Insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

For TRICARE claims, I further certify that I (or any employee) who rendered services am not an active-duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, TRICARE, FECA, AND BLACK LUNG INFORMATION (PRIVACY ACT STATEMENT)

We are authorized by CMS, TRICARE and OWCP to ask you for information needed in the administration of the Medicare, TRICARE, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the Federal Register, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," Federal Register Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR TRICARE CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under TRICARE/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of TRICARE.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Human Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1197. The time required to complete this information collection is estimated to average 10 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850. This address is for comments and/or suggestions only. DO NOT MAIL COMPLETED CLAIM FORMS TO THIS ADDRESS.

**Lincoln/Bunch 1190**



**Other Records**

NAME BUNCH, MARK M ✓ F____ DATE_____ DR. w/c

STREET ___ ___ ___ CITY ___ ST. ___ ZIP ___

TELE. ___ OCCUPATION _____ MARITAL M

BIRTH DATE ___ ___ AGE 54 REF. BY _____

SYMPTOMS _____

INJURY _____

Lincoln/Bunch 1191

**Request Corr.**

# Additional Records Received
# 08/31/2018

**Lincoln/Bunch 1192**

**Request Corr.**

# Additional Records Received
# 09/17/2018

**Lincoln/Bunch 1193**

**Request Corr.**

 

## NO COVER SHEET RECEIVED WITH CHART

RP Number: _____ 4402351_____

Patient Last Name: _____ bunch _____

Patient First Name: _____ mark _____

DOB or Last 4 SSN #: _____

Sender/Facility: _____

---

### Special Chart Notes:

☐ Blurry
☐ Light
☐ Dark
☐ Multiple RP#'s

---

### Reserved for CD/USB notes:

**Lincoln/Bunch 1194**

# Quality Assurance Report

## Request Information

Report Date:    September 17, 2018                    RP ID: 4402351

Patient Name:   BUNCH, MARK

Provider Name: CHRISTIANSEN, DR MICHAEL

## Quality Assurance Information

Scope Requested: **From February 1, 2018 to Present**

Special Request:
   Seen by: Dr. Michael Christiansen

Special Request Included? YES

Secondary Request Confirmed? YES

QC Notes:
   scanned in the best quality possible

Chart Reviewed By: MDELEO

**Lincoln/Bunch 1195**

| | |
|---|---|
| **From:** | GrpMktClmOpsReporting@LibertyMutual.com |
| **Sent:** | Mon, 17 Sep 2018 16:36:06 +0000 |
| **To:** | GARY.COVINGTON@CHARTER.COM;ROBERT.CORTEZ@CHARTER.COM |
| **Subject:** | Claim #8220685, MARK BUNCH |

**THIS IS AN AUTOMATED EMAIL, PLEASE DO NOT RESPOND.**

The above named employee has applied for long term disability benefits.  The claim has been denied.   The case manager for this claim is Kayla Carter.

If you have further questions please call Liberty Mutual at 1-844-384-5858

**Lincoln/Bunch 1196**

| | |
|---|---|
| **From:** | GrpMktClmOpsReporting@LibertyMutual.com |
| **Sent:** | Mon, 17 Sep 2018 16:36:06 +0000 |
| **To:** | GARY.COVINGTON@CHARTER.COM;ROBERT.CORTEZ@CHARTER.COM |
| **Subject:** | Claim #8220685, MARK BUNCH |

**THIS IS AN AUTOMATED EMAIL, PLEASE DO NOT RESPOND.**

The above named employee has applied for long term disability benefits.  The claim has been denied.   The case manager for this claim is Kayla Carter.

If you have further questions please call Liberty Mutual at 1-844-384-5858

**Lincoln/Bunch 1197**

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207

MR. MARK BUNCH

**Lincoln/Bunch 1198**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

September 14, 2018

Mr. Mark B. Bunch

RE:    Long Term Disability (LTD) Benefits
       Charter Communications, Inc.
       Claim #: 8220685

Dear Mr. Mark Bunch:

Liberty Life Assurance Company of Boston ("Liberty") is responsible for managing claims for Long Term Disability (LTD) benefits under Charter Communications, Inc.'s Group Disability Policy.  We are writing in reference to your claim for LTD benefits under the Policy.

We have completed a thorough review of your eligibility for benefits and have determined that benefits are not payable.  Charter Communications, Inc.'s LTD Policy requires that to be eligible for benefits you must meet the following definition of disability:

> **"Disability"** or **"Disabled"** *means:*
>
> 1.  *For persons other than pilots, co-pilots, and crewmembers of an aircraft:*
>
>     i.   *that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and*
>
>     ii.  *thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.*
>
> 2.  *With respect to Covered Persons employed as pilots, co-pilots and crewmembers of an aircraft:*
>
>     **"Disability"** or **"Disabled"** *means as a result of Injury or Sickness: (a) the Covered Person cannot perform the material and substantial duties of his own occupation; and (b) after benefits have been paid for 12 months, the Covered Person is unable to perform the Material and Substantial Duties of Any Occupation*
>
> **"Own Occupation"** *means the Covered Person's occupation that he was performing when*

1  of  3

**Lincoln/Bunch 1199**

*his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.*

In order to evaluate whether or not you have met the above definition of disability, we requested medical information from your physician(s).

You submitted a claim for depression and your claim file contains the following medical documentation:

- Medical records from Dr. Olson dated April 6, 2018 through July 3, 2018.
- Medical records from Dr. Helfenstein dated June 1, 2018.
- Medical records from Dr. Higginbotham dated February 12, 2018 through August 13, 2018.
- Medical records from Dr. Christiansen dated July 30, 2018 through August 6, 2018.

We referred your file to a Consulting Physician Board Certified in Psychiatry and a Consulting Physician Board Certified in Neurology to determine if the medical records on file supported your disability through the entire elimination period and beyond August 12, 2018, which is the date your benefits would have began. The reviews concluded that the medical records were insufficient to determine the presence of impairment beyond August 15, 2018.

Based on the medical documentation received in relation to the requirements of your occupation, you do not meet the definition of disability outlined above. Thus no benefits are payable and we must deny your claim.

This claim determination reflects an evaluation of the claim facts and the Policy provisions. No internal rules, guidelines, protocols, standards or other similar criteria were relied upon in rendering the claim determination. We reserve the right to make a determination on any additional information that may be submitted.

Under the Employee Retirement Income Security Act of 1974 (ERISA), you may request a review of this denial by writing to the address below:

<div align="center">

The Liberty Life Assurance Company of Boston
Attn: Appeal Review Unit
Group Benefits Disability Claims
P.O. Box 7213
London, KY 40742-7213

</div>

The written request for review must be sent within 180 days from the receipt of this letter and state the reasons you feel your claim should not have been denied. In your request for review please include the following documentation:

Any new/updated treatment notes, diagnostic test results, procedure reports; a valid Functional Capacity Evaluation, etc. beyond August 2018 that would support that you are unable to perform the duties of your occupation on a full-time basis.

<div align="center">

2  of 3

</div>

**Lincoln/Bunch 1200**

You should also provide any additional information that you feel will support your claim.

You are entitled to receive, upon request and free of charge, copies of all claim file documents relevant to the claim determination. If Liberty Life does not receive your written request for review within 180 days from the receipt of this notice, our claim decision will be final, your file will remain closed, and no further review will be conducted.

Under normal circumstances, you will be notified of the final decision within 45 days from the date your request is received.

If you require language translation assistance, please contact Liberty Life to initiate a service provided free of charge to assist with understanding your claim and appeal rights.

如果您需要翻译方面的帮助，请联系我，我会免费为您服务以便了解您的要求和诉求。

Shá ata' hane'go shíká a'doowoł nínízingo saad hosíníłį̨' dóó ná'ookąąh nííní'ą̨ągo naaltsoos nííníłtsoozígíí hazho'ó bik'idi'deeshtį̨́ł nínízingo doo bą́ąh ílínígóó níká a'doowoł éí biniiyé shił hodíílnih áko ákwe'égi níká adeeshwoł.

Si necesita traducción, contácteme para iniciar un servicio gratuito a fin de ayudarle a entender sus derechos de reclamo y apelación.

Kung nangangailangan ka ng tulong sa translation, mangyaring makipag-ugnayan sa akin upang gumamit ng serbisyong ibinigay nang walang bayad upang matulungan kang maunawaan ang iyong mga karapatan sa paghahabol at pag-aapela.

If special circumstances cause a delay in our decision, you will be notified of the final decision no later than 90 days from the date your request is received.

Nothing in this letter should be construed as a waiver of any rights and defenses under the above captioned Policy, and all of these rights and defenses are reserved to the company, whether or not they are specifically mentioned herein.

If you have any questions regarding this matter, please contact me.

Sincerely,

Kayla Carter
LTD Specialist
Phone No.: (844) 384-5858 Ext. 18334
Secure Fax No.: (603) 559-9400

**Lincoln/Bunch 1201**

**Medical Record Overview**

**ReleasePoint**

**Date:**     **September 3, 2018**

**Patient Name:**     BUNCH, MARK

**Records From:**     Dr. Michael Christiansen

,
(719) 275-8109

**Request Scope:**     From February 1, 2018 to Present

**Chart Range:**     07/30/2018 - 08/27/2018

**RP ID:** 4402351

**Client ID:** 8220685

**Source:** LIBMT3

**Req By:** K Carter
Kayla Carter

**SSN:**

| Classification | From | To | Total | Starts on Page |
|---|---|---|---|---|
| Progress Notes | Jul 30 2018 | Aug 27 2018 | 10 | 2 |
| Other Records | | | 7 | 12 |
| Request Corr. | | | 1 | 19 |

**Total Page Count:**     18

**Notes From QC:**

scanned in the best quality possible

**Lincoln/Bunch 1202**

| D.O.B. | NAME |
|---|---|
| | Mark Bunch |
| DATE | VISITS & FINDINGS |

8-27-18

Has been feeling some better this time. Can move the Left arm better. Has less pain when moving the C-Spine and upper back regions. Has been doing his Exercises and using a rolled Towel for the T-spine. Noticed he is not slumped as much. So all is still improving each time.

Found a slight Low Lt. Hip. There is some decreased Range of Motion to the T-Spine, Bi-Lateral. There is a slight stabbing pain of the C-Spine at the C6,7 level. More with Left Lateral Tilt of the C-Spine with Compression. There is also tension of the C6,4 area upon Palpation.

Treatment was done of the T 4,5, 9, 10 area in the Prone Position. The C 2, 4, 6, 7 area were done Supine. Then an Anterior was done of the T 4,5 region on the Left Side. The Left Hip was done on the Side.

The Treatment has been working for the Patient. So I will keep him at the Twice weekly program. Maybe for a couple weeks. Then hopefully can change it.

Lincoln/Bunch 1203

| D.O.B. | NAME |
| --- | --- |
| | Mark Bunch |
| DATE | VISITS & FINDINGS |

8-16-18
Cont'd     Found a slight Low Left Hip with slight pressure. There is tenderness of the T3, 4 and T12, 1 areas upon Bi-Lateral Rotation. There is tension of the C2, 5, 6, 7 Block upon Left Lateral Tilt and upon Palpation. Not as much pain.

    Treatment was done of the T4, 5, 10, 11 areas in the Prone Position. Then done a Sacral Base Drop. The C6, 7 and C2 areas were done in the Supine Position. The Left hip was done on the side. Then an Anterior was done of the T3, 4 area on the Left. Could move better after the treatment.

    I will yet see the Patient in 4 days.

8-20-18
    The Neck and upper Back with the Left shoulder has felt better this time. For a longer time. The Neck X-ercise given him has been working well so far. Is sore as of yet. But not near as bad. Has not been real active to hurt himself.

    Found Left Hip some (Low). The T-Spine shows tension of the T10, 11 area upon Palpation. The T-4, 5 area is sore upon Palpation and Lt. Rotation. Has pain of the C6, 7 area upon Right and Left Lateral Extension. Then the Left arm has better range of motion.

    Treatment was done of the T5 and T10, 11 areas in the Prone Position. The C6, 7 area was done Supine, along with C2 etc. Done an Anterior of the T4, 5 regions Bi-Lateral.

    Gave the Patient an Exercise for the upper Back. (Rhomboid Area). The Left little finger was still there.

    I am staying with this 2X's / week treatment program, as it is working well for now. So I will see the patient in 3 days.

8-23-18
    Has done some better this time. Hasn't had as much sharp pain in the upper Back and Left side of the neck. The arm movement has been some better also. Has been more careful with his activities. There has also had a slight headache off & on. States that he has been doing his exercise.

    Found T-Spine tenderness of the T4, 5 and T9, 10 areas upon Bi-Lateral Rotation. Has a Low Lt. Hip slight. There is tenderness upon the C4, 5 area today upon Left Lateral Flexion. So this is a Change somewhat.

    Treatment was done of the T4, 5 and T9, 10 areas in the Prone Position. The C2, 4, 5 areas were done Supine. The Left Hip was done on the side. Then an Anterior was done of the T4, 5 regions Bi-Lateral.

    There has been change, so today with the Change. I will still see the patient in 4 days.

Lincoln/Bunch 1204

Progress Notes - 08/06/2018

| D.O.B. | NAME Bunch Mark. | | |
|---|---|---|---|
| DATE | VISITS & FINDINGS | | |
| 8-6-18 cont'd | Treatment was done of the T 9, 10 and T 5, 6 areas in the Prone Position. Then done a Sacral Base Drop. The C 5, 6 area was done Supine. I also done an Anterior of the T 3, 4 area on the Left. Pain was deminished after treatment. I will see the Patient in 3 days to stay with the Assessment. | | |

**Lincoln/Bunch 1205**

Progress Notes - 07/30/2018

# PERSONAL HISTORY

Date _7/30/18_ Birthdate _____ Age _54_ SS# _____
Name _Mark Bunch_ _____ Address _____
City _____ State _____ Zip _____ Email _____
Home Ph _____ Work Ph _____ Cell Ph _____
☑ Male  ☐ Female  Height _6_  Weight _235_  Number of Children _0_
Referred by _Dr Olson_ _____ Emergency Contact &/Ph # _____
Marital Status:    ☑ Married  ☐ Single  ☐ Divorced  ☐ Widowed  ☐ Separated
Education:    # of Years Completed _15_    Presently a Student? (No) ☐ Part Time ☐ Full Time
Business/Employer: _Charter Communications_ _____ ☐ Part Time ☐ Full Time
Job Satisfaction:    ☑ Very Satisfied  ☐ Satisfied  ☐ Unsatisfied    Years Employed: _3_
☐ Working With Restrictions  ☐ Working Without Restrictions  ☐ Not Working Since _____
Job Description _Outside Sales_ _____
Who is Responsible For Your Bill:  ☐ Self ☐ Spouse ☐ Workers Compensation ☐ Medicare ☐ Auto Insurance
☐ Personal Health Ins. ☐ Other _____    X _____ Patient Signature

# PAST HEALTH HISTORY

Have You Ever Been to a Chiropractor?  ☑ No ☐ Yes  Name & Date of Last Service _____
Family Doctor _Dr Olson_ _____
Have You Gained or Lost More Than 10 lbs In the Last 6 Months:  ☐ Gained  ☐ Lost  ☑ Neither
Pregnant? ☐ No ☐ Yes ☑ N/A  Date of Last Cycle _____  Started Menopause? ☑ No ☐ Yes  When _____
Overall, How Would You Rate Your Health:  ☐ Excellent  ☑ Average  ☐ Poor  ☐ other _____

## HOSPITALIZATIONS, OPERATIONS / WORK, AUTO OR PERSONAL ACCIDENTS OR INJURIES
### (Please be Specific, Include Dates, Areas Involved, and Treatment Received)

1. _Hernia Repair May 2017_
2. _Tonsilectomy 1970_
3.
4.
5.
6.

## SERIOUS ILLNESSES
### (List Current and Past Illnesses Not Mentioned Above, Including Cancer, Diabetes etc, and Include Dates)

1. _N/A_
2.
3.
4.
5.
6.

**Lincoln/Bunch 1206**

Progress Notes - 07/30/2018

**Name:** Mark Bunch    **DOB:** ___    **Date:** 7/30/18

**ALLERGIES:** Please list all known allergies, especially to medicines. _penicillin and stupid people_

**MEDICINES:** Please list all currently used medicines, prescription or non-prescription, vitamins and herbs.

**HOBBIES OR INTERESTS:** _Reading, ATV Riding, biking, gardening_

**ARE YOU:** ☑ Right-handed    ☐ Left-Handed    ☐ Ambidextrous

## CURRENT HEALTH CONDITION

### MAJOR COMPLAINTS

1. Neck and upper back pain loss of range of motion
2. Left shoulder pain loss of range of motion
3. left hip.
4. ___

No Pain 0 1 2 3 4 (5) 6 7 8 9 10 Severe Pain

1. When did this Condition Begin? _2/13/18_    2. Cause of Condition _car accident_
3. Condition is Related to: ☑ Auto Accident ☑ Work ☐ Sports Injury ☐ Personal Injury ☐ Other ___
4. Is this Condition: ☑ Getting Worse    ☐ Getting Better    ☐ Staying the Same
5. What Movements or Positions Aggravate this Condition? _laying down, lifting anything_
6. Is the Condition Worse: ☐ In the Morning ☑ In the Afternoon ☑ In the Evening ☑ Same all Day
7. Does Anything Relieve the Pain? ☐ No ☐ Yes (explain) _pain pills help_
8. Have You Been Treated for Present Condition? ☐ No ☑ Yes    When _may 1st CR_
9. Who Treated you? _PT Ethan_    City ___ State ___ Phone ___
10. Type of Treatment Received: _Balance issues, vestibular problems, neck shoulder pain_
11. Reason for Changing Care: ___
12. Ever Had Similar Condition? ☑ No ☐ Yes    When? ___    Were you Treated? ☐ No ☐ Yes
13. Who Treated You? ___ City ___ State ___ Phone ___
14. Treatment Received: ___
15. Has Anyone in Your Family had Similar Condition? ☑ No ☐ Yes  Who? ___
16. Are You off Work Due to This Condition? ☐ No ☑ Yes  If Yes, date you last worked _2/13/18_

**Lincoln/Bunch 1207**

**Progress Notes - 07/30/2018**

NAME: _Mark Powell_        DOB: _____        DATE: _7/30/18_

CC #1: _Neck pain_                        Date of Onset: _2/13/18_
Condition related to ☑ work ☐ auto ☐ other incident ☐ other _____
Dates of similar symptoms: _____
Condition is: ☐ same ☐ better ☑ worse (since onset)
Provoked by: ☐ sitting ☐ standing ☐ laying ☑ reaching ☑ bending ☐ walking ☐ other
Relieved by: ☐ ice ☑ heat ☐ sleep ☐ sitting ☐ standing ☐ laying ☐ walking
☑ pain killers, muscle relaxants, anti-inflammatories ☐ other
Quality is: ☐ mild ☑ moderate ☐ severe ☐ very severe
Pain scale: no pain 0 1 2 3 4 ⑤ 6 7 8 9 10 severe pain
Pain radiates into: _Shoulder Arm Back_
Is complaint worse in: ☐ am ☑ pm ☑ afternoon ☐ same all day
Medical treatment or diagnosis: _Cervical Sprain, whiplash_
Results: _helped by PT_
Reviewed outside records: ☐ yes ☐ no                    S B W

CC #2: _Stiff Back / shoulder (left)_    Date of Onset: _2/13/18_
Condition related to ☑ work ☐ auto ☐ other incident ☐ other _____
Dates of similar symptoms: _____
Condition is: ☑ same ☐ better ☐ worse (since onset)
Provoked by: ☐ sitting ☑ standing ☐ laying ☑ reaching ☑ bending ☐ walking ☐ other
Relieved by: ☐ ice ☑ heat ☑ sleep ☐ sitting ☐ standing ☐ laying ☐ walking
☐ pain killers, muscle relaxants, anti-inflammatories ☐ other
Quality is: ☐ mild ☑ moderate ☐ severe ☐ very severe
Pain scale: no pain 0 1 2 3 4 5 6 7 8 9 10 severe pain
Pain radiates into: _Neck and shoulder And left hip_
Is complaint worse in: ☐ am ☑ pm ☑ afternoon ☐ same all day
Medical treatment or diagnosis: _Cervical sprain_
Results: _____
Reviewed outside records: ☐ yes ☐ no                    S B W

Social History/Comorbidity Factors:

☐ smoker                ☐ cancer              E-edema
☐ alcohol               ☐ diabetes            P-pain
☐ coffee/tea            ☐ heart disease       T-tenderness
☐ drug use (street)     ☐ proceed w/chiro. Exam   N-numbing
☑ exercise              ☐ refer out           H-hypoasthesia
                                              S-spasm

Complications: _____
Any Activities Limits: _____
Surgeries: ☐ see entry form _____
D.C. History: ☐ see entry form _____
Medications Presently Taking: ☐ see entry form _____
History of Accidents: ☐ see entry form _____

**Lincoln/Bunch 1208**

Progress Notes - 07/30/2018

NAME *Mark Brunch*          DOB ___          DATE *7-30-18*

**DNP—Did Not Perform**

※※ (*more on the Left arm & Hand*)

**Sensation**
1 Good
2 More
3 Less

**Upper Dermatomes:**
___ C-4 Lat. Aspect of Shoulder
___ C-5 Lat. Aspect of Upper Arm
*3* C-6 Lat. Aspect of Lower Arm & Thumb
*3* C-7 First Finger
*2* C-8 Middle Finger & 1/2 Ring Finger
___ T-1 1/2 Ring Finger, Pinky & Medial Forearm
___ T-2 Medial Upper Arm

**Lower Dermatomes:**
___ L-2 Anterior & Medial Thigh
___ L-3 Ant & Medial Thigh & Leg
___ L-4 Medial Leg & Foot
___ L-5 Anterior Leg & Foot
___ S-1 Outside of Foot
___ S-2 Post & Lat Thigh & Leg

**DNP—Did Not Perform**

## PATIENT SITTING
Blood Pressure: _____ systolic _____ diastolic _____ pulse pressure
Pulse rate: ☐ high ☐ low ☐ normal at _____ per minute
Chest Expansion was _____ inches
Neck Flexion          (45) *Pos.* restricted at _____ degrees
Neck Extension        (55) *Pos.* restricted at _____ degrees
Neck R. Lat Flexion   (60) *Pos.* restricted at _____ degrees
Neck L. Lat Flexion   (60) *Pos.* restricted at _____ degrees
Neck R. Rotation      (70) *Pos.* restricted at _____ degrees
Neck L. Rotation      (70) *Pos.* restricted at _____ degrees
Foramina Comp:  ☐ no increase ☒ increase in pain ☐ rt ☒ lt arm/neck/shoulder
Shoulder Comp:  ☐ no increase ☒ increase in pain ☐ rt ☒ lt arm/neck/shoulder
Adson's Sign or Scalenus Anticus Syndrome:  ☒ no evidence ☐ evidence of brachial
          irritation on the ☐ right side ☐ left side
Pupil Reflex Response to Light: ☐ normal ☐ abnormal on ☐ right ☐ left ☐ both
Patellar Reflex right:  ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Patellar Reflex left:  ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Biceps Reflex in the Right Arm:  ☐ exaggerated ☒ normal ☐ sluggish ☐ not present
Biceps Reflex in the Left Arm:  ☐ exaggerated ☒ normal ☐ sluggish ☐ not present
Triceps Reflex in the Right Arm:  ☐ exaggerated ☒ normal ☐ sluggish ☐ not present
Triceps Reflex in the Left Arm:  ☐ exaggerated ☒ normal ☐ sluggish ☐ not present
Dejerines Triad: ☐ none ☐ cough ☐ sneeze ☐ laugh
Hyper Extension Comp: ☐ rt ☒ lt ☒ base of neck ☒ shoulder ☐ arm
Lhermitte's Sign: ☐ positive ☐ negative
Valsalva: ☐ increase ☐ no increase in thecal pressure

Patellar

Patient is
Rt.   Lt.
___ Lbs. ___ Lbs.
___ Lbs. ___ Lbs.
Grip Test

Foramina Compression

Shoulder Compression

Cervical Flexion Extension

Lateral Flexion

BICEPS

TRICEPS

Lateral Rotation

**Notes:** _____

**Progress Notes - 07/30/2018**

NAME _Mark Brunell_ DOB_____ DATE _7-30-18_

**DNP—Did Not Perform**

**PATIENT SUPINE**

Apparent short leg: ☑ left _1/4"_ ☐ right _____
True short leg: ☐ left _____ ☐ right _____
Umbilicus: ☐ left ☐ right
Soto-Hall: ☐ none   nerve irritation in the ☐ neck ☐ mid back ☐ low back (Pain) ✱✱
Neck flexors: ☐ good ☐ moderate ☐ fair ☑ poor
Trunk flexors: ☐ good ☐ moderate ☐ fair ☐ poor
Pelvic elevators: ☐ good ☐ moderate ☐ fair ☐ poor
Goldthwait's: ☐ none ☐ nerve irr. in ☐ lumbo-sacral ☐ sacro-iliac joints ☐ lt ☐ rt
Lasegue's: ☐ none ☐ sciatic nerve pressure in the ☐ right leg ☐ left leg
Braggard's: ☐ none ☐ sciatic nerve irritation in the ☐ right leg ☐ left leg
Patrick's: ☐ none ☐ restricted hip movement on the ☐ right ☐ left ☐ low back
Leg drop: ☐ none ☐ disc compression at lumbo-sacral joint. ☐ left ☐ right
Bilat. Leg Lowering: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt
Straight Leg Raise: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt

| ☐ RT ☐ LT ☐ POS ☐ NEG PSOAS | Soto-Hall | Goldthwait Test | ☐ POS ☐ NEG Naffziger Test | Braggard Test |
|---|---|---|---|---|
| Lasegue's Sign | ☐ POS ☐ NEG Hoover Sign | Leg Drop Test | Fabere-Patrick Test | Babinski |

**PATIENT PRONE**

Bending of the neck backward: ☐ good ☐ moderate ☐ fair ☑ poor (Pain) ✱✱
Bending of the trunk backward: ☐ good ☐ moderate ☐ fair ☐ poor
Left achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Right achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Babinski: ☐ none ☐ extension of toes instead of flexion on simulation of the sole of foot
& indicated ☐ no ☐ an organic ☐ a spinal cord lesion of central nervous system
Ely's sign of heel-to-buttock test: ☐ no ☐ a sacro-iliac disorder

| Sacral-Apex PR | Achilles | Ely's Test |
|---|---|---|

**SPINAL ANALYSIS**

| Sub/Phase | Spasms | Incr. Temp | Palp. Listing | | | Palp. Listing | Incr. Temp | Spasms | Sub/Phase |
|---|---|---|---|---|---|---|---|---|---|
| | | | | Oc | | | | | |
| | | | ✓ | A1 | ✓ | | | | |
| | | | ✓ | Ax | ✓ | | | | |
| | | | | 3C | | | | | |
| | | | | 4 | | | | | |
| | | | ✓ | 5 | | | | | |
| ✓ | | | | 6 | ✓ | | | | |
| | | | ✓ | 7 | ✓ | | | | |
| | | | | 1T | | | | | |
| | | | | 2 | | | | | |
| | | | | 3 | | | | | |
| | | | | 4 | ✓ | | | | |
| | | | ✓ | 5 | ✓ | | | | |
| | | | | 6 | | | | | |
| | | | | 7 | | | | | |
| | | | | 8 | | | | | |
| | | | | 9 | | | | | |
| | | | ✓ | 10 | ✓ | | | | |
| | | | ✓ | 11 | ✓ | | | | |
| | | | | 12 | | | | | |
| | | | | 1L | | | | | |
| | | | | 2 | | | | | |
| | | | | 3 | | | | | |
| | | | | 4 | | | | | |
| | | | | 5 | | | | | |

**Notes:**_____

Progress Notes - 07/30/2018

NAME _Mark Bunch_ DOB _____ DATE _7-30-18_

**DNP—Did Not Perform**

**PATIENT STANDING**

Height ___6___ feet, _____ inches. Weight: _235_ lbs.

Weight distribution: Patient carries _____ lbs. more on right _____ left _____

General appearance: ☐ well nourished ☐ strong ☒ good ☐ fair ☐ run down ☐ poor

Posture: ☐ good ☒ fair ☐ poor

Gait: ☒ regular ☐ irregular _____

Head Tilt: ☐ right ear lower than left ☒ left ear lower than right

Neck: ☒ no curvature ☐ curvature to the ☐ left ☐ right

Muscle Tension: ☐ not present ☒ present in the ☒ neck ☒ rt ☒ lt

    shoulder ☐ rt ☒ lt ☐ middle back ☐ rt ☒ lt ☐ lower back ☐ rt ☐ lt

Shoulder Tilt: ☒ left shoulder lower ☐ right shoulder lower

The middle back or thorax: ☒ no curvature ☐ showed side curvature ☐ left ☐ right

Abnormal backward curvature or kyphosis: ☒ not present ☐ present in the

    ☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Abnormal forward curvature or lordosis: ☒ not present ☐ present in the

    ☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Hip Level: ☐ normal ☒ not normal and showed ☐ left ☒ right illum higher

The lower back: ☒ no side curvature ☐ showed side curvature to the ☐ left ☐ right

Flexion (90) _____ restricted at _____ degrees

Extension (20) _____ restricted at _____ degrees

R. Lat Flexion (40) _____ restricted at _____ degrees

L. Lat Flexion (40) _____ restricted at _____ degrees

R. Rotation (45) _____ restricted at _____ degrees

L. Rotation (45) _____ restricted at _____ degrees

Trendelenberg's test: ☐ no hip weakness ☐ hip weakness on the ☐ right ☐ left

Romberg's test: ☐ no ☐ some ☐ much body swaying

Balance test: ☐ none ☐ some ☐ much instability on ☐ left ☐ right ☐ both feet

    (eyes closed, standing on one foot)

Coordination tests: ☐ heel walk ☐ toe walk ☐ finger to finger ☐ finger to nose

    toe to shin were abnormal on the ☐ right side ☐ left side ☐ normal

Lewin : Standing ☐ Pos ☐ Neg ☐ rt ☐ lt ☐ Bending ☐ Pos ☐ Neg ☐ rt ☐ lt

| Kemps | Posture |
| Lewin Test | Lateral Flexion |
| Dorsal Flexion Extension | Lewin Sign |

**CRANIAL NERVES**

| | | Normal | Impaired |
|---|---|---|---|
| 1. | OLFACTORY— Smell | | |
| 2. | OPTIC — Acute, perimetry, fundus | | |
| 3. | OCC.-MOT — Eye movement, accom. to light | | |
| 4. | TROCHLEAR — Eye Movements | | |
| 5. | TRIGEMINAL—Sensation, wink, mus. | | |
| 6. | ABDUCENS — Eye movements | | |
| 7. | FACIAL —Smile, taste, tongue | | |
| 8. | ACOUSTIC — A. Cochlear B. Vestibular | | |
| 9. | GLOSSOPHARYNGEAL — Gag, taste | | |
| 10. | VAGUS — Voice, swallow | | |
| 11. | SPINAL ACCESSORY — Shoulder shrug | | |
| 12. | HYPOGLOSSAL—Tongue movements | | |

**GAIT**

| | Left | Right |
|---|---|---|
| Limping | ☐ | ☐ |
| Painful | ☐ | ☐ |
| Shortening | ☐ | ☐ |
| Deformity | ☐ | ☐ |
| Paralysis | ☐ | ☐ |
| Ataxia | ☐ | ☐ |
| None | | |

**SKIN APPEARANCE**

| | Left | Right | Ant | Post |
|---|---|---|---|---|
| Redness | ☐ | ☐ | ☐ | ☐ |
| Indications | Infection/Heat Pad Use | | | |
| Lipomata | ☐ | ☐ | ☐ | ☐ |
| Indications | Spina Bifida/Bone Pathology | | | |
| Hairy patches | ☐ | ☐ | ☐ | ☐ |
| Café Au-Lait | ☐ | ☐ | ☐ | ☐ |
| Birth Marks | ☐ | ☐ | ☐ | ☐ |
| Port Wine Marks | ☐ | ☐ | ☐ | ☐ |
| Fauns Beard | Yes ☐ | | No ☐ | |
| Gibbus Deformity | Yes ☐ | | No ☐ | |
| ☐ None | | | | |

Notes: _____

**Lincoln/Bunch 1211**

**Progress Notes - 07/30/2018**

| D.O.B. | NAME Burch, Mark |
|---|---|
| DATE | VISITS & FINDINGS |
| 7-30-18 | Has had upper, Rib and Neck pains on the Lt. Side. Was in an Accident on 2-13-18. Was the driver of an Auto that was hit head on. Other driver was driving in Reverse. Impact was on Drivers Side, Front. Upon impact his head hit the steering wheel. Has some Visual Issues & is being treated. After was nauseated and did Vomit. Has a problem with headaches in the Temporal. Had a Moderate concussion. Has more Neck, upper Rib and maybe Low Rib. Had a CT scan Done and supposedly Good. Had an MRI done and has some Brain Issues. (?) Did do an Exam of the Patient and charted the Results on the Exam Form. Treatment was done of the Left Hip as a P.I. Using the Drops. The T-5,6 and T 10,11 areas were done Prone. Done C 2,6 in the Supine Position. Then done an anterior of the T 4,5 area on the Left. Patient felt a lot better after treatment. The assessment is to see the patient 2x's/wk for the next month. So I will see the Patient in 3 days. |
| 8-2-18 | Patient noticed that he was a little sore the evening after treatment. Then was some better afterward for a short time. Then his condition came back again. The headaches calmed down some also, but still there some. Exam showed a slight Low Left Hip. There is decreased Range of motion to the T-Spine at the T 10,11 and T 3,4 levels. Upon rotation to the Left. There is C-Spine Pain at the C 5,6,7 area. upon Left Lateral Tilt. There is lesser pain on the Right. There is also tenderness of the C 1,2 area upon Palpation. Treatment was done of the T 10,11 and T 4,5 area in the Prone Position. The C 2,6,7 areas were done Supine. The Left Hip was done on the Side. Then an Anterior was done of the T 3,4 area on the Left. His ability to move his Neck and Left arm were better after treatment. I will see the patient again in 4 days. |
| 8-6-18 | Patient stated that he felt some better for a longer time period. It was lasted for about a day before, coming Back. He now has the original Pain in the upper Back and Neck. More on the Left side as usual. Also Left Arm. Headaches are still some. Found the patient to have the slight Low Left Hip with tension. There is tenderness of the T-9,10 area upon palpation. The T 3,4 area is painful on the Left. Not as much on the Right, and less than before. Found upon Lateral Head Tilt The C 2,6 area was tender upon Palpation and C-Spine Rotation bi-Lateral. The Left arm has diminished movement. |

**Lincoln/Bunch 1212**

Other Records

## INFORMED CONSENT FOR CHIROPRACTIC CARE

I hereby request and consent to the performance of chiropractic adjustments and other chiropractic procedures, including various modes of physical therapy and diagnostic x-rays, on me (or the patient named below, for whom I am legally responsible) by the doctor of chiropractic named below, other licensed doctors of chiropractic, or other staff members who now or in the future work at the office listed below or any other associated office.    If participating in the NRCT program,    I further understand that this technique has not been approved by the Colorado Board of Examiners and may be considered experimental. _____ MMS (initials)

I understand and am informed that, as in the practice of medicine, the chiropractic adjustments or other clinical procedures are usually beneficial and seldom cause any problems.  There are some risks to treatment, including but not limited to fractures, disc injuries, strokes, dislocations and sprains.  I do not expect the doctor to be able to anticipate and explain all risks and complications, and I wish to rely upon the doctor to exercise judgment during the course of the procedure which the doctor feels at the time, based upon the facts then known to him, is in my best interest.   It is my responsibility to make known any conditions that might not come to the attention of the doctor.  There has been no promise, implied or otherwise, of a cure for any symptom, disease or condition as a result of treatment in this clinic, and I understand that results are not guaranteed. _____ MB _____ (initials)

Chiropractic is a science, philosophy and art which concerns itself with the relationship between structure (primarily the spine) and function (primarily the nervous system) relative to range of motion, muscular and neurological aspects, as the relationship may affect the restoration and preservation of health.  Health is a state of optimal physical, mental and social well-being, not merely the absence of disease, pain or infirmity.  I understand that the chiropractor will use his hands or a mechanical device upon my body to adjust a joint, which may cause an audible "pop" or "click". _____ MB _____ (initials)

Neither the practice of chiropractic or medicine is an exact science, but relies upon information related by the patient, information gathered during examination, and the doctor's interpretation thereof, as well as the doctor's judgment and expertise in working with like cases.   If during the course of care, we encounter non-chiropractic or unusual findings, we will advise you of those findings and recommend that you seek the services of another health care provider. _____ MM _____ (initials)

I understand that my consent need only be obtained one time for my present condition and any future condition(s) for which I may seek treatment.  I also understand that I can revoke this consent at any time in writing for all future procedures.  I also understand that any video or photographic material I may appear in, may be used for documentation and for any way this office sees fit to further research and awareness.  If I decline to sign this consent this office has the right to refuse to render care. _____ MK _____ (initials)

I have read, or have had read to me, this Informed Consent for Chiropractic Care.   I have had the opportunity to ask questions about its content, and have had my questions explained to my satisfaction in a way that I can understand. By voluntarily signing below I agree to the above named procedures regarding my care in this office and am authorizing them to proceed with any treatment they may deem necessary in my case. _____ MR _____ (initials)

**PREGNANCY RELEASE:**  This is to certify that to the best of my knowledge, I am not pregnant and the above doctor (and associates) has my permission to perform an x-ray evaluation if deemed necessary.
I have been advised that x-ray can be hazardous to an unborn child.
Date of last Menstrual Cycle: _____ N/A _____ Initials: _____ MR _____

I authorize the Doctor's office to release personal, financial &/or health information, if requested, to:

Nikki Giordano  447-5991                           Fiance
                                                    **Relationship**

_____ Mark Bunch _____
**Signature of Legal Representative**              **Patient Name**                                **Witness**
(Attorney-in-fact, guardian, parent if minor)

_____          _____          _____          _____
**Name (printed)**             **DOB**         **Signature**                  **Date**

**Lincoln/Bunch 1213**

Other Records



# Arkansas Valley Chiropractic Center

760 Piedra        Canon City, Colorado 81212        275-8109

DR. M. V. CHRISTIANSEN       FINANCIAL POLICY

This is an agreement between Arkansas Valley Chiropractic of Canon City, as creditor, and the Patient/Debtor named on this form.

In this agreement the words "you," "your," and "yours" mean the account that has been established in your name to which charges are made and payments are credited. The words "we," "us," and "our," refer to Arkansas Valley Chiropractic.

**STATEMENTS:** If you have a balance on your account, we will send you a statement each month. It will show separately the previous balance, any new charges to the account, the finance charge, if any, and any payments or credits applied to your account during the month.

**PAYMENTS:** Unless other arrangements are approved by us in writing, the balance on your statement is due and payable when the statement is issued, and is past due if not paid by the end of the month.

**CHARGES TO ACCOUNT:** We shall have the right to cancel your privilege to make charges against your account in the event that your account becomes delinquent. Future visits would then need to be paid at the time of service.

**PAYMENT OPTIONS:** Payment methods accepted by this office include cash, check, or money order. Our office also accepts credit card payments at this time.

**INSURANCE:** Insurance is a contract between you and your insurance company. We are NOT a party to this contract, in most cases. We will bill your primary insurance. It is the insurance company that makes the final determination of your eligibility. You agree to pay any portion of the charges not covered by insurance. It is your responsibility to notify our office any time a change is made to your insurance coverage. We ask that you have your insurance card (s) available for our staff to photocopy for billing purposes.

**DIVORCE:** In the case of divorce or separation, the party responsible for the account prior to the divorce or separation remains responsible for the account.

**FINANCE CHARGE:** A finance charge may be imposed on each item of your account which has not been paid within thirty (30) days of the time the item was added to the account as a patient responsibility. The FINANCE CHARGE will be computed at the rate of one percent (1%) per month or an ANNUAL PERCENTAGE RATE of twelve percent (12%). The finance charge on your account is computed by applying the periodic rate (1%) to the "overdue" balance of your account. The "overdue" balance of your account is calculated by taking the balance owed thirty (30) days ago, and then subtracting any payments or credits applied to the account during that time. The minimum Finance Charge is $50.00.

**Lincoln/Bunch 1214**

Other Records

**PAST DUE ACCOUNTS:** If your account becomes past due, we will take necessary steps to collect this debt. If we have to refer your account to a collection agency, you agree to pay all of the collection costs which are incurred.
If we have to refer collection of the balance to a lawyer, you agree to pay all lawyer' fees which we incur plus all court costs. In case of suit, you agree the venue shall be in Fremont County, Colorado.

**RETURNED CHECKS:** There is a $15.00 fee for any returned by the bank.

**MISSED APPOINTMENTS:** Patients with three missed appointments that were not previously cancelled or rescheduled may be asked to transfer their records to another doctor.

**WAIVER OF CONFIDENTIALITY:** You understand if this account is submitted to an attorney or collection agency, if we have to litigate in court or if your past due status is reported to a credit reporting agency, the fact that your received treatment at our office may become a matter of public records.

**TRANSFERRING OF RECORDS:** Any request to release records must be in writing.

**WORKERS COMPENSATION:** We require written approval/authorization by your employer and/or worker's compensation carrier prior to your initial visit. If your claim is denied, you will be responsible for payment in full.

**PERSONAL INJURY:** If you are being treated as part of a personal injury lawsuit or claim, we require verification from your attorney prior to your initial visit. In addition to this verification, we require that you allow us to bill your health insurance. In the absence of insurance, other financial arrangements may be discussed. Payment of the bill remains the patients responsibility. We cannot bill your attorney for charges incurred due to a personal injury case.

**EFFECTIVE DATE:** Once you have signed this agreement, you agree to all the terms and conditions contained herein and the agreement will be in full force and effect.

By signature below, I acknowledge that I have read the entire financial agreement and understand the terms contained in this **FINANCIAL POLICY**.

_____         _____
Patient's Name (Please Print)         Responsible Party

_____         7/30/18
Signature of Responsible Party         Date Signed

**Lincoln/Bunch 1215**



NAME _Bunch, Mark_ M ✓ F _____ DATE _7/30/3(10)_ R. _W/C_

STREET _____ _____ CITY _____ ST. _ _ ZIP.

TELE. _____ OCCUPATION _Sales_ MARITAL _M_

BIRTH DATE _ _ _ AGE _54_ REF. BY _____

SYMPTOMS _____

INJURY _____

# HEALTH INSURANCE CLAIM FORM

APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

PICA | PICA

| 1. MEDICARE (Medicare#) | MEDICAID (Medicaid#) | TRICARE (ID#/DoD#) | CHAMPVA (Member ID#) | GROUP HEALTH PLAN (ID#) | FECA BLK LUNG (ID#) | OTHER [X] (ID#) | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
**Bunch, Mark**

3. PATIENT'S BIRTH DATE SEX  M [X]  F [ ]

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
**Bunch, Mark**

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED
Self [ ]  Spouse [ ]  Child [ ]  Other [X]

7. INSURED'S ADDRESS (No., Street)

CITY | STATE | 8. RESERVED FOR NUCC USE | CITY | STATE

ZIP CODE | TELEPHONE (Include Area Code) | | ZIP CODE | TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER
**8220685       4402351**

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)  [X] YES  [ ] NO

a. INSURED'S DATE OF BIRTH       SEX  M [X]  F [ ]

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?  PLACE (State)  [ ] YES  [X] NO

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?  [ ] YES  [X] NO

c. INSURANCE PLAN NAME OR PROGRAM NAME
**Liberty Mutual Insurance**

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  [ ] YES  [ ] NO  If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.
SIGNED **SOF**  DATE

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.
SIGNED **SOF**

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)
**02  13  18**  QUAL. **431**

15. OTHER DATE  QUAL.  MM  DD  YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM    TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
17a. | 17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM    TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC)

20. OUTSIDE LAB?  [ ] YES  [ ] NO  $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY  Relate A-L to service line below (24E)   ICD Ind. **1 0**

A. **V43.52xA**  B. **S13.4xxA**  C. **M54.2**  D. **M79.2**
E. **M25.512**  F.  G.  H.
I.  J.  K.  L.

22. RESUBMISSION CODE    ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From MM DD YY — To MM DD YY | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS | MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT Family Plan | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|---|
| 08 23 18  08 23 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| 08 27 18  08 27 18 | 11 | | 98940 | | abcde | 67 53 | 1 | | NPI | 1669531018 |
| | | | | | | | | | NPI | |
| | | | | | | | | | NPI | |
| | | | | | | | | | NPI | |
| | | | | | | | | | NPI | |

25. FEDERAL TAX I.D. NUMBER  SSN EIN
**84-6140753**  [X]

26. PATIENT'S ACCOUNT NO.

27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  [X] YES  [ ] NO

28. TOTAL CHARGE  $ **135 06**

29. AMOUNT PAID  $

30. Rsvd for NUCC Use  **135 06**

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)
*M.V.Christiansen DC*
SIGNED **8-28-18**  DATE

32. SERVICE FACILITY LOCATION INFORMATION
**Dr. Michael V. Christiansen, D.C.**
**760 Piedra Street**
**Cañon City, CO 81212**
a. **1669531018**  b.

33. BILLING PROVIDER INFO & PH # **(719) 275-8109**
**Dr. Michael V. Christiansen, D.C.**
**760 Piedra Street**
**Cañon City, CO 81212**
a. **1669531018**  b.

NUCC Instruction Manual available at: www.nucc.org    **PLEASE PRINT OR TYPE**    APPROVED OMB-0938-1197 FORM 1500 (02-12)

**Lincoln/Bunch 1217**

Other Records

ecords



| DATE | VITAMINS | # Tabs. | Amt. Daily |
|---|---|---|---|
| | | | |

NAME Bunch, Mark    M ✓   F _____ DATE 8-16-18   DR. W/C

STREET _____ L _____ CITY _____ ST. _____ ZIP _____

TELE. _____ OCCUPATION _____ MARITAL M

BIRTH DATE _____ AGE _____ REF. BY _____

SYMPTOMS _____

INJURY _____

SPINAL ANALYSIS

| DATE | CON | AT | AX | C3 | 4 | 5 | 6 | 7 | T1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | L1 | 2 | 3 | 4 | 5 | (L6) | Sac | R Ili | L Ili | Coc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

X-RAY RECORD

| DATE | VIEWS | | POST |
|---|---|---|---|
| | | | |

NOTE:

**Lincoln/Bunch 1219**

**Request Corr.**

# Additional Records Received
# 08/31/2018

**Lincoln/Bunch 1220**

# Quality Assurance Report

## Request Information

Report Date:    September 3, 2018                          **RP ID: 4402351**

Patient Name:   BUNCH, MARK

Provider Name: CHRISTIANSEN, DR MICHAEL

## Quality Assurance Information

Scope Requested: **From February 1, 2018 to Present**

Special Request:
    Seen by: Dr. Michael Christiansen

Special Request Included? YES

Secondary Request Confirmed? YES

QC Notes:
    scanned in the best quality possible

Chart Reviewed By:  MGALV

**Lincoln/Bunch 1221**

## Psychiatric Clinical Case Review

| Customer Name | Claimant Name (Last, First) | Claim number |
|---|---|---|
| Charter Communications, Inc. | Bunch, Mark | 8220685 |

| | |
|---|---|
| **Referred by:** | Kayla Carter |
| **Report Date:** | 9/10/18 |
| **Claimant DOB:** | |
| **Job Title/Occupation:** | Direct Sales Representative |
| **DOD:** | 2/14/18 |
| **Diagnosis:** | Unspecified Depressive Disorder F32.9 |
| **Type of Claim:** | LTD |

### Conclusions:

- There is insufficient medical evidence to establish/support that the insured's psychiatric symptoms are of a nature and severity to support impairment which would require restrictions or limitations.

- Recent psychological and neuropsychological testing were considered invalid and suggest symptom magnification.

### Case Summary:

The insured is a 54 year old male employed as a Direct Sales Representative at Charter Communications, Inc. where he worked from 1/4/16 until 2/13/18, his last day of work. He went out of work after hitting his head in an MVA and subsequently reported various pain, depressive, and anxiety symptoms which have been labeled post-concussive and/or post-traumatic symptoms. Psychological and neuropsychological testing done since the MVA were considered invalid.

### Analysis:

I have reviewed the entire available medical record contained in the insured's Liberty Mutual SystemOne DOC list and all claim notes. The focus of this report is on the salient aspects of the insured's mental health symptomatology, diagnoses, treatment, and functioning. I have reviewed the records from medical providers/specialists not providing psychiatric treatment, but non-psychiatric medical illness is outside the scope of my expertise and is respectfully deferred to the appropriate specialists for review and consideration, e.g. Neurology. The conclusions below are based on the information available to me at the time the report was written.

**Lincoln/Bunch 1222**

Claimant: Mark Bunch
Claim #: 8220685
Page 2

There is insufficient medical evidence to establish/support that the insured's psychiatric symptoms are of a nature and severity to support impairment which would require restrictions or limitations. The following information supports this conclusion:

- Psychological and neuropsychological testing done since the MVA do not corroborate cognitive/memory complaints. Neuropsychological evaluation by Dr. Helffenstein dated 6/1/18 reflects testing results suggesting symptom magnification, with TOMM and Victoria Symptom Validity being "…concerning for an intentional lack of effort."[1] Dr. Helffenstein considered testing results invalidated. Psychological assessment by Dr. Staudenmeyer dated 8/6/18 suggested "extreme overreporting bias" of symptoms and also invalidated testing results.

- There are few recent clinical findings usually observed (e.g., via mental status evaluation) in individuals with severe psychiatric conditions such as deficits in grooming or eye contact, psychomotor agitation or retardation, psychosis or thought disorder, frequent panic attacks, dissociations, mania, suicidal preoccupation, or intractable crying. Such clinical observations are important for corroborating self-reported symptoms.

- In this case the nature and frequency of psychiatric treatment would not necessitate separation from the workplace and is of lower intensity than would be expected for treating severe/incapacitating symptoms of depression or anxiety. For example, records reflect the insured is not taking any psychiatric medications and has received minimal psychotherapy – a  timely initiation of both psychotherapy and medications would be the expected standard of care. Similarly, there is no evidence of medical necessity or a plan to escalate the insured's level of care to a partial hospital, intensive outpatient program, or inpatient psychiatric unit, as would be expected in the management of a severe/incapacitating mental illness.

Respectfully Submitted,

*-Electronically signed-*

John Young, M.D.
Consulting Physician, Liberty Life Assurance Company
ABPN Board Certified in General Psychiatry
ABPN Board Certified and Fellowship in Forensic Psychiatry
Clinical Assistant Professor - Department of Psychiatry
University of Vermont College of Medicine
Fellow, American Psychiatric Association

---

[1] Clinical Assessment of Malingering and Deception, Third Edition, edited by Richard Rogers, The Guilford Press (2008).

**Lincoln/Bunch 1223**

Claimant: Mark Bunch
Claim #: 8220685
Page 3

*This report was written with the use of voice recognition software. It may contain inadvertent spelling or grammatical errors which were not detected during the editing process. Please do not hesitate to contact the author directly if there any questions or concerns.*

**Lincoln/Bunch 1224**

# Billing Statement:



**Invoice Date: 09/07/2018**          **Invoice #: 708628**
**Liberty Mutual**

**Invoice for Requests for Medical Information completed between Aug 1 2018 and Aug 31 2018**

**LIBMT3**                                                    **Bill Code: LIBSFU**

| RP # Cust ID | Patient Name Provider Name | Status | Date Req By | RP Fee | Med Fee | Rush | QC Amt Pages | Total |
|---|---|---|---|---|---|---|---|---|
| 4402351 8220685 | BUNCH, MARK CHRISTIANSEN, DR MICHAEL | Complete | 09/03/18 K Carter | 8.00 | 17.50 | 0.00 | 0.00 18 | **25.50** |
| 4402352 8220685 | BUNCH, MARK HELFENSTEIN, DR DENNIS, PHD | Complete | 08/09/18 K Carter | 8.00 | 0.00 | 0.00 | 0.00 14 | **8.00** |
| 4402353 8220685 | BUNCH, MARK OCCUPATIONAL & ENVIRONMENTAL ... | Complete | 08/16/18 K Carter | 8.00 | 0.00 | 0.00 | 0.00 94 | **8.00** |

**ReleasePoint**

**405 W. Foothill Blvd.**
**Suite 204**
**Claremont, CA 91711**

**Total Amount Due:**          **41.50**

**Tax ID: 95-2843455**

**Lincoln/Bunch 1225**

# CP INITIAL ASSESSMENT (TRIAGE) – LTD PENDED CLAIM

**REFERRAL DATE:** 8/21/2018
**DCM NAME:** Kayla Carter
**SDN/TEL#:** 7318334
**EMAIL:** Kayla.Carter@lfg.com
**CLAIMANT:** Mark Bunch
**CLAIM#:** 8220685
**ELIMINATION PERIOD:** 182 Days

**DOB:**
**DOD:**  2/14/2018
**BBD:**  8/15/2018
**JOB TITLE:**  Direct Sales Rep
**PHYSICAL DEMANDS:** Light
**No**

**IDENTIFIED EE/ER ISSUE?**  No
**IF YES, DESCRIBE:**

**AVAILABLE MEDICAL RECORDS:**
ALL MR
**ADDITIONAL COMMENTS:**
Charter Communications

**CP REVIEWER:** Dr. Markovitz

**SPECIALTY: Neurology**

**RECORDS REVIEWED: the claimant's medical records include an emergency department visit on February 13, 2018 where the claimant was described as being involved in a motor vehicle accident where his head hit on the steering wheel and he was dazed. No airbag deployed. Following the injury he complained of headache, blurry vision, and dizziness. Brain CT and CT of the neck were reported to be normal. The clinical impression was possible concussion. He was recommended to follow up with his primary care physician.**

**The claimant saw Dr. Steven Wayne Olson on April 6, 2018 and April 13, 2018 when he is described as having posttraumatic symptoms and possible traumatic brain injury. He was referred for neuropsychiatric testing as well as chiropractic treatments for neckache.**

**Physical therapy notes from May through June 2018 describe the claimant receiving treatment for neckache.**

**There are a series of chiropractic treatment notes in July and August 2018 by Arkansas Valley chiropractic care by Dr. Michael Christiansen describing the claimant having neck and upper back shoulder and left hip pain. The history included his history of a motor vehicle accident in February 2018. The claimant received chiropractic treatments for the cervical and thoracic spine and was reported to have some degree of decreased pain following treatment.**

**Lincoln/Bunch 1226**

There are notes from Dr. Thomas Higginbotham from May 3, 2018 through August 13, 2018 describing the claimant having a collection of symptoms to include depression, anxiety, panic attack, posttraumatic stress disorder, dizziness, posttraumatic headaches, tinnitus, photophobia, and phonophobia, insomnia, neckache and backache. The symptoms are lumped together as postconcussive/posttraumatic symptoms. Two neuropsych tests were performed and both were reported to be invalid, but suggest possible mild traumatic brain injury. Neurology and neuroophthalmology referrals were recommended, but apparently not performed. A brain MRI dated March 21, 2018 was described as having nonspecific mild white matter changes and in the differential the possibility of MS was suggested, although the claimant had no history or physical exam evidence to suggest multiple sclerosis. The claimant was recommended to seek cognitive behavioral therapy.

**Analysis:**

The claimant's available medical records do not include any neurologic evaluation. The neuropsych testing had invalid results of questionable clinical significance. The claimant was described as having anxiety, depression, and posttraumatic stress disorder. Mention was made of a prior history of assaults in 1990 and 1993 when he worked for the Department of Corrections. At this time, the claimant's available medical records fail to support any neurologic diagnoses leading to impairment restrictions or limitations. There may be psychiatric diagnoses, depression, anxiety, panic attack, and/or posttraumatic stress disorder, but I will defer opinion on that to the appropriate psychiatric consulting physicians.

**PRIMARY DIAGNOSIS / ICD10 Codes:**

| ICD 10 Diagnosis Name | ICD 10 Diagnosis Code |
|---|---|
| Postconcussive syndrome | F07.81 |
|  |  |

**CO-MORBID CONDITIONS POTENTIALLY IMPACTING CAPACITY:** the claimant's medical records describe the claimant as having posttraumatic stress disorder anxiety, and depression.

**ARE LIMITATIONS AND/OR RESTRICTIONS SUPPORTED AT THE TIME OF THE LTD BBD 8/15/2018?**  ○ Yes  ○ No  ⦿ Uncertain

**SUGGESTED ACTION PLAN:**


☐DCM to consider attempting to get consensus on the above R&L's to facilitate a RTW with accommodations
☐Refer to me for full file review
    ☐now

**Lincoln/Bunch 1227**

☐on the following date _____

☐when the following becomes available _____

☐comments _____

☒**Refer to _psychiatry _____ specialty for full file review**

    ☒**now**

    ☐**on the following date** _____

    ☐**when the following becomes available** _____

    ☐**comments** _____

☐**Refer for nurse case manager review:**

    ☐**now**

    ☐**on the following date** _____

    ☐**when the following becomes available** _____

    ☐**comments** _____

**CP ASSESSMENT DATE: 09/01/2018**

**Lincoln/Bunch 1228**

**ReleasePoint**

**Medical Record Overview**

**Date:** **August 20, 2018**

**Patient Name:** BUNCH, MARK

**Records From:** Dr. Michael Christiansen                    **RP ID:** 4402351

,
(719) 275-8109                    **Client ID:** 8220685

**Request Scope:** From February 1, 2018 to Present        **Source:** LIBMT3

**Chart Range:** 07/30/2018 - 08/06/2018        **Req By:** K Carter
Kayla Carter

**SSN:**

|  |  |  |  | Starts on |
|---|---|---|---|---|
| **Classification** | **From** | **To** | **Total** | **Page** |
| Progress Notes | Jul 30 2018 | Aug 6 2018 | 8 | 2 |
| Other Records |  |  | 4 | 10 |
| **Total Page Count:** |  |  | 12 |  |

**Notes From QC:**

pt was seen thrice within the scope

Scanned in the best quality possible.

**Lincoln/Bunch 1229**

Progress Notes - 08/06/2018

| D.O.B. | NAME |
| --- | --- |
| | Bunch Mark. |

| DATE | VISITS & FINDINGS |
| --- | --- |
| 8-6-18 Cont'd | Treatment was done of the T9, 10 and T5, 6 areas in the Prone Position. Then done a Sacral Base Diag. The C5, 6 area was done Supine. I also done an Anterior of the T3, 4 area on the Left. Pain was diminished after treatment. I will see the Patient in 3 days to stay with the Assessment. |

**Lincoln/Bunch 1230**

Progress Notes - 07/30/2018

# PERSONAL HISTORY

Date _7/30/18_ Birthdate _____ Age _54_ SS# _____

Name _Mark Bunch_ _____ Address _____

City ____ State ____ Zip ____ Email _____

Home Ph ____ Work Ph _____ Cell Ph _____

☒ Male  ☐ Female  Height _6_ Weight _235_ Number of Children _0_

Referred by _Dr Olson_ Emergency Contact &/Ph # _____

Marital Status:  ☒ Married  ☐ Single  ☐ Divorced  ☐ Widowed  ☐ Separated

Education:  # of Years Completed _15_ Presently a Student? ⓃNo ☐ Part Time ☐ Full Time

Business/Employer: _Charter Communications_ ☐ Part Time ☐ Full Time

Job Satisfaction:  ☒ Very Satisfied  ☐ Satisfied  ☐ Unsatisfied  Years Employed: _3_

☐ Working With Restrictions  ☐ Working Without Restrictions  ☐ Not Working Since _____

Job Description _Outside Sales_

Who is Responsible For Your Bill:  ☐ Self ☐ Spouse ☐ Workers Compensation ☐ Medicare ☐ Auto insurance

☐ Personal Health Ins. ☐ Other _____    X _____ Patient Signature

# PAST HEALTH HISTORY

Have You Ever Been to a Chiropractor? ☒ No ☐ Yes  Name & Date of Last Service _____

Family Doctor _Dr Olson_

Have You Gained or Lost More Than 10 lbs In the Last 6 Months:  ☐ Gained ☐ Lost ☒ Neither

Pregnant? ☐ No ☐ Yes ☒ N/A  Date of Last Cycle _____ Started Menopause? ☒ No ☐ Yes  When _____

Overall, How Would You Rate Your Health:  ☐ Excellent ☒ Average ☐ Poor ☐ other _____

## HOSPITALIZATIONS, OPERATIONS / WORK, AUTO OR PERSONAL ACCIDENTS OR INJURIES
(Please be Specific, Include Dates, Areas Involved, and Treatment Received)

1. _Hernia Repair May 2017_
2. _Tonsillectomy 1970_
3.
4.
5.
6.

## SERIOUS ILLNESSES
(List Current and Past Illnesses Not Mentioned Above, Including Cancer, Diabetes etc, and Include Dates)

1. _N/A_
2.
3.
4.
5.
6.

**Lincoln/Bunch 1231**

Progress Notes - 07/30/2018

Name: _Mark Bunch_ DOB: _____ Date: 7/30/18

ALLERGIES: Please list all known allergies, especially to medicines. _penicillin and stupid people_

MEDICINES: Please list all currently used medicines, prescription or non-prescription, vitamins and herbs.

HOBBIES OR INTERESTS: _Reading, Atv Riding, biking, gardening_

ARE YOU:  ☑ Right-handed    ☐ Left-Handed    ☐ Ambidextrous

## CURRENT HEALTH CONDITION

### MAJOR COMPLAINTS

1. _Neck and upper back pain loss of range of motion_
2. _left shoulder pain loss of range of motion_
3. _left hip._
4. _____

No Pain  0  1  2  3  4 (5) 6  7  8  9  10  Severe Pain

1. When did this Condition Begin? _2/13/18_  2. Cause of Condition _Car accident_
3. Condition is Related to: ☑ Auto Accident ☑ Work ☐ Sports Injury ☐ Personal Injury ☐ Other ____
4. Is this Condition: ☑ Getting Worse    ☐ Getting Better,    ☐ Staying the Same
5. What Movements or Positions Aggravate this Condition? _laying down, lifting any things_
6. Is the Condition Worse: ☐ In the Morning  ☑ In the Afternoon  ☑ In the Evening  ☐ Same all Day
7. Does Anything Relieve the Pain? ☐ No ☐ Yes (explain) _pain pills help_
8. Have You Been Treated for Present Condition?  ☐ No ☑ Yes  When _may JCp_
9. Who Treated you? _PT Ethan_  City ____ State ___ Phone ____
10. Type of Treatment Received: _Balance issues, vestibular problems, neck shoulder pain_
11. Reason for Changing Care: ____
12. Ever Had Similar Condition? ☑ No ☐ Yes  When? ____  Were you Treated? ☐ No ☐ Yes
13. Who Treated You? ____ City ____ State ___ Phone ____
14. Treatment Received: ____
15. Has Anyone in Your Family had Similar Condition? ☑ No ☐ Yes  Who? ____
16. Are You off Work Due to This Condition? ☐ No  ☑ Yes  If Yes, date you last worked _2/13/18_

**Lincoln/Bunch 1232**

Progress Notes - 07/30/2018

NAME: Mark Rowe    DOB:    DATE: 7/30/18

CC #1: Neck pain    Date of Onset: 2/13/18

Condition related to ☑work ☐auto ☐other incident ☐other _____

Dates of similar symptoms: _____

Condition is: ☐same ☐better ☑worse (since onset)

Provoked by: ☑sitting ☑standing ☑laying ☑reaching ☑bending ☐walking ☐other

Relieved by: ☐ice ☑heat ☐sleep ☐sitting ☐standing ☐laying ☐walking ☑pain killers, muscle relaxants, anti-inflammatories ☐other

Quality is: ☐mild ☑moderate ☐severe ☐very severe

Pain scale: no pain 0 1 2 3 4 ⑤ 6 7 8 9 10 severe pain

Pain radiates into: Shoulder Arm Back

Is complaint worse in: ☐am ☑pm ☑afternoon ☐same all day

Medical treatment or diagnosis: Cervical Sprain, whiplash

Results: helped by PT

Reviewed outside records: ☐yes ☐no    S B W

CC #2: Stiff Back + Shoulder (left)    Date of Onset: 2/13/18

Condition related to ☑work ☐auto ☐other incident ☐other _____

Dates of similar symptoms: _____

Condition is: ☑same ☐better ☐worse (since onset)

Provoked by: ☐sitting ☑standing ☐laying ☑reaching ☑bending ☐walking ☐other

Relieved by: ☐ice ☑heat ☑sleep ☐sitting ☐standing ☐laying ☐walking ☐pain killers, muscle relaxants, anti-inflammatories ☐other

Quality is: ☐mild ☑moderate ☐severe ☐very severe

Pain scale: no pain 0 1 2 3 4 5 6 7 8 9 10 severe pain

Pain radiates into: Neck and Shoulder And left hip

Is complaint worse in: ☐am ☑pm ☑afternoon ☐same all day

Medical treatment or diagnosis: Cervical Sprain

Results: _____

Reviewed outside records: ☐yes ☐no    S B W

Social History/Comorbidity Factors:

| | | |
|---|---|---|
| ☐ smoker | ☐ cancer | E-edema |
| ☐ alcohol | ☐ diabetes | P-pain |
| ☐ coffee/tea | ☐ heart disease | T-tenderness |
| ☐ drug use (street) | ☐ proceed w/chiro. Exam | N-numbing |
| ☑ exercise | ☐ refer out | H-hypoasthesia |
| | | S-spasm |

Complications: _____
Any Activities Limits: _____
Surgeries: ☐ see entry form _____
D.C. History: ☐ see entry form _____
Medications Presently Taking: ☐ see entry form _____
History of Accidents: ☐ see entry form _____

**Lincoln/Bunch 1233**

Progress Notes - 07/30/2018

NAME *Mark Brunch*          DOB _____          DATE 7-30-18

**DNP—Did Not Perform**

(more on the Left arm & Hand)



**Sensation**
1  Good
2  More
3  Less

**Upper Dermatomes:**
___ C-4  Lat. Aspect of Shoulder
___ C-5  Lat. Aspect of Upper Arm
*3*  C-6  Lat. Aspect of Lower Arm & Thumb
*3*  C-7  First Finger
*2*  C-8  Middle Finger & 1/2 Ring Finger
___ T-1  1/2 Ring Finger, Pinky & Medial Forearm
___ T-2  Medial Upper Arm

**Lower Dermatomes:**
___ L-2  Anterior & Medial Thigh
___ L-3  Ant & Medial Thigh & Leg
___ L-4  Medial Leg & Foot
___ L-5  Anterior Leg & Foot
___ S-1  Outside of Foot
___ S-2  Post & Lat Thigh & Leg

**DNP—Did Not Perform**

**PATIENT SITTING**

Blood Pressure: _____ systolic _____ diastolic _____ pulse pressure
Pulse rate: ☐ high ☐ low ☐ normal at _____ per minute
Chest Expansion was _____ inches
Neck Flexion          (45) *Pos.* restricted at _____ degrees
Neck Extension        (55) *Pos.* restricted at _____ degrees
Neck R. Lat Flexion   (60) *Pos.* restricted at _____ degrees
Neck L. Lat Flexion   (60) *Pos.* restricted at _____ degrees
Neck R. Rotation      (70) *Pos.* restricted at _____ degrees
Neck L. Rotation      (70) *Pos.* restricted at _____ degrees
Foramina Comp: ☐ no increase ☑ increase in pain ☐ rt ☑ lt arm/neck/shoulder
Shoulder Comp: ☐ no increase ☑ increase in pain ☐ rt ☑ lt arm/neck/shoulder
Adson's Sign or Scalenus Anticus Syndrome: ☑ no evidence ☐ evidence of brachial
          irritation on the ☐ right side ☐ left side
Pupil Reflex Response to Light: ☐ normal ☐ abnormal on ☐ right ☐ left ☐ both
Patellar Reflex right: ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Patellar Reflex left: ☐ exaggerated ☐ normal ☐ sluggish ☐ not present
Biceps Reflex in the Right Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Biceps Reflex in the Left Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Triceps Reflex in the Right Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Triceps Reflex in the Left Arm: ☐ exaggerated ☑ normal ☐ sluggish ☐ not present
Dejerines Triad: ☐ none ☐ cough ☐ sneeze ☐ laugh
Hyper Extension Comp: ☐ rt ☑ lt ☑ base of neck ☑ shoulder ☐ arm
Lhermitte's Sign: ☐ positive ☐ negative
Valsalva: ☐ increase ☐ no increase in thecal pressure

| | Patient is |
|---|---|
| | Rt.    Lt. |
| | ____ Lbs. ____ Lbs. |
| | ____ Lbs. ____ Lbs. |
| Patellar | Grip Test |
| Foramina Compression | Shoulder Compression |
| Cervical Flexion Extension | Lateral Flexion |
| BICEPS / TRICEPS | Lateral Rotation |

Notes: _____

Lincoln/Bunch 1234

**Progress Notes - 07/30/2018**

NAME _Mark Brunel_ _____ DOB_____ DATE _7-30-18_

**DNP—Did Not Perform**

**PATIENT SUPINE**

Apparent short leg: ☑ left _¼"_  ☐ right _____
True short leg: ☐ left _____  ☐ right _____
Umbilicus: ☐ left  ☐ right
Soto-Hall: ☐ none   nerve irritation in the ☐ neck  ☐ mid back  ☐ low back (Pain) ✳✳
Neck flexors: ☐ good ☐ moderate ☐ fair ☑ poor
Trunk flexors: ☐ good ☐ moderate ☐ fair ☐ poor
Pelvic elevators: ☐ good ☐ moderate ☐ fair ☐ poor
Goldthwait's: ☐ none  ☐ nerve irr. in ☐ lumbo-sacral ☐ sacro-iliac joints ☐ lt ☐ rt
Lasegue's: ☐ none  ☐ sciatic nerve pressure in the ☐ right leg ☐ left leg
Braggard's: ☐ none  ☐ sciatic nerve irritation in the ☐ right leg ☐ left leg
Patrick's: ☐ none  ☐ restricted hip movement on the ☐ right ☐ left ☐ low back
Leg drop: ☐ none  ☐ disc compression at lumbo-sacral joint. ☐ left ☐ right
Bilat. Leg Lowering: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt
Straight Leg Raise: ☐ none ☐ increased pain ☐ hip ☐ low back ☐ lt ☐ rt

| ☐ RT ☐ LT ☐ POS ☐ NEG PSOAS | Soto-Hall | Goldthwait Test | ☐ POS ☐ NEG Naffziger Test | Braggard Test |
|---|---|---|---|---|
| Lasegue's Sign | ☐ POS ☐ NEG Hoover Sign | Leg Drop Test | Fabere-Patrick Test | Babinski |

**PATIENT PRONE**

Bending of the neck backward: ☐ good ☐ moderate ☐ fair ☑ poor (Pain) ✳✳
Bending of the trunk backward: ☐ good ☐ moderate ☐ fair ☐ poor
Left achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Right achilles reflex: ☐ normal ☐ exaggerated ☐ sluggish ☐ not present
Babinski: ☐ none ☐ extension of toes instead of flexion on simulation of the sole of foot
& indicated ☐ no ☐ an organic ☐ a spinal cord lesion of central nervous system
Ely's sign of heel-to-buttock test: ☐ no ☐ a sacro-iliac disorder

| Sacral-Apex PR | Achilles | Ely's Test |
|---|---|---|

| | | SPINAL ANALYSIS | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Sub/Phase | Spasms | Incr. Temp | Palp. Listing | | Palp. Listing | Incr. Temp | Spasms | Sub/Phase |
| | | | | Oc | | | | |
| | | | | A1 | | | | |
| | | | | Ax | | | | |
| | | | | 3C | | | | |
| | | | | 4 | | | | |
| | | | | 5 | | | | |
| | | | | 6 | | | | |
| | | | | 7 | | | | |
| | | | | 1T | | | | |
| | | | | 2 | | | | |
| | | | | 3 | | | | |
| | | | | 4 | | | | |
| | | | | 5 | | | | |
| | | | | 6 | | | | |
| | | | | 7 | | | | |
| | | | | 8 | | | | |
| | | | | 9 | | | | |
| | | | | 10 | | | | |
| | | | | 11 | | | | |
| | | | | 12 | | | | |
| | | | | 1L | | | | |
| | | | | 2 | | | | |
| | | | | 3 | | | | |
| | | | | 4 | | | | |
| | | | | 5 | | | | |

**Notes:**_____

rogress Notes - 07/30/2018

NAME _Mack Bunch_ DOB _____ DATE _7-30-18_

**DNP—Did Not Perform**

**PATIENT STANDING**

Height ___b___ feet, _____ inches.  Weight _235_ lbs.

Weight distribution: Patient carries _____ lbs. more on    right _____    left _____

General appearance: ☐ well nourished ☐ strong ☑ good ☐ fair ☐ run down ☐ poor

Posture: ☐ good ☑ fair ☐ poor

Gait: ☑ regular ☐ irregular _____

Head Tilt: ☐ right ear lower than left   ☑ left ear lower than right

Neck: ☑ no curvature ☐ curvature to the ☐ left ☐ right

Muscle Tension: ☐ not present ☑ present in the ☑ neck ☑ rt ☑ lt

shoulder ☐ rt ☑ lt ☐ middle back ☐ rt ☑ lt ☐ lower back ☐ rt ☐ lt

Shoulder Tilt: ☑ left shoulder lower ☐ right shoulder lower

The middle back or thorax: ☑ no curvature ☐ showed side curvature ☐ left ☐ right

Abnormal backward curvature or kyphosis: ☑ not present ☐ present in the
☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Abnormal forward curvature or lordosis: ☑ not present ☐ present in the
☐ cervical ☐ thoracic ☐ lumbar region ☐ increased ☐ decreased

Hip Level: ☐ normal ☑ not normal and showed ☐ left ☑ right illum higher

The lower back: ☑ no side curvature ☐ showed side curvature to the ☐ left ☐ right

Flexion      (90) _____ restricted at _____ degrees
Extension    (20) _____ restricted at _____ degrees
R. Lat Flexion (40) _____ restricted at _____ degrees
L. Lat Flexion (40) _____ restricted at _____ degrees
R. Rotation   (45) _____ restricted at _____ degrees
L. Rotation   (45) _____ restricted at _____ degrees

Trendelenberg's test: ☐ no hip weakness ☐ hip weakness on the ☐ right ☐ left

Romberg's test: ☐ no ☐ some ☐ much body swaying

Balance test: ☐ none ☐ some ☐ much instability on   ☐ left ☐ right ☐ both feet
(eyes closed, standing on one foot)

Coordination tests:   ☐ heel walk ☐ toe walk ☐ finger to finger ☐ finger to nose
toe to shin were abnormal on the ☐ right side ☐ left side ☐ normal

Lewin : Standing ☐ Pos ☐ Neg ☐ rt ☐ lt ☐ Bending ☐ Pos ☐ Neg ☐ rt ☐ lt

| | |
|---|---|
| Kemps | Posture |
| Lewin Test | Lateral Flexion |
| Dorsal Flexion Extension | Lewin Sign |

**CRANIAL NERVES**

| | Normal | Impaired |
|---|---|---|
| 1. OLFACTORY— Smell | | |
| 2. OPTIC — Acute, perimetry, fundus | | |
| 3. OCC.-MOT — Eye movement, accom. to light | | |
| 4. TROCHLEAR — Eye Movements | | |
| 5. TRIGEMINAL—Sensation, wink, mus. | | |
| 6. ABDUCENS — Eye movements | | |
| 7. FACIAL —Smile, taste, tongue | | |
| 8. ACOUSTIC — A. Cochlear  B. Vestibular | | |
| 9. GLOSSOPHARYNGEAL — Gag, taste | | |
| 10. VAGUS — Voice, swallow | | |
| 11. SPINAL ACCESSORY — Shoulder shrug | | |
| 12. HYPOGLOSSAL—Tongue movements | | |

**GAIT**

| | Left | Right |
|---|---|---|
| Limping | ☐ | ☐ |
| Painful | ☐ | ☐ |
| Shortening | ☐ | ☐ |
| Deformity | ☐ | ☐ |
| Paralysis | ☐ | ☐ |
| Ataxia | ☐ | ☐ |
| None | | |

**SKIN APPEARANCE**

| | Left | Right | Ant | Post |
|---|---|---|---|---|
| Redness | ☐ | ☐ | ☐ | ☐ |
| Indications  Infection/Heat Pad Use | | | | |
| Lipomata | ☐ | ☐ | ☐ | ☐ |
| Indications  Spina Bifida/Bone Pathology | | | | |
| Hairy patches | ☐ | ☐ | ☐ | ☐ |
| Café Au-Lait | ☐ | ☐ | ☐ | ☐ |
| Birth Marks | ☐ | ☐ | ☐ | ☐ |
| Port Wine Marks | ☐ | ☐ | ☐ | ☐ |
| Fauns Beard | Yes ☐ | | No ☐ | |
| Gibbus Deformity | Yes ☐ | | No ☐ | |
| ☐ None | | | | |

Notes: _____

Lincoln/Bunch 1236

**Progress Notes - 07/30/2018**

| D.O.B. | NAME Burch, Mark |
|--------|------------------|
| DATE   | VISITS & FINDINGS |

| | |
|---|---|
| 7-30-18 | Has had upper bk. and Neck pains on the Lt. Side. Was in an Accident on 2-13-18. Was the driver of an Auto that was hit headon. Other driver was driving in Reverse. Impact was on Drivers Side Front. Upon impact his head hit the steering wheel. Has some Visual Issues & is being treated. After was nauseated and did Vomit. Has a problem with headaches in the Temporals. Had a Moderate concussion. Has more Neck, upper bk. and maybe Low bk. Had a CT scan Done and supposedly Good. Had an MRI done and has some Brain Issues. (?)<br><br>Did do an Exam of the Patient and Charted the Results on the Exam Form.<br><br>Treatment was done of the Left Hip as a P.I. Using the Drops. The T-5,6 and T 10,11 areas were done Prone. Done C 2,6 in the Supine Position. Then done an Anterior of the T 4,5 area on the Left. Patient felt a lot better after treatment.<br><br>The assessment is to see the patient 2 x's/wk for the next month.<br><br>So I will see the Patient in 3 days. |
| 8-2-18 | Patient noticed that he was a little sore the evening after treatment. Then was some better afterward for a short time. Then his condition Came back again. The headaches calmed down some also, but still there some.<br><br>Exam showed a slight Low Left Hip. There is decreased range of motion to the T-Spine at the T 10,11 and T 3,4 levels. Upon rotation to the Left. There is C-spine Pain at the C 5,6,7 area upon Left Lateral Tilt. There is lesser pain on the Right. There is also tenderness of the C 1,2 area upon Palpation.<br><br>Treatment was done of the T 10,11 and T 4,5 areas in the Prone Position. The C 2,6,7 areas were done Supine. The Left Hip was done on the Side. Then an Anterior was done of the T 3,4 area on the Left.<br><br>His ability to move his Neck and Left arm were better after treatment.<br><br>I will see the patient again in 4 days. |
| 8-6-18 | Patient stated that he felt some better for a longer time period. It was lasted for about a day before coming back. He now has the original Pain in the upper back and Neck. More on the Left side as usual. Also Left arm. headaches are still some.<br><br>Found the patient to have the slight Low Left Hip with tension. There is tenderness of the T-9,10 area upon palpation. The T 3,4 area is painful on the Left. Not as much on the Right, and less than before. Found upon Lateral Head Tilt The C 2,6 area was tender upon Palpation and C-Spine Rotation bi-Lateral. The Left arm has diminished movement. |

**Lincoln/Bunch 1237**

Other Records

## INFORMED CONSENT FOR CHIROPRACTIC CARE

I hereby request and consent to the performance of chiropractic adjustments and other chiropractic procedures, including various modes of physical therapy and diagnostic x-rays, on me (or the patient named below, for whom I am legally responsible) by the doctor of chiropractic named below, other licensed doctors of chiropractic, or other staff members who now or in the future work at the office listed below or any other associated office.      If participating in the NRCT program,   I further understand that this technique has not been approved by the Colorado Board of Examiners and may be considered experimental. ____ MS (initials)

I understand and am informed that, as in the practice of medicine, the chiropractic adjustments or other clinical procedures are usually beneficial and seldom cause any problems.  There are some risks to treatment, including but not limited to fractures, disc injuries, strokes, dislocations and sprains.  I do not expect the doctor to be able to anticipate and explain all risks and complications, and I wish to rely upon the doctor to exercise judgment during the course of the procedure which the doctor feels at the time, based upon the facts then known to him, is in my best interest.   It is my responsibility to make known any conditions that might not come to the attention of the doctor.  There has been no promise, implied or otherwise, of a cure for any symptom, disease or condition as a result of treatment in this clinic, and I understand that results are not guaranteed. ____ MB (initials)

Chiropractic is a science, philosophy and art which concerns itself with the relationship between structure (primarily the spine) and function (primarily the nervous system) relative to range of motion, muscular and neurological aspects, as the relationship may affect the restoration and preservation of health.  Health is a state of optimal physical, mental and social well-being, not merely the absence of disease, pain or infirmity.  I understand that the chiropractor will use his hands or a mechanical device upon my body to adjust a joint, which may cause an audible "pop" or "click". ____ MB (initials)

Neither the practice of chiropractic or medicine is an exact science, but relies upon information related by the patient, information gathered during examination, and the doctor's interpretation thereof, as well as the doctor's judgment and expertise in working with like cases.   If during the course of care, we encounter non-chiropractic or unusual findings, we will advise you of those findings and recommend that you seek the services of another health care provider. ____ MS (initials)

I understand that my consent need only be obtained one time for my present condition and any future condition(s) for which I may seek treatment.  I also understand that I can revoke this consent at any time in writing for all future procedures.  I also understand that any video or photographic material I may appear in, may be used for documentation and for any way this office sees fit to further research and awareness.  If I decline to sign this consent this office has the right to refuse to render care. ____ MK (initials)

I have read, or have had read to me, this Informed Consent for Chiropractic Care.   I have had the opportunity to ask questions about its content, and have had my questions explained to my satisfaction in a way that I can understand. By voluntarily signing below I agree to the above named procedures regarding my care in this office and am authorizing them to proceed with any treatment they may deem necessary in my case. ____ MR (initials)

PREGNANCY RELEASE:  This is to certify that to the best of my knowledge, I am not pregnant and the above doctor (and associates) has my permission to perform an x-ray evaluation if deemed necessary.
I have been advised that x-ray can be hazardous to an unborn child.
Date of last Menstrual Cycle: ____ n/a ____  Initials: ____ MR

I authorize the Doctor's office to release personal, financial &/or health information, if requested, to:

____ Nikki Giordano  447-5991 ____          ____ Fiance ____
                                                        Relationship

____ [signature] ____                   ____ Mark Bunch ____          ____ ____
Signature of Legal Representative         Patient Name                Witness
(Attorney-in-fact, guardian, parent if minor)

____ ____          ____ ____          ____ ____          ____ ____
Name (printed)          DOB          Signature          Date

                                                        **Lincoln/Bunch 1238**

Other Records



# Arkansas Valley Chiropractic Center

760 Piedra                    Canon City, Colorado 81212                    275-8109

DR. M. V. CHRISTIANSEN                    FINANCIAL POLICY

This is an agreement between Arkansas Valley Chiropractic of Canon City, as creditor, and the Patient/Debtor named on this form.

In this agreement the words "you," "your," and "yours" mean the account that has been established in your name to which charges are made and payments are credited. The words "we," "us," and "our," refer to Arkansas Valley Chiropractic.

**STATEMENTS:** If you have a balance on your account, we will send you a statement each month. It will show separately the previous balance, any new charges to the account, the finance charge, if any, and any payments or credits applied to your account during the month.

**PAYMENTS:** Unless other arrangements are approved by us in writing, the balance on your statement is due and payable when the statement is issued, and is past due if not paid by the end of the month.

**CHARGES TO ACCOUNT:** We shall have the right to cancel your privilege to make charges against your account in the event that your account becomes delinquent. Future visits would then need to be paid at the time of service.

**PAYMENT OPTIONS:** Payment methods accepted by this office include cash, check, or money order. Our office also accepts credit card payments at this time.

**INSURANCE:** Insurance is a contract between you and your insurance company. We are NOT a party to this contract, in most cases. We will bill your primary insurance. It is the insurance company that makes the final determination of your eligibility. You agree to pay any portion of the charges not covered by insurance. It is your responsibility to notify our office any time a change is made to your insurance coverage. We ask that you have your insurance card (s) available for our staff to photocopy for billing purposes.

**DIVORCE:** In the case of divorce or separation, the party responsible for the account prior to the divorce or separation remains responsible for the account.

**FINANCE CHARGE:** A finance charge may be imposed on each item of your account which has not been paid within thirty (30) days of the time the item was added to the account as a patient responsibility. The FINANCE CHARGE will be computed at the rate of one percent (1%) per month or an ANNUAL PERCENTAGE RATE of twelve percent (12%). The finance charge on your account is computed by applying the periodic rate (1%) to the "overdue" balance of your account. The "overdue" balance of your account is calculated by taking the balance owed thirty (30) days ago, and then subtracting any payments or credits applied to the account during that time. The minimum Finance Charge is $50.00.

**Lincoln/Bunch 1239**

Other Records

**PAST DUE ACCOUNTS:** If your account becomes past due, we will take necessary steps to collect this debt. If we have to refer your account to a collection agency, you agree to pay all of the collection costs which are incurred.
If we have to refer collection of the balance to a lawyer, you agree to pay all lawyer' fees which we incur plus all court costs. In case of suit, you agree the venue shall be in Fremont County, Colorado.

**RETURNED CHECKS:** There is a $15.00 fee for any returned by the bank.

**MISSED APPOINTMENTS:** Patients with three missed appointments that were not previously cancelled or rescheduled may be asked to transfer their records to another doctor.

**WAIVER OF CONFIDENTIALITY:** You understand if this account is submitted to an attorney or collection agency, if we have to litigate in court or if your past due status is reported to a credit reporting agency, the fact that your received treatment at our office may become a matter of public records.

**TRANSFERRING OF RECORDS;** Any request to release records must be in writing.

**WORKERS COMPENSATION:** We require written approval/authorization by your employer and/or worker's compensation carrier prior to your initial visit. If your claim is denied, you will be responsible for payment in full.

**PERSONAL INJURY:** If you are being treated as part of a personal injury lawsuit or claim, we require verification from your attorney prior to your initial visit. In addition to this verification, we require that you allow us to bill your health insurance. In the absence of insurance, other financial arrangements may be discussed. Payment of the bill remains the patients responsibility. We cannot bill your attorney for charges incurred due to a personal injury case.

**EFFECTIVE DATE:** Once you have signed this agreement, you agree to all the terms and conditions contained herein and the agreement will be in full force and effect.

By signature below, I acknowledge that I have read the entire financial agreement and understand the terms contained in this **FINANCIAL POLICY.**

| | |
|---|---|
| _Mark K_____ | _m.____ |
| Patient's Name (Please Print) | Responsible Party |
| _Mark Emil G_____ | _7/20/18____ |
| Signature of Responsible Party | Date Signed |

**Lincoln/Bunch 1240**



NAME Bunch, Mark    M ✓    F _____    DATE 7/30/3 (10)    R. W/C

STREET _____ CITY _____ ST. __ __ ZIP

TELE. _____    OCCUPATION Sales _____ MARITAL M

BIRTH DATE _____ __ ___ AGE 54 REF. BY _____

SYMPTOMS _____

INJURY _____

**Lincoln/Bunch 1241**

# Quality Assurance Report

## Request Information

Report Date:    August 20, 2018                              RP ID: **4402351**

Patient Name:    BUNCH, MARK

Provider Name: CHRISTIANSEN, DR MICHAEL

## Quality Assurance Information

Scope Requested: **From February 1, 2018 to Present**

Special Request:
    Seen by: Dr. Michael Christiansen

Special Request Included? YES

Secondary Request Confirmed? YES

QC Notes:
    pt was seen thrice within the scope    Scanned in the
    best quality possible.

Chart Reviewed By:  ASANT

**Lincoln/Bunch 1242**

**ReleasePoint**

**Medical Record Overview**

**Date:**     **August 16, 2018**

**Patient Name:**     BUNCH, MARK

**Records From:**     Dr. Thomas Higginbotham          **RP ID:** 4402353

,                                                 **Client ID:** 8220685
(719) 260-8109
                                                  **Source:** LIBMT3
**Request Scope:**     From February 1, 2018 to Present
                                                  **Req By:** K Carter
**Chart Range:**     02/13/2018 - 08/13/2018                  Kayla Carter


                                                  **SSN:**

|  |  |  |  | **Starts on** |
| --- | --- | --- | --- | --- |
| **Classification** | **From** | **To** | **Total** | **Page** |
| Progress Notes | Feb 13 2018 | Aug 13 2018 | 84 | 2 |
| Labs/Diagnostics | Feb 13 2018 | Mar 13 2018 | 2 | 86 |
| Other Records |  |  | 7 | 88 |
| Request Corr. |  |  | 1 | 95 |

**Total Page Count:**     94

**Notes From QC:**

**Lincoln/Bunch 1243**

# PSYCHOLOGICAL COUNSELING & CONSULTING, P. C.
## Herman Staudenmayer, Ph.D.

Colorado License Number 684

Offices:

UMB Bank Building
101 N Cascade Ave, Atrium Level #4
Colorado Springs, CO 80903

411 Colorado Avenue
Pueblo, CO 81004

Phone: 303-758-8934

Fax: (303) 736-4373

Email: herman.staudenmayer@gmail.com

## TREATMENT NOTE

Client: Mark Bunch
DOS: 08-13-18
Claim #: 5070376
DOB:
DOI: 02/13/2018
Diagnoses: (F54) Psychological factors affecting other medical conditions

Mood is dysphoric, affect appears distressed. To accommodate his visual difficulties, florescent lights were turned off in my office. I reviewed my psychological evaluation report with the patient and gave him a copy that I summarized for him because he could not read it. I went through my initial impressions and explain to him why the MMPI-2 RF was invalid, showing him how scales are standardized and that his presentation of such high levels of symptomatology are unrealistic. He did not seem resistant to this assessment and stated "I answered the questions to way I felt." I explained to him that even veterans with PTSD do not have such high scores on the validity scales. He seemed to understand this explanation and did not object to it. We discussed possible motives to over-report symptoms, one of which was "a cry for help." This seemed to resonate with him.

We explored his trauma history further because he had indicated on social history that he had 2 assaults while working for the DOC. He states that the first one, when he was stabbed in the leg, occurred in 1990 and he has complete recollection of it. The second one, when he was stabbed in the abdomen occurred in 1993 and he has no recollection of the event. He recall waking up in the hospital. He has never bothered to retrieve the incident report of this assault from the prison records, but it may be available. He states that after this assault he had significant disturbing dreams and nightmares with flashbacks. When he return to work he was extremely hypervigilant and could not tolerate going back into the inmate population. His marriage deteriorated and he divorced shortly thereafter and left the DOC. His description suggests symptoms of trauma consistent with PTSD.

I asked him if there were any other traumatic particularly in childhood. He thought about it for a while and then offered an experience he had when he was about 8 or 9 years old. He had gone hiking by himself in the foothills and accidentally fell into a dry well. The well was so deep that he could not get out and he spent the night terrorized at the bottom of the well. He states that at that time he thought he would die. He does not recall how he was rescued but he was told that fireman came to get him. He states that he had nightmares thereafter from this experience through his teenage years. He was taken to see the family doctor who told his mother to read stories to him before he goes to bed. He never had any kind of psychological treatment for this.

Based on this updated assessment, he meets criteria for complex PTSD, a diagnosis is not in DSM 5 but is under review for inclusion in the next version of the DSM.

I explained to him the nature of how trauma memories, particularly sensory and emotional memories, are stored and how they are interconnected by association pathways such that a recent experience can trigger the others. It appears that the motor vehicle accident was traumatic enough it its own right, but also rekindled past associated experiences and traumatic symptoms.

I indicated to him that my assessment does not preclude a head injury and this would have to be assessed by his doctors. However, given the extreme overreporting bias, further neuropsychological testing would be of no benefit.

I presented treatment options and explained the method of trauma therapy including reliving the experience with imagery and exposure. He stated that he is motivated to participate in treatment and wants to get better because he is tired of feeling so terrorized all his life. He is scheduled in one week, August 20.

Time of session was 60 minutes, 3:00-4:00 PM. More than 50 % of time was spent face-to-face with the patient.

Disclaimer: This record was transcribed using voice recognition software and some errors may have been inadvertently missed during proofreading. Please contact me for corrections of major errors.

Lincoln/Bunch 1244

Progress Notes - 08/13/2018                    8/13/2018 4:01:53 PM MST    13037364373  From: Psychological Counseling & Consul

*[signature]* PhD

Herman Staudenmayer PhD

cc:    Thomas Higginbotham DO
       Landon Wallis ESIS
       Kenneth Shakeshaft, Esq.

---

Disclaimer: This record was transcribed using voice recognition software and some errors may have been inadvertently missed during proofreading. Please contact me for corrections of major errors.

**Lincoln/Bunch 1245**

Progress Notes - 08/06/2018        9-2018(THU) 12:03        13037364373        P.002
To:    Page 2 of 8                  8/9/2018 12:06:23 PM MST    13037364373  From: Psychological Counseling & Consul

# PSYCHOLOGICAL COUNSELING & CONSULTING, P. C.
## Herman Staudenmayer, Ph.D.

Colorado License Number 684

Offices:        UMB Bank Building                      411 Colorado Ave
                101 N Cascade Ave, Atrium Level #4     Pueblo, CO 81004
                Colorado Springs, CO 80903

Phone:  (303) 758-8934  Fax: (303) 736-4373  Email: herman.staudenmayer@gmail.com

## PSYCHOLOGICAL EVALUATION

Client:          Mark Bunch
Address:

Phone:
DOB:
Age:             54
SS#:             *
Referral:        Thomas Higginbotham DO        F: 719-260-6086
DOI:             02/13/2018
Insurance:       ESIS
Adjuster:        Landon Wallis     landon.wallis@esis.com
Claim #:         5070376
Date Evaluated:  08-06-2018

## MEDICAL RECORDS REVIEW

### Thomas Higginbotham DO

**History of Presenting Condition, 05/03/18:** On 02/13/2018 patient was involved in a motor vehicle accident as he was coming off a freeway exit ramp and the car in front of him backed up at the light and crashed into him. He states his vehicle was eventually completely totaled. He denies loss of consciousness. He presents head trauma, his forehead hit the steering wheel forcibly. He recalls being dazed and stunned momentarily. He did notice the other driver preparing to leave the scene of the collision. He gave chase for about 1 mile that involve going down the road and then turning into a shopping center and around a shopping center until the other driver finally stopped. He states he was attempting to take pictures of the other vehicle's license plate when he gave chase. He called 911 and about 20-25 minutes later, the police came. He also summoned his boss who also came about the time that the police arrived. He did not get out of the vehicle but wanted to take pictures of the other car. When he stepped out, he held onto the door and took pictures and sat back in the vehicle. He attempted to get out of the vehicle when his boss arrived. He became dizzy and fell to the ground. He does not recall this but was reminded about the incident by his boss. He began noticing pain and discomfort immediately. He experiences pain about the head and neck. His boss helped him deal with the police report. His boss transported him to the Parkview Medical Center emergency department. He does not recall much of those events. He does not recall much of the trip to the ED. When he got out of the vehicle to walk to the ED, he lost his balance got dizzy and fell. According to his boss who told him later, several people assisted him up onto a wheelchair and into the emergency department room. He has poor recollection of those events. At the emergency room he received diagnostics that included a CT of the head and neck. He recalls having visual difficulties with the left eye. He recalls having difficulties dealing with bright fluorescent lights. He recalls that there was some discussion as to whether they would admit him for observation but he was released after 6 hours.

He was initially treated by his PCP, Dr. Olson, who referred him to a neuropsychologist, Dr. Helffenstein. After about 2 weeks he was referred to Worker's Comp. He is not driving as he is disoriented with visual difficulties and with headache.

Symptoms are dizziness, headaches, muscle cramps, depression, nervousness, nausea, recent change in vision, blurred vision, photophobia, phonophobia with ringing in the ears, tiredness, trouble falling and staying asleep, and mood swings with panic attacks. He relates headaches and neck and back pains.

He relates sensitivity to fluorescent lights not only from their brightness but also from the sound.

Physical examination: patient indicates a positive Romberg. Blood pressure is 188/100

1

**Lincoln/Bunch 1246**

Assessment: Postconcussion sequelae with spacial disorientation, imbalance, headache, tinnitus, cognitive difficulties, and sound and light sensitivity.
He is referred to a neurologist and a neural optometrist.

**06/05/18 tx note Dr Higginbotham**: Mr Bunch and his fiancé feel victimized, affronted and adversarial as a consequence of the claim adjustor's actions in the private investigation. Apparently, the claim adjustor wanted to steer him to another provider for which she declined. There is an undertone of distress now.

**07/03/18 treatment note Dr. Higginbotham**: He states when he gets stressed, his headaches worsened and he gets tunnel vision. He reports photosensitivity and the offices blinds were brought down to minimize the light. Dr. Higginbotham reviewed Dr. Helffenstein's neuropsychological report and deemed it to be invalid because of the patient's visual difficulties, headaches and inability to concentrate and focus. He provided Mr. Bunch something to read but he could not see very well complaining of double vision and blurred vision cannot see the text. Eighth, "I cannot imagine him attending to detail questioning of validity testing, the lower psychometric testing with his visual difficulties." With corrective visual measures and lenses, his vision is in the midline and much improved. He was observed unknowingly, walking from the waiting room to the exam room and back without swelling or bumping into items. Fact, he was able to gaze to his right at a picture on the wall and maintain a straight course for the future for diffuse paces. This is something he had not been able to do before the corrective measures. Romberg's maneuver is equivocal. He is able to maintain the posture longer but still has sense of falling backwards. Tandem gait with heel-to- toe is improved but still marginal.

**Referral Request:** Evaluate and treat.

### Dennis Helffenstein PhD

**05/18/2018 Neuropsychological testing.**
**Victoria Symptom Validity Test:** Forced choice recognition test is 6/24, far below chance, which is concerning for intentional lack of effort.
**Tombaugh Test of Memory Malingering.** The TOMM trail 2 result was 27/50 correct, well below the cutoff of 45/50.
**The Beck Depression Inventory-2.** The BHI-2 total score was 45, a high score but contaminated by nonspecific items that may also reflect residual effects of post-concussion.
**DSM5 Diagnostic 20 item checklist for PTSD, PCL-5.** The total score was 79 out of a maximum possible score of 80.
DSM5 Diagnosis:
  1. Mild neurocognitive disorder due to traumatic brain injury with behavioral disturbance (331.83)
  2. Depressive disorder due to traumatic brain injury (293.83)
  3. PTSD (309.81)
Comprehensive neuropsychological testing was not attempted due to confounding factors.

### DIAGNOSTIC INTERVIEW
#### Mental Status and Behavioral Observations

**General Appearance.** Mr Bunch is a 54 yo, overweight, Caucasian male appearing his stated age. Appearance and dress were appropriate.
**Motor Behavior:** Gait normal. Posture sitting and standing unimpaired. Facial expressions changed with content (sad, tearful). Patient made eye contact.
**Energy Level:**   low
**Speech/Language:** Form was clear, fluent, logical, and coherent. Rate and response latency were normal. Quality was controlled. Content was responsive and the patient elaborated answers. Speech comprehension was normal. Language expression and vocabulary were appropriate. Patient demonstrated no word finding difficulty.
**Discussion of emotional material:** tearful, at times he stated he felt overwhelmed
**Demeanor:** Cooperative, agreeable, friendly, and focused.
**Rapport:** Easily established
**Unusual mannerisms:** Unusual behavior of placing reading material on the floor while seated so he could see it. He was wearing corrective lenses prescribed by Dr Sexarud but his behavior suggested little if any benefit.
**Interview style:**  Answers focused.
**Cooperation with testing:** Good effort

2

**Lincoln/Bunch 1247**

**Mood (Inquired):**
- unhappy
- tearful, sad
- depressed
- anxious, nervous
- hostile angry
- frustrated-
- irritable short-tempered
- reliving trauma anxiety

**Affect (observed):** dysphoric. Range: Blunted (decrease in emotional expression)

**Perception and Cognition:** Oriented to person, time, and place. Alert and attentive. Immediate and remote memory intact. Fund of knowledge intact.

**Thought disorder:** Absent for signs of loose associations, hallucinations, and delusions.

**Thought Process:** Coherent, logical, and goal directed

**Thought Content:** Denies suicidal thoughts, homicidal thoughts, thoughts of violence, and thoughts of persecution.

**Insight:** fair

### History of Injury

Consistent with medical record. I asked him to describe, to the best of his recollection, the experiences and feelings he had at the time of the impact during the motor vehicle accident and doing the ensuing chase of the hit-and-run driver. He stated that he felt like he was "watching myself from behind" [depersonalization]. In giving case, he stated "I was watching myself drive." He recalls following the other driver into a hardware store parking lot going West on Highway 50, which most likely was Lowes. He states he was trying to take a picture with his cell phone but he did not get any. He states that he does not recall being taken to the hospital and he does not recall vomiting in the emergency department. He did not become aware of this until the next day when he looked at his shoes which had been stained with vomit. States he was in the ED until 2-3 AM and he was released because "more serious cases came in." He states he lost vision in his left eye while in the ED. His boss had come to the scene and he drove him back to Canyon to his home. His boss's wife drove his car even though it had a punctured radiator.

### Past Medical History

| | |
|---|---|
| Prior related history of injury: | Denied |
| History psychological dx or tx: | Denied |
| History of alcohol/drug abuse: | Denied |

### Current Medical Conditions

He stated that his symptoms have improved during the past 6 months since the accident but he has significant dizziness, nausea, tinnitus, and difficulty with vision. He states that his vision has improved with the corrective lenses provided by Dr. Sexarud. He stated that his headaches have improved with chiropractic manipulation. He states that the chiropractor described him as "a train wreck."

### Current Psychological Conditions

He reports symptoms of emotional dysfunction including depression, anxiety, hostility, and PTSD.

### Family History

He was born and raised in Canyon city. His father was a Marine veteran of World War II. After his service, he was a highway patrolman. He defined his father as "stern, allowing no excuses." He stated that when his father became angry, his mood became ugly and he was a severe disciplinarian. He described his mother as a good mother who was a socialite and successful executive. One time she was the purchasing agent for the State of Colorado. He has one older sister by 7 years and one older brother by 16 years and he is estranged from both of them. He described them as "worthless." His mother died in 2007 and his father died in 2010, and he states he continues to grieve both of them. He has not talked to his siblings since their father's funeral. He denied all forms of adverse childhood experiences. Education is high school graduate, a bachelor's degree from the University of Southern Colorado, and a master's degree in business from the University of Phoenix.

### Social History

3

**Lincoln/Bunch 1248**

He states he has had a diverse professional career and has been working since age 12. At one time he was a journeyman press operator. He worked for the DOC from the late 1980s to the mid 1990s, achieving the rank of lieutenant and shift commander. During this time he experienced two assaults involving stabbing, one in the side requiring 28 stitches without organ damage. The other was a stabbing in the upper left leg and he states he still has a noticeable scar. When asked, he states he does not recall having symptoms of trauma after these assaults, but adds that he was never evaluated. After leaving the DOC, he went into sales including Yellow Pages advertisements and his last job was in cable sales when he had the MVA.

He married his first wife in 1989-1990 at age 26. They divorced after 7 years with no children. Both worked at the DOC and he stated the divorce was the reason why he left that department because she continued to work there. The second marriage was from 2000 to 2013 ending in divorce with no children. He is currently in a relationship with his fiancée and they had planned to marry the day after his motor vehicle accident. They had plans to fly to Hawaii that morning but he could not fly after his accident and the marriage has been postponed. They remain together, but he states that his injury and effects of the injury have put a strain on the relationship. He states that he is unable to talk to her about his condition. He asked me if I would have a collateral contact with his fiancée and I stated I would at some later time if both consented. He reports financial stress since not working. He states his income had been at the 6 figure level, and now is dramatically reduced since being on WC.

### PSYCHOLOGICAL TESTING

### MMPI-2-RF

**PROTOCOL VALIDITY**

**Infrequent Responses (F-r = 120).** Elevated scores are associated with over-reporting of a broad range of psychological cognitive, and somatic symptoms. This protocol is invalid.

### Montreal Cognitive Assessment (MOCA)

His score was 20 out of a possible 30. A normal score is 26 or greater. He showed impairment on the Visual/Spatial and Executive Functioning tasks (which required vision) and Language (does not require vision).

### Sport Concussion Assessment Tool 2 (SCAT2)

Concussion is defined as a disturbance in the brain function caused by a direct or indirect force to the head. It results in a variety of non-specific symptoms and often does not involve loss of consciousness (LOC). Concussion should be suspected in the presence of any one or more of the following:

- Symptoms (e.g., headaches)
- Signs (e.g., unsteadiness)
- Impaired brain function (e.g., confusion)
- Abnormal behavior

The SCAT2 represents a standardized method of evaluating injured athletes for concussion and is a Post-Concussion Symptom Scale. There are 22 symptoms associated with concussion. The rating is made on a seven point scale from 0 = no symptoms, 3 = moderate, 6 = severe. Rate the symptoms for the **past 24 hours**. Maximum score is 132.

1. Headache                4
2. Nausea                  4
3. Vomiting                0
4. Balance problems        4
5. Dizziness               4
6. Fatigue                 5
7. Trouble falling to sleep 5
8. Excessive sleep         0
9. Loss of sleep           5

4

**Lincoln/Bunch 1249**

10. Drowsiness                4
11. Light sensitivity         5
12. Noise sensitivity         5
13. Irritability              5
14. Sadness                   5
15. Nervousness               4
16. More emotional            5
17. Numbness                  2
18. Feeling "slow"            5
19. Feeling "foggy"           5
20. Difficulty concentrating  5
21. Difficulty remembering    4
22. Visual problems           5

Total score:      90
The mean score of 22 items:      4.1
Conclusion: Mr Bunch reports severe post-concussion symptoms including neurological, emotional, and cognitive impairments.

## PCL-5

The PCL-5 PTSD checklist for DSM-5 is a 20 item self-report measure that assesses the presence and severity of PTSD symptoms. Items on the PCL 5 correspond with DSM-5 criteria for PTSD. Respondents are asked to rate how bothered they have been by each of 20 items in the PAST MONTH on a 5-point Likert scale ranging from 0-4. Items are summed to provide a total severity score (range equals 0–80). A recommended cut-off indicating an elevated total score is 38. Annotated comments in square brackets are not on the questionnaire, but rather reflect basic constructs in trauma.

0 = not at all      1 = a little bit      2 = moderately      3 = quite a bit      4 = extremely

| Question | Score |
|---|---|
| 1. Repeated, disturbing and unwanted memories of the stressful experience? [**Intrusive thoughts**] | 4 |
| 2. Repeated, disturbing dreams of the stressful experience? [**Nightmares**] | **3** |
| 3. Suddenly feeling or acting as if the stressful experience were actually happening again (as if you were actually back there reliving it)? [**Flashbacks**] | 3 |
| 4. Feeling very upset when something reminded you of the stressful experience? [**Triggers**] | 3 |
| 5. Having strong physical reactions when something reminded you of the stressful experience (for example, heart pounding, trouble breathing, sweating)? [**Panic**] | 4 |
| 6. Avoiding memories, thoughts, or feelings related to the stressful experience? [**Avoidance**] | 3 |
| 7. Avoiding external reminders of the stressful experience (for example, people, places, conversations, activities, objects, or situations)? [**Avoidance**] | 3 |

5

**Lincoln/Bunch 1250**

8.  Trouble remembering important parts of the stressful experience?  [Dissociation]          3

9.  Having strong negative beliefs about yourself, other people, or the world (for example, having thoughts such as: I am bad, there is something seriously wrong with me, no one can be trusted, the world is completely dangerous)?  [Self-Incrimination, Paranoid ideation]          9

10.  Blaming yourself or someone else for the stressful experience or what happened after it? [Blame]  3

11.  Having strong negative feelings such as fear horror, anger, guilt, or shame? [Negative emotions]   4

12.  Loss of interest in activities that you used to enjoy?  [Anhedonia]          4

13.  Feeling distant or cut off from other people?  [Estrangement]          4

14.  Trouble experiencing positive feelings (for example, being unable to feel happiness or have loving feelings for people close to you)? [Lack of positive feelings]          3

15.  Irritable behavior, angry outbursts, or acting aggressively?  [ Hostility]          3

16.  Taking too many risks or doing things that could cause you harm? [Recklessness]          2

17.  Being "super alert" or watchful or on guard?  [Hypervigilance]          3

18.  Feeling jumpy or easily startled? [Hyperactive stress response]          3

19.  Having difficulty concentrating? [Cognitive dysfunction]          3

20.  Trouble falling or staying asleep? [Poor sleep]          4

**Total score( Max = 80):   66**          **Average Score: 3.3 "Quite a bit to Extremely"**

## SUMMARY AND CONCLUSIONS

### Initial Impressions

1.  Mr Bunch presents in distress, with some unusual, bizarre mannerisms that he attributes to visual impairment. During interview, he showed no lapses in thinking or impaired cognitive processing that I could detect. The interview was conducted in a room with no fluorescent lights and only lamps with incandescent bulbs which he stated he tolerates. All of the psychological testing and questionnaires were administered orally and he did not have read any of the material. The only exception was the MOCA for the Trails B test and the Copy Cube test.
2.  He reports symptoms of cognitive dysfunction that he attributes to postconcussion effects. He is 6 months post injury.
3.  He reports thoughts and feelings of emotional dysfunction that he attributes to the injury as well as the impact on his daily functioning. He is not working at this time and reports financial distress.

6

**Lincoln/Bunch 1251**

4. Family history indicates he grew up in a very strict disciplinarian environment with a father who was prone to physical discipline and mother who appeared to be absent consumed by her career and "socialite" activities. He does not have a good relationship with his 2 older siblings and has not talked to them in over 10 years since the death of his father. He continues to grieve the loss of his parents after 10+ years.

5. Social history indicates 2 failed marriages without children. He is currently in a relationship with his fiancé and they had planned to marry, scheduled to leave for Hawaii the day after his accident. That marriage has been postponed. He states there has been significant impact from his injury on their relationship. He reports 2 incidences of assault during his time at the DOC both involving stabbing. He does not recall if he had symptoms of trauma after these events.

6. The MMPI2-RF was invalid because F-r =120, indicating over-reporting of psychiatric, somatic, and cognitive symptoms

7. The Sport Concussion Assessment Tool 2 (SCAT2) results indicate he reported severe post-concussion symptoms including neurological, emotional, and cognitive impairments approximately 6 months post injury.

8. The PCL-5 indicate he reported a high level of trauma symptoms indicating he meets DSM5 Criteria B, C, and D for a diagnosis of PTSD. Criteria A is based on the MVA, which he perceived to have been significant based on his description of depersonalization during the accident.

9. The bias to over-report symptoms on the MMPI2-RF suggests the self-reported symptoms on the PCL-5 and the SCAT2 are not valid.

10. The bias to over-report symptoms precludes recommendation for comprehensive neuropsychological testing at this time.

11. The patient may benefit from psychotherapy to address the bias and its motivation.

### Summary

Mr Bunch was involved in a MVA and was referred for a psychological evaluation and screening for comprehensive neuropsychological testing. Mental Status Exam suggest exaggeration and adopting the sick role. Psychological testing indicated that his self-report reflects over-reporting bias, making the self-reported symptoms invalid. Comprehensive neuropsychological testing is contraindicated at this time. He may benefit from psychotherapy to address these issues.

### Working Diagnoses

(F54) Psychological factors affecting other medical conditions

### Treatment Recommendations/Plan

Cognitive Therapy was reviewed with the patient and he expressed interest in treatment. The patient may benefit from cognitive therapy. I recommend an initial course of 8, 1hr. sessions of counseling with me. He is scheduled for a debriefing session to review my evaluation next week on 08/13/18.

### Time Allotment

90 minutes were spent on diagnostic interview. 2 1/2hours were spent on psychological testing and interpretation of results. More than 50% of my time was spent face-to-face with the patient in clinical interview and psychological testing.

Thank you for the opportunity to evaluate this patient. If you have any questions, please feel free to call or email me.

Respectfully Submitted,

Herman Staudenmayer, PhD

cc:     Thomas Higginbotham DO
        Landon Wallis ESIS
        Kenneth Shakeshaft, Esq.

7

**Lincoln/Bunch 1252**

Progress Notes - 07/31/2018

BUNCH, Mark                                                        **WC/MVC**
07/31/18
DOB:

S:    Mr. Bunch is here for further evaluation and treatment for injuries
      related to a work related motor vehicle collision.  He is accompanied
      by his fiancée, Nikki.  They were brought here through arranged
      transportation.

      I received correspondence from Dr. Staudenmayer, psychologist, of an
      appointment scheduled for him on 08/06/2018.  I am awaiting
      correspondence from the neuro-optometrist, although he did leave a
      phone message stating that Mr. Bunch's eye conditions are definitely
      related to his head trauma from this WC-MVC.

      He continues with physical therapy.  We are still waiting for
      authorization for speech/cognitive therapy.  We are still awaiting
      authorization for the neurologist.

      He continues to be restricted from driving and relates that he has
      not driven.  He is requesting medication refills for anti-
      inflammation and muscle relaxation.  He has avoided the use of any
      opioid medications for pain.

      He still persists with headache and left-sided neck discomfort with
      stiffness.  He does relate that he has been responding to physical
      therapy.  There are still difficulties with cognition, memory, and
      balance.

O:    He is wearing the corrective spectacles.  He is still having some
      difficulty with focus.  Midline testing is still aberrant being about
      an inch off midline bilaterally.  Balance is suboptimal.  He dozed
      off a few times in the office and waiting room.  He has been using
      the nutritional supplements as recommended.

      General counseling was provided.  They are appreciative of the
      psychologic consultation scheduled next week.

A:    TBI with altered consciousness
      TBI with neurocognitive disorder G31.84
      TBI with emotional/behavioral disturbance and change F59
      TBI with visual difficulties with spatial neglect disorientation
            H53.30
      Persistent cervicalgia M54.2
      Persistent cervical strain S 16.1XXD

**Lincoln/Bunch 1253**

Progress Notes - 07/31/2018

Page 2
BUNCH, Mark
07/31/18

P:     He will return in 2-3 weeks for follow-up.   The psychologic
       consultation is scheduled for 08/06.   He follows-up with the neuro-
       optometrist on 08/17/18.   He is to continue with physical therapy.   I
       recommend sleep/cognitive therapy and will await the opinion of the
       psychologist.

       I gave him a prescription for topical 4% diclofenac in 40% DMSO gel-
       base.  I don't believe he filled the first prescription.   I refilled
       the Flexeril 10 mg, #30 with one refill.   I refilled the triple drug
       combination of betamethasone 0.75 mg, Robaxin 215 mg and indomethacin
       25 mg, #10.

       Reassurances were given.  He remains limited with no driving.

Thomas Higginbotham D.O.

**Lincoln/Bunch 1254**

Progress Notes - 07/17/2018

BUNCH, Mark                                                                    **MVC/WC**
07/17/18
DOB:

S:    Mr. Bunch had his neurooptometry evaluation yesterday. He was
      provided corrective lenses and other measures for his vision
      difficulties. I await the neurooptometrist's report. He has noted
      marked improvement with the corrective lenses already. In fact, last
      night and this morning, he was able to watch the news on TV. He has
      not been able to focus well enough to watch TV since the accident.
      He has avoided reading because of visual difficulties. This, no
      doubt, affected his initial neuropsychologic testing which was
      invalidated. This may have led to misinterpretation by respondent
      attorney. It is important for a neuropsychologist to fully appreciate
      any medical conditions that may affect testing measures.

      The previous video surveillance capturing him driving 0.4 miles from
      his home did not entail him going to a grocery store or to a pawn
      shop but rather to the car repair shop to discuss further details on
      repairing his vehicle. He apparently was told by the
      neurooptometrist not to drive. There is a follow-up appointment in
      one month.

      He is more alert and oriented today. Headaches seem to be improved.
      He still has neck stiffness and discomfort. He still is undergoing
      physical therapy.

      We have not heard from the referral for speech therapist for
      cognitive behavioral therapy for his head injury or the
      neuropsych/psychologist evaluation. I placed a call in to his
      attorney asking for the status of these referrals; we have been
      playing phone tag in the last day or so.

      Mr. Bunch still relates of sensory overload with photosensitivity and
      with motion resulting in headache and dizziness.

O:    With the corrective visual measures, his vision is in the midline and
      much improved. He was observed unknowingly, walking from the waiting
      room to the exam room and back without swaying or bumping into items.
      In fact, he was able to gaze to his right at a picture on the wall
      and maintain a straight course for the few paces. This is something
      he had not been able to do before the corrective measures.

      Romberg's maneuver is equivocal now. He is able to maintain the
      posture longer but still has a sense of falling backwards. Tandem
      gait with heel-to-toe is improved but still marginal.

**Lincoln/Bunch 1255**

Progress Notes - 07/17/2018

Page 2
BUNCH, Mark
07/17/18

Cervical range of motion is limited and with palpatory tenderness about the paraspinal, suboccipital and scalp musculature as well as about the suprascapular regions bilaterally. Deep tendon reflexes are symmetrical. He has negative Spurling's maneuver.

A:    History of closed head injury with,
       Neurocognitive disorder, improved G31.84
       Emotional/behavioral disturbance and changes, improved F59
       Visual difficulties with spatial neglect and disorientation
       with early improvement with corrective lenses H53.30
       Cervicalgia M54.2
       Cervical strain S16.1 XXD
       Cephalgia, posttraumatic and intermittent in improved G 44.311

P:    I hope we can get on track with referrals for neuropsych, psychologist and speech therapy. He is to continue with the physical therapy. He is precluded from work as he is precluded from driving. He will follow up with the neuro-optometrist in one month.

Upon his queries, we discussed MMI, impairment, and disability issues. Self-care strategies were reviewed. I encouraged that he continue with the memory improving exercises we've discussed over our visits.

Thomas Higginbotham D.O.

CC:    WC Adjuster
      Atty. Pollart
      Atty. Shakeshaft

*pt received a copy on 7/31/18 PM*

820/900 'd          9809 092 611(XBJ)          WHHTOBNI99IH 80    02:Pl (NHT)8102-91-9NB

**Lincoln/Bunch 1256**

**Progress Notes - 07/03/2018**

BUNCH, Mark                                                      WC MVA
07/03/18
DOB:

S:    Mr. Bunch  returns for a follow-up visit after last seeing him on
      06/19/2018.  He is about 30 minutes late for his appointment, and he
      is frustrated with the tardiness of the prearranged driver.

      He relates that when he gets stressed, his headaches worsen and he
      gets tunnel vision.  He denies any of these complexes happening prior
      to his motor vehicle collision.  He relates that he rarely took an
      Advil perhaps only after many hours of working hard in his property.

      I relayed the gist of the SAMMS conference on 06/22/2018.
      Unfortunately, my recommendations for a neurologist, a neuro-
      optometrist and a neuropsychologist/psychologist has not happened to
      date.  He was able to get the rescheduled appointment for the other
      neuro-optometrist earlier on 07/16 instead of 07/26.  The initial
      referral was made on 05/03/2018.

      He is attending to physical therapy and they are doing balance
      exercises.  He has also not heard about the speech therapy referral.

O:    He is with photosensitivity and the office blinds were brought down
      in to minimize the light.  He holds his head in his hands,
      complaining of a throbbing headache.  His gait is slightly unsteady.
      He cannot attend to left-sided finger-to-nose testing even while
      watching the finger.  He still persists with a midline visual shift
      on testing.  The Romberg's testing is improved in that he doesn't
      fall readily backwards, but he does rock and reel and must catch
      himself a couple times during the 10 second test.

      I reviewed Dr. Hellfenstein's report, and it is likely invalid
      because of his visual difficulties, headaches and inability to
      concentrate and focus.  I believe these issues were brought up by Dr.
      Helffenstein.  I believe the respondent attorney finds the word
      'invalid' as meaning something else.  Probably the basic premise that
      a neuropsychologist is to understand the nature of the medical
      conditions that are present when evaluating a person for
      neuropsychologic sequela from a head injury.

      When I provided Mr. Bunch with something to read, he can't see it
      very well, complaining of double vision and blurred vision and moves
      the paper and his neck in angles in order to see it and, even when he
      sees it, he cannot maintain his glance but for a couple seconds.

**Lincoln/Bunch 1257**

Progress Notes - 07/03/2018

Page 2
BUNCH, Mark
07/03/18

I cannot imagine him attending to detailed questioning of validity testing, let alone psychometric testing with his visual difficulties.

A:    Concussion with
        Emotional and behavioral disturbance and changes F59
        Neurocognitive disorder G 31.84
        Visual difficulties with spatial disorientation H53.30
    Cervicalgia M 54.2
    Cephalgia, posttraumatic and intermittently intractable G 44.311

P:    I will contact his attorney regarding the status of these referrals

I described a potential worker's comp scenario in an attempt to prepare him. This is a possible scenario whereby the adjuster and the respondent attorney doubt his veracity enough to schedule a flurry of independent medical evaluations that will no less discredit him and all involved. Only to run months later an ALJ undoubtedly will rule in his favor because of how these circumstances prevail. He needs to get his finances in order and prepare his fiancée for this as well. I invited his fiancée to his next visit.

I reiterated self-directed strategies. I would like to see him again in 2 weeks, the day or so after his neuro-optometry evaluation.

Thomas Higginbotham D.O.

cc:    WC carrier
        Atty. Pollart
        Atty. Shakeshaft
        Dr. Saxerud

7/17/18

Lincoln/Bunch 1258

**Progress Notes - 06/22/2018**

BUNCH, Mark                                          **WC MVC**
06/22/18
DOB:

I had a 30 minute SAMMS conference with Attorneys Pollart and Shakeshaft.
Questions were raised about his PI surveillance with him driving 0.4 miles
from his home to a pawn shop.  I had surmised that he went out for food and
personal items.  Concerns were raised about my treatment plan.  The referrals
were discussed.  They will forward me Dr. Hellfenstein's neuropsych
evaluation which apparently was invalid.

Thomas Higginbotham D.O.

**Progress Notes - 06/19/2018**

MVC/WC

BUNCH, Mark
06/19/18
DOB:

S:    Mr. Bunch returns for a follow-up visit for injuries stemming from a work-related motor vehicle collision. He was last seen on 06/05/2018.

In the interim, I reviewed a short video and commented about that on a separate dictation. I shared with him my follow-up conversation with the neuro-optometry's office and shared that dictation to his attorney for assistance in expediting this neuro-optometry referral.

He denies any subsequent injuries. We haven't heard regarding the referral for a neuropsych evaluation. He continues with physical therapy and I received some notes from the therapist. The therapist apparently concurs with my concerns of visuals vestibular disruption related to his head injury. The therapist is working on strategies on helping Mr. Bunch. My hope is to have a neuropsych evaluation and based on the findings, direct cognitive-behavioral therapy through early speech-language pathologist.

O:    On observation of walking in and about the exam room and with positive Romberg's maneuver and balance testing, there are still concerns with coordination and proprioception. He still has a positive visual midline shift testing that regressed from the last visit and consistent with our initial visit. He relates of having a fall in physical therapy when trying to attend to some balance exercises while under the care of the therapist.

I took time discussing and recommending nutritional support for his condition. I reviewed briefly the DOWC Medical Treatment Guidelines for Traumatic Brain Injury. I noted that there is no consensual acceptance of specific nutritional supplements in the Guidelines and he likely will need to have to self-pay for these.

A:    Concussion with
          Emotional and behavioral disturbance/changes F59
          Neurocognitive disorder G31.84
          Visual difficulties with spatial disorientation H53.30
          Posttraumatic headache, not intractable G44.309
      Cervicalgia M54.2
      Cervical strain S16.1XXD

**Lincoln/Bunch 1260**

Progress Notes - 06/19/2018

Page 2
BUNCH, Mark
06/19/18

P:    I am concerned about the delays in the initial referrals for
      neurology, neuropsychology, and neuro-optometry and cognitive
      behavioral therapy.

      His visual-spatial disorientation is concerning that I again have
      recommended that he not drive unless absolutely necessary for urgent
      needs.

      He raised concerns about his ability to continue in his usual
      capacity with what he is experiencing presently.  He is about 17
      weeks past his motor vehicle collision.  He is not at MMI.  It is too
      early to assess permanent impairment but he does have concerns for
      such.

      I've asked that he return to see me in 1-2 weeks to continue review
      of self-care strategies, monitor his progress, and await
      authorizations for the referrals. (Time spent: 40 minutes with 100%
      of the time spent in face-to-face)

Thomas Higginbotham D.O.

Cc:   Mr. Bunch
      Atty. Ken Shakeshaft
      Landon Wallis, Adjuster

**Lincoln/Bunch 1261**

Progress Notes - 06/12/2018
From:

2-2018(TUE) 12:44

06/12/2018 12:49     P. 002
#595 P.002/011

## St. Thomas More
## Rehabilitation Services
Centura Health.

St. Thomas More Hospital Campus
Phone: 719-285-2600
Fax: 719-285-2601
(Map on reverse side)

Patient Name: _Mark Bunch_     DOB: _____

Diagnosis: 1) _Chronic Neck Pain_  ICD9 Code: _M54.2_

2) _____     _G89.29_

3) _____     _____

**Speech Therapy Evaluation and Treatment**

☐ Speech and Language     ☐ Swallowing

**Therapy Services (PT/OT)**

☐ Wound/Burn Care          ☐ Vestibular Rehabilitation
☐ Home exercise            ☐ Hand/Wrist/Arm
☐ Joint Mobilization       ☐ Splint Fabrication
☐ Modalities as indicated  ☐ Orthotics
☐ Brace                    ☐ Inclinometer
☐ Soft tissue Mobilization ☐ Home Needs Assessment
☐ Therapeutic Exercise     ☐ Jobsite analysis
☐ Orthotics                ☐ Work Conditioning
☐ Pre-Op Eval              ☐ ROM/Strength Testing
☐ Lymphedema Therapy
☐ Pool Therapy

**Frequency:**

☐ Daily  ☐ 3x/wk  ☒ 2x/wk  ☐ PRN

Duration: _8 VISITS_

Special Instructions/Precautions: _PT Cont_

Physician Name: _Dr Thomas Higginbotham_
(please print)

Physician Signature: _____  Date: _6/12/18_

457942-0198                    11/12

P.002       (FAX)719 260 6086       DR HIGGINBOTHAM       12:49 (THU)8102-91-9UA

**Lincoln/Bunch 1262**

**Progress Notes - 06/11/2018**

BUNCH, Mark                                    **Video Surveillance Review**
06/11/18
DOB:

I reviewed the video surveillance video sent to me by the Claims Adjuster,
Landon Wallis.  This was dated 05/03/2018.  There was a short clip from
about 4 PM to 8 PM.  At 4:47 PM, it showed Mr. Bunch opened and closed a
gate  and  pulled  his  black  sedan  in  and  out  of  the  gate.   He  wore
sunglasses.  He walked short distances unencumbered.  At 4:58 he climbed
into his black sedan.

Thomas Higginbotham D.O.

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                          Encounter Date: 06/11/2018

# Bunch, Mark Bryan                                   MRN: CEUL0963303

**Treatment** 6/11/2018        Provider: Ethan J Freedman, PT (Physical Therapy)
St Thomas More Hospital       Primary diagnosis: Cervical pain (neck)
Outpatient Rehabilitation Dept  Reason for Visit: Referred by Steven Wayne Olson, MD

## Progress Notes                    Ethan J Freedman, PT (Physical Therapist) • Physical Therapy
Expand All   Collapse All


✚ **Centura Health**®

**St. Thomas More Hospital**
**Outpatient Rehabilitation**
**1338 Phay Avenue**
**Canon City, CO 81212**
**Phone: (719) 285-2000**
**Fax: (719) 285-2255**

---

**Physical Therapy Daily Note - Visit #8**

Treatment date: 06/11/18

Time Calculation
Start Time : 0755
Stop Time : 0835
Time Calculation (min): 40 min

Precautions: driving restrictions.

**Assessment/Plan:**

Difficulty coordinating supine punches actively and with weight, but was able to better control
tcord resisted punches. Patient reported that throughout session, whenever patient closes his
eyes, he feels the room spinning and then it accelerates the longer he is staying with his eyes
closed. Consider to treat more as an equilibrium issue, rather than a vestibular issue. Will
continue to assess if continued therapy is indicated.

**Subjective:**

**Subjective**

Mark Bryan Bunch is a 54 y.o. male c/o acute on chronic L sided cervical pain, muscle
restrictions post MVA.
Current pain rated at 4/10 and at worst since last session rated at 6/10 as stiffness. Patient
reported improved symptoms overall but was very sore after last session.

**Objective:**

Patient completed following exercises:
UBE lvl 4 x6 mins
Supine B scapular punches with 3# 3x10
Lvl 2 tcord punches 3x10
Parallel bars:

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 6/12/18 1:35 PM                          Page 1 of 2

**Lincoln/Bunch 1264**

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 06/11/2018

Firm surface shoulder width apart, romberg, tandem EO 3x20" ea with no LOB; EC with all situations caused LOB (inconsistent LOB direction with stepping and hip strategies with attempts to self correct plus MinA in <5 seconds).

Foam pad shoulder width apart, romberg,and tandem EO 3x20" ea with no LOB; EC shoulder width apart caused LOB in <2 seconds with hip/stepping strategies.

Seated Hautard's test: no arm drifting, but excessive trunk side bending to R and rotational compensations x3 trials.

MHP on thoracic and cervical spine x10mins

Consider quadruped stabilization as indicated.

Not today:
Manual x15mins:
        Supine: cervical SOR, B trap stretches, STM of suboccipital mm.
Lvl 2 tcord rows, extensions, reverse flys, diagonals, shrugs 2x10ea.
B UE 0.5kg ball CW/CCW circles 2x20ea.
Lateral band walks with lvl 2 tband x2 lengths
Lazer diode stabilization x1 ea:
Spiral balloon (improved from last session, but still requires more control at bottom of page); maze (improved ability to maintain center of maze); tracing lines (difficulty with curves more than diagonals).

Referring Provider: Olson

Ethan J Freedman, PT

## Additional Documentation

Flowsheets:     PT Daily Treatment, PT Charges
Encounter Info:   Billing Info, History, Allergies, Detailed Report, Patient Education, Facesheet

## History
Not marked as reviewed during this visit.

## Linked Episodes
PT cervical spine pain 2018 Noted 5/4/2018

## Orders Placed
None

## Medication Changes
As of 6/11/2018 12:42 PM
None

## Visit Diagnoses
Cervical pain (neck) M54.2

**Lincoln/Bunch 1265**

**Progress Notes - 06/08/2018**

**ADDENDUM**

BUNCH, Mark
06/08/18

On 06/08/2018, I received by correspondence through the mail from the Claims Adjuster, Landon Wallis, a CD dated 05/03/2018, presumably a video surveillance. I will review this at a later date.

Also on 06/08/2018, I received a call from Dr. Blair's office, neuro-optometrist. I was informed that they don't take worker's compensation claims because of previous poor-to-no reimbursement for their work. They would accept an attorney lien. I will convey this to all parties. Hopefully some resolution or exception can be made. Mr. Bunch will keep his appointment with Dr. Saxerud on 07/23/2018. Based upon my examination of his visuospatial disorientation and upon his subjective complaints, I may not release Mr. Bunch to return to work until this has been evaluated and treated which may take until mid-August 2018. His usual duties involve frequent driving.

Thomas Higginbotham D.O.

**Lincoln/Bunch 1266**

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 06/07/2018

# Bunch, Mark Bryan                                          MRN: CEUL0963303

**Treatment** 6/7/2018         Provider: Ethan J Freedman, PT (Physical Therapy)
St Thomas More Hospital        Primary diagnosis: Cervical pain (neck)
Outpatient Rehabilitation Dept  Reason for Visit: Referred by Steven Wayne Olson, MD

## Progress Notes                Ethan J Freedman, PT (Physical Therapist) • Physical Therapy
Expand All   Collapse All

 **Centura Health**

**St. Thomas More Hospital
Outpatient Rehabilitation
1338 Phay Avenue
Canon City, CO 81212
Phone: (719) 285-2000
Fax: (719) 285-2255**

### Physical Therapy Daily Note - Visit #7

Treatment date: 06/07/18

Time Calculation:
Start Time : 0235
Stop Time : 0330
Time Calculation (min): 55 min

Precautions: driving restrictions.

**Assessment/Plan:**

Patient tolerated all exercises well, and was concerned after seeing results of coordination testing. Will continue to assess if continued therapy is indicated. Patient continues to wince and not tolerate manual therapy well. Provided HEP addition including lvl 2 tcord for rows, extensions, reverse flys, diagonals, and shrugs.

**Subjective:**

#### Subjective

Mark Bryan Bunch is a 54 y.o. male c/o acute on chronic L sided cervical pain, muscle restrictions post MVA.
Current pain rated at 3/10 and at worst since last session rated at 5/10. Patient reported improved symptoms overall but was very sore after last session. Per patient, follow up with Dr. Higginbathom went well, and continued recommendation of additional vision speciality and work on balance based exercises.

**Objective:**

Additional coordination testing:
Dysdiadochokinesia: negative/absent for UE and LE.
Heel to shin slide test: negative for B LE.
Finger to nose testing: negative R UE, L UE hypermetria.

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 6/12/18 1:34 PM          Page 1 of 2

**Lincoln/Bunch 1267**

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 06/07/2018

Finger to finger testing: negative R UE, L UE dysmetria (increased concentration required with decreased speed and intention).

Patient completed following exercises:
UBE lvl 4 x6mins
Lvl 2 tcord rows, extensions, reverse flys, diagonals, shrugs 2x10ea.
Manual x15mins:
      Supine: cervical SOR, B trap stretches, STM of suboccipital mm.
MHP on thoracic and cervical spine x10mins

Consider proprioception testing, balance training, quadruped stabilization as indicated.

Not today:
B UE 0.5kg ball CW/CCW circles 2x20ea.
Lateral band walks with lvl 2 tband x2 lengths
Lazer diode stabilization x1 ea:
      Spiral balloon (improved from last session, but still requires more control at bottom of page); maze (improved ability to maintain center of maze); tracing lines (difficulty with curves more than diagonals).

Referring Provider: Olson

Ethan J Freedman, PT

## Additional Documentation
Flowsheets:    PT Daily Treatment, PT Charges
Encounter Info:    Billing Info, History, Allergies, Detailed Report, Patient Education, Facesheet

## History
Not marked as reviewed during this visit.

## Linked Episodes
PT cervical spine pain 2018 Noted 5/4/2018

## Orders Placed
None

## Medication Changes
As of 6/7/2018 4:19 PM
None

## Visit Diagnoses
Cervical pain (neck) M54.2

**Lincoln/Bunch 1268**

Progress Notes - 06/05/2018

WC-MVC

BUNCH, Mark
06/05/18
DOB:

S:    Mr. Bunch returns for further evaluation and treatment for injuries
      stemming from a work-related motor vehicle collision.    The injury
      occurred on 02/13/2018.    His first visit with myself was on
      05/03/2018.  This is his third follow-up visit.  He is accompanied by
      his fiancée.

      In the interim, I received from his attorney those medical records
      from Parkview Medical Center involving an ED visit of 02/14/2018 at
      about 1 AM.

      From my initial visit, he raised concerns for post-concussion
      syndrome with visual spatial disorientation and cognitive and
      behavioral concerns.  Based on the initial exam, he was referred for
      neuro-optometry and neurology consults.

      A number of issues have evolved since he was seen on 05/22/2018.
      First, the claims adjuster stopped all involvement on his claim.
      This seemingly was based on me not being recognized by the claims
      adjuster as an authorized treating provider.  This is in part based
      on confusing his primary care provider, Dr. Olson, with the workers
      compensation provider also by the name Dr. Olson.  Unfortunately, his
      temporary total disability wage protection was stopped, as well as
      the appointments for the neuro-optometrist and neurologist.
      Apparently, his attorney got involved and, as of this date, the
      misperceptions and mismanagements have been corrected.
      Unfortunately, the appointment for the neuro-optometrist now was
      rescheduled for 07/23/2018.

            Given his affective visual spatial disorientation stemming from
            this motor vehicle related concussion, he cannot afford to wait
            any longer.  I called and attempted to move the appointment up
            earlier but, due to the neuro-optometrist's schedule, he is
            booked that that far away, and is now 7th on the list for
            cancellation.

      Secondly, there apparently has already been video surveillance of Mr.
      Bunch.  Apparently, he was driving about a half a mile from his home
      to a grocery/retail store and back. I had recommended that he not
      drive given his visuospatial disorientation and imbalance and
      dizziness. Mr. Bunch relates that he needed food and personal items
      and had no one to help him in a timely manner.  He also wanted to
      test his ability to drive.

**Lincoln/Bunch 1269**

**Progress Notes - 06/05/2018**

Page 2
BUNCH, Mark
06/05/18

He relates that he was successful with his errand but also relates that he feels compromised with respects to safely operating a vehicle.

I again recommended that he not drive, particularly for work, and only for urgent issues and with caution that he drive otherwise. He was driven here today through a contracted transportation service, Coach Transportation Inc. Total miles was identified as being 96 miles.

Thirdly, Mr. Bunch and his fiancé feel victimized, affronted and adversarial as a consequence of the claims adjuster's actions and the private investigation. Apparently, the claims adjuster wanted to steer him to another provider for which he declined.

> There is an undertow of distrust now. I reviewed the mores of the workers' compensation system. I attempted to depersonalize the claims adjuster's actions, noting that he is just doing his job on behalf of his employer. I emphasized the importance of trying to get back on track and to be positive with his health expectations.

On a good note, he does seem to be responsive to the anti-inflammatories/muscle relaxant combination. He did respond to last visit's osteopathic manipulative treatment. He still has evidence of not visualizing items in the midline of his vision. He still demonstrates issues with imbalance, albeit slightly improved. He continues with headache and neck tension. He continues with facial pain. He is having difficulty sleeping. His fiancé notes irritability. He is attempting simple recollection strategies that we have discussed previously. He is attending to self-care with auto-massage techniques and stretching. He continues with physical therapy.

I reviewed the ED notes of Dr. Wilson.
> Blood pressures averaged ~180/120. PERLA. Speech pattern was normal. Coma scale was 15. Patient denied visual changes. Had dizziness and eye pain which resolved. Left scalp tenderness with mild abrasion noted; some left masseter muscle tenderness noted; appeared to be developing a right periorbital ecchymosis; noted cervicoparaspinal muscle tenderness; noted normal gait with no ataxia and with no neuromotor or neurosensory deficits of the upper or lower extremities.

**Lincoln/Bunch 1270**

Progress Notes - 06/05/2018

Page 3
BUNCH, Mark
06/05/18

CT of the head and cervical spine revealed no evidence for any acute traumatic process. Noted the elevated blood pressures; was stable at discharge with diagnoses of concussion with closed head injury, dizziness, cervical strain, right periorbital ecchymosis and elevated blood pressure.

A:    History of a head trauma with
        Emotional and behavioral disturbance/changes F59
        Neurocognitive disorder G31.84
        Visual difficulties with spatial disorientation H53.30
        Cervicalgia
        Cervical strain
        Cephalgia, combination of myofascial tension and posttraumatic
        Situational adjustment reactions with anxiety and depressed mood

P:    Given that it has been almost 4 months since his injury and he persists with concussion sequela, I have asked that he attend to a neuropsychologic screening with considerations for cognitive behavioral therapy. I called and talked to Dr. Staudenmayer (303-758-8934/fax 303-736-4373) who is able and capable of evaluating him and, more importantly, he maintains a presence in Pueblo, Colorado, closer to Mr. Bunch's residence.

To facilitate a quicker evaluation and likely treatment for the visuospatial issues, I wrote a referral to Dr. Blair (719-999-8404), neuro-optometrist. Dr. Blair also maintains a presence in Pueblo, Colorado. I left a message for Dr. Blair to discuss the referral.

I completed a WC 164 form and identified no return to work until 07/04/2018. I've asked that he return in the next 1-2 weeks for directing treatment and evaluation and a course of osteopathic manipulative therapy. Several questions were asked and answered. Reassurances were given. (Time spent face to face with patient: 75 minutes)

Thomas Higginbotham D.O.

cc:    Mr. Bunch
        WC adjuster
        Dr. Blair
        Dr. Staudenmayer
        Atty. Shakeshaft

**Lincoln/Bunch 1271**

Progress Notes - 06/05/2018

**COLORADO DEPARTMENT OF LABOR AND EMPLOYMENT
DIVISION OF WORKERS' COMPENSATION**

**PHYSICIAN'S REPORT OF WORKER'S COMPENSATION INJURY**

A COPY OF THIS REPORT MUST BE SENT TO THE INJURED WORKER AND THE INSURER.

1. REPORT TYPE  ☐ Initial  ☑ Progress  ☐ Closing

2. CASE INFORMATION
   Date of Injury  2-13-18          Workers' Comp # _____
   Injured Worker's Name  Mark Bunch     Insurer Claim # _____
   Social Security # _____          Insurer Name _____
   Date of Birth  2-17-63             Insurer Phone/Fax _____
   Exam Date  6-5-18                  Employer Name  Charter Communications
                                      Employer Phone/Fax _____

3. INITIAL VISIT (only)
   Injured worker's description of accident/injury _____

   Are your objective findings consistent with history and/or work related mechanism of injury/illness ?  ☐ Yes   ☐ No

4. CURRENT WORK STATUS  ☐ Is Working  ☑ Not Working

5. WORK RELATED MEDICAL DIAGNOSIS (ES) Post-concussion, vestibular disorientation, cervical strain

6. PLAN OF CARE
   a. TREATMENT PLAN
      ☐ Diagnostic tools/tests _____
      ☐ Procedures _____
      ☐ Therapy _____
      ☐ Medications _____
      ☐ Supplies _____
      ☑ Other  Psych/Neuro Ophth for CBT/BF / Neuro opth refp

   b. WORK STATUS
      ☐ Able to return to full duty on _____
      ☐ Able to return to modified duty from _____ to _____
      ☑ Unable to work from  6/5/18  to  7/4/18
      ☐ Able to return to part time work on _____ for _____ hrs per day

   c. LIMITATIONS/RESTRICTIONS  ☐ No Restrictions   ☐ Temporary Restrictions   ☐ Permanent Restrictions
      ☐ Lifting (maximum weight in pounds) ____ lbs.     ☐ Walking ____ hours per day
      ☐ Repetitive lifting ____ lbs.                     ☐ Standing ____ hours per day
      ☐ Carrying ____ lbs.                               ☐ Sitting ____ hours per day
      ☐ Pushing / Pulling ____ lbs.                      ☐ Crawling ____ hours per day
      ☐ Pinching / Gripping _____                     ☐ Kneeling ____ hours per day
      ☐ Reaching over head _____                      ☐ Squatting ____ hours per day
      ☐ Reaching away from body _____                 ☐ Climbing ____ hours per day
      ☐ Repetitive Motion Restrictions _____

      ☐ Other _____

7. FOLLOW UP CARE AND REFERRALS
   a. ☐ Return Appointment Date  1-2 w/s
   b. ☐ Referral for  ☐ Treatment (specify) _____   ☐ Evaluation (specify) _____
                       ☐ Impairment Rating _____      ☐ Other (specify) _____
      Referral Appointment to be made by  ☐ Injured Worker  ☐ Referring physician's office
      Referred Provider's Name and Address _____   Phone Number _____
   c. ☐ Discharged from care (explain) _____   ☐ Discharged for non compliance

8. MAXIMUM MEDICAL IMPROVEMENT (MMI)
   ☐ Injured Worker has reached MMI   Date _____
      Maintenance care after MMI required?  ☐ No  ☐ Yes   If yes, specify care _____
   ☐ Injured Worker is not at MMI, but is anticipated to be at MMI in/on _____
   ☐ MMI date unknown at this time

9. PERMANENT MEDICAL IMPAIRMENT
   ☐ No permanent impairment
   ☐ Anticipate permanent impairment
                                        ☐ Permanent Impairment (attach required worksheets and narrative)
                                        ☐ Needs referral to Level II physician for impairment rating (see 7 b above)

10. PHYSICIAN'S SIGNATURE _____        Date of Report  6-5-18
    Print Name _____                   License number  27703
    Address _____                      Telephone Number  719 260 8190

WC164  11/00

Thomas W. Higginbotham, D.O.
1430 South 21st Street, Suite. 101
Colorado Springs, CO  80904

**Lincoln/Bunch 1272**

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 06/04/2018

## Bunch, Mark Bryan                                        MRN: CEUL0963303

**Treatment** 6/4/2018        Provider: Ethan J Freedman, PT (Physical Therapy)
St Thomas More Hospital      Primary diagnosis: Cervical pain (neck)
Outpatient Rehabilitation Dept  Reason for Visit: Referred by Steven Wayne Olson, MD

### Progress Notes                Ethan J Freedman, PT (Physical Therapist) • Physical Therapy

Expand All   Collapse All

 **Centura Health.**

St. Thomas More Hospital
Outpatient Rehabilitation
1338 Phay Avenue
Canon City, CO 81212
Phone: (719) 285-2000
Fax: (719) 285-2255

**Physical Therapy Daily Note - Visit #6**

Treatment date: 06/04/18

Time Calculation
Start Time : 0920
Stop Time : 1000
Time Calculation (min): 40 min

Precautions: driving restrictions.

**Assessment/Plan:**

Patient significantly improved the lazer stabilization ability, but continues to not tolerate manual therapy well.  Will follow up with PCP and neurology specialist to inquire as to POC in PT.  Patient to see Dr. Higginbathom tomorrow (6/5/18).

**Subjective:**

**Subjective**
  Mark Bryan Bunch is a 54 y.o. male c/o acute on chronic L sided cervical pain, muscle restrictions post MVA.
Current pain rated at 3/10 and at worst since last session rated at 5/10.  Patient reported improved symptoms overall but was very sore after last session.

**Objective:**

Patient completed following exercises:
B UE 0.5kg ball CW/CCW circles 2x20ea.
Lateral band walks with lvl 2 tband x2 lengths
UBE lvl 3 x6mins
Lazer diode stabilization x1 ea:

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 6/12/18 1:33 PM            Page 1 of 2

**Lincoln/Bunch 1273**

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                              Encounter Date: 06/04/2018

Spiral balloon (improved from last session, but still requires more control at bottom of page); maze (improved ability to maintain center of maze); tracing lines (difficulty with curves more than diagonals).
Manual x10mins:
        Supine: cervical SOR, B trap stretches, STM of suboccipital mm.
MHP on thoracic and cervical spine x10mins

Consider quadruped stabilization as indicated.

Not today:
Lvl 2 tcord rows, extensions, and reverse flys 2x10ea.

Referring Provider: Olson

Ethan J Freedman, PT

## Additional Documentation

Flowsheets:      Travel and Exposure Screening, PT Daily Treatment, PT Charges
Encounter Info:   Billing Info, History, Allergies, Detailed Report, Patient Education, Facesheet

## Media
Electronic signature on 6/4/2018 9:18 AM
Electronic signature on 6/4/2018 9:18 AM

## History
Not marked as reviewed during this visit.

## Linked Episodes
PT cervical spine pain 2018 Noted 5/4/2018

## Orders Placed
None

## Medication Changes
As of 6/4/2018 11:04 AM

None

## Visit Diagnoses
Cervical pain (neck) M54.2

Lincoln/Bunch 1274

Progress Notes - 06/01/2018

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Clinical Director

Diana M. Helffenstein, M.A., L.P.C.
Licensed Professional Counselor

Brian D. Reusink, M. Ed.
Director of Operations

**COLORADO**
Neuropsychological
ASSOCIATES, P.C.

Primary Office
10 Inverness Dr, East
Suite 215
Englewood, CO 80112
(720) 529-0190
(720) 529-1099 Fax

Also serving clients in
Colorado Springs

## NEUROPSYCHOLOGICAL SCREENING

NAME:      Mark B. Bunch          EVALUATION DATES:   5/03/18 & 5/18/18

DOB:                              REPORT PREPARED:    6/01/18

THIS REPORT REPRESENTS EIGHT (8) HOURS OF SERVICE

### REFERRAL INFORMATION

Mr. Bunch was referred for a Neuropsychological Evaluation by his Workers' Compensation physician, Steven Olson, M.D. Mr. Bunch was involved in a work-related motor vehicle accident on February 13, 2018 at 6:37 p.m. On that date, he was the driver of a 2003 Ford Taurus and he was on Colorado Highway 50 in Pueblo, Colorado. Mr. Bunch reported that he was exiting I-25 onto Highway 50 West. This was a three-lane exit and he was in the middle lane. Traffic in the left lane was stopped for traffic. As he came down the ramp, a Jeep Cherokee that was in the left lane pulled into the middle lane, at which point the driver of the Jeep put his vehicle in reverse and started backing up quickly. Mr. Bunch is unsure why the driver of the Jeep took this action. The rear of the Jeep crashed into the front of Mr. Bunch's Ford Taurus. Mr. Bunch estimated that he was traveling at approximately 20 miles per hour at the time of impact and that the Jeep Cherokee was traveling at approximately 15 to 20 miles per hour. Mr. Bunch reported that his Ford Taurus did not have airbags, but he was wearing a seatbelt and shoulder harness. The impact propelled him forward and he struck his forehead on the steering wheel. Mr. Bunch showed me pictures of his forehead from following the accident. His forehead was red and swollen just to the right of center high on his forehead. To the best of his awareness, Mr. Bunch did not lose consciousness. He does report altered consciousness post-accident in the form of being dazed and confused. He reported feeling "woozy" post-accident. In addition, he experienced problems with communication such as transposing words when he talked. He texted his fiancee post-accident and he noted that his text made no sense. He reports that this altered consciousness lasted for approximately four weeks.

Sent to OC
06/06/2018
by PM LLC

**Lincoln/Bunch 1275**

Progress Notes - 06/01/2018

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 2

I had an opportunity to review the State of Colorado Traffic Accident Report dated February 13, 2018. That report confirms that Mr. Bunch was driving a 2003 Ford Taurus Sedan. The Police Officer's report confirms Mr. Bunch's description of the accident. That report clarifies that the driver of the Jeep reversed his vehicle as he felt he was too close to the vehicle in front of him and did not see Mr. Bunch's vehicle in his rearview mirror. The report indicated there was "slight" damage to the front of Mr. Bunch's Ford Taurus. The report also indicates there was "slight" damage to the rear of the Jeep Grand Cherokee.

Mr. Bunch reports that he recalls seeing the brake lights of the Grand Cherokee. He does recall the sound and force of the accident as well as hitting his head on the steering wheel, although he described this memory as "vague." While Mr. Bunch felt "stunned" immediately post-accident, when he looked up, he saw the driver of the Jeep Cherokee leaving the scene of the accident. He followed the Jeep Cherokee for two to three minutes. The driver of the Jeep Cherokee ultimately pulled into the parking lot of some frontage road stores. When Mr. Bunch exited his vehicle, he felt "woozy." At that point, he sat back down in his vehicle and called 911 as well as his immediate supervisor. He believes it took the Police approximately 20 to 30 minutes to arrive on scene. His immediate supervisor arrived on scene shortly after the Police Officer. He remained in his vehicle while talking with the Police Officer. When his immediate supervisor arrived, he helped Mr. Bunch move into his vehicle. At that point, he was still feeling woozy and was also experiencing dizziness. His immediate supervisor took him to Parkview Hospital Emergency Room where he was evaluated and released. The Emergency Room physician apparently diagnosed a concussion with closed head injury as well as cervical sprain. A CT scan of the brain performed in the Emergency Room was negative. Mr. Bunch reports minimal memory of the Emergency Room evaluation. He was experiencing nausea and apparently vomited on two occasions but has no memory for doing so. Following release from the Emergency Room, his immediate supervisor drove him to his home in Canyon City. He believes he slept most of the way home. He reported feeling quite fatigued and lethargic for several weeks post-accident. The nausea, vomiting, dizziness and lethargy would all be behavioral indicators of a concussion. His memories for the day leading up to the accident are quite vague.

Mr. Bunch continues to report a constellation of physical, fatigue, visual, cognitive and emotional coping deficits consistent with a post-concussive syndrome. Dr. Olson has referred him for a Neuropsychological Evaluation as a way to more fully evaluate his current neurocognitive and neurobehavioral status. I was also asked to assist with treatment planning. Mr. Bunch is represented by an attorney, Kenneth Shakeshaft, Esq.

**BACKGROUND INFORMATION**

**Developmental History**

Mr. Bunch was born via normal vaginal delivery without complications. He met all developmental milestones within normal limits.

Sent to OC
06/06/2018
by PM LLC

AUG-16-2018(THU) 14:37    DR HIGGINBOTHAM    (FAX)719 260 0086    P.012

**Lincoln/Bunch 1276**

Progress Notes - 06/01/2018

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 3

**Educational History**

Mr. Bunch graduated from Canyon City High School in May of 1982. He reported his Grade Point Average was 3.84. He went on to attend the University of Southern Colorado. There, he completed a B.S. Degree in Communications in May of 1986. His Grade Point Average was 3.55. He obtained a M.A. in Organizational Management from the University of Phoenix in 2000. His Grade Point Average was 3.95. He reports no learning disabilities, involvement with special education or ever having been held back a grade.

**Work History**

From 1975 to 1979 Mr. Bunch worked as a cook at Mr. Ed's Restaurant. From 1979 to 1981, he was a cook at Sambo's Restaurant. From 1981 to 1988, he worked in advertising sales for the Canyon City Daily Record newspaper. From 1988 to 1995, he worked for the Colorado Department of Corrections as a Security Officer. From 1995 to 1997, he worked in advertising sales for Telecom Yellow Pages. From 1997 to 1999, he worked as Director of Marketing for Pueblo Diversified Industries. From 1999 to 2001, he worked as Director of Sales for Knowledge Alliance. From 2001 to 2007, he worked as a Sales Representative for Organo Pharmaceuticals. From 2007 to 2008, he was the Director of Marketing for HealthSouth. From 2008 to 2013, he was Director of Business Development for Evercare Hospice. From 2013 to 2015, he was a Sales Manager at Goodwill.

From January of 2016 to present, Mr. Bunch has worked as a Direct Sales Representative for Charter Communications. He described Charter Communications is a high-speed fiber-optic company similar to Comcast. He sells their products residentially, door-to-door. His marketing area is all of Southern Colorado. Mr. Bunch remains off work post-accident.

**Medical History**

Mr. Bunch does not use alcohol and has never abused alcohol in anyway. He has never used or experimented with illicit drugs. He does not use tobacco or marijuana products. His medical history is notable for a tonsillectomy in 1970 and an umbilical hernia repair in May of 2017. He currently does not use any prescription medications. He uses over-the-counter pain medication such as Advil or Tylenol for his headaches and body pains.

His neuropsychological history is unremarkable, having never sustained any other traumatic brain injuries or concussions of any type, periods of unconsciousness for any reason, epilepsy, toxic exposure or neurological illnesses.

Mr. Bunch's family psychological history is unremarkable. His personal psychological history is also unremarkable. He has never previously worked with a mental health professional. To the best of his awareness, he has never been given a psychological or psychiatric diagnosis. He has never been prescribed a psychotropic medication.

Sent to OC
06/06/2018
by PM LLC

AUG-16-2018(THU) 14:37    DR HIGGINBOTHAM    (FAX)719 580 9086    P.010

**Lincoln/Bunch 1277**

'rogress Notes - 06/01/2018

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 4

### CLINICAL INTERVIEW

When asked about his current physical status, Mr. Bunch reports ongoing neck, back, and shoulder pain. He would rate this pain as ranging from 5 to 7 on a 10-point scale with 10 being pain so severe that he would go to the Emergency Room if he experienced it. He reports that he is now receiving physical therapy and chiropractic care for his neck, back, and shoulder pain. He reports a constant headache, which he rated as 4 to 8 on a 10-point scale. He denied any significant problems with headaches pre-accident. He is also now occasionally experiencing what he refers to as "migraine" headaches. He would rate this headache pain as 9 on a 10-point pain scale. With these headaches, he notes a decrease in his peripheral vision as well as significant light sensitivity. He reports that with these headaches he has to lie down in a dark quiet room. He denied any migraine headaches pre-accident. Mr. Bunch reports ongoing dizziness and vertigo post-accident. These are both severe enough to negatively impact his balance. Triggers include closing his eyes. He gave the example that he cannot close his eyes when he takes a shower, therefore, he now takes baths. He also experiences episodes of disequilibrium. He is particularly aware of this problem when he reaches over to pick something up and then stands back up. He reports that his sense of smell is hypersensitive post-accident. He also note some change in his taste post-accident. By this, he is referring to the fact that there are some foods and drinks that he used to like, but no longer likes post-accident (e.g., Pepsi and pizza). He reports an ongoing problem with tinnitus bilaterally post-accident. He experiences tinnitus approximately 75% of the time. He denied any tinnitus pre-accident. He reports an ongoing problem with noise sensitivity (phonophobia) post-accident. When in a noisy or loud environment, this causes him to feel irritable, edgy, and anxious. He reports an ongoing problem with fatigue post-accident. He finds he becomes more tired more easily whether performing physical or cognitive activities. He would rate his current stamina and endurance as 25% of normal for him. He noted that he was a very high-energy individual pre-accident.

When asked about his current visual status, Mr. Bunch reports ongoing problems with both double vision and blurry vision post-accident. He reports that when he is tired the vision in his left eye will become extremely blurry as though he is looking through some sort of mesh. He also notes some decrease in his peripheral vision at those times. He reports ongoing sensitivity for fluorescent lights post-accident. He is aware that he bumps into things more frequently most notably on his left side. When driving or walking in a straight line, he tends to be veer center to the left side. He reports an ongoing problem both eye fatigue and depth perception post-accident. Based on his description, objects seem further away from him than they actually are. He notes that his eyes are slow to refocus, suggesting a possible problem with accommodation. He reports difficulties with visual scanning such as missing things that he is looking for and losing his place when reading.

When asked about his current cognitive status, Mr. Bunch reports ongoing problems with attention and concentration. He finds his mind wanders more easily and that he is more easily distractible. He reports events that most likely relate to cognitive set-loss. He reports problems with multi-tasking post-accident. He has difficulty alternating his attention between several tasks and he can no longer attend to several things simultaneously. He reports a significant

Sent to OC
06/06/2018
by PM LLC

Lincoln/Bunch 1278

Progress Notes - 06/01/2018

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 5

problem with short-term memory post-accident. He finds he will more frequently forget his intentions, appointments, what is said to him, what he is doing if he is distracted, what he has done or said, and that he loses and misplaces things more frequently. He uses written notes, alarms, and post-it notes as a means of compensation for his memory problem. He reports that cueing will most often help his memory but occasionally it does not. He also reports that there are times when his memory for events or conversations is distinctly different from the memory of other people who have participated in the same event or conversation. Based on his description, this appears to relate to some memory contamination and/or confabulation. He reports a slight problem at times accessing remote memories but indicates that cueing typically will help his memory. He reports a number of language-based problems post-accident including difficulties with word finding, paraphasic errors in his speech, language comprehension, reading comprehension, and spelling. Mental math and math on paper are more difficult for him post-accident. Problem-solving and decision-making activities are more difficult for him post-accident. He feels his speed of information processing is slower than prior to the accident. He notes that it takes him longer to complete all tasks at this time. When writing, he will at times transpose letters and numbers. He reports an ongoing problem with spatial disorientation, finding that he will more frequently get disoriented and lost. He is aware that he makes more mistakes than usual and has difficulty catching his mistakes. He also reports problems with initiation post-accident.

When asked about his current emotional and psychological status, Mr. Bunch acknowledges feelings of depression post-accident. He would rate his depression as 3 to 4 on a 10-point scale with 10 being depression so severe that he would seriously consider suicide. Issues which he remains depressed and concerned about include his ongoing physical and cognitive deficits and the limitations that these impose. He is extremely distressed at being unable to work, as this is causing significant financial stressors for him. He is also acknowledging grief and loss associated with his various limitations. He made observation, "I just want myself back." He denied any depression pre-accident. At this point, Mr. Bunch is acknowledging social isolation which to some degree he attributes to his significant fatigue. He also avoids social situations due to cognitive and stimulus overload. He reports that if there is too much stimuli in the environment or if too much information is presented to him too rapidly, he will become overloaded and overwhelmed. At those times, he has to leave the environment. He also reports that post-accident he has difficulty filtering out background noise, suggesting an ongoing problem with his auditory gating mechanism. He denied any suicidal ideation. He does acknowledge some anhedonia, emotional lability (crying more frequently and easily), mood swings, reduced motivation, and being more emotional when tired. He reports difficulty getting to sleep at night secondary to rumination. He made the observation, "I just can't my brain off." He reports that once he gets to sleep he will wake almost hourly and at times has difficulty falling back to sleep. He reports some decreased appetite post-accident. He also reports a significant ongoing problem with irritability and reduced stress tolerance. He finds he becomes more easily upset and angry over small things that would not have bothered him previously.

Mr. Bunch acknowledges some generalized feelings of anxiety post-accident as well as more specific performance anxiety. At this point, he drives occasionally, but keeps his driving to a

Sent to OC
06/06/2018
by PM LLC

**Lincoln/Bunch 1279**

Progress Notes - 06/01/2018

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 6

minimum. He reports some ongoing passenger anxiety. He would rate his passenger anxiety as 0 to 5 on a 10-point scale with 10 being a panic attack. His anxiety is highest when the vehicle was traveling at high speeds or there are bad road conditions (e.g., snow or rain). Mr. Bunch is hypervigilant when in a motor vehicle. If other vehicles get too close, he experiences a hyperstartle response. He reports nightly nightmares. He also reports intrusive thoughts related to the accident.

**RECORDS REVIEWED**

I reviewed the Parkview Medical Center Emergency Room Report dated February 13, 2018 authored by David Wilson, M.D. Dr. Wilson's description of the accident was similar to the description that I received from Mr. Bunch, including hitting his head on the steering wheel. Mr. Bunch denied loss of consciousness. Symptoms reported included blurry vision; left eye pain; disequilibrium; headache; dizziness; neck and shoulder pain; left scalp tenderness with mild abrasion; and, bruising around his right eye. A CT scan of the brain was normal. Mr. Bunch was placed on concussion precautions. His discharge diagnoses were Concussion with Closed Head Injury; Cervical Strain; and, Right Periorbital Ecchymosis. He was alert and oriented and his Glasgow Coma Scale Score was 15.

I had an opportunity to review the CT Scan Report. This was a CT scan of the head without contrast performed on February 13, 2018 as part of his evaluation in the Emergency Room at Parkview Medical Center. That study was read as normal.

I reviewed the Employer's First Report of Injury. That report indicates that the accident occurred on February 13, 2018 on Colorado Highway 50 in Pueblo, Colorado. This report confirms the basic information provided by Mr. Bunch related to the accident. The report indicates that he immediately experienced blurry vision and had difficulty moving his left eye sideways. The injury summary cites soft tissue (head) contusion due to motor vehicle accident.

I reviewed the results of an MRI of the brain without contrast performed on March 19, 2018 and read by Curtis Harlow, M.D. Dr. Harlow identified significant findings as mild scattered areas of high signal intensity seen on FLAIR and T2-weighted sequences in the periventricular white matter regions. He noted that some of these signal intensities were in the perpendicular pattern suggesting demyelinating white matter disease from multiple sclerosis.

I reviewed some records from Steven Olson, M.D. Regarding the MRI of the brain cited above. Dr. Olson states, "For symptoms to be present after an accident seems coincidental for MS without previous symptoms. More likely the changes are secondary to the trauma." I would totally agree with Dr. Olson regarding his opinion regarding the MRI results. Dr. Olson's records document persisting problems with headaches, neck pain, balance, coordination and eye movement. Specifically related to the eye movement deficit, he noted problems with coordination and smoothness of tracking suggesting an eye smooth pursuit deficit. He noted that Mr. Bunch does not have a history of neurological deficits. His diagnoses include Concussion

Sent to OC
06/06/2018
by PM LLC

**Lincoln/Bunch 1280**

Progress Notes - 06/01/2018

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 7

and Traumatic Brain Injury. I received a letter, dated April 13, 2018, authored by Dr. Olson referring him to me for Neuropsychological Evaluation.

## ATTEMPTED TESTING

On May 18, 2018, we attempted formal neuropsychological testing with Mr. Bunch. He presented for the evaluation ambulatory. He was well groomed and casually dressed. He was experiencing a headache that day, which he rated as 4 on a 10-point pain scale. He was also reporting significant pain in his left shoulder when he moved his left arm. He also reported that from the time of my original interview with him until the day of testing, he had begun use of Flexeril, a muscle relaxant, as a sleep aid. He reported that this medication did help somewhat with his sleep but that his sleep was still significantly disrupted. He reported that he was also utilizing a medication for anxiety. He could not recall the name of that medication. He reported that he had used both medications the night prior to testing.

Early on in the course of testing, Mr. Bunch was administered a standalone Performance Validity Test. This was the Victoria Symptom Validity Test. His performance on the Easy Subtest was 20/24 correct. This is considered to be a passing score. His performance on the Difficult Subtest was 6/24 correct. This is considered to be a failing score. As the Victoria Symptom Validity Test is a forced-choice digit recognition test, his score of 6/24 is far below chance which is concerning for intentional lack of effort. His Total Score of 26/48 correct is a "questionable" score. Due to Mr. Bunch's performance on the VSVT, we then administered the Tombaugh Test of Memory Malingering (TOMM). His score on Learning Trial 1 was to 22/50 correct. This is a borderline passing score. His performance on Learning Trial 2 was 27/50 correct. His performance on the Retention Trial was 24/50 correct. These are both failing scores. A passing score for the TOMM Learning Trial 2 and Retention Trial would be 45/50 correct. Based on Mr. Bunch's performance on two standalone Performance Validity Tests, I made the decision to discontinue his testing. At that point in time, it was evident that I was not going to be able to obtain valid neuropsychological test scores.

## PSYCHOLOGICAL FACTORS

As part of the current evaluation, Mr. Bunch completed the Beck Depression Inventory – 2 (BDI-2). His Raw Score on this depression inventory was 45. However, his score was notably elevated as a result of his responding affirmatively to a variety of symptoms that may relate to the residual effects of a Post-Concussive Syndrome. This includes ongoing problems with fatigue, concentration, irritability, sleep disturbance, difficulties with decision making, loss of interest, agitation and emotional lability. When this factor is taken into account, Mr. Bunch's BDI-2 is best interpreted as representing at least moderate feelings of depression at this time.

Mr. Bunch was also administered the PCL-5, a PTSD inventory based on the diagnostic criteria for PTSD as established by the DSM-5. His Raw Score on this PTSD inventory was 79 (Note: maximum score on the PCL-5 is 80). In summary, Mr. Bunch is reporting essentially all symptoms of PTSD at a very high level.

Sent to OC
06/06/2018
by PM LLC

Lincoln/Bunch 1281

Progress Notes - 06/01/2018

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 8

## SUMMARY AND RECOMMENDATIONS

Based on Mr. Bunch's retrospective description of the motor vehicle accident of February 13, 2018, he does meet the diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic Brain Injury as established by the American Congress of Rehabilitation Medicine (1993). This definition has now been accepted by the World Health Organization (2009). He also meets the diagnostic criteria for a Mild Traumatic Brain Injury as established by the DSM-5 (2013). He meets the diagnostic criteria for a Grade II (Moderate) Concussion as established by the American Academy of Neurology (1997). He sustained a blow from the steering wheel to his forehead in the course of the accident. He experienced an acceleration-deceleration force to his head that resulted in a whiplash injury. While he did not experience a loss of consciousness related to the accident, he did experience altered consciousness in the form of being dazed and confused. This altered consciousness lasted for approximately four weeks. His memories up to and during the accident are quite vague. He has several gaps in his memory post-accident, which may relate to a period of post-traumatic amnesia. He experienced nausea, vomiting, dizziness, and lethargy post-accident, which would all be behavioral indicators of a concussion. Mr. Bunch continues to report a constellation of physical, fatigue, visual, cognitive and emotional coping deficits consistent with a Post-Concussive Syndrome. He reports a clear temporal onset of cognitive problems immediately post-accident. He has been diagnosed with a Concussion/Closed Head Injury by his primary care provider, Steven Olson, M.D.

We attempted neuropsychological testing with Mr. Bunch on May 18, 2018. Based on his suboptimal performance on two standalone Performance Validity Tests, I made the decision to discontinue his testing as it was evident that we were not going to be able to obtain valid neuropsychological test results. There are a number of factors that can negatively impact performance on standalone Performance Validity Tests including pain, depression, fatigue and intentional lack of effort. At the time of his attempted testing, Mr. Bunch was experiencing at least a moderate to perhaps severe level of depression based on his self-report and results of his the Beck Depression Inventory – 2. He was experiencing a significant headache as well as left shoulder pain the day of testing. He was also experiencing a high level of fatigue due to poor and disrupted sleep as well as the potential effects of a concussion and chronic pain. These factors alone or in combination can explain most of his sub-optimal scores from the Performance Validity Tests. As noted in the body of the report, his below chance performance on the Difficult Subtest of the Victoria Symptom Validity Test is concerning for an intentional lack of effort.

As noted above, Mr. Bunch does meet the diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic Brain Injury as established by a number of professional organizations as well as by the DSM-5. We attempted testing with Mr. Bunch at just three months post-accident. He is therefore experiencing the most rapid phase of spontaneous recovery from the concussion that I would anticipate. At this point, he is not at MMI related to the concussion that he sustained in the February 13, 2018 motor vehicle accident.

Sent to OC
06/06/2018
by PM LLC

**Lincoln/Bunch 1282**

Progress Notes - 06/01/2018

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 9

Mr. Bunch is experiencing some moderate to severe feelings of depression at this time. He is also reporting significant ongoing problems with fatigue, irritability, reduced stress tolerance, emotional lability and reduced motivation. These are all post-concussive symptoms that typically respond well to use of anti-depressant medications in the Select Serotonin Reuptake Inhibitor (SSRI) Class. By the writing of this report, I was informed that Frank Polanco, M.D. has taken over as Mr. Bunch's primary Workers' Compensation physician. Dr. Polanco may wish to consider Mr. Bunch for prescription of an SSRI-type anti-depressant medication. I would initially recommend Cymbalta or it's generic duloxetine. If that medication is ineffective then I would suggest Zoloft.

By the time of attempted testing, Mr. Bunch had been prescribed a muscle relaxant to be used at night as a sleep aid. He has also apparently been prescribed an anti-anxiety medication, again to be used at night possibly as a sleep aid. He could not recall the name of this medication. In either event, he reports that the medications do help somewhat, but he still experiences significant problems with both sleep onset and sleep maintenance. I would, therefore, suggest that Dr. Polanco consider trazodone as a sleep aid.

For Mr. Bunch's residual cognitive problems, he would likely benefit from a period of individual cognitive rehabilitation. Given that he is early post-accident that treatment should take a restorative approach. It should also focus on helping him to develop strategies to compensate for his residual cognitive problems.

As noted above, Mr. Bunch is experiencing moderate to perhaps severe feelings of depression at this time. He is also reporting problems with irritability and reduced stress tolerance. He is reporting symptoms consistent with a Post-Traumatic Stress Disorder related to the accident. These are all accident-related issues that should be addressed in individual psychotherapy. I would recommend that this be with a therapist familiar with Post-Concussive Syndrome if at all possible.

Mr. Bunch is reporting a variety of vision problems consistent with a Post-Traumatic Vision Syndrome. It appears that ocular motor and smooth pursuit deficits have been identified post-accident. He is also reporting symptoms suggestive of a possible left visual inattention. He would, therefore, benefit from further evaluation and possible treatment with a neuro-optometrist. Based on the type of visual problems that Mr. Bunch is reporting, I would recommend evaluation with a neuro-optometrist prior to releasing him to return to drive.

As noted above, I would recommend evaluation with a neuro-optometrist prior to releasing Mr. Bunch to return to driving. Some consideration might also be given to a formal driving evaluation prior to releasing Mr. Bunch to drive. As driving is an integral part of Mr. Bunch's job, a release to return to driving will be a key component to his overall release to return to work.

Sent to OC
06/06/2018
by PM LLC

**Lincoln/Bunch 1283**

Progress Notes - 06/01/2018

NEUROPSYCHOLOGICAL SCREENING
Mark R. Bunch
Page 10

**DSM-5 DIAGNOSIS**

331.83                Mild Neurocognitive Disorder due to Traumatic
                      Brain Injury with Behavioral Disturbance
                      (behavioral disturbance includes irritability, reduced
                      stress tolerance, and anger outburst).

293.83                Depressive Disorder due to Traumatic Brain Injury,
                      Mild.

309.81                Post-Traumatic Stress Disorder.

Once Mr. Bunch's pain, depression and fatigue are better resolved, I will be happy to see him back for a neuropsychological update. Until that time, I hope the above findings and recommendations are helpful to your overall care and treatment of Mr. Bunch. Should you have any further questions, please feel free to contact me at anytime.

Dennis A. Helffenstein, Ph.D.

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Colorado License # 1484
Certified Rehabilitation Counselor # 00001338
Diplomate, American Board of Vocational Experts # 64073
Certified, Health Service Provider in Psychology National Register # 41454

Sent to OC
06/06/2018
by PM LLC

Lincoln/Bunch 1284

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 05/31/2018



Bunch, Mark Bryan

MRN: CEUL0963303
Description: 54 year old male

Treatment 5/31/2018    Provider: Ethan J Freedman, PT (Physical Therapy)
St Thomas More Hospital    Primary diagnosis: Cervical pain (neck)
Outpatient Rehabilitation Dept    Reason for Visit: Referred by Steven Wayne Olson, MD

## Progress Notes

Expand All   Collapse All

Ethan J Freedman, PT (Physical Therapist) • Physical Therapy

### ✚ Centura Health®

**St. Thomas More Hospital**
**Outpatient Rehabilitation**
**1338 Phay Avenue**
**Canon City, CO 81212**
**Phone: (719) 285-2000**
**Fax: (719) 285-2255**

**Physical Therapy Re-evaluation Note - Visit #5**

Treatment date: 05/31/18

Time Calculation
Start Time : 1002
Stop Time : 1057
Time Calculation (min): 55 min

Precautions: driving restrictions.

**Assessment/Plan:**

In 3 wks, pt will:
1. Demonstrate safety and independence with HEP--met
2. Decrease pain at worst to 6/10--met
3. Increase ROM of cervical spine to <50% restricted and pain free--not met
4. Increase ROM of L shoulder to: flexion and ABD 0-160--not met
5. Decrease score on NDI by 9 points (22/50)--not met

In 6 wks, pt will:
1. Decrease pain at worst to 4/10--not met
2. Increase strength of B UE to 5/5--met
3. Increase ROM of cervical spine to <20% restricted and pain free--not met
4. Increase ROM of L shoulder to WFL--not met
5. Decrease score on NDI by 18 points (13/50)--not met

At this time, patient has only made improvements on B UE strength, and all other goals there
has been minimal progress. Patient's re-evaluation shows inconsistent results with B UE
strength, visual tracking, and balance testing. Will follow up with PCP and neurology specialist
to inquire as to POC in PT. Requesting additional 6 visits to achieve PT goals.

**Subjective:**

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 6/4/18 4:57 PM                    Page 1 of 3

**Lincoln/Bunch 1285**

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 05/31/2018

**Subjective**

   Mark Bryan Bunch is a 54 y.o. male c/o acute on chronic L sided cervical pain, muscle restrictions post MVA.
Current pain rated at 4/10 and at worst since last session rated at 6/10.  Patient reported improved symptoms but was very sore after last session.

**Objective:**

Cervical Scan:
Cervical spine ROM (in % restricted): flexion 25% with pain in posterior cervical spine, extension 25% with tightness; R side bending 25%, increased with overpressure and hold; L side bending 25% restricted and no increased pain with overpressure and hold; R rotation 50% restricted and increased sharp pain with overpressure and no change with holds; L rotation 25% restricted and no increased pain from overpressure and holds.
Neurogenic fatigue: Cervical retraction and protraction painful, with protraction > retraction; L scapular elevation painful and weak; all others WFL.
Compression/Traction: increased pain with compression in neutral and extension; tractions in neutral no increased pain.
Reflexes: 2+
Sensation: Intact to light touch sensation to B UE.
UMN: Hoffman's and clonus absent.
Dural testing: Cervical slump (-).
Posture: FHP
Shoulder ROM (in degrees):
L shoulder flexion 0-160 and tightness; ABD 0-142 no increased pain; IR WFL at 0*, 1" difference behind back; ER WFL at 0*, no pain at 90*.
B UE Strength: B UE 5/5 and pain free.
Palpation: severe TTP L lateral neck, C2-6, and ~T6.
Outcome Measures--NDI: Evaluation score on 5/4/18: 31/50=62%; Re-evaluation score on 5/31/18: 30/50=60%.
CN testing: H-testing showed smooth tracking, no impairment, convergence slightly delayed on L; saccades showed smooth and direct tracking with no impairment.
Balance: EO shoulder width apart, narrow BOS, tandem good; EC with all situations instantaneous and inconsistent LOB, with resistance when guarded.  No attempt to self correct.

Patient completed following exercises:
UBE lvl 2 x6mins

Consider specific segmental cervical spine mobility, quadruped stabilization as indicated.

Referring Provider: Olson

                    Ethan J Freedman, PT

**Additional Documentation**
   Flowsheets:      PT Daily Treatment, PT Charges
   Encounter Info:  Billing Info, History, Allergies, Detailed Report, Patient Education, Facesheet

**History**
   Not marked as reviewed during this visit.

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 6/4/18 4:57 PM              Page 2 of 3

**Lincoln/Bunch 1286**

Progress Notes - 05/31/2018 ········ 2-2018(TUE) 12:44                                    P. 005
    From:                                                       06/12/2018 12:51    #595 P.005/011

    Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 05/31/2018

## Linked Episodes
PT cervical spine pain 2018 Noted 5/4/2018

## Orders Performed
Ambulatory Referral to Physical Therapy Closed

## Medication Changes
As of 5/31/2018  3:51 PM

None

## Visit Diagnoses
Cervical pain (neck) M54.2
Chronic neck pain M54.2, G89.29

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 6/4/18 4:57 PM            Page 3 of 3

**Lincoln/Bunch 1287**

**Progress Notes - 05/23/2018**

%

May 23, 2018

ESIS                    1-303-728-9013 tel
ESIS West WC Claims     1-800-208-8281 fax
P.O. Box 6569
Scranton, PA  18505-    www.esis.com
6569


**Landon Wallis**
*Senior Claims Representative*

Dr. Hellfenstein
325 E. 2nd, Ste K
Monument, CO 80132


RE:    Claimant: MARK BUNCH
       DOB:
       SS:
       Claim #: 2d338776817591


       Date of Injury: 2/13/18

Dear Dr. Hellfenstein:

We are writing to clarify Mr. Bunch's medical and work status as it relates to his work injury.    We would appreciate it if you would take the time to answer a few questions please.

The claimant was in a Motor Vehicle Accident on February 13th, 2018.  Mr. Bunch has not been released to drive or work by Dr. Olsen.  Dr. Olsen wanted the claimant to be evaluated by Neurologists before his work status could be evaluated.  An MRI of March 19, 2018 indicates mild white matter disease.  No other findings listed.

We would appreciate it if you answered the following questions related to causation and overall current medical status.  Please include a bill with your response if necessary.  Please answer the questions below and either fax or mail your response.  Our fax number is: **800-208-8281**.


1.     It has been 11 weeks since the injury.  Please indicate what the claimant's diagnosis is related to the work injury?  Did the claimant suffer a work injury?  If so, please list the body parts affected, and what treatment is needed at this time?


Comment:

*Dx: Concussion (moderate); Post Concussive syndrome*

*Post Traumatic Stress Disorder*

*Major Depression*

*Tx/ Individual Psychotherapy*
*Cognitive Rehabilitation*
*Neuro-optometry Evaluation*
*SSRI antidepressant*
*sleep aide*

A Risk Management Services Company

Sent to OC
06/06/2018
by PM LLC

**Lincoln/Bunch 1288**

**Progress Notes - 05/23/2018**



2.      Please comment on Mr. Bunch's ability to drive.  Can Mr. Bunch drive without restrictions?
Are there any other restrictions indicated?   If unable to drive, when can Mr. Bunch drive without
restrictions?   If he cannot drive, why can he not drive at this time?

Comment:
*Prior to release to drive I recommend (1) Neuro-optometry Eval.*
*(2) Driving Eval.*

3.      Is Mr. Bunch at Maximum Medical Improvement?  If not at MMI, what further treatment is
needed to obtain MMI, and when can we expect MMI to be obtained?

Comment:
*He is only 3 mo post. Related to Post Concussion*
*Syndrome he is Not at MMI*

4.      Please provide any other relevant information to assist with the compensability, treatment
and resolution of this condition.

Comment:
*I reviewed the surveillance video that you asked me to watch. I saw*
*nothing in the video that sheds any light on his cognitive problems. I saw*
*nothing that was inconsistent with his self report (ie he reports that*

DOCTOR SIGNATURE: *Jennifer A. Wolf ... PhD*  *he does drive*
DATE: *5-30-18*                                *occasionally)*

*There is nothing in the*
*video that speaks to*
*his driving safety*

Thank you

Landon Wallis
Senior Claims Representative
PO Box 6569, Scranton, PA 18505-6569
O 303-728-9013  Fax 800-208-8281
landon.wallis@csis.com

cc: SHAKESHAFT & GORMAN LAW FIRM – 1935 JAMBOREE DR.  S202  COLORADO SPRINGS,
CO 80920.

Page 2/3

Sent to OC
06/06/2018
by PM LLC

**Progress Notes - 05/22/2018**

BUNCH, Mark                                                                      **WC**
05/22/18
DOB:

S:    Mr. Bunch returns for follow-up evaluation of injuries related to a
      work related motor vehicle collision. He denies any new trauma. He
      has been attending to physical therapy. He notes that the triple
      drug combination of betamethasone-Robaxin-indomethacin has been
      helpful and would like a refill prescription if possible. He has
      been resting and doing general self-care stretch exercises.

      We are still awaiting authorization for neuro-optometry and neurology
      consults. He drove himself to this visit.

O:    Body habitus remains the same. He is alert and oriented. Sitting
      tolerance is reasonable. Gait and stance seem unremarkable. Sitting
      tolerance is reasonable. Hydration is adequate.

      He seems to be more cogent today. He has negative Romberg's
      maneuver. Balance is reasonable. He is still with a midline shift
      on testing but somewhat improved. Cervical range of motion is still
      quite limited with sharp pain about the left mid cervical area
      radiating into the left scapulothoracic area. Deep tendon reflexes
      are symmetrical. He has negative Spurling's maneuver.

      With his consent, osteopathic manipulative therapy was performed to
      the cervical, thoracic, upper rib, and upper quadrant areas using
      combination of soft tissue and vertebral mobilization. He responded
      quite well. He had better range of motion of his neck after the
      treatment and felt that his headaches were lessened.

A:    Posttraumatic headache G44.309
      Muscle tension headache G47.3
      Closed head injury with sequela S06.2XOD
      Visuospatial disorientation H 53.30
      Cognitive changes, unspecified R 41.89
      Cervicalgia M54.2
      Cervical strain S16.1XXD
      Thoracalgia M54.6
      Thoracic strain S23.5XXD
      Osteopathic segmental and somatic dysfunction of the cervical spine
            M9901
      Osteopathic segmental and somatic dysfunction of the thoracic region
            M9902
      Osteopathic segmental and somatic dysfunction of the rib cage M9908

**Lincoln/Bunch 1290**

**Progress Notes - 05/22/2018**

Page 2
BUNCH, Mark
05/22/18

P:    He remains off work as previously identified.

Self-care strategies were reviewed including strategies to help him
with his cognition and particularly involving his work as a customer
service representative. I also emphasized auto-massage techniques.

I refilled the betamethasone 0.75 mg, Robaxin 215 mg and indomethacin
25 mg, #10 to use one every other night.  I asked that he return to
see me in 1-2 weeks.  He is to coordinate with his attorney to
facilitate referrals to the neuro-optometrist and neurologist.

Thomas Higginbotham D.O.

**Lincoln/Bunch 1291**

Progress Notes - 05/10/2018

BUNCH, Mark                                                        MVC
05/10/18
DOB:

S:    Mr. Bunch returns for a second visit.  He is accompanied by his
      significant other.  The new patient evaluation report was reviewed,
      and a correction was made under work duties on page 1, noting that he
      does very little in the way of lifting or carrying.

      He still describes headache and neck pain, visual difficulties,
      imbalance and dizziness and cognitive issues such as forgetfulness
      and word finding.  He denies any radicular component into the upper
      extremities.

      He is still pending the neurology and neuro-optometry consults.

      He has questions about work restrictions.

O:    His visual perception of objects is grossly not centered.  He has
      difficulty with gaze to his right.  He still has a positive Romberg's
      sign.  There is palpatory tenderness about the suboccipital, scalp
      and cervical paraspinal musculature.  Deep tendon reflexes are
      symmetrical.

A:    History of a work-related motor vehicle collision
      History of closed head trauma with visual spatial disorientation,
          posttraumatic headache and cognitive sequela
      Cervicalgia
      Cervical strain without signs of radiculopathy

P:    Counseling was offered with strategies to minimize frustration and
      anxiety with respects to his cognitive difficulties.

      I recommended a trial of triple drug combination of an anti-
      inflammatories and muscle relaxant of betamethasone 0.75 mg,
      methocarbamol 210 mg and indomethacin 25 mg to use one a night for
      the next 3 nights and then every 3 nights thereafter.  I reviewed its
      use, indications and side effects.

      I completed a WC 164 form.  I provided him with a prescription,
      noting he is unable to return to work in any capacity for 1 month
      until further evaluation.

Thomas Higginbotham D.O.

820/020 'd        9809 092 611(XBJ)        WBH10BNI99IH ЯО    ЬZ:ÞI (ΠH1)8102-91-9ΠB

**Lincoln/Bunch 1292**

Progress Notes - 05/10/2018

## COLORADO DEPARTMENT OF LABOR AND EMPLOYMENT
### DIVISION OF WORKERS' COMPENSATION

### PHYSICIAN'S REPORT OF WORKER'S COMPENSATION INJURY

**A COPY OF THIS REPORT MUST BE SENT TO THE INJURED WORKER AND THE INSURER.**

1. REPORT TYPE  ☒ Initial   ☐ Progress   ☐ Closing

2. CASE INFORMATION
   Date of Injury _2-13-18_
   Injured Worker's Name _Mark Bunch_
   Social Security # _____
   Date of Birth _____
   Exam Date _5/10/18_
   Workers' Comp # _____
   Insurer Claim # _2033727681 7591_
   Insurer Name _CSCS_
   Insurer Phone/Fax _____
   Employer Name _Charter Communications_
   Employer Phone/Fax _____

3. INITIAL VISIT (only)
   Injured worker's description of accident/injury _MVC ₹ TBI ₹ cognitive & visual effects, headache_
   _Cervical pain, midline_

   Are your objective findings consistent with history and/or work related mechanism of injury/illness ?   ☐ Yes   ☐ No

4. CURRENT WORK STATUS   ☐ Is Working   ☒ Not Working

5. WORK-RELATED MEDICAL DIAGNOSIS (ES) _TBI post MVA, c-strain, headache, concussion_

6. PLAN OF CARE
   **TREATMENT PLAN**
   ☐ Diagnostic tools/tests _Request neurology & neurooptometry_
   ☐ Procedures _PT_
   ☐ Therapy
   ☐ Medications
   ☐ Supplies
   ☐ Other

   b. WORK STATUS
   ☐ Able to return to full duty on _____   ☒ Unable to work from _2/13/18_ to _6/10/18_
   ☐ Able to return to modified duty from _____ to _____   ☐ Able to return to part time work on _____ for _____ hrs per day

   c. LIMITATIONS/RESTRICTIONS   ☐ No Restrictions   ☐ Temporary Restrictions   ☐ Permanent Restrictions
   ☐ Lifting (maximum weight in pounds) _____ lbs.
   ☐ Repetitive lifting _____ lbs.
   ☐ Carrying _____ lbs.
   ☐ Pushing / Pulling _____ lbs.
   ☐ Pinching / Gripping _____
   ☐ Reaching over head _____
   ☐ Reaching away from body _____
   ☐ Repetitive Motion Restrictions _____
   ☐ Walking _____ hours per day
   ☐ Standing _____ hours per day
   ☐ Sitting _____ hours per day
   ☐ Crawling _____ hours per day
   ☐ Kneeling _____ hours per day
   ☐ Squatting _____ hours per day
   ☐ Climbing _____ hours per day

   ☐ Other _____

7. FOLLOW UP CARE AND REFERRALS
   a. ☒ Return Appointment Date _2 wks_
   b. ☒ Referral for  ☒ Treatment (specify) _neuro-optometry_   ☒ Evaluation (specify) _neurology_
      ☐ Impairment Rating   ☐ Other (specify) _____
      Referral Appointment to be made by   ☐ Injured Worker   ☐ Referring physician's office
      Referred Provider's Name and Address _____   Phone Number _____
   c. ☐ Discharged from care (explain) _____   ☐ Discharged for non compliance

8. MAXIMUM MEDICAL IMPROVEMENT (MMI)
   ☐ Injured Worker has reached MMI   Date _____
   Maintenance care after MMI required?   ☐ No   ☐ Yes   If yes, specify care _____

   ☐ Injured Worker is not at MMI, but is anticipated to be at MMI in/on _____
   ☒ MMI date unknown at this time

9. PERMANENT MEDICAL IMPAIRMENT
   ☐ No permanent impairment
   ☒ Anticipate permanent impairment
   ☐ Permanent Impairment (attach required worksheets and narrative)
   ☐ Needs referral to Level II physician for impairment rating (see 7 b above)

10. PHYSICIAN'S SIGNATURE _____   Date of Report _5/10/18_
    Print Name _____   License number _2783_
    Address _____   Telephone Number _719.260.9150_

WC164 11/00

Thomas W. Higginbotham, D.O.
1430 South 21st Street, Suite. 101
Colorado Springs, CO 80904

**Lincoln/Bunch 1293**

Progress Notes - 05/03/2018

# Occupational
# And
# Environmental Health Services

Thomas W. Higginbotham, DO
Board Certified,
Occupational And
Environmental Medicine

**NEW PATIENT EVALUATION/WC**

BUNCH, Mark
05/03/18
DOB:

Mr. Bunch was referred here by Dr. Steven Olson of Centura Health Primary Care at St. Thomas-Moore Hospital in Canon City, Colorado. The referral reads, 'for evaluation of traumatic brain injury'.

DOI:                        02/13/2018

CARRIER:                    ESIS
CARRIER #:                  2D338776817591
CLAIM REPRESENTATIVE:       Landon Wallis (303-728-9013)
CARRIER ATTORNEY:           NA
CLAIMANT ATTORNEY:          Kenneth Shakeshaft, Esq. (719-635-5886

EMPLOYER AT TIME OF INJURY:   Charter Communications
EMPLOYED AT TIME OF INJURY:   2.5 years
JOB TITLE AT TIME OF INJURY:  Direct Sales Representative

DUTIES:
At the time of his injury, he worked full-time-plus. He did not have a second job at the time of his injury. He relates that he would travel in his vehicle for up to 6 hours a day and sees clients an additional 6-8 hours. He relates it wasn't uncommon for him work 12-hour days. They do not do much in the way of lifting or carrying.

PRESENT EMPLOYER: The same
EMPLOYED:         The same
JOB TITLE:        The same
DUTIES:           He hasn't worked since the date of injury, 02/13/2018.

MECHANISM OF INJURY:
Mr. Bunch was involved in a motor vehicle collision on 02/13/2018 at about 6 p.m. There was a police report. The collision occurred at the off-ramp intersection of I-25 and Highway 50 West in Pueblo, Colorado. Weather was not a factor. Construction was not a factor.

1430 South 21st Street, Suite 101
Colorado Springs, CO 80904
(719)260-8190
FAX: 260-6086

**Lincoln/Bunch 1294**

Progress Notes - 05/03/2018

Page 2
BUNCH, Mark
05/03/18

He was the driver of a Ford Taurus, wearing seatbelt and shoulder harness. There were no passengers.

He was struck about the front of his vehicle when another vehicle sped backwards. He was traveling about 20-25 mph. The striking vehicle, a 1990's Jeep Cherokee, was traveling backwards at about 5-10 mph. He was unaware of the impending impact until the moments before. He had come off the interstate with the green light for a left turn underneath the intersection. Mr. Bunch surmises that the other driver was trying to get back into another lane and decided to back into it quickly, unaware of on-coming traffic. He recalls driving, looking straight ahead with his hands on the steering wheel in a 11:00 and 5:00 o'clock position. The airbag did not deploy. There was no second impact. The force of the impact caused his vehicle to arrest in a diagonal manner to his right. His vehicle was eventually completely totaled.

He denies loss of consciousness. He relates of head trauma; his forehead hit the steering wheel forcibly. He recalls his knees hitting the under dash. He relates of being dazed and stunned momentarily. He then noticed the other driver preparing to leave the scene of the collision. He gave chase for about a mile that involved going down the road and then turning into a shopping center and around the shopping center until the other driver finally stopped. Mr. Bunch relates that he was attempting to take pictures of the other vehicle's license plate when he gave chase. It was quite obvious to Mr. Bunch that the other driver was evading responsibility.

He called 911 and about 20-25 minutes later, the police came. He also summoned his boss who also came to the scene about the time that the police arrived. He didn't get out of the vehicle but once to take pictures of the other car. When he stepped out, he held onto the door and took the pictures and sat back in the vehicle. He attempted to get out of the vehicle when his boss arrived. He summarily got dizzy and fell to the ground. He doesn't recall this but was reminded about the incident by his boss. He began noting pain and discomfort immediately. He experienced pain about the head and neck. His boss helped him deal with the police report. His boss then transported him to Parkview Medical Center emergency department. He doesn't recall much of those events.

**Lincoln/Bunch 1295**

Progress Notes - 05/03/2018

Page 3
BUNCH, Mark
05/03/18

He does not recall much of the trip to the emergency room.  However, when
he got out of the vehicle to walk to the ED, he again lost his balance, got
dizzy and fell.  According to his boss who told him later, several people
assisted him up onto a wheelchair and into the emergency department room.
He, again, has poor recollection of those events.

At the emergency room, he received diagnostics that included a CT of the
head and neck.  He recalls having visual difficulties with the left eye.
He recalls having difficulties dealing with the bright fluorescent lights.
There were no lacerations to repair.  He was observed and eventually
released after ~6 hours.  He does recall that there was some discussion as
to whether they would admit him for observation.

His first medical assessment since the emergency room visit/collision was
with his PCP, Dr. SW Olson. He relates that eventually the worker's
compensation carrier admitted liability about 2 weeks after the injury.
Dr. Olson referred him to see a neuropsychologist, Dr. Helfenstein.  He saw
Dr. Helfenstein this morning.  A neuropsychologic testing is scheduled.  He
asked for chiropractic care, but it hasn't been authorized yet.  He had
asked for physical therapy, and it starts tomorrow with Centura Hospital in
in Canon City, Colorado.  He relates that he is not driving, as he is
disoriented with visual difficulties and with headache.

MEDICAL RECORDS REVIEW:
02/23/2018:   Dr. SW Olson, PCP: Follow-up from a car accident; did not have
              loss of consciousness; did have head trauma with some vision
              changes and balance/coordination issues; CT scan at that time
              was negative; diagnosed with a concussion; speech fluent;
              positive Romberg's; cranial nerve exam unremarkable other than
              difficulty tracking; eye movement was intact but he is not
              fluidly tracking; blood pressure 150/90; diagnoses were
              traumatic brain injury without loss of consciousness with
              cranial nerve impairment, balance problem; referred to
              neurologist; MRI of the brain ordered

03/21/2018:   MRI of the brain: White matter disease possibly from multiple
              sclerosis; white matter lesion showed perpendicular pattern
              suggesting demyelinating white matter disease from MS; the
              sinuses and mastoids were clear; no evidence of hemorrhage

04/13/2018:   Dr. SW Olson, PCP: Seen for TBI; had significant eye findings
              but those had resolved; a referral for neurology to evaluate
              was considered;

**Lincoln/Bunch 1296**

Progress Notes - 05/03/2018

Page 4
BUNCH, Mark
05/03/18

Referrals were made for chiropractic care and physical therapy for chronic neck pain; he continued with headaches and neck pain; MRI of the brain was done showing some white matter change possibly MS; no history of neuro deficits before the trauma; 180/122..82..95% O2 on room air; BMI 31.7; prescribed extra strength Tylenol and Flexeril

PAST MEDICAL HISTORY:
Surgical history is positive for a 1970 tonsillectomy and a 2017 umbilical hernia repair. Past medical history is positive for a bout of pneumonia around 2004 for which he denies any ongoing sequela. THERE IS A KNOWN DRUG ALLERGY TO PENICILLIN. His present medication is over-the-counter Tylenol. He takes no nutritional or herbal supplements.

PRIOR INJURIES:
He relates of fracturing his right fingers and ankle in 2004 and in 2007. He denies any prior motor vehicle collisions that required treatment. He denies any prior work-related injuries. He denies any prior traumatic brain injuries or loss of consciousness.

SOCIAL HISTORY:
Smoking history is negative. He denies ever being treated for drug or alcohol problems. He is engaged to be married. Education history is a BS in Communications and a Master's in Business. He is a native to the Canon City, Colorado area. Prior hobbies included target shooting, ATV riding, and movies. With respect to exercise, he did none regularly but relates that his work involved a lot of walking.

OCCUPATIONAL HISTORY:
Occupationally, he has been involved in some form of sales for years. He also worked in a long-term care facility for years.

REVIEW OF SYSTEMS:
Mr. Bunch has completed a clinical pain picture diagram. He identifies pain and discomfort about the head, left scapulothoracic area, left upper hip, left elbow, and left thumb. He identifies numbness and tingling sensations about the dorsum of the left hand and the back of his head.

On a symptom checklist, the following are identified: Dizziness; headaches; muscle cramps; depression and nervousness; nausea; recent change in vision with blurred vision and photophobia; sonophobia with ringing in the ears; marked tiredness; trouble falling and staying asleep; and mood swings with panic attacks. He relates of headaches and neck and back pains.

**Lincoln/Bunch 1297**

Progress Notes - 05/03/2018

Page 5
BUNCH, Mark
05/03/18

He relates of sensitivity to fluorescent lights not only from their brightness but also from the sound.

A neuropsychologic symptom screening was reviewed and positive for the following:
Change in sense of taste and smell
Headaches
Ringing in the ears
Change in vision with difficulty focusing, double vision or blurred vision and problems seen at night
Changes in sensitivity to sound and light
Sense of weakness of the left side
Dizziness that is better presently than initially
Fatigue, described as rapid onset with mild activity
Numbness and tingling sensations of the left hand and neck/head
Disrupted sleep patterns with only 1 hour of sleep continuously
Difficulty remembering things
Problems with attention
Distractibility particularly with noise
Trouble finding the right words, but this has improved since initially
Difficulty with arithmetic
Irritability and less patient

He denies any hearing changes, excessive energy, coughing, trouble breathing, vomiting, problems with handwriting, or weight loss.

He relates that his headache is constant. He denies having headaches prior to the MVC. He relates that physical and emotional stressors may worsen the headache. The headache is about the forehead but will generalize about the head. He relates of tunnel vision when the headache gets bad enough. He is sensitive to sound and light. Bright lights and loud sounds will aggravate the headache. He describes the pain quality of the headache as throbbing. He did have nausea with the headaches soon after the accident but not so now. He does relate of dizziness with the headaches. He does experience nasal stuffiness.

PHYSICAL EXAMINATION:
Mr. Bunch is a 54-year-old, Caucasian male that is in no acute distress, but he is quite uncomfortable with his headaches and neck discomforts. He is accompanied by his significant other. He shows me pictures of his head and face that were taken within the hour of the collision. He has a positive Romberg's sign in that he falls to the back rather readily.

**Lincoln/Bunch 1298**

Progress Notes - 05/03/2018

Page 6
BUNCH, Mark
05/03/18

He cannot recognize a pencil being in the center of his vision when coming from the periphery of either side. He has difficulty tracking, particularly to the right horizon, but the eyes do move in all directions. Pupils are equal and reactive to light. He puffs his cheeks symmetrically, and his smile is symmetrical and can shrug his shoulders symmetrically. Tongue protrusion is midline. Blood pressure is 188/100. Heart rate is 87. Pulse oximetry is 97% O2 on room air. There is no pedal edema. Heart is of regular rate and rhythm with a 1/6 systolic ejection murmur heard best at the mid-sternal and fifth intercostal space. Lungs are clear to auscultation. There are no carotid bruits. Backward extension of the head results in dizziness. He is diffusely tender about the cervical anterior and posterior musculature.

ASSESSMENTS:
History of a work-related motor vehicle collision
History of head trauma without loss of consciousness

Postconcussion sequala with spatial disorientation, imbalance, cervicalgia, headache, tinnitus, cognitive difficulties, and sound and light sensitivity

Cervical myofascial strain
Thoracic myofascial strain
Right thumb sprain

PLAN:
Mr. Bunch will return as soon as practical for a complete physical examination. In the meantime, I will referrals for him to see a neurologist and a neuro-optometrist. He is to attend to physical therapy. I hope to get a copy of the neuropsychologic report. I do not endorse him to drive; hence, he cannot attend to his usual duties at work.

Thomas W. Higginbotham, DO, FAADEP
Board Certified, Occupational Medicine

cc:  Mr. Bunch
     Dr. SW Olson
     Neurologist
     Neurooptometrist
     WC carrier
     Atty. Shakeshaft ✓— *via email 5/7/18 & notes*

Encl:  Clinical pain diagram

**Lincoln/Bunch 1299**

**Progress Notes - 05/03/2018**



# Clinical Pain Picture

Patient: _MarkBurcott_    Date: _5/3/18_

Mark the area on your body where you feel the described sensation.
Use the appropriate symbol and include all the affected areas.

**Use the following symbols:**
Pain . . . . . . . . . .    XXX
Numbness . . . . . . . .    OOO



**Centura Health**®

CHPG PRIMARY CARE ST THOMAS MORE

CHPG PRIMARY CARE ST THOMAS MORE

*scheduled for
Thursday, May 3, 2018*

*@ 2 pm
by
Represented by
Kon Shaleshaft*

## Referral to External Consultant

April 13, 2018

Dr. Thomas Higginbotham MD
1430 S 21st St Ste 101 Colorado Springs, CO 80904
(719) 260-8190 PHONE NUMBER
(719) 260-6086 FAX NUMBER

Patient:    Mark Bryan Bunch
Date of Birth:
Date of Visit: 4/13/2018

Dear Dr. Thomas Higginbotham MD

I am referring my patient, Mark Bunch, to you for evaluation of TBI (traumatic brain injury) (CMS/HCC).

He has a past medical history of Allergy; Bronchitis; Bunion; Pneumonia; and Umbilical hernia. His has a past surgical history that includes Tonsillectomy and Tonsillectomy (1970). He reports that he has never smoked. He has never used smokeless tobacco. He reports that he does not drink alcohol or use drugs.

He has a current medication list which includes the following prescription(s): acetaminophen and cyclobenzaprine. He is allergic to penicillins.

I appreciate your assistance in his care and look forward to your findings and recommendations.

Sincerely,

Steven Wayne Olson, MD

**Lincoln/Bunch 1301**

## Assessment/Plan:

### Problem List Items Addressed This Visit
None

### Visit Diagnoses
**Chronic neck pain** - Primary
Relevant Orders
Ambulatory Referral to Chiropractic
Ambulatory Referral to Physical Therapy

**Traumatic injury of head, sequela**

Patient is here for follow up TBI. He had significant eye findings but these have resolved. For symptoms to be present after an accident seems coincidental for MS without previous symptoms. More likely the changes are secondary to the trauma. Referral already done for Neurology to evaluate. He is requesting PT and chiropractor for help with the chronic neck pain. I think that is reasonable as CT scan was negative. He is unable to work in the short term.

1. Mr. Bunch did suffer a concussion
2. Are current symptoms related to the MVA - very likely but unable to confirm without additional testing - ordered referral to Neurology
3. Return to work - Unknown

25 minutes spent in patient encounter with 15 minutes spent face to face counseling physical activity, reviewing medications, chart review

## Subjective:

Mark Bryan Bunch is a 54 y.o. male here for follow up car accident. CT scan at the time was negative. He was diagnosed with a concussion and sent home. He continues to have headaches and neck pain. Given the positive findings on exam from last visit, Brain MRI was done showing some white matter change, possibly MS. There was no previous history of neuro deficits before the trauma. He continues to have neck pain.

The following portions of the patient's history were reviewed and updated as appropriate: allergies, current medications, past family history, past medical history, past social history, past surgical history and problem list.

### Review of Systems

General: No fevers, chills
Psychological: Mood normal, no anxiety or depression
Respiratory: Denies cough, shortness of breath, wheezing
Cardiovascular: No chest pain, peripheral edema, palpitations
Gastrointestinal: Denies abdominal pain, constipation, bloody stools
Musculoskeletal: neck pain
Neurological: headaches
Dermatological: Denies rashes, lesions, pruritis

## Objective:

**EXAM:**
RE: Bunch, Mark -- MR#: CEUL0963303                                    Page 2

**Lincoln/Bunch 1302**

**Vital Signs**

BP          (!) 180/122
Pulse       82
Temp        36.5 °C (97.7 °F) (Tympanic)
Resp        18
Ht          182.9 cm (6')
Wt          106 kg (234 lb)
SpO2        95%
BMI         31.74 kg/m²

General Appearance:  Alert, cooperative, no distress, comfortable
Lungs:  Clear to auscultation bilaterally, respirations unlabored
Heart:  Regular rate and rhythm, S1 and S2 normal, no murmur
Neurologic:  Speech fluent, answers questions appropriately.  Romberg
positive.  Eye movement is more fluid today

Psych:  Pleasant, cooperative, affect normal, judgement normal

Current Outpatient Prescriptions:
• acetaminophen (TYLENOL) 500 MG tablet, Take 500 mg by mouth every 6 (six) hours as needed for mild pain., Disp: , Rfl:
• cyclobenzaprine (FLEXERIL) 10 MG tablet, Take 1 tablet (10 mg total) by mouth 2 (two) times a day as needed for muscle spasms., Disp: 60 tablet, Rfl: 11

Steven Wayne Olson, MD

RE: Bunch, Mark -- MR#: CEUL0963303                                    Page 3

Progress Notes - 04/13/2018

04/13/2018 11:51:48 AM -0600 FAXCOM

nrn-13-2018(FRI) 10:48    7207227800    P.005

PAGE 5    OF 11

## Patient Demographics for BUNCH,MARK BRYAN [CEUL0963303]

| | | | |
|---|---|---|---|
| DOB: | | SSN: | |
| Age: | **54 yrs** | Sex: | **Male** |
| Home Phone: | | Work Phone: | |
| E-Mail: | | Mobile Phone: | |
| Address: | | | |
| City/State/Zip: | | | |
| Perm Comments: | | | |

### Referral Information

| | | | |
|---|---|---|---|
| Patient: | BUNCH,MARK BRYAN [CEUL0963303] | Referral #: | 2326205 |

<="">

| | | | |
|---|---|---|---|
| Status: | Pending Review | Type: | Consultation |
| Class: | Outgoing | Reason(s): | Specialty Services Required [5] |
| Diagnosis: | S06.9X9A (ICD-10-CM) - TBI (traumatic brain injury) (CMS/HCC) | Procedure: | REF52 - AMB REFERRAL TO OCCUPATIONAL MEDICINE |
| Start: | 04/13/2018 | Expiration: | 04/13/2019 |
| Requested: | 1 | Authorized: | 1 |
| Scheduled: | | Completed: | |
| Referring Location: | CHPG Primary Care St Thomas More | Referred to Location: | |
| Referring Department: | PRST PC STM | Referred To Department: | |
| Referring Provider: | OLSON, STEVEN WAYNE | Referred To Provider: | |

### Coverages Used

| Pt Covered? | Payor | Plan | Phone # | Auth # | Precert # | Authorization Comments |
|---|---|---|---|---|---|---|
| Yes | BLUE CROSS | BLUE CROSS PPO COLORADO | (877)833-57 42 | | | |
| | WORK COMP ACE USA ESIS | WORK COMP ACE USA ESIS | 800-992-75 78 | | | |

### Order Information

| | | | |
|---|---|---|---|
| Order #: | 125860311 | Procedure: | AMB REFERRAL TO OCCUPATIONAL MEDICINE |
| Order Date: | 4/13/2018 | Expected Date: | 5/13/2018 |
| Priority: | Routine | Proc Category: | Outpatient Referral Orderables |
| Class: | Outgoing Referral | Status: | |
| Auth Provider: | OLSON, STEVEN WAYNE | Ordering User: | Brianna K Rowell, MA |
| Diagnosis: | TBI (traumatic brain injury) (CMS/HCC) | Enc Provider: | Brianna K Rowell, MA |
| Department: | Prst Pc Stm | | |
| Sched Instruct: | | | |
| Comment: | Dr. Thomas W. Higginbotham, DO Occupational medical physician in Colorado Springs, Colorado Address: 1430 S 21st St #101, Colorado Springs, CO 80904 | | |

RE: Bunch, Mark -- MR#: CEUL0963303                                    Page  4

**Lincoln/Bunch 1304**

Phone: (719) 260-8190

## Order Specific Questions

| Question | Answer | Comment |
|---|---|---|

Referral Notes

| Date | Time | Type | Summary | User |
|---|---|---|---|---|
| 04/13/2018 | 11:26 AM MDT | Provider Comments | Provider Comments | ROWELL, BRIANNA |

Note Text:
Dr. Thomas W. Higginbotham, DO
Occupational medical physician in Colorado Springs, Colorado
Address: 1430 S 21st St #101, Colorado Springs, CO 80904
Phone: (719) 260-8190

## Appointments Currently Assigned to this Referral

| Date | Time | Status | Visit Type | Provider | Department | Benefits Link |
|---|---|---|---|---|---|---|

MR Brain without Contrast

RE: Bunch, Mark -- MR#: CEUL0963303                                        Page 5

**Lincoln/Bunch 1305**

Status: Final result
**Result Notes**

**Notes recorded by Steven Wayne Olson, MD on 3/21/2018 at 11:07 AM MDT**
Let pt know MRI positive for white matter changes. No tumors. Possible MS. Referral to Neurology ordered

**PACS Images**

Show images for MR Brain without Contrast
**Study Result**

EXAM: MR BRAIN WO CONTRAST

HISTORY: Head and neck pain

COMPARISON: None

TECHNIQUE: Routine MRI sequences performed to the head without contrast.

FINDINGS: The ventricles and sulci are normal. There are no masses. There is no evidence of hemorrhage. Mild scattered areas of high signal intensity seen on FLAIR and T2-weighted sequences in the periventricular white matter regions. Some of these white matter lesions show perpendicular pattern suggesting demyelinating white matter disease from multiple sclerosis. The sinuses and mastoids are clear. Calvarium is unremarkable.

IMPRESSION:
Mild white matter disease possibly from multiple sclerosis.

Transcribed by: NTS

WS: CECANSTM-RAD460
DICTATED BY: Harlow, Curtis Date: 03/19/2018 11:30:23 MT
TRANSCRIBED DATE: 03/19/2018 11:34:08 MT

**Office Visit**

RE: Bunch, Mark -- MR#: CEUL0963303                                                              Page 6

**Lincoln/Bunch 1306**

⊕
2/23/2018
CHPG PRIMARY CARE ST THOMAS MORE

| | Traumatic brain injury, without loss of consciousness, subsequent encounter +3 more | Motor Vehicle |
| Steven Wayne Olson, MD Family Medicine Progress Notes | Dx | Crash 🖹 Reason for Visit |

Expand All Collapse All
Assessment/Plan

**Problem List Items Addressed This Visit**
    None

**Visit Diagnoses**
  Traumatic brain injury, without loss of consciousness, subsequent encounter    -  Primary
      Relevant Orders
        MR Brain without Contrast
        Ambulatory Referral to Neurology
  **Cranial nerve impairment**
      Relevant Orders
        MR Brain without Contrast
        Ambulatory Referral to Neurology
  **Balance problem**
      Relevant Orders
        MR Brain without Contrast
        Ambulatory Referral to Neurology

Patient is here for follow up TBI.  He has significant eye findings, namely coordination problems.  He doesn't exactly have cranial nerve deficits.  His eyes have full ROM but the coordination and smoothness of tracking is not present.  Romberg also positive. Since the CT scan was negative and symptoms are perhaps worse, I am going to Order an MRI.

Follow up in 2 weeks.

25 minutes spent in patient encounter with 15 minutes spent face to face counseling physical activity, reviewing medications, chart review

Subjective

**Subjective** ⩔
  Mark Bryan Bunch is a 54 y.o. male here for follow up car accident.  The other driver reversed full speed and hit him.  He did not have loss of consciousness.  He had a head trauma with some vision changes and balance/coordination issues.  CT scan at the time was negative.  He was diagnosed with a concussion and sent home.  No fevers, chills.  No nausea, vomiting.  He had no neurological problems before the car accident.

RE: Bunch, Mark -- MR#: CEUL0963303                                              Page 7

Lincoln/Bunch 1307

The following portions of the patient's history were reviewed and updated as appropriate: allergies, current medications, past family history, past medical history, past social history, past surgical history and problem list.

**Review of Systems**

**General:** No fevers, chills
**Psychological:** Mood normal, no anxiety or depression
**ENT:** Denies sore throat, ear pain, hearing changes
**Respiratory:** Denies cough, shortness of breath, wheezing
**Cardiovascular:** No chest pain, peripheral edema, palpitations
**Gastrointestinal:** Denies abdominal pain, constipation, bloody stools
**Genito-Urinary:** Denies incontinence, dysuria
**Musculoskeletal:** joint aches in back, shoulders, knees
**Neurological:** headaches, balance problems, vision changes.
**Dermatological:** Denies rashes, lesions, pruritis

**Objective:**

**EXAM:**

**Vital Signs**
BP                  150/90
Pulse               63
Temp                36.3 °C (97.3 °F) (Touch free)
Wt                  106 kg (234 lb)
SpO2                97%
BMI                 31.74 kg/m²

**General Appearance:** Alert, cooperative, no distress, comfortable
**Lungs:** Clear to auscultation bilaterally, respirations unlabored
**Heart:** Regular rate and rhythm, S1 and S2 normal, no murmur
**Neurologic:** Speech fluent, answers questions appropriately. Romberg positive. CN2-12 normal but he has difficulty tracking. Eye movement is intact but he is not fluidly tracking.
**Psych:** Pleasant, cooperative, affect normal, judgement normal

Current Outpatient Prescriptions:
• acetaminophen (TYLENOL) 500 MG tablet, Take 500 mg by mouth every 6 (six) hours as needed for mild pain., Disp: , Rfl:
• HYDROcodone-acetaminophen (NORCO) 7.5-325 mg per tablet, Take 1 tablet by mouth every 6 (six) hours as needed for moderate pain. Max Daily Amount: 4 tablets, Disp: 40 tablet, Rfl: 0
• tadalafil (CIALIS) 10 MG tablet, Take 1 tablet (10 mg total) by mouth daily as needed for erectile dysfunction., Disp: 10 tablet, Rfl: 3

Steven Wayne Olson, MD

RE: Bunch, Mark -- MR#: CEUL0963303                                    Page 8

**Lincoln/Bunch 1308**

**Instructions**

Patient declined After Visit Summary
**Additional Documentation**

Vitals:       BP 150/90
              Pulse 63
              Temp 36.3 °C (97.3 °F) (Touch free)
              Wt 106 kg (234 lb)
              SpO2 97%
              BMI 31.74 kg/m²
              BSA 2.28 m²
Flowsheets:   Travel and Exposure Screening,
              Custom Formula Data

SmartForms:   AMB MERCY RISK TOOL ADVANCED

Encounter     Billing Info,
Info:         History,
              Allergies,
              Detailed Report,
              Patient Education,
              Facesheet

**History**

Not marked as reviewed during this visit.
**Orders Placed**

MR Brain without Contrast

Ambulatory Referral to Neurology Authorized
**Other Orders Performed**

Ambulatory Referral to Podiatry Pending Review
**Medication Changes**

None

                              Medication List
**Visit Diagnoses**

Traumatic brain injury, without loss of consciousness, subsequent encounter

Cranial nerve impairment

Balance problem

Bunion, right

RE: Bunch, Mark -- MR#: CEUL0963303                              Page 9

**Lincoln/Bunch 1309**

Progress Notes - 02/13/2018

Rx Date/Time     MAY-31-2018(THU) 07:39                                    P. 003

Parkview Medical Center
400 W 16th Street
Pueblo, CO 81003
719-584-4000

ED Physician Documentation

Patient: BUNCH,MARK B
DOB:                    MRN: M000886127
Age. 54      Acct #: A00191377982
Sex: M       Loc: ED
Adm Date:
Disch Date:

Admitting Physician:
Attending Physician:
PCP Specified,None

Documenting Provider: David R Wilson

**Adult-HPI**

**- Note Date & Time**
Note Date & Time: 02/13/18  2236

**- Gen Info/Blank HPI**
**Note(s):**

This is a 54-year-old male who presents after a motor vehicle accident.  He was going about 15 miles per hour and the exit ramp, when some he stopped in front of him and then started to back up.  He estimates the total force of occlusion was around 25 miles per hour.  No airbags deployed, though he does not believe his vehicle has airbags.  He was restrained, but hit hard enough that his head struck the steering wheel on the left forehead region.  He denies loss of consciousness.  Initially he felt like he had some blurred vision and maybe even some left eye pain, but this has resolved.  When he first got out of the car, he felt like his equilibrium was off, like he has felt previously with sports injuries to the head.  He no longer has that symptom.  He does have a pounding headache.  He denies and anticoagulate use.  No history of hypertension in the past, although his blood pressures were noted to be ultimately high here.  No other acute complaints.  He denies chest or abdominal injury.
**Chief Complaint:** Motor Vehicle Collision
**Stated Complaint:** MVC/neck pain
**Time Seen by Provider:** 02/13/18 22:32
**Source:** Patient

**- Triage Note - View Only**
**Triage Assessment/Note - Documented by Nursing Staff:** pt presents after MVC around 1840. pt states a another backed into him going about 25mps. pt states hitting head on stearing wheel, denies LOC, pt states being dizzy after MVC. pt having left eye, neck/shoulder "muscle" pain. Pt denies visual changes, denies extermity numbness/weakness. nauses/vomiting.

**Adult-PMH**

**- Past Medical History**
**Past Medical History:** PMH;  Denies significant past meddial problems.  Social hx:  nonsmoker
                                                              1 of 4

Progress Notes - 02/13/2018

Rx Date/Time        MAY-31-2018(THU) 07:39                                          P. 004

BUNCH,MARK B
M000886127
A00191377982

### Adult-ROS

**- Review of Systems**
**Constitutional:** negative: Chills, Fever
**Neurological:** Dizziness - though the dizziness is now resolved, Headache.  negative: Fainting Spells
**Eyes:** Other - he was having some eye pain earlier but this has resolved.  negative: Photophobia, Pain
**ENT:** Other - some pain in the left jaw, which is now resolved other than tenderness over the left masseter muscle.  No chipped or loose teeth.

### Adult-Medical EXAM

CONSTITUTIONAL
Vital signs reviewed, Patient appears non toxic.
HEAD
        There is left scalp tenderness and a mild abrasion . No cephalohematoma.
EYES
Pupils equally round and reactive to light, Extraocular muscles intact, Conjunctiva normal, Sclera normal.
No photophobia.  Anterior and posterior segments are unremarkable.  No evidence for hyphema or vitreous hemorrhage.
ENT
        MMM, No oral lesions. Oropharynx is clear without tonsilar exudate.  No mandibular tenderness.
No tenderness over the maxilla or zygomatic arches.  There is some left masseter muscle tenderness.
There appears to be developing right periorbital ecchymosis.
NECK
Supple, no midline ttp.  No cervical adenopathy.  No JVD.  Paraspinal muscle tenderness bilaterally,
RESPIRATORY CHEST
        Breath sounds clear to auscultation bilaterally, No wheezing, No rales.  No crepitus or subcutaneous emphysema.  No significant tenderness to the chest wall.
CARDIOVASCULAR
        RRR, normal S1, normal S2, no murmurs, no rub, no thrills,
ABDOMEN
        Soft, nontender and non distended.  No guarding or rebound tenderness.
BACK
        No midline tenderness to palpation, range of motion normal, no costovertebral angle tenderness,
UPPER EXTREMITY
        Range of motion normal, Motor strength normal. Radial pulse normal.
LOWER EXTREMITY
        Range of motion normal, Motor strength normal, no cyanosis, no clubbing, no edema.  No palpable venous cords,
NEURO
        Awake, Alert and appropriate, Moves all extremities, Cranial nerves II-XII intact.  Normal gait.  No ataxia,
SKIN

2 of 4

P. 003        9809 092 61L(XHF)        WHH108NI99IH 80    IP:PI (NHL)810S-91-90H

**Lincoln/Bunch 1311**

Progress Notes - 02/13/2018

Rx Date/Time        MAY-31-2018(THU) 07:39                                      P. 005

BUNCH,MARK B
M000586127
A00191377982

Warm, dry and normal in color, no rash.

PSYCHIATRIC
Normal affect, Mood appropriate.

**Infant/Child/Adult-Data**

**- Vital Signs**
**Vital Signs:**

**Vital Signs (All)**

|            | Temp   | Pulse | Resp | BP      | Pulse Ox |
|------------|--------|-------|------|---------|----------|
| 02/13/18 22:24 |        | 74    | 16   | 182/119 | 95       |
| 02/13/18 20:05 | 98.3 F | 76    | 18   | 205/119 | 97       |

**Vital Signs - 12 hr**

|            | Temp   | Pulse | Resp | BP      | Pulse Ox |
|------------|--------|-------|------|---------|----------|
| 02/13/18 22:24 |        | 74    | 16   | 182/119 | 95       |
| 02/13/18 20:05 | 98.3 F | 76    | 18   | 205/119 | 97       |

**Infant/Child/Adult-Doctor Note**

**- ED Course**

This is a 54-year-old male who presents after a motor vehicle accident that is fairly low mechanism. He did strike his head, and had several neurologic symptoms such as blurred vision and dizziness, which is now resolved. This does seem consistent with concussion. CT of the head and cervical spine were performed revealing no evidence for any acute traumatic process. The patient was doing better. He was given acetaminophen for his headache, and we discussed concussion precautions, which she will be given. His blood pressures were elevated, but with the recent trauma, the headache, and being in the emergency department, I do not feel that immediate treatment with antihypertensives would be beneficial. I instructed the patient that this was very important to follow-up within one week with his primary care physician to have this rechecked and to initiate treatment of his blood pressures remained high. He verbalized understanding.

He was comfortable with the plan and stable at discharge.

**- Attending**
**Agree Statement:**

*ED Physician Scribe Agree*

Scribe documentation is identified by corresponding username and ID. Identified user acted as a scribe only, under the direct supervision of the Attending ED Provider as identified by that provider's signature authenticating this record.
In the event of a discrepancy between the scribe's transcription and that of the Attending, it should

3 of 4

**Progress Notes - 02/13/2018**

Rx Date/Time      MAY-31-2018(THU) 07:39

BUNCH,MARK B
M000866127
A00191377952

be understood that the attending's documentation is correct.

Cosigned by: David R Wilson

Date: 02/13/18 Time:2257

**Infant/Child/Adult-Diagnosis**
**Diagnosis:** concussion with closed head injury
**Secondary Diagnosis:** cervical strain
**Additional Diagnosis:** right periorbital ecchymosis
**Additional Diagnosis:** elevated blood pressure
**Additional Diagnosis:** Status post MVA

**Infant/Child/Adult-Disposition**

- Departure
Follow up with::
Specified, None [Primary Care Provider] -

<Electronically signed by David R Wilson MD> 02/13/18 2258

P. 005

(FAX)719 260 6086

UK HIGGINBOTHAM

**Lincoln/Bunch 1313**

Progress Notes - 02/13/2018

Rx Date/Time        MAY-31-2018(THU) 07:39                                          P. 002

```
DATE: 02/20/18 @ 0811      Parkview Medical Center - ABS *LIVE*              PAGE 1
USER: INFCS                    ATTESTATION STATEMENT

NAME:     BUNCH MARK S                              ACCT #:    A00191177982

ADM DATE:    02/13/18                          UNIT #:    H0008861.27
ATTEND PHYS: David R. Wilson, MD               SEX:       M
DIS DATE:    02/13/18                          AGE:       54
DISCH DISP:  Home - 01                         DOB:
LOS:         1                                 FIN CLASS:  WC
PT CLASS:    ERWC                              ABS STATUS: FINAL

DIAGNOSES:
ADMIT:  R42      DIZZINESS AND GIDDINESS                                    POA?
PRINC:  S06.0X9A CONCUSSION W LOSS OF CONSCIOUSNESS OF UNSP DURATIO
SECOND: S16.1XXA STRAIN OF MUSCLE  FASCIA AND TENDON AT NECK LEVEL.
        S00.11XA CONTUSION OF RIGHT EYELID AND PERIOCULAR AREA. INI
        I10      ESSENTIAL (PRIMARY) HYPERTENSION
        V49.40XA DRIVER INJURED IN COLLISION W UNSP MV IN TRAF. INI

OPERATIONS:

DRG·

STATUS    $ REIMB  MIN-LOS  MAX-LOS  STD-LOS     GRP VERS  GRP FC
F                                       36
```

I certify that the narrative descriptions of the principal and secondary diagnoses and
the major procedures performed are accurate and complete to the best of my knowledge.

_____                      DATE: _____

Progress Notes - 02/13/2018
Rx Date/Time          MHY-31-2018(THU) 07:39                                    P.009

```
DATE. 02/14/18 @ 0057      Parkview Medical Center - PHA *LIVE*          PAGE 1
USER: 04SINE               Medication Administration Summary

Patient                           Responsible Doctor David R. Wilson, MD
Account Number A00191377982  Location  ED        Unit Number   N000S86127
Age/Sex        54/M          Room                Registered Date 02/13/18
Status         DEP ER        Bed                 Discharged Date

Height   6 ft      in  182.88 cm         Body Surface Area   2.26 m2
Weight  229 lb   3.2 oz 103.963 kg

Drug Allergies  Penicillins (Penicillins)

ADRS  Not Recorded

Creatinine Test Results
No results available.

Pregnant:
Hx Diabetes

Hx Dialysis

ACETA300T - TYLENOL 500 MG ES TAB 500 MG TAB

Dose
Range Dose Low 500 MG   High 1,000 MG
Dose Instructions
Admin Route  PO
Frequency ED (ONE)
Start Date 02/13/18-2233   Stop Date 02/13/18 2234 Soft Stop      Fill Frequency
Discontinue     02/13/18-2234
Ordering Doctor David R  Wilson, MD
Rx Number       05199992
Inventory       ED
Dispensed Total ITEMS: 2           Total Forms 2.
PHA Site        MAIN

Label Comments  Adult: Pain score 1-3
                ED Msg Pain 50

Discontinued Comments Reached Stop Date

Warnings
Reviewed by Pharmacist:
REVIEW TEXT:


                              Scanned
Admin Date Time  User      Given Rx/Pt  Bag Reason Code       Items       Charge
02/13/18  2240   04SINE      Y   No /No                          2         0.00
(02/13/18 2233)


Admin Totals                                                     2           0

History
  02/13/18 2234 - EDM ORDER              by 04SINE
  02/13/18 2234 - DISCONTINUE           by PHARRGJOB    Eff: 02/13/18 2234
     FROM:
```

Lincoln/Bunch 1315

Progress Notes - 02/13/2018
**Rx Date/Time**          MAY-31-2018(THU) 07:39                                      P. 010

```
DATE: 02/14/18 @ 0057    Parkview Medical Center - PHA *LIVE*              PAGE 2
USER: 04SIME             Medication Administration Summary

Patient  ████████████████████  Responsible Doctor David R. Wilson, MD
Account Number A00191377982    Location  ED      Unit Number    M000886129
Age/Sex        54/M            Room              Registered Date 02/13/18
Status         DEP ER          Bed               Discharged Date

BUNCH,MARK B                   A00191377982                    (Continued)

       DC COMMENTS:
    TO
       DC COMMENTS:
       Reached Stop Date
  02/13/18 2239 - DEBIT                        by 04SIME
       ITEMS: 2      DOSES: 2

This is the end of the MAR Summary for Patient A00191377982 - BUNCH,MARK B.
```

**Lincoln/Bunch 1316**

Progress Notes - 02/13/2018
Rx Date/Time    MAY-31-2018(THU) 07:39

P. 011

Parkview Medical Center Inc.                    Page: 1
                    Rehab Pre-Admission Screening        Date: 05/30/18 01:07

BUNCH,MARK B
Fac: Parkview Medical Center Inc PV    Loc:Emergency Department    Bed:-
54 M                        Med Rec Num:M00008812?    Visit:A0019107780?
    Attending:                        Reg Date:02/13/18
    Reason:CONCUSSION

## Demographics

SS#:
Address:                    Phone:
Language: English Marital Status: DIVORCED Race: WHITE Religion: NO PREFERENCE OF RELIGION
Next of Kin: NONE,GIVEN ?        OTHER RELATIONSHIP
Person to Notify:

## Special Needs or Precautions

Pain Score (0-10)            5
Pain Score (0-10)            5
Pain Location            HA/ LEFT JAW
Pain Location            Left eye, neck
New Onset                No
Patient's Primary Language    English

## Current Vital Signs

Temperature            98.3 F
Heart Rate                59
Heart Rate                74
Heart Rate                78
Blood Pressure            173/115
Blood Pressure            182/119
Blood Pressure            205/113.
Respiratory Rate            19
Respiratory Rate            16
Respiratory Rate            18
O2 Sat by Pulse Oximetry (SpO2        95
%)
O2 Sat by Pulse Oximetry (SpO2        95
%)
O2 Sat by Pulse Oximetry (SpO2        97
%)
Height                6 ft
Weight                105.2?? kg

## Allergies (Entered)

Penicillins Allergy (Unverified 02/13/18 20:17)
    Rash

## Updated Pre-Screen Assessment
(if patient not admitted within 48 hours of initial pre-screen)

Review's Signature:_____

Physician's review and admission determination:_____

Continued on Page 2

P. 013        9809 092 61L(XAA)        WAHTOBNIGGIH 8O    00:01 (NHT)8102-01-NNA

**Lincoln/Bunch 1317**

Progress Notes - 02/13/2018
Rx Date/Time     MAY-31-2018(THU) 07:39                                    P.014

Parkview Medical Center Inc.                                        Page: 1
                              Vital Signs/Intake & Output           Date: 02/20/18 02:08

BUNCH,MARK B
Fac: Parkview Medical Center Inc PV     Loc:Emergency Department      Bed:-
54 M                          Med Rec Num:M000086127                  Visit:A00191277865
        Attending:                                                   Reg Date:02/13/18
        Reason:CONCUSSION

**Vital Signs**

|                              | 02/13/18 20:05 | 02/13/18 22:24 | 02/13/18 23:22 |
|------------------------------|----------------|----------------|----------------|
| Temperature                  | 98.3 F         |                |                |
| Heart Rate                   | 76             | 74             | 69             |
| Respiratory Rate             | 18             | 18             | 18             |
| Blood Pressure               | 205/119        | 182/119        | 173/119        |
| O2 Sat by Pulse Oximetry (SpO2 %) | 97        | 95             | 95             |

**Lincoln/Bunch 1318**

**Progress Notes - 02/13/2018**

Rx Date/Time          MAY-31-2018(THU) 07:39                                P.015

Parkview Medical Center Inc.                                    Page: 1
                                    Clinical Data             Date: 02/14/18 0A:19

BUNCH,MARK B
 Fac: Parkview Medical Center Inc PV    Loc:Emergency Department      Bed:-
 Age:                        Med Rec Num:M000086127                Visit:A00121377982
    Attending:                                              Reg Date:02/13/18
       Reason:CONCUSSION

**Allergies**

Penicillins Allergy (Unverified 02/13/18 20:17)
       Rash

**Clinical Data**

| Communication Special Needs | Contacts |
| --- | --- |
| Patient's Primary Language | English |
| Diagnosis | concussion with closed head injury |
| Height | 6 ft |
| Weight | 103.963 kg |
| Weight (in lbs) | 229.200000 |

| Condition | Good |
| --- | --- |
| Visit Reason | CONCUSSION |

Parkview Medical Center Inc. | ED Nursing | Page: 1
Date: [illegible]

BUNCH, MARK B
Fac: Parkview Medical Center Inc PV | Loc: Emergency Department | Bed: -
Med Rec Num: M000896127 | Visit: [illegible]
54 M | Reg Date: 02/13/18
Attending:
Reason: CONCUSSION

**ED Nursing**

ED Disposition | Start: 02/13/18 19:54
Status: Active
Freq:
Document 02/13/18 23:22 MKS (Rec: 02/13/18 23:24 MKS DEDRC9)
Disposition/Discharge Note

| | |
|---|---|
| Discharge Note/Left the Department | |
| Discharged | Home |
| Orders were initiated by the nurse per the standing order sets or per verbal order, based on the patient complaint | Yes |
| The patient left the department prior to being evaluated by the ER physician | No |
| Mobility | Independent |
| Mode of Transportation | Family/Friend Driving |
| Accompanied By | Friend |
| Discharge Checklist | Patient left with all belongings (Property Log Complete); Educated patient/guardian on all DC instructions; Copies of all instructions given to patient/guardian; Discharge instructions signed; All questions/concerns answered; Patient/Family verbalized understanding of discharge instructions |

ED First Contact | Start: 02/13/18 19:54
Freq: | Status: Active
Document 02/13/18 20:05 BDD (Rec: 02/13/18 20:12 BDD ERSHIRLPS)
ED Triage

| | |
|---|---|
| Domestic Violence Screening | |
| Do you feel safe at home? | Yes |
| Fall Risk Assessment | |
| Fall Risk Factors (Select All That Apply) | Weak and/or Dizzy |
| Total Fall Score | 1 |
| ED Suicide Screening | |
| Suicide Screening | |
| In the past 30 days have you had any thoughts that life is not worth living | No |
| ED Assessed Risk Level | No Assessed Risk/Denies Thoughts of Life not Worth Living |

ED Focused Assessment | Start: [illegible]
Freq: | Status: Active
Document 02/13/18 22:27 MKS (Rec: 02/13/18 22:31 MKS TEMROOM)
Isolation Information

Continued on Page 2

Lincoln/Bunch 1320

**Progress Notes - 02/13/2018**
Rx Date/Time          MAY-31-2018(THU) 07:39                          P. 017

---

Page: 2

BUNCH, MARK B
Fac: Parkview Medical Center Inc RV    Loc: Emergency Department         Bed: -
                                       Med Rec Num: M000086127           Visit: A00151377062

ED Nursing - Continued
  Isolation Information
    Isolation Type                          Not Isolated
Neurological
  Pupil(s)
    Right Pupil Size                        3mm
    Right Pupil Reaction                    Reactive
    Left Pupil Size                         3mm
    Left Pupil Reaction                     Reactive
  Speech Pattern
    Speech Pattern                          Normal
  Extremities/Reflexes
    Right Grip                              Strong
    Left Grip                               Strong
    Left Upper Extremity Sensation          Present
    Right Upper Extremity Sensation         Present
    Left Lower Extremity Sensation          Present
    Right Lower Extremity Sensation         Present
  Associated Symptoms
    Associated Symptoms                     Dizziness
  GCS
    Coma Scale Eye Opening                  Spontaneous
    Coma Scale Motor Response               Obeys Commands
    Coma Scale Verbal Response              Oriented
    Coma Scale Total                        15
  Comment(s)
    Comment(s)                              PT STATES THAT HE WAS IN A CAR
                                            ACCIDENT ON HIS WAY HOME AT
                                            1800, HIT HIS HEAD ON THE
                                            STEERING WHEEL WHEN A PERSON
                                            BACKED INTO HIM GOING ABOUT
                                            20MPH. HAD A BOUT OF DIZZINESS
                                            AND HAS A HA. STATES HE HAS A
                                            HX OF CONCUSSION ABOUT 30 YRS
                                            AGO. PT DENIES ANY
                                            NEUROLOGICAL ISSUES NOW, ONLY
                                            STATES HE HAS A HA. PT IS
                                            ALERT ORIENTED WARM PINK DRY
                                            RESPIRATIONS EVEN AND
                                            UNLABORED

HEENT
  Headache
    Worst Headache of Life                  No
    Onset of Symptoms                       1830
    History of Migraines                    No
  Dysphagia Screen
    ***Patients 65 Yrs or Older

  ***Swallowing Evaluation Protocol***
  Administer 3 ounces of water via cup (NO STRAWS). Consume water
  uninterrupted. Observe patient for one minute for signs or symptoms of
  aspiration.

    Unimpaired Each Step                    Position Patient upright at 90
                              Continued on Page 3

**Lincoln/Bunch 1321**

Progress Notes - 02/13/2018
Rx Date/Time      MAY-31-2018(THU) 07:39      P.018

| | Page: 2 |
|---|---|

BUNCH, MARK B

Fac: Parkview Medical Center Inc PV   Loc: Emergency Department   Bed: -
54 M    Med Rec Num: 5/05896127      Visit: 1200,01371993

ED Nursing - Continued

|  |  |
|---|---|
|  | degrees |
|  | Administered 2 ounces of water |
|  | Consumed Water Uninterrupted |
|  | Observed patient for one |
|  | minute for signs or symptoms |
|  | of aspiration |
| Swallow Screen-Results | Pass |
| Hat Chart | No |
| Swallow Screen-Physician Notified | No |
| Cardiovascular |  |
| Heart Sounds |  |
| Heart Sounds | Regular |
| Peripheral Pulses |  |
| Left Radial Pulse | 3+ (easily palpated) |
| Right Radial Pulse | 3+ (readily palpated) |
| Left Dorsalis Pedis Pulse | 3+ (easily palpated) |
| Right Dorsalis Pedis Pulse | 3+ (easily palpated) |
| Circulation |  |
| Left Upper Extremity | <3 Seconds Capillary Refill |
| Right Upper Extremity | <3 Seconds Capillary Refill |
| Left Lower Extremity | <3 Seconds Capillary Refill |
| Right Lower Extremity | <3 Seconds Capillary Refill |
| Respiratory |  |
| Distress/Effort/Pattern |  |
| Conversne Ability | Regular |
| Respiratory Pattern | Regular |
| Respiratory Distress/Effort | Unlabored |
| Lung Sounds |  |
| Lung Sounds (Upper Right) | Clear |
| Lung Sounds (Middle Right) | Clear |
| Lung Sounds (Lower Right) | Clear |
| Lung Sounds (Upper Left) | Clear |
| Lung Sounds (Lower Left) | Clear |
| Musculoskeletal |  |

Please expand "SKIN" below to access "Skin Problem(s)-BODY Documentation"

ED General

Prov:                                     Start: 02/13/18 2011

Document    02/13/18 22:32   MKS   (Rec: 02/13/18 22:32   MKS   TERRY())

General
   Patient Identifier
      Patient Identifier                    Patient Stating Name
                                            Patient Stating Birthdate
                                            Hospital ID Bracelet
   General
      History Given By                      Patient
      Arrival                               Ambulatory
      Gait                                  Steady
      Overall Appearance                    Comfortable
                                            Well Groomed
      Patient Behavior                      Cooperative
                                            Alert
      Safety                                Oriented x4

Continued on Page 4

**Lincoln/Bunch 1322**

**Progress Notes - 02/13/2018**
Rx Date/Time        MAY-31-2018(THU) 07:39                                P. 019

| | Page: 4 |
|---|---|
| **BUNCH, MARK B** | |
| Fac: Parkview Medical Center Inc PV    Loc: Emergency Department | Bed:- |
| 54 M    Med Rec Num: M00886157 | Visit: A00191371982 |

**ED Nursing - Continued**

Safety Precautions                          Side Rails Up
                                            Stretcher in Lowest Position

Comfort Interventions
    Comfort Interventions                   Assistance Offered
                                            Warm Blanket Offered/Given

ED Triage VS/Height/Weight/Sepsis           Start:  02/13/18 19:54
Item:                                       Status: Active
Document      02/13/18 20:05   BOD  (Rec: 02/13/18 20:12   BOD  ERNURSES)
VS/Height/Weight-Sepsis
    Triage/Assessment Note
        Triage Assessment/Note              pt presents after MVC around
                                            1840. pt states a another
                                            backed into him going about
                                            25mph. pt states hitting head
                                            on steering wheel, denies LOC,
                                            pt states being dizzy after
                                            MVC. pt having left eye, neck
                                            pain. Pt denies vomiting.
        Mode of Transport                   Wheelchair
        Condition on Arrival                Fair
        Information Source                  Patient
        Isolation Type                      Not Isolated
    Foreign Travel
        Foreign Travel in the Last 30 Days  No
    Height/Weight
        Height                              6 ft
        Weight (kg)                         101.563 kg
        Weight (lbs)                        229.200000
    Glasgow Coma Scale
        Coma Scale Motor Response           Obeys Commands
        Coma Scale Verbal Response          Oriented
    Pain
        0    1    2    3    4    5    6    7    8    9    10
        +----+----+----+----+----+----+----+----+----+----+
        No            Distressing           Unbearable
        Pain          Pain                       Pain
        Experiencing Pain                   Yes
        Pain Score (0-10)                   5
        Pain Scale Used                     Adult (0-10) Scale
        Pain Location                       left eye, neck
    Sepsis Screen
        Temperature
            *TEMPERATURE*
            WAS TEMPERATURE DOCUMENTED IN CORRECT UNITS:
            Temperature (94 F-108 F)        98.3 F
            Source                          Oral
        Pulse
            Rate                            76
            Source                          Automatic (Monitor)
        Blood Pressure
            Blood Pressure                  205/119
            Blood Pressure Mean             147
            Source                          Automatic (Monitor)
                    Continued on Page 5

**Lincoln/Bunch 1323**

**Progress Notes - 02/13/2018**
Rx Date/Time            MAY-31-2018(THU) 07:39                                    P. 020

BUNCH, MARK B
Fac: Parkview Medical Center Inc RV    Loc: Emergency Department       Bed:-
54 M                        Med Rec Num: M000906127                    Visit: A00131377982

ED Nursing - Continued
        Respiration
            Rate                                    18
            Oximetry (SpO2%)                         97
            Room Air                                Yes
        Sepsis Indicators
            Infection Criteria Present              None
            Query Text: As evidenced by any of the
            following:
            *Recent Invasive Procedure or Surgery
            *Fever/Chills
            *Cough/Shortness of Breath
            *Central Line
            *Abdominal Pain
            *Purulent Wound Drainage
            *Cellulitis
            *On Antibiotic Therapy (Not Prophylactic)
            )
            New/Unexplained Change in Mental Status     No
        Sepsis Screen
            Sepsis Screen                           No Definite Risk
            Action Taken                            No Action Required
Edit Result  02/13/18 20:05  BDD  (Rec: 02/13/18 20:15  BDD  ERNURLT3)
ED Height/Weight-Sepsis
        Triage/Assessment Note
            Triage Assessment/Note                  pt presents after MVC around
                                                    1840. pt states a another
                                                    backed into him going about
                                                    25mph. pt states hitting head
                                                    on steering wheel, denies loc,
                                                    pt states being dizzy after
                                                    MVC. pt having left eye, neck/
                                                    shoulder "muscle" pain. pt
                                                    denies visual changes, denies
                                                    extremity numbness/weakness,
                                                    nausea/vomiting.
ED Vitals Flowsheet                                 Start: 02/13/18 20:11
Freq:                                               Status: Active
Document      02/13/18 22:24  MKS  (Rec: 02/13/18 22:37  MKS  ERNURTW3)
Vital Signs
        Blood Pressure
            Blood Pressure                          161/115
            Site                                    Left
                                                    Arm
            Source                                  Automatic (Monitor)
        Pulse
            Rate                                    74
            Source                                  Automatic (Monitor)
        Respiration
            Rate                                    16
            Oximetry (SpO2%)                        95
            Room Air                                Yes
Pain
        Pain Assessment
                              Continued on Page 6

**Lincoln/Bunch 1324**

Progress Notes - 02/13/2018
Rx Date/Time          MAY-31-2018(THU) 07:39

P. 021

BUNCH, MARK B
Fac: Parkview Medical Center Inc PV    Loc: Emergency Department    Bed:*
54 X                                   Med Rec Num: M/95986127        Visit:A0P171(T3982
ED Nursing - Continued
        0    1    2    3    4    5    6    7    8    9    10
        *----*----*----*----*----*----*----*----*----*----*
        No           Distressing          Unbearable
        Pain         Pain                 Pain

        Experiencing Pain              Yes
        Pain Score (0-10)              6
        Pain Scale Used                Adult (0-10) Scale
        Pain Location                  RR/ LEFT JAW
        Does your pain radiate         No
        Pain Description               Throbbing
W/(date):  02/13/18 23:00  MKS   (Tme: 02/13/18 23:03  MKS  DEPRON)
Vital Signs
    Blood Pressure
        Blood Pressure                 113/113
        Site                           Right
                                       Arm
        Method                         Automatic (Monitor)
    Pulse
        Rate                           60
        Source                         Automatic (Monitor)
    Respiration
        Rate                           18
        Oximetry (SpO2%)               96
        Room Air                       Yes

                         User Key

| Monogram | Mnemonic | Name              | Credentials | Provider Type     |
|----------|----------|-------------------|-------------|-------------------|
| BDD      | 80DRBR   | Dreier,Bridgette D| RN          | Registered Nurse  |
| MKS      | 04SIME   | Sillaman,Megan K  | RN          | Registered Nurse  |

P. 023

(FAX)719 560 6086          DR HIGGINBOTHAM

Lincoln/Bunch 1325

Lincoln/Bunch 1326

AUG-16-2018(THU) 14:44    DR HIGGINBOTHAM                (FAX)719 260 6086        P.014

Case No. 1:21-cv-02896-CYB-MDB    Document 14-4    Filed 05/03/22    USDC Colorado

P.012

Rx Date/Time        MAY-31-2018(THU) 07:39

Progress Notes

Progress Notes
Rx Date/Time MAY-31-2018(THU) 07:39 P. 013

[illegible]

Medication Discharge Summary

[illegible]

Allergy History

| Date | Time | User Name | Database | Type | Allergy |
|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | No Known Drug Allergies |

This document is part of the legal medical record.

Labs/Diagnostics - 03/13/2018

Rx Date/Time    MAY-31-2018(THU) 07:39    P. 007

PARKVIEW MEDICAL CENTER
400 W. 16th Street
Pueblo, CO 81003
(719)584-4550

Diagnostic Imaging-CT

Patient: BUNCH, MARK B
Physician: Caton, Trace C MD
DOB:        Age: 54    Sex: Male
Order #: 0213-0176
Exam: Head W/O Contrast

Exam Date: 02/13/18
Location: ED
Unit #: M000886127    Acct #: A00191377982
CT PLAIN HEAD 70450
TECHNIQUE: CT scan of the head was performed without contrast. Dose
reduction, utilizing iterative reconstruction technique, was used in
the performance of the examination.

INDICATION: Pain post MVA, dizziness.

FINDINGS.

The ventricles and sulci are appropriate for the patient's age. No
space-occupying lesion, mass effect or midline shift. No abnormal
extra-axial fluid collections are identified. There is no evidence of
acute intracranial hemorrhage.

The visualized paranasal sinuses, mastoid air cells and the orbits
are unremarkable. The calvarium is intact.

IMPRESSION:

No acute intracranial process identified

Electronic Signature by Mark Abbott on 2/13/2018 9.13 PM

02/13/18 2058

Transcribed by: SBI

Primary Care Physician: Specified, None
00:

1 of 1

**Lincoln/Bunch 1328**

Labs/Diagnostics - 02/13/2018

Rx Date/Time        MAY-31-2018(THU) 07:39                                          P. 008

**PARKVIEW MEDICAL CENTER**
400 W. 16th Street
Pueblo, CO 81003
(719)584-4550

**Diagnostic Imaging-CT**

Patient: BUNCH,MARK B
Physician: Caton, Trace C MD·
DOB:            Age: 54    Sex: Male
Order #: 0213-0180
Exam: Spine Cervical W/O Contrast.

Exam Date: 02/13/18
Location: ED
Unit #: M000886127    Acct #: A00191377952
CT PLAIN C SPINE 72125
TECHNIQUE. CT scan of the cervical spine was performed without
contrast. Coronal and sagittal reformatted images were generated and
reviewed to improve anatomic localization and optimize lesion
detection. Dose reduction, utilizing iterative reconstruction
technique, was used in the performance of the examination.

INDICATION: Pain post MVA.

FINDINGS:

The cervical spine is normally aligned. There is no significant
listhesis. There are minimal degenerative changes. The dens is
normally seated between the lateral masses of C1.

No acute cervical spine fracture is identified.

Limited evaluation of the regional paraspinal soft tissues is
unremarkable

IMPRESSION:

No acute cervical spine fracture identified.

Electronic Signature by Mark Abbott on 2/13/2018 9:13 PM

02/13/18 2058

Transcribed by: SBI

Primary Care Physician: Specified,None
cc:

1 of 1

**Lincoln/Bunch 1329**

# Occupational
## And
# Environmental Health Services

Thomas W. Higginboth
Board Certified
Occupational And
Environmental Medic

FAX COVER SHEET

TO: _Arjun_____ FAX NO. _213-864-4921_

FROM: ____Thomas Higginbotham, D.O.____ FAX NO. ___(719) 260-6086___

DATE: _8-16-18___ NO. OF PAGES _29___ (INCLUDES COVER SHEET)

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CONTACT US AS SOON AS
POSSIBLE FOR RE-TRANSMISSSION.

*1 of 3*

Ref # 4402353

Re: Mark Bunch

claim #: 8220685

The information contained in this facsimile transmission is intended solely for the addressee(s) named above and is privileged and/or confidential. If the reader of this message is not the intended recipient or the person responsible to deliver it to the intended recipient, you are prohibited from reading or disclosing the information contained in this transmission. Any examination, use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by phone for instructions.

1430 South 21ˢᵗ Street, Suite 101
Colorado Springs, CO 80904
(719)260-8190
FAX 260-6086

Other Records

# Occupational
## And
## Environmental Health Services

Thomas W. Higginboth
Board Certified
Occupational And
Environmental Medic

## FAX COVER SHEET

TO: _Arjun_      FAX NO. _213-884-4921_

FROM: _____Thomas Higginbotham, D.O.___    FAX NO. ___(719) 260-6086___

DATE: _8-16-18_ NO. OF PAGES _33_ (INCLUDES COVER SHEET)

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CONTACT US AS SOON AS POSSIBLE FOR RE-TRANSMISSSION.

*2 of 3*

*Ref # 4402353*

*Re: Mark Bunch*

*Claim # : 8220685*

The information contained in this facsimile transmission is intended solely for the addressee(s) named above and is privileged and/or confidential. If the reader of this message is not the intended recipient or the person responsible to deliver it to the intended recipient, you are prohibited from reading or disclosing the information contained in this transmission. Any examination, use, dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by phone for instructions.

**1430 South 21ˢᵗ Street, Suite 101**
**Colorado Springs, CO 80904**
**(719)260-8190**
**FAX 260-6086**

Other Records _____ _____    _____ _2-2018(TUE) 12:44                                    P. 001

From:                                                          06/12/2018 12:48    #595 P.001/011

# ✚ Centura Health®

## Fax Cover Sheet
☐ **CLINICAL INFORMATION**
☐ **NON-CLINICAL INFORMATION**
(see below for sender's contact information)

| Date: 06/12/18 | Time: 1325 | Number of Pages (including cover sheet): |
|---|---|---|

**To:**

DR THOMAS HIGGINBOTHAM

Authorized Receiver's Name

Authorized Receiver's Facility

| Telephone: 719-260-8190 | Fax: 719-260-6086 |
|---|---|

**From:** Darcie Kilgore/darciekilgore@centura.org    **Dept:** Outpatient Rehab

Sender's Name

**Facility:** St. Thomas More Hospital

| Telephone: ( 719 ) 285 | 2627 | Fax: ( 719 | 285 | 2601 ) |
|---|---|---|

**Comments:**

Please have  Dr. Thomas Higginbotham sign the attached orders so we can obtain additional
authorization for  physical therapy for Mark Bunch (dob:          Attached is the progress note
from his  physical therapist for his review.  thank you

☐ DS  ☐ HP  ☐ OP  ☐ XRAY  ☐ EKG  ☐ LAB  ☐ ED  ☐ PERTINENT
☐ OTHER: _____

| Urgent | ✓ | As Requested | ☐ | For Your Review | ✓ | Reply ASAP | ✓ | Please Comment | ☐ |
|---|---|---|---|---|---|---|---|---|---|

Sender: Please Check All Boxes That Apply

NOTICE: The information contained in this fax message is intended only for the confidential use of the individual(s) named
above. If you are not the named recipient, or an agent responsible for delivering it to the named recipient, you are hereby
notified that you have received this document in error and that review, dissemination or copying of this communication is
prohibited. If you have received this communication in error, please notify us immediately by telephone or destroy or return
the original documents to us by mail. Thank you for your cooperation.

MRN#: _____    Account #: _____

CHHIM-002 (03/13)

P.003        9809 092 617(XAJ)        MAHTOBNIGGIH 80    62:01 (NHT)8102-61-9UA

**Lincoln/Bunch 1332**

Other Records

# Occupational
# And
# Environmental Health Services

Thomas W. Higginbott
Board Certified
Occupational And
Environmental Medi

## FAX COVER SHEET

TO: _Arjun_____ FAX NO. _213-864-4921_

FROM: ___Thomas Higginbotham, D.O.___ FAX NO. __(719) 260-6086__

DATE: _8-16-18__ NO. OF PAGES _33__ __ (INCLUDES COVER SHEET)

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CONTACT US AS SOON AS
POSSIBLE FOR RE-TRANSMISSSION.

3 of 3

Ref # 4402353

Re: Mark Bunch

Claim # : 8220685

The information contained in this facsimile transmission is intended solely for the
addressee(s) named above and is privileged and/or confidential. If the reader of this
message is not the intended recipient or the person responsible to deliver it to the
intended recipient, you are prohibited from reading or disclosing the information
contained in this transmission. Any examination, use, dissemination, distribution, or
copying of this communication is strictly prohibited. If you have received this
communication in error, please notify us immediately by phone for instructions.

1430 South 21ˢᵗ Street, Suite 101
Colorado Springs, CO 80904
(719)260-8190
FAX 260-6086

Other Records
Rx Date/Time        MAY-31-2018(THU) 07:33                                    P. 001

# SHAKESHAFT & GORMAN LAW FIRM, LLP

1935 Jamboree Dr. | Suite 202 | Colorado Springs, CO 80920
Tel 719.635.5886 | Fax 719.635.0966 | www.shakeshaftlawfirm.com

## FACSIMILE TRANSMISSION

**DATE:**           May 31, 2018

**TO:**             Dr. Higginbotham

**FROM:**           Brandy Newton| Paralegal

**PAGES INCLUDING COVER SHEET:** 21

**FAX NUMBER:**     719-260-6086

**REGARDING:**      Mark Bunch

**Comments:**       Please see attached Parkview Medical Center records for Mark Bunch.

IF YOU DO NOT RECEIVE ALL THE PAGES OR IF ANY PART IS ILLEGIBLE, PLEASE CALL (719) 635-5886.

### NOTICE

THIS MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN PRIVILEGED OR CONFIDENTIAL INFORMATION WHICH IS EXEMPT FROM DISCLOSURE PURSUANT TO APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR IS NOT AN EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERY OF THIS MESSAGE TO THE INTENDED RECIPIENT, DISTRIBUTION, COPYING OR OTHER DISSEMINATION OF THE INFORMATION CONTAINED IN THIS COMMUNICATION IS PROHIBITED. PLEASE CONTACT (719) 635-5886 AND RETURN THE ORIGINAL MESSAGE TO SHAKESHAFT LAW FIRM, 1935 JAMBOREE DRIVE, STE. 202, COLORADO SPRINGS, CO 80920.

P. 009        (FAX)719 260 6086        DR HIGGINBOTHAM        AUG-16-2018(THU)14:43

**Lincoln/Bunch 1334**

Other Records
Rx Date/Time     MAY-31-2018(THU) 07:39                                    P. 001

# SHAKESHAFT & GORMAN LAW FIRM, LLP
1935 Jamboree Dr. | Suite 202 | Colorado Springs, CO 80920
Tel 719.635.5886 | Fax 719.635.0966 | www.shakeshaftlawfirm.com

## FACSIMILE TRANSMISSION

**DATE:**              May 31, 2018

**TO:**                **Dr. Higginbotham**

**FROM:**              Brandy Newton| Paralegal

**PAGES INCLUDING COVER SHEET:**  21

**FAX NUMBER:**        719-260-6086

**REGARDING:**         Mark Bunch

**Comments:**          Please see attached Parkview Medical Center records for Mark Bunch.


IF YOU DO NOT RECEIVE ALL THE PAGES OR IF ANY PART IS ILLEGIBLE, PLEASE CALL (719) 635-5886.

### NOTICE

THIS MESSAGE IS INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN PRIVILEGED OR CONFIDENTIAL INFORMATION WHICH IS EXEMPT FROM DISCLOSURE PURSUANT TO APPLICABLE LAW. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR IS NOT AN EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERY OF THIS MESSAGE TO THE INTENDED RECIPIENT, DISTRIBUTION, COPYING OR OTHER DISSEMINATION OF THE INFORMATION CONTAINED IN THIS COMMUNICATION IS PROHIBITED. PLEASE CONTACT (719) 635-5886 AND RETURN THE ORIGINAL MESSAGE TO SHAKESHAFT LAW FIRM, 1935 JAMBOREE DRIVE, STE. 202, COLORADO SPRINGS, CO 80920.

**Lincoln/Bunch 1335**

## Shakeshaft Law Firm

From:      "Shakeshaft Law Firm" <office@shakeshaftlawfirm.com>
Date:      Thursday, May 31, 2018 8:10 AM
To:        "Brian D. Reusink, M.Ed." <cnaops55@aol.com>
Attach:    Parkview Medical Center part 1.pdf
Subject:   Mark Bunch

Hello Brian,

Hope all is well. I have attached records for Mark Bunch. These are his ER records from Parkview Medical Center.

Please contact me with any questions.

Thank you.

Brandy Newton | Paralegal
SHAKESHAFT & GORMAN LAW FIRM, LLP
1935 Jamboree Dr. | Suite 202 | Colorado Springs, CO 80920
Tel 719.635.5886 | Fax 719.635.0966 | www.shakeshaftlawfirm.com

CONFIDENTIALITY NOTICE: This e-mail transmission may contain confidential information that is protected by the attorney-client privilege or work-product doctrine. The information is intended only for the person named above. If you have received this transmission in error, please immediately notify us and destroy the transmission.

5/31/2018

Lincoln/Bunch 1336

Request Corr.           .5-2018(WED) 15:36            626 628 9628            P. 001

From WFI Incorporated 1.626.628.9628 Wed Aug 15 16:39:42 2018 MDT Page 1 of 1

**Liberty Mutual.**
INSURANCE

Liberty Life Assurance Co. of Boston
c/o RP Claims Processing
P.O. Box 1390
St. Peters, MO  63376

Aug 15, 2018

OCCUPATIONAL & ENVIRONMENTAL HEALTH
1430 S 21st Street Suite 101
ATTN: MEDICAL RECORDS
Colorado Springs, CO  80904

Re: Disability Benefits
Claim# 8220685            4402353
Claimant: BUNCH, MARK
Claimant DOB:

## REQUEST FOR STATUS

Liberty Mutual is the Disability Claim Administrator for your patient, listed above.

On **Aug 7 2018** we sent you a request for medical information, and as of today, that information has not yet been received. Since benefits cannot be awarded until this information is received, would you please take a moment and update us on the status of this request. Your response will help us keep your patient informed as to the status of the request.

Please review and check the appropriate box below, and fax to us at: (423) 933-2029

*213 - 884 - 4921    Arjun    Ref# 4402353*

☑ I am FAXING records to: (423) 933-2029

☐ I am MAILING records on or before (DATE): _____ (See mailing address above)

☐ Records are being reviewed, and will be released no later than (DATE): _____

☐ Records cannot be released because:

_____

☐ Other status information we should know:

_____

If you have any questions regarding this matter, please contact me.

Sincerely,

Anna Margarita Comia

Disability Information Specialist
Phone No.: (213) 349-9450
Fax No: (423) 933-2029

**Lincoln/Bunch 1337**

# Quality Assurance Report

**Request Information**

Report Date:     August 16, 2018                    **RP ID: 4402353**

Patient Name:    BUNCH, MARK

Provider Name: OCCUPATIONAL & ENVIRONMENTAL HEALTH

**Quality Assurance Information**

Scope Requested: **From February 1, 2018 to Present**

Special Request:
    Seen by: Dr. THOMAS HIGGINBOTHAM

Special Request Included? YES

Secondary Request Confirmed? YES

QC Notes:

Chart Reviewed By:  MJALA

**Lincoln/Bunch 1338**



**Medical Record Overview**

**Date:**         **August 9, 2018**

**Patient Name:**   BUNCH, MARK

**Records From:**   Dr. Dennis Helfenstein          **RP ID:** 4402352

                                      **Client ID:** 8220685
,
(720) 520-0190                        **Source:** LIBMT3

**Request Scope:** From February 1, 2018 to Present   **Req By:** K Carter
                                      Kayla Carter
**Chart Range:**    06/01/2018 - 06/01/2018

                                      **SSN:**

|  |  |  | | **Starts on** |
| Classification | From | To | Total | Page |
| --- | --- | --- | --- | --- |
| Progress Notes | Jun 1 2018 | Jun 1 2018 | 10 | 2 |
| Request Corr. |  |  | 4 | 12 |

**Total Page Count:**        14

**Notes From QC:**

**Lincoln/Bunch 1339**

Progress Notes - 06/01/2018                    08/09/2018 12:00    #874 P.005/014

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Clinical Director

Diana M. Helffenstein, M.A., L.P.C.
Licensed Professional Counselor

Brian D. Reusink, M. Ed.
Director of Operations

COLORADO

Neuropsychological

ASSOCIATES, P.C.



Primary Office
10 Inverness Dr. East
Suite 215
Englewood, CO 80112
(720) 529-0190
(720) 529-1099 Fax

Also serving clients in
Colorado Springs

## NEUROPSYCHOLOGICAL SCREENING

**NAME:**      Mark B. Bunch            **EVALUATION DATES:**    5/03/18 & 5/18/18

**DOB:**                                **REPORT PREPARED:**    6/01/18

**THIS REPORT REPRESENTS EIGHT (8) HOURS OF SERVICE**

### REFERRAL INFORMATION

Mr. Bunch was referred for a Neuropsychological Evaluation by his Workers' Compensation physician, Steven Olson, M.D. Mr. Bunch was involved in a work-related motor vehicle accident on February 13, 2018 at 6:37 p.m. On that date, he was the driver of a 2003 Ford Taurus and he was on Colorado Highway 50 in Pueblo, Colorado. Mr. Bunch reported that he was exiting I-25 onto Highway 50 West. This was a three-lane exit and he was in the middle lane. Traffic in the left lane was stopped for traffic. As he came down the ramp, a Jeep Cherokee that was in the left lane pulled into the middle lane, at which point the driver of the Jeep put his vehicle in reverse and started backing up quickly. Mr. Bunch is unsure why the driver of the Jeep took this action. The rear of the Jeep crashed into the front of Mr. Bunch's Ford Taurus. Mr. Bunch estimated that he was traveling at approximately 20 miles per hour at the time of impact and that the Jeep Cherokee was traveling at approximately 15 to 20 miles per hour. Mr. Bunch reported that his Ford Taurus did not have airbags, but he was wearing a seatbelt and shoulder harness. The impact propelled him forward and he struck his forehead on the steering wheel. Mr. Bunch showed me pictures of his forehead from following the accident. His forehead was red and swollen just to the right of center high on his forehead. To the best of his awareness, Mr. Bunch did not lose consciousness. He does report altered consciousness post-accident in the form of being dazed and confused. He reported feeling "woozy" post-accident. In addition, he experienced problems with communication such as transposing words when he talked. He texted his fiancee post-accident and he noted that his text made no sense. He reports that this altered consciousness lasted for approximately four weeks.

**Lincoln/Bunch 1340**

**NEUROPSYCHOLOGICAL SCREENING**
**Mark B. Bunch**
**Page 2**

I had an opportunity to review the State of Colorado Traffic Accident Report dated February 13, 2018. That report confirms that Mr. Bunch was driving a 2003 Ford Taurus Sedan. The Police Officer's report confirms Mr. Bunch's description of the accident. That report clarifies that the driver of the Jeep reversed his vehicle as he felt he was too close to the vehicle in front of him and did not see Mr. Bunch's vehicle in his rearview mirror. The report indicated there was "slight" damage to the front of Mr. Bunch's Ford Taurus. The report also indicates there was "slight" damage to the rear of the Jeep Grand Cherokee.

Mr. Bunch reports that he recalls seeing the brake lights of the Grand Cherokee. He does recall the sound and force of the accident as well as hitting his head on the steering wheel, although he described this memory as "vague." While Mr. Bunch felt "stunned" immediately post-accident, when he looked up, he saw the driver of the Jeep Cherokee leaving the scene of the accident. He followed the Jeep Cherokee for two to three minutes. The driver of the Jeep Cherokee ultimately pulled into the parking lot of some frontage road stores. When Mr. Bunch exited his vehicle, he felt "woozy." At that point, he sat back down in his vehicle and called 911 as well as his immediate supervisor. He believes it took the Police approximately 20 to 30 minutes to arrive on scene. His immediate supervisor arrived on scene shortly after the Police Officer. He remained in his vehicle while talking with the Police Officer. When his immediate supervisor arrived, he helped Mr. Bunch move into his vehicle. At that point, he was still feeling woozy and was also experiencing dizziness. His immediate supervisor took him to Parkview Hospital Emergency Room where he was evaluated and released. The Emergency Room physician apparently diagnosed a concussion with closed head injury as well as cervical sprain. A CT scan of the brain performed in the Emergency Room was negative. Mr. Bunch reports minimal memory of the Emergency Room evaluation. He was experiencing nausea and apparently vomited on two occasions but has no memory for doing so. Following release from the Emergency Room, his immediate supervisor drove him to his home in Canyon City. He believes he slept most of the way home. He reported feeling quite fatigued and lethargic for several weeks post-accident. The nausea, vomiting, dizziness and lethargy would all be behavioral indicators of a concussion. His memories for the day leading up to the accident are quite vague.

Mr. Bunch continues to report a constellation of physical, fatigue, visual, cognitive and emotional coping deficits consistent with a post-concussive syndrome. Dr. Olson has referred him for a Neuropsychological Evaluation as a way to more fully evaluate his current neurocognitive and neurobehavioral status. I was also asked to assist with treatment planning. Mr. Bunch is represented by an attorney, Kenneth Shakeshaft, Esq.

**BACKGROUND INFORMATION**

**Developmental History**

Mr. Bunch was born via normal vaginal delivery without complications. He met all developmental milestones within normal limits.

**Lincoln/Bunch 1341**

Progress Notes - 06/01/2018                    08/09/2018 12:00     #874 P.007/014

NEUROPSYCHOLOGICAL SCREENING
Mark B. Bunch
Page 3

### Educational History

Mr. Bunch graduated from Canyon City High School in May of 1982. He reported his Grade Point Average was 3.84. He went on to attend the University of Southern Colorado. There, he completed a B.S. Degree in Communications in May of 1986. His Grade Point Average was 3.55. He obtained a M.A. in Organizational Management from the University of Phoenix in 2000. His Grade Point Average was 3.95. He reports no learning disabilities, involvement with special education or ever having been held back a grade.

### Work History

From 1975 to 1979 Mr. Bunch worked as a cook at Mr. Ed's Restaurant. From 1979 to 1981, he was a cook at Sambo's Restaurant. From 1981 to 1988, he worked in advertising sales for the Canyon City Daily Record newspaper. From 1988 to 1995, he worked for the Colorado Department of Corrections as a Security Officer. From 1995 to 1997, he worked in advertising sales for Telecom Yellow Pages. From 1997 to 1999, he worked as Director of Marketing for Pueblo Diversified Industries. From 1999 to 2001, he worked as Director of Sales for Knowledge Alliance. From 2001 to 2007, he worked as a Sales Representative for Organo Pharmaceuticals. From 2007 to 2008, he was the Director of Marketing for HealthSouth. From 2008 to 2013, he was Director of Business Development for Evercare Hospice. From 2013 to 2015, he was a Sales Manager at Goodwill.

From January of 2016 to present, Mr. Bunch has worked as a Direct Sales Representative for Charter Communications. He described Charter Communications is a high-speed fiber-optic company similar to Comcast. He sells their products residentially, door-to-door. His marketing area is all of Southern Colorado. Mr. Bunch remains off work post-accident.

### Medical History

Mr. Bunch does not use alcohol and has never abused alcohol in anyway. He has never used or experimented with illicit drugs. He does not use tobacco or marijuana products. His medical history is notable for a tonsillectomy in 1970 and an umbilical hernia repair in May of 2017. He currently does not use any prescription medications. He uses over-the-counter pain medication such as Advil or Tylenol for his headaches and body pains.

His neuropsychological history is unremarkable, having never sustained any other traumatic brain injuries or concussions of any type, periods of unconsciousness for any reason, epilepsy, toxic exposure or neurological illnesses.

Mr. Bunch's family psychological history is unremarkable. His personal psychological history is also unremarkable. He has never previously worked with a mental health professional. To the best of his awareness, he has never been given a psychological or psychiatric diagnosis. He has never been prescribed a psychotropic medication.

**Lincoln/Bunch 1342**

**NEUROPSYCHOLOGICAL SCREENING**
**Mark B. Bunch**
**Page 4**

## CLINICAL INTERVIEW

When asked about his current physical status, Mr. Bunch reports ongoing neck, back, and shoulder pain. He would rate this pain as ranging from 5 to 7 on a 10-point scale with 10 being pain so severe that he would go to the Emergency Room if he experienced it. He reports that he is now receiving physical therapy and chiropractic care for his neck, back, and shoulder pain. He reports a constant headache, which he rated as 4 to 8 on a 10-point scale. He denied any significant problems with headaches pre-accident. He is also now occasionally experiencing what he refers to as "migraine" headaches. He would rate this headache pain as 9 on a 10-point pain scale. With these headaches, he notes a decrease in his peripheral vision as well as significant light sensitivity. He reports that with these headaches he has to lie down in a dark quiet room. He denied any migraine headaches pre-accident. Mr. Bunch reports ongoing dizziness and vertigo post-accident. These are both severe enough to negatively impact his balance. Triggers include closing his eyes. He gave the example that he cannot close his eyes when he takes a shower, therefore, he now takes baths. He also experiences episodes of disequilibrium. He is particularly aware of this problem when he reaches over to pick something up and then stands back up. He reports that his sense of smell is hypersensitive post-accident. He also note some change in his taste post-accident. By this, he is referring to the fact that there are some foods and drinks that he used to like, but no longer likes post-accident (e.g., Pepsi and pizza). He reports an ongoing problem with tinnitus bilaterally post-accident. He experiences tinnitus approximately 75% of the time. He denied any tinnitus pre-accident. He reports an ongoing problem with noise sensitivity (phonophobia) post-accident. When in a noisy or loud environment, this causes him to feel irritable, edgy, and anxious. He reports an ongoing problem with fatigue post-accident. He finds he becomes more tired more easily whether performing physical or cognitive activities. He would rate his current stamina and endurance as 25% of normal for him. He noted that he was a very high-energy individual pre-accident.

When asked about his current visual status, Mr. Bunch reports ongoing problems with both double vision and blurry vision post-accident. He reports that when he is tired the vision in his left eye will become extremely blurry as though he is looking through some sort of mesh. He also notes some decrease in his peripheral vision at those times. He reports ongoing sensitivity for fluorescent lights post-accident. He is aware that he bumps into things more frequently most notably on his left side. When driving or walking in a straight line, he tends to be veer center to the left side. He reports an ongoing problem both eye fatigue and depth perception post-accident. Based on his description, objects seem further away from him than they actually are. He notes that his eyes are slow to refocus, suggesting a possible problem with accommodation. He reports difficulties with visual scanning such as missing things that he is looking for and losing his place when reading.

When asked about his current cognitive status, Mr. Bunch reports ongoing problems with attention and concentration. He finds his mind wanders more easily and that he is more easily distractible. He reports events that most likely relate to cognitive set-loss. He reports problems with multi-tasking post-accident. He has difficulty alternating his attention between several tasks and he can no longer attend to several things simultaneously. He reports a significant

**Lincoln/Bunch 1343**

08/09/2018 12:01    #874 P.009/014

**NEUROPSYCHOLOGICAL SCREENING**
**Mark B. Bunch**
**Page 5**

problem with short-term memory post-accident. He finds he will more frequently forget his intentions, appointments, what is said to him, what he is doing if he is distracted, what he has done or said, and that he loses and misplaces things more frequently. He uses written notes, alarms, and post-it notes as a means of compensation for his memory problem. He reports that cueing will most often help his memory but occasionally it does not. He also reports that there are times when his memory for events or conversations is distinctly different from the memory of other people who have participated in the same event or conversation. Based on his description, this appears to relate to some memory contamination and/or confabulation. He reports a slight problem at times accessing remote memories but indicates that cueing typically will help his memory. He reports a number of language-based problems post-accident including difficulties with word finding, paraphasic errors in his speech, language comprehension, reading comprehension, and spelling. Mental math and math on paper are more difficult for him post-accident. Problem-solving and decision-making activities are more difficult for him post-accident. He feels his speed of information processing is slower than prior to the accident. He notes that it takes him longer to complete all tasks at this time. When writing, he will at times transpose letters and numbers. He reports an ongoing problem with spatial disorientation, finding that he will more frequently get disoriented and lost. He is aware that he makes more mistakes than usual and has difficulty catching his mistakes. He also reports problems with initiation post-accident.

When asked about his current emotional and psychological status, Mr. Bunch acknowledges feelings of depression post-accident. He would rate his depression as 3 to 4 on a 10-point scale with 10 being depression so severe that he would seriously consider suicide. Issues which he remains depressed and concerned about include his ongoing physical and cognitive deficits and the limitations that these impose. He is extremely distressed at being unable to work, as this is causing significant financial stressors for him. He is also acknowledging grief and loss associated with his various limitations. He made observation, "I just want myself back." He denied any depression pre-accident. At this point, Mr. Bunch is acknowledging social isolation which to some degree he attributes to his significant fatigue. He also avoids social situations due to cognitive and stimulus overload. He reports that if there is too much stimuli in the environment or if too much information is presented to him too rapidly, he will become overloaded and overwhelmed. At those times, he has to leave the environment. He also reports that post-accident he has difficulty filtering out background noise, suggesting an ongoing problem with his auditory gating mechanism. He denied any suicidal ideation. He does acknowledge some anhedonia, emotional lability (crying more frequently and easily), mood swings, reduced motivation, and being more emotional when tired. He reports difficulty getting to sleep at night secondary to rumination. He made the observation, "I just can't my brain off." He reports that once he gets to sleep he will wake almost hourly and at times has difficulty falling back to sleep. He reports some decreased appetite post-accident. He also reports a significant ongoing problem with irritability and reduced stress tolerance. He finds he becomes more easily upset and angry over small things that would not have bothered him previously.

Mr. Bunch acknowledges some generalized feelings of anxiety post-accident as well as more specific performance anxiety. At this point, he drives occasionally, but keeps his driving to a

**Lincoln/Bunch 1344**

**NEUROPSYCHOLOGICAL SCREENING**
Mark B. Bunch
Page 6

minimum. He reports some ongoing passenger anxiety. He would rate his passenger anxiety as 0 to 5 on a 10-point scale with 10 being a panic attack. His anxiety is highest when the vehicle was traveling at high speeds or there are bad road conditions (e.g., snow or rain). Mr. Bunch is hypervigilant when in a motor vehicle. If other vehicles get too close, he experiences a hyperstartle response. He reports nightly nightmares. He also reports intrusive thoughts related to the accident.

**RECORDS REVIEWED**

I reviewed the Parkview Medical Center Emergency Room Report dated February 13, 2018 authored by David Wilson, M.D. Dr. Wilson's description of the accident was similar to the description that I received from Mr. Bunch, including hitting his head on the steering wheel. Mr. Bunch denied loss of consciousness. Symptoms reported included blurry vision; left eye pain; disequilibrium; headache; dizziness; neck and shoulder pain; left scalp tenderness with mild abrasion; and, bruising around his right eye. A CT scan of the brain was normal. Mr. Bunch was placed on concussion precautions. His discharge diagnoses were Concussion with Closed Head Injury; Cervical Strain; and, Right Periorbital Ecchymosis. He was alert and oriented and his Glasgow Coma Scale Score was 15.

I had an opportunity to review the CT Scan Report. This was a CT scan of the head without contrast performed on February 13, 2018 as part of his evaluation in the Emergency Room at Parkview Medical Center. That study was read as normal.

I reviewed the Employer's First Report of Injury. That report indicates that the accident occurred on February 13, 2018 on Colorado Highway 50 in Pueblo, Colorado. This report confirms the basic information provided by Mr. Bunch related to the accident. The report indicates that he immediately experienced blurry vision and had difficulty moving his left eye sideways. The injury summary cites soft tissue (head) contusion due to motor vehicle accident.

I reviewed the results of an MRI of the brain without contrast performed on March 19, 2018 and read by Curtis Harlow, M.D. Dr. Harlow identified significant findings as mild scattered areas of high signal intensity seen on FLAIR and T2-weighted sequences in the periventricular white matter regions. He noted that some of these signal intensities were in the perpendicular pattern suggesting demyelinating white matter disease from multiple sclerosis.

I reviewed some records from Steven Olson, M.D. Regarding the MRI of the brain cited above. Dr. Olson states, "For symptoms to be present after an accident seems coincidental for MS without previous symptoms. More likely the changes are secondary to the trauma." I would totally agree with Dr. Olson regarding his opinion regarding the MRI results. Dr. Olson's records document persisting problems with headaches, neck pain, balance, coordination and eye movement. Specifically related to the eye movement deficit, he noted problems with coordination and smoothness of tracking suggesting an eye smooth pursuit deficit. He noted that Mr. Bunch does not have a history of neurological deficits. His diagnoses include Concussion

**Lincoln/Bunch 1345**

**NEUROPSYCHOLOGICAL SCREENING**
Mark B. Bunch
Page 7

and Traumatic Brain Injury. I received a letter, dated April 13, 2018, authored by Dr. Olson referring him to me for Neuropsychological Evaluation.

## ATTEMPTED TESTING

On May 18, 2018, we attempted formal neuropsychological testing with Mr. Bunch. He presented for the evaluation ambulatory. He was well groomed and casually dressed. He was experiencing a headache that day, which he rated as 4 on a 10-point pain scale. He was also reporting significant pain in his left shoulder when he moved his left arm. He also reported that from the time of my original interview with him until the day of testing, he had begun use of Flexeril, a muscle relaxant, as a sleep aid. He reported that this medication did help somewhat with his sleep but that his sleep was still significantly disrupted. He reported that he was also utilizing a medication for anxiety. He could not recall the name of that medication. He reported that he had used both medications the night prior to testing.

Early on in the course of testing, Mr. Bunch was administered a standalone Performance Validity Test. This was the Victoria Symptom Validity Test. His performance on the Easy Subtest was 20/24 correct. This is considered to be a passing score. His performance on the Difficult Subtest was 6/24 correct. This is considered to be a failing score. As the Victoria Symptom Validity Test is a forced-choice digit recognition test, his score of 6/24 is far below chance which is concerning for intentional lack of effort. His Total Score of 26/48 correct is a "questionable" score. Due to Mr. Bunch's performance on the VSVT, we then administered the Tombaugh Test of Memory Malingering (TOMM). His score on Learning Trial 1 was to 22/50 correct. This is a borderline passing score. His performance on Learning Trial 2 was 27/50 correct. His performance on the Retention Trial was 24/50 correct. These are both failing scores. A passing score for the TOMM Learning Trial 2 and Retention Trial would be 45/50 correct. Based on Mr. Bunch's performance on two standalone Performance Validity Tests, I made the decision to discontinue his testing. At that point in time, it was evident that I was not going to be able to obtain valid neuropsychological test scores.

## PSYCHOLOGICAL FACTORS

As part of the current evaluation, Mr. Bunch completed the Beck Depression Inventory – 2 (BDI-2). His Raw Score on this depression inventory was 45. However, his score was notably elevated as a result of his responding affirmatively to a variety of symptoms that may relate to the residual effects of a Post-Concussive Syndrome. This includes ongoing problems with fatigue, concentration, irritability, sleep disturbance, difficulties with decision making, loss of interest, agitation and emotional lability. When this factor is taken into account, Mr. Bunch's BDI-2 is best interpreted as representing at least moderate feelings of depression at this time.

Mr. Bunch was also administered the PCL-5, a PTSD inventory based on the diagnostic criteria for PTSD as established by the DSM-5. His Raw Score on this PTSD inventory was 79 (Note: maximum score on the PCL-5 is 80). In summary, Mr. Bunch is reporting essentially all symptoms of PTSD at a very high level.

**Lincoln/Bunch 1346**

**NEUROPSYCHOLOGICAL SCREENING**
Mark B. Bunch
Page 8

## SUMMARY AND RECOMMENDATIONS

Based on Mr. Bunch's retrospective description of the motor vehicle accident of February 13, 2018, he does meet the diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic Brain Injury as established by the American Congress of Rehabilitation Medicine (1993). This definition has now been accepted by the World Health Organization (2009). He also meets the diagnostic criteria for a Mild Traumatic Brain Injury as established by the DSM-5 (2013). He meets the diagnostic criteria for a Grade II (Moderate) Concussion as established by the American Academy of Neurology (1997). He sustained a blow from the steering wheel to his forehead in the course of the accident. He experienced an acceleration-deceleration force to his head that resulted in a whiplash injury. While he did not experience a loss of consciousness related to the accident, he did experience altered consciousness in the form of being dazed and confused. This altered consciousness lasted for approximately four weeks. His memories up to and during the accident are quite vague. He has several gaps in his memory post-accident, which may relate to a period of post-traumatic amnesia. He experienced nausea, vomiting, dizziness, and lethargy post-accident, which would all be behavioral indicators of a concussion. Mr. Bunch continues to report a constellation of physical, fatigue, visual, cognitive and emotional coping deficits consistent with a Post-Concussive Syndrome. He reports a clear temporal onset of cognitive problems immediately post-accident. He has been diagnosed with a Concussion/Closed Head Injury by his primary care provider, Steven Olson, M.D.

We attempted neuropsychological testing with Mr. Bunch on May 18, 2018. Based on his suboptimal performance on two standalone Performance Validity Tests, I made the decision to discontinue his testing as it was evident that we were not going to be able to obtain valid neuropsychological test results. There are a number of factors that can negatively impact performance on standalone Performance Validity Tests including pain, depression, fatigue and intentional lack of effort. At the time of his attempted testing, Mr. Bunch was experiencing at least a moderate to perhaps severe level of depression based on his self-report and results of his the Beck Depression Inventory – 2. He was experiencing a significant headache as well as left shoulder pain the day of testing. He was also experiencing a high level of fatigue due to poor and disrupted sleep as well as the potential effects of a concussion and chronic pain. These factors alone or in combination can explain most of his sub-optimal scores from the Performance Validity Tests. As noted in the body of the report, his below chance performance on the Difficult Subtest of the Victoria Symptom Validity Test is concerning for an intentional lack of effort.

As noted above, Mr. Bunch does meet the diagnostic criteria for a Post-Concussive Syndrome/Mild Traumatic Brain Injury as established by a number of professional organizations as well as by the DSM-5. We attempted testing with Mr. Bunch at just three months post-accident. He is therefore experiencing the most rapid phase of spontaneous recovery from the concussion that I would anticipate. At this point, he is not at MMI related to the concussion that he sustained in the February 13, 2018 motor vehicle accident.

**Lincoln/Bunch 1347**

**NEUROPSYCHOLOGICAL SCREENING**
Mark B. Bunch
Page 9

Mr. Bunch is experiencing some moderate to severe feelings of depression at this time. He is also reporting significant ongoing problems with fatigue, irritability, reduced stress tolerance, emotional lability and reduced motivation. These are all post-concussive symptoms that typically respond well to use of anti-depressant medications in the Select Serotonin Reuptake Inhibitor (SSRI) Class. By the writing of this report, I was informed that Frank Polanco, M.D. has taken over as Mr. Bunch's primary Workers' Compensation physician. Dr. Polanco may wish to consider Mr. Bunch for prescription of an SSRI-type anti-depressant medication. I would initially recommend Cymbalta or it's generic duloxetine. If that medication is ineffective then I would suggest Zoloft.

By the time of attempted testing, Mr. Bunch had been prescribed a muscle relaxant to be used at night as a sleep aid. He has also apparently been prescribed an anti-anxiety medication, again to be used at night possibly as a sleep aid. He could not recall the name of this medication. In either event, he reports that the medications do help somewhat, but he still experiences significant problems with both sleep onset and sleep maintenance. I would, therefore, suggest that Dr. Polanco consider trazodone as a sleep aid.

For Mr. Bunch's residual cognitive problems, he would likely benefit from a period of individual cognitive rehabilitation. Given that he is early post-accident that treatment should take a restorative approach. It should also focus on helping him to develop strategies to compensate for his residual cognitive problems.

As noted above, Mr. Bunch is experiencing moderate to perhaps severe feelings of depression at this time. He is also reporting problems with irritability and reduced stress tolerance. He is reporting symptoms consistent with a Post-Traumatic Stress Disorder related to the accident. These are all accident-related issues that should be addressed in individual psychotherapy. I would recommend that this be with a therapist familiar with Post-Concussive Syndrome if at all possible.

Mr. Bunch is reporting a variety of vision problems consistent with a Post-Traumatic Vision Syndrome. It appears that ocular motor and smooth pursuit deficits have been identified post-accident. He is also reporting symptoms suggestive of a possible left visual inattention. He would, therefore, benefit from further evaluation and possible treatment with a neuro-optometrist. Based on the type of visual problems that Mr. Bunch is reporting, I would recommend evaluation with a neuro-optometrist prior to releasing him to return to drive.

As noted above, I would recommend evaluation with a neuro-optometrist prior to releasing Mr. Bunch to return to driving. Some consideration might also be given to a formal driving evaluation prior to releasing Mr. Bunch to drive. As driving is an integral part of Mr. Bunch's job, a release to return to driving will be a key component to his overall release to return to work.

**Lincoln/Bunch 1348**

**NEUROPSYCHOLOGICAL SCREENING**
Mark B. Bunch
Page 10

### DSM-5 DIAGNOSIS

| | |
|---|---|
| 331.83 | Mild Neurocognitive Disorder due to Traumatic Brain Injury with Behavioral Disturbance (behavioral disturbance includes irritability, reduced stress tolerance, and anger outburst). |
| 293.83 | Depressive Disorder due to Traumatic Brain Injury, Mild. |
| 309.81 | Post-Traumatic Stress Disorder. |

Once Mr. Bunch's pain, depression and fatigue are better resolved, I will be happy to see him back for a neuropsychological update. Until that time, I hope the above findings and recommendations are helpful to your overall care and treatment of Mr. Bunch. Should you have any further questions, please feel free to contact me at anytime.

*Dennis A. Helffenstein, Ph. D.*

Dennis A. Helffenstein, Ph.D., C.R.C.
Licensed Clinical Psychologist
Colorado License # 1484
Certified Rehabilitation Counselor # 00001338
Diplomate, American Board of Vocational Experts # 64073
Certified, Health Service Provider in Psychology National Register # 41454

Request Corr.                                                      08/09/2018 11:59    #874 P.001/014

From WFI Incorporated 1.626.628.9628 Tue Aug  7 12:28:33 2018 MDT Page 1 of 4

 **Liberty Mutual.** INSURANCE

Liberty Life Assurance Co. of Boston
c/o RP Claims Processing
P.O. Box 1390
St. Peters, MO  63376

Aug 7, 2018

HELFENSTEIN, DR DENNIS, PHD
10 Iverness Dr East, Ste 215
ATTN: MEDICAL RECORDS
Englewood, CO  80112

Re:  Long Term Disability Benefits
Claim# 8220685          4402352
Claimant: BUNCH, MARK
Claimant DOB:

Dear  Medical Records,

Liberty Mutual is the Disability Claim Administrator for your patient, listed above.

To evaluate your patient's eligibility for disability benefits and help facilitate a return to work when appropriate, we are requesting the following information:

**From February 1, 2018 to Present**

Seen by: Dr Dennis Helfenstein

We ask that you provide this information within a week of the date of this mailing.  Failure to provide the requested information may result in an adverse benefit or claim determination.  The information can be faxed to our office at our secure fax number (213) 884-4921     or mailed to the above address.

If prepayment is required, please fax an invoice indicating the number of pages, the Federal TAX ID, and the amount due.  If you're a hospital, only abstract records are required:  admission, history/physical, OP reports, discharge summaries, etc.

Although HIPAA does not apply to disability insurance carriers, we understand your responsibilities under HIPAA as a health care provider, and our associated responsibility of ensuring this information is protected against deliberate or inadvertent misuse or disclosure.

As the insurance carrier providing employer sponsored LTD benefits coverage to your patient, we have enclosed a HIPAA compliant authorization signed by your patient allowing the release of information to our company.  This authorization specifically allows you to release medical information to Liberty Mutual, and is valid for 2 years from the date of signature.

If you have any questions regarding this matter, please contact me.

Sincerely,

Anna Margarita Comia
Disability Information Specialist
Phone No.:  (213) 269-5922
Fax No:   (213) 884-4921

**Lincoln/Bunch 1350**

Request Corr.                                                08/09/2018 11:59    #874 P.002/014

From WFI Incorporated 1.626.628.9628 Tue Aug  7 12:28:33 2018 MDT Page 2 of 4





**Liberty Mutual.**
INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5656
Secure Fax No.: (603) 334-9400

### AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:

Person(s) or group(s) of persons authorized to use or disclose the information: Any physicians, medical practitioners, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

Person(s) or group(s) of persons authorized to collect or otherwise receive the information: The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employers, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

Description of the information that may be used or disclosed: This Authorization specifically includes the release of all information related to:
* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatment, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including HIV/AIDS.
* Job duties, earnings, personnel records and other work related information and credit reports, bank account, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents.

The information will be used or disclosed only for the following purpose(s): For purposes of investigating, evaluating and processing my claim, and/or for insurance-related functions.

### STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:

I understand that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

I understand that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

I understand that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization. If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration. The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print)  _Frank Bunch_

Name of legal representative, if applicable (print) _Ken Stoleshaft_           Relationship  _Attorney_

Signature of claimant or legal representative  _Ken Bunch_

Date of birth: _____    Claim Number: _1230685_    Date: _____

A copy of this authorization will be considered as valid as the original.

pg. 1  Authorization-Standard-2016

**Lincoln/Bunch 1351**

Request Corr.                                          08/09/2018 11:59    #874 P.003/014

From WFI Incorporated 1.626.628.9628 Tue Aug  7 12:28:33 2018 MDT Page 3 of 4



November 15, 2017

To Whom It May Concern:

Liberty Life Assurance Company of Boston ("Liberty Life") authorizes ReleasePoint to act on its behalf for the purpose of obtaining medical records in connection with the administration of your patient's disability claim.

The enclosed authorization to Obtain and Release Information, as executed by the patient, directs the release of medical information to Liberty Life.  We request that you please mail records to:

Liberty Life Assurance Company of Boston
c/o ReleasePoint
P.O. Box 1390
St. Peters, MO  63376

Sincerely,

Robert A. Parks, FLMI, ALHC, RHU, HIA
Operations Manager
Liberty Mutual Benefits Claims

**Lincoln/Bunch 1352**

Request Corr.                                                08/09/2018 12:00     #874 P.004/014
      From WFI Incorporated 1.626.628.9628 Tue Aug  7 12:28:33 2018 MDT Page 4 of 4

# Save Time and Avoid Follow-up Calls
# Use our Secure Status and Upload Portal

Using our secure online portal, you can provide us with status information on our request for medical records, and upload records directly to our system.

Here's how it works:

**STEP 1:** Go to https://portal.releasepoint.com to bring up the portal on your browser.

**STEP 2:** Enter the RPID and Access Key:

| | |
|---|---|
| Patient Name: | BUNCH, MARK |
| RP ID: | 4402352 |
| Access Code: | HEL097 |

**STEP 3:** Select either "Upload Records" or "Update Status" and follow the instructions on the screen.

**STEP 4:** Record your confirmation number, and you're done.

**Thank you for using the ReleasePoint Provider Portal.**

Powered By ReleasePoint

**Lincoln/Bunch 1353**

# Quality Assurance Report

## Request Information

Report Date:    August 9, 2018              **RP ID: 4402352**

Patient Name:    BUNCH, MARK

Provider Name: HELFENSTEIN, DR DENNIS, PHD

## Quality Assurance Information

Scope Requested: **From February 1, 2018 to Present**

Special Request:
    Seen by: Dr Dennis Helfenstein

Special Request Included? YES

Secondary Request Confirmed? YES

QC Notes:

Chart Reviewed By:  MJALA

**Lincoln/Bunch 1354**

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207

MR. MARK BUNCH

**Lincoln/Bunch 1355**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

August 7, 2018

Mr. Mark B. Bunch

RE:    Long Term Disability (LTD) Benefits
       Charter Communications, Inc.
       Claim #: 8220685

Dear Mr. Mark Bunch:

Liberty Life Assurance Company of Boston ("Liberty") is responsible for managing claims for Long Term Disability (LTD) benefits under Charter Communications, Inc.'s Group Disability Policy.  We are writing in reference to your claim for LTD benefits under the Policy.

We are currently reviewing your eligibility for disability benefits, and are in need of additional information.

On August 7, 2018, we requested medical records from Dr. Higginbotham, Dr. Helfenstein, and Dr. Christiansen.     This information is necessary to complete our initial claims investigation.  Please provide us with the following information to assist us with our review of your eligibility for benefits:

- Office treatment notes, test results, operative reports, prescription histories, and treatment plans from February 1, 2018 through the present from Dr. Higginbotham, Dr. Helfenstein, and Dr. Christiansen.

If there are any other attending physicians or specialists, including physical therapy providers, that we are unaware of, please have them forward all medical records pertinent to your disability within the timeframe stated above.

Charter Communications, Inc.'s LTD Policy requires that, in order to receive benefits, you provide proof of disability within a required timeframe.  Your cooperation in providing the requested information is essential to our claim investigation.

In the absence of this information, your claim may be denied.

We ask that you provide us with this information no later than August 21, 2018 as required under the terms of the Policy.

1  of  2

**Lincoln/Bunch 1356**

If you have any questions regarding this matter, please contact me.

Sincerely,

Kayla Carter
LTD Specialist
Phone No.: (844) 384-5858 Ext. 18334
Secure Fax No.: (603) 559-9400

2  of  2

**Lincoln/Bunch 1357**

3W212580030

 Liberty Mutual. INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

## AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

**I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:**

**Person(s) or group(s) of persons authorized to use or disclose the information:** Any physicians, medical practitioners, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

**Person(s) or group(s) of persons authorized to collect or otherwise receive the information:** The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employees, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

**Description of the information that may be used or disclosed:** This Authorization specifically includes the release of all information related to:

* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatments, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including HIV/AIDS.
* Job duties, earnings, personnel records and other work related information and credit reports, bank records, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents

**The information will be used or disclosed only for the following purpose(s):** For purposes of investigating, evaluating and processing my claim, and/or for insurance-related functions.

### STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:

I understand that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

I understand that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

I understand that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization. If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration. The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print) Frank Bunett

Name of legal representative, if applicable (print) Ken shokeshaft          Relationship  Attorney

Signature of claimant or legal representative  Mon Em

Date of Birth: _____    Claim Number: 8220685    Date: _____

**A copy of this authorization will be considered as valid as the original.**

pg. 1 Authorization-Standard-2016

**Lincoln/Bunch 1358**

3W212180030



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

July 2, 2018

Mr. Mark B. Bunch

RE:     Long Term Disability (LTD) Benefits
        Charter Communications, Inc.
        Claim #: 8220685

Dear Mr. Mark Bunch:

Liberty Life Assurance Company of Boston ("Liberty") is responsible for managing claims for Long Term Disability (LTD) benefits under Charter Communications, Inc.'s Group Disability Policy.  We are writing in reference to your claim for LTD benefits under the Policy.

We are currently reviewing your eligibility for disability benefits, and are in need of additional information.

On July 2, 2018, we requested medical records from you and your treating providers.    This information is necessary to complete our initial claims investigation.  Please provide us with the following information to assist us with our review of your eligibility for benefits:

- Office treatment notes, test results, operative reports, prescription histories, and treatment plans from February 1, 2018 through the present from your treating providers.

If there are any other attending physicians or specialists, including physical therapy providers, that we are unaware of, please have them forward all medical records pertinent to your disability within the timeframe stated above.

Please complete the forms indicated below and return them to our office by August 1, 2018:

   ___   Activities Questionnaire Form
   ___   Authorization - Medical
   ___   Claimant Information Form
   ___   Claimant Supplementary Statement
   ___   Family Information Questionnaire
   ___   Training Education Experience
   ___   Other

Lincoln/Bunch 1359

3W212180030

Charter Communications, Inc.'s LTD Policy requires that, in order to receive benefits, you provide proof of disability within a required timeframe. Your cooperation in providing the requested information is essential to our claim investigation.

In the absence of this information, your claim may be denied.

We ask that you provide us with this information no later than August 16, 2018 as required under the terms of the Policy.

If you have any questions regarding this matter, please contact me.

Sincerely,

Kayla Carter
LTD Specialist
Phone No.: (844) 384-5858 Ext. 18334
Secure Fax No.: (603) 559-9400

Attachments:   Activities Questionnaire Form
               Authorization - Medical
               Claimant Information Form
               Claimant Supplementary Statement
               Family Information Questionnaire
               Training Education Experience

Lincoln/Bunch 1360

3W212180030



Liberty
Mutual.
INSURANCE

| Liberty Life Assurance Company of Boston |
| Group Benefits Disability Claims |
| P.O. Box 7207 |
| London, KY 40742-7207 |
| Phone No.: (844) 384-5858 |
| Secure Fax No.: (603) 559-9400 |

## AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

**I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:**

**Person(s) or group(s) of persons authorized to use or disclose the information:** Any physicians, medical practitioners, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

**Person(s) or group(s) of persons authorized to collect or otherwise receive the information:** The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employees, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

**Description of the information that may be used or disclosed:** This Authorization specifically includes the release of all information related to:

* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatments, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including HIV/AIDS.
* Job duties, earnings, personnel records and other work related information and credit reports, bank records, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents

**The information will be used or disclosed only for the following purpose(s):** For purposes of investigating, evaluating and processing my claim, and/or for insurance-related functions.

## STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:

**I understand** that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

**I understand** that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

**I understand** that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization. If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration. The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print) _Alan K Bunch_

Name of legal representative, if applicable (print) _Ken stakeshaft_    Relationship _Attorney_

Signature of claimant or legal representative _____

Date of Birth: _____    Claim Number: _8220685_    Date: _____

**A copy of this authorization will be considered as valid as the original.**

pg. 1 Authorization-Standard-2016

**Lincoln/Bunch 1361**

Bunch, Mark Bryan (MR # CEUL0963303) DOB:  Encounter Date: 04/13/2018

3W212180030

Letter by Steven Wayne Olson, MD on 4/13/2018



## Centura Health®
CHPG PRIMARY CARE ST THOMAS MORE

CHPG PRIMARY CARE ST THOMAS MORE
## Referral to External Consultant

April 13, 2018

Colorado Neuropsychological: Helffenstein Dennis MD
Address: 10 Inverness Dr E, Englewood, CO 80112
Phone: (720) 529-0190
Fax:720-529-1099

Patient:    **Mark Bryan Bunch**
Date of Birth:
Date of Visit: **4/13/2018**

Dear Colorado Neuropsychological: Helffenstein Dennis MD :

I am referring my patient, Mark Bunch, to you for evaluation of - **TBI (traumatic brain injury) (CMS/HCC** .

He has a past medical history of Allergy; Bronchitis; Bunion; Pneumonia; and Umbilical hernia. His has a past surgical history that includes Tonsillectomy and Tonsillectomy (1970). He reports that he has never smoked. He has never used smokeless tobacco. He reports that he does not drink alcohol or use drugs.

He has a current medication list which includes the following prescription(s): acetaminophen and cyclobenzaprine. He is allergic to penicillins.

I appreciate your assistance in his care and look forward to your findings and recommendations.

Sincerely,

Steven Wayne Olson, MD

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 5/18/18 4:47 PM            Page 1 of 9

Lincoln/Bunch 1362

Bunch, Mark Bryan (MR # CEUL0963303) DOB:

3W212180030
Encounter Date: 04/13/2018

**Assessment/Plan:**

**Problem List Items Addressed This Visit**
    None

**Visit Diagnoses**
    **Chronic neck pain**    - Primary
        Relevant Orders
            Ambulatory Referral to Chiropractic
            Ambulatory Referral to Physical Therapy

    **Traumatic injury of head, sequela**

Patient is here for follow up TBI.  He had significant eye findings but these have resolved.  For symptoms to be present after an accident seems coincidental for MS without previous symptoms.  More likely the changes are secondary to the trauma.  Referral already done for Neurology to evaluate.  He is requesting PT and chiropractor for help with the chronic neck pain.  I think that is reasonable as CT scan was negative.  He is unable to work in the short term.

1.  Mr. Bunch did suffer a concussion
2.  Are current symptoms related to the MVA - very likely but unable to confirm without additional testing - ordered referral to Neurology
3.  Return to work - Unknown

25 minutes spent in patient encounter with 15 minutes spent face to face counseling physical activity, reviewing medications, chart review

**Subjective:**

  Mark Bryan Bunch is a 54 y.o. male here for follow up car accident.  CT scan at the time was negative.  He was diagnosed with a concussion and sent home.  He continues to have headaches and neck pain.  Given the positive findings on exam from last visit, Brain MRI was done showing some white matter change, possibly MS.  There was no previous history of neuro deficits before the trauma.  He continues to have neck pain.

The following portions of the patient's history were reviewed and updated as appropriate: allergies, current medications, past family history, past medical history, past social history, past surgical history and problem list.

**Review of Systems**

**General:** No fevers, chills
**Psychological:** Mood normal, no anxiety or depression
**Respiratory:** Denies cough, shortness of breath, wheezing

Lincoln/Bunch 1363

Bunch, Mark Bryan (MR # CEUL0963303) DOB:

3W212180030
Encounter Date: 04/13/2018

**Cardiovascular:** No chest pain, peripheral edema, palpitations
**Gastrointestinal:** Denies abdominal pain, constipation, bloody stools
**Musculoskeletal:** neck pain
**Neurological:** headaches
**Dermatological:** Denies rashes, lesions, pruritis

**Objective:**

**EXAM:**

**Vital Signs**
| | |
|---|---|
| BP | (!) 180/122 |
| Pulse | 82 |
| Temp | 36.5 °C (97.7 °F) (Tympanic) |
| Resp | 18 |
| Ht | 182.9 cm (6') |
| Wt | 106 kg (234 lb) |
| SpO2 | 95% |
| BMI | 31.74 kg/m² |

**General Appearance:** Alert, cooperative, no distress, comfortable
**Lungs:** Clear to auscultation bilaterally, respirations unlabored
**Heart:** Regular rate and rhythm, S1 and S2 normal, no murmur
**Neurologic:** Speech fluent, answers questions appropriately. Romberg
positive. Eye movement is more fluid today

**Psych:** Pleasant, cooperative, affect normal, judgement normal

Current Outpatient Prescriptions:
• acetaminophen (TYLENOL) 500 MG tablet, Take 500 mg by mouth every 6 (six) hours as
needed for mild pain., Disp: , Rfl:
• cyclobenzaprine (FLEXERIL) 10 MG tablet, Take 1 tablet (10 mg total) by mouth 2 (two) times
a day as needed for muscle spasms., Disp: 60 tablet, Rfl: 11

Steven Wayne Olson, MD

Lincoln/Bunch 1364

Bunch, Mark Bryan (MR # CEUL0963303) DOB:    3W212180030
Encounter Date: 04/13/2018

**Assessment/Plan:**

**Problem List Items Addressed This Visit**
None

**Visit Diagnoses**
**Traumatic brain injury, without loss of consciousness, subsequent encounter   -**
Primary
  Relevant Orders
    MR Brain without Contrast
    Ambulatory Referral to Neurology

**Cranial nerve impairment**
  Relevant Orders
    MR Brain without Contrast
    Ambulatory Referral to Neurology

**Balance problem**
  Relevant Orders
    MR Brain without Contrast
    Ambulatory Referral to Neurology

Patient is here for follow up TBI.  He has significant eye findings, namely coordination problems.
He doesn't exactly have cranial nerve deficits.  His eyes have full ROM but the coordination
and smoothness of tracking is not present.  Romberg also positive.  Since the CT scan was
negative and symptoms are perhaps worse, I am going to Order an MRI.

Follow up in 2 weeks.

25 minutes spent in patient encounter with 15 minutes spent face to face counseling physical
activity, reviewing medications, chart review

**Subjective:**

  Mark Bryan Bunch is a 54 y.o. male here for follow up car accident.  The other driver reversed
full speed and hit him.  He did not have loss of consciousness.  He had a head trauma with
some vision changes and balance/coordination issues.  CT scan at the time was negative.  He
was diagnosed with a concussion and sent home.  No fevers, chills.  No nausea, vomiting.  He
had no neurological problems before the car accident.

Lincoln/Bunch 1365

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 04/13/2018

3W212180030

The following portions of the patient's history were reviewed and updated as appropriate:
allergies, current medications, past family history, past medical history, past social history, past
surgical history and problem list.

**Review of Systems**

**General:** No fevers, chills
**Psychological:** Mood normal, no anxiety or depression
**ENT:** Denies sore throat, ear pain, hearing changes
**Respiratory:** Denies cough, shortness of breath, wheezing
**Cardiovascular:** No chest pain, peripheral edema, palpitations
**Gastrointestinal:** Denies abdominal pain, constipation, bloody stools
**Genito-Urinary:** Denies incontinence, dysuria
**Musculoskeletal:** joint aches in back, shoulders, knees
**Neurological:** headaches, balance problems, vision changes.
**Dermatological:** Denies rashes, lesions, pruritis

**Objective:**

**EXAM:**

**Vital Signs**
BP              150/90
Pulse           63
Temp            36.3 °C (97.3 °F) (Touch free)
Wt              106 kg (234 lb)
SpO2            97%
BMI             31.74 kg/m²

**General Appearance:** Alert, cooperative, no distress, comfortable
**Lungs:** Clear to auscultation bilaterally, respirations unlabored
**Heart:** Regular rate and rhythm, S1 and S2 normal, no murmur
**Neurologic:** Speech fluent, answers questions appropriately. Romberg
positive. CN2-12 normal but he has difficulty tracking. Eye
movement is intact but he is not fluidly tracking.
**Psych:** Pleasant, cooperative, affect normal, judgement normal

Current Outpatient Prescriptions:
• acetaminophen (TYLENOL) 500 MG tablet, Take 500 mg by mouth every 6 (six) hours as
needed for mild pain., Disp: , Rfl:
• HYDROcodone-acetaminophen (NORCO) 7.5-325 mg per tablet, Take 1 tablet by mouth
every 6 (six) hours as needed for moderate pain. Max Daily Amount: 4 tablets, Disp: 40 tablet,
Rfl: 0
• tadalafil (CIALIS) 10 MG tablet, Take 1 tablet (10 mg total) by mouth daily as needed for
erectile dysfunction., Disp: 10 tablet, Rfl: 3

Steven Wayne Olson, MD

Lincoln/Bunch 1366

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    3W212180030
                                                      Encounter Date: 04/13/2018

| Patient Demographics for BUNCH,MARK BRYAN [CEUL0963303] | |
|---|---|
| DOB: | SSN: |
| Age:            **54 yrs** | Sex:            **Male** |
| Home Phone: | Work Phone: |
| E-Mail: | Mobile Phone: |
| Address: | |
| City/State/Zip: | |
| Perm Comments: | |

**Referral Information**

| | | | |
|---|---|---|---|
| Patient: | **BUNCH,MARK BRYAN [CEUL0963303]** | Referral #: | **2326206** |

**<="">**

| | | | |
|---|---|---|---|
| Status: | **Pending Review** | Type: | **Neurology** |
| Class: | **Outgoing** | Reason(s): | **Specialty Services Required [5]** |
| Diagnosis: | **S06.9X9A (ICD-10-CM) - TBI (traumatic brain injury) (CMS/HCC)** | Procedure: | **REF46 - AMB REFERRAL TO NEUROLOGY** |
| Start: | **04/13/2018** | Expiration: | **04/13/2019** |
| Requested: | **1** | Authorized: | **1** |
| Scheduled: | | Completed: | |
| Referring Location: | **CHPG Primary Care St Thomas More** | Referred to Location: | |
| Referring Department: | **PRST PC STM** | Referred To Department: | |
| Referring Provider: | **OLSON, STEVEN WAYNE** | Referred To Provider: | |

**Coverages Used**

| Pt Covered? | Payor | Plan | Phone # | Auth # | Precert # | Authorization Comments |
|---|---|---|---|---|---|---|

Lincoln/Bunch 1367

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    Encounter Date: 04/13/2018
                                                                            3W212180030

| Yes | BLUE CROSS | BLUE CROSS PPO COLORADO | (877) 833-5742 |
| --- | --- | --- | --- |
| | WORK COMP ACE USA ESIS | WORK COMP ACE USA ESIS | 800-992-7578 |

**Order Information**

| | | | |
| --- | --- | --- | --- |
| Order #: | 125860312 | Procedure: | AMB REFERRAL TO NEUROLOGY |
| Order Date: | 4/13/2018 | Expected Date: | 5/13/2018 |
| Priority: | **Routine** | Proc Category: | **Outpatient Referral Orderables** |
| Class: | **Outgoing Referral** | Status: | |
| Auth Provider: | **OLSON, STEVEN WAYNE** | Ordering User: | **Brianna K Rowell, MA** |
| Diagnosis: | **TBI (traumatic brain injury) (CMS/HCC)** | Enc Provider: | **Brianna K Rowell, MA** |
| Department: | **Prst Pc Stm** | | |
| Sched Instruct: | | | |
| Comment: | **Colorado Neuropsychological: Helffenstein Dennis MD Doctor in Arapahoe County, Colorado Address: 10 Inverness Dr E, Englewood, CO 80112 Phone: (720) 529-0190** | | |

**Order Specific Questions**

| Question | Answer | Comment |
| --- | --- | --- |

**Referral Notes**

| Date | Time | Type | Summary | User |
| --- | --- | --- | --- | --- |
| 04/13/2018 | 11:26 AM MDT | **Provider Comments** | **Provider Comments** | **ROWELL, BRIANNA** |

Note Text:
**Colorado Neuropsychological: Helffenstein Dennis MD
Doctor in Arapahoe County, Colorado
Address: 10 Inverness Dr E, Englewood, CO 80112
Phone: (720) 529-0190**

**Appointments Currently Assigned to this Referral**

| Date | Time | Status | Visit Type | Provider | Department | Benefits Link |
| --- | --- | --- | --- | --- | --- | --- |

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 5/18/18 4:47 PM                    Page 7 of 9

Lincoln/Bunch 1368

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                    3W212180030
                                                    Encounter Date: 04/13/2018

**MR Brain without Contrast**
Status: Final result
**Result Notes**

**Notes recorded by Steven Wayne Olson, MD on 3/21/2018 at 11:07 AM MDT**
Let pt know MRI positive for white matter changes.  No tumors.  Possible MS.  Referral to
Neurology ordered


**PACS Images**

Show images for MR Brain without Contrast
**Study Result**

EXAM: MR BRAIN WO CONTRAST

HISTORY: Head and neck pain

COMPARISON: None

TECHNIQUE:  Routine MRI sequences performed to the head without
contrast.

FINDINGS: The ventricles and sulci are normal. There are no masses.
There is no evidence of hemorrhage. Mild scattered areas of high
signal intensity seen on FLAIR and T2-weighted sequences in the
periventricular white matter regions. Some of these white matter
lesions show perpendicular pattern suggesting demyelinating white
matter disease from multiple sclerosis. The sinuses and mastoids are

**Lincoln/Bunch 1369**

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                Encounter Date: 04/13/2018

3W212180030

clear. Calvarium is unremarkable.

IMPRESSION:
Mild white matter disease possibly from multiple
sclerosis.

Transcribed by: NTS

WS: CECANSTM-RAD460
DICTATED BY: Harlow, Curtis Date: 03/19/2018 11:30:23 MT
TRANSCRIBED DATE: 03/19/2018 11:34:08

Lincoln/Bunch 1370

Bunch, Mark Bryan (MR # CEUL0963303) DOB:

3W212180030
Encounter Date: 04/06/2018

Letter by Steven Wayne Olson, MD on 4/6/2018



Centura Health®    CHPG PRIMARY CARE ST THOMAS MORE

CHPG PRIMARY CARE ST THOMAS MORE

**Referral to External Consultant**

April 6, 2018

Dr. Christiansen
760 Piedra Dr Canon City, CO 81212
Phone(719) 275-8109
Fax number(719) 275-6036

Patient:    **Mark Bryan Bunch**
Date of Birth:
Date of Visit: **4/6/2018**

Dear Dr. Christiansen:

I am referring my patient, Mark Bunch, to you for evaluation of Chronic neck pain .

He has a past medical history of Allergy; Bronchitis; Bunion; Pneumonia; and Umbilical hernia. His has a past surgical history that includes Tonsillectomy and Tonsillectomy (1970). He reports that he has never smoked. He has never used smokeless tobacco. He reports that he does not drink alcohol or use drugs.

He has a current medication list which includes the following prescription(s): acetaminophen and cyclobenzaprine. He is allergic to penicillins.

I appreciate your assistance in his care and look forward to your findings and recommendations.

Sincerely,

Steven Wayne Olson, MD

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 5/18/18 4:47 PM    Page 1 of 3

Lincoln/Bunch 1371

Bunch, Mark Bryan (MR # CEUL0963303) DOB:    Encounter Date: 04/06/2018

3W212180030

| Patient Demographics for BUNCH,MARK BRYAN [CEUL0963303] | |
|---|---|
| DOB: | SSN: |
| Age:    **54 yrs** | Sex:    **Male** |
| Home Phone: | Work Phone: |
| E-Mail: | Mobile Phone: |
| Address: | |
| City/State/Zip: | |
| Perm Comments: | |

### Referral Information

| | | | |
|---|---|---|---|
| Patient: | **BUNCH,MARK BRYAN [CEUL0963303]** | Referral #: | **2284588** |

**<="">**

| | | | |
|---|---|---|---|
| Status: | **Authorized** | Type: | **Chiropractic** |
| Class: | **Outgoing** | Reason(s): | **Specialty Services Required [5]** |
| Diagnosis: | **M54.2,G89.29 (ICD-10-CM) - Chronic neck pain** | Procedure: | **REF16 - AMB REFERRAL TO CHIROPRACTIC** |
| Start: | **04/04/2018** | Expiration: | **04/04/2019** |
| Requested: | **1** | Authorized: | **1** |
| Scheduled: | | Completed: | |
| Referring Location: | **CHPG Primary Care St Thomas More** | Referred to Location: | |
| Referring Department: | **PRST PC STM** | Referred To Department: | |
| Referring Provider: | **OLSON, STEVEN WAYNE** | Referred To Provider: | |

### Coverages Used

| Pt Covered? | Payor | Plan | Phone # | Auth # | Precert # | Authorization Comments |
|---|---|---|---|---|---|---|
| Yes | **BLUE CROSS** | **BLUE CROSS PPO COLORADO** | **(877) 833-5742** | **npr** | | |
| | **WORK COMP ACE USA ESIS** | **WORK COMP ACE USA ESIS** | **800-992-7578** | **npr** | | |

### Order Information

| | | | |
|---|---|---|---|
| Order #: | **125860308** | Procedure: | **AMB REFERRAL TO CHIROPRACTIC** |

Lincoln/Bunch 1372

3W212180030

Bunch, Mark Bryan (MR # CEUL0963303) DOB:                                Encounter Date: 04/06/2018

| | | | |
|---|---|---|---|
| Order Date: | **4/4/2018** | Expected Date: | **5/4/2018** |
| Priority: | **Routine** | Proc Category: | **Outpatient Referral Orderables** |
| Class: | **Internal Referral** | Status: | |
| Auth Provider: | **OLSON, STEVEN WAYNE** | Ordering User: | **Steven Wayne Olson, MD** |
| Diagnosis: | **Chronic neck pain** | Enc Provider: | **Steven Wayne Olson, MD** |
| Department: | **Prst Pc Stm** | | |

Sched
Instruct:
Comment:

### Order Specific Questions

| Question | Answer | Comment |
|---|---|---|

### Referral Notes

| Date | Time | Type | Summary | User |
|---|---|---|---|---|
| **04/5/2018** | **9:49 AM MDT** | **General** | **Self referral with BCBS patient just needs to make a appointment** | **MURTON, TRISTA** |

Note Text:
**Self referral with BCBS patient just needs to make a appointment**

| Date | Time | Type | Summary | User |
|---|---|---|---|---|
| **04/4/2018** | **4:29 PM MDT** | **General** | **Patient to call back on where he wants to go** | **MURTON, TRISTA** |

Note Text:
**Patient to call back on where he wants to go**

### Appointments Currently Assigned to this Referral

| Date | Time | Status | Visit Type | Provider | Department | Benefits Link |
|---|---|---|---|---|---|---|

.

Bunch, Mark Bryan (MR # CEUL0963303) Printed at 5/18/18 4:47 PM                    Page 3 of 3

**Lincoln/Bunch 1373**



Lincoln/Bunch 1374

3W212180030

BUNCH, Mark                                                    **WC MVA**
07/03/18
DOB:

S:    Mr. Bunch returns for a follow-up visit after last seeing him on
      06/19/2018. He is about 30 minutes late for his appointment, and he
      is frustrated with the tardiness of the prearranged driver.

      He relates that when he gets stressed, his headaches worsen and he
      gets tunnel vision. He denies any of these complexes happening prior
      to his motor vehicle collision. He relates that he rarely took an
      Advil perhaps only after many hours of working hard in his property.

      I relayed the gist of the SAMMS conference on 06/22/2018.
      Unfortunately, my recommendations for a neurologist, a neuro-
      optometrist and a neuropsychologist/psychologist has not happened to
      date. He was able to get the rescheduled appointment for the other
      neuro-optometrist earlier on 07/16 instead of 07/26. The initial
      referral was made on 05/03/2018.

      He is attending to physical therapy and they are doing balance
      exercises. He has also not heard about the speech therapy referral.

O:    He is with photosensitivity and the office blinds were brought down
      in to minimize the light. He holds his head in his hands,
      complaining of a throbbing headache. His gait is slightly unsteady.
      He cannot attend to left-sided finger-to-nose testing even while
      watching the finger. He still persists with a midline visual shift
      on testing. The Romberg's testing is improved in that he doesn't
      fall readily backwards, but he does rock and reel and must catch
      himself a couple times during the 10 second test.

      I reviewed Dr. Hellfenstein's report, and it is likely invalid
      because of his visual difficulties, headaches and inability to
      concentrate and focus. I believe these issues were brought up by Dr.
      Helffenstein. I believe the respondent attorney finds the word
      'invalid' as meaning something else. Probably the basic premise that
      a neuropsychologist is to understand the nature of the medical
      conditions that are present when evaluating a person for
      neuropsychologic sequela from a head injury.

      When I provided Mr. Bunch with something to read, he can't see it
      very well, complaining of double vision and blurred vision and moves
      the paper and his neck in angles in order to see it and, even when he
      sees it, he cannot maintain his glance but for a couple seconds.

**Lincoln/Bunch 1375**

3W212180030

Page 2
BUNCH, Mark
07/03/18

I cannot imagine him attending to detailed questioning of validity testing, let alone psychometric testing with his visual difficulties.

A:    Concussion with
            Emotional and behavioral disturbance and changes F59
            Neurocognitive disorder G 31.84
            Visual difficulties with spatial disorientation H53.30
        Cervicalgia M 54.2
        Cephalgia, posttraumatic and intermittently intractable G 44.311

P:    I will contact his attorney regarding the status of these referrals.

I described a potential worker's comp scenario in an attempt to prepare him. This is a possible scenario whereby the adjuster and the respondent attorney doubt his veracity enough to schedule a flurry of independent medical evaluations that will no less discredit him and all involved. Only to run months later an ALJ undoubtedly will rule in his favor because of how these circumstances prevail. He needs to get his finances in order and prepare his fiancée for this as well. I invited his fiancée to his next visit.

I reiterated self-directed strategies. I would like to see him again in 2 weeks, the day or so after his neuro-optometry evaluation.

Thomas Higginbotham D.O.

cc:    WC carrier
        Atty. Pollart
        Atty. Shakeshaft
        Dr. Saxerud

**Lincoln/Bunch 1376**

3W212180030

Based on this information, please update the applicable systems appropriately, including PeopleSoft system.

Thank you for your assistance,

Gary Covington |Sr. Human Resources Generalist |Office: 458.225.9235|Fax 541.500.8775

Cell: 541.690.6744|3581 Excel Drive Medford, OR 97504| gary.covington@charter.com

From: Cortez, Robert J
Sent: Tuesday, February 13, 2018 7:35 PM
To: Trammell, Doyle D; Finn, Jody P; Covington. Gary; Allen, Grady P
Subject: Mark Bunch Accident

Doyle,

I'm currently with Mark Bunch at the Parkview Medical Center Emergency Room, in Pueblo, Co.

Mark was invloved in a vehicle accident at approximately 6:20 Pm. He was waiting for a light on US 50 West and Elizabeth Ave, when the vehicle in front of him reversed and backed into the front of his vehicle at a fast speed. When his vehicle was hit, Mark hit his head on the center of his steering wheel. The other driver took off, but Mark followed him, and got him to pull over one block later.

Mark called me, and informed what happenned, and he also called the Pueblo Police. When I arrived at the scene, the Pueblo Police were at the scene, and had concluded their investigation. They issued a citation to the other driver.

000113

Sent to OC
03/23/2018
by PM LLC

**Lincoln/Bunch 1377**

3W212180030

I had Mark call the ESIS Hotline, and he spoke with the Nurse. He described what had happenned, and they advised him to seek medical attention.

When Mark got out of his vehicle, he was wobbly on his feet, and unsteady. I assisted Mark to my vehicle, and drove him here to the Emergency Room. Mark pretty well collapsed when we got him out of my vehicle, and the Emergency Room staff brought a wheelchair out for him.

I'll send another email once he is seen by the medical staff, and let you know what they determine. I will do the Supervisor's Investigation Report and the Vehicular Accident Report and have them submitted within 24 hours.

I advised Doyle Trammell if what happenned after I received Mark's initial call. I called Doyle again after we arrived at the hospital. He advised me to keep him posted via email once we have more info from the Emergency Room.

Bob Cortez ; Direct Sales Supervisor

719-345-4155 (Desk) 719-251-5782 (Cell)

117 S Greydene Ave, Canon City, CO 81212

Sent from my Verizon 4G LTE smartphone

The contents of this e-mail message and any attachments are intended solely for the addressee(s) and may contain confidential and/or legally privileged information. If you are not the intended recipient of this message or if this message has been addressed to you in error, please immediately alert the sender by reply e-mail and then delete this message and any attachments. If you are not the intended recipient, you are notified that any use, dissemination, distribution, copying, or storage of this message or any attachment

000114

Sent to OC
03/23/2018
by PM LLC

**Lincoln/Bunch 1378**

3W212180046



# CLAIMANT INFORMATION FORM

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

**Return To:** Kayla Carter

**EMPLOYEE/CLAIMANT NAME:** Mark Bunch

**CLAIM NO:** 8220685

**EMPLOYER/SPONSOR:** Charter Communications, Inc.        **DATE OF BIRTH:**

## TO BE COMPLETED BY EMPLOYEE:
Please provide us with the names of all medical providers, hospitals, medical insurance carriers, and pharmacies used during the time period from 02/01/2018 to the present. *If additional space is needed, please use a separate sheet of paper.*

## MEDICAL PROVIDERS/THERAPISTS/CLINICS/HOSPITALS:

Name: _Dr Olson_
Specialty: _pcp_
Address: _Canon City, Ca 81212_
Telephone No.: (719) 285    Fax No.:(   )
2700

Name: _Dr Helfenstein_
Specialty: _Neuro psych_
Address: _Tru ment CO_
Telephone No.:(   )    Fax No.:(   )
720 579-0190

Name: _Dr Hissinbotham_
Specialty: _Occupational Health_
Address: _1421 S 21st st_
_Colorado Springs_
Telephone No.:(719    Fax No.:(
260 8190

Name: _Dr Christianson_
Specialty: _chiropractor_
Address: _Canon City_
Telephone No.:(   )    Fax No.:(   )
719 275-8109

## MEDICAL INSURANCE CARRIER(S):

Name: _Work Comp_
Specialty: _Sedgwick_
Address: _____
Telephone No.:(   )    Fax No.:(   )

Name: _____
Specialty: _____
Address: _____
Telephone No.:(   )    Fax No.:(   )

## PHARMACY(S):

Name: _Palace Drug_
Specialty: _____
Address: _Canon City_
Telephone No.:(719    Fax No.:(   )
275-3375

Name: _Medicine shop_
Specialty: _____
Address: _Colorado Springs_
Telephone No.:(719    Fax No.:(   )
(303)54

I hereby attest the above statement is true. I understand that any person who knowingly and with intent to injure, defraud, or deceive the insurance company files a statement or claim containing any false or misleading information may be guilty of a criminal act punishable under law.

SIGNATURE: _Mark Bunch_        DATE: _7 27 18_

**Lincoln/Bunch 1379**

3W212180046

# CLAIMANT SUPPLEMENTARY STATEMENT



**Liberty Mutual.**
INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

Return to: Kayla Carter

| | | |
|---|---|---|
| **EMPLOYEE/CLAIMANT NAME:** Mark Bunch | | **CLAIM #:** 8220685 |
| **EMPLOYER:** Charter Communications, Inc. | | **DATE OF BIRTH:** |

| Full Name (Last, First, Middle Int.) | Social Security # | Email Address |
|---|---|---|
| Bunch Mark B | | |

| Street Address | City | State | Zip/Code |
|---|---|---|---|
| | | | |

| Telephone Number (include area code) | Cell Phone Number (include area code) | Marital Status |
|---|---|---|
| | | |

| Spouse's Full Name and Date of Birth | Number of Children: 0 | Dates of Birth of Children: N/A |
|---|---|---|

Next of Kin/Emergency Contact (required should additional benefits be payable in the event of your death).
Name Niki Crihfield    Relationship to you? Fiance    Tel #.

Have you returned to any type of employment or activity that provides you money? If yes, please provide name of employer, start date, hours worked per/wk and rate of pay. No

Do you own a business, or are you involved or affiliated with any type of business, corporation, partnership, or sole proprietary? If yes, please explain and provide proof of income from prior year. No

Do you have a tax identification number (TIN) or employer identification number (EIN)? If yes, for what purpose? No

Do you hold a professional license? If yes, for what purpose? No

Are you associated with an Internet business of any kind? Do you have a website? If yes, please explain and provide website address(es) and the date started. No

Are you pursuing money from a third party or involved in any litigation? If yes, please explain why and provide your attorney's contact information. processing insurance

Are you pursuing money from a third party: Workers Compensation Carrier, Insurance Co., or Individual? If yes, please explain. workers comp

Identify other income you are receiving or for which you have applied. You have an ongoing obligation to notify us immediately of receipt of any other income or any other changes to this information, including supporting documentation confirming the amount you receive and the effective date:

| Yes | No | Type | Amount per Week/Month | Date Began Receiving | Date Ceased Receiving | Date Income Applied for |
|---|---|---|---|---|---|---|
| | X | Wages/ Income/ Money/ Unemployment | $ | | | |
| | X | Social Security (disability or retirement) | $ | | | |
| | X | Social Security (for your spouse/dependents) | $ | | | |
| | X | Short Term Disability or State Disability | $ | | | |
| | X | Pension or Retirement benefits (lump sum/ongoing) | $ | | | |
| X | | Workers' Compensation | $948.15 | 3/5/18 | | 2/18/18 |
| | X | Severance or Employment Separation payment (provide Agreement) | $ | | | |
| | X | Other income/money/benefit (describe) | $ | | | |

If my claim is overpaid, I understand and agree that Liberty has the right to recover such overpayment from me, including the right to reduce future disability benefits, or pursue other collection methods as appropriate. The above statements are true and complete to the best of my knowledge and I understand that any person who knowingly, and with intent to injure, defraud, or deceive Liberty and/or Plan Sponsor, files a statement or claim containing any false, incomplete, or misleading information may be guilty of a criminal act punishable under law. A photo static copy of this form will be valid as the original.

**EMPLOYEE'S PRINTED NAME:** Mark Bunch

**DATE:** 7-27-18    **EMPLOYEE'S SIGNATURE:** Mark Bunch

DP 409

Lincoln/Bunch 1380

3W212180046

## ACTIVITIES QUESTIONNAIRE


**Liberty Mutual.**
**INSURANCE**

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

**Return To:** Kayla Carter

*page 1 of 3*

---

**EMPLOYEE/CLAIMANT NAME:** Mark Bunch

**CLAIM NO:** 8220685                    **DATE OF BIRTH:**

**EMPLOYER/SPONSOR:** Charter Communications, Inc.

---

**TO BE COMPLETED BY THE CLAIMANT:**

Please answer the following questions and return the form to Liberty Life Assurance Company of Boston.

How long are you able to:

sit _1 hour_    stand _30 min_    walk _10 min_

How many hours a day do you:

sit _4-5 hours_ stand _3-4 hours_ walk _1 hour_

Do you take a nap during the day?

Yes _X_    No

If Yes, for how long? _just depends_ At what time of the day? _various times_
_2-4 hours_

How many hours a day do you spend in bed? _5-12 hours_

Do you require any assistive devices such as a:

cane _NA_    walker _NA_    crutches _NA_    wheelchair _NA_    other _prism glasses_

How long are you able to sit in a car? _hour or two_

Do you hold a valid driver's license?

Yes _✓_    No

If No, please explain:

If Yes, how long are you able to drive a car?

**Please provide a copy of your driver's license when returning this form.**

How do you maintain contact with people or activities that matter most to you?

_I dont at this time_

Do you have children?

Yes _____    No _✓_    If Yes, what are their dates of birth

Do you need help caring for your children?

Yes _____    No _✓_

Are you responsible for taking care of any grandchildren, an elderly parent or grandparent?

Yes _____    No _✓_    If Yes, please explain

How many times a day do you leave the house during the week? _1 to 3 times for Appointments or light grocery shopping_

On the weekends? _Almost never_

How often do you run errands? _once per week usually_

Please describe what errands you most commonly run: _Bank, post office, or appointments / light grocery shopping_

**Lincoln/Bunch 1381**

3W212180046


**Liberty
Mutual.**
INSURANCE

How often do you get outdoors? _Daily_

Are you left or right hand dominant?    Left _____    Right _✓_

Are you able to work in your garden?    Yes _____    No _✓_

Are you able to work on your house?    Yes _____    No _✓_

Are you able to wash your car?    Yes _____    No _✓_

How much time is spent daily on your home computer?
_____ None _X_ 0-1 hours _____ 1-2 hours _____ 2-3 hours _____ 3+ hours

How much time is spent weekly on your home computer?
_____ None _____ 0-1 hours _____ 1-2 hours _X_ 2-3 hours _____ 3+ hours

What activities do you perform on your home computer. Please check all that apply:
_X_ Pay bills _____ Read news/articles _____ Use search engines _X_ Send emails
_____ Visit chat rooms _____ Photos   Other: _____

What computer software applications do you utilize. Please check all that apply:
_X_ Word processing (Word) _____ Spreadsheets (Excel) _____ Database (Access) _____ Graphics
_____ Photo software (Photoshop) _____ Programming   Other: _____

Do you have a working home copy machine/fax machine? _X_ Yes _____ No

If yes, please explain purpose and usage: , _have had in 10 years use to use for work, now_
_to copy or scans and personal keep into amazon_

The following questions intend to identify whether or not you are able to _independently_ conduct routine daily
activities. If assistance is required, please clarify.

| How are the following accomplished? | By Whom? | Assistance Required? |
|---|---|---|
| Grocery Shopping | My Fiance | yes |
| Carrying groceries into the house | my Fianc | yes |
| Cooking meals | my Fiance | yes |
| Cleaning after meals | me + my fiance | yes |
| Cleaning bathrooms | me + my Fiance | yes |
| Vacuuming | my fiance | yes |
| Doing the laundry | me and my Fiance | yes |
| Opening and responding to mail | me and my Fiance | yes |
| Managing your finances | my Fiance | yes |
| Balancing your checkbook | me and my Fance | yes / yes |
| Bathing yourself | me | No |
| Styling your own hair | me | No |
| Getting dressed | me | No |
| Going up and down stairs | my Fiance | yes |

Have you been confined to a hospital within the last 12 months? Yes _X_    No _____

If Yes, please provide reason and hospital contact Information: _Parkview Pueblo for_
_Car Accident 2/13/18, injured at work by other driver_

3W212180046



**Liberty Mutual.**
**INSURANCE**

| ACTIVITIES QUESTIONNAIRE |
| *page 3 of 3* |

How often do you travel or take vacation? _Not sings last year_

Where do you go?  How do you get there (transportation method)? _Mountains car_

Are you able to pursue your hobbies?        Yes _____    No _X_

If Yes, please describe _____

Do you participate in an exercise program?    Yes _✗_    No _____

If Yes, please describe _PT after car accident_

Do you do any Volunteer work?           Yes _____    No _✗_

If Yes:

    how many hours per day? _____

    how many hours per week? _____

    for whom? _____

Are you working for wages?             Yes _____    No _X_

If Yes, please provide employer's name _____

**Describe in your own words, what prevents you from engaging in any gainful employment.**
_Legally Blind since car accident, Horrible headaches, double vision, ringing in my ears, unable to sleep or concentrate for long, Emotional issues and being depressed and high anxiety, PTSD. Night terrors and major sleep issues, Can barely read, bad headaches, loss of neck movement and maybe talk to someone_

**Please describe your daily routine: (if more space is needed, please use the back of this form)**
_get up finally after I get bed sleep patterns and watch traffic outside, listen to TV, cant watch it, go for a couple walks, eat breakfast and take bath, too unsteady to take showers, go to bed_

Is there a daytime number where you can be reached in the event we have any questions regarding your responses?
_You have my only number_

In the event we cannot reach you, please provide an alternate contact's name and telephone number.
_Nick)_ _____

**Upon completion of this form, please sign and date below and return in the envelope provided to you.  Thank
you for your cooperation.

The above statements are true and complete to the best of my knowledge and belief and I hereby authorize any
hospital or physician who has treated me or other person who has attended me or examined me or any company or
Government agency to furnish the Insurance Company providing this firm or their representative, any and all
information with respect to any illness, injury, medical history, consultations, prescriptions, treatments or benefits
and copies of all applicable records.  A photo static copy of this form will be as valid as the original.  I understand
that if this information changes at any time, I will contact Liberty.

Name: _Mark Bunch_      Date: _7/27/15_

Signature: _Mark Bunch_

**Lincoln/Bunch 1383**

3W212180046

# FAMILY INFORMATION QUESTIONNAIRE


**Liberty Mutual.**
INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

**Return to:** Kayla Carter

---

**EMPLOYEE/CLAIMANT NAME:** Mark Bunch

**CLAIM NO:** 8220685

**EMPLOYER/SPONSOR:** Charter Communications, Inc.     **DATE OF BIRTH:**

---

To document your Long Term Disability Claim file and properly administer benefits, we need the following information. Please complete and return this form in the envelope provided. Thank you for your prompt attention to this request for information.

What is your marital status?        Single _____     Married _____     Divorced _____

If married, please indicate your spouse's name and date of birth.   Name: _____ DOB: _____

Do you have children or dependents*?   Yes _____        No __⌐__

If yes, please provide additional details below, using additional space as needed.

* An Eligible dependent may include:
- Biological Child(ren)
- Stepchildren
- Children not residing in your household
- Custodial Grandchildren
- A child 18 or older with a disability that started before age 22
- Adopted Children
- A child 18-19 and a full-time student (not higher than grade 12)

| Name | DOB | If Divorced or Separated, Indicate Custodial or Non-Custodial | High School Student? Yes or No | Anticipated/Actual Last Month/Year of High School |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Is your spouse and/or children receiving Social Security benefits?    Yes: _____ No: _____
If yes, please complete the information below and include a copy of their Social Security Award Certificate(s).

If no, however, they were previously receiving Social Security benefits in the past and are no longer, please include a copy of the Social Security Termination notice (s), if this information has not already been provided to Liberty Life Assurance Company.

| Name | DOB | Awarded as: Dependent, Spouse or Disabled | Current Monthly Benefit Amount | Date of Entitlement to Benefits | Benefit Termination Date (If applicable) |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Your Name: *Mark Bunch*          Date: 7/27/18

**Lincoln/Bunch 1384**

3W212180046

# TRAINING-EDUCATION-EXPERIENCE FORM (TEE)


**Liberty Mutual.**
INSURANCE

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

**EMPLOYEE/CLAIMANT NAME:** Mark Bunch

**CLAIM NO:** 8220685

**EMPLOYER/SPONSOR:** Charter Communications, Inc.    **DATE OF BIRTH:**

## Please fill out each section completely

### EDUCATIONAL BACKGROUND:    (If you have a resume, please attach)

Highest Grade Completed: _____    Check if earned: ☐ GED ☑ HS Diploma

Vocational Training: _____ Certificate Program completed: _____

Associates Degree: _____ College: number of years: _____

Bachelor's Degree: BA /BS Major: *Communication* Graduate School: MA ☑ MS☐ CAGS☐ PHD Degree: *major*

Professional Training, License, Certificates(s): _____

Are you currently attending any classes: ☐ Y ☐ N  If yes, provide name of school: _____

List any other Training or Classes Attended or Plan to Attend: _____

Additional Skills, Hobbies & Volunteer Work _____

Did you serve in the Armed Forces? ☐ Y ☐ N  From: _____ To: _____

Branch of Service: _____ Specialty: _____

### WORK EXPERIENCE: (If you've held different positions for the same employer, please include them below)
Please list chronologically (starting with the most recent) all the jobs/positions you have held in the past 15 years.
(add additional pages if needed for a complete work history).

1. Company: *Charter* Department: *Sales* From: *11/5/16* To: *Present*
Job Title(s): *DSR*
Supervisory Experience ☐ Y ☑ N
Tasks/Duties (please be specific): *Outside Sales 6 days per week, must walk miles daily door to door, Must work till 8pm remote with hundreds of miles drive time after dark*

2. Company: *Discover Sunwill* Department: *Sales Rehab* From: *12/13* To: *12/15*
Job Title(s): *Sales Manager*
Supervisory Experience ☑ Y ☐ N
Tasks/Duties (please be specific): *Supervise Sales reps, Sales healthcare skilled nursing Management*

**A Liberty Mutual Company**

Lincoln/Bunch 1385

3W212180046

3. Company: _United health_ Department: _Ever Care Hospice_ From: _3/2008_ To: _12/13_
Job Title(s): _Director Business Development_
Supervisory Experience ☑ Y ☐ N
Tasks/Duties (please be specific): _Hospice strategy, supervision, of sales/etc_

4. Company: _Organon Pharmaceuticals_ Department: _pharma sales_ From: _11/1/2000_ To: _3/2008_
Job Title(s): _District sales manager_
Supervisory Experience ☑ Y ☐ N
Tasks/Duties (please be specific): _pharma sales and sales supervision, budgets forecasts etc_

5. Company: _Knowledge Alliance_ Department: _Training_ From: _12/99_ To: _11/2000_
Job Title(s): _Director of Sales_
Supervisory Experience ☑ Y ☐ N
Tasks/Duties (please be specific): _tech strategy and overall sales exapritions_

## Computer Utilization:

Computer Training/Courses, Certifications: _____

|  | Home | Work |  | Home | Work |
|---|:---:|:---:|---|:---:|:---:|
| Email | ☑ | ☑ | Graphics Software | ☐ | ☐ |
| Internet | ☑ | ☑ | Installation/Repair Hardware | ☐ | ☐ |
| Word Processing (MS Word) | ☑ | ☐ | | | |
| Spread Sheet (MS Excel) | ☑ | ☐ | Installation/Repair Programming | ☐ | ☐ |
| Database | ☐ | ☐ | Project Management | ☐ | ☐ |
| Photo Software | ☐ | ☐ | Other: _____ | | |

How much time is spent daily on your work computer? ☑ None ☐ 1-2 hours ☐ 2-3 hours ☐ 3+ hours
How much time is spent daily on your home computer? ☐ None ☑ 1-2 hours ☐ 2-3 hours ☐ 3+ hours
Keyboarding/Typing Experience: ☐ Yes ☐ No   If yes, WPM (words per minute) _5 wpm_
(We recommend- http://typingtest.com to determine WPM)

Please provide your email address: Personal: _____   Work: _Mark.Bunch@chater-com_

SIGNATURE: _Alan Vsuch_ PHONE NO: (_____

2

**Lincoln/Bunch 1386**

3W212180046

## COLORADO DEPARTMENT OF LABOR & EMPLOYMENT
### DIVISION OF WORKERS' COMPENSATION

# GENERAL ADMISSION OF LIABILITY

| | |
|---|---|
| WC # | 5070376 |
| Carrier # | 2D338776817591 |

TO: **MARK BUNCH**

_Claimant's Name_

_Claimant's Address_

| | |
|---|---|
| Soc. Sec. # | |
| Employer | CHARTER COMMUNICATIONS |
| Date of Injury | 2/13/18 |
| Average Weekly Wage | $1923.08 |
| Date first payment paid TTD | 3/5/18 |
| Date first payment PPD | |
| Date of MMI | |

and

**DIVISION OF WORKERS' COMPENSATION**

**YOU ARE HEREBY NOTIFIED** that the Insurance carrier or self-insured employer (named below) admits that the injury or occupational disease reported herein is compensable. **YOU ARE ALSO NOTIFIED** that if a child-support obligation is owed, compensation benefits may be attached and payment of the child-support obligation may be withheld and forwarded to the obligee pursuant to sections 8-42-124 and 26-13-122(4), C.R.S. **YOU ARE FURTHER NOTIFIED** that you must provide written notice of any award for social security, pension, disability or other source of income that might reduce your compensation benefits. This notice must be sent to the Insurance carrier or self-insured employer within 20 days after learning of the payment or award. Failure to report may result in suspension of your benefits pursuant to section 8-42-113.5, C.R.S.

Liability is admitted for the following benefits:

See Reverse Side for Codes

Safety Rule Violation ☐

[X] medical benefits

[X] temporary total disability

☐ temporary partial disability

☐ rehabilitation maintenance benefits

☐ disfigurement

☐ permanent partial disability

Offset ☐     Attach Calculation

Amount of Interest Paid $ _____

Amount of Penalties Paid $ _____

☐ Working unit _____ % Disability _____ Age

1. ☐ Schedule Injury _____ % _____ (part of body)

2. ☐ Schedule Injury _____ % _____ (part of body)

Complete the following if admitting for disability

| Type of Benefit | Time Periods | | | | | Rate per Week | Totals |
|---|---|---|---|---|---|---|---|
| TTD | 2/14/18 | thru UNDET | = UNDET | wks | $ 948.15 | $ UNDET |
| | | thru | = | wks | $ | $ |
| | | thru | = | wks | $ | $ |
| | | thru | = | wks | $ | $ |
| | | thru | = | wks | $ | $ |
| | | thru | = | wks | $ | $ |
| | | thru | = | wks | $ | $ |

The above time periods represent inclusive dates.

Remarks: The claimant is entitled to the maximum state rate of $948.15 per week.

**NOTICE TO CLAIMANT: IF YOU DISAGREE WITH THE AMOUNT OR TYPE OF BENEFITS WHICH THE CARRIER HAS AGREED TO PAY, YOU MAY WRITE A LETTER TO THE DIVISION OF WORKERS' COMPENSATION, 633 17TH ST., SUITE 400, DENVER, CO 80202-3660, STATING THAT YOU OBJECT TO THIS ADMISSION OF LIABILITY.**

Carrier or Self-Insured
**NEW HAMPSHIRE INS CO**

Address
c/o ESIS PO Box 6569

Scranton, PA 18505-6569

(800) 992-7578
Telephone No.

By: Landon Wallis

_Adjuster or Claims Representative_

Copies of this admission were mailed this **5** day of **MARCH**, **2018** to:

☐ Claimant's Attorney   [X] Employer   [X] Division of Workers' Compensation   ☐ Respondent's Attorney   [X] Claimant

| | |
|---|---|
| WC2 Rev 04/11 | PLEASE READ REVERSE SIDE |

| Block # | Adj. Code |
|---|---|
| 269 | NQ |

**Lincoln/Bunch 1387**



«Sequence_Number»
Liberty Life Assurance Company of Boston
Disability Claims
P.O. Box 7216
London, KY 40742-7216


MARK BUNCH

            0000



**Lincoln/Bunch 1388**

**Lincoln/Bunch 1389**



Liberty Life Assurance Company of Boston
Disability Claims
P.O. Box 7216
London, KY 40742-7216
Phone: (877) 353-6404
Secure Fax No.: (877) 353-6412

July 3, 2018

MARK BUNCH

0000

RE:    CHARTER COMMUNICATIONS, INC.
Long Term Disability Benefits
Claim #: 8220685

MR. BUNCH

We acknowledge receipt of your request for consideration of disability benefits.

Liberty Life Assurance Company is required to inform you of certain state mandated regulations, one of which is fraud notification.

For your protection, Colorado law requires us to provide the following statement:  It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance and civil damages.  Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado division of insurance within the department of regulatory agencies.

Sincerely,

Kayla Carter
Disability Case Manager
Phone: (877) 353-6404
Secure Fax No.: (877) 353-6412

**Lincoln/Bunch 1390**

**Lincoln/Bunch 1391**

| | |
|---|---|
| **From:** | GrpMktClmOpsReporting@LibertyMutual.com |
| **Sent:** | Tue, 3 Jul 2018 14:29:39 +0000 |
| **To:** | GARY.COVINGTON@CHARTER.COM;ROBERT.CORTEZ@CHARTER.COM |
| **Subject:** | Claim #8220685, MARK BUNCH |

**THIS IS AN AUTOMATED EMAIL, PLEASE DO NOT RESPOND.**

The above named employee has applied for long term disability benefits.  The claim number is 8220685.

At this point, the claim has neither been approved nor denied -- it has been opened for review. Once all required documentation is submitted and reviewed, you will receive notification of approval or denial for this request.

If you have further questions or if the employee has returned to work, please call Liberty Mutual at 1-844-384-5858

**Lincoln/Bunch 1392**

| | |
|---|---|
| **From:** | GrpMktClmOpsReporting@LibertyMutual.com |
| **Sent:** | Tue, 3 Jul 2018 14:29:39 +0000 |
| **To:** | GARY.COVINGTON@CHARTER.COM;ROBERT.CORTEZ@CHARTER.COM |
| **Subject:** | Claim #8220685, MARK BUNCH |

**THIS IS AN AUTOMATED EMAIL, PLEASE DO NOT RESPOND.**

The above named employee has applied for long term disability benefits.  The claim number is 8220685.

At this point, the claim has neither been approved nor denied -- it has been opened for review. Once all required documentation is submitted and reviewed, you will receive notification of approval or denial for this request.

If you have further questions or if the employee has returned to work, please call Liberty Mutual at 1-844-384-5858

**Lincoln/Bunch 1393**

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207

MR. MARK BUNCH

**Lincoln/Bunch 1394**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

July 2, 2018

Mr. Mark B. Bunch

RE:    Long Term Disability (LTD) Benefits
       Charter Communications, Inc.
       Claim #: 8220685

Dear Mr. Mark Bunch:

Liberty Life Assurance Company of Boston ("Liberty") is responsible for managing claims for Long Term Disability (LTD) benefits under Charter Communications, Inc.'s Group Disability Policy.  We are writing in reference to your claim for LTD benefits under the Policy.

We are currently reviewing your eligibility for disability benefits, and are in need of additional information.

On July 2, 2018, we requested medical records from you and your treating providers.     This information is necessary to complete our initial claims investigation.  Please provide us with the following information to assist us with our review of your eligibility for benefits:

- Office treatment notes, test results, operative reports, prescription histories, and treatment plans from February 1, 2018 through the present from your treating providers.

If there are any other attending physicians or specialists, including physical therapy providers, that we are unaware of, please have them forward all medical records pertinent to your disability within the timeframe stated above.

Please complete the forms indicated below and return them to our office by August 1, 2018:

____    Activities Questionnaire Form
____    Authorization - Medical
____    Claimant Information Form
____    Claimant Supplementary Statement
____    Family Information Questionnaire
____    Training Education Experience
____    Other

1  of  2

**Lincoln/Bunch 1395**

Charter Communications, Inc.'s LTD Policy requires that, in order to receive benefits, you provide proof of disability within a required timeframe. Your cooperation in providing the requested information is essential to our claim investigation.

In the absence of this information, your claim may be denied.

We ask that you provide us with this information no later than August 16, 2018 as required under the terms of the Policy.

If you have any questions regarding this matter, please contact me.

Sincerely,

Kayla Carter
LTD Specialist
Phone No.: (844) 384-5858 Ext. 18334
Secure Fax No.: (603) 559-9400

Attachments:    Activities Questionnaire Form
                Authorization - Medical
                Claimant Information Form
                Claimant Supplementary Statement
                Family Information Questionnaire
                Training Education Experience

**Lincoln/Bunch 1396**

## ACTIVITIES QUESTIONNAIRE



<div align="right">

Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

</div>

**Return To:** Kayla Carter

*page 1 of 3*

---

EMPLOYEE/CLAIMANT NAME:  Mark Bunch

CLAIM NO:  8220685                                  DATE OF BIRTH:

EMPLOYER/SPONSOR: Charter Communications, Inc.

---

**TO BE COMPLETED BY THE CLAIMANT:**

Please answer the following questions and return the form to Liberty Life Assurance Company of Boston.

How long are you able to:

sit _____    stand _____    walk _____

How many hours a day do you:

sit _____    stand _____    walk _____

Do you take a nap during the day?

Yes_____    No  _____

If Yes, for how long? _____    At what time of the day?_____

How many hours a day do you spend in bed?_____

Do you require any assistive devices such as a:

cane _____    walker_____    crutches _____    wheelchair _____    other_____

How long are you able to sit in a car?_____

Do you hold a valid driver's license?

Yes_____    No  _____

If No, please explain: _____

If Yes, how long are you able to drive a car?_____

**Please provide a copy of your driver's license when returning this form.**

How do you maintain contact with people or activities that matter most to you?

_____

---

Do you have children?

Yes_____    No _____    If Yes, what are their dates of birth _____

_____

Do you need help caring for your children?

Yes _____    No _____

Are you responsible for taking care of any grandchildren, an elderly parent or grandparent?

Yes_____    No _____    If Yes, please explain _____

How many times a day do you leave the house during the week? _____

On the weekends? _____

How often do you run errands? _____

Please describe what errands you most commonly run: _____

---

**Lincoln/Bunch 1397**



**Liberty Mutual.**
**INSURANCE**

How often do you get outdoors? _____

Are you left or right hand dominant?     Left _____     Right _____

Are you able to work in your garden?     Yes _____     No _____

Are you able to work on your house?     Yes _____     No _____

Are you able to wash your car?     Yes _____     No _____

How much time is spent daily on your home computer?
_____ None  _____ 0-1 hours  _____ 1-2 hours  _____ 2-3 hours  _____ 3+ hours

How much time is spent weekly on your home computer?
_____ None  _____ 0-1 hours  _____ 1-2 hours  _____ 2-3 hours  _____ 3+ hours

What activities do you perform on your home computer.   Please check all that apply:

_____ Pay bills  _____ Read news/articles  _____ Use search engines  _____ Send emails

_____ Visit chat rooms  _____ Photos   Other: _____

What computer software applications do you utilize.  Please check all that apply:

_____ Word processing (Word)  _____ Spreadsheets (Excel)  _____ Database (Access)  _____ Graphics

_____ Photo software (Photoshop)  _____ Programming  Other: _____

Do you have a working home copy machine/fax machine?  _____ Yes  _____ No

If yes, please explain purpose and usage:  _____

The following questions intend to identify whether or not you are able to independently conduct routine daily

activities.  If assistance is required, please clarify.

| **How are the following accomplished?** | **By Whom?** | **Assistance Required?** |
|---|---|---|
| Grocery Shopping | | |
| Carrying groceries into the house | _____ | _____ |
| Cooking meals | _____ | _____ |
| Cleaning after meals | _____ | _____ |
| Cleaning bathrooms | _____ | _____ |
| Vacuuming | | |
| Doing the laundry | _____ | _____ |
| Opening and responding to mail | _____ | _____ |
| Managing your finances | _____ | _____ |
| Balancing your checkbook | _____ | _____ |
| Bathing yourself | _____ | _____ |
| Styling your own hair | _____ | _____ |
| Getting dressed | _____ | _____ |
| Going up and down stairs | _____ | _____ |

Have you been confined to a hospital within the last 12 months?  Yes _____     No _____

If Yes, please provide reason and hospital contact Information: _____

_____

**Lincoln/Bunch 1398**



How often do you travel or take vacation? _____

Where do you go?  How do you get there (transportation method)? _____

_____

Are you able to pursue your hobbies?          Yes _____     No _____

If Yes, please describe _____

Do you participate in an exercise program?      Yes _____     No _____

If Yes, please describe _____

Do you do any Volunteer work?                Yes _____     No _____

If Yes:

    how many hours per day? _____

    how many hours per week? _____

    for whom? _____

Are you working for wages?                   Yes _____     No _____

If Yes, please provide employer's name _____

**Describe in your own words, what prevents you from engaging in <u>any gainful employment</u>.**

_____

_____

_____

_____

_____

**Please describe your daily routine: (if more space is needed, please use the back of this form)**

_____

_____

_____

_____

_____

Is there a daytime number where you can be reached in the event we have any questions regarding your responses?

_____

In the event we cannot reach you, please provide an alternate contact's name and telephone number.

_____

**Upon completion of this form, please sign and date below and return in the envelope provided to you.  Thank you for your cooperation.

The above statements are true and complete to the best of my knowledge and belief and I hereby authorize any hospital or physician who has treated me or other person who has attended me or examined me or any company or Government agency to furnish the Insurance Company providing this firm or their representative, any and all information with respect to any illness, injury, medical history, consultations, prescriptions, treatments or benefits and copies of all applicable records.  A photo static copy of this form will be as valid as the original.  I understand that if this information changes at any time, I will contact Liberty.

Name: _____     Date: _____

Signature: _____

**Lincoln/Bunch 1399**



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

## AUTHORIZATION FOR THE RELEASE OF INFORMATION INCLUDING PROTECTED HEALTH INFORMATION

**I HEREBY AUTHORIZE THE USE OR DISCLOSURE OF INFORMATION ABOUT ME AS DESCRIBED BELOW:**

**Person(s) or group(s) of persons authorized to use or disclose the information:** Any physicians, medical practitioners, hospitals, clinics, HMOs, long-term care facilities, medical or medically-related facilities, pharmacies, insurance companies, credit or consumer reporting agency, financial/educational institutions, current or former employer, governmental agency, MIB Inc., and any insurance support organizations.

**Person(s) or group(s) of persons authorized to collect or otherwise receive the information**: The particular Company in the Liberty Mutual Group of companies to which I am submitting a claim and its authorized representatives, agents and/or employees, the Plan Sponsor (if self-insured Plan) and other organizations providing claims management services.

**Description of the information that may be used or disclosed**: This Authorization specifically includes the release of all information related to:

* My physical and mental health and my insurance policies and claims, including, but not limited to, those containing diagnosis, treatments, prognosis, prescription drug information, alcohol or drug abuse or information regarding communicable or infectious conditions, including HIV/AIDS.
* Job duties, earnings, personnel records and other work related information and credit reports, bank records, and federal and state tax returns.
* Information concerning Social Security benefits, including any records pertaining to me and my dependents

**The information will be used or disclosed only for the following purpose(s):** For purposes of investigating, evaluating and processing my claim, and/or for insurance-related functions.

## STATEMENTS OF UNDERSTANDING & ACKNOWLEDGMENT:

**I understand** that information used or disclosed pursuant to this authorization could be subject to redisclosure as necessary by the recipient and, if so, may not be subject to federal or state law protecting its confidentiality.

**I understand** that I may revoke this authorization in writing at any time by sending a written revocation to the Company in the Liberty Mutual Group of companies to which I have submitted a claim, except to the extent that action has been taken in reliance on this authorization, or to the extent that other law provides the Company with the right to contest a claim. I also understand that the revocation of this authorization will not affect uses and disclosures of my health information for purposes of treatment, payment and health care operations.

**I understand** that authorizing the disclosure of my health information is voluntary and the provision of health care services to me is not conditioned on whether I sign this authorization. If I choose not to sign this authorization, insurance coverage or claim payments may be denied or delayed.

This authorization shall remain in force for 24 months from the date of signature, except to the extent applicable state law imposes or allows a different duration. The information obtained under this authorization will be retained in accordance with the Company's standard retention policy and applicable law. I understand that I may request a copy of this authorization.

Name of claimant (print) _____

Name of legal representative, if applicable (print) _____    Relationship _____


Signature of claimant or legal representative _____

Date of Birth: _____ Claim Number: __8220685__ Date: _____

**A copy of this authorization will be considered as valid as the original.**

pg. 1  Authorization-Standard-2016

**Lincoln/Bunch 1400**

# CLAIMANT INFORMATION FORM



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

**Return To:**  Kayla Carter

EMPLOYEE/CLAIMANT NAME:  Mark Bunch

CLAIM NO:  8220685

EMPLOYER/SPONSOR:  Charter Communications, Inc.          DATE OF BIRTH:

**TO BE COMPLETED BY EMPLOYEE:**

Please provide us with the names of all medical providers, hospitals, medical insurance carriers, and pharmacies used during the time period from 02/01/2018 to the present.   *If additional space is needed, please use a separate sheet of paper.*

**MEDICAL PROVIDERS/THERAPISTS/CLINICS/HOSPITALS:**

Name:                                      Name:
Specialty:                                 Specialty:
Address:                                   Address:

Telephone No. :(   )       Fax No. :(   )       Telephone No. :(   )       Fax No. :(   )

Name:                                      Name:
Specialty:                                 Specialty:
Address:                                   Address:

Telephone No. :(   )       Fax No. :(   )       Telephone No. :(   )       Fax No. :(   )

**MEDICAL INSURANCE CARRIER(S):**

Name:                                      Name:
Specialty:                                 Specialty:
Address:                                   Address:

Telephone No. :(   )       Fax No. :(   )       Telephone No. :(   )       Fax No. :(   )

**PHARMACY(S):**

Name:                                      Name:
Specialty:                                 Specialty:
Address:                                   Address:

Telephone No. :(   )       Fax No. :(   )       Telephone No. :(   )       Fax No. :(   )

I hereby attest the above statement is true. I understand that any person who knowingly and with intent to injure, defraud, or deceive the insurance company files a statement or claim containing any false or misleading information may be guilty of a criminal act punishable under law.

SIGNATURE:                                   DATE:

**Lincoln/Bunch 1401**

# CLAIMANT SUPPLEMENTARY STATEMENT



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

**Return to:**  Kayla Carter

**EMPLOYEE/CLAIMANT NAME:**  Mark Bunch                          **CLAIM #:** 8220685

**EMPLOYER:** Charter Communications, Inc.                       **DATE OF BIRTH:**

| Full Name (Last, First, Middle Int.) | Social Security # | Email Address | |
|---|---|---|---|
| Street Address | City | State | Zip Code |
| Telephone Number (include area code) | Cell Phone Number (include area code) | Marital Status | |
| Spouse's Full Name and Date of Birth | Number of Children | Dates of Birth of Children | |

Next of Kin/Emergency Contact (required should additional benefits be payable in the event of your death).

Name                              Relationship to you?                        Tel #.

Have you returned to any type of employment or activity that provides you money? If yes, please provide name of employer, start date, hours worked per/wk and rate of pay.

Do you own a business, or are you involved or affiliated with any type of business, corporation, partnership, or sole proprietary? If yes, please explain and provide proof of income from prior year.

Do you have a tax identification number (TIN) or employer identification number (EIN)? If yes, for what purpose?

Do you hold a professional license? If yes, for what purpose?

Are you associated with an Internet business of any kind? Do you have a website? If yes, please explain and provide website address(es) and the date started.

Are you pursuing money from a third party or involved in any litigation? If yes, please explain why and provide your attorney's contact information.

Are you pursuing moneys from a third party: Workers' Compensation  Carrier, Insurance Co., or Individual? If yes, please explain.

Identify other income you are receiving or for which you have applied. You have an ongoing obligation to notify us immediately of receipt of any other income or any other changes to this information, including supporting documentation confirming the amount you receive and the effective date:

| Yes | No | Type | Amount per Week/Month | Date Began Receiving | Date Ceased Receiving | Date Income Applied for |
|---|---|---|---|---|---|---|
| ☐ | ☐ | Wages/ Income/ Money/ Unemployment | $ | | | |
| ☐ | ☐ | Social Security (disability or retirement) | $ | | | |
| ☐ | ☐ | Social Security (for your spouse/dependents) | $ | | | |
| ☐ | ☐ | Short Term Disability or  State Disability | $ | | | |
| ☐ | ☐ | Pension or Retirement benefits (lump sum/ongoing) | $ | | | |
| ☐ | ☐ | Workers' Compensation | $ | | | |
| ☐ | ☐ | Severance or Employment Separation payment (provide Agreement) | $ | | | |
| ☐ | ☐ | Other income/money/benefit  (describe) | $ | | | |

**If my claim is overpaid, I understand and agree that Liberty has the right to recover such overpayment from me, including the right to reduce future disability benefits, or pursue other collection methods as appropriate. The above statements are true and complete to the best of my knowledge and I understand that any person who knowingly, and with intent to injure, defraud, or deceive Liberty and/or Plan Sponsor, files a statement or claim containing any false, incomplete, or misleading information may be guilty of a criminal act punishable under law. A photo static copy of this form will be valid as the original.**

**EMPLOYEE'S PRINTED NAME:**

**DATE:**                        **EMPLOYEE'S SIGNATURE:**

DP 409

**Lincoln/Bunch 1402**

# FAMILY INFORMATION QUESTIONNAIRE



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

**Return to:** Kayla Carter

EMPLOYEE/CLAIMANT NAME: Mark Bunch

CLAIM NO: 8220685

EMPLOYER/SPONSOR: Charter Communications, Inc.       DATE OF BIRTH:

To document your Long Term Disability Claim file and properly administer benefits, we need the following information. Please complete and return this form in the envelope provided. Thank you for your prompt attention to this request for information.

What is your marital status?       Single _____       Married _____       Divorced _____

If married, please indicate your spouse's name and date of birth.   Name: _____   DOB: _____

Do you have children or dependents*?     Yes _____          No _____

If yes, please provide additional details below, using additional space as needed.

* An Eligible dependent may include:
- Biological Child(ren)
- Stepchildren
- Children not residing in your household
- Custodial Grandchildren
- A child 18 or older with a disability that started before age 22
- Adopted Children
- A child 18-19 and a full-time student (not higher than grade 12)

| Name | DOB | If Divorced or Separated, Indicate Custodial or Non-Custodial | High School Student? Yes or No | Anticipated/Actual Last Month/Year of High School |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Is your spouse and/or children receiving Social Security benefits?     Yes: _____ No: _____

If yes, please complete the information below and include a copy of their Social Security Award Certificate(s).

If no, however, they were previously receiving Social Security benefits in the past and are no longer, please include a copy of the Social Security Termination notice (s), if this information has not already been provided to Liberty Life Assurance Company.

| Name | DOB | Awarded as: Dependent, Spouse or Disabled | Current Monthly Benefit Amount | Date of Entitlement to Benefits | Benefit Termination Date (if applicable) |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Your Name: _____       Date: _____

**Lincoln/Bunch 1403**

# TRAINING-EDUCATION-EXPERIENCE FORM (TEE)



Liberty Life Assurance Company of Boston
Group Benefits Disability Claims
P.O. Box 7207
London, KY 40742-7207
Phone No.: (844) 384-5858
Secure Fax No.: (603) 559-9400

EMPLOYEE/CLAIMANT NAME: Mark Bunch

CLAIM NO: 8220685

EMPLOYER/SPONSOR: Charter Communications, Inc.          DATE OF BIRTH:

## Please fill out each section completely

**EDUCATIONAL BACKGROUND:**                    **(If you have a resume, please attach)**

Highest Grade Completed: _____    Check if earned: ☐ GED  ☐ HS Diploma

Vocational Training: _____  Certificate Program completed: _____

Associates Degree: _____  College: number of years: _____

Bachelor's Degree: BA /BS Major: _____  Graduate School: MA ☐ MS ☐ CAGS ☐ PHD Degree:_____

Professional Training, License, Certificates(s): _____

Are you currently attending any classes: ☐ Y   ☐ N   If yes, provide name of school: _____

List any other Training or Classes Attended or Plan to Attend: _____

Additional Skills, Hobbies & Volunteer Work _____

Did you serve in the Armed Forces? ☐ Y   ☐ N   From: _____   To: _____

Branch of Service: _____   Specialty: _____

**WORK EXPERIENCE:** (If you've held different positions for the same employer, please include them below)
Please list chronologically (starting with the most recent) all the jobs/positions you have held in the past 15 years.
(add additional pages if needed for a complete work history).

1.  Company: _____ Department:_____ From: _____ To: _____
    Job Title(s): _____
    Supervisory Experience ☐ Y   ☐ N
    Tasks/Duties (please be specific): _____
    _____

2.  Company: _____ Department:_____ From: _____ To: _____
    Job Title(s): _____
    Supervisory Experience ☐ Y   ☐ N
    Tasks/Duties (please be specific): _____
    _____

A Liberty Mutual Company

**Lincoln/Bunch 1404**

3.  Company: _____ Department: _____ From: _____ To: _____

   Job Title(s): _____

   Supervisory Experience  ☐ Y      ☐ N

   Tasks/Duties (please be specific): _____

   _____

4.  Company: _____ Department: _____ From: _____ To: _____

   Job Title(s): _____

   Supervisory Experience  ☐ Y      ☐ N

   Tasks/Duties (please be specific): _____

   _____

5.  Company: _____ Department: _____ From: _____ To: _____

   Job Title(s): _____

   Supervisory Experience  ☐ Y      ☐ N

   Tasks/Duties (please be specific): _____

   _____

**Computer Utilization:**

Computer Training/Courses, Certifications: _____

|  | Home | Work |  | Home | Work |
|---|---|---|---|---|---|
| Email | ☐ | ☐ | Graphics Software | ☐ | ☐ |
| Internet | ☐ | ☐ | Installation/Repair Hardware | ☐ | ☐ |
| Word Processing (MS Word) | ☐ | ☐ | | | |
| Spread Sheet (MS Excel) | ☐ | ☐ | Installation/Repair Programming | ☐ | ☐ |
| Database | ☐ | ☐ | Project Management | ☐ | ☐ |
| Photo Software | ☐ | ☐ | Other: _____ | | |

How much time is spent daily on your work computer? ☐ None  ☐ 1-2 hours  ☐ 2-3 hours  ☐ 3+ hours

How much time is spent daily on your home computer? ☐ None  ☐ 1-2 hours  ☐ 2-3 hours  ☐ 3+ hours

Keyboarding/Typing Experience:  ☐ Yes  ☐ No   If yes, WPM (words per minute) _____
(We recommend- http://typingtest.com to determine WPM)

Please provide your email address: Personal: _____ Work: _____

```
   SIGNATURE: _____        PHONE NO: (    ) _____
```

2

**Lincoln/Bunch 1405**

**n0256719**

| | |
|---|---|
| **From:** | Wills, Matthew |
| **Sent:** | Monday, July 02, 2018 10:28:47 AM |
| **To:** | 088DCSU |
| **Cc:** | Wills, Matthew |
| **Subject:** | Charter LTD Claim Creation Request for MARK BUNCH, WIN: mbunch |

Please create a new LTD Claim based on the information provided.

**Triage Status:** Pend
**SSN:**
**Last Name:** BUNCH
**First Name:** MARK
**EE ID:** mbunch
**Gender:** M
**Date of Birth:**
**Date of Hire:** 1/4/2016
**Address:**
**Address:**
**City:**
**State:**
**Zip:**
**Phone:**
**Cell Phone:**
**LDW:** 2/13/2018
**DOD:**
**Approve Through Date:**
**Work State:** CO
**Primary ICD Code:**
**Primary ICD Description:**
**Secondary ICD Code:**
**Secondary ICD Description:**
**Work Related:** y
**Job Description:** Direct Sales Rep
**Loc Code:** CHT
**Escalation Date:**
**Weeks of Benefits:** 52
**STD Plan:**
**LTD Effective Date:** 09/27/2017
**HR LTD Benefit Plan:** 1092
**STD Max Date:** 8/14/2018
**Salary:** 107543.52
**Note:** Appeal


If you have further questions, please contact your Manager.


**Lincoln/Bunch 1406**

Matthew Wills
Email: Matthew.Wills@LibertyMutual.com

PLEASE NOTE: Liberty Mutual Insurance Company ("Liberty Mutual") has recently completed an agreement with Lincoln Financial Group pursuant to which it has sold the Liberty Life Assurance Company of Boston. The employee who sent this email is no longer employed by Liberty Mutual or any of its affiliates, and instead is now an employee of Lincoln Financial Group. In order to facilitate a smooth transition between the entities and allow our customers the opportunity to update contact information, this email is being delivered using a legacy Liberty Mutual email address and email system, but Liberty Mutual is not responsible for its contents. We ask that you please update your contact information accordingly.

**Lincoln/Bunch 1407**